UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE BARCLAYS PLC SECURITIES LITIGATION | Case No. 1:22-cv-08172-KPF<br><br><u>JURY TRIAL DEMANDED</u> |

**AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ................................................................ 2

II.   JURISDICTION AND VENUE ......................................................... 12

III.  PARTIES ............................................................................................ 14

    A.    Lead Plaintiff ......................................................................... 14

    B.    Section 10(b) Defendants ....................................................... 14

    C.    Section 20(a) Control Person Defendants ............................. 17

IV.  SUBSTANTIVE ALLEGATIONS .................................................. 18

    A.    Company Background ............................................................ 18

    B.    The 2005 Securities Offering Reform and "Well-Known Seasoned Issuer" Status .................................................................. 18

    C.    Barclays' Structured Note and ETN Offerings..................... 20

    D.    Barclays' History of SEC Violations and Ineligible Issuer Penalty Waiver Requests ...................................................... 21

    E.    May 2017: Barclays Becomes an Ineligible Issuer, Losing Its WKSI Privileges ................................................................ 23

          1.    The Shelf Registrations at Issue in This Case .......... 24

          2.    Barclays Working Group Formed Following the May 2017 Loss of WKSI Status.......................................... 25

          3.    Registration of the 2019 Shelf ................................... 26

    F.    The Over-Issuances of Securities In Excess of What Barclays Registered in the 2018 and 2019 Shelf Registration Statements ............................................. 28

    G.    April and May 2022: Barclays' Restatements for BPLC and BBPLC ................ 30

    H.    Rescission Offer (August 1, 2022 - September 12, 2022) ................... 30

    I.    September 29, 2022: SEC Issues Consent Decree and Cease-and -Desist Order Against Barclays for Violating Federal Securities Laws Through the Over-Issuance ................................................... 31

V. INTERNAL CONTROLS OVER FINANCIAL REPORTING ......................................35

    A. Requirements Under Sarbanes-Oxley Act of 2002 ...............................................35

    B. COSO Framework ................................................................................................37

    C. The Federal Reserve Reiterated the Need for Barclays to Maintain Effective ICFR ......................................................................................................38

    D. ICFR and DCP .....................................................................................................39

    E. Barclays Certified to Investors ICFR and DCP Were Effective During the Class Period ........................................................................................................42

    F. Barclays Restates Its 2021 Financials and Admits a Material Weakness in Internal Controls ................................................................................................43

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ....................................................46

    A. Overview of Defendants' Fraudulent Conduct ....................................................46

    B. Defendants' Materially False and Misleading Statements and Omissions ...........46

        1. February 18, 2021: FY 2020 Results and Filing of Form 20-F ...............46

        2. April 30, 2021: Q1 2021 Results and Filing of Form 6-K .......................51

        3. July 28, 2021: Q2 2021 Results and Filing of Form 6-K ........................51

        4. October 21, 2021: Q3 2021 Results and Filing of Form 6-K ..................52

        5. February 23, 2022: FY 2021 Results and Filing of Form 20-F ...............52

        6. March 14, 2022: Announcement of Suspension of Sales and Issuance of Two Popular ETNs ................................................................55

    C. The Truth Begins to Emerge, But Defendants Continue to Mislead the Market ..................................................................................................................56

        1. March 28, 2022: Revelation of Over-Issuance on 2019 Shelf Registration Statement (First Disclosure) ................................................56

        2. April 28, 2022: Q1 2022 Results and Filing of Form 6-K .......................60

        3. May 4, 2022: Barclays Annual General Meeting .....................................63

        4. May 16, 2022: Barclays Announces The Need to Restate Its 2021 Financial Statements ................................................................................64

5.      May 23, 2022: Barclays Files Amended Form 20-F Restating 2021
        Financial Results ..................................................................................65

6.      July 25, 2022: Details of Recission Offer Announced ............................68

7.      July 28, 2022: Q2 2022 Results and Revelation of Additional
        Over-Issuance (Second Disclosure) ......................................................69

8.      October 26, 2022: Q3 2022 Results and Filing of Form 6-K .................70

VII.    THE FULL TRUTH IS REVEALED AS BARCLAYS DISCLOSES
        COMPENSATION CLAWBACKS FOR RESPONSIBLE EXECUTIVES .................71

        A.      February 15, 2023: Revelation that FY 2022 Results and Defendant
                Compensation Was Impacted by Defendants' Fraud (Final Disclosure).............71

VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER .........................................................78

        A.      Barclays Admits that Maintaining Effective Internal Controls Over
                Financial Reporting, even as an Illegible Issuer, Is "Not Rocket Science" ..........80

        B.      Issuing Securities Is a Core Operation for Barclays and Maintaining WKSI
                Status Was Critical to that Core Operation ...........................................................81

        C.      Barclays' Board Claws Back Compensation from Certain Individual
                Defendants As a Direct Consequence of the Over-Issuance ................................82

        D.      Throughout Its Three-Year Term as an Ineligible Issuer, Barclays Self-
                Identified on its Forms 20-F as Not Being a WKSI.............................................84

        E.      Barclays' Share of Structured Note Market Artificially Propped Up by
                Sale and Issuance of Unregistered Securities......................................................85

IX.     LOSS CAUSATION/ECONOMIC LOSS .......................................................................87

        A.      March 28, 2022 – First Partial Revelation of the Truth .......................................88

        B.      July 28, 2022 – Second Partial Revelation of the Truth ......................................88

        C.      February 15, 2023 – Final Revelation of the Truth .............................................89

X.      CONTROL PERSON ALLEGATIONS .........................................................................89

XI.     APPLICABILITY OF THE PRESUMPTION OF RELIANCE: *AFFILIATED
        UTE* AND FRAUD-ON-THE-MARKET PRESUMPTIONS ........................................92

XII.    NO SAFE HARBOR .....................................................................................................94

XIII.   CLASS ACTION ALLEGATIONS................................................................................94

XIV.   COUNTS ................................................................................................... 96

XV.    PRAYER FOR RELIEF ............................................................................ 100

XVI.   JURY TRIAL DEMANDED ...................................................................... 100

Lead Plaintiff Boston Retirement System ("Lead Plaintiff" or "BRS"), individually and on behalf of all others similarly situated, by its undersigned counsel, hereby brings this Amended Class Action Complaint (the "Complaint") against Barclays PLC ("BPLC") and Barclays Bank PLC ("BBPLC," and together with BPLC, "Barclays" or the "Company"), James E. Staley, former Chief Executive Officer ("CEO") of Barclays, C.S. Venkatakrishnan (known as "Venkat"), CEO of Barclays since November 1, 2021, Tushar Morzaria ("Morzaria"), Barclays' former Group Finance Director, Nigel Higgins ("Higgins"), Barclays Group Chairman from May 2019 until his retirement in April 2022, and Anna Cross ("Cross"), Group Finance Director at Barclays since April 2022.  The allegations herein are based on Lead Plaintiff's personal knowledge as to its own acts, and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by Barclays; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; review of the materials publicly available related to the September 29, 2022 Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("SEC Order"); other publicly available documents; and consultation with experts in the areas of loss causation and damages.  Lead Counsel's investigation into the matters alleged herein is ongoing and many of the relevant facts are known only to, or are exclusively within the custody or control of, the Defendants.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of itself and the class it seeks to represent, Lead Plaintiff alleges as follows:

I.      NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons and entities who or which purchased or otherwise acquired Barclays-sponsored American Depositary Receipts ("ADRs") during the period from February 18, 2021 through February 14, 2023, inclusive (the "Class Period"), and were damaged thereby.  The action is brought against BPLC, BBPLC, and certain of Barclays' current and former officers and directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

2.      A foundational principle of the federal securities laws in the United States is that securities must either be registered with the SEC before they are offered or sold; alternatively, securities offerings must be exempt from such registration requirements prior to offer or sale.  It is illegal to offer or sell unregistered securities.

3.      This "entirely avoidable" matter, according to CEO Venkat, arises from Barclays' admitted failure to implement any internal controls around the real-time tracking of securities being offered or sold from two of its shelf registration statements during its period as a "ineligible issuer" and the materially false and misleading statements and omissions about Barclays' internal controls during the Class Period.  As a result of its lack of any internal controls related to the tracking of securities issuances, Barclays sold approximately **$17.7 billion in securities in excess of what it had registered with the SEC** in clear violation of the Securities Act of 1933 ("Securities Act") and the Exchange Act.

4.      In connection with the over-issuances and because of the lack of effective or adequate internal controls over financial reporting, BPLC and BBPLC were forced to restate their year-end 2021 financial statements.  The restatements for 2021 also amended disclosures to reflect management's conclusions that Barclays' internal controls over financial reporting ("ICFR") and

disclosure controls and procedures ("DCP") were not effective as of December 31, 2021, due to a material weakness in ICFR as a result of the over-issuances from its 2018 and 2019 Shelf Registration Statements (defined below). Defendants subsequently admitted that the over-issuances were a "self-inflicted problem" because "we missed some simple tasks" that are "not rocket science," and that the "situation was entirely avoidable" and that "the necessity of a strong internal controls culture has never been clearer."

5.      Barclays' problems in this regard stemmed from the loss, in May 2017, of its coveted "well-known seasoned issuer" ("WKSI" for short) status as that term is defined in Securities Act Rule 405 ("Rule 405"). *See* 17 C.F.R. § 230.405. In short, WKSI provides issuers greater flexibility in accessing the U.S. public capital markets. One of the major benefits of WKSI issuer status is qualifying for "automatic shelf registration," meaning that shelf offerings are immediately effective upon filing a Form S-3 (or its functional equivalent Form F-3 in the case of a foreign issuer like Barclays), since WKSI shelf registration statements are not subject to SEC review. This means that WKSIs do not have to wait weeks or even months for the SEC to approve shelf registration statements before issuing securities, saving valuable time and, likely, optimizing the WKSI's opportunities to make money through the sales of additional registered securities. Additionally, for their shelf offerings, WKSIs do not need to disclose as much detail in their base prospectuses/registration statements as ineligible issuers do. Most relevant to this case, WKSIs do not need to specify the amount of securities they plan to sell or name selling shareholders.

6.      WKSI status is desirable for a host of reasons, and most major banks have WKSI status and take steps to protect their WKSI status. Among other things, WKSI status allows issuers: (i) to offer additional securities of the classes covered by a shelf registration statement without filing a new registration statement; (ii) to register additional classes of securities not covered by the registration statement by filing a post-effective amendment which becomes

immediately effective; (iii) to omit certain information from the prospectus; (iv) to take advantage of the pay-as-you-go fees; or (v) to qualify a new indenture under the Trust Indenture Act of 1939, as amended, should the need arise, without filing or having the SEC declare effective a new registration statement.

7.     But WKSI status is a privilege and can be automatically lost in certain limited circumstances, including when a WKSI violates the federal securities laws, rendering it an "ineligible issuer," as prescribed in Rule 405.  Yet, federal law also grants the SEC the authority to grant waivers for this ineligible issuer penalty in spite of a securities violation.  Indeed, more often than not, the SEC has granted such waivers, including on numerous occasions to Barclays.

8.     In May 2017, for the first time, however, Barclays did not receive a waiver and lost its WKSI status after it admitted to violating the federal securities laws in connection with an SEC settlement of allegations that Barclays overcharged clients for mutual funds.[1]  But unlike when it settled prior securities law violations with the SEC, Barclays did not receive a waiver by the SEC to maintain its WKSI status.  In prior waiver applications, Barclays had argued that losing WKSI status and becoming an ineligible issuer was an "unduly severe" penalty and "not necessary . . . either in the public interest or for the protection of investors."[2]

9.     Following its 2017 loss of WKSI status, Barclays convened a Working Group purportedly to address its securities issuance needs during its "ineligible issuer" penalty period of three (3) years.  This Working Group supposedly endeavored to estimate the amount of securities purportedly needed for Barclays' shelf registration statements in 2018 and 2019 for its U.S. structured note business.

---

[1] *In the Matter of Barclays Capital Inc.*, Adm. Proc. File No. 3-17978 (May 10, 2017).

[2] Letter from G. White, Sullivan & Cromwell, LLP to E. Choi, SEC, *In the Matter of Barclays Capital Inc.*, at 11, 13 (Jan. 27, 2016).

10.     Despite the likely time-consuming process required to estimate the amount of securities Barclays' structured products desks needed for the 2018 and 2019 Shelf Registration Statements as a non-WKSI, Barclays later admitted to the SEC that **neither the Working Group, nor anyone at Barclays, implemented a single internal control at the Company to keep track of securities issued under the 2018 and 2019 Shelf Registration Statements**, and to ensure that Barclays did not exceed the aggregate amount of securities it had registered.[3]  In the absence of any internal controls to keep track of securities issuances, Barclays blew past its registered amount of securities (only $20.8 billion) and sold an additional $17.7 billion of unregistered securities, resulting in **an over-issuance of approximately 185% of the securities the SEC permitted Barclays to offer or sell**.

11.     Indeed, Barclays has now admitted that it "did not put in place a mechanism to track issuances after BBPLC became subject to a limit on such issuances, as a result of losing WKSI status" and "[t]he principal causes of the Over-issuance of Securities were, first, the failure to identify and escalate to senior executives the consequences of the loss of WKSI status and, secondly, a decentralised ownership structure for securities issuances."[4]

12.     Given the potential exposure to the securities laws and legal liability from the potential over-issuance of securities, the failure to have any controls in place to account for the

---

[3] SEC Order, at ¶24 ("During the pendency of the Working Group's efforts, the need to track actual offers and sales of securities against the amount of registered securities on a real-time basis was understood by and discussed among members of the Working Group. ***Nevertheless, no internal control was established to track offers and sales of securities, nor was any member of the Working Group or other BBPLC personnel performing that task***.").

[4] Barclays 2022 Annual Report - Strategic Report (Part 1), ("2022 Annual Report"), p. 17. https://home.barclays/content/dam/home-barclays/documents/investor-relations/reports-and-events/annual-reports/2022/AR/Barclays-PLC-Annual-Report-2022.pdf.

number of securities issued against the number of securities registered is such an elementary failure of internal controls that is so obvious as to be deliberately reckless.

13.     Barclays' quarterly earnings and annual results for 2020 and 2021 were materially false and misleading, or failed to disclose material information necessary to make the statements made therein not misleading because, among other reasons, Defendants failed to disclose:

(a)     that Barclays had sold and was continuing to sell unregistered securities in excess of the amounts registered in its shelf registration statements;

(b)     a material weakness existed in Barclays' internal control environment evidenced by the fact that the over-issuances had occurred;

(c)     that Barclays had violated and was continuing to violate the federal securities laws and SEC regulations, subjecting Barclays to: (i) legal liability in the U.S., (ii) reputational risk, (iii) the possibility of an extension of its ineligible issuer status for an additional three-year period, and (iv) fines, penalties and/or other sanctions by regulatory agencies in the UK and overseas;

(d)     that Barclays would be required to conduct a Recission Offer for more than 3,000 unregistered structured notes and ETNs at significant cost to the Company; and

(e)     that Barclays would be required to temporarily halt sale of at least thirty (30) different structured note products and exchange traded notes (ETNs), including, but not limited to, the popular VXX and OIL ETNs, until the Recission Offer period was over; and

(f)     as a result, Barclays' reported litigation and conduct expenses and total operating expenses during the Class Period were understated and its reported net profit was overstated.

14.     On March 14, 2022, Barclays reported the over-issuance to the SEC and announced the suspension of sales and issuance of two popular exchange traded notes ("ETNs"),[5] specifically one that tracked the Vix volatility index (known as "VXX") and a second that tracked the price of crude oil (known as "OIL").[6]   However, at the time Barclays suspended sales of these ETNs and notified the SEC of the over-issuance, it did not publicly disclose the over-issuance.[7]   Instead, Barclays cryptically noted that it "does not currently have sufficient issuance capacity to support further sales from inventory and any further issuance of the ETNs."  Without a public disclosure of the over-issuance, the market was left in the dark for two more weeks.

15.     Two weeks later, on March 28, 2022, Barclays disclosed it had exceeded its 2019 Shelf Registration Statement (defined below) by approximately **$15.2 billion**.  Barclays also announced that it was required to conduct a rescission offer for customers who purchased unregistered ETNs and structured notes in the over-issuance, and that it expected the rescission losses to be approximately £450 million.[8]   Additionally, Barclays' press release revealed that "regulatory authorities are conducting inquiries and making requests for information" with respect to the over-issuance.

16.     In response to this news, on March 28, 2022, the price of Barclays ADRs plunged 10.61%, declining $0.96 per ADR from a closing price on Friday March 25, 2022 of $9.05 per ADR to a closing price of $8.09 per ADR on Monday March 28, 2022.

---

[5] ETNs are unsecured debt obligations of financial institutions that trade on a securities exchange. ETN payment terms are linked to the performance of a reference index or benchmark, representing the ETN's investment objective.  SEC Order, at ¶11.

[6] Barclays subsequently expanded the list of structured note and ETN products whose sale was suspended through September 2022.

[7] The SEC initiated an investigation of Barclays in March 2022.

[8] Approximately $590 million (USD) as of March 28, 2022.

17.     The ginormous over-issuance and the fallout from it impacted Barclays' year-end 2021 financial statements.  On May 23, 2022, Barclays filed with the SEC amendments to its annual reports on Forms 20-F restating the BPLC and BBPLC financial statements reflecting: (i) a £220 million litigation and conduct charge and an associated income statement charge as of year-end 2021[9]; and (ii) a contingent liability disclosure, all due to the over-issuance from the 2019 Shelf Registration Statement.  The restatement also amended disclosures to reflect management's conclusions that internal controls over financial reporting and disclosure controls and procedures were not effective as of year-end 2021 due to a material weakness in ICFR identified after the original filing date as a result of the over-issuance from the 2019 Shelf.

18.     Further revealing the extent of Defendants' fraud, on July 28, 2022, Barclays disclosed it also had over-issued unregistered securities from the 2018 Shelf Registration Statement in the amount of **$1.3 billion**.[10]  Barclays purportedly had discovered this second over-issuance in early June 2022 in connection with its internal review of the over-issuance from the 2019 Shelf.[11]

19.     In response to this news, on July 28, 2022, the price of Barclays ADRs declined $0.41 per ADR, falling 5.2% from a closing price of $7.89 per ADR on July 27, 2022 to a closing price of $7.48 per ADR on July 28, 2022.

20.     On September 29, 2022, the SEC issued a Cease-and-Desist Order against Barclays relating to the over-issuances (the "SEC Order").  In the SEC Order, Barclays admitted to violating Sections 5(a) and 5(c) of the Securities Act and Sections 13(a) and 13(b)(2)(A), and 13(b)(2)(B)

---

[9] Approximately $275 million (USD) as of May 23, 2022.

[10] SEC Order, ¶¶20-24.

[11] *See id.* at ¶33.

and Rule 13a-15(a) of the Exchange Act.  In order to resolve the matter, Barclays agreed to pay a $200 million penalty and more than $161 million in disgorgement and prejudgment interest.[12]

      (a)     The SEC also ordered Barclays to adopt and implement the "BBPLC Shelf Review recommendations" which included, among other remediation measures: (i) the centralization of oversight of BBPLC's SEC-registered shelves in Group Treasury; (ii) the maintenance of clear minimum control requirements for BBPLC's SEC-registered shelves, including, but not limited to, a process for reviewing any change in WKSI status for BBPLC and the tracking of offers and sales off of BBPLC's SEC-registered shelves as appropriate; and (iii) the maintenance of a data repository, with appropriate controls and governance designed to ensure reliability of the data, for the purpose of tracking offers and sales, as appropriate, off of BBPLC's SEC-registered shelves.

      (b)     Additionally, the SEC Order directed Barclays to, among other things, complete an audit of its internal controls, to submit an Internal Audit Report to the BBPLC Board of Directors Audit Committee, and to certify, in writing, compliance with the procedures described in the SEC Order.

      21.     The full truth was finally revealed on February 15, 2023 when, in connection with the release of its 2022 financial results and the filing of its Report on Form 20-F, Barclays announced that its full year 2022 revenue was down 19% due, in part, to costs related to the over-issuances of securities and resulting recission offer. The Company also revealed in the 2022 Form 20-F, that as a result of the over-issuances, it was clawing back compensation from certain of the Individual Defendants (including Defendants Venkat, Morzaria, and Cross) because of their

---

[12] According to the SEC Order, payment of the disgorgement amounts was to be deemed satisfied by BBPLC's offer of rescission to impacted investors that commenced on August 1, 2022 and expired on September 12, 2022.  SEC Order, at 11.

responsibility in the failure to implement effective internal controls over financial reporting to prevent the over-issuance following Barclays' loss of WKSI privileges. Additionally, with respect to Barclays' U.S. structured note business, as a result of Barclays' halting of any new issuances in early March 2022, the Company's share of the structured note market in the U.S. dropped from 14% in the first half of 2021 to under 5% a year later.[13]

22.     In reaction to this news, on February 15, 2023, Barclays' ADRs fell 8.35%, dropping from $9.22 per ADR on February 14, 2023 to $8.45 per ADR on February 15, 2023.

23.     Analysts attributed the 2022 profit drop directly to Barclays' over-issuance of unregistered securities. For example, on February 15, 2023, *Reuters* reported that Hargreaves Lansdown equity analyst Sophie Lund-Yates reported: "Barclays has bitterly disappointed the market… Profits have been stunted partly because of a big increase in litigation costs relating to the over-issuance of U.S. securities."[14]

24.     The cost and time spent remediating Barclays' failure to implement any internal controls for tracking the issuance of securities under shelf registration statements, which the Company described as "a deeply disappointing feature of 2022" which it "deeply regrets," was extremely "significant" for the Company in 2022.[15] In Barclays 2022 Annual Report, the Barclays Board of Directors disclosed the myriad steps it was required to take, in close collaboration with Barclays' Audit and Risk Committees, Barclays' personnel, and outside legal, financial and

---

[13] Christopher Whittal. *Barclays plans US structured note rebound after hefty loss*, INTERNATIONAL FINANCING REVIEW (Feb. 17, 2023), *available at* https://www.ifre.com/story/3753899/barclays-eyes-us-structured-note-rebound-after-hefty-loss-ps4s7x63lb.

[14] White, Lawrence and Withers, Iain. *Barclays shares tumble 9% as profit disappoints*, REUTERS (Feb. 16, 2023), *available at* https://www.reuters.com/business/finance/barclays-annual-profit-falls-15-over-issuance-error-investment-bank-returns-2023-02-15/.

[15] 2022 Annual Report, at 154, 188, 197.

accounting advisors, to address the lack of effective controls at the Company and the requirements imposed by the SEC Order.  Those steps included:

(a)     the assessment of the financial impacts of the over-issuance of securities and the associated hedging arrangements undertaken to help manage the risks associated with the rescission offer and Barclays' financial exposure;

(b)     the review and approval of disclosures to the market regarding the over-issuance of securities;

(c)     commissioning a review led by external legal counsel of the facts and circumstances relating to the over-issuance of securities and, among other matters, the control environment related to such issuances (the Review) and assessing the findings of the Review;

(d)     working with the Board's Remuneration Committee to determine the financial effect of the over-issuance on the compensation of certain Executive Directors ("We have thoughtfully and deliberately adjusted our remuneration decisions to ensure that this over-issuance matter is reflected.");[16]

(e)     oversight of discussions with the Group's key regulators including the SEC in the U.S. and the following regulators in the UK: the Prudential Regulation Authority (PRA), the Financial Conduct Authority (FCA) and Financial Reporting Council (FRC);

(f)     working with Barclays' outside auditor, KPMG LLP ("KPMG"), to assess the implications of the over-issuance of securities on BPLC's financial statements, including the approval of the restatement of the financial statements included in the BPLC 2021 Annual Report on Form 20-F filed with the SEC, as well as the amendment of such report;

---

[16] *Id.* at 197-201.

(g)     suspending sales of certain popular ETNs issued by Barclays effective March 14, 2022;

(h)     planning for and conducting the Rescission Offer including assessing the associated hedging arrangements undertaken to help manage the risks associated with the Rescission Offer and Barclays' financial exposure therein;

(i)     producing documents to the SEC and negotiating the settlement with the SEC in connection with its investigation of the over-issuance of securities;

(j)     oversight of the remediation of the material weakness in internal controls over financial reporting which led to the Over-issuance of Securities, as well as directing the work required to address the specific requirements of the SEC set out in its order of 29 September 2022;[17] and

(k)     creating a Group-wide programme "seeking to identify issues and lessons learned."[18]

25.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the price of the Barclays' ADRs in response to revelation of Defendants' fraud, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

26.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

---

[17] *Id.* at 188-89.

[18] *Id.* at 17.

27.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

28.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) because:

(a)     Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District;

(b)     The Company's ADRs, each representative of four shares of Barclays ordinary shares, are listed and trade under the ticker symbol "BCS" on the New York Stock Exchange ("NYSE"), a national stock market based in this Judicial District;

(c)     The depositary bank for Barclays' sponsored ADRs is JP Morgan Chase Bank, N.A. ("JPM"). JPM is incorporated as a bank with limited liability in the State of New York and has its principal office, where it administers its depositary receipts business, in New York, NY, within this Judicial District;

(d)     The ADRs and the deposit agreement, which governs the relationship among Barclays, JPM, and the holders and beneficial owners of the ADRs, are governed by New York law;

(e)     Barclays agent for service for its ADRs is the offices of BBPLC located in New York, NY, within this Judicial District; and

(f)     According to Barclays' website, Barclays has Corporate Bank and Investment Bank employees and/or offices based in this Judicial District.

29.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiff

30.    Court-appointed Boston Retirement System is a government defined benefit pension plan that administers retirement benefits to all employees of the City of Boston, Massachusetts, as well as its autonomous agencies, including: the City of Boston, the Boston Planning & Development Agency, the Boston Housing Authority, the Boston Public Health Commission, and the Boston Water and Sewer Commission.  Boston Retirement System oversees the pensions of more than 34,000 retired and active members.  The value of Boston Retirement System's assets under management is approximately $7.131 billion as of February 24, 2023.  As set forth in the certification attached to Boston Retirement System's motion for appointment as Lead Plaintiff (ECF No. 23-1), it purchased or otherwise acquired Barclays' ADRs at artificially inflated and/or artificially maintained prices during the Class Period and was damaged as a result of the violations of the federal securities laws alleged in this action.

### B.    Section 10(b) Defendants

31.    Defendant Barclays PLC ("BPLC") is a bank holding company, headquartered in London, United Kingdom.  BPLC provides various financial services, including investment banking, wealth management, and the offer and sale of securities.  BPLC has registered the common shares underlying its American Depository Receipts ("ADR") with the SEC pursuant to Section 12(b) of the Exchange Act, and its ADRs trade on the New York Stock Exchange under the ticker symbol "BCS."  As of February 18, 2021, Barclays had over 191 million sponsored ADRs outstanding.

32.     Defendant James E. Staley ("Staley") served as Chief Executive Officer ("CEO") of Barclays, a member of its Executive Committee, and a Director on Barclays' Board of Directors ("Barclays Board") from December 2015 through October 31, 2021.  From March 2019 through October 31, 2021, Staley also served as CEO of BBPLC and a Director on BBPLC's Board of Directors ("BBPLC Board").  During his tenure, Staley signed Barclays' annual reports and certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to the Company's internal controls over financial reporting.  Staley was a direct and substantial participant in the fraud.

33.     Defendant C.S. Venkatakrishnan ("Venkatakrishnan" or "Venkat") has served as the CEO of Barclays, a member of its Executive Committee, and a Director on the Barclays Board since November 1, 2021.  Venkatakrishnan has also served as the CEO of BBPLC and as a Director on the BBPLC Board since November 1, 2021.  Prior to his position as CEO, Venkat served as Barclays' Global Head of Markets from October 2020 to October 2021, and the Company's Chief Risk Officer from March 2016 to October 2020, which included the entire time Barclays was an ineligible issuer (May 2017 – May 2020).  During his tenure as CEO, Venkat signed Barclays' annual reports and certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to the Company's internal controls over financial reporting.  Venkat was a direct and substantial participant in the fraud.

34.     Defendant Tushar Morzaria ("Morzaria") served as Barclays' Group Finance Director (the most senior finance position at Barclays), a member of its Executive Committee, and a Director on BPLC's Board of Directors and as a Director on the BBPLC Board.  Morzaria retired from the BBPLC Board, Barclays Board, and as Group Finance Director effective April 22, 2022.

- 15 -

Currently, Morzaria is Chairman of the Global Financial Institutions Group of Barclays' Investment Bank. During his tenure, Morzaria signed Barclays' annual reports and certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to the Company's internal controls over financial reporting. Morzaria was a direct and substantial participant in the fraud.

35.    Defendant Anna Cross ("Cross") has served as the Group Finance Director at Barclays (the most senior finance position), since April 2022 and as a member of its Executive Committee during that time. Prior to that appointment, Cross served as Deputy Finance Director, Group Financial Controller, and Chief Financial Officer of Barclays. Cross was a direct and substantial participant in the fraud.

36.    Defendants Staley, Venkatakrishnan, Morzaria, and Cross are referred to herein as the "Individual Defendants" and, together with the Company and the Section 20(a) Defendants (defined below), are collectively referred to herein as "Defendants." The Individual Defendants made, or caused to be made, material misstatements and omissions that either artificially inflated and/or artificially maintained the price of Barclays' ADRs during the Class Period.

37.    The Individual Defendants, because of their positions within Barclays, possessed the power and authority to control the contents of the Company's reports to the SEC, shareholder letters, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each of the Individual Defendants was provided with copies of and/or contributed to the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or caused them to be corrected. Because of their positions, and their access to material non-public information available to them but not to the public, the Individual Defendants

- 16 -

knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations and omissions being made were materially misleading.  The Individual Defendants are liable for the misleading statements and material omissions pleaded herein.

38.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future business prospects, as alleged herein.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the misleading statements and information alleged herein, were aware of, or recklessly disregarded, the misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

**C.      Section 20(a) Control Person Defendants**

39.     Defendant Nigel Higgins ("Higgins") has served as the "Group Chairman" at Barclays since May 2019 (a position known as the "Chairman of the Board" in the U.S.), and as a Director on the Barclays Board for three months prior to that appointment (starting in March 2019).

40.     Defendant Barclays Bank PLC ("BBPLC") is BPLC's wholly owned United States-based subsidiary, headquartered in New York, New York.  BBPLC is the non-ring-fenced bank of Barclays and consists of a corporate and investment banking division, a consumer, cards, and payment division, and a private bank.

41.     Defendants Higgins and BBPLC are together referred to as the "Section 20(a) Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.      Company Background

42.     Headquartered in London, United Kingdom, Barclays is a transatlantic consumer and wholesale bank with global reach offering products and services across person, corporate and investment banking, credit cards, and wealth management.  BBPLC is Barclays' wholly owned U.S.-based subsidiary with its headquarters in New York, New York.

43.     In 2019, the Barclays Board and BBPLC Board merged and the BBPLC Board members are a subset of the Barclays Board members.  Each member of the Barclays Board, except the Senior Independent Director, Brian Gilvary, and the Chairman of Barclays Bank UK PLC, Crawford Gillies, also serve on the BBPLC Board.

44.     As a result of the consolidation, the Barclays Board Audit Committee and BBPLC Board Audit Committee were also consolidated, and BBPLC matters are covered in concurrent meetings.  One of the roles of the Barclays Board Audit Committee is to evaluate the effectiveness of Barclays' internal controls over financial reporting.

### B.      The 2005 Securities Offering Reform and "Well-Known Seasoned Issuer" Status

45.     In 2005, in its Securities Offering Reform release, the SEC adopted modifications to the registration, communications and offering processes under the Securities Act.  One of the reforms in the SEC's 2005 modifications was the adoption of a new category of issuer—the "well-known seasoned issuer" or, for short, "WKSI."  The SEC designed WKSI to apply to the most widely followed issuers representing the most significant amount of capital raised and traded in the United States.

46.     Under Securities Act Rule 405, a WKSI is an issuer that meets the registrant requirements of Form S-3 or Form F-3 and either: (1) "[a]s of a date within 60 days of

determination date, has a worldwide market value of its outstanding voting and non-voting common equity held by non-affiliates of $700 million or more"; or (2) "as of a date within 60 days of the determination date, has issued in the last three years at least $1 billion aggregate principal amount of non-convertible securities, other than common equity, in primary offerings for cash, not exchange, registered under the [Securities] Act."  17 C.F.R. § 230.405.

47.     Issuers who are WKSIs benefit from the flexible communications and registration rules and regulations in the 2005 Securities Offering Reform, most notably that WKSIs may register their securities offerings on shelf registration statements that become effective automatically upon filing.  In practice, this reform means there is no requirement for WKSIs to wait for the Division of Corporation Finance at the SEC to review the registration statement and declare it effective before the WKSI is permitted to make offers and/or sales from that registration statement, a process that may take several weeks or months to conclude.

48.     To qualify as a WKSI, an issuer must not be an "ineligible issuer."  Rule 405 defines an "ineligible issuer" to be, among other characteristics, an issuer that has (or whose subsidiary has) been convicted of a felony or misdemeanor specified in four enumerated provisions under Section 15 of the Exchange Act or an issuer that has violated (or whose subsidiary has violated) the anti-fraud provisions of the federal securities laws (or that are subject of a judicial or administrative decree or order prohibiting certain conduct or activities involving the anti-fraud provisions of federal securities laws) within the last three years.  Ineligible issuer status attaches automatically upon a securities violation.[19]

---

[19] Although not relevant here, issuers also may lose WKSI status and become an "ineligible issuer" if they: (a) fail to timely file periodic reports for 12 calendar months; (b) default on debt or long-term leases; or (c) their public float falls below $700 million, and they have more than $1 billion in principal of non-convertible debt securities in primary offerings.  See 17 C.F.R. § 230.405.

49.     Yet, despite the automatic imposition of ineligible issuer status, Rule 405 permits the SEC to grant waivers of ineligible issuer status "upon a showing of good cause, that it is not necessary under the circumstances that the issuer be considered an ineligible issuer."  Since the 2005 Offering Reform, the SEC has liberally granted ineligible issuer status waivers, permitting companies, including Barclays, to retain their WKSI status despite violating the federal securities laws.

### C.     Barclays' Structured Note and ETN Offerings

50.     Historically, Barclays has offered and sold securities in the United States pursuant to an effective shelf registration statement on Form F-3 through BBPLC.

51.     A shelf registration statement is a filing with the SEC to register a public offering, usually where there is no present intention to immediately sell all of the securities being registered. A shelf registration statement permits multiple offerings based on the same registration.

52.     The BBPLC shelf registration statement is largely used by BBPLC's Structured Products Group for the offer or sale of ETNs and structured notes.[20]  A structured note is a debt security whose return is based on equity indexes, a single equity, a basket of equities, interest rates, commodities, or foreign currencies.  Every structured note has two components: (1) a bond; and (2) a derivative.

53.     On occasion, the Group Treasury at Barclays also uses the shelf registration statement to sell corporate debt securities.[21]

---

[20] SEC Order, ¶16.

[21] *Id.*

**D.      Barclays' History of SEC Violations and Ineligible Issuer Penalty Waiver Requests**

54.      Between 2007 and 2016, Barclays requested and received waivers regarding ineligible issuer status from the Division of Corporation Finance pursuant to delegated authority granted by the SEC.

55.      For example, in 2007, Barclays received a waiver of ineligible issuer status related to alleged conduct with respect to trading of third-party debt securities by Barclays Bank on the basis of material non-public information obtained through membership on bankruptcy creditors' committees in violation of Section 17(a) of the Securities Act and Section 10(b) and Rule l0b-5 of the Exchange Act.

56.      In 2014, Barclays received a waiver of ineligible issuer status related to violations of Sections 204(a), 206(2), 206(3), 206(4) and 207 of the Investment Advisers Act of 1940 ("Advisers Act"), and Rules 204-2, 206(4)-2 and 206(4)-7 thereunder, as a result of certain failures after Barclays Capital Inc. ("BCI"), a broker-dealer subsidiary of Barclays, acquired Lehman Brothers' investment advisory business in September 2008, including BCI's failure to: (i) enhance its infrastructure to support the new business; (ii) adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act; and (iii) make and keep certain books and records.

57.      More recently, on May 20, 2015 and January 27, 2016, in the face of the potential loss of WKSI status, Barclays' legal counsel again submitted waiver requests advancing arguments to the SEC that Barclays should not be considered an "illegible issuer" as defined in Rule 405.

58.      In both of the Waiver Requests submitted on May 20, 2015 and January 27, 2016, Barclays implored the SEC to allow it to retain WKSI status because "[t]he WKSI shelf []process allows access to the widest possible global investor base and provides an important means of

accessing capital and funding for Barclays' global operations."   Barclays also stressed "the importance of the WKSI shelf to Barclays in meeting its capital and funding requirements" because without being a WKSI it would:

> lose the flexibility (i) to offer additional securities of the classes covered by a registration statement without filing a new registration statement, (ii) to register additional classes of securities not covered by the registration statement by filing a post-effective amendment which becomes immediately effective, (iii) to omit certain information from the prospectus, (iv) to take advantage of the pay-as-you-go fees or (v) to qualify a new indenture under the Trust Indenture Act of 1939, as amended, should the need arise, without filing or having the Commission declare effective a new registration statement.

59.     In the same WKSI waiver requests, Barclays lamented that becoming an ineligible issuer would leave it "unable to use free writing prospectuses," which "would restrict Barclays from using investor presentation FWP materials in connection with its offers and sales of its regulatory capital securities, which it believes is an important channel of communication to investors in regulatory capital securities."

60.     In waiver requests, Barclays has expressed its concern that becoming an ineligible issuer would have an "impact on [Barclays'] speed to the market" relating to new securities. According to Barclays, the delay it would face as an ineligible issuer seeking to issue "new" securities could mean that "by the time Barclays could issue such new type of securities, market conditions may have become unfavorable or similar securities issued by other issuers in the intervening period may decrease the market demand for Barclays' securities, which could have a negative pricing effect on Barclays' securities."

61.     Yet, despite the SEC's liberal policy of granting of waivers to Barclays and other investment banks following securities violations, the SEC did not grant such a waiver for the loss of WKSI status resulting from Barclays' May 2017 settlement with the SEC.

E.     **May 2017: Barclays Becomes an Ineligible Issuer, Losing Its WKSI Privileges**

62.     On May 10, 2017, the SEC instituted public administrative and cease-and-desist proceedings against Barclays Capital Inc.—a subsidiary of BBPLC—arising out of its former wealth and investment management business.  *In the Matter of Barclays Capital Inc.*, Adm. Proc. File No. 3-17978 (May 10, 2017).  In connection with settling that action, Barclays agreed to pay $97 million to the SEC for overcharging clients for mutual funds.

63.     As a result of that settlement, Barclays automatically became an ineligible issuer under Rule 405 and lost its status as a WKSI for a period of three (3) years.  *See* 17 C.F.R. § 230.405.

64.     Loss of WKSI status meant that, among other things, Barclays would be unable to file automatically effective shelf registration statements.  Thus, Barclays could no longer register unspecified amounts of different specified types of securities on immediately effective registration statements.   Additionally, loss of WKSI status meant that Barclays could no longer use an automatic shelf registration statement and pay filing fees on a "pay-as-you-go" basis at the time of each takedown off the shelf.  This forced Barclays, as a practical matter, to quantify the total amount of securities that they anticipated offering and selling over the duration of the shelf and pay the registration fees for those securities in advance.

65.     Following the loss of WKSI status, according to the SEC, certain personnel from Barclays understood the consequences of this status change.[22]   These consequences included consideration for implementing a mechanism to track offers and sales of securities off any shelf,

_____

[22] SEC Order, ¶19.

relative to the registered amount of securities available to be offered or sold off that shelf, in order to ensure that no securities in excess of the amount registered were offered or sold.[23]

### 1. The Shelf Registrations at Issue in This Case

66. Prior to losing its WKSI status, on July 18, 2016, Barclays had filed a shelf registration statement with the SEC on Form F-3, and the shelf registration statement was automatically effective that same day (the "2016 Shelf Registration Statement"). The 2016 Shelf Registration Statement was subsequently amended, following Barclays' loss of WKSI status and assumption of its status as an ineligible issuer, by a post-effective amendment declared effective on March 30, 2018 (the "2018 Shelf Registration Statement" or "2018 Shelf").

67. The securities registered and issued pursuant to the 2018 Shelf Registration Statement consisted of debt securities, warrants, preference shares, and American Depositary Shares ("ADS").

68. On June 14, 2019, Barclays filed another shelf registration statement with the SEC on Form F-3. Again, like the 2018 Shelf Registration Statement, this shelf was registered at a time when Barclays was an ineligible issuer without WKSI status. This 2019 Shelf Registration Statement was declared effective on August 1, 2019 and registered $20.76 billion of debt securities (the "2019 Shelf Registration Statement" or "2019 Shelf").

69. The securities registered and issued pursuant to the 2019 Shelf Registration Statement consisted of structured notes and exchange traded notes ("ETNs"). [24]

---

[23] *Id.*

[24] The 2018 Shelf Registration Statement was valid for the approximately 18 months remaining until its expiration. The 2018 Shelf Registration Statement included a specification of the maximum aggregate offering price of securities available to be offered or sold from the 2018 Shelf.

2.    **Barclays Working Group Formed Following the May 2017**
      **Loss of WKSI Status**

70.    Following the May 2017 SEC cease-and-desist proceedings and order, Barclays needed to address its loss of WKSI status with respect to its ongoing securities offerings in the United States.  Barclays self-reported that, in or around January 2018, it formed a working group ("Working Group") "that included trading desk heads from the Structured Products Group, personnel from an administrative support function called business management, personnel from the product origination group, a member of the compliance department, and a member of the legal department."[25]  The Working Group endeavored to estimate the amount of securities purportedly needed for Barclays shelf registration statements in 2018 and 2019 for its U.S. structured note business during Barclays period as an ineligible issuer.

71.    The Working Group principally focused on two issues.  First, the Working Group considered whether to amend the existing registration statement to convert the existing WKSI shelf into a non-WKSI shelf for approximately 18 months or to file a new registration statement to register a new, non-WKSI shelf for three years.[26]  The Working Group concluded that the shelf conversion was the better option and converted the WKSI shelf into what eventually became the 2018 Shelf.[27]

72.    Second, the Working Group worked with the trading desks that would be using the 2018 Shelf in their business, as well as Group Treasury, to calculate the total amount of securities that they anticipated offering and selling over the next approximately 18 months, given that Barclays sought to register the total amount of securities that it anticipated offering and selling

---

[25] SEC Order, ¶20.

[26] *Id.* at ¶21.

[27] *See id.*

during that period and pay the registration fees for that amount of securities in advance.[28]  As part of these calculations, the Working Group also determined an initial allocation of fees among the trading desks accessing the 2018 Shelf, with the expectation that these allocations would be revisited as data regarding actual offers and sales off of the 2018 Shelf became available.

73.     On February 22, 2018, Barclays filed a post-effective amendment, which amended its prior registration statement on Form F-3, and on March 30, 2018, Barclays' post-effective amendment was declared effective.[29]  The filing fees for the 2018 Shelf covered the offer or sale of approximately $21.3 billion of securities, for a period of approximately 18 months.[30]

74.     While performing the work described herein, members of the Working Group recognized, discussed and understood the need to track actual offers and sales of securities against the amount of registered securities on a real-time basis.[31]  Nevertheless, no internal control was established to track offers and sales of securities, nor was any member of the Working Group or other BBPLC personnel performing that task.[32]

### 3.     Registration of the 2019 Shelf

75.     As the 2018 Shelf approached its expiration in 2019, the Working Group reconvened with largely the same membership as in 2018.[33]  As during the 2018 WKSI shelf conversion, the Working Group calculated the total amount of securities that they anticipated offering or selling during the three-year duration of what would become the 2019 Shelf and

---

[28] *Id.* at ¶22.

[29] *Id.* at ¶23.

[30] *Id.*

[31] SEC Order, at ¶24.

[32] *Id.*

[33] *Id.* at ¶25.

determined an initial allocation of fees among the trading desks accessing the 2019 Shelf.  Unlike during its work in 2018, however, the Working Group's 2019 work required it to perform "Carry-Over Calculations."[34]

76.     The Carry-Over Calculations were necessary because the 2018 Shelf had excess securities still available to offer or sell. [35]  Accordingly, the Working Group needed to determine two amounts: (1) how much was needed for offers or sales of securities from the 2018 Shelf during the time between when Barclays filed the 2019 Shelf Registration Statement and when the 2019 Shelf became effective ("Gap Period"); and (2) how many securities would be left over on the 2018 Shelf after accounting for the anticipated Gap Period offers or sales.[36]  Barclays de-registered those remaining securities and used the fees that were originally assessed on those securities to offset a portion of its registration fees due for the 2019 Shelf Registration Statement.[37]

77.     On August 1, 2019, Barclays' registration statement on Form F-3 was declared effective.[38]  The filing fees for the 2019 Shelf Registration Statement covered the offer or sale of approximately $20.8 billion of securities, for a period of three years.[39]

78.     Despite the labor-intensive work to manually calculate the Carry-Over Calculations and the payment of registration fees related to the 2019 Shelf, Barclays failed to establish any internal control to track offers and sales of securities on a real-time basis and no member of the Working Group or other Barclays personnel was performing that task.[40]

---

[34] *See id.*

[35] *Id.* at ¶26.

[36] *See id.*

[37] SEC Order, at ¶26.

[38] *Id.* at ¶27.

[39] *See id.*

[40] *Id.* at ¶28.

F.      **The Over-Issuances of Securities In Excess of What Barclays Registered in the 2018 and 2019 Shelf Registration Statements**

79.    According to the SEC Order, on March 8, 2022, a member of Group Treasury reached out to the member of the legal department who had been part of the Working Group, inquiring as to how many securities remained available to be offered and sold off of the 2019 Shelf because Group Treasury was planning on doing a sale of corporate debt securities.[41]

80.    Shortly thereafter, Barclays attempted to calculate the cumulative amount of securities offered and sold from the 2019 Shelf in order to determine the amount of securities that remained available for sale.[42]  The SEC Order states that as a result of these calculation efforts, "it became clear to all involved that there was no internal control in place to track in real time the amount of securities offered and sold against the amount of securities registered." *Id.*[43]

81.    Then, on or around March 9, 2022, Barclays concluded that securities had been offered and sold in excess of what had been registered on the 2019 Shelf and Barclays halted new offers and sales of securities from that shelf, effectively suspending its structured note business.[44] Five days later, on March 14, 2022, Barclays notified regulators about the over-issuance and told investors that it did not have sufficient issuance capacity to support further sales from inventory and any further issuances of the VXX and OIL ETNs.[45]  This explanation, though true, did not include any information regarding Barclays' failure to maintain effective internal controls to track the offers and sales from the 2019 Shelf.

---

[41] *Id.* at ¶29.

[42] *Id.* at ¶30.

[43] All emphasis has been added unless otherwise noted.

[44] *See* SEC Order, ¶¶7, 29.

[45] *See id.* at ¶31.

82.     Then, on March 28, 2022, Barclays filed a Form 6-K with the SEC and publicly disclosed details around its internal control issues, a forthcoming rescission offer to purchasers of securities in the over-issuance, and an estimate of potential financial impact of the over-issuance at around £450 million ($590 million).[46]  In the March 28, 2022 Form 6-K, Barclays also told the market that it commissioned an independent review of "the control environment related to such issuances" and that "regulatory authorities are conducting inquiries and making requests for information" concerning the over-issuance.

83.     On April 22, 2022 and April 28, 2022, Barclays issued press releases announcing the suspension of more than thirty (30) additional ETNs.

84.     Shortly thereafter, in early June 2022, Barclays discovered that the Carry-Over Calculations described above were incorrect because the Company had de-registered too large an amount of securities from the 2018 Shelf.[47]  As a result, beginning on June 26, 2019, Barclays offered and sold approximately $1.3 billion of securities in excess of what had remained on the 2018 Shelf.[48]

85.     These miscalculations elongated the time period covered by the over-issuance due to Barclays' ineffective internal controls over financial reporting, and increased the total amount of the over-issuance.[49]  In the end, the Company offered and sold approximately: (i) $16.37 billion of securities in excess of the amount registered with the SEC from the 2019 Shelf; and (ii) $1.3

---

[46] *See id.* at ¶32.

[47] *See id.* at ¶33.

[48] *Id.*

[49] *See id.* at ¶34.

billion of securities in excess of what had remained on the 2018 Shelf for (iii) a grand total of $17.7 billion in over-issuances.[50]

### G.    April and May 2022: Barclays' Restatements for BPLC and BBPLC

86.    On April 28, 2022, in connection with its first quarter 2022 results announcement, Barclays disclosed that it was in discussions with the SEC about filing a restatement of the year-end 2021 audited financial statements previously filed with the SEC for both BPLC as well as BBPLC in connection with over-issuance.[51]  Barclays announced on May 16, 2022, that its Board of Directors determined that BPLC would restate its year-end 2021 audited financial statements filed with the SEC.[52]

87.    On May 23, 2022, Barclays filed amendments to BPLC and BBPLC's 2021 annual reports on Forms 20-F with the SEC including the restatements, reflecting a £220 million litigation and conduct provision and an associated income statement charge as of year-end 2021 and a contingent liability disclosure, all due to the over-issuance from the 2019 Shelf.[53]  The restatements also amended disclosures to reflect management's conclusions that ICFR and DCP were not effective as of year-end 2021, due to a material weakness in ICFR identified after the original filing date as a result of the over-issuance from the 2019 Shelf.[54]

### H.    Rescission Offer (August 1, 2022 - September 12, 2022)

88.    On August 1, 2022, before the market opened, Barclays filed a Form 424B5 with the SEC and commenced a Recission Offer for $17.6 billion over- issued securities that were sold

---

[50] SEC Order, at ¶34.

[51] *See id.* at ¶35.

[52] *See id.*

[53] *See id.* at ¶36.

[54] *Id.*

pursuant to the March 2018 Shelf Registration Statement and 2019 Shelf Registration Statement, whereby Barclays has offered "to repurchase the applicable securities from relevant purchasers who acquired such securities, at their purchase price plus interest, less the amount of any interest, coupon payments, principal or other income received pursuant to the terms of the securities, or to pay rescissory damages if such securities, after being purchased, were sold, redeemed or matured at a loss." **According to the Prospectus that Barclays filed with the SEC on August 1, 2022, as well as an amended thereto filed on August 12, 2022, the rescission offer applied to more than 3,000 structured notes and ETNs**.

89.     The August 1, 2022 Form 424B5 disclosed that from February 18, 2021 through March 2022, Barclays sold approximately $16.37 billion of unregistered securities in excess of the maximum $20.8 billion of securities registered under the 2019 Shelf Registration Statement (for a total of approximately $37 billion).

90.     The August 1, 2022 Form 424B5 also disclosed that Barclays sold an additional $1.27 billion of unregistered securities in excess of the maximum aggregate amount registered pursuant to the 2018 Shelf Registration Statement.

91.     The Rescission Offer expired on September 12, 2022.  According to a Barclays Form 6-K filed with the SEC on September 15, 2022, during the rescission offer, initial investors in the impacted structured notes validly submitted claims valued at nearly $7.7 billion.

**I.      September 29, 2022: SEC Issues Consent Decree and Cease-and -
         Desist Order Against Barclays for Violating Federal Securities Laws
         Through the Over-Issuance**

92.     On September 29, 2022, the SEC released an "Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order" ("SEC Order")

which, among other things, documented a settlement between Barclays and the SEC.  According to the SEC Order, Barclays offered the settlement terms that the SEC accepted.[55]

93.    In the SEC Order, Barclays admitted to violating Sections 5(a) and 5(c) of the Securities Act and Sections 13(a) and 13(b)(2)(A), and 13(b)(2)(B) and Rule 13a-15(a) of the Exchange Act and agreed to pay a $200 million penalty and more than $161 million in disgorgement and prejudgment interest.[56]

94.    The SEC Order notes at its outset that it "**arises from BBPLC's failure to put into place any internal control around the real-time tracking of securities being offered or sold off its Commission-registered shelf registration statement**."  This failure, as noted by the SEC Order, resulted in Barclays' offer and sale of "an unprecedented amount of securities – cumulatively totaling approximately $17.7 billion – in excess of what [Barclays] had registered" with the SEC.[57]

95.    Additionally, the SEC Order highlighted that "[a]t the time of the registration of both the 2018 Shelf and the 2019 Shelf, certain BBPLC personnel recognized the need to accurately record relevant information about securities that were offered or sold so as to be able to track the aggregate amount of securities that were cumulatively offer and sold from each respective [s]helf on a real-time basis."  Such tracking, the SEC Order explained, would "ensur[e] that BBPLC did not offer or sell any securities in excess of what had been registered."  Yet, "**no**

---

[55] *Id.* at p. 1.

[56] The SEC Order directed BBPLC to pay $149,731,011.00 in disgorgement and $11,463,229.00 in prejudgment interest, which were deemed satisfied by the rescission offer commenced on August 1, 2022 and expired on September 12, 2022. SEC Order, at p. 11.

[57] *Id.* at ¶1.

internal control was established" and "**the amount of securities that were offered and sold was not tracked**."[58]

96.     According to the SEC, on or around March 9, 2022, Barclays discovered that, beginning on or around January 28, 2021, it had offered or sold securities in excess of what was registered on the 2019 Shelf.  According to the SEC Order, "[o]ver the 14-month period of the over-issuance, BBPLC offered and sold approximately $16.37 billion of securities in excess of what was registered with the Commission on the 2019 Shelf."[59]

97.     On March 14, 2022, Barclays reported the issue to regulators and disclosed to the market that it did not have sufficient issuance capacity to support further sales from inventory and any further issuances of certain exchange-traded notes ("ETN") traded under symbols "OIL" and "VXX."  On March 28, 2022, Barclays publicly disclosed, on a Form 6-K filed with the SEC, the details concerning the internal control issues related to, and the potential financial impact of, the over-issuance by Barclays.  That same day, Barclays announced its intent to offer rescission to investors who had purchased securities in relevant unregistered transactions.[60]

98.     The over-issuance impacted both BPLC's and BBPLC's year-end 2021 financial statements.  On May 23, 2022, both BPLC and BBPLC filed amendments to their annual reports on Forms 20-F with the SEC, restating their financial statements, by recording a provision and contingent liability relating to the over-issuances and disclosing management's conclusions as to the ineffectiveness of internal control over financial reporting ("ICFR") and disclosure controls and procedures ("DCP") due to a material weakness identified in ICFR.[61]

---

[58] *Id.* at ¶5.

[59] *Id.* at ¶7.

[60] *Id.* at ¶8.

[61] *Id.* at ¶9.

99.    The SEC Order also required Barclays to adopt and implement the "BBPLC Shelf Review recommendations" which include:

(a)    the centralization of oversight of BBPLC's SEC-registered shelves in Group Treasury;

(b)    the maintenance of clear minimum control requirements for BBPLC's SEC-registered shelves, including, but not limited to, a process for reviewing any change in WKSI status for BBPLC and the tracking of offers and sales off of BBPLC's SEC-registered shelves as appropriate; and

(c)    the maintenance of a data repository, with appropriate controls and governance designed to ensure reliability of the data, for the purpose of tracking offers and sales, as appropriate, off of BBPLC's SEC-registered shelves.[62]

100.    Additionally, the SEC Order directed Barclays to complete an audit of its "policies and procedures and internal controls relating to compliance with Section 5 of the Securities Act in connection with Barclays' SEC-registered shelves to confirm the adoption and implementation" of the procedures described in [the SEC Order] and to submit an Internal Audit Report to the BBPLC Board of Directors Audit Committee.[63]  Finally, the SEC directed Barclays to certify, in writing, compliance with the procedures described in [the SEC Order] no later than thirty days after the Internal Audit report was submitted to the BBPLC Audit Committee.[64]

---

[62] SEC Order, at 10.

[63] *Id.*

[64] *Id.*

## V.   INTERNAL CONTROLS OVER FINANCIAL REPORTING

### A.   Requirements Under Sarbanes-Oxley Act of 2002

101.   Federal law requires that the CEO and CFO of public companies certify their company's quarterly and annual reports filed with the SEC and the procedures established by those companies to prepare the financial statements and disclosures.

102.   Section 302 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241 ("SOX")—designed to ensure that a public company's CEO and CFO take a proactive role in their company's public disclosures and to instill investors with confidence concerning the accuracy, quality, and reliability of a company's periodic SEC reports—require that a CEO and CFO of a public company address the following topics in annual SEC filings (a Form 20-F for Barclays): (1) the material accuracy and fair presentation of the report's disclosures; (2) establishment and maintenance of disclosure controls and procedures ("DCP"); and (3) any material changes to the company's internal controls over financial reporting ("ICFR").  The CEO and CFO must certify that: (1) they have reviewed the periodic report; (2) it does not contain any untrue statement of material fact or omit to state a material fact necessary to make any statements made not misleading; (3) based on their knowledge, the financial statements and other financial information fairly present the financial condition and operations of the company; (4) they have maintained disclosure controls and internal controls and have designed such controls to ensure that all material information is made known to them and to provide reasonable assurance regarding the reliability of financial information; and (5) they have disclosed to the audit committee and auditors all significant deficiencies and material weaknesses in the design or operation of internal controls.  These certifications communicate to investors that all material information required to be disclosed is contained in the report.

103.     Section 404 of SOX, 15 U.S.C. § 7262, requires management of public companies such as Barclays to establish and maintain a system of internal controls relating to, among other things, financial reporting.   Section 404 further requires management to document, test, and maintain those controls and procedures to ensure their effectiveness, as well as to assess and report on the design and operating effectiveness of internal controls over financial reporting on an annual basis.   Ultimately, Section 404 requires that management of a public company annually evaluate the effectiveness of the company's internal controls over financial reporting and disclose the conclusion, including any material weaknesses, to investors.

104.     Section 404 of SOX was "intended to bring information about material weaknesses in [internal controls] into public view."   SEC Release 33-8810.   Under Item 308 of Regulation S-K, 17 CFR § 229.308(a)(3), "[m]anagement is not permitted to conclude that the registrant's internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting."   A statement that ICFR are effective is, therefore, an assertion by management that there are no material weaknesses in such internal controls.

105.     Section 404 of SOX requires management of public companies to select an internal control framework and then assess and report on the design and operating effectiveness of those internal controls on an annual basis.   Barclays utilized an "overarching framework" to internal governance called "The Barclays Guide."   According to the Company's filings, the Barclays Guide's key elements pertaining to internal control were "aligned to the recommendations of The Committee of Sponsoring Organizations of the Treadway Commission, Internal Control – Integrated Framework (2013 COSO)."

B.     **COSO Framework**

106.     The COSO Framework states: "[i]nternal control is a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives" relating to: (i) effectiveness and efficiency of operations; (ii) reliability of financial reporting; and (iii) compliance with applicable laws and regulations.

107.     COSO identifies five interrelated components of internal control: (i) control environment, (ii) risk assessment, (iii) control activities, (iv) information and communication, and (v) monitoring activities.  COSO requires that: "[e]ach of the five components of internal control and relevant principles is present and functioning [and that] [t]he five components are operating together in an integrated manner."  COSO also identifies that these components are relevant to an entire entity and to the entity level, its subsidiaries, divisions, or any of its individual operating units or functions.

108.     COSO states that the "control environment" is "the set of standards, processes, and structures that provide the basis for carrying out internal control across the organization" and recognizes that "[t]he board of directors and senior management establish the tone at the top regarding the importance of internal control and expected standards of conduct."  With respect to the "control environment," COSO requires that "[t]he board of directors demonstrate[] independence from management and exercise[] oversight of the development and performance of internal control," and that "[m]anagement establishes, with board oversight, structures, reporting lines, and appropriate authorities and responsibilities in the pursuit of objectives."  The "control environment" also requires that the "organization holds individuals accountable for their internal control responsibilities in the pursuit of objectives."

109.    The "risk assessment" component requires that the Company "identifies risks to the achievement of its objectives across the entity and analyzes risks as a basis for determining how the risks should be managed."  It also requires that "[t]he organization identifies and assesses changes that could significantly impact the system of internal control."

110.    The "control activities" component requires that an "organization selects and develops control activities that contribute to the mitigation of risks to the achievement of objectives to acceptable levels"; "selects and develops general control activities over technology to support the achievement of objectives"; and "deploys control activities through policies that establish what is expected and procedures that put policies into action."

111.    The "information and communication" component requires that an "organization obtains or generates and uses relevant, quality information to support the functioning of internal control"; "internally communicates information, including objectives and responsibilities for internal control, necessary to support the functioning of internal control"; and "communicates with external parties regarding matters affecting the functioning of internal control."

112.    The "monitoring activities" component requires that an "organization selects, develops, and performs ongoing and/or separate evaluations to ascertain whether the components of internal control are present and functioning," and "evaluates and communicates internal control deficiencies in a timely manner to those parties responsible for taking corrective action, including senior management and the board of directors, as appropriate."

### C.    The Federal Reserve Reiterated the Need for Barclays to Maintain Effective ICFR

113.    In the United States, Barclays' "activities and operations are subject to supervision and regulation by the Board of Governors of the Federal Reserve System (FRB)," amongst others. The FRB regulates Barclays as a Bank Holding Company (BHC).  The FRB identified in its Bank

Holding Company Supervision Manual (November 2021) ("FRB Handbook") that a "bank holding company's internal control structure is critical to promoting safe-and-sound operations and effective risk-management system…When properly structured, an internal control system promotes effective operations and reliable financial and regulatory reporting; safeguards assets; and promotes compliance with relevant laws, regulations, and bank holding company policies." FRB Handbook, §1060.31.3.4.

114.   The FRB Handbook notes certain elements of controls that are of particular importance, including:

(a)   The bank holding company's organization structure establishes a clear line of authority and responsibility for monitoring adherence to policies, procedures, and limits; and

(b)   Adequate procedures exist for ensuring compliance with applicable laws and regulations.

115.   The FRB Handbook is clear that "[s]erious lapses or deficiencies in internal controls…may warrant supervisory action, including formal enforcement action." FRB Handbook, §1060.31.3.4.

**D.   ICFR and DCP**

116.   Public companies like Barclays are required to design and implement two kinds of control systems to ensure the accuracy of their financial and non-financial representations to investors: (1) disclosure controls and procedures ("DCP"); and (2) ICFR.

117.   DCP ensure that information a company must disclose under the federal securities laws is communicated to company management and its board sufficiently in advance of the company's filing dates, to allow them ample time for those groups to consider the information before disclosing it to investors.  *See* 17 C.F.R. § 240.13a-15(e).  The Exchange Act defines DCP to mean "controls and other procedures of an issuer that are designed to ensure that information

required to be disclosed by the issuer in the reports that it files or submits under the [Exchange] Act . . . is recorded, processed, summarized and reported within the time periods specified" by the SEC. *Id.*

118.    The SEC defines ICFR as "[a] process designed by, or under the supervision of, the issuer's principal executive and principal financial officers . . . to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with [GAAP]." *See* 17 C.F.R. § 240.13a-15(f).

119.    The Exchange Act states that ICFR specifically includes "policies and procedures" that "(1) [p]ertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;" [and] (2) [p]rovide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with [GAAP], and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer." *Id.*   Company management is required to review and evaluate these controls quarterly to determine their effectiveness.

120.    A company's DCP and ICFR cannot be considered effective if a "material weakness" exists.   A "material weakness" in ICFR is "a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis."   SEC Release No. 33-8810 § II.A, n.18.   Likewise, a material weakness in DCP arises when there is a reasonable possibility that the company's controls

will fail to timely prevent or detect a material misstatement in a public disclosure.[65]  A reasonable

possibility arises when the chance of a future event occurring (*e.g.*, a material misstatement) is

more than slight.  *Id.* § II.B, n.47.

121.     A deficiency in ICFR may pertain to either a deficiency in the design or operation

of a control.  SEC Release No. 33-8810 § I, pp. 4-5.  A design deficiency "exists when (a) necessary

controls are missing or (b) existing controls are not properly designed so that even if the control

operates as designed, the financial reporting risks would not be addressed."  SEC Release No. 33-

8810 § II.A.1.b., p. 15, n.29.  "The evaluation of the operating effectiveness of a control considers

whether the control is operating as designed and whether the person performing the control

possesses the necessary authority and competence to perform the control effectively."  SEC

Release No. 33-8810 § II.A.2., p.21.  In other words, a material weakness exists regardless of any

error in the financial statements if any design or operating deficiency gives rise to a reasonable

possibility that a material misstatement will not be prevented or detected.

122.     The effectiveness of Barclays' internal controls was particularly important to

investors during the Class Period.  As described above, Barclays had a history of lapses and control

deficiencies that led to significant violations of federal securities law, which resulted in cease-and-

desist orders, fines, and penalties.  Barclays specifically stated that effective risk management, a

component of a company's internal controls, was of primary importance to the Company's overall

operations.   Investors and analysts focused on whether Barclays had, in fact, remedied the

deficiencies and turned the corner on its troubled past.  A material weakness in DCP or ICFR was

---

[65] The SEC has noted that ICFR is a subset of DCP.  See SEC Final Rule, *Certification of Disclosure in Companies' Quarterly and Annual Reports*, Release No. 33-8124.  ("these procedures [relating to DCP] are intended to cover a broader range of information than is covered by an issuer's internal controls related to financial reporting").  Thus, a material weakness in ICFR demonstrates a material weakness in DCP.

likely to cause investors to lose faith in Barclays' ability to operate in a safe and sound manner and consistent with government regulations, as the Company consistently stated it was doing.

### E.   Barclays Certified to Investors ICFR and DCP Were Effective During the Class Period

123.   An evaluation of ICFR begins with the identification and assessment of the risks to reliable financial reporting.  SEC Release No. 33-8810, § II.A., pp. 9-10.  While undertaking this evaluation, Barclays should have considered the sources and potential likelihood of misstatements occurring within its financial statements.  *Id.* at p. 4.  Specifically, and as the SEC emphasizes, management should have "perform[ed] more extensive testing in high-risk areas."  *Id.* at p. 5.  In particular, the SEC observes that the likelihood that a control would fail to operate was an important consideration in focusing management on those areas most critical to evaluate.  SEC Release No. 33-8810, § II.A.2.a, at pp. 25-26.

124.   Next, management evaluates whether its ICFR is in place to address those risks (i.e., the design of ICFR).  SEC Release No. 33-8810, § II.A.1, p. 12.

125.   Finally, management should ensure that testing procedures are performed regarding the operating effectiveness of those ICFR.  *Id.*, § II.A.2, p. 21.  The COSO Framework characterizes such testing as part of an entity's monitoring of ICFR because "[m]onitoring ensures that internal control continues to operate effectively."  COSO Framework, Ch. 9, Monitoring, p. 124.

126.   If management is aware, or determines, that a control is not designed or operating effectively, a deficiency exists that must be evaluated.  *See* SEC Release No. 33-8810, § II.A.1.b, p. 15.  Management's evaluation of the severity of a control deficiency does not guarantee that a material misstatement has already occurred.  *See id.* § II.B.1, p.35.  Rather, the evaluation focuses on whether a reasonable possibility of a material misstatement existed.  This evaluation focuses

on the likelihood of the risk occurring and the impact if the misstatement were to occur. Likelihood is assessed as higher in consideration of factors such as whether the defect is known to be present as opposed to vulnerability to the defect, whether a history of similar defects have occurred, and the presence of any mitigating controls. Impact is assessed higher in consideration of factors such as financial materiality, the business area affected, the business processes affected, effect on the entity's reputation, expected response of external stakeholders, as well as mitigating controls.

127.   Ultimately, prior to making the SOX 302 and SOX 404 certifications, management was required to conduct an appropriate evaluation. In doing so, the SEC expected management's evaluation to focus on "areas of weakness or continuing concern." (SEC Release No. 33-8238 § II.E.). This is because the "required evaluation should help to identify potential weaknesses and deficiencies in advance of a system breakdown, thereby ensuring the continuous, orderly and timely flow of information within the company and, ultimately, to investors and the marketplace." (SEC Release No. 33-8124 § VII.).

### F.   Barclays Restates Its 2021 Financials and Admits a Material Weakness in Internal Controls

128.   A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

129.   As set forth herein, Barclays' over-issuance of unregistered structured notes and ETNs constituted a material weakness in Barclays' internal controls. Indeed, in its 2022 Form 20-F Barclays admitted that:

> On 10 March 2022, management became aware that BBPLC had, since February 2021, issued securities in excess of the amount it had pre-registered under BBPLC's 2019 F-3. The fact that such over-issuance occurred and was not immediately identified highlighted a weakness in controls over the identification of external

regulatory limits that constituted a material weakness in internal control over financial reporting from the time BBPLC filed its shelf registration statement in 2018 and as at 31 December 2021, and the material weakness continues to exist as at the date of the filing of this Amendment No.1 as it will not be considered by the Company to be fully remediated until the applicable controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively.

130.    Barclays' internal controls suffered from the material weakness for approximately five years, beginning in 2018 when the Company filed its shelf registration statement until 2022, when the issue was discovered.   Consequently, Barclays was required to retract its previous affirmation that the Company's internal controls had been operating effectively:

Management has assessed the internal control over financial reporting as at 31 December 2021.  In making its assessment, management utilised the criteria set out in the 2013 COSO framework and identified a control deficiency that constitutes a material weakness as described below. A material weakness is a deficiency in internal controls over financial reporting such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.  As a result of this material weakness, management has concluded that the Company's internal control over financial reporting and disclosure controls and procedures were not effective as at 31 December 2021.

131.    Further, Barclays disclosed, in its 2022 Form 20-F, that the Company's material weakness in internal controls went against a specific COSO principle:

The fact that such over-issuance occurred and was not immediately identified highlighted a weakness in controls over the identification of external regulatory limits related to securities issuance and monitoring against these limits that constituted  a material weakness in internal control over financial reporting under 'COSO Principle 9: Identifies and Analyzes Significant Change – The organisation identifies and assesses changes that could significantly impact the system of internal control.'

132.    This principle is a constituent of the risk management component of the COSO Framework.  Within this principle, the main point of focus is that a Company's "risk identification process" needs to consider "changes to the regulatory, economic, and physical environment in which the entity operates."  Barclays loss of its WKSI status, and related changes to the Company's

- 44 -

shelf registration statements and security issuances, was a clear-cut change to the Company's regulatory environment.

(a)     COSO notes that internal controls "effective within one set of conditions may not necessarily be effective when those conditions change significantly."  Management is required, as part of its risk assessment, to identify changes that could significantly impact the entity's system of internal control and act as necessary.  Despite the change to the Company's regulatory requirements and manner in which it could conduct its sales of securities, Barclays management failed to re-design existing internal controls to address the Company's new ineligible issuer status and its associated requirements.

(b)     COSO describes internal controls as an "integrated process in which components can and will impact another."  Barclays failure to implement satisfactory control activities despite the Company's risk management component identifying the glaring need for such implicates Barclays officers for failing to maintain an effective control environment, the first component of internal control.

(c)     An effective control environment, which is "the set of standards, processes, and structures that provide the basis for carrying out internal controls across the organization," is premised on several principles, perhaps none more important than what is referred to as the "tone at the top."  It is incumbent on Barclays directors and officers to set the tone at the top, which is to "demonstrate through their directives, actions, and behavior the importance of integrity and ethical values to support the functioning of the system of internal control."  Considering that the need for control procedures regarding the Company's issuance of securities was identified as far back as 2018, yet remained unaddressed until 2022, it is evident that Barclays management failed to set the tone at the top and maintain an effective control environment.

- 45 -

## VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A.   Overview of Defendants' Fraudulent Conduct

133.   Lead Plaintiff alleges that the statements highlighted in ***bold and italics*** within this section were materially false and misleading because, among other reasons, they omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements artificially inflated or artificially maintained the price of Barclays' ADRs and operated as a fraud or deceit on all persons and entities that purchased or otherwise acquired Barclays' ADRs during the Class Period. Because Defendants chose to speak on the issues described below, it was important that they not mislead investors or withhold material information.

### B.   Defendants' Materially False and Misleading Statements and Omissions

134.   The Class Period begins on February 18, 2021, when BBPLC first sold unregistered securities in excess of the maximum aggregate amount of securities registered pursuant to the 2019 Shelf Registration Statement.[66]  Throughout the Class Period, Defendants made materially false and misleading statements and failed to disclose material information about both the strength and effectiveness of Barclays' internal controls and procedures and Barclays' over-issuance of securities.

### 1.   February 18, 2021: FY 2020 Results and Filing of Form 20-F

135.   On February 18, 2021, the first day of the Class Period and the same day that Barclays exceeded the limit of registered securities under the 2019 Shelf Registration Statement,

---

[66] As discussed above, the August 2019 Shelf Registration Statement authorized the issuance of a maximum of $20.8 billion of securities, for a period of three years.  Barclays has admitted that it exceeded that maximum with the issuance of securities starting on February 18, 2021.  In the end, Oak Street exceeded the number of registered securities issued from the 2019 Shelf Registration by nearly 75%.

Barclays filed its 2020 Annual Report on Form 20-F (the "2020 Form 20-F"), which Defendant Morzaria signed.

136.    In the 2020 Form 20-F, Barclays detailed the Company's purportedly "**robust internal controls**" and highlighted that Barclays had "successfully completed" a three-year program, known as the Barclays Internal Control Environment Programme or "BICEP." The 2020 Form 20-F explained that BICEP "**was focus[ed] on strengthening the internal control environment across the Group**" and, having undergone BICEP, "**[t]he Group's control environment [] now in a much stronger position**."

137.    The 2020 Form 20-F also touted that Barclays "**is committed to operating within a strong system of internal control**," and that the Company's "**frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance**." Additionally, the 2020 Form 20-F stated that "**[m]anagement has assessed the internal control over financial reporting as of 31 December 2020 [], utilized the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2020**."

138.    The 2020 Form 20-F included a Board Audit Committee report. The Board Audit Committee Report stated, "**The Committee reached the conclusion that there are no control issues that are considered to be a material weakness and which merit specific disclosure**." Further, the Board Audit Committee Report stated, "**The Committee [] evaluated and tracked the status of the more significant control issues through regular reports from the Chief Controls Officer, including updates on the progress of remediation programmes, ongoing COVID-19 related issues and return to office planning**." Finally, the Board Audit Committee Report stated that the Audit Committee "**concluded that, throughout the year ended 31 December 2020 and to**

*date, the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations.*"

139.    The 2020 Form 20-F also noted which groups at Barclays were responsible for ensuring the maintenance of effective internal controls over financial reporting.  For example, the 2020 Form 20-F highlighted that Barclays Board had overall responsibility for ensuring that "management maintained an effective system of risk management and internal control and for assessing its effectiveness" and that the Risk Committee and the Audit Committee regularly review the effectiveness of the risk management and internal control systems.

140.    With respect to "Controls over financial reporting," the 2020 Form 20-F reported:

> *A framework of disclosure controls and procedures is in place to support the approval of the financial statements of the Group. Specific governance committees are responsible for examining the financial reports and disclosures to ensure that they have been subject to adequate verification and comply with applicable standards and legislation. Where appropriate, these committees report their conclusions to the Board Audit Committee, which debates such conclusions and provides further challenge. Finally, the Board scrutinises and approves results announcements and the Annual Report and ensures that appropriate disclosures have been made. This governance process ensures that both management and the Board are given sufficient opportunity to debate and challenge the financial statements of the Group and other significant disclosures before they are made public.*

141.    Attached as Exhibit 12.1 to the 2020 Form 20-F were certifications, signed by Defendants Staley and Morzaria,[67] which stated:

1.    I have reviewed this annual report on Form 20-F of Barclays PLC;

2.    *Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

3.    Based on my knowledge, *the financial statements, and other financial information included in this report, fairly present in all material respects the*

---

[67] Defendants Staley and Morzaria signed these certifications pursuant to 17 C.F.R. 240.13(A)-14(A).

*financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report*;

4.      The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and15d-15(f)) for the company and have:

(a)      *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities*, particularly during the period in which this report is being prepared;

(b)      *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

(c)      *Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*; and

(d)      *Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting*; and

5.      *The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's boards of directors (or persons performing the equivalent functions)*:

(a)      *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information*; and

(b)      *Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting*.

142.    Further, attached as Exhibit 13.1 to the 2020 Form 20-F was a certification, signed by Defendants Staley and Morzaria,[68] which stated:

> Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), each undersigned officer of Barclays PLC, a public limited company incorporated under the laws of England and Wales ("Barclays"), hereby certifies, to such officer's knowledge, that:
>
> **The Annual Report on Form 20-F for the year ended December 31, 2020 (the "Report") of Barclays fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Barclays.**

143.    Defendants' statements, concerning Barclays' internal controls over financial reporting, contained in ¶¶136-138, 140, and the certifications referenced in ¶¶141–42, were materially false and/or misleading when made in that they failed to disclose:

(a)    that Barclays had sold and was continuing to sell unregistered securities in excess of the amounts registered by the 2018 Shelf Registration Statement and the August 2019 Shelf Registration Statement;

(b)    a material weakness existed in Barclays' internal control environment evidenced by the fact that the over-issuances had occurred;

(c)    that Barclays had violated and was continuing to violate the federal securities laws and SEC regulations, subjecting Barclays to: (i) legal liability in the U.S., (ii) reputational risk, (iii) the possibility of an extension of its ineligible issuer status for an additional three-year period, and (iv) fines, penalties and/or other sanctions by regulatory agencies in the UK and overseas;

---

[68] Defendants Staley and Morzaria signed this certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

(d)      that Barclays would be required to conduct a Recission Offer for more than 3,000 unregistered structured notes and ETNs at significant cost to the Company; and

(e)      that Barclays would be required to temporarily halt sale of at least thirty (30) different structured note products and exchange traded notes (ETNs), including, but not limited to, the popular VXX and OIL ETNs, until the Recission Offer period was over.

### 2.      April 30, 2021: Q1 2021 Results and Filing of Form 6-K

144.      On April 30, 2021, Barclays issued its Q1 2021 Results Announcement, containing financial results for Barclays for the quarter ending March 31, 2022 ("Q1 2021 RA").  Barclays filed a copy of the Q1 2021 RA as an attachment, Exhibit 99.1, to a Form 6-K filed with the SEC on April 30, 2021.

145.      The Q1 2021 RA incorporated the 2020 Form 20-F by reference, discussed above in ¶¶136-138, 140-142.  Therefore, for the reasons stated in ¶143, the statements in the Q1 2021 RA were materially false and/or misleading for their failure to disclose the true state of Barclays' internal controls.

### 3.      July 28, 2021: Q2 2021 Results and Filing of Form 6-K

146.      On July 28, 2021, Barclays issued its Interim 2021 Financial Results for the six month period ending June 30, 2021 ("Q2 2021 RA").  Barclays filed a copy of the Q2 2021 RA as an attachment, Exhibit 99.1, to a Form 6-K filed with the SEC on July 28, 2021.

147.      The Q2 2021 RA incorporated the 2020 Form 20-F by reference, discussed above in ¶¶136-138, 140-142.  Therefore, for the reasons stated in ¶143, the statements in the Q2 2021 RA were materially false and/or misleading for their failure to disclose the true state of Barclays' internal controls.

### 4.    October 21, 2021: Q3 2021 Results and Filing of Form 6-K

148.    On October 21, 2021, Barclays issued its Q3 2021 Results Announcement, containing financial results for the nine months ended September 30, 2021 ("Q3 2021 RA"). Barclays filed a copy of the Q3 2021 RA as an attachment, Exhibit 99.1, to a Form 6-K filed with the SEC on October 21, 2021.

149.    The Q3 2021 RA incorporated the 2020 Form 20-F by reference, discussed above in ¶¶136-138, 140-142.  Therefore, for the reasons stated in ¶143, the statements in the Q3 2021 RA were materially false and/or misleading for their failure to disclose the true state of Barclays' internal controls.

### 5.    February 23, 2022: FY 2021 Results and Filing of Form 20-F

150.    On February 23, 2022, Barclays filed its 2021 Form 20-F.  The 2021 Form 20-F was signed by defendant Morzaria.

151.    The 2021 Form 20-F stated, in pertinent part, that Barclays "***is committed to operating within a strong system of internal control,***" and that the Company's "***frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance***."  Similar to its 2020 Form 20-F, the 2021 Form 2021 20-F stated that "***[m]anagement has assessed the internal control over financial reporting as at 31 December 2021…and concluded that, based on its assessment, the internal control over financial reporting was effective as at 31 December 2021***."

152.    The 2021 Form 20-F further stated that Barclays' Audit Committee was charged with "***[o]verseeing the integrity of our financial disclosures and the effectiveness of the internal control environment***," was "***[k]eenly focused on the Group's internal control environment***" and "***continued to oversee the ongoing evolution and enhancement of the internal control environment***."

153.     The 2021 Form 20-F also stated:

**Risk management and internal control**

The Directors are responsible for ensuring that management maintains an effective system of risk management and internal control and for assessing its effectiveness. Such a system is designed to identify, evaluate and manage, rather than eliminate, the risk of failure to achieve business objectives and can only provide reasonable, and not absolute, assurance against material misstatement or loss. ***The Group is committed to operating within a strong system of internal control***. Barclays has an overarching framework that sets out the approach of the Group to internal governance, The Barclays Guide. This establishes the mechanisms, principles and processes through which management implements the strategy set by the Board.

***Processes are in place for identifying, evaluating and managing the Principal Risks facing the Group in accordance with the 'Guidance on Risk Management, Internal Control and Related Financial and Business Reporting'***, published by the FRC. A key component of The Barclays Guide is the ERMF. The purpose of the ERMF is to identify and set minimum requirements in respect of the main risks to the strategic objectives of the Group. There are nine Principal Risks under the ERMF: Credit risk, Market risk, Treasury and Capital risk, Operational risk, Climate risk, Model risk, Reputation risk, Conduct risk and Legal risk. The system of risk management and internal control is set out in the risk frameworks relating to each of our nine Principal Risks and the Barclays Control Framework, which details requirements for the delivery of control responsibilities. ***Group-wide frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance.***

\*   \*   \*

**Effectiveness of internal controls**

Key controls are assessed on a regular basis for both design and operating effectiveness. Issues arising out of these assessments, where appropriate, are reported to the Board Audit Committee. The Board Audit Committee oversees the control environment (and remediation of related issues) . . . The Board Audit Committee also reviews annually the risk management and internal control system, which includes the ERMF. ***It has concluded that, throughout the year ended 31 December 2021 and to date, the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations***.

\*   \*   \*

**Controls over financial reporting**

***A framework of disclosure controls and procedures is in place to support the approval of the financial statements of the Group.***

- 53 -

*  *  *

**Management's report on internal control over financial reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting under the supervision of the principal executive and financial officers, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements, in accordance with (a) UK-adopted international accounting standards; and (b) International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB), including interpretations issued by the IFRS Interpretations Committee.

154.    Attached as Exhibit 12.1 to the Barclays 2021 Form 20-F were certifications signed by Defendants Venkatakrishnan and Morzaria.[69]  The text of the certifications was identical to the certifications attached as Exhibit 12.1 to the Barclays 2020 Form 20- F.  *See* ¶141.

155.    Attached as Exhibit 13.1 to the Barclays 2021 Form 20-F was a certification signed by Defendants Venkatakrishnan and Morzaria.[70]  The text of the certification was identical to the certification attached as Exhibit 13.1 to the Barclays 2020 Form 20-F, except the certification was made for the Barclays 2021 20-F.  *See* ¶142.

156.    Defendants' statements, concerning Barclays' internal controls over financial reporting, contained in ¶¶151–53, and the certifications referenced in ¶¶154–55, were materially false and/or misleading when made in that they failed to disclose:

(a)    that Barclays had sold and was continuing to sell unregistered securities in excess of the amounts registered by the 2018 Shelf Registration Statement and the August 2019 Shelf Registration Statement;

---

[69] Defendants Venkatakrishnan and Morzaria signed these certifications pursuant to 17 C.F.R. 240.13(A)-14(A).

[70] Defendants Venkatakrishnan and Morzaria signed this certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

(b)      a material weakness existed in Barclays' internal control environment evidenced by the fact that the over-issuances had occurred;

(c)      that Barclays had violated and was continuing to violate the federal securities laws and SEC regulations, subjecting Barclays to: (i) legal liability in the U.S., (ii) reputational risk, (iii) the possibility of an extension of its ineligible issuer status for an additional three-year period, and (iv) fines, penalties and/or other sanctions by regulatory agencies in the UK and overseas;

(d)      that Barclays would be required to conduct a Recission Offer for more than 3,000 unregistered structured notes and ETNs at significant cost to the Company; and

(e)      that Barclays would be required to temporarily halt sale of at least thirty (30) different structured note products and exchange traded notes (ETNs), including, but not limited to, the popular VXX and OIL ETNs, until the Recission Offer period was over.

(f)      As a result, Barclays' expenses as reported in its 2021 Form 20-F were materially understated, and profit-before-tax and profit-after-tax, as reported in the Barclays 2021 Form 20-F were materially overstated.

### 6.    March 14, 2022: Announcement of Suspension of Sales and Issuance of Two Popular ETNs

157.    On March 14, 2022, announced the suspension of sales and issuance of two popular ETNs, the VXX and the OIL.  Specifically, Barclays stated, in pertinent part:

> Barclays Bank PLC ("Barclays") announced today that it has suspended, until further notice, any further sales from inventory and any further issuances of each of the iPath ® Pure Beta Crude Oil ETNs due April 18, 2041 (Ticker: OIL; Exchange: NYSE Arca) and the iPath ® Series B S&P 500 ® VIX Short-Term Futures ™ ETNs due January 23, 2048 (Ticker: VXX; Exchange: CBOE BZX Exchange), in each case effective as of the open of trading on Monday, March 14, 2022. This suspension may cause fluctuations in the trading value of such ETNs. Daily redemptions at the option of holders of the ETNs will not be affected by this suspension.

This suspension is being imposed because Barclays does not currently have sufficient issuance capacity to support further sales from inventory and any further issuances of the ETNs. These actions are not the result of the crisis in Ukraine or any issue with the market dynamics in the underlying index components. Barclays expects to reopen sales and issuances of the ETNs as soon as it can accommodate additional capacity for future issuances.

The market value of the ETNs may be influenced by, among other things, the levels of supply and demand for such ETNs. It is possible that this suspension may influence the market value of the ETNs.[71]

158.    On March 14, 2022, Barclays also reported the over-issuances to regulators, including the SEC.  SEC Order, at ¶8.

159.    However, at the time Barclays suspended sales of the VXX and OIL ETNs and notified the SEC of the over-issuance, it did not publicly disclose the over-issuance of more than $17 billion in structured notes and ETNs.   Instead, Barclays cryptically noted that it "does not currently have sufficient issuance capacity to support further sales from inventory and any further issuance of the ETNs."  Without a public disclosure of the over-issuance on March 14, 2022, the market was left in the dark for two more weeks.

**C.    The Truth Begins to Emerge, But Defendants Continue to Mislead the Market**

**1.    March 28, 2022: Revelation of Over-Issuance on 2019 Shelf Registration Statement (First Disclosure)**

160.    On March 28, 2022, before the market opened, Barclays issued a press release (also filed with the SEC on Form 6-K) announcing: (i) it had sold $15.2 billion of unregistered securities in excess of the maximum $20.8 billion of securities registered under the August 2019 Shelf Registration Statement; (ii) it would conduct a rescission offer for the unregistered securities at the

---

[71] Barclays subsequently expanded the list of structured note and ETN products whose sale was suspended through September 2022. *See* ¶83.

original sale price; and (iii) it expected the rescission losses to be approximately £450 million

(approximately $590 million):

> **<u>BBPLC has determined that the securities offered and sold under its US shelf registration statement during a period of approximately one year exceeded the registered amount (such excess, the "Affected Securities")[Note 1] giving rise to a right of rescission among certain purchasers of Affected Securities requiring BBPLC to repurchase the Affected Securities at their original purchase price.  As a result, BBPLC has elected to conduct a rescission offer to eligible purchasers of the Affected Securities.  Details of the rescission offer will be published by BBPLC in due course.</u>**

> Based on current market prices of the Affected Securities and the estimated pool of potentially eligible purchasers electing to participate in the rescission offer, **<u>Barclays expects the rescission losses (net of tax) to be c.£450m…</u>**

> The above represents Barclays' best estimate at this time of losses which may arise from these matters and will be reflected in BPLC's Q122 Results Announcement.

> Barclays is also assessing the impact of these matters on prior period financial statements of BBPLC….

> Barclays has commissioned an independent review of the facts and circumstances relating to this matter including, among other things, the control environment related to such issuances.   Separately, regulatory authorities are conducting inquiries and making requests for information….

> Note 1: **<u>In August 2019, BBPLC registered US$20.8bn in maximum aggregate offering price of securities (the "Registered Amount")</u> *and has exceeded the Registered Amount by approximately US$15.2bn.*** [72]

161.    In response to this shocking news, on March 28, 2022, the price of Barclays' ADRs

declined $0.96 per ADR, <u>plunging 10.61%</u>, from a closing price on Friday, March 25, 2022 of

$9.05 per ADR to a closing price of $8.09 per ADR on Monday, March 28, 2022 (the next trading

day) on uncharacteristically heavy volume of more than six times the average daily trading volume

of Barclays' ADRs.

---

[72] Text that is **<u>bolded and underlined</u>** in this Section indicates the partial revelation of the truth or the materialization of previously undisclosed risks.

162.    Notwithstanding Barclays' March 28, 2022 disclosure, Defendants' statements concerning the size of the over-issuance and the affected Shelf Registration Statements, contained in ¶160, were materially false and/or misleading when made in that they failed to disclose:

(a)    that Barclays had sold and was continuing to sell unregistered securities in excess of the amounts registered by the 2018 Shelf Registration Statement.

(b)    As a result, Barclays' litigation and conduct expenses and total operating expenses as reported in the Barclays 2021 Form 20-F were materially understated, and profit-before-tax and profit-after-tax, as reported in the Barclays 2021 Form 20-F, were materially overstated.

163.    Furthermore, following Barclays' assessment of the "impact of the over-issuance on prior period financial statements," Barclays, in connection with its auditor KPMG, determined it was necessary to restate Barclays' financial statements for the year ended December 31, 2021, to reflect approximately $300 million USD in additional "litigation and conduct charges"[73] and a material weakness in ICFR.

164.    A restatement, which is the process of revising previously issued financial statements to reflect the correction of an error, is significant.  The provisions of generally accepted accounting principles do not apply to immaterial items, meaning that by definition, Barclays concluded that the error was material to the users of the Company's financial statements.  It is also noteworthy that Barclays restated the Company's 2021 Form 20-F despite the issues purportedly rising to the level of Barclays senior management in March 2022, which was after the Company's balance sheet date of December 31, 2021.  Companies are only required to restate in this

---

[73] In its Amended Form 20-F/A, filed May 23 2022, Barclays defined "litigation and conduct charges" to include "regulatory fines, litigation settlements and conduct-related customer redress."

circumstance if additional evidence emerges about conditions that existed contemporaneously as of the balance sheet date, meaning that Barclays senior management had information available to it during fiscal 2021 that should have allowed it to avoid the error.

165.    Analysts quickly commented on the news of the over-issuance and forthcoming rescission offer.

(a)    On March 28, 2022, UBS issued an analyst report on Barclays, entitled "Structured product loss & control weakness delivers repurchase losses, CET1 hits, delays buyback and potential regulatory costs," noting that, "an important and costly control issue like this necessarily – as confirmed by the company – leads to an internal review and 'enquiries and requests for information' from regulators.  We could, we think, see increased operational risk capital requirements in addition to the refund loss and associated review process and control remediation opex [operating expense].  We'd expect such costs to be modest but flag regulatory consequences as a key uncertainty."

(b)    An analyst report issued by Jeffries on March 28, 2022, entitled "£450m Hit from Structure Note Matter; £1bn Buyback to Start After Q1 Results," described Barclays' announcement of the over-issuance as "[a]n unhelpful matter which has triggered an independent review around the control environment + regulatory enquiries may weigh on sentiment."

166.    Due to the costs and charges related to the over-issuance, Barclays was forced to delay a share buyback it had planned to undertake in Q1 2022.

167.    News articles also highlighted the revelation of Barclays' over-issuance and remarked on how it reflected poorly on Defendant Venkat who had been the Company's Chief Risk Officer the entire time Barclays was an ineligible issuer (May 2017 – May 2020).

(a)    For example, on March 28, 2022, *Reuters* published an article entitled "Barclays faces $590 million hit, scrutiny over sales slip-up," declaring that "[t]he major

regulatory blunder is an early embarrassment for C.S. Venkatakrishnan, the newly appointed chief executive of Barclays, whose previous roles included heading up the bank's global markets and risk operations."

(b)     Also, on March 28, 2022, the *Financial Times* published an article entitled "Barclays expects £450mn hit from $15bn US trading error," in which it deemed the over-issuance and forthcoming rescission offer "episode" as "an embarrassing early blow for new chief executive CS Venkatakrishnan, who was group chief risk officer at the time of the sales."

## 2.     April 28, 2022: Q1 2022 Results and Filing of Form 6-K

168.    On April 28, 2022, during the trading day, Barclays issued its Q1 2022 Results Announcement which contained financial results for the three months ended March 31, 2022 ("Q1 2022 RA").  A copy of the Q1 2022 RA was filed by Barclays with the SEC as Exhibit 99.1 to a Form 6-K on April 28, 2022.

169.    In the Q1 2022 RA, Barclays provided additional information on the over-issuance, including that BBPLC had started selling securities in excess of the $20.76 billion maximum aggregate amount registered under the 2019 Shelf Registration Statement by no later than February 18, 2021, and updating the market on reserves and liabilities related to the over-issuance:

> ***Barclays has a provision of £540m at Q122 relating to this matter, £320m (post-tax impact of £240m) of which was recognised in Q122 and £220m (post-tax of £170m) recognised in 2021 in relation to the c.US$13bn over issuance of structured notes which represents the best estimate of the rescission right investors have for these securities***.  A contingent liability exists in relation to the c.US$2bn over issuance of ETNs due to evidentiary challenges and the high level of trading in the securities.  A contingent liability also exists in relation to any potential claims or enforcement actions taken against Barclays Bank PLC but there is currently no indication of the timetable for resolution and it is not practicable to provide an estimate of the financial effects.  Barclays Bank PLC is unable to assess the likelihood of liabilities that may arise out of any civil claims or enforcement actions.  Any such liabilities, claims or actions could have an adverse effect on Barclays Bank PLC's and the Group's business, financial condition, results of operations and reputation as a frequent issuer in the securities markets.

170.    In the Q1 2022 RA, Barclays admitted that the securities sold in excess of the maximum aggregate amount were unregistered and that there was the potential for civil claims and regulatory enforcement actions to be brought against BBPLC:

> Securities issued in excess of the limit are considered to be 'unregistered securities' for the purposes of US securities law with [] certain purchasers of those securities having the right to require [BBPLC] to repurchase those securities at their original purchase price with compensatory interest and the potential for the certain purchasers to bring civil claims and the SEC and other regulators to take enforcement actions against [BBPLC].

171.    In the Q1 2022 RA, Barclays stated that, as a result of the over-issuance, it would restate the financial statements in BBPLC's 2021 Annual Report on Form 20-F, filed by BBPLC with the SEC on February 23, 2022, and was in discussions with the SEC as to whether it would need to withdraw, refile, or restate BPLC's financial statements included in the 2021 Form 20-F (discussed above at ¶¶151–53):

> Financial Statements in BPLC 2021 Form 20-F: Barclays is currently in discussions with the SEC regarding whether the fact that the financial statements of BPLC included in its Annual Report on Form 20-F for the year ended 31 December 2021 (the BPLC 2021 Form 20-F) do not reflect the £220m provision at 31 December 2021 for the over-issuance of structured notes and a contingent liability disclosure in respect of the over-issuance of exchange traded notes (ETNs) and related potential claims and enforcement actions against BBPLC and its affiliates constitutes a material accounting error under US securities laws.  Depending on the outcome of those discussions, Barclays may be required to withdraw and refile (Restate or Restatement) the financial statements included in the BPLC 2021 Form 20-F to reflect these matters.  In any event, Barclays will be required to reflect the financial impact of these matters by adjusting the comparative financial periods in its subsequent financial filings until the error has been fully corrected….
>
> *[D]ue to the lower applicable materiality threshold for BBPLC, on 27 April 2022 the directors of BBPLC determined that BBPLC would Restate the financial statements included in its Annual Report on Form 20-F for the year ended 31 December 2021 (the BBPLC 2021 20-F) previously filed with the SEC*.  BBPLC intends to Restate such financial statements to reflect both the provision and the contingent liability referred to above.  There will therefore be differences between the 2021 financial statements included in the BBPLC 2021 Form 20-F once amended and the BBPLC 2021 ARA, and investors are therefore cautioned to exercise care in using these financial statements during the course of 2022.

172.    The Q1 2022 RA also confirmed what the March 28, 2022 had already make clear to the market—Barclays' internal controls were not effective and had a material weakness:

> [M]anagement has concluded that, by virtue of the fact that the over-issuance occurred and was not immediately identified, both BPLC and BBPLC had a material weakness in relation to certain aspects of their internal control environment and, as a consequence, their internal control over financial reporting for the year ended 31 December 2021 was not effective under the applicable Committee of Sponsoring Organizations (COSO) Framework.  The material weakness that has been identified relates to a failure to monitor issuances of structured notes and ETNs under BBPLC's US Shelf during the period in which BBPLC's status changed from a "well-known seasoned issuer" to an "ineligible issuer" for US securities law purposes, and BBPLC was required to pre-register a set amount of securities to be issued under its US Shelf with the SEC.  As a result of this failure, BBPLC issued securities in excess of that set amount.

173.    The Q1 2022 RA also revealed that Barclays and BBPLC would be filing amendments to their respective 2021 Forms 20-F as a result of the material weakness in internal controls:

> Amendments to Forms 20-F: BPLC is preparing an amendment to the BPLC 2021 Form 20-F to reflect the change in management's assessment of BPLC's internal control over financial reporting and KPMG's auditor attestation thereon as well as its disclosure controls and procedures.  BBPLC is preparing an amendment to the BBPLC 2021 Form 20-F to include its Restated 2021 financial statements and to reflect the change in management's assessment of internal control over financial reporting and disclosure controls and procedures.  These amendments will be filed as soon as practicable.

174.    The Q1 2022 RA also cautioned that investors should not rely on BPLC's or BBPLC's 2021 Forms 20-F:

> Until the BPLC 2021 Form 20-F has been amended to disclose that its internal controls were not effective, KPMG's audit report should not be relied upon by users of BPLC's financial statements.  Until BBPLC has Restated its financial statements for the year ended 31 December 2021 and amended the BBPLC 2021 Form 20-F, investors and other users of BBPLC's filings with the SEC are cautioned not to rely on the financial statements included in the BBPLC 2021 Form 20-F.

175.    The Q1 2022 RA also revealed that a portion of the costs associated with the upcoming Rescission Offer for the unregistered securities issued in excess of the amounts

registered by the 2019 Shelf Registration Statement "are attributable to the financial statements for the year ended 31 December 2021," and "[t]his omission in the financial statements has resulted in the restatement of the prior period comparatives with the following impact":

> - ***Litigation and conduct charges in the income statement in relation to 2021 were under reported by £220m increasing total operating expenses from a reported £14,439m to £14,659m. Provisions on the balance sheet have increased from a reported £1,688m to £1,908.***

*   *   *

> The overall impact of the restatement on the 2021 comparatives has been to reduce the reported profit after tax from £7,226m to £7,056m for the full financial year. This reduction in profit after tax was incurred after Q121 and as such, no adjustments have been made to the Q121 reported income statement figures.

> Reflecting this adjustment in this Q122 results announcement results in a pre-tax provision of £220m (£170m post-tax) being reflected as at 31 December 2021. This reduces the 2022 impact of the provision previously communicated on 28 March 2022 and results in a pre-tax provision of £320m (£240m post-tax) being recognised in Q122. Had such adjustment not been made the impact on the key performance ratios for Q122 would have been to reduce the return on average tangible shareholders equity to 10.1% and increase the cost:income ratio to 67%.

176.    Defendants' statements at ¶¶169, 171, 175 were materially false and/or misleading when made for the reasons described in ¶162.

### 3.    May 4, 2022: Barclays Annual General Meeting

177.    On May 4, 2022, Barclays held its 2022 Annual General Meeting (AGM), where Nigel Higgins, Chairman of Barclays, and Defendant Venkatakrishnan addressed investors in their 2022 AGM Statements. In his 2022 AGM Statement, Higgins addressed the over-issuance:

> As I have said before, we do not get everything right. Let me say a few words about our recently reported failure to comply with SEC registration requirements, a failure which has cost us hundreds of millions of pounds, and more in reputation. First, all of us here were dismayed that, after so much progress, we had this entirely self-inflicted problem. We have not yet finished the review, but I believe that we will find that, in all our complexities, we missed some simple tasks. This is not rocket science and we can and will do better, learning the lessons from this particular issue and applying discipline across all of our controls.

178.     Venkatakrishnan also addressed the over-issuance in his remarks on May 4, 2022:

Our strong performance in 2021 has carried over into the first quarter of this year, although we have seen a disappointing increase in costs.  This has been driven in particular by the over-issuance of securities in the US, which Nigel talked about.  Let me echo his comments.  This situation was entirely avoidable, and I am deeply disappointed that it occurred.

The necessity of a strong controls culture has never been clearer to me.  In fact, we have made considerable progress improving our controls since 2016.  So the fact that this happened is particularly upsetting.

179.     From statements by Higgins and Venkatakrishnan that the over-issuance from the 2019 Shelf Registration Statement was entirely avoidable, that: (i) it was a simple control that was not in place, and (ii) that it was not "rocket science" to stop the over-issuance from taking place, the Court can infer that Defendants were reckless in creating, or in failing to create, effective and adequate internal controls which would have tracked securities issued under the Company's shelf registration statements and would have identified when the Company was close to exceeding the amount of securities registered with the SEC.

### 4.     May 16, 2022: Barclays Announces The Need to Restate Its 2021 Financial Statements

180.     On May 16, 2022, before the market opened, Barclays issued a press release which announced that on May 13, 2022 , the Company's Board of Directors had concluded that Barclays would restate the financial statements included in the 2021 Form 20-F and that investors and other users of Barclays' filings with the SEC were "cautioned not to rely on the financial statements included in the 2021 Form 20-F, or KPMG LLP's audit report thereon, until the amended 2021 Form 20-F has been filed."

181.     A copy of the May 16, 2022 press release was filed by Barclays with the SEC on Form 6-K on May 16, 2022.

5.      **May 23, 2022: Barclays Files Amended Form 20-F Restating 2021 Financial Results**

182.    On May 23, 2022, during the trading day, Barclays filed its an Amended 2021 Annual Report on Form 20-F ("Barclays 2021 20-F/A") with the SEC, which, among other things:

(a)      "reflect[ed] the restatement of the Company's financial statements and consolidated financial statements as at and for the year ended 31 December 2021, including the notes thereto (Restated Financial Statements), which are hereby refiled to reflect both *a £220m litigation and conduct provision* and associated income statement charge recognised in the year ended 31 December 2021 and *a contingent liability disclosure in respect of the impact of the c.$15bn over-issuance of securities by Barclays Bank PLC (BBPLC) in excess of the maximum aggregate offering price registered under BBPLC's Registration Statement on Form F-3*, as declared effective by the SEC in August 2019 (2019 F-3) (the Over-issuance of Securities), and related potential claims and enforcement actions against BBPLC and its affiliates, as well as a small number of non-adjusting post-balance sheet events, as described in further detail under Note 1a to the Restated Financial Statements";

(b)      amended various disclosures and risk factors in the 2021 20-F "to reflect management's conclusion that the Company's internal control over financial reporting and disclosure controls and procedures were not effective under the applicable Committee of Sponsoring Organizations (COSO) Framework as at 31 December 2021 due to a material weakness in the Company's internal control over financial reporting identified subsequent to the Original Filing Date as a result of the Over-issuance of Securities having occurred and not being immediately identified, as publicly disclosed by the Company in its announcement of 28 March 2022, and to disclose the remediation efforts undertaken by the Company's management as at the date of this filing" and

(c)     "include[d]   the   revised   Report   of   Independent   Registered   Public
Accounting Firm of KPMG LLP (KPMG) on the Restated Financial Statements" and "Internal
Controls Over Financial Reporting."

183.     Specifically, Barclays' 2021 Form 20-F/A stated, in pertinent part:

**Impact of over-issuance of securities in the US**

In March 2022, the Group became aware that BBPLC had issued securities in
excess of the amount it had pre-registered with the SEC under BBPLC's 2019 F-3.
The securities issued in excess of the registered amount comprised structured
products and exchange traded notes. As these securities were not issued in
compliance with the Securities Act, a right of rescission has arisen for certain
purchasers of the securities. A proportion of these costs associated with the right of
rescission are attributable to the financial statements for the year ended 31
December 2021. This omission in the financial statements has resulted in the
restatement of the 2021 figures in the disclosures below. ***Litigation and conduct
charges in the income statement in relation to 2021 were under reported by
£220m (pre-tax)***[74]…The leverage exposure increased £1.9bn to recognise on a
regulatory basis, the potential commitment relating to the rescission offer.

\*   \*   \*

£7bn of capital generated from profits, after absorbing the impact of the £0.2bn
litigation and conduct charge relating to the over-issuance of securities in the US,
were partially offset by distributions of £3bn comprising:

  • £1bn of dividends paid and foreseen for ordinary shares, which includes
  £0.3bn half year dividend and a £0.7bn accrual towards the 2021 full year
  dividend

  • £1.2bn for share buybacks made up of £0.7bn for the share buyback
  announced with FY20 results and £0.5bn for the share buyback announced
  with H121 results; and

  • £0.8bn of equity coupons paid

\*   \*   \*

The Group continued to incur costs in relation to litigation and conduct matters,
refer to Note 26 Legal, competition and regulatory matters and Note 24 Provisions
for further details. Costs include customer redress and remediation, as well as fines
and settlements. Resolution of these matters remains a necessary and important part

---

[74] Approximately $275 million (USD) as of May 23, 2022.

of delivering the Group's strategy and an ongoing commitment to improve oversight of culture and conduct.

\*   \*   \*

**1a Restatement of financial statements**

Barclays PLC has restated these financial statements to reflect both a provision and a contingent liability disclosure in respect of the impact of an over-issuance of securities in excess of the maximum aggregate offering price registered under BBPLC's registration statement on Form F-3, as declared effective by the SEC in August 2019 (2019 F-3).

Due to a historic SEC settlement order, at the time the 2019 F-3 was filed, BBPLC had ceased to be a "well-known seasoned issuer" (or WKSI) and had become an "ineligible issuer," as defined in Rule 405 under the Securities Act of 1933, as amended (Securities Act), thus being required to register upfront a certain amount of securities with the SEC.

In March 2022, BBPLC became aware that it had issued securities in the US in excess of the amount it had registered with the SEC under the 2019 F-3. It has been estimated that the maximum offering price set forth in the 2019 F-3 was exceeded in February 2021, with issuances through to March 2022 exceeding the $20.8bn limit by approximately $15bn. The securities that were issued in this period comprise structured notes and exchange traded notes (ETNs). As such, certain offers and sales of these securities were not made in compliance with the Securities Act, giving rise to rights of rescission for certain purchasers of the securities. Under Section 12(a)(1) of the Securities Act, certain purchasers of unregistered securities have a right to recover, upon the tender of such security, the consideration paid for such security with interest, less the amount of any income received, or damages if the purchaser no longer owns the security (the Rescission Price). As a result, BBPLC has elected to make a rescission offer to eligible purchasers of the relevant affected securities at the Rescission Price.

A proportion of the expected costs associated with the rights of rescission of certain investors are attributable to Barclays PLC's financial statements for the year ended 31 December 2021. Accordingly, Barclays PLC's financial statements have been restated. The restatement impacts the consolidated income statement, the consolidated statement of comprehensive income, the consolidated balance sheet, the consolidated statement of changes in equity, and the consolidated cash flow statement for the year ended 31 December 2021.

\*   \*   \*

The impact of the restatement is as follows:

• Litigation and conduct charges in the income statement for the year ended 31 December 2021 were under reported by £220m, increasing total operating expenses from a reported £14,439m to £14,659m.

• Provisions on the consolidated balance sheet have increased from a reported £1,688m to £1,908m.

• The taxation charge in the income statement has reduced by £50m from a reported £1,188m to £1,138m with a corresponding decrease in current tax liabilities on the balance sheet from £739m to £689m.

• The overall impact of the restatement has been to reduce reported profit after tax from £7,226m to £7,056m.

• The consolidated financial statements have been restated for the increased provision of £220m and lower tax charge of £50m.

• The contractual maturity profile of financial liabilities designated at fair value has been restated to reflect the impact of the over-issuance of securities.[75]

184.    The 2021 20-F/A was signed by Defendant Cross, the Group Finance Director who succeeded Defendant Morzaria on April 22, 2022.

185.    Defendants' statements, contained in ¶¶182–83, were materially false and/or misleading when made for the reasons described in ¶162.

### 6.    July 25, 2022: Details of Recission Offer Announced

186.    On July 25, 2022, before the market opened, Barclays issued a press release, filed on Form 6-K with the SEC, announcing the scheduled commencement of the rescission offer on August 1, 2022 for a total of approximately "$17.6 billion of relevant securities issued in excess

---

[75] In its September 29, 2022 Cease and Desist Order, the SEC ordered Barclay to pay more than $161 million in disgorgement and prejudgment interest which the SEC Order states, "does not exceed BBPLC's net profits from its violations." Ultimately, the SEC determined that payment of the more than $161 million in disgorgement amounts was deemed satisfied by Barclays' offer of rescission to impacted investors.  SEC Order, at 11. Thus, Barclays' net profits from its improper sale of unregistered securities in 2021 were at least $150 million which should have been reversed by the Company in its Form 20-F/A for the year ended December 31, 2021. Indeed, all of the ill-gotten profits from the sale of the $17.7 billion in unregistered securities should have been reversed or restated.

of amounts registered by BBPLC under its U.S. shelf registration statements. Such securities consist of c.U.S.$14.8 billion of structured notes and c.U.S.$2.8 billion of exchange traded notes."[76]

### 7.    July 28, 2022: Q2 2022 Results and Revelation of Additional Over-Issuance (Second Disclosure)

187.    On July 28, 2022, before the market opened, Barclays issued interim financial results for the six-month period ending June 30, 2022 ("Q2 2022 RA").  A copy of the Q2 2022 RA was filed by Barclays with the SEC as Exhibit 99.1 to Form 6-K on July 28, 2022.

188.    In the Q2 2022 RA, Barclays informed investors for the first time that BBPLC had also over-issued $1.3 billion worth of unregistered securities under a second shelf registration statement noting that: "while the vast majority of the over-issuance occurred under the [2019 Shelf Registration Statement], **a small portion of the over-issuance also occurred under the Predecessor Shelf [the 2018 Shelf Registration Statement]**."  **This revelation brought the total value of the over-issuance to approximately $17.7 billion**.

189.    In the Q2 2022 RA, Barclays also updated its reserves for the rescission offer and regulatory and civil liability related to the over-issuance and rescission offer:

> **As at 30 June 2022, Barclays PLC has recogni[z]ed a balance sheet provision of £1,757m (December 2021: £220m) in relation to this matter, out of which £1,592m [approximately $1.940 billion] (December 2021: £220m) relates to the overissuance of structured notes and £165m [approximately $201 million] (December 2021: nil) relates to liabilities that could be incurred arising out of ongoing discussions in respect of a potential SEC resolution**.

---

[76] On August 1, 2022, Barclays filed a Form 424B5 with the SEC and commenced a rescission offer for $17.6 billion overissued securities that were sold pursuant to the March 2018 Shelf Registration Statement and August 2019 Shelf Registration Statement, whereby BBPLC offered "to repurchase the applicable securities from relevant purchasers who acquired such securities, at their purchase price plus interest, less the amount of any interest, coupon payments, principal or other income received pursuant to the terms of the securities, or to pay rescissory damages if such securities, after being purchased, were sold, redeemed or matured at a loss." BBPLC Rescission Offer (Aug. 1, 2022) ("BBPLC Rescission Offer"), at S-6.

190.    In response to this news, on July 28, 2022, the price of Barclays ADRs declined $0.41 per ADR, or 5.2%, falling from a closing price of $7.89 per ADR on July 27, 2022, to a closing price of $7.48 per ADR on July 28, 2022.

191.    News publications were swift to tie the Q2 2022 RA to the over-issuance and charges associated with the rescission offer and other legal issues.

(a)    For example, *Yahoo! Finance* reported in a July 28, 2022 article entitled "Barclays profits slump as US trading error bites" that Barclays profits "slumped 24% in the first half [of 2022] after a costly trading error in the US" and that the Company's "results were marred by a £1.3bn charge in the half to cover the costs of buying back $17.6bn worth of securities [Barclays] sold in breach of US regulations."

(b)    That same day, in an article entitled "Barclays posts profit slump after hit from costly trading error in the U.S." *CNBC* reported that the Company's "slump in second-quarter profit" was due to a "substantial provision relating to a costly trading error in the U.S."

**8.    October 26, 2022: Q3 2022 Results and Filing of Form 6-K**

192.    On October 26, 2022, before the market opened, Barclays issued interim financial results for the period ending September 30, 2022 ("Q3 2022 RA").  A copy of the Q3 2022 RA was filed by Barclays with the SEC on as Exhibit 99.1 to Form 6-K on October 26, 2022.

193.    In the Q3 2022 RA, Barclays included a discussion of the securities over-issuances in a section called "Group Finance Director's [i.e. Cross's] Review."  Specifically, Barclays revealed purported findings from its "external counsel-led review" (the "Review") investigating "the facts and circumstances relating to the over-issuance and the control environment related to such issuances is now complete." Barclays reported:

The Review found that the over-issuance occurred because Barclays did not put in place a mechanism to track issuances after BBPLC was subjected to a limit on issuance.  Among the principal causes of the over-issuance were, first, the failure

to identify and escalate to senior executives the consequences of the loss of well-known seasoned issuer status, and, secondly, a decentralised ownership structure for securities issuance.

***

*The Review further concluded that the over-issuance was not the result of a general lack of attention to controls by Barclays, and that Barclays' management has consistently emphasised the importance of maintaining effective controls.*

194.    Defendants' statement that the over-issuance was not the result of a general lack of attention to internal controls by Barclays, contained in ¶193, was materially false and/or misleading when made in that it failed to disclose:

(a)    that the Barclays Board was continuing to assess the situation surrounding the over-issuance and had yet to issue its final report assessing the individuals responsible for the over-issuance and its overall negative impact on Barclays' financials for the year ended December 31, 2022; and

(b)    the harm to the Company's reputation and standing in the U.S. structured note market caused by the magnitude of the over-issuance.

## VII.    THE FULL TRUTH IS REVEALED AS BARCLAYS DISCLOSES COMPENSATION CLAWBACKS FOR RESPONSIBLE EXECUTIVES

### A.    February 15, 2023: Revelation that FY 2022 Results and Defendant Compensation Was Impacted by Defendants' Fraud (Final Disclosure)

195.    On February 15, 2023, Barclays reported a full-year net profit of £5.023 billion ($6.07 billion) for 2022, beating consensus expectations of £4.95 billion, **but suffering a 19% fall from the previous year's restated profit of £6.2 billion, in part due to "a costly trading blunder in the U.S**.["][77]    Fourth-quarter attributable profit was £1.04 billion, above analyst

---

[77] Other articles claim "Barclays reported a near 15% drop in pre-tax profits to £7bn for the whole of 2022, down from £8.2bn a year earlier. That was lower than analysts' expectations of £7.2bn in annual profits." Kalyeena Makortoff. *Barclays staff to share £1.2bn in bonuses despite drop in*

- 71 -

projections of £833.29 million but down 4% from the £1.08 billion posted in the fourth quarter of 2021.  Pretax profit for the fourth quarter came in at £1.31 billion, short of a consensus forecast of £1.5 billion, while full-year pretax profit fell 14% to £7 billion.

196.    The Company's earnings announcement noted that "**Group operating expenses were £16.7bn, reflecting £1.6bn of litigation and conduct charges, primarily driven by the Over-issuance of Securities**" and "**Litigation and conduct charges were £1,597m (2021: £397m) including £966m from the Over-issuance of Securities**."  The announcement also stated, in pertinent part:

> **Over-issuance of Securities: Barclays recognised a net attributable loss of £0.6bn in 2022 (£nil in Q422, £0.7bn total loss including 2021). This included a monetary penalty of $200m (£165m) following the resolution of the SEC's investigation of BPLC and BBPLC relating to the Over-issuance of Securities**.
>
> As previously disclosed, Barclays has a contingent liability in relation to current and potential private civil claims and other potential enforcement actions relating to the Over-issuance of Securities. For further details see Restatement of financial statements (Note 1a) in the BPLC 2022 Annual Report on page 428.

197.    Additionally, with respect to Barclays' U.S. structured note business, as a result of Barclays' halting of any new issuances after its first discovery of the over-issuance in early March 2022, the Company's share of the structured note market in the United States dropped from "14% in the first half of 2021 to under 5% a year later."[78]

198.    On February 15, 2023, Barclays also filed its Report on 2022 Form 20-F with the SEC for the year-ended December 31, 2022.  Among other things, the report discussed the material

---

*profits*,   THE   GUARDIAN   (Feb.   15,   2023),   *available   at* https://www.theguardian.com/business/2023/feb/15/barclays-staff-bonuses-drop-in-profits.

[78]  Christopher Whittal.   *Barclays plans US structured note rebound after hefty loss*, INTERNATIONAL   FINANCING   REVIEW   (Feb.   17,   2023),   *available   at* https://www.ifre.com/story/3753899/barclays-eyes-us-structured-note-rebound-after-hefty-loss-ps4s7x63lb.

weakness in Barclays internal control over financial reporting as of December 31, 2021. The 2022

Form 20-F noted, in part:

### Identification and Remediation of a Material Weakness

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

In March 2022, the Company's management became aware that BBPLC had issued securities materially in excess of the amount BBPLC had registered with the SEC under its 2019 US shelf registration statement and subsequently became aware that securities had also been issued in excess of the set amount under the predecessor US shelf registration statement. A proportion of the costs associated with the impact of the Over-issuance of Securities was attributable to the Company's financial statements for the year ended 31 December 2021. Accordingly, in the UK, the Company has restated the prior period comparatives in BBPLC's 2022 UK Annual Report and Accounts to reflect the impact of the Overissuance of Securities. In the US, the Company amended its annual report on Form 20-F for the year ended 31 December 2021 to include restated financial statements to reflect the impact of the Over-issuance of Securities.

**The fact that the Over-issuance of Securities occurred and was not immediately identified highlighted a weakness in controls over the identification of external regulatory limits related to securities issuance and monitoring against these limits that constituted a material weakness in internal control over financial reporting under "COSO Principle 9: Identifies and Analyses Significant Change - The organization identifies and assesses changes that could significantly impact the system of internal control".**

Since the identification of this material weakness, management has strengthened the internal controls relating to the tracking of issuance programme limits through the implementation and strengthening of a series of controls across the Barclays Group, together with central governance, with key actions being:

- development of a Group Issuance Standard, which includes minimum control requirements

- documentation of, and agreement on roles and responsibilities

- implementation of a Group Issuance Oversight Committee, with senior management representation, to monitor issuance activity against agreed limits

The strengthened controls over financial reporting have operated for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively.

**Changes in internal control over financial reporting**

As noted above, management has strengthened and effectively operated controls to remediate the material weakness in respect of the Over-issuance of Securities which was identified in March 2022. These remediation efforts represent a significant improvement to the Company's internal control environment. There have been no other changes to highlight during the period covered by this report, which have materially affected or are reasonably likely to materially affect the Barclays Bank Group's internal control over financial reporting.

\* \* \*

**Litigation and conduct charges were £1,189m (2021: £237m) including £966m in relation to the Over-issuance of Securities** …

\* \* \*

**The Barclays Bank Group is engaged with, and responding to inquiries and requests for information from, various other regulators who may seek to impose fines, penalties and/or other sanctions as a result of this matter.** Furthermore, Barclays Bank PLC and/or its affiliates may incur costs and liabilities in relation to private civil claims which have been filed and may face other potential private civil claims, class actions or other enforcement actions in relation to this matter. By way of example. . .in February 2023, a claim was brought in a New York federal court by holders of a series of ETNs alleging that Barclays' failure to disclose that these ETNs were unregistered securities misled investors and that, as a result, Barclays is liable for the holders' alleged losses following the suspension of further sales and issuances of such series of ETNs.

Following completion of the rescission offer on 12 September 2022, Barclays utilised a provision of £1,008m in settlement of valid structured note claims and paid a monetary penalty of $200m (£165m ) to the SEC. **A contingent liability exists in relation to civil claims or any further enforcement actions taken against Barclays Bank PLC and/or its affiliates, but Barclays Bank PLC is unable to assess the likelihood of liabilities that may arise out of such claims or actions**.

Any liabilities, claims or actions in connection with the over-issuance of securities under Barclays Bank PLC's US shelf registration statements could have an adverse effect on Barclays Bank PLC's and the Barclays Bank Group's business, financial condition, results of operations and reputation as a frequent issuer in the securities markets.

199.    Barclays' 2022 Form 20-F also revealed, for the first time, that as a result of the over-issuances, the Company was clawing back compensation from certain of the Individual Defendants (including Venkatakrishnan, also known at Venkat, Morzaria, and Cross) because of their responsibility in the failure to implement effective internal controls over financial reporting to prevent the over-issuance following Barclays' loss of WKSI privileges in May 2017.

200.    In notes from Brian Gilvary, Chair of Barclays' Remuneration Committee, under the title "Risk and control impacts on remuneration," Barclays disclosed the following:

**Risk and control impacts on remuneration**

We have considered the significant impact on the Group of risk and control issues during 2022 throughout our remuneration decision-making this year, including the financial impact, the reputational impacts and how these events reflect on our control environment.

Principally, our consideration has been focused on the incentive pool for 2022. **Our incentive funding incorporates a significant reduction to reflect the impact of risk and control issues, as referenced above. The Over-issuance of Securities in the US was a key factor in determining these remuneration impacts and accounts for the majority of the incentive pool reduction. The monetary penalties imposed by the SEC and CFTC for the use of unauthorised business communications channels were also taken into account**.

**2022 incentive pool reduction c.£500m**

This reduction was c.£500m, which had an impact across the whole of Barclays **but was more focused in the areas of the Group closest to where the incidents occurred, resulting in larger year-on-year reductions in those areas. . . our review of individuals who may be considered responsible or otherwise accountable for the over-issuance is progressing. Once concluded, appropriate action will be taken including negative adjustment to variable remuneration where applicable. As that review is ongoing, unvested variable remuneration of relevant persons will be suspended as required to allow the review to run its course**.

For the Executive Directors, the financial measures for both the 2022 bonus and the 2020-2022 LTIP awards are defined as excluding material items (material one-off items that are typically called out within our financial reporting). The Committee exercised its discretion not to exclude the impacts associated with the Over-issuance of Securities in the US or the monetary penalties imposed by the SEC and CFTC for the use of unauthorised business communications channels. **As a result, the 2022 annual bonus awards were £403,000, £166,000 and £76,000 lower**

**than they would otherwise have been, for Venkat, Anna and Tushar respectively (after pro-rating for Anna and Tushar). The 2020-2022 LTIP vesting outcome was 5% less than it might have been, as the Committee set the Control environment element of the LTIP Risk scorecard to zero.**

**In addition, the Committee reduced the 2021 annual bonus outcomes for Venkat and Tushar, and the 2019-2021 LTIP outcome for Tushar, to reflect the impact of the restatement of the 2021 financial statements on the financial metrics for those awards, as outlined earlier**.

In summary, the aggregate remuneration impacts for the Executive Directors in this respect are as shown in the following table:

| Executive Directors' incentive outcomes | Reduction |
|---|---|
| 2022 bonus outcomes | £ 645,000 |
| 2020-2022 LTIP outcome | £ 213,000 |
| 2021 bonus outcomes | £  30,000 |
| 2019-2021 LTIP outcome | £ 116,000 |
| Total | £1,004,000 |

201.    During the Company's earnings call on February 15, 2023, CEO Venkatakrishnan stated, in part: "While our performance in 2022 was very gratifying overall, it was marred by the over-issuance of securities in the U.S., which I have discussed previously.  I am determined that an incident like this should not happen again.  And we are committed in Barclays to operating at a very high level, reliably and consistently, day in and day out.  Our focus will be on high-quality client service on shedding complexity and achieving operational excellence."  On the same earnings call, Anna Cross, Barclays' Group Finance Director stated: "Our Corporate and Investment Bank delivered 10.2% despite the effects of the over-issuance of securities."

202.    In response to this news, on February 15, 2023, Barclays' ADRs fell 8.35%, dropping from $9.22 per ADR on February 14, 2023 to $8.45 per ADR on February 15, 2023.

203.    The market was quick to comment on the news.  On February 15, 2023, in an article entitled, "Barclays staff to share £1.2bn in bonuses despite drop in profits," *The Guardian* reported that:

Barclays' profits were hit, in part, by the £1.2bn it put aside for a potential increase in defaults by customers, who are considered more at risk of falling behind on payments given the uncertain economic outlook.

*   *   *

Barclays' profits were also knocked by £1.6bn in legal and misconduct charges. That figure includes the costs of rectifying a trading blunder that led to the sale of US securities that Barclays had not been authorised to sell. Barclays not only had to pay a US fine for the error but also had to buy back the securities it wrongly sold.

204.    On February 15, 2023, in an article entitled "Barclays docks execs' pay by 1 million pounds over regulatory failures," *Reuters* reported:

Barclays (BARC.L) has docked the pay of some top executives by a combined 1 million pounds ($1.2 million) following regulatory missteps and a costly overissuance of billions of dollars' worth of investment products in the United States.

The British bank said in its annual report it had cut the 2022 bonus for Chief Executive C.S. Venkatakrishnan by 403,000 pounds, while Finance Chief Anna Cross saw her compensation docked by 166,000 pounds.

Some long-term awards have also been clawed back, the bank said, including from ex-finance chief Tushar Morzaria.

Barclays' overall bonus pool dipped to 1.8 billion pounds for 2022 from 1.9 billion the previous year, as a plunge in investment banking fees soured its finances and sent its shares sharply lower.

*   *   *

Barclays said [former CEO Jes] Staley was contractually entitled to the payments during his 12-month notice period after leaving in October 2021, adding it had made no further decision on clawing back pay or awards pending the outcome of the investigation. Staley's unvested awards remain suspended, the bank said.

Barclays said the bonus cuts for executives also reflected a fine from U.S. authorities over the use of unauthorized communication channels by staff, after a wider regulatory crackdown on bankers' use of platforms such as WhatsApp for sharing market-sensitive information.

205.    Analysts reacted negatively to Barclays' February 15, 2023 announcement of its surprisingly large drop in 2022 profits especially as rising interest rates should have boosted the

bank's returns, and directly attributed the 2022 profit drop to Barclay's over-issuance fiasco.  For example:

        (a)      On February 15, 2023, *Reuters* reported that Hargreaves Lansdown equity analyst Sophie Lund-Yates reported: "Barclays has bitterly disappointed the market… Profits have been stunted partly because of a big increase in litigation costs relating to the over-issuance of U.S. securities."

        (b)      In a February 16, 2023 report, RBC Capital Markets described a "[d]ownside scenario" for Barclays' valuation related to "significant increase in cost of … additional private party litigation in respect of the over-issuance of securities in the US in FY 2022."

## VIII.  ADDITIONAL ALLEGATIONS OF SCIENTER

206.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company, or in their own name, were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt or access to information reflecting the true facts regarding Barclays, their control over, or receipt, or modification of Barclays' allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

207.    Defendants knew or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent conduct described herein could not have been perpetrated during the Class Period without the

knowledge and complicity, or at least, the reckless disregard, of Barclays' personnel at the highest levels of the Company.

208.    Among other things, the Individual Defendants, and other Barclays' officers and directors who were responsible for creating and overseeing Barclays' internal controls over financial reporting, failed to install "simple" control procedures to ensure that the "entirely avoidable" over-issuance of billions of dollars of unregistered securities above the maximum amount of securities registered under Barclays' March 2018 and August 2019 Shelf Registration Statements did not occur.  As admitted by Nigel Higgins, Chairman of Barclays, "this is not rocket science."

209.    Given the potential exposure to the securities laws and legal liability from the over-issuance of securities, the failure to have such simple control procedures in place to account for the amount of securities issued against the amount of securities registered is such an elementary failure of internal control that is so obvious as to be deliberately reckless.

210.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Barclays, their control over, receipt, and/or modification of Barclays' allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Barclays participated in the fraudulent conduct alleged herein.

211.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Barclays' ADRs by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding the intrinsic value of Barclays' ADRs, and caused Plaintiff and members of the Class to purchase Barclays' ADRs at artificially inflated and/or artificially maintained prices.

212.     The following allegations all support a strong inference of scienter:

(a)     Defendant Higgins admitted in April 2022 at the Company's Annual Meeting, following the first revelation of the over-issuance on March 28, 2022, that for a large financial institution like Barclays, maintaining effective internal controls over financial reporting is "not rocket science."

(b)     Issuing securities is a core operation of Barclays and maintaining WKSI status is critical to supporting that core operation.

(c)     The Barclays' Board of Directors clawed back compensation for the Defendants Venkat, Morzaria, and Cross because of the significant failure of internal controls related to the over-issuances and resulting restatement, material weakness of internal controls for financial reporting, and SEC settlement and fine.

(d)     Throughout its three-year term as an ineligible issuer without WKSI status, Barclays self-identified on its Forms 20-F as not being a WKSI.

(e)     Barclays' share of the structured note and ETN market was artificially propped up by the Company's sale and issuance of more than $17 billion in unregistered securities.

**A.     Barclays Admits that Maintaining Effective Internal Controls Over Financial Reporting, even as an Illegible Issuer, Is "Not Rocket Science"**

213.     During the Class Period, Defendants admitted that the over-issuance was not the result of some complicated accounting error or vague regulatory language.  Instead, Defendants simply failed to institute adequate internal controls over financial reporting in a situation Defendant Venkatakrishnan described as "entirely avoidable."

214.     Specifically, on May 4, 2022, at Barclays 2022 Annual General Meeting (AGM), Nigel Higgins, Chairman of Barclays, and Defendant Venkatakrishnan addressed investors in their 2022 AGM Statements.  In his 2022 AGM Statement, Higgins addressed the over-issuance:

As I have said before, we do not get everything right.  Let me say a few words about our recently reported failure to comply with SEC registration requirements, a failure which has cost us hundreds of millions of pounds, and more in reputation. First, all of us here were dismayed that, after so much progress, we had this entirely self-inflicted problem.  We have not yet finished the review but I believe that we will find that, in all our complexities, we missed some simple tasks.  This is not rocket science and we can and will do better, learning the lessons from this particular issue and applying discipline across all of our controls.

215.    Venkatakrishnan also addressed the over-issuance in his prepared remarks on May

4, 2022:

Our strong performance in 2021 has carried over into the first quarter of this year, although we have seen a disappointing increase in costs.  This has been driven in particular by the over-issuance of securities in the US, which Nigel talked about. Let me echo his comments.  This situation was entirely avoidable and I am deeply disappointed that it occurred.

The necessity of a strong controls culture has never been clearer to me.  In fact, we have made considerable progress improving our controls since 2016.  So the fact that this happened is particularly upsetting.

216.    Defendant Higgins's admission at the 2022 Barclays Annual Meeting that the over-

issuance was a "self-inflicted problem" because "we missed some simple tasks" that are "not

rocket science," combined with Defendant Venkatakrishnan's admission that the "situation was

entirely avoidable" and that "the necessity of a strong internal controls culture has never been

clearer," exposes that Defendants knew, or were reckless in not knowing, that Barclays did not

implement any internal controls to account for the aggregate amount of securities issued once it

became an ineligible issuer yet represented repeatedly that the Company had effective internal

controls over financial reporting.

**B.    Issuing Securities Is a Core Operation for Barclays and Maintaining WKSI Status Was Critical to that Core Operation**

217.    In its own words, in a January 27, 2016 letter to the SEC seeking a waiver to avoid

becoming an ineligible issuer (the "January 27, 2016 Waiver Letter"), Barclays stated that it "is a

frequent issuer of securities" and "issues a variety of securities that are registered under the WKSI

shelf, including ordinary shares, regulatory capital securities (Additional Tier 1 contingent convertible securities and Tier 2 subordinated debt), and senior debt securities issued in syndicated transactions in 'benchmark' size."

218.    The January 27, 2016 Waiver Letter also emphasized the "importance of the WKSI shelf to Barclays in meeting its capital and funding requirements."

219.    Accordingly, having lost its WKSI status in May 2017 and become an ineligible issuer, a rare situation for a sophisticated financial institution to be in, Barclays' failure to implement any internal controls at all once it had a non-WKSI shelf exposed it to significant liability and loss of reputation.

220.    Because of "the importance of the WKSI shelf" to Barclays, as stated in its own words, Defendants knew, or were reckless in not knowing, that Barclays did not implement any internal controls to account for the amount of securities issued once it became an ineligible issuer yet represented repeatedly that the Company had effective internal controls over financial reporting.

**C.    Barclays' Board Claws Back Compensation from Certain Individual Defendants As a Direct Consequence of the Over-Issuance**

221.    On February 15, 2023, Barclays announced that it cut the compensation of certain of the Individual Defendants by a combined 1 million British pounds (approximately $1.2 million) which it directly attributed to regulatory errors and oversights, including the over-issuance. *Supra*, at ¶¶199–200.

(a)    Specifically, as disclosed in the 2022 Form 20-F, the Company decreased the 2022 bonuses for Defendant Venkat by 403,000 British pounds and Defendant Cross by 106,000 British pounds.

(b)     Barclays also clawed back prior compensation awards from Defendant Morzaria.

222.    In the Remuneration report from the Barclays' Board of Directors in the 2022 Annual Report, the Barclays Board provided some insight into how the over-issuance factored into compensation decisions.  Specifically, the Chair of the Remuneration Committee stated:

> The Over-issuance of Securities under BBPLC's US shelf registration statements was a deeply disappointing feature of 2022. A review of the facts and circumstances was completed by external counsel and the Committee has taken the findings of that review seriously. We have thoughtfully and deliberately adjusted our remuneration decisions to ensure that this over-issuance matter is reflected.[79]

223.    Additionally, the Barclays Board stated, "The [Remuneration] Committee exercised its discretion not to exclude the impacts associated with the Overissuance of Securities in the US or the monetary penalties imposed by the SEC and CFTC for the use of unauthorized business communications channels.  As a result, the 2022 annual bonus awards were £403,000, £166,000 and £76,000 lower than they would otherwise have been, for Venkat, Anna and Tushar respectively (after pro-rating for Anna and Tushar)."[80]

224.    The Company's actions to clawback compensation from several Individual Defendants as a direct result of the expenses related to addressing the legal and regulatory issues stemming from the over-issuance evidence that Defendants were, at a minimum, reckless in implementing inadequate (or no) internal controls to account for the aggregate amount of securities issued once Barclays became an ineligible issuer.

---

[79] 2022 Annual Report, p. 197.

[80] *Id.* at 202.

**D.     Throughout Its Three-Year Term as an Ineligible Issuer, Barclays Self-Identified on its Forms 20-F as Not Being a WKSI**

225.    After it became an ineligible issuer, Barclays self-identified on its Forms 20-F during the three-year penalty period as a non-WKSI.  For example, below is the statement filed by Barclays on its Form 20-F/A filed on March 19, 2018 for FY 2017:

Indicate by check mark if each registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☐  No ☑

Notably, the above was filed after Barclays initially filed its Form 20-F for FY 2017 on February 22, 2018 and self-identified as a WKSI even though it had become an ineligible issuer in March 2017:

Indicate by check mark if each registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☑  No ☐

This initial Form 20-F filing from Barclays following its loss of WKSI privileges exposes that the Company and Defendants knew, or were reckless in not knowing, that Barclays had lost its WKSI status and had become an ineligible issuer.

226.    Barclays continued to self-identify as an ineligible issuer by checking "No" as to whether it was a WKSI on its Forms 20-F filed with the SEC on February 21, 2019 for FY 2018 and on February 13, 2020 for FY 2019.

227.    Barclays then resumed self-identifying as a WKSI by checking yes on its Form 20-F filed with the SEC on February 18, 2021 for FY 2020, as appropriate under the three-year penalty period for loss of WKSI status pursuant to Securities Act Rule 405.

228.    That Barclays amended its Form 20-F for FY 2017 to accurately reflect its status as an ineligible issuer after initially claiming to be a WKSI and its subsequent filings reporting the same ineligible issuer status until the three-year penalty period expired and its WKSI status was

automatically restored evidences that it was known within Barclays exactly when the bank lost WKSI status and exactly when that status was restored and that the Defendants knew, or reckless in not knowing, about the loss of WKSI status.  Accordingly, Defendants knew, or were reckless in not knowing, that Barclays did not implement any internal controls to account for the amount of securities issued once it became an ineligible issuer yet represented repeatedly that the Company had effective internal controls over financial reporting.

### E.    Barclays' Share of Structured Note Market Artificially Propped Up by Sale and Issuance of Unregistered Securities

229.    As discussed above, on March 14, 2022, Barclays announced the suspension of any new issuances of its VXX and OIL ETNs, leaving only those structured notes already in inventory available to be sold.  But as Barclays' March 14, 2022 press releases noted: "It is possible that this suspension may influence the market value of the ETNs. Barclays believes that the above-mentioned limitations on issuance and sale may cause an imbalance of supply and demand in the secondary market for the ETNs, which may cause the ETNs to trade at a premium or discount in relation to their indicative value. Therefore, any purchase of the ETNs in the secondary market may be at a purchase price significantly different from their indicative value."

230.    On April 22, 2022, Barclays issued a press release, entitled "Barclays Suspends Until Further Notice Further Sales of the iPath ® Series B Bloomberg Natural Gas Subindex Total Return SM ETNs," informing the market that "Barclays believes that it does not currently have sufficient capacity of registered ETNs issued under its shelf registration statement to support further sales."  The April 22, 2022 Barclays press release referred the market to the Company's March 28, 2022 statement on the over-issuances and prior halting of sales for certain ETNs.

231.    Then, on April 28, 2022, Barclays issued a press release, titled "Barclays Suspends Until Further Notice Further Sales of iPath® ETNs," announcing that it was **halting the sale of**

**thirty (30) additional ETNs until further notice**.  In response to this news and after noting that analysts had deemed the over-issuance "basic", "bizarre" and "embarrassing," *Bloomberg* reported in an article entitled "Barclays Halts Sales of 30 More ETNs After Paperwork Blunder" that "[m]arket observers couldn't recall a bank's issuance exceeding the amount it registered, let alone blowing billions past its limit."[81]

232.   As Barclays sought to uncover the reasons for the nearly $17.7 billion in over-issuances that brought its once humming ETN business to a halt, Barclays' standing the U.S. structure note market slipped dramatically, dropping from 14% market share in the first half of 2021 to under 5% in the first half of 2022.[82]

233.   Notably, Barclays did not resume new issuances of its structure note products until September 26, 2022.  In a September 19, 2022 press release, Barclays identified six iPath® ETNs for which "further issuances and sales . . . are being resumed now that the rescission offer has been completed and settlement of the rescission offer with respect to the ETNs has occurred."

234.   The suspension of Barclays' structure note business in spring 2022 and its deleterious impact on Barclays' standing in the U.S. structured note market exposed Defendants' lack of confidence in their internal controls over financial reporting.  This lack of confidence and Defendants' related decision to halt the issuance of new structured notes until the Recission Offer concluded further revealed that Defendants knew, or were reckless in not knowing, that Barclays had not implemented any internal controls to account for the amount of securities issued once it

---

[81] Dakers, Marion. *Barclays Halts Sales of 30 More ETNs After Paperwork Blunder*, Bloomberg (Apr. 28, 2022), *available at* https://www.bloomberg.com/news/articles/2022-04-28/barclays-halts-sales-for-more-products-after-15-billion-blunder.

[82] Christopher Whittal.  *Barclays plans US structured note rebound after hefty loss*, International Financing Review (Feb. 17, 2023), *available at* https://www.ifre.com/story/3753899/barclays-eyes-us-structured-note-rebound-after-hefty-loss-ps4s7x63lb.

became an ineligible issuer yet represented repeatedly that the Company had effective internal controls over financial reporting.

235.    Furthermore, the drastic reduction in Barclays' market share of the structured note market in the United States exposes that Defendants were motivated to not disrupt their trading business, despite the time-consuming process they were required to adhere to as an "ineligible issuer" following Barclays' loss of WKSI status in 2017, as the lag time between filing a shelf registration statement and receiving approval from the SEC lasted from several weeks to more than one month.   Instead, Defendants operated as if they maintained their WKSI status and ran their structured productions business as normal to keep pace with their competitors.   At the very least, Defendants were reckless in not knowing that failing to change their procedures to account for the issuances from the limited inventory, non-WSKI registration statements and demonstrates that Defendants acted with scienter in failing to establish effective internal controls over financial reporting to prevent the over-issuances.

## IX.    LOSS CAUSATION/ECONOMIC LOSS

236.    During the Class Period, as detailed herein, Barclays and the Individual Defendants engaged in a course of conduct that artificially inflated and/or artificially maintained the price of Barclays' ADRs and operated as a fraud or deceit on the Class Period purchasers of Barclays' ADRs by making the materially false and misleading statements and omissions recited above.

237.    When the truth was revealed and became known to the market, the price of Barclays' ADRs declined precipitously as the prior artificial inflation was removed from the price of the ADRs.   As a result of their purchases of Barclays' ADRs at artificially inflated and/or artificially maintained prices during the Class Period, Lead Plaintiff and other members of the Class suffered a substantial economic loss (i.e., damages under the federal securities laws).

238.    The truth about the over-issuances was revealed through two disclosures beginning on March 28, 2022, when the Company disclosed details around the internal control issues and potential financial impact of the over-issuance from the August 2019 Shelf.  The truth concerning additional over-issuances was fully revealed on July 28, 2022.

A.    **March 28, 2022 – First Partial Revelation of the Truth**

239.    The truth about the over-issuance under the 2019 Shelf Registration was partially revealed on March 28, 2022, *before the market opened*, when Barclays publicly disclosed details around the internal control issues and potential financial impact of the over-issuance from the August 2019 Shelf.  Barclays also announced that it would conduct a rescission offer for customers who purchased ETNs and structured notes in the over-issuance and that Barclays expected the rescission losses to be approximately £450 million ($590 million).

240.    In response to this news, on March 28, 2022, the price of Barclays' ADRs plunged 10.61%, declining $0.96 per ADR from a closing price on Friday March 25, 2022 of $9.05 per ADR to a closing price of $8.09 per ADR on Monday March 28, 2022.

B.    **July 28, 2022 – Second Partial Revelation of the Truth**

241.    On July 28, 2022, *before the market opened*, the full extent of Defendants' fraud was revealed when Barclays disclosed it also had over-issued unregistered securities under a second shelf registration statement that was registered in March 2018, when Barclays was an ineligible issuer.

242.    In response to this news, on July 28, 2022, the price of Barclays ADRs declined $0.41 per ADR, falling 5.2% from a closing price of $7.89 per ADR on July 27, 2022 to a closing price of $7.48 per ADR on July 28, 2022.

243.    The price decline in Barclays' ADRs was a direct result of the nature and extent of the materially false and misleading statements and omissions revealed to investors and the market.

Thus, the Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and the Class.

### C.    February 15, 2023 – Final Revelation of the Truth

244.    On February 15, 2023, *before the market opened*, in connection with the release of its 2022 financial results and the filing of its Report on Form 20-F, Barclays announced that its full year 2022 revenue was down 19% due, in large part, to costs related to the over-issuances of securities. The Company also revealed that, because of the over-issuances, it was clawing back compensation from certain of the Individual Defendants (including Venkat, Morzaria, and Cross) because of their responsibility in the failure to implement effective or adequate internal controls over financial reporting to prevent the over-issuance following Barclays' loss of WKSI status in May 2017.

245.    In reaction to the news of Barclays' Q4 2022 profit drop and compensation clawbacks, on February 15, 2023, Barclays' ADRs fell 8.5%, dropping from $9.22 per ADR on February 14, 2023 to $8.45 per ADR on February 15, 2023.

## X.    CONTROL PERSON ALLEGATIONS

246.    During the Class Period, Defendants' statements were materially false and misleading when made in that Defendants failed to disclose:

(a)    The Company had failed to implement any internal controls to ensure that it did not issue more securities than it had registered for on its March 2018 Shelf and August 2019 Shelf;

(b)    The Company had issued more than $17.7 billion worth of unregistered securities; and

(c)    As a result, the Company was at a heightened risk of legal and regulatory scrutiny and enforcement.

247.   The Individual Defendants and Defendant Higgins, as senior executive officers of the Company, as well as BBPLC, were able to and did control the content of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants and Defendant Higgins are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

248.   The Individual Defendants and Defendant Higgins, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about Barclays' business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

249.   As senior officers and controlling persons of a publicly held company whose ADRs were, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants and Defendant Higgins each had a duty to promptly disseminate accurate and truthful information issued in statements that were or had become materially misleading or untrue, so that the market price of the Company's ADRs would be based upon truthful and accurate information.  The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

250. The Individual Defendants are liable as primary participants in a wrongful scheme and course of business that operated as a fraud and deceit on all persons and entities who purchased or otherwise acquired Barclays' publicly traded ADRs during the Class Period, which included the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omissions) regarding the Company's business.

251. Likewise, the Section 20(a) Defendants are liable as control persons under Section 20(a) for Barclays' violations of Section 10(b). At all relevant times, BBPLC operated as Barclays' wholly-owned U.S. subsidiary where the over-issuances at issue in this action occurred following the May 2017 loss of WKSI status for Barclays, who oversaw the August 2022 rescission offer for those over-issued securities, and who was subject to the subsequent SEC cease-and-desist order, along with BPLC, on September 29, 2022, which included, among other penalties, a $200 million penalty.

252. Similarly, for the entirety of the Class Period, Defendant Higgins was Group Chairman at Barclays. When he became Group Chairman in 2019, Barclays was an ineligible issuer without WKSI privileges as a result of the May 2017 SEC Settlement; yet, under Defendant Higgins' watch, as admitted by Barclays and Defendant Higgins himself (¶177), Barclays failed to establish any internal controls to track securities issuances from its non-WKSI shelves in real-time, which was not "rocket science." Defendant Higgins served as Group Chairman at Barclays during the over-issuance, the investigation into the over-issuance, the Company's rescission offer to customers who purchased unregistered securities from Barclays in August and September 2022; and the SEC's investigation and ultimate September 29, 2022 settlement order with Barclays as a result of the over-issuance, for which Barclays paid a $200 million penalty.

## XI.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE: *AFFILIATED UTE* AND FRAUD-ON-THE-MARKET PRESUMPTIONS

253.    Lead Plaintiff alleges that throughout the Class Period, Defendants omitted material information of which Defendants were aware or reckless in not knowing.  Such statements artificially inflated or artificially maintained the price of Barclays' publicly traded ADRs and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired those ADRs during the Class Period.  Because Defendants chose to speak on the issues described in Section VI, it was important that Defendants not mislead investors or withhold material information.  To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Barclays and its failure to maintain adequate internal controls following its loss of WKSI privileges, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 152-53 (1972).

254.    Lead Plaintiff is entitled to a presumption of reliance established by the fraud-on-the-market doctrine, in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's sponsored ADRs traded in an efficient market;

(d)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADRs; and

(e)    Lead Plaintiff and other members of the Class purchased Barclays' ADRs between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

255.    At all relevant times, the market for Barclays' ADRs was an efficient market for the following reasons, among others:

(a)    Barclays' ADRs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    According to the Company, it had approximately 191 million sponsored ADRs outstanding demonstrating a very active and broad market for Barclays' ADRs;

(c)    Barclays filed periodic public reports with the SEC;

(d)    Barclays regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services, the internet, and other wide-ranging public disclosures;

(e)    Barclays was followed by several securities analysts employed by major brokerage firms, including RBC Capital Markets, Jefferies, Morgan Stanley, Goldman Sachs, and UBS, which wrote reports that were distributed to the sales force and certain customers of their respected brokerage firms, were publicly available, and entered the public marketplace; and

(f)    Unexpected material news about Barclays was rapidly reflected in and incorporated into the Company's ADR price during the Class Period.

256.    As a result of the foregoing, the market for Barclays' ADRs promptly digested current information regarding Barclays from publicly available sources and reflected such information in Barclays' ADR price.  Under these circumstances, all persons or entities who purchased or otherwise acquired Barclays' ADRs during the Class Period suffered similar injury through their purchase of Barclays' ADRs at artificially inflated and/or artificially maintained prices, and the presumption of reliance applies.

## XII.   NO SAFE HARBOR

257.    The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein.

258.    The statements alleged to be false and misleading herein are all related to then-existing facts and conditions.  To the extent certain statements alleged to be false and misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

259.    To the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningfully cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

260.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Barclays who knew that the statement was false when made.

## XIII.   CLASS ACTION ALLEGATIONS

261.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who or which purchased or otherwise acquired the publicly traded, Barclays-sponsored ADRs during the period from February 18, 2021, through February 14, 2023, inclusive, and were damaged thereby (the "Class").  Excluded from

the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, and/or control person of Barclays during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Barclays' employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

262.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Barclays' ADRs were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Barclays or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

263.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions may affect individual Class members include:

(a)    whether Defendants violated the Exchange Act;

(b)    whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)    whether Defendants knew or recklessly disregarded that their statements were false and misleading;

- 95 -

(d)      whether the price of the Company's ADRs was artificially inflated and/or artificially maintained and

(e)      the extent of damage sustained by Class members and the appropriate measure of damages.

264.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

265.    Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Lead Plaintiff has no interests that conflict with those of the Class.

266.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIV.   COUNTS

### COUNT I
### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Individual Defendants and BPLC

267.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

268.    This Count is asserted pursuant to § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, on behalf of Lead Plaintiff and the Class, against Barclays and the Individual Defendants.

269.    During the Class Period, Defendants carried out a plan that was intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the Class; and (b) artificially manipulate the price of Barclays' ADRs.

270.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of conduct that operated as a fraud and deceit upon purchasers of Barclays' ADRs in violation of § 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

271.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as specified herein.

272.    Defendants' liability arises from the fact that they developed and engaged in a scheme to manipulate the price of Barclays' ADRs and were aware of the dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading.

273.    Defendants had actual knowledge of the misrepresentations, omissions, and deceptive conduct alleged herein, or acted with reckless disregard for the truth.  Defendants' acts were done for the purpose and effect of concealing the scheme alleged herein from the investing public, and to artificially manipulate the market price of Barclays' ADRs.

274.    By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

275.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of Barclays' ADRs during the Class Period.

**COUNT II**
**Violation of § 20(a) of the Exchange Act**
**Against the Individual Defendants and the Section 20(a) Defendants**

276.     Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

277.     This Count is asserted pursuant to § 20(a) of the Exchange Act, on behalf of Lead Plaintiff and the Class, against the Individual Defendants and the Section 20(a) Defendants.

278.     As alleged above, Barclays violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omitting material information in connection with the purchase of Barclays' ADRs.

279.     This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants and Section 20(a) Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period.  Thus, Barclays is primarily liable under § 10(b) of the Exchange Act.

280.     As set forth above, the Individual Defendants had control over Barclays and made the materially false and misleading statements and omissions on behalf of Barclays within the meaning of § 20(a) of the Exchange Act as alleged herein.  By virtue of their executive positions and their culpable participation, as alleged above, the Individual Defendants had the power and influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends were false and misleading.  The Individual Defendants were provided with or had

unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

281.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

282.    Likewise, the Section 20(a) Defendants are liable as control persons under Section 20(a) for Barclays' violations of Section 10(b).   At all relevant times, BBPLC operated as Barclays' wholly-owned U.S. subsidiary where the over-issuances at issue in this action occurred following the May 2017 loss of WKSI status for Barclays, who oversaw the August 2022 rescission offer for those over-issued securities, and who was subject to the subsequent SEC cease-and-desist order, along with BPLC, on September 29, 2022, which included, among other penalties, a $200 million penalty.

283.    Similarly, for the entirety of the Class Period, Defendant Higgins was Group Chairman at Barclays.  When he became Group Chairman in 2019, Barclays was an ineligible issuer without WKSI privileges as a result of the May 2017 SEC Settlement; yet, under Defendant Higgins' watch, as admitted by Barclays and Defendant Higgins himself (¶177), Barclays failed to establish any internal controls to track securities issuances from its non-WKSI shelves in real-time, which was not "rocket science."  Defendant Higgins served as Group Chairman at Barclays during the over-issuance, the investigation into the over-issuance, the Company's rescission offer to customers who purchased unregistered securities from Barclays in August and September 2022; and the SEC's investigation and ultimate September 29, 2022 settlement order with Barclays as a result of the over-issuance, for which Barclays paid a $200 million penalty.

284.     By reasons of such wrongful conduct, Individual Defendants and the Section 20(a) Defendants are liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's ADRs during the Class Period.

## XV.     PRAYER FOR RELIEF

285.     WHEREFORE, Lead Plaintiff respectfully prays for judgment against the Defendants as follows:

(a)     Determining that this action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as a class representative, and appointing Labaton Sucharow LLP as lead class counsel pursuant to Rule 23(g);

(b)     Determining and declaring that Defendants violated the Exchange Act, as charged in Counts I-II, by reason of the acts, omissions and, status of control alleged herein;

(c)     Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with interest thereon;

(d)     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by Lead Plaintiff's consulting and testifying expert witnesses; and

(e)     Granting such other and further relief as the Court deems just and proper.

## XVI.   JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: March 6, 2023

Respectfully Submitted,

/s/Christine M. Fox
LABATON SUCHAROW LLP
CHRISTINE M. FOX
JAMES M. FEE
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)
cfox@labaton.com
jfee@labaton.com

*Lead Counsel for Lead Plaintiff Boston Retirement System and the Proposed Class*