**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**IN RE BARCLAYS PLC**
**SECURITIES LITIGATION**

Case No. 1:22-cv-08172-KPF

ORAL ARGUMENT REQUESTED

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

Jeffrey T. Scott *(scottj@sullcrom.com)*
Matthew J. Porpora *(porporam@sullcrom.com)*
Julia A. Malkina *(malkinaj@sullcrom.com)*
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for Defendants*

May 5, 2023

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ................................................................................................ 6

    A.    The Parties ..........................................................................................6

    B.    Barclays Bank's Loss of WKSI Status and the 2018 and 2019 Shelf Registration Statements. .................................................................7

    C.    Barclays Discovers Its Over-Issuance and Immediately Self-Reports to the SEC and Discloses to the Market Its Mistake. ........................9

    D.    The SEC Order .................................................................................12

    E.    Plaintiff's Allegations ......................................................................12

ARGUMENT ................................................................................................... 14

I.      PLAINTIFF HAS NOT PLED A STRONG INFERENCE OF SCIENTER. .................. 14

    A.    Plaintiff Does Not Allege that Any Defendant Had a Motive to Commit Fraud. .....................................................................................15

    B.    Plaintiff Does Not Allege Conscious Misbehavior or Recklessness. ...................16

II.    PLAINTIFF FAILS TO ADEQUATELY ALLEGE THAT DEFENDANTS MADE ANY ACTIONABLE MISSTATEMENTS. ....................................................... 24

    A.    Defendants Made No Misstatements Regarding Barclays' Internal Controls. .......24

    B.    Defendants Did Not Misrepresent Barclays' "Best Estimate" of the Financial Exposure from the Over-Issuance Mistake. ..........................28

III.   PLAINTIFF'S LOSS CAUSATION ALLEGATIONS ARE FATALLY FLAWED. ........................................................................................................ 32

IV.   PLAINTIFF'S CONTROL-PERSON LIABILITY CLAIM SHOULD BE DISMISSED. ................................................................................................... 36

CONCLUSION ................................................................................................ 37

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Africa* v. *Jianpu Tech. Inc.*,
 2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022) .........................................................................16

*Altayyar* v. *Etsy, Inc.*,
 242 F. Supp. 3d 161 (E.D.N.Y. 2017) .....................................................................................16

*Amorosa* v. *Gen. Elec. Co.*,
 2022 WL 3577838 (S.D.N.Y. Aug. 19, 2022) .........................................................................14

*Ark. Teachers Ret. Sys.* v. *Bankrate, Inc.*,
 18 F. Supp. 3d 482 (S.D.N.Y. 2014) .......................................................................................36

*Asay* v. *Pinduoduo Inc.*,
 2020 WL 1530745 (S.D.N.Y. Mar. 30, 2020) .........................................................................25

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
 493 F.3d 87 (2d Cir. 2007) ...............................................................................................14, 15

*In re Aus. & N.Z. Banking Grp. Ltd. Sec. Litig.*,
 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) .........................................................................25

*In re Banco Bradesco S.A. Sec. Litig.*,
 277 F. Supp. 3d 600 (S.D.N.Y. 2017) ...................................................................15, 27, 36

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
 980 F. Supp. 2d 564 (S.D.N.Y. 2013) .....................................................................................32

*In re Baxter Int'l Inc. Sec. Litig.*,
 2021 WL 100457 (N.D. Ill. Jan. 12, 2021) .............................................................................21

*In re Biogen Inc. Secs. Litig.*,
 857 F.3d 34 (1st Cir. 2017) .....................................................................................................19

*Born* v. *Quad/Graphics, Inc.*,
 521 F. Supp. 3d 469 (S.D.N.Y. 2021) .....................................................................................35

*Bratusov* v. *Comscore, Inc.*, 2020 WL 3447989,
 2020 WL 3447989, at *13 (S.D.N.Y. June 24, 2020) .......................................................22, 36

*Brine* v. *MHPI VII LLC*,
 2022 WL 2199826 (C.D. Cal. Feb. 15, 2022) .....................................................................21, 22

*Chill* v. *Gen. Elec. Co.*,
101 F.3d 263 (2d Cir. 1996)...........................................................................21

*Christian* v. *BT Grp. PLC*,
2018 WL 3647213 (D.N.J. Aug. 1, 2018) ....................................................21

*In re Citigroup Sec. Litig.*,
2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) .......................................27, 28

*City of Birmingham* v. *Ryanair Holdings*,
2020 WL 2834857 (S.D.N.Y. June 1, 2020) .................................................20

*City of Brockton Ret. Sys.* v. *Avon Prod., Inc.*,
2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)......................................17, 23

*City of Brockton Ret. Sys.* v. *Shaw Grp. Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008).......................................................3, 19

*City of Pontiac* v. *UBS AG*,
752 F.3d 173 (2d Cir. 2014)...........................................................................26

*In re Corning Inc. Sec. Litig.*,
2005 WL 714352 (2d Cir. Mar. 30, 2005)....................................................29

*Dalberth* v. *Xerox Corp.*,
766 F.3d 172 (2d Cir. 2014)...........................................................................32

*Das* v. *Rio Tinto PLC*,
332 F. Supp. 3d 786 (S.D.N.Y. 2018)............................................................28

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ..............................................28

*Doshi* v. *Gen. Cable Corp.*,
823 F.3d 1032 (6th Cir. 2016) .......................................................................21

*In re DraftKings Inc. Sec. Litig.*,
2023 WL 145591 (S.D.N.Y. Jan. 10, 2023) ..................................................20

*ECA* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)...........................................................4, 5, 24, 25

*Ellison* v. *Am. Image Motor Co., Inc.*,
36 F. Supp. 2d 628 (S.D.N.Y. 1999) ............................................................37

*Fain* v. *USA Techs., Inc.*,
707 F. App'x 91 (3d Cir. 2017) .....................................................................19

*In re Ford Motor Co. Sec. Litig.*,
    381 F.3d 563 (6th Cir. 2004) ............................................20

*Gamm* v. *Sanderson Farms, Inc.*,
    944 F.3d 455 (2d Cir. 2019)............................................14

*Gavish* v. *Revlon, Inc.*,
    2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004)........................30

*Gray* v. *Alpha & Omega Semiconductor Ltd.*,
    2021 WL 4429499 (S.D.N.Y. Sept. 27, 2021)........................20

*Gusinsky* v. *Barclays PLC*,
    944 F. Supp. 2d 279 (S.D.N.Y. 2013)............................25, 26

*Hensley* v. *IEC Elecs. Corp.*,
    2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014)........................22

*Holbrook* v. *Trivago N.V.*,
    2019 WL 948809 (S.D.N.Y. Feb. 26, 2019) ........................20

*Inter-Loc. Pension Fund GCC/IBT* v. *Gen. Elec. Co.*,
    445 F. App'x 368 (2d Cir. 2011) ....................................20

*In re IPO Sec. Litig.*,
    399 F. Supp. 2d 261 (S.D.N.Y. 2005)............................35, 36

*Jackson* v. *Abernathy*,
    960 F.3d 94 (2d Cir. 2020)........................................3, 4, 15

*Kleinman* v. *Elan Corp.*,
    706 F.3d 145 (2d Cir. 2013)............................................11

*Kuriakose* v. *Fed. Home Loan Mortg. Corp.*,
    897 F. Supp. 2d 168 (S.D.N.Y. 2012)............................17, 23

*Lachman* v. *Revlon, Inc.*,
    487 F. Supp. 3d 111 (E.D.N.Y. 2020) ............................21, 28

*Landesbank Baden-Wurttemberg* v. *Goldman, Sachs & Co.*,
    478 F. App'x 679 (2d Cir. 2012) ....................................16

*Lentell* v. *Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)........................................32, 33

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
    667 F.3d 1331 (10th Cir. 2012) ....................................20

*In re Liberty Tax*,
828 F. App'x 747 (2d Cir. 2020) ..................................................................25

*Lipow* v. *Net1 UEPS Techs., Inc.*,
131 F. Supp. 3d 144 (S.D.N.Y. 2015)...........................................................18

*In re Lone Pine Res., Inc.*,
2014 WL 1259653 (S.D.N.Y. Mar. 27, 2014) ...............................................30

*Long Miao* v. *Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020)...........................................................23

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
26 F. Supp. 3d 278 (S.D.N.Y. 2014).................................................17, 29, 34

*In re Molycorp, Inc. Sec. Litig.*,
2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015) ...............................................19

*Monroe Cty. Emps.' Ret. Sys.* v. *YPF Sociedad Anonima*,
15 F. Supp. 3d 336 (S.D.N.Y. 2014)........................................................34, 35

*N. Collier Fire Control & Rescue Dist.* v. *MDC Partners, Inc.*,
2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)..................................................4

*Novak* v. *Kasaks*,
216 F.3d 300 (2d Cir. 2000).......................................................................5, 29

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010).........................................................................33

*Ong* v. *Chipotle Mexican Grill, Inc.*,
2017 WL 933108 (S.D.N.Y. Mar. 8, 2017) ...................................................17

*Plumber & Steamfitters* v. *Danske Bank*,
11 F.4th 90 (2d Cir. 2021) ...........................................................................25

*Pompano-Windy City Partners, Ltd.* v. *Bear Stearns & Co.*,
794 F. Supp. 1265 (S.D.N.Y. 1992)..............................................................27

*Pub. Emps. Ret. Sys. of Miss.* v. *Merrill Lynch & Co. Inc.*,
714 F. Supp. 2d 475 (S.D.N.Y. 2010)...........................................................36

*In re Rockwell Med., Inc. Sec. Litig.*,
2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ...............................................18

*Rombach* v. *Chang*,
355 F.3d 164 (2d Cir. 2004)..........................................................................24

*Rotunno* v. *Wood*,
2022 WL 14997930 (2d Cir. Oct. 27, 2022)...................................................................23

*S. Cherry St., LLC* v. *Hennessee Grp. LLC*,
573 F.3d 98 (2d Cir. 2009)............................................................................................17

*In re Sanofi-Aventis Sec. Litig.*,
774 F. Supp. 2d 549 (S.D.N.Y. 2011)...........................................................................37

*Schiro* v. *Cemex, S.A.B. de C.V.*,
396 F. Supp. 3d 283 (S.D.N.Y. 2019)...........................................................................26

*Singh* v. *Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019).....................................................................14, 24, 25, 26

*Slayton* v. *Am. Exp. Co.*,
604 F.3d 758 (2d Cir. 2010)..........................................................................................23

*Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*,
33 F. Supp. 3d 401 (S.D.N.Y. 2014).............................................................................36

*Strougo* v. *Barclays PLC*,
105 F. Supp. 3d 330 (S.D.N.Y. 2015)......................................................................25, 26

*Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*,
531 F.3d 190 (2d Cir. 2008)..........................................................................................18

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)......................................................................................................14

*In re Tempur Sealy Int'l, Inc. Sec. Litig.*,
2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) ..........................................................34, 35

*Tyler* v. *Liz Claiborne, Inc.*,
814 F. Supp. 2d 323 (S.D.N.Y. 2011)...........................................................................22

*Venkataraman* v. *Kandi Techs. Grp., Inc.*,
2021 WL 4952260 (S.D.N.Y. Oct. 25, 2021) ...............................................................22

*Wyche* v. *Advanced Drainage Sys., Inc.*,
2017 WL 971805 (S.D.N.Y. Mar. 10, 2017) ................................................................18

*Zech Cap. LLC* v. *Ernst & Young Hua Ming*,
636 F. App'x 582 (2d Cir. 2016) .............................................................................15, 19

*Zerman* v. *Ball*,
735 F.2d 15 (2d Cir. 1984)............................................................................................32

**Statutes**

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4................................................ *passim*

Securities Exchange Act of 1934, 15 U.S.C.

    § 78j ........................................................................................................... *passim*

    § 78t ........................................................................................................... *passim*

**Regulation**

17 C.F.R. § 232.303(b) ........................................................................................27

**Rule**

Fed. R. Civ. P. 9(b) .............................................................................................14

## PRELIMINARY STATEMENT

This is yet another case of meritless event-driven securities litigation—a phenomena where enterprising plaintiffs' lawyers try to transform a corporate misstep into securities fraud perpetrated against the company's shareholders. In this particular case, Plaintiff seeks to capitalize on what Plaintiff itself concedes was a *mistake* made by Barclays PLC ("Barclays") when its subsidiary, Barclays Bank PLC ("Barclays Bank"), issued too many shares of Barclays Bank securities. To be sure, this was a significant mistake, and Barclays has gone to great lengths and expended substantial resources to remediate it. But Plaintiff, a shareholder of Barclays, has no basis to assert any claims related to the mistake. Plaintiff does not allege that it was injured in connection with the purchase of any over-issued Barclays Bank securities. Instead, Plaintiff tries to transform Barclays' mistake into an intentional fraud perpetrated against Barclays' shareholders. The Amended Complaint ("AC"), however, is devoid of any facts to support that false narrative. At bottom, Plaintiff asks this Court to impermissibly expand the federal securities laws, which are designed to protect investors against attempts by company officers to *defraud them* in connection with *their transactions* in the *company's securities*, not to permit plaintiffs' lawyers to convert mistakes or even corporate mismanagement into securities fraud.

Because the Amended Complaint acknowledges that the over-issuance of Barclays Bank securities was a mistake, this case has none of the traditional hallmarks of a typical securities fraud class action. Indeed, Plaintiff comes nowhere close to plausibly alleging that Defendants acted with the requisite fraudulent intent, or that any of the challenged statements were false or misleading. Those failures alone require dismissal, but there are more: Plaintiff also fails adequately to plead loss causation, and its derivative control-person claims fail out of the gate.

The mistake at the heart of this case occurred following Barclays Bank's loss, in 2017, of its status as a well-known seasoned issuer ("WKSI") under the federal securities laws. In short,

WKSI status makes it much easier to issue securities. After losing that status, in order to issue securities going forward, Barclays Bank had to undertake a laborious and "time-consuming process" of tracking the amount of securities issued off of its so-called shelf registration statement to "ensure that [it] did not exceed the aggregate amount of securities it had registered." (AC ¶ 10.) Due to what Plaintiff concedes was a mistake, during portions of 2019, 2021, and 2022, Barclays Bank exceeded the registered amount of securities it was permitted to offer ($20.8 billion) and "sold an additional $17.7 billion of unregistered securities." (*Id.*)

On March 28, 2022, just two weeks after discovering the over-issuance, Barclays publicly disclosed the mistake and the internal control failure that caused it, and provided a "best estimate," based on what it knew at the time, of the scope of the over-issuance and the impact it would have on Barclays' financials. (AC ¶ 160.) Barclays also disclosed that it (i) self-reported the mistake to the SEC and other regulators, (ii) voluntarily elected "to conduct a rescission offer to eligible purchasers" of the over-issued Barclays Bank securities, and (iii) "commissioned an independent review of the facts and circumstances relating to this matter including, among other things, the control environment related to such issuances." (AC ¶¶ 81, 160.)

As the independent review unfolded, Barclays repeatedly updated the market with its contemporaneous understanding of the over-issuance's scope and the related impact on Barclays' financial statements. Ultimately, on May 23, 2022, Barclays issued a restatement of Barclays' and Barclays Bank's 2021 annual reports filed on Form 20-F. Between August 1 and September 12, 2022, Barclays Bank made a rescission offer of historic scope to eligible purchasers of the over-issued Barclays Bank securities. Barclays also settled proceedings with the SEC on September 29, 2022 ("SEC Order"), in which the SEC made no findings that the over-issuance resulted from intentional or reckless conduct.

If none of this sounds like fraud, that is because it plainly is not. Yet Plaintiff alleges that these facts—namely, a mistake in over-issuing Barclays Bank securities, immediate self-reporting to regulators and public disclosure of the issue, continuing contemporaneous updates to the market about the independent review, and voluntary remediation efforts aimed at assisting holders of the Barclays Bank securities that were affected by the mistake—amount to *intentional* securities fraud by Barclays and its most senior executives against their own shareholders (*i.e.*, not the Barclays Bank securities-holders actually affected by the over-issued Barclays Bank securities).

In Plaintiff's view, an acknowledged mistake morphs into intentional fraud because Barclays had previously made aspirational statements about its internal controls (*e.g.*, Barclays "is committed to operating within a strong system of internal control"). (AC ¶ 137.) Plaintiff asserts that those statements must have been knowingly false because "the over-issuances had occurred" (AC ¶ 143)—a theory of securities fraud that the Second Circuit has rejected time and again. Plaintiff then impermissibly invokes the "fraud by hindsight" pleading tactic that the Second Circuit long has rejected. The Amended Complaint points to the fact that the size of the over-issuance turned out to be larger than the initial estimates Barclays disclosed in the immediate aftermath of discovering the mistake, based on what it knew at the time, and concludes that Barclays must have lied when it disclosed its preliminary assessment in near-real-time during an evolving situation. None of this is securities fraud. Simply put, "a mistake . . . does 'not constitute fraud.'" *City of Brockton Ret. Sys.* v. *Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008).

The Amended Complaint should be dismissed for a number of independent reasons.

*First*, Plaintiff does not plead that any Barclays employee acted with the required "'strong' inference" of fraudulent intent—*i.e.*, an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Jackson* v. *Abernathy*, 960 F.3d 94,

98 (2d Cir. 2020). Plaintiff tries to plead fraudulent intent by contending that Barclays sought to maximize profits on its "trading business" by disregarding any and all controls that might slow the pace of its efforts to sell Barclays Bank securities. (AC ¶ 235.) But in this Circuit, such a generalized motive to earn a profit—shared by every corporation—has never been sufficient to plead fraud. Moreover, Plaintiff's theory ignores the far more compelling inference that Barclays simply made a mistake, as evidenced by the fact that, as soon as Barclays discovered the over-issuance, Barclays self-reported it to regulators, suspended "sales and issuance of two popular exchange traded notes" (an odd decision for a bank supposedly motivated to earn illicit profits at all costs), and *voluntarily* agreed to buy back the over-issued shares. (AC ¶¶ 14, 160.) "[T]he implausibility of [Plaintiff's] theory of fraud speaks for itself and is far less compelling than an inference of, at most, non-actionable mismanagement and negligence." *N. Collier Fire Control & Rescue Dist.* v. *MDC Partners, Inc.*, 2016 WL 5794774, at *22 (S.D.N.Y. Sept. 30, 2016).

Without any cogent theory of motive, the strength of Plaintiff's "circumstantial allegations" to establish "conscious misbehavior" on the part of a Barclays employee who was responsible for the challenged statements must "be correspondingly greater." *ECA* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198-99 (2d Cir. 2009). Plaintiff's "conscious misbehavior" allegations come nowhere close to meeting that heightened standard. Plaintiff relies on impermissible "fraud-by-hindsight" allegations and the bizarre non sequitur that Barclays' knowledge that Barclays Bank had "los[t] . . . WKSI status" shows that Barclays had actual knowledge that Barclays Bank *had no internal controls* to govern issuances as a non-WKSI. (AC ¶ 228.) That unsupported illogical leap—which amounts to a claim that any non-WKSI that generally describes its internal controls is perpetrating fraud—cannot give rise to the requisite strong inference of scienter.

*Second*, Plaintiff's attempt to gin up an actionable misrepresentation falls flat. The garden-variety descriptions of Barclays' internal control procedures were not guarantees that its controls would never fail. The Second Circuit repeatedly has held that virtually identical statements by financial institutions regarding "risk management practices" are "too general to cause a reasonable investor to rely upon them." *JP Morgan*, 553 F.3d at 206.

Nor does Plaintiff plausibly allege that Barclays made a contemporaneously untrue statement on March 28, 2022, when Barclays reported its initial estimates about the scope of the mistake. Indeed, Plaintiff's own allegations show that this statement could not have been false (and certainly not knowingly false) at the time it was made. The Amended Complaint concedes that Barclays expressly informed the market that its March 28, 2022 disclosures "represent[] Barclays' best estimate *at this time* of losses which may arise from these matters." (AC ¶ 160 (emphasis added).) Moreover, given the Amended Complaint's concession that Barclays did not discover a "second over-issuance" until June 2022, it would have been impossible for Barclays to have disclosed those facts *months earlier* on March 28, 2022. (AC ¶¶ 18, 84, 162.) "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Novak* v. *Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

*Third*, Plaintiff does not adequately plead loss causation as to two of the three alleged "corrective disclosures." Plaintiff fails to allege that the purported July 28, 2022 and February 15, 2023 "corrective disclosures" revealed the falsity of any prior statement or amounted to anything other than materialization of a *disclosed* risk. Consequently, even if Plaintiff's Section 10(b) claim is not dismissed in its entirety (and it should be), Plaintiff's proposed class period should end on March 28, 2022—the date of the only remaining alleged "corrective disclosure."

*Lastly*, because Plaintiff alleges no primary securities law violation, its control-person liability claim against all Defendants must be dismissed. Plaintiff's control-person liability claim against Barclays Bank and Nigel Higgins fails for two additional reasons: Plaintiff fails to plead they were either control persons or culpable participants in the alleged fraud.

## BACKGROUND

### A.    The Parties

Plaintiff Boston Retirement System is a purported holder of Barclays-sponsored ADRs. (AC ¶ 30.)

Defendant Barclays is a bank holding company headquartered in London, United Kingdom. It provides various financial services, including investment banking, wealth management, and offers and sales of securities, through its subsidiaries. (AC ¶ 31.) Barclays' ADRs trade on the New York Stock Exchange. (*Id.*) Defendant Barclays Bank is a bank headquartered in London, United Kingdom, and is a wholly owned subsidiary of Barclays. (AC ¶ 40; Ex. 1 ¶ 11.)[1]

Defendants James E. Staley, C.S. Venkatakrishnan, Tushar Morzaria, and Anna Cross (together, "Individual Defendants") are, or were, Barclays' most senior executives. (AC ¶¶ 32-35.) Mr. Staley served as Barclays' Chief Executive Officer ("CEO") from December 2015 until October 31, 2021. (AC ¶ 32.) Mr. Venkatakrishnan took over that position on November 1, 2021. (AC ¶¶ 32-33.) Mr. Morzaria served as Barclays' Finance Director ("the most senior finance position at Barclays") until April 22, 2022. (AC ¶ 34.) Ms. Cross took over that position in April 2022. (AC ¶ 35.) Lastly, Defendant Nigel Higgins has served as Barclays' "Group Chairman"—

---

[1] All exhibits are from the Declaration of Jeffrey T. Scott, dated May 5, 2023.

similar to the chairman of a company's board of directors and a non-management position—since May 2019.  (AC ¶ 39.)

**B.** **Barclays Bank's Loss of WKSI Status and the 2018 and 2019 Shelf Registration Statements.**

On May 10, 2017, following its subsidiary's settlement with the SEC, Barclays Bank lost its WKSI status.  (AC ¶¶ 62, 66.)  A major benefit of WKSI status is that there is no limit on the amount of securities a WKSI can issue—a WKSI can offer and sell securities using a shelf registration statement from which it can make multiple offerings, paying filing fees to the SEC whenever it chooses to issue securities off of the shelf (a process known as "pay-as-you-go").  (AC ¶¶ 50, 51, 64, 66.)  As a WKSI, Barclays Bank had issued two types of complex securities products on a pay-as-you-go basis:  (i) structured notes, which are debt securities with returns based on a single equity, baskets of equities, equity indexes, interest rates, commodities, or foreign currencies; and (ii) exchange-traded notes ("ETNs"), which are unsecured debt obligations that trade on a securities exchange with payment terms linked to the performance of a reference index or benchmark.  (AC ¶¶ 5, 52; Ex. 1 ¶ 16.)

As a result of losing its WKSI status, Barclays Bank could no longer take advantage of those pre-registration and pay-as-you-go features to issue structured notes and ETNs.  Instead, a non-WKSI must (i) register a shelf registration statement with the SEC for the issuance of securities covering a maximum of three years, (ii) estimate the amount of securities it will issue during those three years, and (iii) pay in advance filing fees to the SEC for the total amount of those securities.  Once a non-WKSI exceeds the amount of securities it estimated at the beginning of the three-year period, it cannot issue any more securities.  A non-WKSI thus must track offers and sales of securities off of any non-WKSI shelf to ensure that excess securities are not offered or sold.  (AC ¶¶ 64, 65.)

Barclays Bank issued two shelf registration statements during its time as a non-WKSI: one in 2018 and another in 2019.

**The 2018 Shelf.** In January 2018, Barclays Bank convened a "working group" to address the consequences of its loss of WSKI status. (AC ¶ 70.) The working group decided that Barclays Bank should convert its existing WKSI shelf into a non-WKSI shelf for 18 months—and therefore estimated the total amount of securities it anticipated offering during that 18-month period. (AC ¶¶ 71-72.) On February 22, 2018, Barclays Bank implemented that conversion, estimating that it would offer and sell approximately $21.3 billion of securities during the 18-month period ("2018 Shelf"). (AC ¶ 73.) Although working group members understood and discussed "the need to track actual offers and sales of securities against the amount of registered securities on a real-time basis," "no internal control was established to track offers and sales of securities, nor was any member of the Working Group or other [Barclays Bank] personnel performing that task." (AC ¶ 74.) Plaintiff does not allege that any Individual Defendant was part of the working group. Nor does the Amended Complaint plead that any Individual Defendant knew that no one at Barclays Bank was tracking this information.

**The 2019 Shelf.** Near the 2018 Shelf's expiration, the working group reconvened to register a new non-WKSI Shelf for a three-year period ("2019 Shelf"), estimating that it would offer and sell $20.8 billion of securities from the 2019 Shelf. (AC ¶¶ 75, 77.) The 2019 Shelf was declared effective on August 1, 2019. (AC ¶ 77.) At that time, Barclays Bank did not "establish any internal control to track offers and sales of securities on a real-time basis and no member of the Working Group or other Barclays personnel was performing that task." (AC ¶ 78.) Again, Plaintiff does not allege that any Individual Defendant was part of the working group or knew that no one at Barclays Bank was tracking this information.

**C.** **Barclays Discovers Its Over-Issuance and Immediately Self-Reports to the SEC and Discloses to the Market Its Mistake.**

On March 8, 2022, a member of Barclays' finance function asked personnel in Barclays Bank's legal department how much capacity "remained available to be offered and sold off of the 2019 Shelf." (AC ¶ 79.) The next day, on March 9, 2022, Barclays Bank personnel tried to calculate the 2019 Shelf's remaining capacity and realized that (i) there was "no internal control in place to track in real time the amount of securities offered and sold against the amount of securities registered," and (ii) "securities had been offered and sold in excess of the amount registered under the 2019 Shelf." (AC ¶¶ 79-81.) As a result, Barclays Bank "halted new offers and sales of securities from that shelf, effectively suspending its structured note business." (*Id.*)

**Barclays' Initial Disclosures about Its Over-Issuance Mistake.** On March 14, 2022, "Barclays reported the over-issuance to the SEC" and announced to the market "the suspension of sales and issuance of two popular exchange traded notes." (AC ¶ 14.)

On March 28, 2022, Barclays publicly disclosed in a Form 6-K filed with the SEC "details" about the over-issuance. (AC ¶ 82.) Barclays disclosed that the "securities offered and sold under its US shelf registration statement"—specifically, structured notes and ETNs—"during a period of approximately one year exceeded the registered amount" by "approximately US$15.2bn." (AC ¶ 160.) Barclays also disclosed the estimated financial impact of the over-issuance, making clear that it "represents [Barclays'] best estimate *at this time* of losses which may arise from these matters." (*Id.* (emphasis added).) Barclays further disclosed that it had voluntarily "elected to conduct a rescission offer to eligible purchasers" of the over-issued structured notes and ETNs and "commissioned an independent review" of the matter, including "the control environment related to such issuances." (*Id.*) Lastly, Barclays disclosed that "regulatory authorities are conducting inquiries and making requests for information." (*Id.*)

***Barclays' Q1 2022 Results Announcement.***  On April 28, 2022, Barclays issued its results announcement for Q1 2022.  Under the heading "Contingent liabilities and commitments," Barclays stated that "Barclays has a provision of £540m at Q122 relating to this matter" (referring to the over-issuance mistake) and contingent liabilities "in relation to any potential claims or enforcement actions taken against Barclays Bank PLC."  (AC ¶ 169; Ex. 2 at 24.)  Barclays made clear that its exposure estimates reflected its "best estimate of the rescission right investors have for these securities."  (*Id.*)  Barclays also "disclosed that it was in discussions with the SEC about filing a restatement of the year-end 2021 audited financial statements previously filed with the SEC for both [Barclays] as well as [Barclays Bank] in connection with [the] over-issuance."  (AC ¶ 86.)

The results announcement also included details about the "costs associated with the upcoming Rescission Offer," which meant that "[l]itigation and conduct charges in the income statement in relation to 2021 were under reported by £220m increasing total operating expenses from a reported £14,439m to £14,659m.  Provisions on the balance sheet have increased from a reported £1,688m to £1,908m."  (AC ¶ 175.)

***Barclays' May 4, 2022 Annual General Meeting.***  On May 4, 2022, Messrs. Higgins and Venkatakrishnan spoke about the over-issuance during Barclays' 2022 annual general meeting.  Noting that "we do not get everything right," Mr. Higgins expressed his "dismay[]" regarding the "entirely self-inflicted problem."  (AC ¶ 177.)  Cautioning that the independent review was ongoing, he expressed his belief that "we will find that, in all our complexities, we missed some simple tasks," finally noting that "[t]his is not rocket science" and that Barclays "can and will do better, learning the lessons from this particular issue and applying discipline across all of our controls."  (*Id.*)  Mr. Venkatakrishnan expressed similar sentiments.  (AC ¶ 178.)  Plaintiff

misconstrues those after-the-fact reflections about the over-issuance mistake as "admission[s]" that Barclays "knew" years earlier when it lost its WKSI status that "Barclays did not implement any internal controls to account for the aggregate amount of securities issued." (AC ¶ 216.)

**Barclays' May 16, 2022 Release and Amended Annual Report.** On May 16, 2022, Barclays publicly disclosed on the Form 6-K it filed with the SEC that it would "restate its year-end 2021 audited financial statements filed with the SEC." (AC ¶¶ 86, 181.) A week later, on May 23, 2022, "Barclays filed its an [*sic*] Amended 2021 Annual Report on Form 20-F." (AC ¶ 182.) Consistent with Barclays' disclosures in its Q1 2021 results announcement, Barclays disclosed that its restatement "reflect[ed] both a £220m litigation and conduct provision" and a "contingent liability disclosure in respect of the impact" of the over-issuance of Barclays Bank structured notes and ETNs. (AC ¶ 182.) Barclays also "amended various disclosures and risk factors in the 2021 20-F 'to reflect management's conclusion that the Company's internal control over financial reporting and disclosure controls and procedures were not effective'" as of year-end 2021 "'due to a material weakness in the Company's internal control over financial reporting identified subsequent to the Original Filing Date as a result of the Over-issuance.'" (*Id.*)

**Barclays' Q2 2022 Results Announcement.** On July 28, 2022, Barclays issued its results announcement for Q2 2022. (AC ¶ 188.) Barclays disclosed (which the Amended Complaint only partially quotes) that the ongoing independent review "of the facts and circumstances relating" to the over-issuance of Barclays Bank structured notes and ETNs had led to "the discovery that, while the vast majority of the over-issuance occurred under the [2019 Shelf], a small portion of the over-issuance also occurred under [the 2018 Shelf]." (Ex. 3 at 9-10.)[2]

---

[2] In assessing a motion to dismiss, the court may consider "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *Kleinman* v. *Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013).

In particular, as reported in the SEC Order, which Plaintiff cites and quotes extensively in the Amended Complaint, in June 2022, as part of the ongoing independent review, Barclays Bank learned that certain "carry-over calculations" relating to the 2018 Shelf were incorrect, and, as a result, Barclays Bank had offered and sold $1.3 billion of securities in excess of what had remained on the 2018 Shelf during the so-called "gap period' between June 26, 2019, when the 2019 Shelf was filed, and August 1, 2019, when the 2019 Shelf was declared effective.  (AC ¶¶ 76, 84 (capitalization omitted).)  Although Plaintiff acknowledges that Barclays "discovered" this issue regarding the 2018 Shelf "in early June 2022," Plaintiff alleges that Barclays' disclosures about the over-issuance months earlier in March 2018 were *knowingly* false because Barclays failed, at that time, to disclose the then-unknown issues regarding the 2018 Shelf.  (AC ¶ 162.)

### D.   The SEC Order

On September 29, 2022, Barclays and Barclays Bank settled with the SEC claims related to Barclays Bank's "failure to put into place any internal control around the real-time tracking of securities being offered or sold off of its Commission-registered shelf registration statement," resulting in an over-issuance of $17.7 billion of structured notes and ETNs.  (AC ¶¶ 92-94.) Tellingly, the SEC Order does not contend that Barclays or Barclays Bank violated any negligence- or fraud-based provisions of the securities laws in connection with the over-issuance mistake.

### E.   Plaintiff's Allegations

To try to transform a mistake in over-issuing Barclays Bank securities into securities fraud perpetrated against Barclays' shareholders under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Plaintiff seizes on two categories of statements.

*First*, Plaintiff challenges generic, aspirational statements about Barclays' efforts to implement internal controls that Barclays made before it discovered the over-issuance mistake.

For example, Plaintiff challenges the following statements in Barclays' 2020 annual report filed on Form 20-F:

- Barclays has "robust internal controls" (AC ¶ 136);

- Barclays "was focus[ed] on strengthening the internal control environment across the Group" (*id.*); and

- Barclays "is committed to operating within a strong system of internal control," and its "frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance" (AC ¶ 137).

According to Plaintiff, those statements must have been false because "the over-issuances had occurred." (AC ¶ 143.)

*Second*, in classic fraud-by-hindsight fashion, Plaintiff declares that the disclosures Barclays made shortly after it discovered the over-issuance mistake (in an effort to inform the market in near-real-time about its then understanding of the mistake's scope) must have been false because those disclosures turned out to underestimate the full extent of the mistake, which Barclays learned later, during the course of the independent review. For example, Plaintiff alleges that Barclays' disclosure on March 28, 2022—approximately two weeks after first discovering the mistake—that its "*best estimate at this time* of the losses which may arise from these matters" was false because that estimate turned out to be lower than the total losses that Barclays reported almost two months later in its annual report for 2021. (AC ¶¶ 160, 162 (emphasis added).)

Plaintiff alleges that the truth "about the over-issuances" was revealed through two disclosures—one on March 28, 2022, when Barclays "disclosed details around the internal control issues and potential financial impact of the over-issuance from the [] 2019 Shelf," and one on July 28, 2022, when Barclays disclosed an "additional over-issuance[]" from the 2018 Shelf. (AC ¶ 238.) Plaintiff alleges that the "final revelation of the truth" occurred on February 15, 2023,

when Barclays "announced that its full year 2022 revenue was down," and that it was "clawing back compensation from certain Individual Defendants." (AC ¶ 244 (capitalization omitted).)

Plaintiff also asserts control-person claims under Section 20(a) of the Exchange Act against the Individual Defendants for its Section 10(b) claim, Mr. Higgins (Barclays' Group Chairman, against whom it does not assert a Section 10(b) claim), and Barclays Bank. (AC ¶¶ 276-84.)

## ARGUMENT

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). The heightened pleading standards under Rule 9(b) and the PSLRA are "demanding," *Amorosa* v. *Gen. Elec. Co.*, 2022 WL 3577838, at *5 (S.D.N.Y. Aug. 19, 2022); they "require a securities fraud complaint to '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent,'" *Gamm* v. *Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019). In addition, Plaintiff must plead particularized facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

The Amended Complaint falls far short of satisfying those demanding standards. Plaintiff's securities fraud claim must be dismissed for failure to plead three independently required elements: (i) "a material misrepresentation (or omission)"; (ii) "scienter"; and (iii) "loss causation." *Singh* v. *Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019).

## I. PLAINTIFF HAS NOT PLED A STRONG INFERENCE OF SCIENTER.

Under the PSLRA, Plaintiff must allege a "strong inference" of scienter, *i.e.*, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319-20 (2007). In this Circuit, "[w]here a defendant is a corporation," the plaintiff must "plead[] facts that give rise to 'a strong inference that someone whose intent could

be imputed to the corporation acted with the requisite scienter.'" *Jackson*, 960 F.3d at 98. An employee's scienter generally can be imputed to the corporation only if the employee "made," "craft[ed]," or "review[ed]" the alleged misstatements or otherwise was "involved in the[ir] dissemination." *Id.* at 98, 99. Here, Plaintiff seeks to impute scienter to Barclays only from the Individual Defendants, Barclays' most senior executives.

To allege a strong inference of scienter, Plaintiff must plead particularized facts (i) "showing that the defendant[] had both motive and opportunity to commit the fraud" or (ii) "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. Regardless of how Plaintiff tries to plead it, the inference of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Jackson*, 960 F.3d at 98. That "inherently comparative" inquiry "does not require a court to draw all inferences in plaintiff's favor." *Zech Cap. LLC* v. *Ernst & Young Hua Ming*, 636 F. App'x 582, 585 (2d Cir. 2016). As the Second Circuit has made clear, the strict pleading requirement for scienter is meant to distinguish "deliberate fraud and an unfortunate (yet unintentional) error caused by mere mismanagement." *Jackson*, 960 F.3d at 98.

Where there are "multiple defendants, a plaintiff [also] must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 664 (S.D.N.Y. 2017). Plaintiff makes *no* attempt to do so here.

### A. Plaintiff Does Not Allege that Any Defendant Had a Motive to Commit Fraud.

Plaintiff comes nowhere close to adequately pleading a strong inference that any Defendant had a "motive" to commit fraud. The Amended Complaint's sole motive allegation is that all of the Defendants "were motivated" to disregard all internal controls so as to "not disrupt their trading business" by "the time-consuming process" of tracking the issuance of Barclays Bank securities.

(AC ¶ 235.)  As an initial matter, that is precisely the type of "general profit motive common to all corporations," which the Second Circuit repeatedly has held "does not suffice" to plead "any particular motive" as a matter of law.  *Landesbank Baden-Wurttemberg* v. *Goldman, Sachs & Co.*, 478 F. App'x 679, 681 (2d Cir. 2012); *see Africa* v. *Jianpu Tech. Inc.*, 2022 WL 4537973, at *11 (S.D.N.Y. Sept. 28, 2022) (company's alleged motive to "hit [its] revenue targets" is "not sufficient" because desire to "sustain the appearance of corporate profitability" is "possessed by virtually all corporate insiders").  Indeed, if courts "were to accept that a corporation's general interest in profitability establishes motive to lie, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'" *Altayyar* v. *Etsy, Inc.*, 242 F. Supp. 3d 161, 183 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018).

Moreover, Plaintiff's motive allegation is contradicted by other allegations in the Amended Complaint and makes no sense.  As Plaintiff acknowledges, as soon as Barclays discovered its mistake, it (i) "reported the over-issuance to the SEC" (AC ¶ 14), (ii) "announced the suspension of sales and issuance of two popular exchange traded notes" (*id.*), and (iii) voluntarily agreed to buy back the over-issued securities (AC ¶ 160).  Those are not the acts of an intentional fraudster bent on "not disrupt[ing] their trading business" at all costs.  (AC ¶ 235.)  What is more, the supposed desire to profit from its trading business does nothing to explain why Defendants would be motivated to misrepresent anything after Barclays had disclosed the over-issuance mistake (*i.e.*, the second category of alleged misstatements) because, by that point, Defendants already had "disrupt[ed] their [structured product] trading business."  (AC ¶ 235.)

**B.    Plaintiff Does Not Allege Conscious Misbehavior or Recklessness.**

"In the absence of a showing of motive, 'it is still possible to plead scienter by identifying circumstances' indicative of conscious misbehavior or recklessness on the part of the defendant,

'though the strength of the circumstantial allegations must be correspondingly greater.'" *Ong* v. *Chipotle Mexican Grill, Inc.*, 2017 WL 933108, at *14 (S.D.N.Y. Mar. 8, 2017). Plaintiff attempts to plead only the latter. The Second Circuit has made clear that "conscious recklessness" is "not merely a heightened form of negligence," but "a state of mind approximating actual intent." *S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009). Pleading recklessness requires allegations of "an extreme departure from the standards of ordinary care to the extent that *the danger was either known to the defendant or so obvious that the defendant must have been aware of it*." *Id.* (emphasis in original). "An allegation that a defendant merely ought to have known is not sufficient to allege recklessness." *Kuriakose* v. *Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 184-85 (S.D.N.Y. 2012), *aff'd sub nom.*, 543 F. App'x 72 (2d Cir. 2013).

For starters, Plaintiff does not even try to allege conscious misbehavior or recklessness for the challenged statements that Barclays made beginning in March 2022 after it discovered the over-issuance mistake. Nor could it. Plaintiff asserts that those statements were false because they did not disclose the over-issuance from the 2018 Shelf. But Plaintiff admits that Barclays did not discover the over-issuance from the 2018 Shelf until June 2022. (AC ¶ 84.) Barclays could not have disclosed information it had not yet discovered. As a matter of law, the fact that a company "acknowledg[es] [its] material weaknesses and disclos[es] [its] continued efforts to resolve them, only to learn of yet more" issues does not give rise to an inference of scienter. *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 297 (S.D.N.Y. 2014). Moreover, the fact that Barclays disclosed the over-issuance from the 2018 Shelf in its "next public filing" after discovering the issue further undermines any inference that Defendants were trying to conceal anything from the market. *City of Brockton Ret. Sys.* v. *Avon Prod., Inc.*, 2014 WL 4832321, at *24 (S.D.N.Y. Sept. 29, 2014); *see* AC ¶ 188. The Court therefore should dismiss Plaintiff's

claims based on the challenged statements made after Barclays discovered the over-issuance mistake for failure to even try to plead scienter.

As to the challenged statements made before Barclays discovered the over-issuance mistake, Plaintiff's grab-bag of speculation falls far short of supporting a strong inference that Barclays' most senior executives—the only people whose intent Plaintiff seeks to impute to Barclays—"knew or recklessly disregarded" that the company's subsidiary, Barclays Bank, did not have internal controls in place to track the securities issued off of the 2018 and 2019 Shelves.

*1.* ***Assumptions Based on Corporate Role.*** Plaintiff speculates that the Individual Defendants' "positions with the Company [] made them privy" to unspecified "confidential information concerning Barclays participated [*sic*] in the fraudulent conduct alleged herein." (AC ¶ 210.) But Plaintiff "must do more than allege that the Individual Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions." *Lipow* v. *Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015). "Courts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight" whatsoever. *Id.*

Instead, to support its assertion that Defendants "recklessly disregarded" the challenged statements' purported inaccuracy (AC ¶ 206), Plaintiff "must specifically identify the reports or statements containing [contrary facts]" *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008). Plaintiff makes no effort to do so. *See Wyche* v. *Advanced Drainage Sys., Inc.*, 2017 WL 971805, at *14 (S.D.N.Y. Mar. 10, 2017) ("Plaintiff has not identified contemporaneous facts, reports, or statements to which Defendants had access and which contained information contrary to the information Defendants conveyed to the public."); *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *13 (S.D.N.Y. Mar. 30, 2018) (no scienter

where complaint "fails to reference a single internal [] document or confidential source" and does not "include any dates or time frame in which Defendants were put on notice of contradictory information").

*2. Plaintiff's "Must Have Known" Theory.*  Plaintiff posits that the over-issuance was "not a complicated accounting error" but merely a "simple" mistake.  (AC ¶¶ 208, 213, 216.)  From that premise alone, Plaintiff concludes that the mistake was "so obvious as to be deliberate recklessness."  (AC ¶ 209.)  That allegation is nothing more than impermissible "fraud by hindsight"—*i.e.*, "because something eventually went wrong, defendants must have known about the problem earlier."  *In re Biogen Inc. Secs. Litig.*, 857 F.3d 34, 44 (1st Cir. 2017).  There is nothing "sinister" or fraudulent about "the failure to catch [] a mistake": "[m]istakes . . . happen in public companies."  *Shaw Grp.*, 540 F. Supp. 2d at 473.  "Just because something is wrong or incorrect as a matter of fact does not mean it was reckless."  *In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1097355, at *14 (S.D.N.Y. Mar. 12, 2015).

As a result, merely pointing to an "error's supposed simplicity" does "not establish a 'strong inference' that Defendants intended to deceive or manipulate investors."  *Fain* v. *USA Techs., Inc.*, 707 F. App'x 91, 97 (3d Cir. 2017).  That is because it is black-letter law that being "'negligent[]' does not provide a basis for [a] fraud claim."  *Zech*, 636 F. App'x at 585.

*3. The Supposed "Admissions."*  Plaintiff cites statements by Messrs. Higgins and Venkatakrishnan on May 4, 2022, acknowledging that Barclays "do[es] not get everything right" and that the over-issuance mistake was an "entirely self-inflicted problem."  (AC ¶¶ 177-78.)  Plaintiff misconstrues those statements as "admissions" that Barclays "knew" years earlier when it lost its WKSI status that "Barclays did not implement any internal controls to account for the aggregate amount of securities issued."  (AC ¶ 216.)  That contention is frivolous on its face.

Simply put, "[s]tatements indicating a present-sense understanding of a prior state of affairs do not give rise to an inference of scienter." *City of Birmingham* v. *Ryanair Holdings*, 2020 WL 2834857, at *3 n.3 (S.D.N.Y. June 1, 2020). The Second Circuit has expressly rejected a plaintiff's attempt to establish "scienter based on [a] *post hoc* statement by [the company's CFO] acknowledging that [he] knew the Company faced risks" because the statement is not probative of whether he was "aware of those risks at the time." *Inter-Loc. Pension Fund GCC/IBT* v. *Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011); *see In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 572 n.5 (6th Cir. 2004) (company president's statement "made in retrospect . . . [at] congressional hearing[]" irrelevant to whether he "knew otherwise *at the time*") (emphasis in original); *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1347 (10th Cir. 2012) ("defendants' hindsight review . . . contributes nothing to an inference of scienter"); *Holbrook* v. *Trivago N.V.*, 2019 WL 948809, at *13 (S.D.N.Y. Feb. 26, 2019) (defendant's "*post hoc* description of the extent of the ultimate impact of" issue "does not speak to what the Company knew . . . at the time of the Offering").

*4. Knowledge of Non-WKSI Status.* Based on the presumption that "it was known within Barclays" that Barclays Bank had "lost WKSI status," Plaintiff leaps to the conclusion that the Individual Defendants knew that Barclays Bank "*did not implement any internal controls to account for the amount of securities issued.*" (AC ¶ 228 (emphasis added).) But that conclusion in no way follows from Plaintiff's premise. Rather, it is akin to an argument recently rejected by Judge Engelmayer that a defendant's knowledge that a company was doing business in China supports an inference that the defendant knew the company was "doing *prohibited* business" in China. *In re DraftKings Inc. Sec. Litig.*, 2023 WL 145591, at *37 (S.D.N.Y. Jan. 10, 2023) (emphasis added); *see Gray* v. *Alpha & Omega Semiconductor Ltd.*, 2021 WL 4429499, at *11 (S.D.N.Y. Sept. 27, 2021) (allegations were "a leap too far" because "[k]nowing that Huawei was

added to [a government red flag list] does not mean knowing that all business with Huawei after that addition was unlawful"); *Lachman* v. *Revlon, Inc.*, 487 F. Supp. 3d 111, 137 (E.D.N.Y. 2020) (allegation that defendants "'led the planning and implementation' . . . does not establish that they 'actually received information about the fraud'"); *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996) ("The fact that [defendant] did not automatically equate record profits with misconduct cannot be said to be reckless.").

5. ***Compensation Adjustments.*** Plaintiff cites Barclays' February 15, 2023 announcement of compensation adjustments for Messrs. Venkatakrishnan and Morzaria and Ms. Cross as evidence of scienter. (AC ¶ 244.) But, fatally, Plaintiff does not plead any facts suggesting that those adjustments related to participation in any purported fraud. And where no such facts are pled, "reduction of the pay of executives to reflect *actual* performance does not give rise to a compelling inference of scienter." *Christian* v. *BT Grp. PLC*, 2018 WL 3647213, at *8 (D.N.J. Aug. 1, 2018) (emphasis added). Even where compensation reductions are due to "the [r]estatement [of financials]" and "the material weakness in [the company's] internal controls over financial reporting," such allegations do not amount to scienter. *In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457, at *17 (N.D. Ill. Jan. 12, 2021). That is because, where an individual defendant was "responsible for, and certified the accuracy of, [the company's] financial reporting," "[i]t is reasonable to infer that [the company] clawed back the remainder of [the individual defendant's] bonus to hold him accountable for the material weakness that manifested on his watch . . . *regardless* of what he knew or *did not know*." *Id.* (emphasis added); *see Doshi* v. *Gen. Cable Corp.*, 823 F.3d 1032, 1044 (6th Cir. 2016) (remedial measures, including compensation clawbacks, "counsel against inferring that [defendants] acted with scienter"); *Brine* v. *MHPI VII*

*LLC*, 2022 WL 2199826, at *5 (C.D. Cal. Feb. 15, 2022) ("the inclusion of a clawback mechanism" supports a "plausible and compelling opposing inference regarding scienter").

   **6.  *The "Core Operations" Doctrine.***   Out of options, Plaintiff asserts that "[i]ssuing securities is a core operation of Barclays and maintaining WKSI status is critical to supporting that core operation."  (AC ¶ 212.)  Once again, Plaintiff leaps from the proposition that WKSI status was important to Barclays to the unsubstantiated assertion that Defendants *must have known* that "Barclays did not implement any internal controls to account for the amount of securities issued." (AC ¶ 220.)  Leaving aside that this allegation, too, does not follow from its premise, Plaintiff's "core operations" arguments fail because, as this Court has recognized, "the Second Circuit has [] questioned whether the core operation doctrine has survived the enactment of the PSLRA," and the doctrine is "not independently sufficient to raise a strong inference of scienter."  *Bratusov* v. *Comscore, Inc*., 2020 WL 3447989, at *13 (S.D.N.Y. June 24, 2020).  At best, the doctrine only "bolsters the strength of the inference of scienter when plaintiff has *already* adequately alleged facts indicating that defendants might have known their statements were false."  *Tyler* v. *Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011) (emphasis added).  Further, even if it survived the PSLRA's enactment, "[c]ourts applying the doctrine have generally 'required that the operation in question constitute nearly all of a company's business before finding scienter.'" *Hensley* v. *IEC Elecs. Corp.*, 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014).  Plaintiff cannot plausibly allege that risk management and internal controls for issuing ETNs and structured notes by its subsidiary Barclays Bank "constitute nearly all" of Barclays' business.   *Id.*; *see Venkataraman* v. *Kandi Techs. Grp., Inc.*, 2021 WL 4952260, at *4 (S.D.N.Y. Oct. 25, 2021) ("not apparent . . . the core operations doctrine applies . . . because the allegations [] predominantly turn on issues related to accounting and internal controls as opposed to 'events affecting a significant

source of income'").  In any event, that risk management and internal controls are generally important says nothing about whether Defendants intended to mislead investors when they made the challenged statements.

*     *     *

Even if Plaintiff had alleged any facts giving rise to any inference of scienter (it does not), the "more compelling inference" is that the over-issuance of Barclays Bank securities was "negligently made [in] [] error," and Defendants "subsequently corrected their disclosures to the Securities and Exchange Commission [] when they became aware of the error." *Rotunno* v. *Wood*, 2022 WL 14997930, at *3 (2d Cir. Oct. 27, 2022).  Indeed, Barclays' prompt disclosure to its regulators and the market of the over-issuance mistake, commencement of a voluntarily-commissioned independent review, continued contemporaneous public disclosures about the impact of the over-issuance mistake, and decision to conduct a rescission offer of historic scope fatally "undermine any inference of scienter." *Avon*, 2014 WL 4832321, at *24; *see Long Miao* v. *Fanhua, Inc.*, 442 F. Supp. 3d 774, 808 (S.D.N.Y. 2020) ("initiation of an independent investigation . . . , if anything, supports the opposite inference [to scienter]"); *Slayton* v. *Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (scienter allegations insufficient where facts suggested that defendant "was endeavoring in good faith to ascertain and disclose future losses").  It "defies logic to conclude that executives who are seeking to perpetrate fraudulent information upon the market would make such fulsome disclosures" and take such extensive corrective measures. *Kuriakose*, 897 F. Supp. at 185.  Tellingly, after conducting its own investigation, the SEC declined to pursue any scienter-based claims against Barclays and Barclays Bank.  Because Plaintiff fails to adequately allege a strong—or indeed any—inference of scienter, and because the opposing

inference of non-fraudulent intent plainly outweighs any inference of scienter, the Court need go no further to dismiss all of Plaintiff's claims.

## II. PLAINTIFF FAILS TO ADEQUATELY ALLEGE THAT DEFENDANTS MADE ANY ACTIONABLE MISSTATEMENTS.

In assessing whether Plaintiff has satisfied the heightened pleading standard for alleging that Defendants made material misrepresentations, the Court must consider whether "[D]efendants' representations, taken together and in context, would have misled a reasonable investor." *Rombach* v. *Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004). None of Plaintiff's misrepresentation theories hits the mark.

### A. Defendants Made No Misstatements Regarding Barclays' Internal Controls.

*1. General Statements Regarding Internal Controls.* To try to conjure a misrepresentation, Plaintiff relies on the same "creative attempt to recast corporate mismanagement as securities fraud" that the Second Circuit has rejected dozens of times. *Singh*, 918 F.3d at 59-60. "The attempt relies on a simple equation: first, point to banal and vague corporate statements affirming the importance of regulatory compliance; next, point to significant regulatory violations." *Id.* But as the Second Circuit has made plain, "[t]he problem with this equation" is that "such generic statements do not invite reasonable reliance . . . and so cannot form the basis of a fraud case." *Id.*

Here, Plaintiff challenges general and aspirational statements in Barclays' 2020 and 2021 annual reports on Form 20-F regarding Barclays' internal controls, such as that Barclays' Audit Committee worked to "maintain[] robust internal controls" and that Barclays is "committed to operating within a strong system of internal control." (AC ¶¶ 136-37, 151, 153; *see id.* ¶¶ 138, 140, 152.) Those are exactly the types of "routine representations" of "risk-management practices"

that "almost every . . . bank makes" and which are inactionable as a matter of law. *JP Morgan*, 553 F.3d at 206.[3]

Indeed, courts have held in other cases brought against Barclays that many of the same or virtually the same statements Plaintiff challenges here are inactionable as a matter of law, including:

| Challenged Statement | Barclays Statement Held Inactionable |
|---|---|
| Barclays "is committed to operating within a strong system of internal control." (AC ¶¶ 137, 151, 153.) | Barclays is "commit[ted] to the management of operational risk." *Gusinsky* v. *Barclays PLC*, 944 F. Supp. 2d 279, 288 (S.D.N.Y. 2013), *aff'd in relevant part*, 750 F.3d 227 (2d Cir. 2014). |
| Barclays has "robust internal controls." (AC ¶ 136.) | Barclays is "committed to robust oversight in the form of a world-class compliance function." *Strougo* v. *Barclays PLC*, 105 F. Supp. 3d 330, 345 (S.D.N.Y. 2015). |
| Barclays' "frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance." (AC ¶¶ 137, 151, 153.) | Barclays' "operation of a system of internal controls [] provides reasonable assurance of effective and efficient operations . . . including . . . compliance with laws and regulations." *Gusinsky*, 944 F. Supp. 2d at 288. |

---

[3] The Second Circuit routinely holds inactionable statements analogous to Barclays' statements about its internal controls and responsibility for those processes within Barclays, including that: defendant "adopted strict measures to protect [it] against these potential liabilities [from counterfeiting], including proactively verifying the authenticity and authorization of products sold on [its] platform," *Asay* v. *Pinduoduo Inc.*, 2020 WL 1530745, at *6 (S.D.N.Y. Mar. 30, 2020), *aff'd*, 2021 WL 3871269 (2d Cir. Aug. 31, 2021); defendant "takes the steps necessary to comply with internationally recognised standards, including Know Your Customer procedures" and "customer due diligence [and] reporting," *Plumber & Steamfitters* v. *Danske Bank*, 11 F.4th 90, 103 (2d Cir. 2021); defendant's "compliance task force was very successful in analyzing, reviewing and evaluating the work of [its] compliance department and taking appropriate action," *In re Liberty Tax*, 828 F. App'x 747, 750 (2d Cir. 2020); defendant "established policies and procedures to comply with applicable requirements" to which it "continue[s] to allocate significant resources," *Singh*, 918 F.3d at 60; and defendant's "Audit Committee plays an active role in reviewing significant issues arising from the work performed by Internal Audit," *In re Aus. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *9, 11 (S.D.N.Y. Dec. 14, 2009).

| Challenged Statement | Barclays Statement Held Inactionable |
|---|---|
| Barclays' "management has assessed the internal control over financial reporting . . . and concluded that, based on its assessment, the internal control over financial reporting was effective." (AC ¶¶ 137-38, 151, 153.)[4] | Barclays' CEO concluded "that the . . . Company's disclosure controls and procedures were effective." *Gusinsky*, 944 F. Supp. 2d at 288. |
| Barclays "was focus[ed] on strengthening the internal control environment across the Group" and, "[t]he Group's control environment [is] now in a much stronger position." (AC ¶ 136.) | Barclays implemented a "new . . . control framework" to "reinforce a control and compliance culture throughout the bank." *Strougo*, 105 F. Supp. 3d at 345.<br><br>Barclays "adopted new processes for effectively learning from mistakes in 2012 following an internal review," which "allow[s] Barclays to understand and address underlying root causes of issues and apply lessons learned more broadly." *Id.* at 347. |

Plaintiff further contends that "the fact that the over-issuances had occurred" must mean that Barclays' general statements were false. (AC ¶ 156.) That too runs headlong into settled Second Circuit law. The Second Circuit has repeatedly held that "simple and generic assertions about having 'policies and procedures' and allocating 'significant resources'" to regulatory compliance efforts—particularly alongside "acknowledgements of the complexity" of such efforts—cannot be construed as guarantees of compliance. *Singh*, 918 F.3d at 64. Simply put, such statements do not "guarantee" any "concrete fact or outcome." *City of Pontiac* v. *UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014). Indeed, Barclays' statements expressly warned that its internal controls could fail, which the Amended Complaint strategically omits. Barclays cautioned that

---

[4] Judge Caproni recently elaborated on why this identical statement (AC ¶¶ 137, 151) and similar statements challenged by Plaintiff (AC ¶¶ 138, 151, 153) are inactionable as a matter of law: that the company "later disclosed that its financial controls had not been effective during this time period" does not render the statement false because the disclosure "did not state that the Company's internal controls were effective—[it] stated only that management had *concluded* as much." *Schiro* v. *Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 299 (S.D.N.Y. 2019). Plaintiff offers no allegations, as it must, that "management had not so concluded." *Id.*

"[i]nternal control systems, no matter how well designed, have inherent limitations and may not prevent or detect misstatements." (Ex. 4 at 14.) Barclays further warned that its internal controls are "designed to identify, evaluate and *manage, rather than eliminate*, the risk of failure to achieve business objectives and can only provide *reasonable, and not absolute*, assurance against material misstatement or loss." (Ex. 4 at 13; Ex. 5 at 11 (emphasis added).)

As a matter of law, statements that controls exist "do not purport to guarantee that [the] controls will perform perfectly in every instance" and "allegations that those controls must have been deficient because they may have failed to detect some weaknesses in [the company's] financial reports or disclosures in some instances, are not sufficient." *Banco Bradesco*, 277 F. Supp. 3d at 648; *see In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *16 (S.D.N.Y. Mar. 24, 2023) ("[T]he fact that Defendants were subject to [consent orders] . . . does not mean that Citigroup was not investing in its risk management system at the times the challenged statements were made or that the investments were inadequate at that time.").[5]

**2. SOX Certifications.** The Amended Complaint also alleges that the Sarbanes-Oxley Act ("SOX") certifications signed by Messrs. Staley, Venkatakrishnan, and Morzaria were false. (AC ¶¶ 141-43, 154-56.) Plaintiff asserts that the SOX certifications were false for only one reason: "the fact that the over-issuance had occurred" must mean that a "material weakness existed in

---

[5] Plaintiff contends that Barclays' quarterly reports for Q1 2021, Q2 2021, and Q3 2021 are actionable solely because they supposedly "incorporated . . . by reference" the generic, aspirational statements regarding internal controls in the 2020 annual report. (AC ¶¶ 145, 147, 149.) Putting aside that the generic statements in the 2020 annual report are inactionable as a matter of law, the three quarterly reports Plaintiff challenges do not purport to incorporate by reference the 2020 annual report because it was not filed as an exhibit to the quarterly reports to be incorporated by reference in accordance with Rule 303(b) of Regulation S-T (17 CFR § 232.303(b)). Thus, even if there were material misstatements in the 2020 annual report (there were not), such statements were not repeated in the three quarterly reports, and Plaintiff's claims based on them must be dismissed. *See Pompano-Windy City Partners, Ltd.* v. *Bear Stearns & Co.*, 794 F. Supp. 1265, 1286 (S.D.N.Y. 1992) (rejecting allegations premised on incorrect incorporation-by-reference claim).

Barclays' internal control environment." (AC ¶ 143.) That is a classically improper form of fraud-by-hindsight pleading. Plaintiff misconstrues statements regarding the "design[]" of financial reporting controls, and opinions regarding those controls, as ironclad assurances and guarantees that Barclays had and would have no control deficiencies. (AC ¶¶ 141, 154.) Courts have uniformly rejected this sort of attempt at pleading that SOX certifications were false. *See, e.g.*, *Lachman*, 487 F. Supp. 3d at 134 ("Plaintiffs fail to allege that [the company's] SOX certifications were materially false or misleading simply because a weakness in [the company's internal controls over financial reporting] was later discovered."); *Citigroup*, 2023 WL 2632258, at *20 (subsequent "identification of control deficiencies and misstatements, without more, does not show" falsity of SOX certifications); *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *12 (S.D.N.Y. Mar. 30, 2021) (same). Moreover, because SOX certifications "contain[] an important qualification that the certifying officer's statements are true 'based on his knowledge,'" courts have required plaintiffs to plead actual knowledge that the certifications were false. *Das* v. *Rio Tinto PLC*, 332 F. Supp. 3d 786, 812 (S.D.N.Y. 2018). Plaintiff falls well short of that requirement.

### B. Defendants Did Not Misrepresent Barclays' "Best Estimate" of the Financial Exposure from the Over-Issuance Mistake.

Plaintiff challenges numerous statements that Defendants made after Barclays discovered the over-issuance mistake. None of its allegations pass muster.

*1. The "Best Estimate" Statements.* Plaintiff alleges that statements Defendants made between March 28, 2022, and May 23, 2022, regarding Barclays' "best estimate" of the financial exposure from the over-issuance mistake, were false because the disclosures did not account for the over-issuance from the 2018 Shelf, which Barclays did not discover until June 2022—*after* the challenged statements were made. (AC ¶¶ 18, 84, 160-76, 182-85.) In other words, Plaintiff

argues that Barclays committed securities fraud because it failed to disclose something it did not know at the time. To state that theory is to refute it. Plaintiff's frivolous argument fails for a number of reasons.

*First*, Plaintiff acknowledges that Barclays did not discover the over-issuance from the 2018 Shelf until June 2022. (AC ¶ 84.) The notion that Barclays should have disclosed the issue before it even knew about it makes no sense. Needless to say, "[c]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Novak*, 216 F.3d at 309; *see In re Corning Inc. Sec. Litig.*, 2005 WL 714352, at *1 (2d Cir. Mar. 30, 2005) (because plaintiff failed to allege that the company "was aware that the photonics business would slow," the company's statements were not "false or materially misleading because they did not disclose a future slowdown in photonics sales").

*Second*, the statements Defendants did make were true when they made them. Barclays disclosed that its exposure estimates reflected its "best estimate" at the time, but cautioned that the independent review relating to the matter remained ongoing.[6] In light of those disclosures, Barclays' subsequent discovery and disclosure of an additional over-issuance does not render the prior statements concerning the size of the over-issuance false or misleading when made. *See Magnum Hunter*, 26 F. Supp. 3d at 295 ("The fact that defendants recognized problems, announced that they were implementing effective controls and procedures, and then [subsequently] recognized more problems does not indicate that their statements were false at the time that they were made.").

---

[6] *See* Ex. 6 at 5 ("Barclays has commissioned an independent review of the facts and circumstances relating to this matter"); Ex. 2 at 24 (same); Ex. 7 at 18 ("[Barclays] is conducting a review, assisted by external counsel, of the facts and circumstances relating to the sale of the relevant affected securities in excess of amounts registered . . . . [Barclays] is also conducting an internal review involving a five-year look-back at limits in other issuance programmes [with external regulatory limits related to securities issuance].").

*Third*, even if Plaintiff could plead that Barclays' "best estimate" of exposure was false by omitting what Barclays had not yet learned about the 2018 Shelf over-issuance, Plaintiff does not allege any facts suggesting that the portion of the over-issuance from the 2018 Shelf was material to Barclays Bank's financial statements for fiscal year 2021. *See Gavish* v. *Revlon, Inc.*, 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004) (no materiality following conclusory allegations where plaintiff "fails . . . to even attempt to approximate the magnitude or degree of those misstatements in relation to [defendants'] total financial picture"). Indeed, Barclays did *not* restate its financial statements after identifying the over-issuance from the 2018 Shelf, demonstrating that this over-issuance did not materially affect the initial approximation of the financial impact attributable to the over-issuance at year-end 2021. *See In re Lone Pine Res., Inc.*, 2014 WL 1259653, at *4 (S.D.N.Y. Mar. 27, 2014) (alleged misstatement immaterial where plaintiff "pleads no facts establishing that the omission . . . had any quantitative impact on the financial information reported . . . , let alone one of 5% or more").

*Fourth*, Plaintiff's contention that Barclays "*was continuing to sell* unregistered securities in excess of the amounts registered by the 2018 Shelf" at the time it made its disclosures of the over-issuance in March, April, and May 2022 is demonstrably wrong. (AC ¶¶ 162, 176, 185 (emphasis added).) As stated in the SEC Order—which the Amended Complaint cites and quotes extensively—the over-issuance from the 2018 Shelf occurred between June 26, 2019 and August 1, 2019. (Ex. 1 ¶¶ 27, 33.) Plaintiff pleads no facts suggesting that Barclays was selling unregistered securities from the 2018 Shelf between March and May 2022, when the challenged statements were made. Nor could Plaintiff have alleged any such facts, because the 2018 Shelf was no longer in existence during the March-May 2022 period. Indeed, as Plaintiff acknowledges, the 2018 Shelf expired in 2019. (AC ¶ 75.)

**2. *Barclays Bank's Financial Restatement.*** Plaintiff claims that the following sentence in the April 28, 2022 results announcement for Q1 2022 was false: "[T]he directors of [Barclays Bank] determined that [Barclays Bank] would Restate the financial statements included in its Annual Report on Form 20-F for the year ended 31 December 2021." (AC ¶ 171.) Plaintiff does not explain why that statement is false, as the PSLRA requires. *See* 15 U.S.C. § 78u-4(b)(1) (Plaintiff must plead with particularity "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading"). Nor could Plaintiff do so because the statement is indisputably true. Barclays Bank *did* restate its 2021 Form 20-F.

**3. *Barclays' Announcement of the Results of the Independent Review.*** In its results announcement for Q3 2022 on October 26, 2022, Barclays discussed the independent review of the over-issuance mistake. Plaintiff takes issue with the following sentence from that discussion: "The Review further concluded that the over-issuance was not the result of a general lack of attention to controls by Barclays, and that Barclays' management has consistently emphasised the importance of maintaining effective controls." (AC ¶ 193.) Plaintiff alleges that this sentence was false and misleading because (i) "the Barclays Board was continuing to assess the situation surrounding the over-issuance and had yet to issue its final report assessing the individuals responsible for the over-issuance," and (ii) Barclays supposedly failed to mention that the over-issuance had "harm[ed] [] the Company's reputation and standing in the U.S. structured note market." (AC ¶ 194.) Those allegations are meritless.

*First*, Barclays had informed the market less than a month earlier, on September 30, 2022, in its Form 6-K that, even though the independent review "concluded that the occurrence of the over-issuance was not the result of a general lack of attention to controls by Barclays, . . . [t]he Review's findings will be used to consider individual accountabilities in relation to this matter and

may include adjustments to remuneration, including to past variable remuneration, the potential for disciplinary action and performance management as appropriate." (Ex. 8 at 3.) Thus, Barclays disclosed the very information Plaintiff claims it did not know. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013) ("Reasonable investors thus had ready access to the very information that the plaintiffs assert should have been disclosed and the defendants are not liable for failing to reiterate that information.").

*Second*, Plaintiff appears to contend that Barclays should have noted in its disclosure that a "final report" of the independent review had not yet been issued. (AC ¶ 193.) But Plaintiff pleads no facts to support its contention that a "final report" existed and that it was not issued until sometime after Barclays made its statement on October 26, 2022. At any rate, Plaintiff does not explain why knowing the exact date that a formal report (if one exists) had been completed would have been material, let alone why Barclays would have a duty to disclose that information. "[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *Dalberth* v. *Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014).

Lastly, there is no merit to Plaintiff's claim that, by October 26, 2022, the market was unaware that the over-issuance mistake had "harm[ed] [] the Company's reputation and standing in the U.S. structured note market." (AC ¶ 194.) Putting aside that there is no duty to disclose what is "obvious," *Zerman* v. *Ball*, 735 F.2d 15, 21 (2d Cir. 1984), Barclays in fact disclosed in its October 26, 2022 results announcement that the over-issuance mistake had "an adverse effect on the Group's . . . reputation" (Ex. 9 at 26.).

## III.   PLAINTIFF'S LOSS CAUSATION ALLEGATIONS ARE FATALLY FLAWED.

Even if Plaintiff had adequately pleaded the falsity and scienter elements of a Section 10(b) claim (it has not), it fails to allege loss causation as to two of the three purported "corrective disclosures." To plead loss causation, a plaintiff must allege "that the subject of the fraudulent

statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (internal citation omitted); *see* 15 U.S.C. § 78u-4(b)(4).  Plaintiff fails to satisfy that burden as to the (i) July 28, 2022 Q2 2022 results announcement and (ii) February 15, 2023 FY 2022 results announcement and 2022 Form 20-F because those purported "corrective disclosures" did not reveal any material information regarding the alleged misrepresentations that had not already been disclosed, and, at most, constitute insufficient materializations of *disclosed* risks.  Given Plaintiff's defective loss causation allegations, even if Plaintiff's claims are not dismissed in their entirety (they should be), the proposed class period should end on March 28, 2022—the date of the only corrective disclosure that possibly could be considered adequately alleged.

***July 28, 2022 "Corrective Disclosure."***  Plaintiff alleges that Barclays' July 28, 2022 Q2 2022 results announcement, which disclosed to the market that "a small portion of the over-issuance also occurred under [the 2018 Shelf]" (Ex. 3 at 10), was a "corrective disclosure" that "further reveal[ed] the extent of Defendants' fraud" (AC ¶¶ 18, 188).  But the disclosed fact that some of the over-issuance occurred under the 2018 Shelf revealed neither the falsity of a prior statement, *Lentell*, 396 F.3d at 175 n.4, nor the materialization of a "risk concealed by [a] misrepresentation[]," *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010).

As detailed above, on March 28, 2022, Barclays disclosed *approximations* of the size and impact of the over-issuance and announced that it had "commissioned an independent review of the facts and circumstances relating to this matter including, among other things, the control environment related to such issuances."  (Ex. 6 at 5); *see* Section II.B, *supra*.  Following the March 28 announcement, Barclays repeatedly communicated to the market that the independent review

remained ongoing. (*See* Ex. 2 at 25; Ex. 10 at 3-4; Ex. 7 at 18.) Given those statements, that Barclays subsequently identified—and disclosed—an additional over-issuance (from the 2018 Shelf) is hardly surprising, and reveals no falsity of any prior statement. (Ex. 1 at ¶ 33; Ex. 3 at 7); *see* Section II.B, *supra*. Put simply, the purported July 28, 2022 "corrective disclosure" "disclosed nothing new." *Magnum Hunter*, 26 F. Supp. 3d at 300 (no loss causation where Defendants warned the market that it may identify additional weakness). At best, this information constituted the materialization of a risk that Barclays previously disclosed and thus fails to support loss causation. *See Monroe Cty. Emps.' Ret. Sys.* v. *YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 358 (S.D.N.Y. 2014) (no loss causation from "materialization of a known risk, rather than the disclosure of a concealed one").

  ***February 15, 2023 "Corrective Disclosure."*** Plaintiff contends that Barclays' announcement that it was adjusting 2021 and 2022 compensation for Messrs. Venkatakrishnan and Morzaria and Ms. Cross, and that 2022 revenue was down 19% "due, in part, to costs related to the over-issuances of securities and resulting recession [*sic*] offer," finally revealed the "full truth" of the supposed fraud almost a year after Barclays disclosed to the market the over-issuance mistake. (AC ¶ 21.) But that disclosure did not correct any prior misstatements.

  On September 30, 2022, Barclays explicitly disclosed that its voluntarily-commissioned independent review's "findings will be used to consider individual accountabilities in relation to this matter and *may include adjustments to remuneration, including to past variable remuneration*." (Ex. 8 at 3 (emphasis added).) Given that disclosure, Barclays' later announcement that three senior executives' compensation was in fact adjusted was nothing more than materialization of a previously disclosed risk. That is fatal to Plaintiff's claim because allegations that a firm's "stock price dropped when a *disclosed* risk . . . materialized" do not suffice

to plead loss causation.  *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, 2019 WL 1368787, at *15 (S.D.N.Y. Mar. 26, 2019) (emphasis added); *see YPF Sociedad Anonima*, 15 F. Supp. 3d at 358 (no loss causation from "materialization of a known risk, rather than the disclosure of a concealed one").

Plaintiff's characterization of Barclays' 2022 financial results is similarly inadequate to plead a "corrective disclosure."  The Amended Complaint points to the "costs" incurred through the "myriad steps," described in Barclays' 2022 annual report, to "remediat[e]" the over-issuance but fails to explain how Barclays' undertaking of remedial measures came as news to the market. (AC ¶¶ 21, 24.)  That Barclays "address[ed] the lack of effective controls at the Company and the requirements imposed by the SEC Order" (AC ¶ 24), was hardly a revelation to the market after Barclays' public settlement with the SEC, in which Barclays expressly *undertook* to complete remedial measures (Ex. 1 at ¶ 43), and Barclays' public announcement that it would "consider findings from external review" of its internal control environment and "take appropriate actions" (Ex. 11 at 5; *see* Ex. 8 at 3.).  Accordingly, the 2022 Form 20-F revealed neither the falsity of a prior statement nor the materialization of a risk concealed by a misrepresentation.

Unable to plead any new information regarding Defendants' alleged fraud, Plaintiff is "reduced to relying solely on Defendants' revelation of poor financial results . . . to allege loss causation.  That is simply not enough."  *Born* v. *Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 494-95 (S.D.N.Y. 2021).  Plaintiff is wrong that Barclays' disclosure of a 19% decline in 2022 revenue was a "corrective disclosure."  (AC ¶¶ 21, 244.)  Simply put, the announcement of those earnings results provided no new material information about Barclays' alleged fraud.  *See In re IPO Sec. Litig.*, 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005) (emphasis omitted) (although "a failure to

meet earnings forecasts has a negative effect on stock prices," it does not have a "corrective effect" because "[i]t does not disclose the scheme").

## IV. PLAINTIFF'S CONTROL-PERSON LIABILITY CLAIM SHOULD BE DISMISSED.

Plaintiff asserts a control-person claim under Section 20(a) of the Exchange Act against the Individual Defendants for its Section 10(b) claims, Mr. Higgins, and Barclays Bank. Because Plaintiff fails to allege any "primary violation" of the securities laws, its control-person liability claim under Section 20(a) also must be dismissed. *Bratusov*, 2020 WL 3447989, at *6.

Plaintiff also fails to plead that either Mr. Higgins (Barclays' Group Chairman, against whom Plaintiff does not assert a Section 10(b) claim) or Barclays Bank had "actual control over the *transaction* in question," *i.e.*, the alleged misstatements that they did not make. *Ark. Teachers Ret. Sys.* v. *Bankrate, Inc.*, 18 F. Supp. 3d 482, 486 (S.D.N.Y. 2014) (emphasis in original). Conclusory allegations that Mr. Higgins is "in a position to control the contents" of disclosures, and that Barclays Bank has a corporate affiliation with Barclays, are "insufficient as a matter of law" to establish control person liability. *Banco Bradesco*, 277 F. Supp. 3d at 669; *see Pub. Emps. Ret. Sys. of Miss.* v. *Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010) ("mere allegations of a corporate affiliation" between defendants insufficient to "indicate control by one over another" for control-person liability).

Moreover, Plaintiff fails to allege "particularized facts" that either Mr. Higgins or Barclays Bank acted with "conscious misbehavior or recklessness," as required to plead that they were "culpable particip[ants]" in the alleged fraud. *Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 438-39 (S.D.N.Y. 2014) (dismissing Section 20(a) claim for failure to plead primary violation and culpable participation). That Mr. Higgins has a high-ranking corporate title—the Amended Complaint's only allegation about him (AC

¶ 252)—is insufficient. "Merely generally alleging" that Section 20(a) defendants were "decision-making officials or had access to material information is inadequate" and "does not indicate involvement in perpetrating the fraud." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 572 (S.D.N.Y. 2011). Similarly, Plaintiff fails to articulate a nexus between the alleged misstatements and any actions taken by Barclays Bank, let alone "the nature of [Barclays Bank's] 'culpable participation'" in the alleged fraud. *Ellison* v. *Am. Image Motor Co., Inc.*, 36 F. Supp. 2d 628, 642 (S.D.N.Y. 1999) (internal citation omitted). Accordingly, the claim against Barclays Bank also fails.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.

Dated: May 5, 2023

Respectfully Submitted,

/s/ *Jeffrey T. Scott*
Jeffrey T. Scott
Matthew J. Porpora
Julia A. Malkina
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Attorneys for Defendants*
