# Exhibit 1

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

**SECURITIES ACT OF 1933**
Release No. 11110 / September 29, 2022

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 95944 / September 29, 2022

**ACCOUNTING AND AUDITING ENFORCEMENT**
Release No. 4344 / September 29, 2022

**ADMINISTRATIVE PROCEEDING**
File No. 3-21181

| | |
|---|---|
| In the Matter of<br><br>BARCLAYS PLC and<br>BARCLAYS BANK PLC<br><br>Respondents. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Barclays PLC ("BPLC") and Barclays Bank PLC ("BBPLC") (together, "Respondents").

**II.**

In anticipation of the institution of these proceedings, Respondents have submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondents' Offer, the Commission finds[1] that

**Summary**

1. This matter arises from BBPLC's failure to put into place any internal control around the real-time tracking of securities being offered or sold off of its Commission-registered shelf registration statement. As a result of this failure, BBPLC offered and sold an unprecedented amount of securities—cumulatively totaling approximately $17.7 billion—in excess of what it had registered with the Commission, in violation of Sections 5(a) and (c) of the Securities Act. And, in connection with the over-issuances and internal control failure, BPLC and BBPLC restated their year-end 2021 audited financial statements filed with the Commission.

2. In May 2017, BPLC and BBPLC lost their status as well-known seasoned issuers ("WKSI"). On February 22, 2018, BBPLC filed an amended registration statement to convert its prior WKSI shelf to a non-WKSI shelf ("2018 Shelf"), for the approximately 18 months remaining until its expiration. The 2018 Shelf was declared effective on March 30, 2018, and included a specification of the maximum aggregate offering price of securities available to be offered or sold from the 2018 Shelf.

3. On June 14, 2019, BBPLC filed a registration statement for a new non-WKSI shelf ("2019 Shelf") to replace the 2018 Shelf. The 2019 Shelf was declared effective on August 1, 2019, and included a specification of the maximum aggregate offering price of securities available to be offered or sold from the 2019 Shelf.

4. As it was nearing expiration, the 2018 Shelf still had securities remaining for additional offers or sales. Therefore, as part of internal considerations around the registration of the 2019 Shelf, BBPLC personnel completed an exercise ("Carry-Over Calculations"), whereby they calculated (1) the amount of securities needed for offers or sales from the 2018 Shelf during the period between BBPLC's filing of its shelf registration statement for the 2019 Shelf and the date when the 2019 Shelf became effective ("Gap Period"), and (2) the amount of securities left over on the 2018 Shelf after accounting for the projected Gap Period offers or sales, which were to be de-registered, with the registration fees originally assessed on those securities to be used to offset a portion of the registration fees associated with the 2019 Shelf.

5. At the time of the registration of both the 2018 Shelf and the 2019 Shelf, certain BBPLC personnel recognized the need to accurately record relevant information about securities that were offered or sold so as to be able to track the aggregate amount of securities that were cumulatively offered and sold from each respective Shelf on a real-time basis, thereby ensuring that BBPLC did not offer or sell any securities in excess of what had been registered. No internal

---

[1] The findings herein are made pursuant to Respondents' Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

control was established to address this issue, and the amount of securities that were offered and sold was not tracked.

6. As a result, the Carry-Over Calculations were incorrect, so that during some of the Gap Period, beginning on or around June 26, 2019, BBPLC offered and sold securities in excess of the amount remaining on the 2018 Shelf, ultimately leading to BBPLC offering and selling approximately $1.3 billion of securities in excess of what was registered with the Commission on the 2018 Shelf.

7. In addition, due to its failure to establish any internal control to track the amount of securities that were offered or sold on a real-time basis, beginning on or around January 28, 2021, BBPLC offered and sold securities in excess of what was registered on the 2019 Shelf. These over-issuances continued until on or around March 9, 2022, when BBPLC discovered this issue. Over the 14-month period of over-issuance, BBPLC offered and sold approximately $16.37 billion of securities in excess of what was registered with the Commission on the 2019 Shelf.

8. On March 14, 2022, BBPLC reported the issue to regulators and disclosed to the market that BBPLC did not have sufficient issuance capacity to support further sales from inventory and any further issuances of certain exchange-traded notes ("ETN"). On March 28, 2022, BPLC publicly disclosed details concerning the internal control issues related to, and the potential financial impact of, the over-issuance by BBPLC. Also on that date, BPLC announced BBPLC's intent to offer rescission to investors who had purchased securities from BBPLC in relevant unregistered transactions.

9. The over-issuance impacted both BPLC's and BBPLC's year-end 2021 financial statements. On May 23, 2022, both BPLC and BBPLC filed amendments to their annual reports on Forms 20-F with the Commission, restating their financial statements, by recording a provision and contingent liability relating to the over-issuances and disclosing management's conclusions as to the ineffectiveness of internal control over financial reporting ("ICFR") and disclosure controls and procedures ("DCP") due to a material weakness identified in ICFR.

10. On August 1, 2022, BBPLC commenced the rescission offer, which expired on September 12, 2022.

**Respondents**

11. BPLC is a bank holding company, headquartered in London, United Kingdom. Through its subsidiaries, BPLC provides various financial services, including investment banking, wealth management, and the offer and sale of securities. BPLC has registered the common shares underlying its American Depository Receipts ("ADR") with the Commission pursuant to Section 12(b) of the Exchange Act, and its ADRs trade on the New York Stock Exchange under the ticker symbol "BCS." BPLC has an obligation to file periodic reports with the Commission pursuant to Section 13(a) of the Exchange Act.

12.     BBPLC is a global bank, headquartered in London, United Kingdom and a wholly-owned subsidiary of BPLC.  BBPLC provides various financial services, including the offer and sale of securities.  BBPLC has listed a series of corporate debt securities on U.S. exchanges, each class of which has been registered with the Commission pursuant to Section 12(b) of the Exchange Act.  BBPLC has an obligation to file periodic reports with the Commission pursuant to Section 13(a) of the Exchange Act.

## Facts

### A.     Section 5 of Securities Act

13.     A foundational principle of the federal securities laws is that securities offerings must either be registered or exempt from registration.

14.     Section 5(a) of the Securities Act prohibits the direct or indirect sale of securities through the mail or interstate commerce unless a registration statement has been filed and is in effect.  Section 5(c) prohibits the offer to sell securities through the mail or interstate commerce unless a registration statement has been filed.  Offers and sales must either be registered or meet the requirements of an exemption from registration.

### B.     BBPLC Shelf

15.     Historically, BBPLC has offered and sold securities pursuant to an effective shelf registration statement,[2] on Form F-3.

16.     The BBPLC shelf registration statement is largely used by BBPLC's Structured Products Group for the offer or sale of structured notes[3] and ETNs.[4]  In addition, on occasion, the Group Treasury function for Respondents and related entities ("Group Treasury") also uses the shelf registration statement to sell corporate debt securities.[5]

---

[2]     A shelf registration statement is a filing to register a public offering of securities which permits an issuer to make multiple offerings based on the same registration statement.

[3]     Structured notes are securities issued by financial institutions whose returns are linked to the performance of reference assets or indices.  Structured notes have a fixed maturity and include two components—a bond component and an embedded derivative.

[4]     ETNs are unsecured debt obligations of financial institutions that trade on a securities exchange.  ETN payment terms are linked to the performance of a reference index or benchmark, representing the ETN's investment objective.

[5]     Corporate debt securities are debt obligations issued by companies, which are used to raise money for a variety of corporate purposes.  Companies promise to return the face value of the bond, also known as principal, on a specified maturity date. Until that date, companies usually pay a stated rate of interest.

### C. Loss of WKSI Status

17. On May 10, 2017, the Commission instituted settled public administrative and cease-and-desist proceedings against Barclays Capital Inc.—a subsidiary of BBPLC—arising out of its former wealth and investment management business. *In the Matter of Barclays Capital Inc.*, Adm. Proc. File No. 3-17978 (May 10, 2017).

18. As a result of that action, BPLC and BBPLC became ineligible issuers under Securities Act Rule 405, thereby losing their status as WKSIs. Loss of WKSI status meant that, among other things, BPLC and BBPLC would be unable to file automatic shelf registration statements, which allow WKSIs to register unspecified amounts of different specified types of securities on immediately effective registration statements. A WKSI using an automatic shelf registration statement also is permitted to pay filing fees on a "pay-as-you-go" basis at the time of each takedown off the shelf. Practically, for any new shelf registration statement on Form F-3 being utilized, BPLC and BBPLC would, among other things, need to quantify the total amount of securities that they anticipated offering and selling over the duration of the shelf and pay the registration fees for those securities in advance.

19. Following the loss of WKSI status, certain personnel from BBPLC understood the consequences of this status change, including that they should consider implementing a mechanism to track offers and sales of securities off any shelf, relative to the registered amount of securities available to be offered or sold off that shelf, in order to ensure that no securities in excess of the amount registered were offered or sold.

### D. BBPLC Working Group

#### 1. Conversion of WKSI Shelf to 2018 Shelf

20. BBPLC needed to address its loss of WKSI status with respect to its ongoing securities offerings. As a result, in or around January 2018, BBPLC formed a working group ("Working Group") that included trading desk heads from the Structured Products Group, personnel from an administrative support function called business management, personnel from the product origination group, a member of the compliance department, and a member of the legal department.

21. Initially, the Working Group focused on two issues. First, the Working Group considered whether (1) to amend the existing registration statement to convert BBPLC's existing WKSI shelf into a non-WKSI shelf for approximately 18 months, or (2) to file a new registration statement to register a new, non-WKSI shelf for three years. The Working Group concluded that BBPLC should convert the WKSI shelf into what eventually became the 2018 Shelf.

22. Second, the Working Group worked with the trading desks that would be using the 2018 Shelf in their business, as well as Group Treasury, to calculate the total amount of securities that they anticipated offering and selling over the next approximately 18 months, given that BBPLC sought to register the total amount of securities that it anticipated offering and selling during that period and pay the registration fees for that amount of securities in advance. As part of these

calculations, the Working Group also determined an initial allocation of fees among the trading desks accessing the 2018 Shelf, with the expectation that these allocations would be revisited as data regarding actual offers and sales off of the 2018 Shelf became available.

23. On February 22, 2018, BBPLC filed a post-effective amendment, which amended its prior registration statement on Form F-3 (File No. 333-212571), and on March 30, 2018, BBPLC's post-effective amendment was declared effective. The filing fees for the 2018 Shelf covered the offer or sale of approximately $21.3 billion of securities, for a period of approximately 18 months.

24. During the pendency of the Working Group's efforts, the need to track actual offers and sales of securities against the amount of registered securities on a real-time basis was understood by and discussed among members of the Working Group. Nevertheless, no internal control was established to track offers and sales of securities, nor was any member of the Working Group or other BBPLC personnel performing that task.

### 2. Registration of 2019 Shelf

25. As the 2018 Shelf approached its expiration, the Working Group was reconstituted, with largely the same membership as in 2018. The Working Group undertook a similar approach as previously—including, calculating the total amount of securities that they anticipated offering or selling during the three-year duration of what would become the 2019 Shelf and determining an initial allocation of fees among the trading desks accessing the 2019 Shelf—but the Working Group also needed to perform the Carry-Over Calculations.

26. Specifically, because the 2018 Shelf had excess securities still available to offer or sell, the Working Group needed to determine two amounts. First, it needed to determine how much was needed for offers or sales of securities from the 2018 Shelf during the Gap Period. Second, it needed to determine how many securities would be left over on the 2018 Shelf after accounting for the anticipated Gap Period offers or sales. BBPLC de-registered those remaining securities and used the fees that were originally assessed on those securities to offset a portion of its registration fees due for the 2019 Shelf.

27. On August 1, 2019, BBPLC's registration statement on Form F-3 (File No. 333-232144) was declared effective. The filing fees for the 2019 Shelf covered the offer or sale of approximately $20.8 billion of securities, for a period of three years.

28. Despite the labor intensive work to manually calculate the Carry-Over Calculations and the payment of registration fees related to the 2019 Shelf, again no internal control was established to track offers and sales of securities on a real-time basis, nor was any member of the Working Group or other BBPLC personnel performing that task.

### E. Over-Issuances

29. On March 8, 2022, a member of Group Treasury reached out to the member of the legal department who had been part of the Working Group, inquiring as to how many securities

remained available to be offered and sold off of the 2019 Shelf because Group Treasury was planning on doing a sale of corporate debt securities.

30.     Over the course of that day and the next, various BBPLC personnel attempted to calculate the cumulative amount of securities offered and sold from the 2019 Shelf in order to determine the amount of securities that remained available for sale.  Over the course of these efforts, it became clear to all involved that there was no internal control in place to track in real time the amount of securities offered and sold against the amount of securities registered.

31.     On or around March 9, 2022, BBPLC personnel concluded that securities had been offered and sold in excess of what had been registered on the 2019 Shelf.  Shortly thereafter, BBPLC halted new offers and sales of securities from the 2019 Shelf and, on March 14, 2022, alerted regulators about the over-issuance and disclosed to the market that BBPLC did not have sufficient issuance capacity to support further sales from inventory and any further issuances of certain ETNs.

32.     On March 28, 2022, BPLC publicly disclosed details around the internal control issues and potential financial impact of BBPLC's over-issuance from the 2019 Shelf.

33.     In early June 2022, in connection with an internal investigation into the over-issuance from the 2019 Shelf, BBPLC discovered that the Carry-Over Calculations were incorrect.  In fact, BBPLC had de-registered too large an amount of securities from the 2018 Shelf.  As a result, during some of the Gap Period, beginning on June 26, 2019, BBPLC offered and sold approximately $1.3 billion of securities in excess of what had remained on the 2018 Shelf.

34.     These miscalculations also elongated the time period and increased the amount of the over-issuance from the 2019 Shelf from what BBPLC had originally calculated.  In the end, the first over-issuance occurred on or around January 28, 2021, and BBPLC offered and sold approximately $16.37 billion of securities in excess of the amount registered with the Commission from the 2019 Shelf.

### F.     BPLC and BBPLC Restatements

35.     On April 28, 2022, in connection with its first quarter 2022 results announcement, BPLC disclosed that, as a result of BBPLC's over-issuance, it was in discussions with the Commission about filing a restatement of its year-end 2021 audited financial statements previously filed with the Commission and that BBPLC was in the process of preparing a restatement for its year-end 2021 audited financial statements previously filed with the Commission.  On May 16, 2022, BPLC announced that its Board of Directors determined that BPLC would restate its year-end 2021 audited financial statements filed with the Commission.

36.     On May 23, 2022, both BPLC and BBPLC filed amendments to their 2021 annual reports on Forms 20-F with the Commission including the restatements.  The restatements reflected a £220 million litigation and conduct provision and an associated income statement charge as of year-end 2021 and a contingent liability disclosure, all with respect to the potential impact of the over-issuance from the 2019 Shelf.  The restatements also amended disclosures to reflect

management's conclusions that ICFR and DCP were not effective as of year-end 2021, due to a material weakness in ICFR identified after the original filing date as a result of the over-issuance from the 2019 Shelf.

### G. Rescission Offer

37. Section 12(a)(1) of the Securities Act provides for civil liability for "[a]ny person who . . . offers or sells a security in violation" of Section 5 of the Securities Act. The remedy available under Section 12(a)(1) is rescission. Section 13 of the Securities Act prohibits actions to enforce liability under Section 12(a)(1) unless brought within one year after the violation upon which it is based.

38. On March 28, 2022, BBPLC announced its intent to conduct a rescission offer with respect to the over-issuance. And, on August 1, BBPLC commenced its rescission offer, as described in a Prospectus Supplement to the Prospectus dated May 23, 2022, in connection with its registration statement on Form F-3 (File No. 333-265158).[6] The rescission offer expired on September 12, 2022.

39. BBPLC included as eligible securities for purposes of its rescission offer all of those securities that were offered or sold in excess of what was registered on the 2018 Shelf and the 2019 Shelf, including over-issuances for which an action otherwise would have been barred under Section 12(a)(1).

### H. Respondents' Cooperation and Remedial Efforts

40. In determining to accept the Offer, the Commission considered cooperation afforded the Commission staff and remedial acts promptly undertaken by Respondents.

41. Among other things, Respondents identified the over-issuance from the 2019 Shelf, later identified the over-issuance from the 2018 Shelf, self-reported both over-issuances to regulators, and initiated an internal investigation. Respondents presented interim findings to Commission staff throughout the internal investigation, as well as conclusions to Commission staff upon substantial completion of the investigation. Respondents also voluntarily provided relevant documents, made personnel available for voluntary testimony, and provided assistance in obtaining relevant information from third parties.

42. BBPLC also initiated a rescission offer to provide compensation to investors by either repurchasing relevant securities from current holders or by paying equivalent rescissory damages to former holders and included as eligible securities for purposes of its rescission offer all securities that were offered or sold in unregistered transactions, including those for which actions would otherwise be barred under Section 12(a)(1) of the Securities Act.

---

[6] BBPLC amended its rescission offer on August 12, 2022, to include certain additional eligible securities.

43. Respondents also initiated a review of policies and procedures and internal controls relating to BBPLC's Commission-registered shelves ("BBPLC Shelf Review") soon after identification of the over-issuance, which included (1) an assessment of end-to-end processes to identify any significant control gaps related to the offers and sales off of BBPLC's Commission-registered shelves, and (2) recommendations for enhancements designed to effect compliance with Section 5 of the Securities Act.

### **Violations**

44. As a result of the conduct described above, BBPLC violated Section 5(a) of the Securities Act, which states that "[u]nless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly, (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise, or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

45. As a result of the conduct described above, BBPLC violated Section 5(c) of the Securities Act, which states that "[i]t shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security."

46. As a result of the conduct described above, Respondents violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder, which, among other things, require every issuer of a security registered pursuant to Section 12 of the Exchange Act to file accurate annual reports with the Commission, and that such reports contain all material information necessary to make the required statements in the reports not misleading.

47. As a result of the conduct described above, Respondents violated Section 13(b)(2)(A) of the Exchange Act, which requires issuers with securities registered under Section 12 of the Exchange Act or which are required to file reports pursuant to Section 15(d) of the Exchange Act to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the issuer.

48. As a result of the conduct described above, Respondents violated Section 13(b)(2)(B) of the Exchange Act, which requires issuers with securities registered under Section 12 of the Exchange Act or which is required to file reports pursuant to Section 15(d) of the Exchange Act to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that, among other things, transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP or other criteria applicable to such statements.

49. As a result of the conduct described above, Respondents violated Exchange Act Rule 13a-15(a), which requires issuers with securities registered under Section 12 of the Exchange Act to maintain disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e) and

also requires issuers required to file reports pursuant to Section 13(a) or Section 15(d) of the Exchange Act to maintain internal control over financial reporting as defined in Exchange Act Rule 13a-15(f).

## Disgorgement

The disgorgement and prejudgment interest ordered in Section IV.D. below is consistent with equitable principles and does not exceed BBPLC's net profits from its violations.

## Undertakings

A.   Respondents have undertaken as follows:

By sixty (60) days from the issuance of the Order, BBPLC shall adopt and implement the following BBPLC Shelf Review recommendations for enhancements designed to effect compliance with Section 5 of the Securities Act:

1. The centralization of oversight of BBPLC's SEC-registered shelves in Group Treasury;

2. The maintenance of clear minimum control requirements for BBPLC's SEC-registered shelves, including, but not limited to, a process for reviewing any change in WKSI status for BBPLC and the tracking of offers and sales off of BBPLC's SEC-registered shelves as appropriate; and

3. The maintenance of a data repository, with appropriate controls and governance designed to ensure reliability of the data, for the purpose of tracking offers and sales, as appropriate, off of BBPLC's SEC-registered shelves.

By ninety (90) days from the completion of the undertakings described above, Respondents' Internal Audit function shall (1) complete an audit of BBPLC's policies and procedures and internal controls relating to compliance with Section 5 of the Securities Act in connection with BBPLC's SEC-registered shelves to confirm the adoption and implementation of the undertakings described above; and (2) submit its audit report ("Internal Audit Report") to the Audit Committee of Respondents' Boards of Directors and the Commission staff.

BBPLC shall certify, in writing, compliance with the undertakings set forth above. The certification shall be made by BBPLC's Treasurer. The certification shall identify the undertaking, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Respondents agree to provide such evidence. The certification and supporting material shall be submitted to Sheldon L. Pollock, with a copy to the Office of Chief Counsel of the Enforcement Division, no later than thirty (30) days from the submission of the Internal Audit Report described above.

B.       The Internal Audit Report will likely include confidential financial, proprietary, competitive business or commercial information.  Public disclosure of the Internal Audit Report could discourage cooperation, impede pending or potential government investigations or undermine the objectives of the reporting requirement.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except (1) pursuant to court order, (2) as agreed to by the parties in writing, (3) to the extent that the Commission determines in its sole discretion that disclosure would be in furtherance of the Commission's discharge of its duties and responsibilities, or (4) is otherwise required by law.

C.       Respondents shall preserve, for a period of not less than six (6) years from the end of the fiscal year last used, the first two (2) years in an easily accessible place, any record of compliance with these undertakings.

D.       For good cause shown, the Commission staff may extend any of the procedural dates relating to the undertakings.  Deadlines for procedural dates shall be counted in calendar days, except that if the last day falls on a weekend or federal holiday, the next business day shall be considered to be the last day.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondents' Offer.

Accordingly, it is hereby ORDERED that:

A.       Pursuant to Section 8A of the Securities Act, BBPLC cease and desist from committing or causing any violations or any future violations of Sections 5(a) and (c) of the Securities Act.

B.       Pursuant to Section 21C of the Exchange Act, Respondents cease and desist from committing or causing any violations and any future violations of Sections 13(a), 13(b)(2)(A), and 13b(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-15(a) thereunder.

C.       Respondents shall comply with undertakings enumerated in Section III.A.-D. above.

D.       BBPLC shall pay disgorgement in the amount of $149,731,011.00 and prejudgment interest thereon in the amount of $11,463,229.00.  Payment of these amounts shall be deemed satisfied by BBPLC's offer of rescission to impacted investors that commenced on August 1, 2022 and expired on September 12, 2022.

E.       Respondents shall, within 14 days of entry of the Order, jointly and severally pay a civil money penalty in the amount of $200,000,000.00 to the Securities and Exchange Commission.  The Commission may distribute civil money penalties collected in this proceeding if, in its discretion, the Commission orders the establishment of a Fair Fund pursuant to 15 U.S.C. § 7246, Section 308(a) of the Sarbanes-Oxley Act of 2002.  The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the

Commission, in its discretion, will seek to distribute funds or, subject to Exchange Act Section 21F(g)(3), transfer them to the general fund of the United States Treasury. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

(1) Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2) Respondents may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3) Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying BPLC and BBPLC as Respondents in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Sheldon L. Pollock, Division of Enforcement, Securities and Exchange Commission, New York Regional Office, 100 Pearl Street, Suite 20-100, New York, New York 10004.

F. Regardless of whether the Commission in its discretion orders the creation of a Fair Fund for the penalties ordered in this proceeding, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondents' payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

G. Respondents shall cooperate fully with the Commission staff and shall provide the Commission staff with files, records, and/or supporting documentation as the Commission staff may request for the purpose of any distribution from any Fair Fund, if, in its discretion, the Commission orders the establishment of a Fair Fund pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002.

By the Commission.

Vanessa A. Countryman
Secretary