# Exhibit 4

# SECURITIES AND EXCHANGE COMMISSION

# WASHINGTON, DC 20549

# FORM 20-F

(Mark One)

☐   REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☑   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended 31 December 2021
OR

☐   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____to _____

☐   SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of event requiring this shell company report _____

| Commission file number | Barclays PLC | 1-09246 |
|---|---|---|

BARCLAYS PLC
(Exact Name of Registrant as Specified in its Charter)

England
(Jurisdiction of Incorporation or Organization)

1 CHURCHILL PLACE, LONDON E14 5HP, England
(Address of Principal Executive Offices)

GARTH WRIGHT, +44 (0)20 7116 3170, GARTH.WRIGHT@BARCLAYS.COM
1 CHURCHILL PLACE, LONDON E14 5HP, England
(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

# 2021 Annual Report on Form 20-F

Barclays PLC Annual Report on Form 20-F 2021

**Barclays PLC**
home.barclays/annualreport

**Notes**

The terms Barclays or Group refer to Barclays PLC together with its subsidiaries. Unless otherwise stated, the income statement analysis compares the year ended 31 December 2021 to the corresponding twelve months of 2020 and balance sheet analysis as at 31 December 2021 with comparatives relating to 31 December 2020. The abbreviations '£m' and '£bn' represent millions and thousands of millions of Pounds Sterling respectively; the abbreviations '$m' and '$bn' represent millions and thousands of millions of US Dollars respectively; and the abbreviations '€m' and '€bn' represent millions and thousands of millions of Euros respectively.

There are a number of key judgement areas, for example impairment calculations, which are based on models and which are subject to ongoing adjustment and modifications. Reported numbers reflect best estimates and judgements at the given point in time.

Relevant terms that are used in this document but are not defined under applicable regulatory guidance or International Financial Reporting Standards (IFRS) are explained in the results glossary that can be accessed at home.barclays/investor-relations/reports-and-events/latest-financial-results.

The information in this document, which was approved by the Board of Directors on 22 February 2022, does not comprise statutory accounts within the meaning of Section 434 of the Companies Act 2006. Statutory accounts for the year ended 31 December 2021, which contain an unmodified audit report under Section 495 of the Companies Act 2006 (which does not make any statements under Section 498 of the Companies Act 2006), will be delivered to the Registrar of Companies in accordance with Section 441 of the Companies Act 2006.

Barclays is a frequent issuer in the debt capital markets and regularly meets with investors via formal road-shows and other ad hoc meetings. Consistent with its usual practice, Barclays expects that from time to time over the coming quarter it will meet with investors globally to discuss these results and other matters relating to the Group.

**Non-IFRS performance measures**

Barclays' management believes that the non-IFRS performance measures included in this document provide valuable information to the readers of the financial statements as they enable the reader to identify a more consistent basis for comparing the businesses' performance between financial periods and provide more detail concerning the elements of performance which the managers of these businesses are most directly able to influence or are relevant for an assessment of the Group. They also reflect an important aspect of the way in which operating targets are defined and performance is monitored by Barclays' management. However, any non-IFRS performance measures in this document are not a substitute for IFRS measures and readers should consider the IFRS measures as well. Refer to the appendix on pages 207 to 211 for further information and calculations of non-IFRS performance measures included throughout this document, and the most directly comparable IFRS measures.

Key non-IFRS measures included in this document, and the most directly comparable IFRS measures, are:

– Average allocated equity represents the average shareholders' equity that is allocated to the businesses. The comparable IFRS measure is average equity. A reconciliation is provided on page 209;

– Average allocated tangible equity is calculated as the average of the previous month's period end allocated tangible equity and the current month's period end allocated tangible equity. The average allocated tangible equity for the period is the average of the monthly averages within that period. Period end allocated tangible equity is calculated as 13.5% (2020: 13.0%) of RWAs for each business, adjusted for capital deductions, excluding goodwill and intangible assets, reflecting the assumptions the Group uses for capital planning purposes. Head Office allocated tangible equity represents the difference between the Group's tangible shareholders' equity and the amounts allocated to businesses. The comparable IFRS measure is average equity. A reconciliation is provided on page 209;

– Average tangible shareholders' equity is calculated as the average of the previous month's period end tangible equity and the current month's period end tangible equity. The average tangible shareholders' equity for the period is the average of the monthly averages within that period. The comparable IFRS measure is average equity. A reconciliation is provided on page 209;

– Return on average allocated equity represents the return on shareholders' equity that is allocated to the businesses. The comparable IFRS measure is return on equity. A reconciliation is provided on page 211;

– Return on average allocated tangible equity is calculated as the annualised profit after tax attributable to ordinary equity holders of the parent, as a proportion of average allocated tangible equity. The comparable IFRS measure is return on equity. A reconciliation is provided on page 208;

– Return on average tangible shareholders' equity excluding structural cost actions and the re-measurement of UK DTAs is calculated as the annualised profit after tax attributable to ordinary equity holders of the parent excluding structural cost actions and the re-measurement of UK DTAs, as a proportion of average allocated tangible equity. The comparable IFRS measure is return on equity. A reconciliation is provided on page 210;

– Return on average tangible shareholders' equity excluding structural cost actions and community aid package is calculated as the annualised profit after tax attributable to ordinary equity holders of the parent excluding structural cost actions and community aid package, as a proportion of average allocated tangible equity. The comparable IFRS measure is return on equity. A reconciliation is provided on page 210;

– Return on average tangible shareholders' equity is calculated as the annualised profit after tax attributable to ordinary equity holders of the parent, as a proportion of average shareholders' equity excluding non-controlling interests and other equity instruments adjusted for the deduction of intangible assets and goodwill. The comparable IFRS measure is return on equity. A reconciliation is provided on page 209; and

– Tangible net asset value per share is calculated by dividing shareholders' equity, excluding non-controlling interests and other equity instruments, less goodwill and intangible assets, by the number of issued ordinary shares. A reconciliation is provided on page 210.

**Forward-looking statements**

This document contains certain forward-looking statements within the meaning of Section 21E of the US Securities Exchange Act of 1934, as amended, and Section 27A of the US Securities Act of 1933, as amended, with respect to the Group. Barclays cautions readers that no forward-looking statement is a guarantee of future performance and that actual results or other financial condition or performance measures could differ materially from those contained in the forward-looking statements. These forward-looking statements can be identified by the fact that they do not relate only to historical or current facts. Forward-looking statements sometimes use words such as 'may', 'will', 'seek', 'continue', 'aim', 'anticipate', 'target', 'projected', 'expect', 'estimate', 'intend', 'plan', 'goal', 'believe', 'achieve' or other words of similar meaning. Forward-looking statements can be made in writing but also may be made verbally by members of the management of the Group (including, without limitation, during management presentations to financial analysts) in connection with this document. Examples of forward-looking statements include, among others, statements or guidance regarding or relating to the Group's future financial position, income growth, assets, impairment charges, provisions, business strategy, capital, leverage and other regulatory ratios, capital distributions (including dividend pay-out ratios and expected payment strategies), projected levels of growth in the banking and financial markets, projected costs or savings, any commitments and targets (including, without limitation, environmental, social and governance (ESG) commitments and targets), estimates of capital expenditures, plans and objectives for future operations, projected employee numbers, IFRS impacts and other statements that are not historical fact. By their nature, forward-looking statements involve risk and uncertainty because they relate to future events and circumstances. The forward-looking statements speak only as at the date on which they are made. Forward-looking statements may be affected by a number of factors, including, without limitation: changes in legislation, the development of standards and interpretations under IFRS, including evolving practices with regard to the interpretation and application of accounting and regulatory standards, emerging and developing ESG reporting standards, the outcome of current and future legal proceedings and regulatory investigations, future levels of conduct provisions, the policies and actions of governmental and regulatory authorities, the Group's ability along with governments and other stakeholders to measure, manage and mitigate the impacts of climate change effectively, environmental, social and geopolitical risks, and the impact of competition. In addition, factors including (but not limited to) the following may have an effect: capital, leverage and other regulatory rules applicable to past, current and future periods; UK, US, Eurozone and global macroeconomic and business conditions; the effects of any volatility in credit markets; market related risks

Case 1:22-cv-08172-KPF   Document 55-4   Filed 05/05/23   Page 5 of 14

such as changes in interest rates and foreign exchange rates; effects of changes in valuation of credit market exposures; changes in valuation of issued securities; volatility in capital markets; changes in credit ratings of any entity within the Group or any securities issued by such entities; direct and indirect impacts of the coronavirus (COVID-19) pandemic; instability as a result of the UK's exit from the European Union ("EU"), the effects of the EU-UK Trade and Cooperation Agreement and the disruption that may subsequently result in the UK and globally; the risk of cyber-attacks, information or security breaches or technology failures on the Group's reputation, business or operations; and the success of future acquisitions, disposals and other strategic transactions. A number of these influences and factors are beyond the Group's control. As a result, the Group's actual financial position, future results, capital distributions, capital, leverage or other regulatory ratios or other financial and non-financial metrics or performance measures or ability to meet commitments and targets may differ materially from the statements or guidance set forth in the Group's forward-looking statements.

Subject to Barclays' obligations under the applicable laws and regulations of any relevant jurisdiction, (including, without limitation, the UK and the US), in relation to disclosure and ongoing information, we undertake no obligation to update publicly or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

**Market and other data**

This document contains information, including statistical data, about certain Barclays markets and its competitive position. Except as otherwise indicated, this information is taken or derived from Datastream and other external sources. Barclays cannot guarantee the accuracy of information taken from external sources, or that, in respect of internal estimates, a third party using different methods would obtain the same estimates as Barclays.

**Uses of Internet addresses**

This document contains inactive textual addresses to internet websites operated by us and third parties. Reference to such websites is made for information purposes only, and information found at such websites is not incorporated by reference into this document.

**References to Strategic Report, Pillar 3 Report and TCFD Report**

This document contains references throughout to the Barclays PLC Strategic Report, Pillar 3 Report and TCFD Report. References to the aforementioned reports are made for information purposes only, and information found in said reports is not incorporated by reference into this document.

# Contents
What's inside this report

## Governance
- Governance contents — 2
- Directors' report — 3
- Remuneration report — 54
- Our people and culture — 92

## Risk review
- Risk review contents — 98
- Risk management — 100
- Material existing and emerging risks — 102
- Climate change risk management — 114
- Principal risk management — 116
- Risk performance — 122
- Supervision and regulation — 187

## Financial review
- Financial review contents — 193
- Key performance indicators — 194
- Consolidated summary income statement — 196
- Income statement commentary — 197
- Consolidated summary balance sheet — 198
- Balance sheet commentary — 199
- Analysis of results by business — 200
- Non-IFRS performance measures — 207

## Financial statements
- Financial statements contents — 212
- Consolidated financial statements — 215
- Notes to the financial statements — 224

## Shareholder information
- Key dates, Annual General Meeting, dividends, and other useful information — 310

# Our Governance

Welcome to our 2021 Governance report. In this report you can see the composition of our Board and our Executive Committee, and find out how our governance framework operates, along with information about the Board's key areas of focus in 2021.

## Directors' report: How we comply

For the year ended 31 December 2021, and as at the date of this report, Barclays PLC has complied in full with the Code's principles and provisions.

# Reporting against the Code's principles and provisions

## The UK Corporate Governance Code

As a company listed on the London Stock Exchange, Barclays PLC applies the principles and provisions of the Code.

A copy of the Code can be found at frc.org.uk. For the year ended 31 December 2021, and as at the date of this report, we are pleased to confirm that Barclays PLC has complied in full with the requirements of the Code. This section sets out how we comply with the Code.

## Disclosure Guidance and Transparency Rules

By virtue of the information included in this Governance section of the Annual Report, we comply with the corporate governance statement requirements of the FCA's DTRs. Certain additional information that is required to be disclosed pursuant to DTR7.2.6 can be found on pages 47 to 52.

## New York Stock Exchange (NYSE)

Barclays is permitted by NYSE rules to follow UK corporate governance practices instead of those applied in the US and any significant variations are explained on page 319.

## Board leadership and company purpose

### Role of the Board

Our governance is designed to deliver an effective and entrepreneurial Board which:

- is effective in providing challenge, advice and support to management
- provides checks and balances and encourages constructive challenge
- drives informed, collaborative and accountable decision-making
- creates long-term sustainable value for our shareholders, having regard to the interests of all our other stakeholders.

You can read more about our governance in the context of the Board, including our Group-wide governance framework and how the Board discharged its responsibilities during 2021, on pages 8 to 14.

### Culture

*The Barclays Way* sets out our Purpose, Values and Mindset, and is the Code of Conduct for everyone working at Barclays, providing a clear path for achieving a dynamic and positive culture within the Group.

The Board is fully supportive of *The Barclays Way* and our Purpose, Values and Mindset, and you can read more about Board's role in this area, including how the Board receives feedback on our culture through a number of channels to ensure it is aligned to our Purpose, Values and Mindset, on page 11.

Our Group Whistleblowing Standard enables employees to raise any matters of concern anonymously and is embedded into our business. You can read more about the role of the Board Audit Committee in reviewing and monitoring the Group's Whistleblowing policies on page 28.

### Relations with shareholders and stakeholders

Considering the views and interests of our stakeholders is an important part of the way in which the Board makes decisions and provides oversight and challenge.

Our comprehensive investor relations engagement helps to inform the Board about investors' views on Barclays, which are communicated regularly to the Board; and our Chairman engages with shareholders on governance and related matters. Our Investor Relations programme returned to a more normalised process in 2021, combining both virtual and in-person formats, as we adapted to new ways of working, allowing high-quality interaction in the ways our investors prefer.

Our shareholder communication guidelines are available on our website at home.barclays/investor-relations/shareholder-information/.

### Institutional investors

In 2021, the Directors, in conjunction with the senior executive team and Investor Relations colleagues, were able to participate in investor meetings, seminars and conferences across many locations, increasingly in person. We held conference calls and webcasts for our quarterly results briefings for both our equity and fixed income investors, and look forward to continuing this engagement through 2022.

During 2021, discussions with investors included, but were not limited to:

- the impact of the COVID-19 pandemic on Barclays, including macroeconomic effects of higher inflation and interest rates
- opportunities arising from the subsequent reopening of global economies, and the recovery in consumer and corporate activity
- drivers of sustained double-digit Group return on average tangible shareholders' equity (RoTE) post-COVID-19 pandemic

## Directors' report: How we comply continued

- Group Chief Executive succession and its impact on the Group's strategic priorities and targets over the medium term
- capital allocation and shareholder distributions, while managing capital towards our target range
- the advance of the climate agenda and furtherance of the Barclays' climate strategy.

### Private shareholders

During 2021, we continued to actively communicate with our private shareholders through shareholder mailings, information available on our website and at our AGM. Our Private Shareholder Relations team is also available to support with any feedback or questions from shareholders. You can read more about our 2021 AGM on this page.

The Group issues regulatory announcements via the Regulatory News Service (RNS) and shareholders can subscribe to receive notifications of such announcements via our website home.barclays/investor-relations/investor-news/regulatory-news-email-alerts/.

More information for shareholders is available on pages 310 to 311, which includes details on signing up to Shareview (which enables shareholders to easily manage their shareholdings and personal information online), receiving dividends electronically, how we return unclaimed funds to shareholders and useful contacts.

### The 2021 AGM

The Board shared the frustration of our shareholders that, like our 2020 AGM, the 2021 AGM was impacted by the COVID-19 pandemic and shareholders were unable to attend in person. The Board and the senior executive team consider our AGM to be an important event in our corporate calendar, providing a key opportunity for shareholder engagement, particularly with our private shareholders, and for shareholders to ask questions of the Board.

In order to maximise shareholder engagement whilst respecting the COVID-19 restrictions and guidance in place at the time, in 2021 we held the AGM as a combined physical and electronic meeting (a 'hybrid' AGM) for the first time. This enabled shareholders to attend the 2021 AGM virtually using electronic facilities and to vote and raise questions in real time, either by telephone or using the electronic facilities. In addition to raising questions at the 2021 AGM itself, shareholders were able to submit questions to the Board in advance of the meeting, as in previous years. All questions received ahead of the 2021 AGM were answered individually and answers to frequently asked questions were published on our website ahead of the meeting.

Voting on all of the resolutions at the 2021 AGM was conducted by way of a poll, thereby giving weight to the number of shares held by shareholders rather than simply attributing a notional one vote to each shareholder voting. With the exception of the shareholder requisitioned Resolution 29, all resolutions were passed with votes 'For' ranging from 91.54% to 99.97% of the total votes cast.

Shareholders voted in favour of amending our Articles of Association (Articles) at the 2021 AGM to include, amongst other changes, specific provisions on how a hybrid general meeting can be conducted, to allow for maximum flexibility in how we might convene and conduct AGMs in future years.

A climate change resolution (Resolution 29) was requisitioned by a group of shareholders co-ordinated by Market Forces. The Board did not consider Resolution 29 to be in the best interests of BPLC and its shareholders as a whole, and recommended that shareholders vote against Resolution 29 for the following reasons (as detailed in the 2021 Notice of AGM available at home.barclays/investor-relations/reports-and-events/general-meetings/):

- firstly, our new climate change strategy was adopted in 2020 to align Barclays to the goals of the Paris Agreement
- secondly, meaningful progress in the 12 months leading to the 2021 AGM had been made to design, refine and embed our detailed approach across Barclays
- thirdly, the Board continued to believe that Barclays can make the greatest difference by supporting the transition to a low-carbon economy, rather than by simply phasing out support for some of the clients who are most engaged in it.

Resolution 29, which was not supported by the Board, was not passed, and the level of shareholder support for it fell well short of the 75% majority required for it to pass. Only 14.04% of the votes cast were cast 'For' Resolution 29, representing 8.92% of the register.

In line with Barclays' announcement at the 2021 AGM to offer shareholders a 'Say on Climate', shareholders will be asked to vote on Barclays' climate strategy at the 2022 AGM. Further details of the 'Say on Climate' vote will be set out in the 2022 Notice of AGM.

### The 2022 AGM

Looking ahead to the 2022 AGM, the Board currently intends to hold the AGM in Manchester on 4 May 2022 at 11:00am as a combined physical and electronic meeting, to allow for shareholders to attend and vote in person or virtually using electronic facilities, should they prefer.

Our plans remain, of course, subject to the ongoing COVID-19 pandemic and any UK Government guidance or restrictions in place at the relevant time, but the Board very much hopes to be able to welcome shareholders to the 2022 AGM in person. Further details will be provided in our 2022 Notice of AGM.

As stated in our 2021 Notice of AGM, it is the Board's intention on an annual basis to alternate AGM venues between London and a venue other than London where Barclays has a significant business or customer presence.

### Stakeholder engagement

Seeking to understand all stakeholders' views, and the impact of our behaviour and business on our customers and clients, colleagues, suppliers, communities and society more broadly, is a key part of how the Board makes decisions and provides oversight and challenge. Accordingly, the Board monitors key indicators across areas such as culture, citizenship, conduct, and customer and client satisfaction on an ongoing basis.

We engaged extensively with shareholders and other stakeholders (including proxy advisory agencies and investor associations) in 2021 on key topics including strategic priorities, governance and succession planning, as well as further engagement on Barclays' climate strategy.

Throughout 2021, we have engaged with our stakeholders through a variety of means including surveys, participation in forums and global and regional industry initiatives.

## Directors' report: How we comply continued

## Colleague engagement

Our colleagues are critical to our success, and the Board recognises that our continued investment in them protects and strengthens our culture.

Barclays has a long-standing commitment to the importance and value of colleague engagement, and in 2021 we continued to listen to colleagues and keep them informed in a number of ways. This included conducting regular 'Here to Listen' employee surveys, first launched in 2020, to make sure we were staying abreast of colleague feedback during the COVID-19 pandemic, as well as our annual 'Your View' employee survey.

You can read more about our commitment to our colleagues and our workforce engagement, including survey results and how we continue to support our colleagues, in the Our people and culture section on pages 92 to 97.

## Conflicts of interest

In accordance with the Companies Act 2006 and BPLC Articles, the Board has the authority to authorise conflicts of interest and this ensures that the influence of third parties does not compromise the independent judgement of the Board. Directors are required to declare any potential or actual conflicts of interest that could interfere with their ability to act in the best interests of the Group.

The Group Company Secretary maintains a conflicts register, which is a record of actual and potential conflicts, together with any Board authorisation of the conflicts. The authorisations are for an indefinite period but are reviewed annually by the Nominations Committee, which also considers the effectiveness of the process for authorising Directors' conflicts of interest. The Board retains the power to vary or terminate these authorisations at any time.

## Division of responsibilities

### Roles on the Board

Executive and Non-Executive Directors share the same duties. However, in line with the principles of the Code, a clear division of responsibilities has been established.

The Chair is responsible for:

- leading the Board and its overall effectiveness
- demonstrating objective judgement
- promoting a culture of openness and constructive challenge and debate between all Directors
- facilitating constructive board relations and the effective contribution of all Non-Executive Directors
- ensuring Directors receive accurate, clear and timely information.

Responsibility for the day-to-day management of the Group is delegated to the Group Chief Executive, who is supported in this role by the ExCo. You can find further information on the membership of the ExCo on page 7.

As a Board we have set out our expectations of each Director in Barclays' *Charter of Expectations*. This includes role profiles and the behaviours and competencies required for each role on the Board, namely the Chair, Deputy Chair (to the extent one is required), the SID, Non-Executive Directors, Executive Directors and Committee Chairs.

Our Non-Executive Directors provide effective oversight and scrutiny, strategic guidance and constructive challenge, holding the Executive Directors to account against their agreed performance objectives. The Non-Executive Directors, led by the Nominations Committee, have primary responsibility for the appointment and removal of the Executive Directors.

The SID provides a sounding board for the Chair, acting as an intermediary for the other Directors when necessary. Our SID is available to shareholders should they have concerns that have not been addressed through the normal engagement channels.

The *Charter of Expectations* is reviewed annually to ensure it remains relevant and accurately reflects the requirements of the Code, the Regulations and industry best practice.

A copy of the *Charter of Expectations* can be found at home.barclays/who-we-are/our-governance/board-responsibilities

### Information provided to the Board

It is the responsibility of the Chair to set the Board agenda, primarily focused on strategy, performance, value creation, culture, stakeholders and accountability, and to ensure that Board members receive timely and high-quality information to enable them to make sound decisions and promote the success of BPLC. Working in collaboration with the Chair, the Group Company Secretary is responsible for ensuring good governance and information flow, to ensure an effective Board.

Throughout the year, both the Executive Directors and senior executives kept the Board informed of key business developments through regular updates. These are in addition to the presentations that the Board and Board Committees receive as part of their formal meetings. Where required to enable them to fulfil their obligations as members of the Board, Directors are able to seek independent and professional advice at Barclays' expense.

## Directors' report: How we comply continued

### Attendance

Directors are expected to attend every Board meeting. In 2021, attendance was very strong both at scheduled meetings and the *ad hoc* meeting (called at short notice), as reflected in the table below. The Chairman met privately, on a quarterly basis, with each Non-Executive Director. If, owing to exceptional circumstances, a Director was not able to attend a Board meeting, the relevant Director ensured that their views were made known to the Chairman in advance of the meeting. The attendance record of Directors at scheduled and *ad hoc* meetings during 2021 is a testament to the commitment of each of our current Directors.

| Board attendance in 2021 | Independent/Executive | Scheduled Meetings eligible to attend | Scheduled Meetings attended | % attendance | Ad hoc Meetings eligible to attend | Ad hoc Meetings attended |
|---|---|---|---|---|---|---|
| **Chairman** | | | | | | |
| Nigel Higgins | On appointment[a] | 14 | 14 | 100 % | 1 | 1 |
| **Executive Directors** | | | | | | |
| C.S. Venkatakrishnan | Executive Director | 4 | 4 | 100 % | 0 | 0 |
| Tushar Morzaria | Executive Director | 14 | 14 | 100 % | 0 | 0 |
| **Non-Executive Directors[b]** | | | | | | |
| Mike Ashley | Independent | 14 | 14 | 100 % | 1 | 1 |
| Tim Breedon | Independent | 14 | 13 | 93 % | 1 | 1 |
| Mohamed A. El-Erian | Independent | 14 | 14 | 100 % | 1 | 1 |
| Dawn Fitzpatrick | Independent | 14 | 14 | 100 % | 1 | 1 |
| Mary Francis | Independent | 14 | 14 | 100 % | 1 | 1 |
| Crawford Gillies | Independent | 14 | 14 | 100 % | 1 | 1 |
| Brian Gilvary | SID[c] | 14 | 14 | 100 % | 1 | 1 |
| Diane Schueneman | Independent | 14 | 14 | 100 % | 1 | 1 |
| Julia Wilson | Independent | 12 | 12 | 100 % | 1 | 1 |
| **Former Directors** | | | | | | |
| Jes Staley | Executive Director | 10 | 10 | 100 % | 0 | 0 |
| Sir Ian Cheshire | Independent | 3 | 3 | 100 % | 0 | 0 |

**Notes**

a   As required by the Code, the Chairman was independent on appointment.

b   Robert Berry did not join the Board until 8 February 2022.

c   Brian Gilvary succeeded Crawford Gillies as SID on 1 January 2021.

## Board Committee cross-membership

The table below shows the number of cross-memberships of the Non-Executive Directors across the Board Committees as at 31 December 2021.



# Directors' report: How we comply continued

**Composition of the Board**

In line with the requirements of the Code, a majority of the Board is comprised of independent Non-Executive Directors. The independence of our Non-Executive Directors is considered by the Nominations Committee on an annual basis, having regard to the independence criteria set out in the Code. As part of this process, our Nominations Committee keeps under review the length of tenure of all Directors, which can affect independence, and makes any recommendations to the Board accordingly.

The independence of Mike Ashley, Crawford Gillies and Diane Schueneman, all of whom have served on the Board for more than six years, and Tim Breedon who has served on the Board for more than nine years, was subjected to a more rigorous review. The Nominations Committee remains satisfied that the lengths of their tenure have no impact on their respective levels of independence or the effectiveness of their contributions. The Nominations Committee and the Board consider all of the Non-Executive Directors to be independent.

In the case of Tim Breedon, having undertaken a rigorous review of his performance as a Non-Executive Director and taking into account other relevant factors that might be considered likely to impair, or could appear to impair, independence including as set out in Provision 10 of the Code, the Nominations Committee and the Board consider Tim to be independent.

During 2021, both Jes Staley and Sir Ian Cheshire stepped down from the Board. Neither raised any concerns about the operation of the Board or management.

You can read more about changes to Board composition and steps taken to further strengthen the Board and consideration of Non-Executive Director independence, including the Nomination Committee's review of Tim Breedon's independence and the appointment of Robert Berry in 2022, in the report of our Nominations Committee on pages 15 to 21.

### Time commitment

All potential new Directors are asked to disclose their other significant commitments. The Nominations Committee then takes this into account when considering a proposed appointment to ensure that Directors can discharge their responsibilities to Barclays effectively. This means not only attending and preparing for formal Board and Board Committee meetings, but also making time to understand the business and to undertake training. The time commitment is agreed with each Non-Executive Director on an individual basis.

In addition, all Directors must seek approval (providing an indication of expected time commitments) before accepting any significant new commitment outside of Barclays. Prior to approving any significant new external commitment for a Director, the Board undertakes a review of all relevant facts and circumstances, including the role and time commitment involved and the nature of the external organisation. In 2021, all external appointment requests were approved on the basis that the Board was comfortable with any actual or potential conflicts and the Board was confident that the Director in question remained able to devote such time necessary to discharge their duties to Barclays effectively.

Set out on this page is the average time commitment expected for the role of Non-Executive Directors and the other Non-Executive positions on the Board.

### Expected time commitment

| Role | Expected time commitment |
|---|---|
| **Chair** | Equivalent of up to 80% of full-time position. |
| **Senior Independent Director** | As required to fulfil the role. |
| **Non-Executive Director** | 35-40 days per year (membership of one Board Committee included, increasing to 50 days a year if member of two Board Committees). |
| **Committee Chairs** | At least 80 days per year (including Non-Executive Director time commitment) for Audit and Risk Committee Chairs and at least 60 days for the Remuneration Committee Chair. |

Where circumstances require it, all Directors are expected to commit additional time as necessary to their work on the Board. The Group Company Secretary maintains a record of each Director's commitments. For the year ended 31 December 2021 and as at the date of publication, the Board is satisfied that none of the Directors is over-committed and that each of the Directors allocates sufficient time to their role in order to discharge their responsibilities effectively.

## Directors' report: How we comply continued

## Composition, succession and evaluation

We have a Nominations Committee, the purpose and activities of which are contained in the report of our Nominations Committee on pages 15 to 21.

### Board appointments

All Board and senior management appointments are viewed through a diversity lens and are based on merit and objective criteria, which focus on the skills and experience required for the Board's effectiveness and the delivery of the Group strategy. Board appointments are made following a rigorous and transparent process facilitated by the Nominations Committee, with the aid of external search consultancy firms.

The Board adopted a revised version of the Board Diversity Policy on 9 February 2021, re-affirming the existing gender diversity target (33% female) and adopting a new ethnic diversity target aligned with the Parker Review on the ethnic diversity of UK Boards (at least one Board member to be a Person of Colour). The Board reconfirmed its commitment to these targets on 9 February 2022.

You can read more about diversity at Board level in the report of our Nominations Committee on page 18, and about Barclays' continued commitment to diversity and inclusion in Our people and culture section on pages 92 to 97.

The composition of the Board, Board Committees and the ExCo is regularly reviewed by the Nominations Committee. It frequently considers the skills required for the Board, Board Committees and the ExCo, identifying the core competencies, diversity and experience required. This, along with the annual effectiveness evaluation, helps to refresh the thinking on Board, Board Committee and ExCo composition and to determine a timeline for proposed new appointments. For the Board, it is standard practice to appoint any new Non-Executive Director or Chair for an initial three-year term, subject to annual re-election at the AGM, which may be extended for up to a further three-year term. As such, Non-Executive Directors typically serve up to a minimum of six years but this period may be extended where the Nominations Committee considers it appropriate.

All Directors are subject to election or re-election (as appropriate) each year by shareholders at the AGM.

Each year, we carry out an effectiveness review in order to evaluate our performance, as a Board, as well as the performance of each of the Board Committees and individual Directors. You can read more about the 2021 Board, Board Committee and Individual Effectiveness review, which was externally facilitated (as required by the Code), in the report of our Nominations Committee on pages 20 to 21.

You can find biographies for each member of the Board, including details of their relevant skills, experience and contribution, Board Committee memberships and other principal appointments on pages 3 to 6. Details of changes to the Board in 2021 and up to the date of this report, together with details of Board appointments, tenure, independence and succession planning are disclosed in the report of our Nominations Committee on pages 15 to 21.

The service contracts for the Executive Directors and the letters of appointment for the Group Chairman and Non-Executive Directors are available for inspection at our registered office and at the AGM.

### Induction

On appointment to the Board, all Directors receive a comprehensive induction that is tailored to the new Director's individual requirements. The induction schedule is designed to provide the new Director with an understanding of how the Group works and the key issues that it faces. The Group Company Secretary consults the Chair when designing a bespoke induction schedule, taking into account the particular needs of a new Director. When a Director is joining a Board Committee, the schedule includes an induction to the operation of that committee.

Following their appointments to the Board in 2021, Venkat and Julia Wilson each received tailored inductions. Robert Berry's induction is in progress, following his appointment to the Board on 8 February 2022. You can read more about their inductions, Dawn Fitzpatrick's induction to the Board Remuneration Committee and Brian Gilvary's briefings in relation to his role as Board Remuneration Committee Chair and responsibilities as SID in the report of our Nominations Committee on page 19.

### Training and development

In order to support the effective contribution by Board and Board Committee members, we regularly provide Directors with the opportunity to take part in ongoing training and development. Directors can also request specific training, as required.

Whilst opportunities for in-person Director training remained limited in 2021 due to the impact of the COVID-19 pandemic and ongoing social distancing guidance, training and development was supported through the Board deep dives, briefings for Board members on key risk topics, and Function reviews described on page 13.

The Board also received an annual briefing on regulatory responsibilities, including the Senior Managers Regime and on Barclays' conduct and financial crime policies and standards.

The Nominations Committee supports the Chair in developing and monitoring effective induction, training and development for the Board, and you can read more on pages 19 to 20.

## Directors' report: How we comply continued

# Audit, Risk and Internal Control

## Accountability

Internal governance processes have been developed to ensure the effective operation of the individual Boards and Board Committees of each of BPLC, BBUKPLC and BBPLC respectively, in recognition of the fact that this is key to the development and execution of the Group's strategy. Generally, there is one set of rules for the Group. Group-wide frameworks, policies and standards are adopted throughout the Group unless local laws or regulations (for example, the ring-fencing obligations applicable to BBUKPLC) require otherwise, or the ExCo decides otherwise in a particular instance.

The Board has a Board Audit Committee and a Board Risk Committee. The purposes and activities of the Board Audit and Board Risk Committees are contained within their respective reports on pages 22 and 31 respectively.

## Internal and external audit functions

The Board, together with the Board Audit Committee, is responsible for ensuring the independence and effectiveness of the internal and external audit functions. For this reason, the Board Audit Committee members met regularly with the Group Chief Internal Auditor and the KPMG lead audit engagement partner, without management present. The appointment and removal of the Group Chief Internal Auditor is a matter reserved to the Board Audit Committee and the appointment, and removal, of the external auditor, is a matter reserved to the Board. Neither task is delegated to management. More detail is provided on pages 28 to 30 of the Board Audit Committee report.

## Company's position and prospects

The Board, together with the Board Audit Committee, is responsible for ensuring the integrity of this Annual Report and that the financial statements as a whole present a fair, balanced and understandable assessment of our performance, position and prospects. This is explained in detail on page 25 of the Board Audit Committee report.

## Risk management and internal control

The Directors are responsible for ensuring that management maintains an effective system of risk management and internal control and for assessing its effectiveness. Such a system is designed to identify, evaluate and manage, rather than eliminate, the risk of failure to achieve business objectives and can only provide reasonable, and not absolute, assurance against material misstatement or loss.

The Group is committed to operating within a strong system of internal control. Barclays has an overarching framework that sets out the approach of the Group to internal governance, *The Barclays Guide*. This establishes the mechanisms, principles and processes through which management implements the strategy set by the Board.

Processes are in place for identifying, evaluating and managing the Principal Risks facing the Group in accordance with the 'Guidance on Risk Management, Internal Control and Related Financial and Business Reporting', published by the FRC. A key component of *The Barclays Guide* is the ERMF. The purpose of the ERMF is to identify and set minimum requirements in respect of the main risks to the strategic objectives of the Group. There are nine Principal Risks under the ERMF: Credit risk, Market risk, Treasury and Capital risk, Operational risk, Climate risk, Model risk, Reputation risk, Conduct risk and Legal risk. The system of risk management and internal control is set out in the risk frameworks relating to each of our nine Principal Risks and the Barclays Control Framework, which details requirements for the delivery of control responsibilities. Group-wide frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance.

## Effectiveness of internal controls

Key controls are assessed on a regular basis for both design and operating effectiveness. Issues arising out of these assessments, where appropriate, are reported to the Board Audit Committee. The Board Audit Committee oversees the control environment (and remediation of related issues) and you can read more about its work on pages 22 to 30. The Board Audit Committee also reviews annually the risk management and internal control system, which includes the ERMF. It has concluded that, throughout the year ended 31 December 2021 and to date, the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations. For more details on that evaluation and its conclusions please see page 28.

The review of the effectiveness of the system of risk management and internal control is achieved through reviewing the effectiveness of the frameworks, principles and processes contained within *The Barclays Guide*, the ERMF and the Barclays Control Framework.

Regular reports are made by management to the Board Risk Committee and the Board covering significant risks, measurement methodologies and appropriate risk appetite for the Group.

Further details of risk management procedures and material existing and emerging risks are given in the Risk review and Risk management sections on pages 98 to 192.

## Controls over financial reporting

A framework of disclosure controls and procedures is in place to support the approval of the financial statements of the Group.

Specific governance committees are responsible for examining the financial reports and disclosures to ensure that they have been subject to adequate verification and comply with applicable standards and legislation.

Where appropriate, these committees report their conclusions to the Board Audit Committee, which debates such conclusions and provides further challenge. Finally, the Board scrutinises and approves results announcements and the Annual Report and ensures that appropriate disclosures have been made. This governance process ensures that both management and the Board are given sufficient opportunity to debate and challenge the financial statements of the Group and other significant disclosures before they are made public.

## Management's report on internal control over financial reporting

Management is responsible for establishing and maintaining adequate internal control over financial reporting under the supervision of the principal executive and financial officers, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements, in accordance with (a) UK-adopted international accounting standards; and (b) International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB), including interpretations issued by the IFRS Interpretations Committee.

## Directors' report: How we comply continued

Internal control over financial reporting includes policies and procedures that pertain to the maintenance of records that, in reasonable detail:

- accurately and fairly reflect transactions and dispositions of assets
- provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with IFRS and that receipts and expenditures are being made only in accordance with authorisations of management and the respective Directors
- provide reasonable assurance regarding prevention or timely detection of unauthorised acquisition, use or disposition of assets that could have a material effect on the financial statements.

Internal control systems, no matter how well designed, have inherent limitations and may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that internal controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

Management has assessed the internal control over financial reporting as at 31 December 2021. In making its assessment, management utilised the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as at 31 December 2021.

The system of internal financial and operational controls is also subject to regulatory oversight in the UK and overseas. Further information on supervision by the financial services regulators is provided under Supervision and Regulation in the Risk review section on pages 187 to 192.

### Changes in internal control over financial reporting

There have been no changes that occurred during the period covered by this report, which have materially affected or are reasonably likely to materially affect the Group's internal control over financial reporting.

## Remuneration

We have a Board Remuneration Committee, the purpose and activities of which are described in the Remuneration report on pages 54 to 91.

The Board has delegated responsibility for the consideration and approval of the remuneration arrangements of the Chairman, the Executive Directors, other senior executives and certain Group employees to the Board Remuneration Committee. The Board Remuneration Committee, when considering the remuneration policies and practices, seeks to ensure that they support our strategy and promote the long-term success of the business and that they are aligned to the successful delivery of the Group's strategy.

All executive and senior management remuneration policies are developed in accordance with the Group's formal and transparent procedures (ensuring that no Director is involved in deciding their own remuneration outcome) and having regard to workforce remuneration and related policies and the alignment of incentives and rewards with culture.

All Board Remuneration Committee members demonstrate independent judgement and discretion when determining and approving remuneration outcomes. The Board as a whole, with the Non-Executive Directors abstaining, considers annually the fees paid to Non-Executive Directors.

You can find further information on the purpose of the Board Remuneration Committee and its activities in 2021 in the Remuneration report on pages 54 to 91.

# Directors' report: Other statutory information

The Directors present their report together with the audited accounts for the year ended 31 December 2021.

# Other statutory information