# Exhibit 5

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549
FORM 20-F

(Mark One)

☐ REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2020

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

OR

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of event requiring this shell company report _____

Commission file number          Barclays PLC                    1-09246

**BARCLAYS PLC**
(Exact Name of Registrant as Specified in its Charter)

ENGLAND
(Jurisdiction of Incorporation or Organization)

1 CHURCHILL PLACE, LONDON E14 5HP, ENGLAND
(Address of Principal Executive Offices)

**GARTH WRIGHT, +44 (0)20 7116 3170, GARTH.WRIGHT@BARCLAYS.COM**
**1 CHURCHILL PLACE, LONDON E14 5HP, ENGLAND**
(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

# Making a difference

Barclays PLC
2020 Annual Report on Form 20-F

**BARCLAYS**

**Notes**
The terms Barclays or Group refer to Barclays PLC together with its subsidiaries. Unless otherwise stated, the income statement analysis compares the year ended 31 December 2020 to the corresponding twelve months of 2019 and balance sheet analysis as at 31 December 2020 with comparatives relating to 31 December 2019. The abbreviations '£m' and '£bn' represent millions and thousands of millions of Pounds Sterling respectively; the abbreviations '$m' and '$bn' represent millions and thousands of millions of US Dollars respectively; and the abbreviations '€m' and '€bn' represent millions and thousands of millions of Euros respectively.

There are a number of key judgement areas, for example impairment calculations, which are based on models and which are subject to ongoing adjustment and modifications. Reported numbers reflect best estimates and judgements at the given point in time.

Relevant terms that are used in this document but are not defined under applicable regulatory guidance or International Financial Reporting Standards (IFRS) are explained in the results glossary that can be accessed at home.barclays/investor-relations/reports-and-events/latest-financial-results.

The information in this announcement, which was approved by the Board of Directors on 17 February 2021, does not comprise statutory accounts within the meaning of Section 434 of the Companies Act 2006. Statutory accounts for the year ended 31 December 2020, which contain an unmodified audit report under Section 495 of the Companies Act 2006 (which does not make any statements under Section 498 of the Companies Act 2006), will be delivered to the Registrar of Companies in accordance with Section 441 of the Companies Act 2006.

Barclays is a frequent issuer in the debt capital markets and regularly meets with investors via formal road-shows and other ad hoc meetings. Consistent with its usual practice, Barclays expects that from time to time over the coming quarter it will meet with investors globally to discuss these results and
other matters relating to the Group.

**Non-IFRS performance measures**
Barclays management believes that the non-IFRS performance measures included in this document provide valuable information to the readers of the financial statements as they enable the reader to identify a more consistent basis for comparing the businesses' performance between financial periods and provide more detail concerning the elements of performance which the managers of these businesses are most directly able to influence or are relevant for an assessment of the Group. They also reflect an important aspect of the way in which operating targets are defined and performance is monitored by Barclays management. However, any non-IFRS performance measures in this document are not a substitute for IFRS measures and readers should consider the IFRS measures as well. Refer to the appendix on pages 198 to 205 for further information and calculations of non-IFRS performance measures included throughout this document, and the most directly comparable IFRS measures.

Key non-IFRS measures included in this document, and the most directly comparable IFRS measures, are:

- Attributable profit/(loss) excluding litigation and conduct represents attributable profit/(loss) excluding litigation and conduct charges. The comparable IFRS measure is attributable profit/(loss). A reconciliation is provided on pages 202 to 205;

- Average allocated equity represents the average shareholders' equity that is allocated to the businesses. The comparable IFRS measure is average equity. A reconciliation is provided on pages 202 to 205;

- Average allocated tangible equity is calculated as the average of the previous month's period end allocated tangible equity and the current month's period end allocated tangible equity. The average allocated tangible equity for the period is the average of the monthly averages within that period. Period end allocated tangible equity is calculated as 13.0% (2019: 13.0%) of RWAs for each business, adjusted for capital deductions, excluding goodwill and intangible assets, reflecting the assumptions the Group uses for capital planning purposes. Head Office allocated tangible equity represents the difference between the Group's tangible shareholders' equity and the amounts allocated to businesses. The comparable IFRS measure is average equity. A reconciliation is provided on pages 202 to 205;

- Average tangible shareholders' equity is calculated as the average of the previous month's period end tangible equity and the current month's period end tangible equity. The average tangible shareholders' equity for the period is the average of the monthly averages within that period. The comparable IFRS measure is average equity. A reconciliation is provided on pages 202 to 205;

- Basic earnings per share excluding litigation and conduct is calculated by dividing statutory profit after tax attributable to ordinary shareholders excluding litigation and conduct charges, by the basic weighted average number of shares. The comparable IFRS measure is basic earnings per share. A reconciliation is provided on pages 202 to 205;

- Cost: income ratio excluding litigation and conduct represents operating expenses excluding litigation and conduct charges, divided by total income. The comparable IFRS measure is cost: income ratio. A reconciliation is provided on pages 202 to 205;

- Operating expenses excluding litigation and conduct represents operating expenses excluding litigation and conduct charges. The comparable IFRS measure is operating expenses. A reconciliation is provided on pages 202 to 205;

- Operating expenses excluding litigation and conduct, and a Guaranteed Minimum Payments (GMP) charge of £140m for 2018 represents operating expenses excluding litigation and conduct charges, and a GMP charge of £140m for 2018. The comparable IFRS measure is operating expenses. A reconciliation is provided on page 187;

- Pre-provision profits is calculated by excluding credit impairment charges from profit before tax. The comparable IFRS measure is profit before tax. A reconciliation is provided on pages 202 to 205;

- Pre-provision profits excluding litigation and conduct is calculated by excluding litigation and conduct, and credit impairment charges from profit before tax. The comparable IFRS measure is profit before tax. A reconciliation is provided on pages 202 to 205;

- Profit/(loss) before tax excluding litigation and conduct represents profit/(loss) before tax excluding litigation and conduct charges. The comparable IFRS measure is profit/(loss) before tax. A reconciliation is provided on pages 202 to 205;

- Return on average allocated equity represents the return on shareholders' equity that is allocated to the businesses. The comparable IFRS measure is return on equity. A reconciliation is provided on page 200;

- Return on average allocated tangible equity is calculated as the annualised profit after tax attributable to ordinary equity holders of the parent, as a proportion of average allocated tangible equity. The comparable IFRS measure is return on equity. A reconciliation is provided on page 201;

- Return on average allocated tangible equity excluding litigation and conduct is calculated as the annualised profit after tax attributable to ordinary equity holders of the parent excluding litigation and conduct charges, as a proportion of average allocated tangible equity. The comparable IFRS measure is return on equity. A reconciliation is provided on page 202;

- Return on average tangible shareholders' equity is calculated as the annualised profit after tax attributable to ordinary equity holders of the parent, as a proportion of average shareholders' equity excluding non-controlling interests and other equity instruments adjusted for the deduction of intangible assets and goodwill. The comparable IFRS measure is return on equity. A reconciliation is provided on page 204; and

- Tangible net asset value per share is calculated by dividing shareholders' equity, excluding non-controlling interests and other equity instruments, less goodwill and intangible assets, by the number of issued ordinary shares. A reconciliation is provided on page 205.

## Forward-looking statements

This document contains certain forward-looking statements within the meaning of Section 21E of the US Securities Exchange Act of 1934, as amended, and Section 27A of the US Securities Act of 1933, as amended, with respect to the Group. Barclays cautions readers that no forward-looking statement is a guarantee of future performance and that actual results or other financial condition or performance measures could differ materially from those contained in the forward-looking statements. These forward-looking statements can be identified by the fact that they do not relate only to historical or current facts. Forward-looking statements sometimes use words such as 'may', 'will', 'seek', 'continue', 'aim', 'anticipate', 'target', 'projected', 'expect', 'estimate', 'intend', 'plan', 'goal', 'believe', 'achieve' or other words of similar meaning. Forward-looking statements can be made in writing but also may be made verbally by members of the management of the Group (including, without limitation, during management presentations to financial analysts) in connection with this document. Examples of forward-looking statements include, among others, statements or guidance regarding or relating to the Group's future financial position, income growth, assets, impairment charges, provisions, business strategy, capital, leverage and other regulatory ratios, capital distributions (including dividend payout ratios and expected payment strategies), projected levels of growth in the banking and financial markets, projected costs or savings, any commitments and targets, estimates of capital expenditures, plans and objectives for future operations, projected employee numbers, IFRS impacts and other statements that are not historical fact. By their nature, forward-looking statements involve risk and uncertainty because they relate to future events and circumstances. The forward-looking statements speak only as at the date on which they are made. Forward-looking statements may be affected by: changes in legislation; the development of standards and interpretations under IFRS, including evolving practices with regard to the interpretation and application of accounting and regulatory standards; the outcome of current and future legal proceedings and regulatory investigations; future levels of conduct provisions; the policies and actions of governmental and regulatory authorities; the Group's ability along with government and other stakeholders to manage and mitigate the impacts of climate change effectively; geopolitical risks; and the impact of competition. In addition, factors including (but not limited to) the following may have an effect: capital, leverage and other regulatory rules applicable to past, current and future periods; UK, US, Eurozone and global macroeconomic and business conditions; the effects of any volatility in credit markets; market related risks such as changes in interest rates and foreign exchange rates; effects of changes in valuation of credit market exposures; changes in valuation of issued securities; volatility in capital markets; changes in credit ratings of any entity within the Group or any securities issued by such entities; direct and indirect impacts of the coronavirus (COVID-19) pandemic; instability as a result of the UK's exit from the European Union (EU), the effects of the EU-UK Trade and Cooperation Agreement and the disruption that may subsequently result in the UK and globally; the risk of cyber-attacks, information or security breaches or technology failures on the Group's business or operations; and the success of future acquisitions, disposals and other strategic transactions. A number of these influences and factors are beyond the Group's control. As a result, the Group's actual financial position, future results, capital distributions, capital, leverage or other regulatory ratios or other financial and non-financial metrics or performance measures may differ materially from the statements or guidance set forth in the Group's forward-looking statements.

Subject to our obligations under the applicable laws and regulations of any relevant jurisdiction, (including, without limitation, the UK and the US), in relation to disclosure and ongoing information, we undertake no obligation to update publicly or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

## Market and other data

This document contains information, including statistical data, about certain Barclays markets and its competitive position. Except as otherwise indicated, this information is taken or derived from Datastream and other external sources. Barclays cannot guarantee the accuracy of information taken from external sources, or that, in respect of internal estimates, a third party using different methods would obtain the same estimates as Barclays.

## Uses of Internet addresses

This document contains inactive textual addresses to internet websites operated by us and third parties. Reference to such websites is made for information purposes only, and information found at such websites is not incorporated by reference into this document.

## References to Strategic Report, Pillar 3 Report and TCFD Report

This document contains references throughout to the Barclays PLC Strategic Report, Pillar 3 Report and TCFD Report. References to the aforementioned reports are made for information purposes only, and information found in said reports is not incorporated by reference into this document.

# Contents
## What's inside this report

| Governance | Governance contents | 2 |
| --- | --- | --- |
| | Directors' report | 11 |
| | Remuneration report | 47 |
| | Our people and culture | 81 |
| Risk review | Risk review contents | 86 |
| | Risk management | 88 |
| | Material existing and emerging risks | 91 |
| | Climate change risk management | 102 |
| | Principal risk management | 104 |
| | Risk performance | 110 |
| | Supervision and regulation | 178 |
| Financial review | Financial review contents | 184 |
| | Key performance indicators | 185 |
| | Consolidated summary income statement | 187 |
| | Income statement commentary | 188 |
| | Consolidated summary balance sheet | 189 |
| | Balance sheet commentary | 190 |
| | Analysis of results by business | 191 |
| | Non-IFRS performance measures | 196 |
| Financial statements | Financial statements contents | 206 |
| | Consolidated financial statements | 212 |
| | Notes to the financial statements | 220 |
| Shareholder information | Key dates, Annual General Meeting, Dividends, and other useful information | 303 |

# Directors' report: How we comply

## How we comply

### The UK Corporate Governance Code

As Barclays PLC is listed on the London Stock Exchange, we apply the principles and provisions of the Code, as set out below. Barclays PLC is reporting against the requirements of the latest version of the Code in this Annual Report, which was published in 2018.

A copy of the Code can be found at frc.org.uk. For the year ended 31 December 2020, and as at the date of this report, we are pleased to confirm that Barclays PLC has complied in full with the Code's principles and provisions.

### Disclosure Guidance and Transparency Rules

By virtue of the information included in this Governance section of the Annual eport, we comply with the corporate governance statement requirements of the FCA's Disclosure Guidance and Transparency Rules. Certain additional information that is required to be disclosed pursuant to DTR7.2.6 can be found on pages 41 to 46.

### New York Stock Exchange (NYSE)

Barclays is permitted by NYSE rules to follow UK corporate governance practices instead of those applied in the US and any significant variations are explained on page 315.

## Board leadership and company purpose

### Role of the Board

As highlighted earlier in this report, our governance is structured to deliver an effective and entrepreneurial Board which:

  is effective in providing challenge, advice and support to management
  provides checks and balances and encourages constructive challenge
  drives informed, collaborative and accountable decision-making
  creates long-term sustainable value for our shareholders, having regard to our other stakeholders.

### Culture

*The Barclays Way* sets the framework for achieving a dynamic and positive culture. The Board supports *The Barclays Way* and the Barclays Purpose and Values. It promotes personal accountability and leadership and monitors our culture to satisfy itself as to the alignment of Barclays' culture to its purpose, values and strategy. See pages 11 and 13 for more details.

Our whistleblowing policy enables employees to raise any matters of concern anonymously and is embedded into our business. For more detail please refer to page 19 of the Board Audit Committee report.

### Relations with shareholders and stakeholders

The Board recognises the importance of listening to, and understanding the views of stakeholders in order to inform the Board's decision-making. You can read more about how we engage with our stakeholders, including what they told us in 2020 and how we responded, including in relation to the Group's climate change strategy and responding to challenges arising from the COVID-19 pandemic, in our Strategic Report available at **home.barclays/annualreport**

Our comprehensive Investor Relations engagement helps the Board to understand investor views about Barclays, which are communicated regularly to the Board; and our Group Chairman engages with shareholders on governance and related matters. Our Investor Relations programme was adjusted to a virtual format for 2020 which ensured we enjoyed a high level of activity with existing and target investors despite restrictions on face to face meetings.

Our shareholder communication guidelines are available on our website at **home.barclays/investorrelations**

### Institutional investors

In 2020, the Directors, in conjunction with the senior executive team and Investor Relations colleagues, participated in a number of virtual investor meetings, seminars and conferences across many locations, given 'in person' meetings were limited due to the COVID-19 pandemic. We held conference calls/webcasts for our quarterly results briefings and an in-person presentation of our 2019 full year results for both our equity and fixed income investors.

During 2020, discussions with investors included, but were not limited to:

  Credit conditions and our ability to manage risk appropriately through the COVID-19 pandemic
  The impact of low interest rates and reduced levels of consumer spending on our income generation
  Regulatory restriction on dividends across all UK banks, to allow continued support for the economy
  Barclays' commitment to tackling climate change.

### Private shareholders

During 2020, we continued to communicate with our private shareholders through shareholder mailings and through the information available on our website and through our AGM. Although shareholders were unable to attend in person due the COVID-19 pandemic, shareholders were able to submit questions ahead of the AGM and all questions were responded to individually and answers to frequently asked questions were published on our website. Shareholders can also choose to sign up to Shareview so that they receive information about Barclays PLC and their shareholding directly by email. We continue to endeavour to trace shareholders who did not take up their share entitlement following the Rights Issue in September 2013, and offered a Share Dealing Service aimed at shareholders with relatively small shareholdings for whom it might otherwise be uneconomical to deal in Barclays shares. For more detail, please see pages 303 to 304.

### The 2020 AGM

The Board was disappointed that the 2020 AGM was impacted by the COVID-19 pandemic and shareholders were unable to attend in person. The Board and the senior executive team consider our AGM to be a key opportunity for shareholder engagement, particularly with our private shareholders and for shareholders to ask questions of the Board. A number of Directors, including the Group Chairman, are normally available for informal discussion before or after an AGM. Given that shareholders were unable to attend in person, they were strongly encouraged to submit questions to the Board in advance of the meeting. All questions received were answered individually and answers to frequently asked questions were published on our website.

# Directors' report: How we comply

Voting in respect of all of the resolutions proposed by the Board at the 2020 AGM was conducted by way of a poll, thereby giving weight to the number of shares held by shareholders rather than simply attributing a notional one vote to each shareholder voting. With the exception of the shareholder requisitioned Resolution 30, all resolutions were passed with votes 'For' ranging from 90.60% to 99.93% of the total votes cast.

A climate change resolution (Resolution 30) was requisitioned by a group of shareholders co-ordinated by ShareAction. The resolution was not supported by the Board, which proposed its own climate change resolution (Resolution 29) and recommended that shareholders vote in favour of Resolution 29 and not Resolution 30. After dialogue, ShareAction and many of the co-filers of Resolution 30 recommended that shareholders vote in favour of both Resolution 29 and Resolution 30. Resolution 29 (the resolution recommended by the Board) was duly passed with overwhelming shareholder support (with 99.93% of votes cast, representing 68.8% of the register, being in favour of that resolution). Resolution 30, which was not supported by the Board, was not passed, and the level of shareholder support for it fell well short of the 75% majority required for it to pass. 23.95% of the votes cast were cast "for" Resolution 30, representing 14.35% of the register.

Based on its extensive engagement with shareholders prior to the AGM, which involved discussions with shareholders holding a very significant percentage of Barclays' share capital, Barclays understands from those shareholders spoken to who voted in favour of Resolution 30 why they did so. Those shareholders represent a very large proportion of the votes cast "For" Resolution 30 and they explained to Barclays, either in writing or orally, in the course of that engagement their reasons for supporting Resolution 30. Barclays has thus gained a clear understanding of the reasons behind the voting outcome in respect of Resolution 30.

Following the 2020 AGM, to begin the process of embedding into the business the changes required by Resolution 29, the Board approved the creation of a new ExCo role focussed on driving the execution and evolution of Barclays' climate strategy.

On 30 November 2020, Barclays published an update on its climate strategy, detailing the methodology it will follow, the metrics for measuring its progress and the targets against which it will report, all of which were developed with the help of a range of stakeholders. For more information on Barclays' climate strategy, please see our Strategic Report available at **home.barclays/annualreport** and the Barclays ESG Report.

Looking ahead to the 2021 AGM, the Board currently intends to hold the AGM on 5 May 2021 at 11:00am, subject to the ongoing COVID-19 pandemic and any UK Government guidance on social distancing, non-essential travel and/or public gatherings. Guidance on whether physical attendance by shareholders will be possible will be determined nearer the time of the AGM. We will keep the considerable benefits of shareholder engagement in the AGM at the forefront of our planning for the 2021 AGM. Further details will be provided in the Notice of AGM.

In the future, and when circumstances permit, the Board expects to alternate AGM venues between London and a venue other than London where the Company has a significant business or customer presence.

### Stakeholder engagement

The Board continues to seek to understand all stakeholders' views, and the impact of our behaviour and business on customers and clients, colleagues, suppliers, communities and society more broadly. Accordingly, the Board monitors key indicators across areas such as culture, citizenship, conduct, and customer and client satisfaction on an ongoing basis.

In 2020, we engaged extensively with shareholders and other stakeholders (including proxy advisory agencies and investor associations) on key topics including our commitment to tackle climate change and our response to the COVID-19 pandemic.

We will publish the Barclays ESG Report at the same time as this Report, which will be made available on our website at **home.barclays/annualreport.**

Throughout 2020, we have engaged with our stakeholders through a variety of means including surveys, participation in forums and global and regional industry initiatives. As a result of COVID-19, many of our events this year have been web based, although where possible we have supported key workers with site visits. This will continue in 2021, subject again to the constraints arising from the pandemic.

For further detail about how we engaged with our customers and clients, colleagues, society and investors in 2020, including what they told us and how we responded, please see our Strategic Report available at **home.barclays/annualreport**

### Colleague engagement

The Group has a long-standing commitment to the importance and value of colleague engagement. Our colleagues make a critical difference to our success, and our investment in them protects and strengthens our culture. In addition to our annual employee survey, in 2020 we ran regular 'Here to Listen' surveys to understand how colleagues were feeling during the COVID-19 pandemic with a specific focus on wellbeing, working remotely and work/life balance. You can read more about our commitment to our colleagues and our workforce engagement, including survey results and our support of colleagues during the COVID-19 pandemic, in our People and culture section on pages 81 to 85 and in our Strategic Report available at **home.barclays/annualreport**

### Conflicts of interest

In accordance with the Companies Act 2006 and Barclays PLC Articles of Association (the Articles), the Board has the authority to authorise conflicts of interest and this ensures that the influence of third parties does not compromise the independent judgement of the Board. Directors are required to declare any potential or actual conflicts of interest that could interfere with their ability to act in the best interests of the Group. The Group Company Secretary maintains a conflicts register, which is a record of actual and potential conflicts, together with any Board authorisation of the conflicts. The authorisations are for an indefinite period but are reviewed annually by the Nominations Committee, which also considers the effectiveness of the process for authorising Directors' conflicts of interest. The Board retains the power to vary or terminate these authorisations at any time.

## Division of responsibilities

### Roles on the Board

Executive and Non-Executive Directors share the same duties. However, in line with the principles of the Code, a clear division of responsibilities has been established.

The Group Chairman is responsible for:

    leading the Board and its overall effectiveness
    demonstrating objective judgement
    promoting a culture of openness and constructive challenge and debate between all Directors
    facilitating constructive board relations and the effective contribution of all Non-Executive Directors
    ensuring Directors receive accurate, clear and timely information.

# Directors' report: How we comply

Responsibility for the day-to-day management of the Group is delegated to the Group Chief Executive Officer who is supported in this role by the ExCo. Further information on the membership of the ExCo can be found on page 7.

As a Board we have set out our expectations of each Director in Barclays' *Charter of Expectations*. This includes role profiles and the behaviours and competencies required for each role on the Board, namely the Group Chairman, Group Deputy Chairman (to the extent one is required), the SID, Non-Executive Directors, Executive Directors and Committee Chairs.

Consistent with our *Charter of Expectations*, the Non-Executive Directors provide effective oversight and scrutiny, strategic guidance and constructive challenge, whilst holding the Executive Directors to account against their agreed performance objectives. The Non-Executive Directors, led by the Nominations Committee, have primary responsibility for the appointment and removal of the Executive Directors.

The SID provides a sounding board for the Group Chairman, acts as an intermediary for the other Directors when necessary and is available to shareholders if they have concerns that have not been addressed through the normal channels.

The *Charter of Expectations* is reviewed annually to ensure it remains relevant and accurately reflects the requirements of the Code, the Regulations and industry best practice. A copy of the *Charter of Expectations* can be found at **home.barclays/who-we-are/our-governance/board-responsibilities**

## Information provided to the Board
It is the responsibility of the Group Chairman, to ensure that Board agendas are focused on key strategy, risk, performance and other value creation issues, and that members of the Board receive timely and high-quality information to enable them to make sound decisions and promote the success of the Company. Working in collaboration with the Group Chairman, the Group Company Secretary is responsible for ensuring good governance and information flow, to ensure an effective Board.

Throughout the year, both the Executive Directors and senior executives kept the Board informed of key business developments through regular updates. These are in addition to the presentations that the Board and Board Committees receive as part of their formal meetings. Directors are able to seek independent and professional advice at Barclays' expense, if required, to enable them to fulfil their obligations as members of the Board.

## Attendance
Directors are expected to attend every Board meeting. In 2020, attendance was very strong both at scheduled and additional meetings (including those called at short notice), as reflected in the table below. The Group Chairman met privately with the Non-Executive Directors on at least three occasions. If, owing to exceptional circumstances, a Director was not able to attend a Board meeting, he or she ensured that his or her views were made known to the Group Chairman in advance of the meeting. In addition, the SID met the other Non-Executive Directors individually, without the Group Chairman, to appraise the Group Chairman's performance, the details of which are included on page 28. Due to the circumstances of the pandemic, the Board met an additional six times during the course of the year. The high level of attendance at these additional meetings, many of which were scheduled at short notice, is a testament to the commitment of each of our current Directors.

| Board attendance in 2020 | Independent/Executive | Scheduled meetings eligible to attend | Scheduled meetings attended | % attendance | Additional meetings eligible to attend | Additional meetings attended |
|---|---|---|---|---|---|---|
| **Chairman** | | | | | | |
| Nigel Higgins | On appointment[1] | 7 | 7 | 100% | 6 | 6 |
| **Executive Directors** | | | | | | |
| Jes Staley | Executive Director | 7 | 7 | 100% | 4 | 4 |
| Tushar Morzaria | Executive Director | 7 | 7 | 100% | 4 | 4 |
| **Non-Executive Directors** | | | | | | |
| Mike Ashley | Independent | 7 | 7 | 100% | 6 | 6 |
| Tim Breedon | Independent | 7 | 7 | 100% | 6 | 5 |
| Sir Ian Cheshire | Independent | 7 | 7 | 100% | 6 | 6 |
| Mohamed El-Erian | Independent | 7 | 7 | 100% | 6 | 6 |
| Dawn Fitzpatrick | Independent | 7 | 7 | 100% | 6 | 6 |
| Mary Francis | Independent | 7 | 7 | 100% | 6 | 6 |
| Crawford Gillies | Senior Independent Director[2] | 7 | 7 | 100% | 6 | 6 |
| Brian Gilvary | Independent[3] | 7 | 7 | 100% | 6 | 6 |
| Diane Schueneman | Independent | 7 | 7 | 100% | 6 | 6 |
| **Former Directors** | | | | | | |
| Mary Anne Citrino | Independent | 7 | 5 | 71% | 6 | 5 |

## Board Committee cross-membership
The table below shows the number of cross-memberships of the Non-Executive Directors across the Board Committees as at 31 December 2020.

| | Board Audit Committee | Board Nominations Committee | Board Remuneration Committee |
|---|---|---|---|
| **Board Risk Committee** | 3 | 3 | 1 |
| **Board Remuneration Committee** | 1 | 2 | |
| **Board Nominations Committee** | 4 | | |

## Composition of the Board
In line with the requirements of the Code, a majority of the Board is comprised of independent Non-Executive Directors. Our Nominations Committee considers the independence of our Non-Executive Directors annually, having regard to the independence criteria set out in the Code. As part of this process, our Nominations Committee keeps under review the length of tenure of all Directors, which can affect independence, and makes any recommendations to the Board accordingly.

[1] As required by the Code, the Chairman was independent on appointment.
[2] Brian Gilvary did not succeed Crawford Gillies as Senior Independent Director until 1 January 2021.
[3] As above.

# Directors' report: How we comply

The independence of Tim Breedon, Mike Ashley and Crawford Gillies, all of whom have served on the Board for more than six years, was subjected to a more rigorous review. The Nominations Committee remains satisfied that the lengths of their tenure have no impact on their respective levels of independence or the effectiveness of their contributions. The Board considers all of the Non-Executive Directors to be independent.

During 2020, both Matthew Lester and Mary Anne Citrino stepped down from the Board. Neither raised raise any concerns about the operation of the Board or management.

You can read more about the changes to Board composition in 2020 and steps taken to further strengthen the Board in the report of our Nominations Committee on pages 23 to 28.

## Time commitment

All potential new Directors are asked to disclose their other significant commitments. The Nominations Committee then takes this into account when considering a proposed appointment to ensure that Directors can discharge their responsibilities to Barclays effectively. This means not only attending and preparing for formal Board and Board Committee meetings, but also making time to understand the business and to undertake training. As stated in our Charter of *Expectations* the time commitment is agreed with each Non-Executive Director on an individual basis. In addition, all Directors must seek approval before accepting any significant new commitment. Set out below is the average time commitment expected for the role of Non-Executive Directors and the other Non-Executive positions on the Board.

| Time Commitment | |
|---|---|
| Role | Expected time commitment |
| Chairman | Equivalent to up to 80% of full-time position. |
| Senior Independent Director | As required to fulfil the role. |
| Non-Executive Director | 35-40 days per year (membership of one Board Committee included, increasing to 50 days a year if member of two Board Committees). |
| Committee Chairs | At least 80 days per year (including Non-Executive Director time commitment) for Audit and Risk Committee Chairs and at least 60 days for the Remuneration Committee Chair. |

Where circumstances require it, all Directors are expected to commit additional time as necessary to their work on the Board. The Group Company Secretary maintains a record of each Director's commitments. For the year ended 31 December 2020 and as at the date of publication, the Board is satisfied that none of the Directors is over-committed and that each of the Directors allocates sufficient time to his or her role in order to discharge their responsibilities effectively.

## Composition, succession and evaluation

We have a Nominations Committee, the purpose and activities of which are contained in the Nominations Committee Report on pages 23 to 28.

## Board appointments

All appointments to the Board and senior management are viewed through a diversity lens and are based on merit and objective criteria, which focus on the skills and experience required for the Board's effectiveness and the delivery of the Group strategy. Board appointments are made following a rigorous and transparent process facilitated by the Nominations Committee, with the aid of an external search consultancy firm. You can read more about the work of the Nominations Committee on pages 23 to 28.

Diversity across the Group remains a key area of focus. For more detail on our actions to increase diversity please see pages 83 to 85.

The Nominations Committee regularly reviews the composition of the Board, Board Committees and the ExCo. It frequently considers the skills required for the Board, its Board Committees and the ExCo, identifying the core competencies, diversity and experience required. This, along with the annual evaluation, helps to refresh the Board, Board Committee and ExCo composition and to determine a timeline for proposed new appointments. For the Board, it is standard practice to appoint any new Non-Executive Director, or Chair for an initial three-year term, subject to annual re-election at the AGM, which may be extended for up to a further three-year term. As such, Non-Executive Directors typically serve up to a total of six years.

All Directors are subject to election or re-election each year by shareholders at the AGM.

Each year we carry out an effectiveness review in order to evaluate our performance, as a Board as well as the performance of each of the Board Committees and individual Directors. More information on the 2020 Board evaluation and effectiveness review can be found on pages 26 to 28.

Our Board member's biographies showing their relevant skills and experience, Board Committee memberships and other principal appointments can be found on pages 3 to 6. Details of changes to the Board in 2020 and up to the date of this Report are disclosed on pages 7 to 8.

The service contracts for the Executive Directors and the letters of appointment for the Group Chairman and Non-Executive Directors are available for inspection at our registered office and at the AGM.

## Induction

On appointment to the Board, all Directors receive a comprehensive induction that is tailored to the new Director's individual requirements. The induction schedule is designed to provide the new Director with an understanding of how the Group works and the key issues that it faces. The Group Company Secretary consults the Chairman when designing an induction schedule giving consideration to the particular needs of a new Director. When a Director is joining a Board Committee, the schedule includes an induction to the operation of that committee.

Following their appointment, Mohamed A. El-Erian and Brian Gilvary have received such inductions. They have each met with the Group Company Secretary, the current Non-Executive Directors, members of the ExCo and certain other senior executives, as part of that process.

## Training and development

In order to continue to contribute effectively to Board and Board Committee meetings, Directors are regularly provided with the opportunity to take part in ongoing training and development and can also request specific training as required.

Opportunities for Director training were more limited in 2020 as a result of social distancing guidance and as the Board and senior management focussed on the Group's response to the COVID-19 pandemic. However, training and development was also supported through the Board deep dives, Risk deep dives and Function reviews described on page 12. In addition, the Board received its annual briefing on regulatory responsibilities, including the Senior Managers Regime.

# Directors' report: How we comply

## Audit, Risk and Internal Control

### Accountability

Internal governance processes have been developed to ensure the effective operation of the individual boards and board committees of each of BPLC, BBUKPLC and BBPLC respectively, in recognition of the fact that this is key to the development and execution of the Group's strategy. Generally, there is one set of rules for the Group, Group-wide frameworks, policies and standards are adopted throughout the Group unless local laws or regulations (for example, the ring-fencing obligations applicable to BBUKPLC) require otherwise, or the ExCo decides otherwise in a particular instance.

The Board has a Board Audit Committee and a Board Risk Committee. The purposes and activities of the Board Audit and Board Risk Committees are contained within their respective reports on pages 14 and 29 respectively.

### Internal and external audit functions

The Board, together with the Board Audit Committee, is responsible for ensuring the independence and effectiveness of the internal and external audit functions. For this reason, the Board Audit Committee members met regularly with the Group Chief Internal Auditor and the KPMG lead audit engagement partner, without management present. The appointment and removal of the Group Chief Internal Auditor is a matter reserved to the Board Audit Committee and the appointment, and removal, of the external auditor, is a matter reserved to the Board. Neither task is delegated to management. This is explained in detail on pages 14 to 22 of the Board Audit Committee report.

### Company's position and prospects

The Board, together with the Board Audit Committee, is responsible for ensuring the integrity of this Annual Report and that the financial statements as a whole present a fair, balanced and understandable assessment of our performance, position and prospects. This is explained in detail on pages 14 to 20 of the Board Audit Committee report.

### Risk management and internal control

The Directors are responsible for ensuring that management maintains an effective system of risk management and internal control and for assessing its effectiveness. Such a system is designed to identify, evaluate and manage, rather than eliminate, the risk of failure to achieve business objectives and can only provide reasonable, and not absolute, assurance against material misstatement or loss.

The Group is committed to operating within a strong system of internal control. Barclays has an overarching framework that sets out the approach of the Group to internal governance, *The Barclays Guide.* This establishes the mechanisms, principles and processes through which management implements the strategy set by the Board.

Processes are in place for identifying, evaluating and managing the Principal Risks facing the Group in accordance with the 'Guidance on Risk Management, Internal Control and Related Financial and Business Reporting', published by the FRC. A key component of *The Barclays Guide* is the ERMF. The purpose of the ERMF is to identify and set minimum requirements in respect of the main risks to the strategic objectives of the Group. There are eight Principal Risks under the ERMF: Credit risk, Market risk, Treasury and Capital risk, Operational risk, Model risk, Reputation risk, Conduct risk and Legal risk. The system of risk management and internal control is set out in the risk frameworks relating to each of our eight Principal Risks and the Barclays Control Framework, which details requirements for the delivery of control responsibilities. Group-wide frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance.

### Effectiveness of internal controls

Key controls are assessed on a regular basis for both design and operating effectiveness. Issues arising out of these assessments, where appropriate, are reported to the Board Audit Committee. The Board Audit Committee oversees the control environment (and remediation of related issues) and you can read more about the work of the Board Audit Committee on pages 14 to 22.

The Board Audit Committee also reviews annually the risk management and internal control system, which includes the ERMF. It has concluded that, throughout the year ended 31 December 2020 and to date, the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations. For more details on that evaluation and its conclusions please see pages 14 to 22.

The review of the effectiveness of the system of risk management and internal control is achieved through reviewing the effectiveness of the frameworks, principles and processes contained within *The Barclays Guide,* the ERMF and the Barclays Control Framework.

Regular reports are made by management to the Board Risk Committee and the Board covering significant risks, measurement methodologies and appropriate risk appetite for the Group.

Further details of risk management procedures and material existing and emerging risks are given in the Risk review and Risk management sections on pages 86 to 177.

### Controls over financial reporting

A framework of disclosure controls and procedures is in place to support the approval of the financial statements of the Group.

Specific governance committees are responsible for examining the financial reports and disclosures to ensure that they have been subject to adequate verification and comply with applicable standards and legislation.

Where appropriate, these committees report their conclusions to the Board Audit Committee, which debates such conclusions and provides further challenge. Finally, the Board scrutinises and approves results announcements and the Annual Report and ensures that appropriate disclosures have been made. This governance process ensures that both management and the Board are given sufficient opportunity to debate and challenge the financial statements of the Group and other significant disclosures before they are made public.

### Management's report on internal control over financial reporting

Management is responsible for establishing and maintaining adequate internal control over financial reporting under the supervision of the principal executive and financial officers, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements, in accordance with international accounting standards in conformity with the requirements of the Companies Act 2006 and prepared in accordance with international financial reporting standards as issued by the IASB and adopted pursuant to Regulation (EC) No 1606/2002 as it applies in the European Union ('IFRSs as adopted by the EU'). Internal control over financial reporting includes policies and procedures that pertain to the maintenance of records that, in reasonable detail:

accurately and fairly reflect transactions and dispositions of assets
provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with IFRS and that receipts and expenditures are being made only in accordance with authorisations of management and the respective Directors
provide reasonable assurance regarding prevention or timely detection of unauthorised acquisition, use or disposition of assets that could have a material effect on the financial statements.

# Directors' report: How we comply

Internal control systems, no matter how well designed, have inherent limitations and may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that internal controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

Management has assessed the internal control over financial reporting as of 31 December 2020. In making its assessment, management utilised the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2020.

Our independent registered public accounting firm has issued a report on the Group's internal control over financial reporting, which is set out on pages 207 to 210.

The system of internal financial and operational controls is also subject to regulatory oversight in the UK and overseas. Further information on supervision by the financial services regulators is provided under Supervision and Regulation in the Risk review section on pages 178 to 183.

## Changes in internal control over financial reporting
There have been no changes that occurred during the period covered by this Report, which have materially affected or are reasonably likely to materially affect the Group's internal control over financial reporting.

## Remuneration
The Company has a Board Remuneration Committee, the purpose and activities of which are described in the Board Remuneration Committee reports on pages 47 to 80.

The Board has delegated responsibility for the consideration and approval of the remuneration arrangements of the Group Chairman, the Executive Directors, other senior executives and certain Group employees to the Board Remuneration Committee. The Board Remuneration Committee, when considering the remuneration policies and practices, seeks to ensure that they support our strategy and promote the long-term success of the business and that they are aligned to the successful delivery of the Group's strategy.

All executive and senior management remuneration policies are developed in accordance with the Group's formal and transparent procedures (ensuring that no Director is involved in deciding his/her own remuneration outcome) and having regard to workforce remuneration and related policies and the alignment of incentives and rewards with culture.

All Board Remuneration Committee members demonstrate independent judgement and discretion when determining and approving remuneration outcomes. The Board as a whole, with the Non-Executive Directors abstaining, considers annually the fees paid to Non-Executive Directors.

Information on the purpose of the Board Remuneration Committee and its activities in 2020 can be found in the Remuneration report on pages 47 to 80.