**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE BARCLAYS PLC<br>SECURITIES LITIGATION | Case No. 1:22-cv-08172-KPF<br><br><u>JURY TRIAL DEMANDED</u> |

**LEAD PLAINTIFF'S**
**<u>BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... iii

I.      INTRODUCTION ...................................................................................1

II.     STATEMENT OF FACTS .......................................................................3

        A.      Barclays' History of SEC Violations and Ineligible Issuer Waiver
                Requests ......................................................................................5

        B.      Barclays' Unprecedented Loss of WKSI Status in May 2017 .............6

                1.      The 2018 Shelf: Conversion of Barclays' Existing WKSI Shelf
                        into a Non-WKSI Shelf ........................................................7

                2.      The 2019 Shelf Registration Statement ....................................7

        C.      The Timeline of the Over-Issuances at Barclays and Their Aftermath .................8

        D.      August 2022: The Rescission Offer Commences ...................................9

        E.      September 2022: SEC Settlement Reveals Barclays Issued Unregistered
                Securities Because the Bank Never Established Any Way to Track or
                Monitor Issuances ............................................................................10

        F.      February 2023: The Over-Issuances Drive Barclays' 2022 Revenue Down
                19% and Result in Compensation Clawbacks for Certain Defendants .................11

        G.      The Truth Emerges ..........................................................................11

III.    ARGUMENT ........................................................................................11

        A.      The Complaint Adequately Pleads Material Misstatements and Omissions .........12

                1.      Defendants Misled the Market Concerning the Effectiveness of
                        Barclays' Internal Controls Over Financial Reporting .............................13

                2.      The Defendants' Statements Regarding the Effectiveness of
                        Barclays' Internal Controls Were Not Mere Puffery ..............................15

                3.      Defendants' Class Period SOX Certifications Were False and
                        Misleading ........................................................................17

                4.      Defendants' Statements Regarding the Financial Impact of the
                        Over-Issuances on Barclays Were False and Misleading ........................19

5. The Financial Restatement Announcement Was False and Misleading ..............................................................................22

6. Barclays' Announcement of the "Independent" Review Was Materially Misleading and Omitted Information .....................................22

B. The Complaint Adequately Pleads Scienter ...........................................23

1. The "Historic" Efforts By Barclays to Remedy the Over-Issuances, Contribute to an Inference of Scienter .....................................................25

2. Admissions Regarding the Failure to Monitor Securities Issuances Support Scienter ...................................................................................26

3. Barclays Publicly Identified Itself as an Ineligible Issuer on the Front Page of Its Annual Report Filed with the SEC ...............................29

4. Defendants' Corporate Roles Do Permit an Inference of Scienter ..........30

5. Barclays' Compensation Clawback from Certain Defendants Supports a Strong Inference of Scienter ...................................................32

6. The Core Operations Doctrine Supports Scienter ...................................33

7. Defendants' Counter-Narrative Is Uncompelling ...................................35

C. The Complaint Adequately Pleads Loss Causation ..............................................37

D. The Complaint Adequately Pleads Section 20(a) Claims ...................................39

IV. CONCLUSION ..........................................................................................................40

ii

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) ................................................................. 31

*In re Aphria, Inc. Sec. Litig.*,
  2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020) .................................................... 32

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010) ................................................................. 16

*In re Barrick Gold Sec. Litig.*,
  2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015) ....................................................... 38

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ............................................................................................ 14

*In re Baxter Int'l Inc. Sec. Litig.*,
  2021 WL 100457 (N.D. Ill. Jan. 12, 2021) ......................................................... 32

*In re Bear Stearns Cos., Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ................................................................. 26

*Born v. Quad/Graphics, Inc.*,
  521 F. Supp. 3d 469 (S.D.N.Y. 2021) ........................................................... 38, 39

*In re Braskem S.A. Sec. Litig.*,
  246 F. Supp. 3d 731 (S.D.N.Y. 2017) ................................................................. 37

*Brine v. MHPI VII LLC*,
  2022 WL 2199826 (C.D. Cal. Feb. 15, 2022) .................................................... 32

*In re Cannavest Corp. Sec. Litig.*,
  307 F. Supp. 3d 222 (S.D.N.Y. 2018) ................................................................. 39

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014) ............................................................................... 39

*Chill v. Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996) ............................................................................... 29

*Christian v. BT Grp. PLC*
  2019 WL 3647213 (D.N.J. Aug. 1, 2018) ........................................................... 33

*In re Citigroup Securities Litigation*,
    2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) .......................................... 16, 17, 18

*City of Birmingham Firemen's & Policemen's Supplemental Pension System v.
    Ryanair Holdings PLC*, 2020 WL 2834857 (S.D.N.Y. June 1, 2020) ............................ 27, 28

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
    2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ...................................................... 36

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) ................................................................. 12

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
    587 F. Supp. 3d 56 (S.D.N.Y. 2022) ............................................................. 37, 38

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
    477 F. Supp. 3d 123 (S.D.N.Y. 2020) ..................................................... 27, 31, 32

*In re Dentsply Sirona, Inc. Sec. Litig.*,
    --- F. Supp. 3d ---, 2023 WL 2682905 (E.D.N.Y. Mar. 29, 2023) ........................................ 34

*In re Diebold Nixdorf, Inc., Securities Litigation*,
    2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) .................................................... 18

*Doshi v. Gen. Cable Corp.*,
    823 F.3d 1032 (6th Cir. 2016) ....................................................................... 33

*DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*,
    413 F. Supp. 3d 187 (S.D.N.Y. 2019) ............................................................ 13, 40

*In re DraftKings Inc. Sec. Litig.*,
    2023 WL 145591 (S.D.N.Y. Jan. 10, 2023) ..................................................... 29

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ................................................................................... 37

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
    794 F.3d 297, 306 (2d Cir. 2015) ................................................................. 24

*In re ForceField Energy Inc. Sec. Litig.*,
    2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017) ........................................... 17-18, 19

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012) ........................................................... 28

*In re Glob. Brokerage, Inc.*,
    2019 WL 1428395 (S.D.N.Y. Mar. 28, 2019) ................................................ 17, 19

*Gray v. Alpha & Omega Semiconductor Ltd.*,
  2021 WL 4429499 (S.D.N.Y. Sept. 27, 2021) ...................................................29

*Gusinsky v. Barclays PLC*,
  944 F. Supp. 2d 279 (S.D.N.Y. 2013) ...............................................................15

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
  422 F. Supp. 3d 821 (S.D.N.Y. 2019) ...............................................................34

*Hensley v. IEC Electronics Corp.*,
  2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014) ...................................................34

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ..................................................33-34

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of
  Scotland Grp., PLC*,
  783 F.3d 383 (2d Cir. 2015) ..............................................................................15

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016) ................................................................................36

*In re Initial Pub. Offering Sec. Litig.*,
  544 F. Supp. 2d 277 (S.D.N.Y. 2008) ...............................................................38

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) ..............................................................................24

*Katz v. Image Innovations Holdings, Inc.*,
  542 F. Supp. 2d 269 (S.D.N.Y. 2008) ...............................................................26

*Kleinman v. Elan Corp.*,
  706 F.3d 145 (2d Cir. 2013) ..............................................................................21

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
  897 F. Supp. 2d 168 (S.D.N.Y. 2012) ...............................................................37

*Lachman v. Revlon, Inc.*,
  487 F. Supp. 3d 111 (E.D.N.Y. 2020) .........................................................18, 29

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011) ..............................................................................21

*Long Miao v. Fanhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020) ...........................................................36-37

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
  2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) .......................................................30

*In re Marsh & McLennan Cos., Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ................................................................24

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
    900 F.2d 576 (2d Cir. 1990) ............................................................................21

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
    761 F.3d 245 (2d Cir. 2014) ............................................................................14

*Moon Joo Yu v. Premiere Power LLC*,
    2015 WL 4629495 (S.D.N.Y. Aug. 4, 2015) (J. Failla) .......................................12

*Moshell v. Sasol Ltd.*,
    481 F. Supp. 3d 280 (S.D.N.Y. 2020) ...............................................................20

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F.App'x 10 (2d Cir. 2011) .........................................................................36

*Noto v. 22nd Century Grp., Inc.*,
    35 F.4th 95 (2d Cir. 2022) ..............................................................................13

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ......................................................................16, 23

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l., Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019) ............................................................26, 35

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC*,
    595 F.3d 86 (2d Cir. 2010) .............................................................................21

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
    2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ...............................................17, 19

*Ret. Sys. of Gov't of the V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) ............................................................................24

*In re Romeo Power Inc. Sec. Litig.*,
    2022 WL 1806303 (S.D.N.Y. June 2, 2022) ......................................................24

*Rotunno v. Wood*,
    2022 WL 14997930 (2d Cir. Oct. 27, 2022).......................................................36

*S.E.C. v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)...........................................................................39

*In re Salix Pharms., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ................................................23, 33

*Schiro v. Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019) ................................................................15

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ................................................................................28

*Set Cap. LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021) ................................................................................13

*Setzer v. Omega Healthcare Invs., Inc.*,
    968 F.3d 204 (2d Cir. 2020) ..............................................................................24

*In re Shanda Games Ltd. Sec. Litig.*,
    2019 U.S. Dist. LEXIS 171592 (S.D.N.Y. Sept. 30, 2019) ................................24

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ....................................................12

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019) .......................................................................... 15, 16

*Sjunde-AP Fonden v. Gen. Elec. Co.*,
    417 F. Supp. 3d 379 (S.D.N.Y. 2019) ................................................................39

*Skiadas v. Acer Therapeutics Inc.*,
    2020 WL 3268495 (S.D.N.Y. June 16, 2020) ....................................................12

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010) ..............................................................................37

*Strougo v. Barclays PLC*,
    105 F. Supp. 3d 330 (S.D.N.Y. 2015) ................................................................15

*In re Synchrony Fin. Sec. Litig.*,
    988 F.3d 157 (2d Cir. 2021) ........................................................................ 12, 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................. 12, 23, 25

*Venkataraman v. Kandi Technologies Group, Inc.*,
    2021 WL 4952260 (S.D.N.Y. Oct. 25, 2021) ....................................................34

*Venkataraman v. Kandi Techs. Grp., Inc.*,
    2022 WL 4225562 (S.D.N.Y. Sept. 13, 2022) ............................................. 17, 19

*In re Veon Ltd. Sec. Litig.*,
    2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018) ....................................................39

*In re Vivendi, S.A. Sec. Litig.*,
 838 F.3d 223 (2d Cir. 2016) ................................................................38

*Wang v. Cloopen Grp. Holding Ltd.*,
 2023 WL 2534599 (S.D.N.Y. Mar. 16, 2023) ..............................................*passim*

*In re Wells Fargo & Co. Sec. Litig.*,
 2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021).............................................12

*Yannes v. SCWorx Corp. et al.*,
 2021 WL 2555437 (S.D.N.Y. June 21, 2021) ..............................................34

**Statutes**

Investment Advisors Act of 1940 ............................................................5

Private Securities Litigation Reform Act ...........................................11, 12

Securities Act of 1933 .........................................................................4
 Section 5(a), 15 U.S.C. § 77e(a) .........................................................10
 Section 5(c), 15 U.S.C. § 77e(c) .........................................................10

Securities Exchange Act of 1934
 Section 13(a), 15 U.S.C. § 78m(a) ......................................................10
 Section 13(b)(2)(B), 15 U.S.C. § 78m(b)(2)(B) ...................................10
 Section 10(b), 15 U.S.C. § 78j(b)........................................................39
 Section 20(a), 15 U.S.C. § 78t(a) ..................................................39, 40

Trust Indenture Act of 1939 .................................................................6

**Regulations**

Rule 10b-5, 17 C.F.R. § 240.10b-5 .....................................................12

Rule 405, 17 C.F.R. § 230.405 .....................................................4, 5, 6

**Rules**

Fed. R. Civ. P. 9...............................................................................37

Fed. R. Civ. P. 9(b) ...........................................................................11

Court-appointed Lead Plaintiff Boston Retirement System ("Plaintiff") hereby submits this opposition to Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Amended Class Action Complaint.[1]  ECF No. 54 ("Motion" or "Mot.").

## I.   INTRODUCTION

This action arises from Barclays' false and misleading statements and omissions during the Class Period of February 18, 2021 through February 14, 2023, regarding the strength and efficacy of the bank's internal controls over financial reporting following its unprecedented loss of well-known seasoned issuer ("WKSI") status in the United States, also known as being an "ineligible issuer."  Barclays lost its WKSI status because of a settlement with the U.S. Securities and Exchange Commission ("SEC") for violating the U.S. securities laws in 2017, which upended the way Barclays issued securities in the United States.  Becoming an ineligible issuer required Barclays to painstakingly account for the number of securities it wished to register with the SEC in advance of being able to sell those securities, in addition to pre-paying all associated registration fees.  Previously, as a WKSI, Barclays could issue securities at will and enjoyed "pay-as-you-go" privileges with respect to any associated fees.  To navigate this fundamental shift in its business, Barclays assembled a Working Group to account for the securities it wished to issue as an ineligible issuer.

Yet, astoundingly, once the Working Group had performed work on the calculations and registration fees, Barclays never established any internal controls to track and monitor the

---

[1] Defendants are: (i) Barclays PLC ("Barclays" or "BPLC"); (ii) James E. Staley; (iii) C.S. Venkatakrishnan; (iv) Tushar Morzaria; (v) Anna Cross; (vi) Nigel Higgins; and (vii) Barclays Bank PLC ("Barclays Bank" or "BBPLC").  Staley, Venkatakrishnan, Morzaria, and Cross are collectively referred to as the "Individual Defendants."  Higgins and BBPLC are collectively referred to as the "20(a) Defendants."  The Amended Class Action Complaint is referred to herein as the "Complaint."  ECF No. 46 (cited as "¶__").  All capitalized terms have the same meaning as in the Complaint, all internal citations are omitted and emphasis is added unless otherwise noted.

securities issued pursuant to its non-WKSI registration statements.  Throughout the Class Period, Defendants concealed this complete and utter failure to adhere to the federal securities laws.  As documented in a September 2022 Consent Order with the SEC, Barclays issued nearly $17.7 billion of unregistered securities – "an unprecedented amount" – from two separate shelves due to its "failure to put into place any internal control around the real-time tracking of securities being offered or sold off its Commission-registered shelf registration statement."  Barclays itself has admitted that it "did not put in place a mechanism to track issuances after BBPLC became subject to a limit on such issuances, as a result of losing WKSI status."

The amount of unregistered securities Barclays issued is not the end of the "unprecedented" aspects of Defendants' fraud.  Indeed, following revelation of the fraud, Barclays conducted a rescission offer that Defendants themselves concede was "historic in scope," resulting in over $7.7 billion of validly submitted claims from investors who unknowingly purchased illegally issued securities from Barclays.  Additionally, the SEC levied $361 million of penalties ($200 million in fines and $161 million in disgorgement and interest) in connection with the Consent Order in September 2022 against Barclays, the Company revealed that its fiscal year 2022 profit plunged 19% because of the bank's response to the over-issuances, and the Barclays Board clawed back compensation from Defendants Venkatakrishnan, Morzaria, and Cross for their responsibility related to the internal controls failure.

Defendants' motion presents an alternative version of the facts that does not exist and whitewashes as a mere "mistake" the drastic violations of federal securities laws and failure of Barclays' internal controls evidenced by the illegal issuance of unregistered securities from two separate registration statements.  Defendants' failure to follow the U.S. securities laws is not the simple mistake they wish it to be, as reflected by the $200 million fine from the SEC and the $17.7

billion value of the over-issuance over the period of more than 13 months. Indeed, Defendants misleadingly state that Plaintiff concedes this was a "mistake," which Plaintiff does not do.

The Defendants load their Motion with rote arguments that bear no relation to the facts Plaintiff pleads in the Complaint. For example, Defendants declare that Plaintiff fails to allege motive to commit the fraud when Plaintiff's complaint makes clear that it presents a "conscious misbehavior or recklessness." Regarding falsity, Defendants lob weak attacks on Plaintiff's well-pled allegations as puffery and truthful statements. In their scienter arguments, Defendants downplay the Individual and 20(a) Defendants' roles at Barclays and the importance of complying with the U.S. federal securities laws when issuing securities to the public while citing whatever case law they could find that mentions the same key words Plaintiff uses and found scienter lacking, while ignoring the most important factual distinctions that set this case apart. Finally, as to loss causation, Defendants do not challenge Plaintiff's first corrective disclosure but only argue that the second and third corrective disclosures are inadequately pled, which is incorrect. Defendants launch misleading and perfunctory arguments claiming that these two disclosures regarding the over-issuance on a second shelf registration, immense profit loss for the year 2022, and compensation claw backs for three of the Individual Defendants directly linked to the fraud did not reveal any new information to the market. The Court should reject each of Defendants' arguments in turn and deny their Motion to Dismiss.

## II.   STATEMENT OF FACTS

Barclays is a transatlantic consumer and wholesale bank with global reach offering products across personal, corporate, and investment banking, credit cards, and wealth management. ¶42. Barclays maintains its headquarters in London, United Kingdom, and operates its U.S.-based subsidiary, BBPLC, from New York, New York. ¶42. Barclays' American

3

Depositary Receipts ("ADRs") trade under the ticker symbol "BCS" on the New York Stock Exchange.  ¶28(b).

Barclays offers and sells securities in the United States pursuant to an effective shelf registration statement filed on Form F-3 with the U.S. Securities and Exchange Commission ("SEC") through its subsidiary, BBPLC.  ¶50.  A shelf registration statement is an SEC filing to register a public offering, usually where there is no present intention to immediately sell all securities being registered and pursuant to which multiple offerings may be conducted.  ¶51.  Barclays' Structured Products Group is the primary user of the shelf registration statement for the offer and sale of exchange traded notes ("ETNs")[2] and structured notes,[3] though the Group Treasury also uses the shelf registration statement to sell corporate debt securities.  ¶¶52-53.

In 2005, through its Securities Offering Reform, the SEC adopted modifications to the registration, communications and offering processes under the Securities Act of 1933.  ¶45.  One of the most notable changes in the SEC's 2005 reforms was the adoption of a new category of issuer known as a "well-known seasoned issuer," or "WKSI" for short.  *Id.*  Specifically, pursuant to Securities Act Rule 405 ("Rule 405"), the SEC imparted WKSI status on issuers who meet the registrant requirements of Form S-3 or Form F-3 and either: (1) "[a]s of a date within 60 days of the determination date, has a worldwide market value of its outstanding voting and non-voting common equity held by non-affiliates or $700 million or more"; or (2) "as of a date within 60 days of the determination date, has issued in the last three years at least $1 billion aggregate principal

---

[2] ETNs are unsecured debt obligations of financial institutions that trade on a securities exchange.  ETN payment terms are linked to the performance of a reference index or benchmark, representing the ETN's investment objective.  ¶14 n.5.

[3] A structured note is a debt security whose return is based on equity indexes, a single equity, a basket of equity, interest rates, commodities, or foreign currencies.  Every structured note has two components: (1) a bond; and (2) a derivative.  ¶52.

amount of non-convertible securities, other than common equity, in primary offerings for cash, not exchange, registered under the [Securities] Act" (17 C.F.R. § 230.405).  ¶46.  WKSIs may register their securities offerings on shelf registration statements that <u>become effective automatically upon filing</u>, avoiding the weeks or months-long process non-WKSIs must endure of awaiting the SEC's review and approval of a registration statement prior to becoming effective.  ¶47.

Even if an issuer meets the requirements to be a WKSI, however, it also must not possess any characteristics that render it an "ineligible issuer" under Rule 405.  ¶48.  The characteristics for an ineligible issuer include, among others, an issuer that has violated (or whose subsidiary has violated) the anti-fraud provisions of the federal securities laws (or that are the subject of a judicial or administrative decree or order prohibition certain conduct or activities involving the anti-fraud provisions of the federal securities laws) within the last three years (*see* 17 C.F.R. § 230.405).  *Id.* Ineligible issuer status attaches automatically upon a securities violation, though Rule 405 permits the SEC to grant waivers of ineligible issuer status "upon a showing of good cause, that it is not necessary under the circumstances that the issuer be considered an ineligible issuer."  ¶¶48-49.

## A.    Barclays' History of SEC Violations and Ineligible Issuer Waiver Requests

Between 2007 and 2016, Barclays requested and received waivers of the automatic imposition of ineligible issuer status pursuant to Rule 405 following a bevy of federal securities violations by the bank.  ¶¶54-60.  These violations included alleged conduct with respect to trading third-party debt securities based on material non-public information (¶55) and violations of the Investment Advisors Act of 1940 in connection with Barclays' acquisition of Lehman Brothers' investment advisory business (¶56).  For these violations and several others, Barclays submitted waiver requests to the SEC and received them.

In these waiver requests, Barclays has stressed the importance of its WKSI status to the operations of the bank as a reason the SEC should allow it to continue as a WKSI despite its myriad

securities violations.  ¶¶58-60.  In two waiver requests submitted in May 2015 and January 2016, Barclays wrote that the SEC needed to allow it to maintain its WKSI status because "[t]he WKSI shelf []process <u>allows access to the widest possible global investor base</u> and <u>provides an important means of accessing capital and funding for Barclays' global operations</u>."  ¶58.  Barclays has stated that losing WKSI status would render it "<u>unable to use free writing prospectuses</u>," which "would restrict Barclays from using investor presentation FWP materials in connection with its offers and sales of its regulatory capital securities, which it believes is <u>an important channel of communication to investors in regulatory capital securities</u>."  ¶59.  Additionally, Barclays has lamented that losing WKSI status would have an "<u>impact on [Barclays'] speed to the market</u>" for "new" securities because when "Barclays could issue such new type of securities, market conditions may have become unfavorable or similar securities issued by other issuers in the <u>intervening period may decrease the market demand for Barclays' securities, which could have a negative pricing effect on Barclays' securities</u>."  ¶60.[4]

### B.    Barclays' Unprecedented Loss of WKSI Status in May 2017

On May 10, 2017, the SEC instituted public and administrative and cease-and-desist proceedings against a subsidiary of BBPLC related to overcharging clients for mutual funds.  ¶62.  In connection with that settlement, Barclays paid $97 million to the SEC and automatically became an ineligible issuer pursuant to Rule 405, losing its WKSI status for three (3) years.  ¶63.  Without an invitation from the SEC to apply for an ineligible issuer waiver, Barclays was forced to confront the reality that the parade of horribles it had repeatedly decried would come to be.  ¶64.  Most

---

[4] Barclays has also decried the loss of WKSI status would cause it to "lose the flexibility" to: (i) offer additional securities of the classes covered by the registration statement; (ii) amend the registration to cover additional classes of securities; (iii) omit certain information from the prospectus; (iv) take advantage of pay-as-you-go fees; or (v) qualify a new indenture under the Trust Indenture Act of 1939.  ¶58.

notably, Barclays would no longer be able to use an automatic shelf registration and would be required to pay filing fees in advance of actual sales.  *Id.*

### 1. The 2018 Shelf: Conversion of Barclays' Existing WKSI Shelf into a Non-WKSI Shelf

In recognition of its loss of WKSI status, Barclays convened a Working Group, in or around January 2018, "that included trading desk heads from the Structured Products Group, personnel from an administrative support function called business management, personnel from the product origination group, a member of the compliance department, and a member of the legal department."  ¶70.  The purpose of the Working Group was to estimate the amount of securities needed for Barclays' shelf registration statements in 2018 and 2019 for its U.S. structured note business.  *Id.*  First, the Working Group decided to convert Barclays' existing WKSI shelf into a non-WKSI shelf (the "2018 Shelf") for a period of approximately 18 months.  ¶71.  Second, the Working Group, in collaboration with the trading desks that would draw upon the 2018 Shelf, as well Group Treasury, calculated the total amount of securities that they anticipated would be offered and sold over the ensuing 18 months after the WKSI shelf was converted in order to pay the appropriate registration fees in connection with the 2018 Shelf.  ¶72.  In the end, the 2018 Shelf covered the offer or sale of $21.3 billion of securities for a period of 18 months.  ¶73.

Despite the Working Group's recognition, discussion, and understanding of the need to the track actual offers and sales of securities from the 2018 Shelf on a real-time basis, Barclays never established an internal control to track actual offers and sales of securities on a real-time basis. ¶74.

### 2. The 2019 Shelf Registration Statement

In 2019, the Working Group reconstituted itself as the 2018 Shelf's expiration date approached and performed many of the same tasks it had during the shelf conversion process to

calculate the amount of securities and fees required for the bank's next shelf, which would have a three-year duration (the "2019 Shelf"). ¶75. Because the 2018 Shelf had excess securities still available for offer or sale, the Working Group also needed to perform "Carry-Over Calculations." ¶76. This task required the Working Group to determine (i) the number of securities Barclays would need form the 2018 Shelf between the time when it filed the registration statement for the 2019 Shelf and when it became effective (the "Gap Period"); and (ii) how many securities would be left over on the 2018 Shelf after accounting for the Gap Period offers and sales. *Id.* This latter figure was necessary so that Barclays could de-register the excess securities on the 2018 Shelf and use the fees that were originally applied to the de-registered securities to offset a portion of the fees it needed to pay in advance of registering the 2019 Shelf. *Id.* When the SEC declared it effective on August 1, 2019, the 2019 Shelf covered the offer or sale of approximately $20.8 billion of securities for a period of three years. ¶77. Barclays again did not establish any internal controls to track offers and sales from the 2019 Shelf, despite determining the Carry-Over Calculations and the pre-payment of registration fees. ¶78.

### C.     The Timeline of the Over-Issuances at Barclays and Their Aftermath

On March 8, 2022, a member of Group Treasury at Barclays reached out to a member of the Working Group inquiring as to the number of securities that remained available on the 2019 Shelf. ¶79. The next day, on March 9, 2022, Barclays concluded the over-issuance from the 2019 Shelf occurred and halted all further sales and issuances from that shelf. ¶81. Five days later, on March 14, 2022, Barclays informed the SEC about the over-issuance and informed investors that it was suspending the sale and issuances of the VXX and OIL ETNs, without mentioning the internal controls problem or the over-issuance, leaving the public in the dark. *Id.* Then, after two more weeks, Barclays filed a Form 6-K disclosing the internal controls problem and announcing a rescission offer to investors who purchased the illegally issued unregistered securities. ¶82.

Then, in late April 2022, Barclays announced the suspension of sales of thirty more ETNs. ¶83.  On April 28, 2022, adding to the torrent of bad news emanating from Barclays following the revelation of the internal controls failure and over-issuance from the 2019 Shelf, Barclays announced that it was in discussions about restating its financial disclosures for the full year 2021 for both Barclays and Barclays Bank.  ¶86.

Ultimately, on May 16, 2022, Barclays announced the Board of Directors determined that Barclays would restate its year-end 2021 audited financials.  *Id.*  Then, on May 23, 2022, Barclays filed amendments to both Barclays' and Barclays Bank's Forms 20-F.  ¶87.  In addition to reflecting a £220 million litigation and conduct provision, the restatement also amended disclosures to reflect management's conclusion that Barclays' internal controls over financial reporting and disclosure controls and procedures were not effective as of year-end 2021 as exposed by the over-issuance from the 2019 Shelf.  *Id.*

The next month, the bad news for Barclays continued.  It came to light that in early June 2022 that Barclays had illegally issued unregistered securities from a separate shelf – the 2018 Shelf – because the Company had improperly performed the Carry-Over Calculations and de-registered too many securities from that shelf.  ¶84.  This failure revealed that Barclays had issued an additional $1.3 billion of unregistered securities during its time as an ineligible issuer.  *Id.* Barclays did not reveal this additional over-issuance from the 2018 Shelf to the market until July 28, 2022.  ¶¶187-88.

### D.     August 2022: The Rescission Offer Commences

On August 1, 2022, Barclays commenced the Rescission Offer for the more than $17.6 billion of unregistered securities it issued to investors on account of the failure of its internal controls following its loss of WKSI status in May 2017.  ¶88.  According to the Rescission offer Prospectus Barclays filed with the SEC, the offer related to more than 3,000 structured notes and

ETNs.  *Id.*  When the Rescission Offer expired on September 12, 2022, Barclays announced that affected investors filed valid claims valued at nearly $7.7 billion.  ¶91.

      **E.**      **September 2022: SEC Settlement Reveals Barclays Issued Unregistered Securities Because the Bank Never Established Any Way to Track or Monitor Issuances**

On September 29, 2022, the SEC released an order pursuant to which Barclays agreed to pay a $200 million fine and $161 million in disgorgement and prejudgment interest and admitted to violating Section 5(a) and 5(c) of the Securities Act and Section 13(a) and 13(b)(2)(B) of the Exchange Act (as well as Rule 13a-15(a) promulgated thereunder) (the "SEC Order").  ¶¶92-93. At its outset, the SEC Order declares that its genesis "arises from BBPLC's failure to put into place any internal control around the real-time tracking of securities being offered or sold off its Commission registered shelf registration statement."  ¶94.  That failure resulted in "an unprecedented amount of securities – cumulatively totaling approximately $17.7 billion – in excess of what [Barclays] had registered."  ¶94.  The SEC Order noted that "certain BBPLC personnel recognized the need to accurately record relevant information about securities that were offered or sold"; however, "no internal control was established" and "the amount of securities that were offered and sold was not tracked."  ¶95.

The SEC Order revealed that the over-issuances first occurred on January 28, 2021 and were not detected by anyone at Barclays until early March 2022.  ¶96.  During that fourteen-month period of issuing unregistered securities, according to the SEC, "BBPLC offered and sold approximately $16.37 billion of securities in excess of what was registered with the Commission on the 2019 Shelf."  *Id.*  According to the SEC Order, on March 8, 2022, a member of Group Treasury reached out to a member of the legal department who had been a part of the Working Group, to inquire as to how many securities remained on the 2019 Shelf in connection with a contemplated sale of corporate debt securities.  ¶79.  In response to this inquiry, personnel at

Barclays endeavored to calculate the remaining securities for sale on the 2019 Shelf and, as a result of those calculations, "it became clear to all involved that there was no internal control in place to track in real time the amount of securities offered and sold against the amount of securities registered." ¶80.

### F.     February 2023: The Over-Issuances Drive Barclays' 2022 Revenue Down 19% and Result in Compensation Clawbacks for Certain Defendants

The effects and impacts of the failure of Barclays' internal controls to monitor and track issuances during its time as an ineligible issuer continued until early 2023 when the Company reported its full-year earnings on February 15, 2023. ¶195.  That day, Barclays shocked the market as it announced a 19% plunge in profits due in part to "a costly trading blunder in the U.S." [i.e., the over-issuances]." *Id.*  Barclays' Form 20-F filed on February 15, 2023 revealed for the first time that the Board had resolved to claw back compensation from Defendants Venkatakrishnan, Morzaria, and Cross to account for their responsibility in the over-issuance fiasco.  ¶200.

### G.     The Truth Emerges

During the Class Period, the truth of the fraud was revealed through a trio of disclosures on March 28, 2022, July 28, 2022, and February 15, 2023, which caused the price of Barclays ADRs to fall sharply.  ¶¶240, 242, 245.  Analyst and press commentary made clear that each disclosure revealed new news to the market, further uncovering the Defendants' fraud.  ¶¶160-67, 187-91, 195-205.  During the Class Period, investors lost millions of dollars in shareholder value.

## III.   ARGUMENT

When alleging securities fraud, plaintiffs must comply with Fed. R. Civ. P. 9(b), which requires pleading "with particularity the circumstances constituting fraud," and the Private Securities Litigation Reform Act ("PSLRA"), which requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an

allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Moon Joo Yu v. Premiere Power LLC*, 2015 WL 4629495, at *7 (S.D.N.Y. Aug. 4, 2015) (J. Failla).   Additionally, the PSLRA requires that plaintiffs plead a "strong inference" of scienter that must be cogent, though it "need not be irrefutable, i.e., of the smoking gun genre, or even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).   Importantly, at the motion to dismiss stage, "a tie on scienter goes to the plaintiff." *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *27 (S.D.N.Y. Sept. 30, 2021); *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

In accordance the Second Circuit's direction, the court "must be careful not to mistake [the PSLRA's] heightened pleading standards for impossible ones," and plaintiffs "need not prove their entire case within the confines of the complaint." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021).   "Even under the [PSLRA], which establishes heightened pleading requirements for securities fraud claims, the usual rules for determining motions to dismiss pertain: the well-pleaded allegations of the complaint are deemed true and all reasonable inferences are drawn in favor of the pleader." *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *10 (S.D.N.Y. Nov. 26, 2018).

### A.   The Complaint Adequately Pleads Material Misstatements and Omissions

Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact" *or* "omit[ting] to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  "A statement is misleading if a reasonable investor would have received a false impression from the statement." *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *7 (S.D.N.Y. June 16, 2020).  "The law is well settled that so-called half-truths—literally true statements that create a materially misleading impression–

12

–will support claims for securities fraud." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021). "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 105 (2d Cir. 2022). An omitted fact is material where "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available." *Wang v. Cloopen Grp. Holding Ltd.*, 2023 WL 2534599, at *8 (S.D.N.Y. Mar. 16, 2023). "[W]hether a reasonable investor, in the exercise of due care, would have received a false impression from a statement requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts [and] is therefore generally a question of fact for the jury"—not for resolution on a motion to dismiss. *DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 210 (S.D.N.Y. 2019) ("*DoubleLine II*").

As set forth below, through the Class Period, Defendants mislead investors by omitting highly material information on the very topics about which they elected to speak, and by making false and misleading statements.

### 1. Defendants Misled the Market Concerning the Effectiveness of Barclays' Internal Controls Over Financial Reporting

Defendants' Class Period statements concerning (a) the strength and effectiveness of Barclays' internal controls and procedures, and (b) Barclays' over-issuance of securities were materially false and misleading, because, unbeknownst to investors, Barclays had failed to implement any internal controls or procedures, as required by the 2017 SEC Order, to track and monitor its issuances of securities while it was an ineligible issuer, without the privileges it had previously enjoyed as a WKSI.

Specifically, as alleged in the Complaint, in its 2020 Form 20-F Barclays detailed the results of the Barclays Internal Control Environment Program ("BICEP") and declared that because of BICEP, which "focus[ed] on strengthening the internal control environment across the Group," Barclays' "control environment [was] now in a much stronger position."   ¶136. Additionally, the 2020 Form 20-F stated that the Board Audit Committee had "reached the conclusion that there are no control issues that are considered to be a material weakness and which merit specific disclosure," and that the Board Audit Committee reached this conclusion after, among other things, receiving "regular reports from the Chief Controls Officer."   ¶138. Additionally, the Board Audit Committee report in the 2020 20-F declared that Barclays "has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations." *Id.*  The 2020 Form 20-F included an attached certification signed by Defendants Staley and Morzaria.  ¶141.

These and like statements (*see* ¶¶136-38, 140-42) were misleading because Defendants failed to disclose that Barclays had sold and was continuing to sell unregistered securities from the 2018 and 2019 Shelf Registration Statements, respectively, and that Barclays had a material weakness in its internal control environment as evidenced by the fact that the over-issuance occurred, despite the 2017 SEC Order's direct impact removing Barclays' WKSI status.   An omission is actionable when the defendant is subject to a duty to disclose the omitted facts, *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988), and "once a company speaks on an issue or topic, there is a duty to tell the whole truth," *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).

>       2.      **The Defendants' Statements Regarding the Effectiveness of Barclays'**
>               **Internal Controls Were Not Mere Puffery**

Statements that are "puffery" are those that are so vague or "obviously unimportant to a

reasonable investor that reasonable minds could not differ on the question of their importance."

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp.,*

*PLC*, 783 F.3d 383, 389-90 (2d Cir. 2015).  Indeed, in a baseless puffery attack, Defendants state

that the Complaint's alleged false statements regarding Defendants' internal controls efforts were

"generic, aspirational statements."  Mot. at 12-13, 24-27.  Defendants are wrong.

Defendants' motion presents a misplaced reliance upon Second Circuit caselaw.  ***First***, in

*Singh v. Cigna Corp.*, defendants made only generic statements "about having 'policies and

procedures' and allocating 'significant resources,'" with the *Singh* court distinguishing cases where,

as here, defendants discussed the "mechanisms of compliance."  918 F.3d 57, 64 (2d Cir. 2019).

Indeed, in *Synchrony Financial*, the Second Circuit distinguished general "optimistic opinions," such

as those at issue in *Singh* and the other cases defendants cite.[5]  988 F.3d at 167-73.  As the Circuit

explained, in contrast to vague, positive statements—like "pretty confident" and "pretty positive"—

defendants' statements that they had not received "pushback" were materially misleading because, like

here, they "misrepresented facts pertaining to events that had already transpired."  *Id.* at 161, 170.

---

[5] Neither of the cases that Defendants identify in their chart on pages 25-26 of the Motion
(decided by the same judge) concern "virtually the same statements here," despite the occasional
overlapping word or phrase.  *See* Mot. at 25-26.  Indeed, each of these cases has factually
distinguishable content and, unlike this Action, does not concern the complete failure of Barclays'
internal controls in response to a federal consent decree from the SEC.  *See Strougo v. Barclays
PLC*, 105 F. Supp. 3d 330, 345 (S.D.N.Y. 2015) (allegations concerning Barclays' favoritism of
high frequency traders over others in bank's alternative trading system); *Gusinsky v. Barclays
PLC*, 944 F. Supp. 2d 279, 288 (S.D.N.Y. 2013) (allegations concerning manipulation of LIBOR
rates).  Similarly, Defendants' reliance upon *Schiro v. Cemex, S.A.B. de C.V.* is misplaced because
there, unlike here, the court found it determinative "there [was] no allegation that they were false."
*See* 396 F. Supp. 3d 283, 299 (S.D.N.Y. 2019).

In this case, Defendants' statements about the strength of Barclays' internal controls following the loss of WKSI status and the ensuing over-issuances "are not the sort of enthusiastic or vague generalizations that amount to puffery;" rather, they are "fact-based expressions of opinion," which are actionable because they conveyed positive beliefs about the strength of Barclays' internal controls that are in conflict with the fact that the over-issuances occurred because no tracking system was in place to monitor the issues of the non-WKSI shelves, an undisclosed fact available to Defendants when the statements were made. *See Cloopen*, 2023 WL 2534599, at *11 (S.D.N.Y. Mar. 16, 2023); *see also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (concluding that statements of supposed "puffery" were actionable where the plaintiff's complaint "allege[d] that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true"); *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010) (observing that "there is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in misrepresentations of existing facts").

**Second**, Defendants' further argument to the contrary – that "'the fact the over-issuances had occurred' … runs headlong into settled Second Circuit law" – is a red herring. *See* Mot. at 26 (citing *Singh*, 918 F.3d at 64). This case is not alleging that Barclays' internal controls systems failed to catch the over-issuances because they did not function properly; rather, the principal allegation in this case is that the over-issuances occurred because Barclays failed to implement, much less bother to design, any internal controls whatsoever to track and monitor the issuances of securities during its period as an ineligible issuer lacking WKSI privileges. *See* SEC Order at 30 (Defs.' Ex. 1, ECF No. 55-1) ("***it became clear to all involved that there was no internal control in place to track in real time the amount of securities offered and sold against the amount of securities registered***"). ¶80. Defendants' mischaracterization of Plaintiff's case is laid bare by their citation to *In re Citigroup Securities Litigation*, 2023 WL 2632258, at *16 (S.D.N.Y. Mar. 24, 2023). Mot. at 27. In *Citigroup*,

the Court found that allegations that "Citigroup was not investing in its risk management system" or that "the investments were inadequate" were lacking (*see id.*); but here, the SEC Consent Order makes clear that no investments were made nor efforts undertaken by any Barclays personnel to track and monitor the securities issued from the shelf registration statements during the time Barclays was an ineligible issuer. ¶¶80, 94-95, 129-31.[6]

### 3.     Defendants' Class Period SOX Certifications Were False and Misleading

Defendants misconstrue Plaintiff's allegations that the Class Period SOX certifications were false and misleading as a "classically improper form of fraud-by-hindsight." Mot. at 28-29. Though it is well-established that "SOX certifications do not constitute a standalone basis for liability," SOX certifications are actionable "to the extent that the Court finds Plaintiff to adequately have alleged that the defendant made any actionable misstatements or omissions in its public filings and with scienter." *See In re Glob. Brokerage, Inc.*, 2019 WL 1428395, at *14 (S.D.N.Y. Mar. 28, 2019); *see also Venkataraman v. Kandi Techs. Grp., Inc.*, 2022 WL 4225562, at *5 (S.D.N.Y. Sept. 13, 2022) (finding statements in SOX certifications about accuracy of financial statements and disclosure of fraud sufficiently alleged to be false to same extent as more specific misstatements); *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *12 (S.D.N.Y. Apr. 14, 2020) (finding statements in SOX certifications plausibly alleged as false or misleading where company's internal controls "failed to arrest" material trend and investors "may have relied on Defendants' certifications in deciding whether to invest"); *In re*

---

[6] Defendants argue in a footnote that the quarterly reports for Q1 2021, Q2 2021, and Q3 2021 are not actionable because they do not incorporate-by-reference the statements in the 2020 Form 20-F because the annual report is not attached as an exhibit. Mot. at 27 n.5. However, the quarterly reports clearly refer to the Form 20-F: "Additional risks and factors which may impact the Group's future financial condition and performance are identified in our filings with the SEC (including, without limitation, our Annual Report on Form 20-F for the fiscal year ended 31 December 2020)."

*ForceField Energy Inc. Sec. Litig.*, 2017 WL 1319802, at *13 (S.D.N.Y. Mar. 29, 2017) (finding SOX certification adequately alleged as misleading).  Because Plaintiff has adequately alleged Defendants made false and misleading statements and omissions with scienter, the Court should find that the SOX Certifications at issue are actionable.  *See* ¶¶141-42, 154-55.

Defendants' cited authority in support of their argument against a finding that Defendants' Class Period SOX Certification were false and misleading are without merit.  ***First***, in *Lachman v. Revlon, Inc.*, the Court found it persuasive against a finding of falsity the Complaint alleged the Individual Defendants had knowledge of operational difficulties in the implementation of an ERP system that Plaintiffs alleged resulted in a weakness in the Company's internal controls over financial report but without "alleg[ing] facts in support of this claim."  487 F. Supp. 3d 111, 135 (E.D.N.Y. 2020).  That is not the case here, where Plaintiff has devoted several pages and numerous factual allegations underpin its allegations that the Class Period SOX certifications are false and misleading.  *See* ¶¶101-27, 141-42, 154-55.  ***Second***, Plaintiff's allegations in this case, which pertain to a specific prohibited activity under the federal securities laws – issuing unregistered securities – are unlike those that were found wanting in *Citigroup*, where the plaintiffs alleged that Class Period SOX certifications were false and misleading with "nothing beyond conjecture to suggest that the Individual Defendants knew . . . of any misrepresentations in Citigroup's financial statements or deficiencies in the Company's internal controls" following a wide ranging probe into compliance practices at the bank and two separate consent decrees with the Federal Reserve Board and Office of the Comptroller of the Currency.  2023 WL 2632258, at *3, *20.  ***Third***, Defendants' reliance upon *In re Diebold Nixdorf, Inc., Securities Litigation*, 2021 WL 1226627, at *12 (S.D.N.Y. Mar. 30, 2021), is also misplaced because there plaintiffs' allegations concerning SOX certifications were insufficient to show that the internal controls

18

contributed to difficulties with a business combination.  As discussed above, that is not the case here, as Plaintiff has alleged that Defendants made false statements with respect to the effectiveness of Barclays' internal controls despite that the over-issuances occurred following the bank's loss of WKSI privileges for violating the federal securities laws.

Based on the foregoing, the Court should find Plaintiff has sufficiently pled that Defendants Staley, Venkatakrishnan, and Morzaria made false statements when they signed SOX certifications attesting to the effectiveness of Barclays' internal controls.  *See In re Glob. Brokerage, Inc.*, 2019 WL 1428395, at *14; *Venkataraman*, 2022 WL 4225562, at *5; *Davis*, 2020 WL 1877821, at *12; *ForceField*, 2017 WL 1319802, at *13.

### 4. Defendants' Statements Regarding the Financial Impact of the Over-Issuances on Barclays Were False and Misleading

Defendants argue Barclays' false and misleading statements regarding the financial impact of the over-issuances were a "best estimate," (Mot. at 28-29), even though Plaintiff's allegations are akin to severe or deliberate recklessness, as the SEC deemed Defendants' internal controls failure in connection with the over-issuances "elementary" and "so obvious as to be deliberately reckless" (SEC Order at 12).  Defendants claim that any statements made between Barclays' disclosure of the over-issuance from the 2019 Shelf on March 28, 2022 and its disclosure of the over-issuance from the 2018 Shelf on July 28, 2022 are not false and misleading because "it did not know at the time" of the announcement of the 2019 Shelf over-issuance that it had also recklessly over-issued securities from the 2018 Shelf.  Defendants' arguments in support of this red herring position all fail.

*Barclays Had Two Non-WKSI Shelves and Defendant Venkatakrishnan Served as Group Chief Officer at the Time of the Over-Issuances*.  Protesting that "corporate officials need not be clairvoyant," Defendants argue that it "makes no sense" that Barclays should have disclosed

the 2018 Shelf over-issuance before Defendants discovered it.  Mot. at 5, 29.  This argument

misses the point. Plaintiff does not allege that Defendants needed to be soothsayers.  Instead,

Plaintiff alleges Defendants utterly failed to establish any internal controls at all to monitor and

track securities issuances on a real-time basis.  This allegation comes directly from the SEC Order

and from Barclays' own subsequent admissions.  *First*, as pled in the Complaint, Barclays had

only two non-WKSI shelf registration statements requiring special accounting and controls due

the limited inventory of securities available for issuance on each of those shelves.  *See generally*

¶¶66-69.  This is not a complex task for Barclays to accomplish as Defendant Higgins deemed the

process to do so as being "simple tasks" and "not rocket science," while Defendant

Venkatakrishnan characterized the failure as "entirely avoidable."  ¶¶214-15.  *Second*, Defendant

Venkatakrishnan <u>was the group chief risk officer at the time of the sales</u>.  ¶¶33, 167(a)-(b).  On

these facts alone, Defendants' statements regarding the financial impact alone expose that they

were false and misleading.  *See Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 292 (S.D.N.Y. 2020)

(finding statements estimating costs misleading by omission where those estimates "failed to

account for already existing" costs).

> ***Defendants' Statements Regarding the Size of the Over-Issuances Were False When***
>
> ***Made.***  Relying upon a case where "a restatement of modest size" underpinned the plaintiffs' case,

Defendants shoehorn the Defendants' false and misleading statements regarding the size of the

over-issuance – a violation of federal securities laws – into an ill-fitting mischaracterization as

"true when they made them."  *See* Mot. at 29 (citing *In re Magnum Hunter Res. Corp. Sec. Litig.*,

26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014).  In announcing that there had been an over-issuance

from the 2019 Shelf, Defendants should have also made clear to Barclays investors that they were

specifically looking into whether an over-issuance occurred on the 2018 Shelf, the bank's other

non-WKSI shelf.  Yet, Defendants failed to do that, as their boilerplate disclosures make clear. *See* Mot. at 29 n.6 (referring generally to "other issuance programmes").

Furthermore, in securities actions, the "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 92 (2d Cir. 2010); *see also Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013) (same).  Literally true statements "can become, through their context and manner of presentation, devices which mislead investors." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).  In this case, the Defendants did not make clear to investors that the internal controls failure impacting the 2019 Shelf may also have caused an over-issuance from the 2018 Shelf, rendering the statements regarding the size of the over-issuance false and misleading when made by omission.

**Defendants' Belated Disclosure of the 2018 Shelf Over-Issuance Does Not Erase the Over-Issuances' Materiality**.  Defendants attempt to take advantage of their belated disclosure of the 2018 Shelf over-issuance as not material, in isolation, and therefore incapable of rendering their statements regarding the costs of the over-issuances false and misleading.  Mot. at 30.  The Court should reject this argument out of hand.  *First*, materiality is a fact-specific inquiry that is inappropriate for resolution at the motion to dismiss stage.  *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011); *Cloopen*, 2023 WL 2534599, at *10.  *Second*, Defendants may not escape liability for the 2018 Shelf over-issuance simply because they failed to track and monitor issuances from that shelf and compounded that failure to by failing to disclose the consequence of that failure to the market in a timely manner.  Such reckless behavior cannot assist Defendants in avoiding their obligations to injured investors when the 2018 Shelf over-issuance combined with the 2019 Shelf over-issuance totaled an astonishing $17.7 billion of unregistered securities.

21

5.      **The Financial Restatement Announcement Was False and Misleading**

In their Motion, Defendants misleadingly quote a partial statement alleged as false with respect to the 2021 Restatement and claim Plaintiff does not allege why that statement is false. *See* Mot. at 31 (citing ¶171).  The Complaint quite clearly alleges that ¶171 includes a statement that was "materially false and/or misleading when made for the reasons described in ¶162."  ¶176. Plaintiff explicitly pleads that this statement is false because the restatement announcement did not reveal the full truth as Barclays' litigation and conduct expenses remained materially understated and Barclays' profits remained materially overstated.  ¶162.  Furthermore, Defendants ignore that this statement in ¶171 is pled in conjunction with false statements explicitly listing the false and misleading litigation and conduct expenses in ¶169 and ¶175.

6.      **Barclays' Announcement of the "Independent" Review Was Materially Misleading and Omitted Information**

Defendants' contention that Barclays' October 26, 2022 statement regarding the findings of its paid-for internal review of the over-issuances was not false or misleading fails.  Mot. at 31-32.  **First**, Barclays' September 30, 2022 Form 6-K provides no basis for finding the October 26, 2022 results announcement was not false and misleading as, far from "disclos[ing] the very information Plaintiff claims it did not know," that announcement purports to absolve "senior executives" from responsibility.  *Id.  See also* Defs.' Ex. 8, ECF No. 55-8 at 3.  As a result, it is far from clear to investors from this announcement that the "individual accountabilities" referred to in the announcement would be Venkatakrishnan, Cross, and Morzaria, a material omission rendering the statement misleading.  *See* ¶¶195-205.  **Second**, the date of a final report would inform investors when the Barclays Board completed its review and determined that Defendants Venkatakrishnan, Morzaria and Cross were deserving of "individual accountabilities" in relation to the over-issuances.  ***Finally***, Defendants misrepresent that the October 26, 2022 results

22

announcement disclosed that the over-issuance "**had** an adverse effect on the Group's . . . reputation" (Mot. at 32) when, in fact, the results announcement stated that the over-issuance "**could have** an adverse effect on the Group's … reputation" (Defs.' Ex. 9, ECF No. 55-9).

### B.    The Complaint Adequately Pleads Scienter

In determining whether scienter is pled, "courts must … accept all factual allegations in the complaint as true." *Tellabs*, 551 U.S. at 309.   Scienter allegations must be viewed "holistically." *Id.* at 326.  The question is whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323.

Scienter is pled by alleging facts giving rise to a strong inference of conscious "misbehavior **or** recklessness." *Novak*, 216 F.3d at 307.  The Court of Appeals for the Second Circuit has defined "conscious" or "reckless" misbehavior to mean, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Cloopen*, 2023 WL 2534599, at *14 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).

A complaint pleads scienter by alleging that defendants "knew facts or had access to information suggesting that their public statements were not accurate," or "failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 311.  The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324.  Rather, it need only be "*at least* as strong as any opposing inference." *Id.* at 326.  Thus, "[w]hen the competing inferences rest in equipoise, the tie . . . goes to the plaintiffs." *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *13 (S.D.N.Y. Apr. 22, 2016).  Such a pleading permits the inference that the "defendants knew or, more importantly, should have

23

known that they were misrepresenting material facts related to the corporation." *See Kalnit*, 264 F.3d at 142.

Here, Plaintiff pleads scienter through evidence of conscious misbehavior or recklessness. *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (finding scienter pled through "strong circumstantial evidence of conscious misbehavior or recklessness"). "Plausible allegations that a defendant 'knew facts or had access to information that their public statements were not accurate' supports a culpable inference of misbehavior or recklessness." *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 1806303, at \*4 (S.D.N.Y. June 2, 2022) (quoting *Set Cap. LLC v. Credit Suisse Grp., AG*, 996 F.3d 64, 79 (2d Cir. 2021)). The Second Circuit has directed that "in determining whether the Complaint adequately alleges facts giving rise to a strong inference that Defendants acted recklessly, we focus on Defendants' degree of knowledge and the seriousness of the impact that results from their conduct." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 215 (2d Cir. 2020). Additionally, the scienter of the management-level employees permits the Court to "readily attribute[]" that scienter to corporate Defendant Barclays. *See In re Marsh & McLennan Cos., Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006); *see also In re Shanda Games Ltd. Sec. Litig.*, 2019 U.S. Dist. LEXIS 171592, \*21 (S.D.N.Y. Sept. 30, 2019) (attributing knowledge of CEO and Director of Board to corporate defendant).

As detailed thoroughly below, Plaintiff's allegations support a strong inference that the Defendants recklessly turned a blind eye to the failure to comply with the 2017 SEC consent order by failing to implement any tracking system for securities issuances after Barclays lost its WKSI status and the results of their conduct had a serious impact on Barclays.[7]

---

[7] Defendants claim that the Complaint fails to plead scienter through motive and opportunity. Mot. at 15-16. But the law is clear that Plaintiff has no obligation to plead a motive

Footnote continued on next page

1.      **The "Historic" Efforts By Barclays to Remedy the Over-Issuances, Contribute to an Inference of Scienter**

Defendants perplexingly claim that Plaintiff "posits that the over-issuance was 'not a complicated accounting error' but merely a 'simple' mistake" and that drawing the conclusion that a simple mistake constitutes "impermissible fraud by hindsight (Mot. at 19).  This is incorrect.

*First*, Defendants Venkatakrishnan and Higgins, not Plaintiff, characterized the failure to implement a tracking system to monitor securities issuances as a "simple mistake," "entirely avoidable," and "not rocket science."  ¶¶214-15.  Furthermore, describing the over-issuance as "simple" does not render it incapable of contributing to an inference of scienter because Defendants were reckless; if anything, Defendants' failure to heed a simple problem contributes more to an inference of scienter than their failure to heed a complex problem.  Indeed, as described by the SEC, "BBPLC's <u>failure</u> to put into place any internal control around the real-time tracking of securities being offered or sold off its Commission-registered shelf statement" resulted in the issuance <u>an unprecedented amount of [unregistered] securities – cumulatively totaling approximately $17.7 billion</u>."  ¶94.

*Second*, despite Defendants' protests to the contrary, Defendants' conduct in this case was not merely negligent, as evidenced by the efforts the Complaint details regarding the response to the over-issuance.  In order to remedy the fraud when the truth of Defendants' failure to heed federal securities laws, Barclays conducted a rescission offer[8] in which investors submitted more than $7.7 billion of claims (¶91), paid a $200 million fine and more than $161 million in

_____

to sufficiently allege scienter. *See Tellabs*, 551 U.S. at 310 ("absence of a motive . . . is not fatal.").

   [8] Defendants argue the rescission offer was "voluntary" (Mot. at 9); yet, the SEC Order makes clear that Barclays announced it was "required to conduct a rescission offer" (SEC Order at 15).

disgorgement and prejudgment interest in connection with a settlement with the SEC (¶93), and suffered a 19% decline in full-year 2022 revenue as a result of the over-issuances (¶244). As courts in this district have found, "[s]imply put, the magnitude of the aftershock [of the fraud] suggests more than a careless mistake or trivial miscalculation" and contributes to an inference of scienter. *See Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l., Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019) (finding scienter where fraudulent inventory practices led to inventory drawdown of between $50 million and $70 million); *see also In re Bear Stearns Cos., Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 517 (S.D.N.Y. 2011) (finding "enormous amounts at stake coupled with the detailed allegations" created strong inference that defendants were reckless in not knowing that their public statements materially misrepresented company's financial state); *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) (finding magnitude of fraud may provide some additional circumstantial evidence of scienter). Here, the Court should find that the magnitude of the Defendants' fraud – implicating $17.7 billion of illegally issued unregistered securities – and remedial efforts that Defendants themselves deem "of historic scope" contribute to a strong inference of scienter against Defendants.

### 2.     Admissions Regarding the Failure to Monitor Securities Issuances Support Scienter

At the May 4, 2022 Annual General Meeting, Defendant Higgins made several admissions regarding the over-issuance including deeming it a "failure to comply with SEC registration requirements, a failure which has cost us hundreds of millions of pounds, and more in reputation." ¶214. Higgins stated further that the over-issuance was an "entirely self-inflicted problem" and that "we missed some simple tasks," as well as that "[t]his is not rocket science." *Id.* Similarly, Defendant Venkatakrishnan said the over-issuance "was entirely avoidable and I am deeply

disappointed that it occurred."   ¶215.   Venkatakrishnan added, "[T]he fact that this happened is particularly upsetting," given "considerable progress improving our controls since 2016."   *Id.* Through their admissions of the failures that led to the over-issuances and statements with respect to the purported importance of a "strong controls culture," Defendants Higgins and Venkatakrishnan's admissions demonstrate scienter since it is "virtually" inconceivable that the Chairman and CEO of Barclays, who was the Chief Risk Officer when Barclays was an ineligible issuer, would not be aware of the impact of Barclays' not having WKSI status on the bank's process to issue securities in the United States.   *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 136 (S.D.N.Y. 2020) (finding scienter adequately pled relating to CEO and Co-Presidents with respect to "important contract" and admissions by those individuals regarding that contract).

Defendants' reliance upon *City of Birmingham Firemen's & Policemen's Supplemental Pension System v. Ryanair Holdings PLC* is particularly misplaced because it highlights the actionability of Higgins' and Venkatakrishnan's admissions.   *See* Mot. at 20 (citing 2020 WL 2834857, at *3 (S.D.N.Y. June 1, 2020)).   In *Ryanair*, the Court found that the Defendant CEO's statements against unionization "are impossible to reconcile" with his "subsequent admission that he had 'long anticipated' unionization."   2020 WL 2834857, at *3.   Similarly, Defendants' statements here that Barclays was, for example, "focus[ed] on strengthening the internal control environment across the Group" through BICEP and that BICEP resulted in "[t]he Group's control environment [being] now in a much stronger position" (¶136) in its 2020 Form 20-F are "impossible to reconcile" with Defendant Higgins' admissions that Defendants "missed some simple tasks" that were "not rocket science" resulting in the "entirely self-inflicted program" of the over-issuance (¶214) and Defendant Venkatakrishnan's admissions that "[t]his situation was

entirely avoidable," "[t]he necessity of a stronger controls culture has never been clearer to me" (showing it was at least clear to him before), and that because "considerable progress improving our controls since 2016… the fact that this happened is particularly upsetting" (¶215).  Far from the *post hoc* statements representing a present-sense understanding of a prior state of affairs as Defendants wish Plaintiff's allegations to be (Mot. at 20), Defendants Higgins and Venkatakrishnan's admissions about the failure of internal controls at Barclays leading to the over-issuance despite the Company's "focus" on controls is "direct evidence of Defendants' knowledge" of the weaknesses in Barclays' internal controls at the time they extolled their strength; thus, the Court should find that these admissions support a strong inference of scienter. *See Ryanair*, 2020 WL 2834857, at *3.

In light of the plethora of statements and claims Defendants made during the Class Period regarding the strength and adequacy of Barclays' internal controls, there can be no dispute that Defendants were reckless, at a minimum, with respect to these statements in light of Defendants Higgins and Venkatakrishnan's admissions.[9]   Indeed, "it would be absurd" to suggest that Defendants did not have this knowledge, given the unprecedented loss of WKSI status and the drastic difference between issuing securities as a WKSI compared to the laborious, time-consuming process required to do the same business function without the preferential status as a WKSI.  *See In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012).

---

[9] Defendants argue that these admissions are not probative of whether they had scienter.  *See* Mot. at 19-20.  But that is not the law.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001) (even "post-class period data may be relevant to determining what a defendant knew or should have known during the class period").

###     3.     Barclays Publicly Identified Itself as an Ineligible Issuer on the Front Page of Its Annual Report Filed with the SEC

Rather than address Plaintiff's allegation directly that Barclays' representation on the front page of its annual report regarding its WKSI status illustrates that Defendants were reckless in not knowing that BBPLC failed to implement any internal controls to account for the amount of securities issues during Barclays' period as an ineligible issuer, Defendants obfuscate and offer several red herrings that have no bearing on this case. *See* Mot. at 20-21.[10]  As they do throughout their Motion, Defendants misconstrue Plaintiff's allegation that Barclays' status as non-WKSI was so widely known within the Company that Defendants were reckless in failing to know that the internal controls at the bank did not account for the fact that Barclays was an ineligible issuer. *Id.* The designation of WKSI status is of such a high level of importance to the SEC – Barclays' primary regulator in the United States for securities issuances – that the SEC requires public companies to certify whether they are a WKSI or not on the front page of their annual reports. ¶225.  As noted in the Complaint, Barclays not only filed annual reports during its period as an ineligible issuer following the 2017 SEC Order identifying as a non-WKSI but it even corrected its very first filing during that time which imprecisely stated that the Company had WKSI status

---

[10] Defendants cite cases regarding whether Defendants knew that "black-market dealings" were occurring on their platform supported a strong inference of scienter (*see In re DraftKings Inc. Sec. Litig.*, 2023 WL 145591, at *37 (S.D.N.Y. Jan. 10, 2023)), whether Defendants knew that continued "indirect sales" with a company on a government ban list were illegal and supported a strong inference of scienter (*Gray v. Alpha & Omega Semiconductor Ltd.*, 2021 WL 4429499, at *11 (S.D.N.Y. Sept. 27, 2021)), whether Defendants involvement in "planning and implementation" of a new ERP system supported a strong inference of scienter (*Lachman*, 487 F. Supp. 3d at 137), and whether an "increased level of activity" at a company's subsidiary contributed to an inference of scienter (*Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996)). None of these cases are on all fours with the facts of this case, which concerns the failure of Barclays and Defendants to implement adequate internal controls to account for and track the issuances of securities due to the bank's status as an ineligible issuer, a status that was publicly known to all on the front pages of its Annual Reports filed with the SEC.

when it did not.  ¶¶225-28.  Therefore, the Court should disregard Defendants' nonsensical rejoinders and find that Plaintiff's allegation that Barclays' publicly-filed Annual Reports with its status as an ineligible issuer made clear on the front page contributes to an inference of scienter that Defendants acted recklessly in failing to implement effective internal controls in light of Barclays' loss of WKSI status.

### 4.    Defendants' Corporate Roles Do Permit an Inference of Scienter

In their Motion, Defendants misstate the law regarding the propriety of drawing an inference of scienter based upon a Defendants' role in the Company.  *See* Mot. at 18-19.  In this case, Defendant Staley was CEO of Barclays, a member of Barclays Executive Committee, and a member of the Barclays Board of Directors from December 2015 through October 31, 2021.  ¶32.  Additionally, Staley was a CEO of Barclays Bank and a member of Barclays Bank's Board of Directors from March 2019 through October 31, 2021.  *Id.*  Defendant Venkatakrishnan succeeded Staley as CEO of both Barclays and Barclays Bank and a member of both entities Board of Directors.  ¶33.  Prior to these roles, Venkatakrishnan served as Barclays' Global Head of Markets from October 2020 to October 2021, following his four-and-a-half-year tenure as Barclays' Chief Risk Officer from March 2016 to October 2020, which encompasses the entire period Barclays was an ineligible issuer without WKSI status.  *Id.*  Until his retirement on April 22, 2022, Defendant Morzaria served as Barclays Group Finance Director, a member of its Executive Committee, a member of both the Barclays and Barclays Bank Boards of Directors.  ¶34.  Defendant Cross succeeded Morzaria as Group Finance Director, following several leadership roles in Barclays financial unit.  ¶35.

Indeed, courts in this Circuit credit allegations where CEOs and CFOs are presumed to have knowledge of "basic facts" pertaining to important matters at their public companies.  For example, in *Wang v. Cloopen Group Holding Limited*, the court found that "it is plausible to infer"

that the defendant CFO, as "the officer responsible for managing [the corporation's] finances, knew the basic facts related to the [issuance]." *See* 2023 WL 2534599, at *15. Similarly, in this case, Defendants Morzaria and Cross, as Group Finance Chair, also know the "basic facts" relating to Barclays' issuances of stock. *See id.*; *see also In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) (concluding that plaintiff adequately alleged CFO's scienter where the CFO's "role in financial reporting should have alerted him to the corporation's sudden rise in revenues and history of inadequate financial controls"); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 222 (S.D.N.Y. 2004) (finding that CFO's role "as the executive most responsible for the Company's accounting" supporting inference "that [the CFO] knew of Company's [undisclosed accounting problems]").

Additionally, as in *Cloopen*, "it is difficult to believe" that the Individual Defendants "never contemplated" what the loss of WKSI status meant for Barclays, given the extensive importance the Company claimed that status meant to it in its waiver requests. *See* 2023 WL 2534599, at *15. For the Individual Defendants, leaders of a global investment bank, to claim that the loss of WKSI status, which upended its securities process in the United States, did not rise to a level warranting their concerns "is virtually inconceivable" and exposes, at a minimum, their reckless conduct during its ineligible issuer. *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent.*, 477 F. Supp. 3d 123, 136 (S.D.N.Y. 2020) (finding scienter against CEO and Co-Presidents due to termination of important contract).

In their Motion, Defendants misstate the law regarding how Plaintiff may show that they recklessly disregarded the inaccuracy of their public statements regarding the strength of Barclays' internal controls following the bank's loss of WKSI status. Mot. at 18-19. Defendants contend that the only way for Plaintiff to show this Court that Defendants recklessly disregarded the

inaccuracy of their statements during the Class Period is to "specifically identify the reports or statements containing [contrary facts]." *Id.* at 18.  However, courts have made clear that such facts "may also be learned in other ways."  *See Cloopen*, 2023 WL 2534599, at \*15; *see also City of Warren*, 477 F. Supp. 3d at 136 (finding that plaintiff alleging "access to contrary facts," but not specific reports or statements, adequately pled scienter because other alleged facts "constitute[d] circumstantial evidence supporting an inference of scienter"); *In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at \*9 (S.D.N.Y. Sept. 30, 2020) (finding site visits, meetings with "local authorized representatives," and inspecting operations constituted circumstantial evidence supporting scienter).  Indeed, Defendants' involvement in, or knowledge of, the response to the 2017 Consent Order and the strictures imposed upon Barclays' securities issuing activities upon becoming an ineligible issuer constitutes circumstantial evidence supporting an inference of scienter.  *See City of Warren*, 477 F. Supp. 3d at 136.

### 5.   Barclays' Compensation Clawback from Certain Defendants Supports a Strong Inference of Scienter

In their Motion, Defendants grossly misstate Plaintiff's scienter argument regarding Barclays' February 15, 2023 announcement that it would clawback compensation from Defendants Venkatakrishnan, Morzaria, and Cross.  Mot. at 21-22.  Defendants claim that "Plaintiff does not plead any facts suggesting that those adjustments related to participation in any purported fraud" (Mot. at 21) and cite several off-point, out-of-Circuit cases.  *See* Mot. at 21-22 (citing *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1044 (6th Cir. 2016) (analyzing corporate, not individual, scienter in context of compensation clawback); *Brine v. MHPI VII LLC*, 2022 WL 2199826, \*5 (C.D. Cal. Feb. 15, 2022) (analyzing clawback provision in real estate contract); *In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457, at \*17 (N.D. Ill. Jan. 12, 2021) (analyzing scienter related to clawback where "no allegations" allowed inference "recoupment . . . signified punishment" for

alleged conduct); *Christian v. BT Grp. PLC* 2019 WL 3647213, at *8 (D.N.J. Aug. 1, 2018) (finding no scienter where clawback only "reflect[ed] [Company's] actual performance"). These cases have no bearing on this case since Plaintiff has laid out in detail that the compensation clawbacks were tied directly to the fraud at issue, not only Barclays' performance.

While Defendants claim that "Plaintiff does not plead any facts suggesting that those adjustments related to participation in any purported fraud" (Mot. at 21), the Complaint explicitly alleges: (i) that the compensation clawbacks were "<u>directly attributed to regulatory errors and oversights, including the over-issuance</u>" (¶221); (ii) that the Chair of the Remuneration Committee at Barclays stated, in relevant part, "The Over-issuance of Securities under BBPLC's US shelf registration statements was a deeply disappointing feature of 2022 . . . <u>We have thoughtfully and deliberately adjusted our remuneration decisions to ensure that this over-issuance matter is reflected</u>" (¶222); and (iii) that the Barclays Board stated, in connection with the compensation clawbacks, "The [Remuneration] Committee <u>exercised its discretion not to exclude the impacts associated with the Overissuance of Securities in the US or the monetary penalties imposed by the SEC or CFTC</u> … As a result, the 2022 annual bonus awards were £403,300, £166,000, and £76,000 lower than they would have otherwise been, for Venkat, Anna, and Tushar" (¶223). The Court should find these facts sufficiently contribute to a strong inference of scienter. *See Salix*, 2016 WL 1629341, at *15 (finding Board's decision to exercise clawback against Individual Defendants supported strong inference of scienter).

### 6.     The Core Operations Doctrine Supports Scienter

"To fulfill the scienter pleading requirement, a plaintiff may rely on the 'core operations doctrine,' which permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *In re Hi-Crush Partners L.P. Sec.*

*Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013).[11]  Yet, Defendants go to great lengths

to mischaracterize and misrepresent Plaintiff's core operations allegations by claiming "that risk

management and internal controls are generally important."  *See* Mot. at 23.[12]   However,

Defendants' own repeated assertions about the importance of maintaining WKSI status in

Barclays' pleas to the SEC to restore that status following several consent orders belie Defendants'

position here.  *See* ¶¶217-20.  In its submissions to the SEC, imploring for restoration of its WKSI

status despite flouting the federal securities laws repeatedly, Barclays has claimed: (i) that it is a

"frequent issuer of securities" (¶217); and (ii) that it "issues a variety of securities that are issued

under the WKSI shelf, including <u>ordinary shares</u>, <u>regulatory capital securities</u> (Additional Tier 1

---

[11] Indeed, the core operations doctrine is alive and well in the Second Circuit.  *See In re Dentsply Sirona, Inc. Sec. Litig.*, --- F. Supp. 3d ---, 2023 WL 2682905, at *21 (E.D.N.Y. Mar. 29, 2023) (crediting core operations allegations as part of adequate scienter pleading); *Cloopen*, 2023 WL 2534599, at *17 (finding core operations sufficiently pled because "customer retention and the ability to increase revenues from existing customers were core aspects of [a company's] business"); *Yannes v. SCWorx Corp. et al.*, 2021 WL 2555437, at *5 (S.D.N.Y. June 21, 2021) ("[A]t the very least, the [core operations] doctrine can provide supplemental support for allegations of scienter . . ."); *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 852 (S.D.N.Y. 2019) ("Given that the importance of an issue to a corporation supports an inference that an executive would be aware of it, this Court agrees with these other courts that this doctrine continues to be valid.").

[12] The cases Defendants rely upon in support of their misfired attack on Plaintiff's core operations allegations are inapposite and therefore fall flat.  *See* Mot. at 22.  These cases either stand for the uncontroversial proposition that the core operations doctrine "bolsters" other allegations of scienter, or have no bearing on this case.  First, Plaintiff does not "rely heavily" on the core operations doctrine as in *Hensley v. IEC Electronics Corp.*, 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014).  Mot. at 22 (Defendants claim Plaintiff alleges core operations facts after it is "[o]ut of options" (it is not)).  Second, the allegations in this case do not turn on "issues relating to accounting and internal controls" (Mot. at 22) as in *Venkataraman v. Kandi Technologies Group, Inc.*, 2021 WL 4952260 at *4 (S.D.N.Y. Oct. 25, 2021), where the plaintiffs' "conclusory" scienter allegations centered on "errors in the financial statements" "made unwittingly" without "disregard that the applicable accounting rules required more." *See id.*  Here, the allegations focus on Barclays' and Defendants reckless disregard and failure to comply with a federal consent decree entered following the Company's admission to violations of the federal securities laws, not an "unwitting[]" misunderstanding of mere "accounting rules" resulting in "errors in the financial statements." *See, e.g.*, ¶121.

contingent convertible securities and Tier 2 subordinated debt), and <u>senior debt securities</u> issued in syndicated transactions in 'benchmark' size" (¶217). Barclays has also previously stressed the "<u>importance of the WKSI shelf to Barclays in meeting its capital and funding requirements</u>." ¶218. Indeed, Courts in this district have repeatedly held that "a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue" and the Court should do so here. *See Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37-38 (S.D.N.Y. 2016).

Indeed, contrary to Defendants' misconstruing of Plaintiff's allegations as relating WKSI status only to "issuing ETNs and structured notes" (Mot. at 22), Barclays has declared that "[t]he WKSI shelf []process <u>allows access to the widest possible global investor base</u> and <u>provides an important means of accessing capital and funding for Barclays' global operations</u>." ¶58. Additionally, Barclays has claimed that because losing WKSI status would render it "unable to use free writing prospectuses," Barclays would lose "<u>an important channel of communication to investors in regulatory capital securities</u>." ¶59. Finally, Barclays has stressed repeated that losing WKSI status would negatively impact its "speed to the market" for new securities, "decreas[ing] the market demand for Barclays' securities, which could have a negative pricing effect on Barclays' securities." ¶60. Additionally, maintenance of WKSI status is so important to Barclays' participation in the U.S. securities market that the SEC requires Barclays to note whether it is a WKSI or not on the front page of its Annual Form 20-F filing. *See* ¶¶225-28. Thus, the Court should find the core operations allegations "provide supplemental support for allegations of scienter." *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F.App'x 10, 14 n.3 (2d Cir. 2011).

### 7.   Defendants' Counter-Narrative Is Uncompelling

Indeed, courts routinely find that postponing the revelation of the truth, even in the short term, is consistent with an inference of scienter because "the benefits of concealment might [have]

exceed[ed] the costs." *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016).  Here, a clear benefit for Defendants was the postponement of the drastic reduction in Barclays' market share of the structured note market in the United States.  ¶¶229-35.  The Court should reject each facet of Defendants' purported "inference of non-fraudulent intent" (*see* Mot. at 23-24) and find they acted with scienter.

*First*, Defendants contend that the "more compelling inference" is that "the over-issuance of Barclays Bank securities was 'negligently made [in] [] error,' and Defendants 'subsequently corrected their disclosures to the Securities and Exchange Commission [] when they became aware of the error.'"  Mot. at 23.  This argument is without merit as Defendants' own authority involves an ***accounting error***, not a failure to comply with the federal securities laws after losing WKSI status in light of an SEC consent order.  *See Rotunno v. Wood*, 2022 WL 14997930, at *3 (2d Cir. Oct. 27, 2022).

*Second*, Defendants claim that their "prompt disclosure" of the discovery of the "over-issuance mistake, commencement of an independent review, continued contemporaneous public disclosures about the impact of the over-issuance mistake, and decision to conduct a rescission offer of historic scope fatally 'undermine any inference of scienter.'"  Mot. at 23.  Defendants overstep the scope of the case law they cite in support of their positions, which only speaks to internal investigations.  *See City of Brockton Ret. Sys. v. Avon Prods., Inc.*, 2014 WL 4832321, at *24 (S.D.N.Y. Sept. 29, 2014).  Yet, Defendants' reliance upon *Long Miao v. Fanhua, Inc.* is particularly misplaced because in that case, not only did the Plaintiff allege that the Defendants' commission of an investigation supported scienter but that investigation was conducted "after not

only the alleged misstatements but also the end of the Class Period."  *See* 442 F. Supp. 3d 774, 808 (S.D.N.Y. 2020).[13]

### C.     The Complaint Adequately Pleads Loss Causation

To plead loss causation, a plaintiff must allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."  *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 765 (S.D.N.Y. 2017).  Generally, "plaintiffs sufficiently plead loss causation when they allege that their share's price fell significantly after the truth became known through an express, corrective disclosure."  *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 100 (S.D.N.Y. 2022).  Thus, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind," and a complaint is sufficient so long as it sets forth what the alleged loss and causal connection to the fraud "might be."  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).[14]  Plaintiff alleges in detail how the truth about Defendants' false and misleading statements was revealed to the market through a series of partial revelations.  ¶¶236-45.  Defendants claim that two of the alleged corrective disclosures – on July 28, 2022 and on February 15, 2023 – did not disclose new information or amount to materializations of disclosed risks.  Mot. at 33-36.[15]

---

[13] Defendants' other internal investigation case is easily distinguishable.  *See Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (analyzing whether company's investigation into investments in CDO's contributing to scienter).  Similarly, Defendants may not find refuge in *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 185 (S.D.N.Y. 2012), where a "bevy of truthful disclosures [made] throughout the Class Period" about exposure to subprime loans negated an inference of scienter, unlike during the Class Period here.

[14] Even under Rule 9, the Complaint adequately pleads loss causation because it alleges that the subject of the fraudulent statement was the cause of the actual loss suffered, which is what courts in this Circuit require.  *See Braskem*, 246 F. Supp. 3d at 765-66.

[15] Defendants do not challenge the adequacy of the March 28, 2022 corrective disclosure.

Defendants are incorrect.  First, Plaintiff alleges that the disclosure on July 28, 2022 that an over-issuance occurred from an entirely distinct shelf registration statement – the 2018 Shelf – from the over-issuance identified in the March 28, 2022 corrective disclosure which addressed the 2019 Shelf.  Prior to this disclosure, investors were not aware that there may have been an over-issuance from the 2018 Shelf.  Second, Plaintiff alleges that the February 15, 2023 corrective disclosure revealed that Barclays' 2022 full year revenue decreased 19% due to costs related to the over-issuance and rescission offer as well as that it was clawing back compensation from three of the Defendants in connection with the over-issuance.  Furthermore, arguments like Defendants' that "information disclosed in [partial disclosures] was known to the market . . . are better considered at a later stage of the litigation on a more complete fact record."  *City of Sterling Heights*, 587 F. Supp. 3d at 101.

Despite Defendants' contentions otherwise, a plaintiff need not show that a "specific corrective disclosure . . . exposed the precise extent of [the] alleged fraud," so long as the plaintiff's "theory of loss causation nevertheless rest[s] on the revelation of the truth," *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261-62 (2d Cir. 2016), and "there is no requirement that the disclosure take a particular form or be of a particular quality."  *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008).  Additionally, Defendants' argument that there was no materialization of a concealed risk because they disclosed the risk (Mot. at 33-35) is misguided. Defendants' misstatements meant that investors "could not accurately weigh that risk," and "[t]he risk that caused the loss . . . was within the 'zone of risk concealed by the misrepresentations.'"  *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *13 (S.D.N.Y. Apr. 1, 2015).[16]

---

[16] Defendants misrepresent the factual context of *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 494-95 (S.D.N.Y. 2021).  *See* Mot. at 35-36.  In that case, the Court found plaintiffs were

Footnote continued on next page

D.      **The Complaint Adequately Pleads Section 20(a) Claims**

To state a claim of control person liability under Section 20(a), a plaintiff must show: (1) a primary violation by the controlled person; (2) control of the primary violator by the defendant; and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud. *Sjunde-AP Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 415 (S.D.N.Y. 2019). Whether a person is a "controlling person" is a fact-intensive inquiry and generally should not be resolved on a motion to dismiss. *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 253 (S.D.N.Y. 2018); *In re Veon Ltd. Sec. Litig.*, 2018 WL 4168958, at *21 (S.D.N.Y. Aug. 30, 2018). Contrary to Defendants' contentions (Mot. at 36-37), Plaintiff has adequately pled that Barclays and the Individual Defendants violation Section 10(b).[17]

The Complaint alleges primary violations of Section 10(b) by Barclays and each of the Individual Defendants, as described above.  Thus, the only question that remain are whether the Control Person Defendants (including the Individual Defendants) "controlled" the Defendants and whether they were each "a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).  Indeed, the Complaint amply alleges the Control Person Defendants' "actual involvement in the making of the fraudulent statements by the putatively controlled entity." *Id.*  Among other things, the Control

---

"reduced to relying solely on Defendants' revelation of poor financial results" to allege loss causation where "Plaintiffs ha[d] not, however, alleged the existence of any corrective disclosures." *See Born*, 521 F. Supp. 3d at 494.  That is not the case here, where Plaintiff has alleged three distinct partial corrective disclosures.  ¶¶236-45.

[17] Though there are intra-circuit divides on whether culpable participation is necessary for a Section 20(a) claim, *Gen. Elec.*, 417 F. Supp. 3d at 415, the facts showing that each Individual Defendant knowingly or recklessly made materially misleading statements is sufficient to allege culpable participation. *Veon*, 2018 WL 4168958, at *22; *Cannavest*, 307 F. Supp. 3d at 254-55. Defendants do not dispute that each Individual Defendant controlled Barclays (Mot. at 36-37); corporate officers usually are presumed to possess the ability to control, and the allegations show that they did. *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996).

Person Defendants were "involved in … the concealment" of the true facts regarding the Bank's compliance with the 2017 SEC Order, including through their "spreading the misstatements" to investors that Barclays had effective internal controls. *DoubleLine II*, 413 F. Supp. 3d at 221.

The Court should reject Defendants' argument that Defendants Higgins and BBPLC did not have actual control over the misstatements regarding the internal controls at Barclays. *See* Mot. at 36. As pled in the Complaint, Defendant Higgins has been the Group Chairman of Barclays since May 2019 and a member of the Barclays Board since March 2019. ¶39. BBPLC is Barclays' wholly owned U.S.-subsidiary and the locus of the over-issuances. ¶¶40, 42. Since 2019, the BBPLC Board members represent a subset of the Barclays Board. ¶43. Each member of the Barclays Board, including Defendant Higgins, sits on the BBPLC Board. ¶43. The Barclays Board and Barclays Bank Board audit committees consider matters at the same meetings. ¶44. Based on the foregoing, Plaintiff adequately pleads control person claims against Defendant Higgins and BBPLC through their "actual involvement in the making of the fraudulent statements by the putatively controlled entity." *DoubleLine II*, 413 F. Supp. 3d at 220.[18]

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in its entirety.[19]

---

[18] Although the Defendants dispute Higgins' liability under Section 20(a), they do not dispute that, as Group Chairman, he "possessed the power to direct or caused the direction of management and policies of [Barclays and Barclays Bank]." *DoubleLine II*, 413 F. Supp. at 220. Therefore, upon becoming Group Chairman in May 2019, Higgins culpably participated in the fraudulent statements made to investors thereafter by not acting to correct them when made.

[19] If the Court grants the Defendants' motion in any part, Plaintiff respectfully requests leave to replead.

Dated:  July 12, 2023

Respectfully submitted,

**LABATON SUCHAROW LLP**

By:

CHRISTINE M. FOX
JAMES M. FEE
140 Broadway
New York, NY  10005
Telephone: 212 907 0700
Fax: 212 818 0477
cfox@labaton.com
jfee@labaton.com

*Lead Counsel for Lead Plaintiff Boston*
*Retirement System and the Proposed Class*