# Supplemental Exhibit 1

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, DC 20549
## FORM 20-F

(Mark One)

☐ REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended 31 December 2022

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____to _____

☐ SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of event requiring this shell company report _____

| Commission file number | Barclays PLC | 1-09246 |
|---|---|---|

BARCLAYS PLC
(Exact Name of Registrant as Specified in its Charter)

England
(Jurisdiction of Incorporation or Organization)

1 CHURCHILL PLACE, LONDON E14 5HP, England
(Address of Principal Executive Offices)

GARTH WRIGHT, +44 (0)20 7116 3170, GARTH.WRIGHT@BARCLAYS.COM
1 CHURCHILL PLACE, LONDON E14 5HP, England
(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

# Directors' report: Over-issuance of Securities – Shareholder Q&A

To help shareholders understand the circumstances relating to the Over-issuance of Securities and remediation activity taken by Barclays to resolve this matter, we have set out below a series of questions and answers. Shareholders should refer to the underlying disclosures, including the Group's results and stock exchange announcements, for more information about the matters discussed below.

### Where did the Over-issuance of Securities occur?

The Group operates a structured products business in BBPLC, through which it issues structured notes and exchange traded notes to customers in the US and elsewhere. In order to issue securities of this nature in the US, BBPLC maintains a shelf registration statement with the US SEC.

### What securities were over-issued?

In March 2022, management became aware that BBPLC had issued securities materially in excess of the amount registered under BBPLC's shelf registration statement on Form F-3, as declared effective by the SEC in August 2019 (2019 F-3). The amount registered should have operated as a limit on the amount of BBPLC's issuances. Subsequently, management also became aware of issuances in excess of the amount registered under BBPLC's prior shelf registration statement (the Predecessor Shelf). Across both shelf registration statements, BBPLC issued a cumulative total of approximately $17.7 billion in securities in excess of the amounts it had registered with the SEC.

### Why did BBPLC's US Shelf have limited capacity?

In May 2017, Barclays Capital Inc. entered into a settlement with the SEC in connection with a matter arising out of its former Wealth and Investment Management business. As a result, at the time the 2019 F-3 was filed and the Predecessor Shelf was amended, BBPLC had become an 'ineligible issuer' thereby ceasing to be a 'well known seasoned issuer' (or WKSI). This meant that BBPLC was not able to take advantage of SEC rules that allow WKSIs to file shelf registration statements to register unspecified amounts of securities (and then issue securities without limit), and was instead required to pre-register a fixed amount of securities under its shelf registration statements and only issue securities up to that amount.

### What was the legal significance of the Over-issuance of Securities?

The securities issued in excess of the registered amounts were considered to be 'unregistered securities' for the purposes of US securities law and certain offers and sales of these securities were not made in compliance with the US Securities Act of 1933, which requires that offers and sales of securities be registered unless there is an exemption from registration. This gave rise to rights of rescission for certain purchasers of relevant securities under US securities laws, whereby such purchasers had a right to recover either, upon the tender of such security, the consideration paid for such security (together with interest but less the amount of any income received), or damages if the purchaser had sold the security at a loss. As a result, BBPLC elected to conduct a rescission offer, as approved by the Board, to eligible purchasers of relevant securities. The rescission offer was launched on 1 August 2022 and settled on 15 September 2022.

### Why did the Over-issuance of Securities happen and what were the findings of Barclays' review?

Barclays commissioned a review led by external counsel of the facts and circumstances relating to the Over-issuance of Securities and, among other matters, the control environment related to such issuances (the Review). The Review concluded that the Over-issuance of Securities occurred because Barclays did not put in place a mechanism to track issuances after BBPLC became subject to a limit on such issuances, as a result of losing WKSI status. Among the principal causes of the Over-issuance of Securities were, first, the failure to identify and escalate to senior executives the consequences of the loss of WKSI status and, secondly, a decentralised ownership structure for securities issuances.

The Review further concluded that the occurrence of the Over-issuance of Securities was not the result of a general lack of attention to controls by Barclays, and that Barclays' management has consistently emphasised the importance of maintaining effective controls.

### What was the Board's response?

The Board has worked to address the root cause and impacts of the Over-issuance of Securities, including through the Review, and deeply regrets its occurrence. The Over-issuance of Securities also underlined to the Board the need to continue to focus on embedding Barclays' Values and Mindset at all levels of the organisation to achieve operational and controls excellence. Further, the Board has supported the creation of a Group-wide programme, established by the Group Chief Executive. This programme will seek to identify issues and lessons learned across the Group's remediation initiatives to help ensure that Barclays is consistently excellent, in customer and client service, in operational capability and in financial performance, with all activities underpinned by a strong risk management culture.

### What actions has the Board taken in response to the Over-issuance of Securities?

The Board spent significant time throughout 2022 in both scheduled and ad hoc meetings considering the impacts of the Over-issuance of Securities and the Group's response to it, including through the work of its Risk and Audit Committees. This work has included the following:

- the assessment of the financial impacts of the Over-issuance of Securities and the associated hedging arrangements undertaken to help manage the risks associated with the rescission offer and Barclays' financial exposure

- the review and approval of disclosures to the market regarding the Over-issuance of Securities

- considering the findings of the Review and, among other matters, the control environment related to such issuance

# Directors' report: Over-issuance of Securities - Shareholder Q&A (continued)

- oversight of discussions with the Group's key regulators including the SEC, PRA, FCA and FRC
- engagement with Barclays' shareholders to discuss the Over-issuance of Securities and Barclays' response to it;
- consideration of the implications of the Over-issuance of Securities for BPLC's financial statements, including the approval of the restatement of the financial statements included in the BPLC 2021 Annual Report on Form 20-F filed with the SEC, as well as the amendment of such report
- noting the approval by BBPLC of the launch of the rescission offer;
- oversight of the settlement with the SEC in relation to the Over-issuance of Securities
- oversight of the remediation of the material weakness in internal control over financial reporting which led to the Over-issuance of Securities, as well as the work required to address the specific requirements of the SEC set out in its order of 29 September 2022.

## What were the main financial consequences of the Over-issuance of Securities?

In addition to a £0.2bn net attributable loss referable to the year ended 31 December 2021, Barclays has recognised a net attributable loss of £0.6bn in the year ended 31 December 2022 in relation to the Over-issuance of Securities, materially in line with the anticipated financial impact disclosed in BPLC's and BBPLC's H1 2022 results announcements. These amounts represent the net attributable loss to Barclays in connection with the Over-issuance of Securities, taking into account the costs of the rescission offer, the hedging arrangements entered into to manage the risks associated with the rescission offer and the $200m (£165m[1]) penalty paid following the resolution of the SEC's investigation into the Over-issuance of Securities (see below for further detail).

## How has Barclays reflected the financial consequences of the Over-issuance of Securities in its financial statements?

It was concluded that it was not necessary or appropriate, under UK company law and financial reporting standards, to revise the financial statements of BPLC or BBPLC for the year ended 31 December 2021 included in their respective 2021 UK Annual Report and Accounts to reflect the impact of the Over-issuance of Securities. Instead, each of BPLC and BBPLC has restated the prior period comparatives in the Group's quarterly and half-year results in 2022, and in their respective 2022 UK Annual Report and Accounts, to reflect the impact of the Over-issuance of Securities.

As a US foreign private issuer, each of BPLC and BBPLC is required to file with the SEC annual reports on Form 20-F, including financial statements. In May 2022, BPLC and BBPLC amended their respective annual reports on Form 20-F for the year ended 31 December 2021 to include restated financial statements for this period reflecting the impact of the Over-issuance of Securities. Such amended annual reports on Form 20-F also disclosed the existence of a material weakness in internal control over financial reporting (as defined in the applicable SEC rules) and management's conclusions that BPLC's and BBPLC's internal control over financial reporting and disclosure controls and procedures were not effective as at 31 December 2021. The material weakness that had been identified related to a weakness in controls over the identification of external regulatory limits related to securities issuance and monitoring against these limits.

## What remediation activity has been taken to address the material weakness identified?

Since the identification of this material weakness, the Group has strengthened the internal controls relating to the tracking of issuance programme limits through the implementation and strengthening of a series of controls across the Group, together with central governance. Accordingly, as at 31 December 2022, management concluded that the previously disclosed material weakness in internal control had been resolved. Please see pages 106 to 107 for details on how this material weakness was remediated.

## Has Barclays been the subject of any regulatory enforcement action in relation to the Over-issuance of Securities?

In September 2022, the SEC issued an order announcing the resolution of its investigation of BPLC and BBPLC relating to the Over-issuance of Securities. Pursuant to the terms of the resolution, BPLC and BBPLC paid a combined penalty of $200m (£165m[1]), without admitting or denying the SEC's findings, and BBPLC agreed to undertakings requiring the adoption and implementation of certain enhancements to controls and governance with respect to its shelf registration statements filed with the SEC. The SEC found that BBPLC's previously announced rescission offer satisfied its requirements for disgorgement and prejudgment interest.

## How has Barclays assessed the consequences for remuneration and for individuals?

The Board Remuneration Committee has adjusted its remuneration decisions to reflect the Over-issuance of Securities, and in doing so has taken into consideration the financial impact, reputational impacts and how these events reflect on the Group's control environment. More detail can be found in the Remuneration report on page 123.

## How does the Over-issuance of Securities continue to impact Barclays?

The Group is engaged with, and responding to inquiries and requests for information from, various other regulators and BBPLC and/or its affiliates is involved in purported class action litigation in relation to the Over-issuance of Securities.

The Group may face other potential private civil claims, class actions or other enforcement actions in relation to the Over-issuance of Securities. Please see Note 26 (Legal, competition and regulatory matters) to the audited financial statements for the year ended 31 December 2022 for further information.

**Note:**
1  Exchange rate USD/GBP 1.22 as at 30 June 2022

Case 1:22-cv-08172-KPF    Document 60-1    Filed 08/21/23    Page 5 of 6

Strategy | sustainability | Governance | review | review | statements | information | Barclays PLC Annual Report on Form 20-F | 123

# Remuneration report (continued)

### Reduction in Executive Director bonus for 2021 and 2019-2021 LTIP vesting

The Over-issuance of Securities resulted in the restatement of the 2021 financial statements, as well as adversely impacting 2022 performance. Consequently, we revisited the 2021 annual bonus outcomes for Venkat and Tushar, and the 2019-2021 LTIP outcome for Tushar. The Committee reduced the outcomes of the financial measures to reflect that restatement, and the outstanding deferred elements of those annual bonus and LTIP awards will be reduced accordingly. Venkat and Tushar were both supportive of this.

No changes were made to any in-flight LTIP awards and the performance measures and targets for those awards have not been altered. The Committee will determine the vesting of those awards in due course, following the end of the relevant performance period.

### The Executive Directors' pay in 2023

In February 2023, the Committee reviewed the level of Fixed Pay for Venkat and Anna, in the same way and at the same time as fixed pay was reviewed for the wider workforce. The maximum total compensation opportunity for each is driven by their level of Fixed Pay, and for both is materially behind market when compared to the equivalent total compensation opportunity for comparable roles in our international banking peer group.

The Committee considered this relative market positioning, in the context of the strong performance and significant personal contribution made by each of the Executive Directors, and their continued development in their respective roles.

The Committee increased Fixed Pay by 3.4% for Venkat and 4.3% for Anna, in line with the current DRP, resulting in Fixed Pay of £2,875,000 and £1,800,000 respectively from 1 March 2023. This percentage increase is significantly lower than the average increase across the wider workforce, including the 11% and 6.75% spend on salary increases that were agreed as part of the 2023 UK pay deal. Even after these Fixed Pay increases, the total compensation opportunity for each Executive Director remains well behind the equivalent opportunity across our international banking peer group.

The Committee carefully considered the performance measures for the Executive Directors' 2023 annual bonus and the 2023-2025 LTIP. Our conclusion was that the measures that we adopted last year continue to represent the most relevant building blocks towards our key longer-term financial and non-financial goals. The Committee will continue to review the measures and weightings for the Executive Directors' incentives to ensure that they appropriately support the delivery of our strategy.

### Shareholder alignment

Of the total variable pay awards (annual bonus plus LTIP) to be granted to Venkat and Anna, 97% and 96% respectively will be in shares that must be retained for a period of between one and eight years from grant, aligning the Executive Directors' interests more closely to the shareholder experience. Both Venkat and Anna already have significant shareholdings and will continue building these over the coming years towards the level stipulated under the personal shareholding requirements.

### Group Chair and Non-Executive Director fees

The Committee reviews the Group Chair's fee from time to time and the current DRP allows for fee increases of up to 20% during the three-year term of the policy. In practice, the Group Chair's fee has remained at the same level since 2015. In February 2023, the Committee considered the fee in the context of the chair fees paid across our international banking peer group, with a particular focus on the UK banks, given the regional differences in both the role and pay for non-executive directors including chairs. The Committee approved an increase in the Group Chair's fee of 5%, from £800,000 to £840,000, effective 1 January 2023, equivalent to 1.6% per annum compounded over the three-year life of the current DRP. Of this, £100,000 each year will continue to be used to purchase Barclays shares that are retained on the Group Chair's behalf until he retires from the Board. No other changes to the Group Chair's remuneration arrangements or benefits were made.

The Board reviewed the other Non-Executive Directors' fees during 2022 and in December approved (with the impacted Non-Executive Directors having recused themselves from discussion) an increase in those fees of 5% with effect from 1 January 2023. This is equivalent to 1.6% per annum compounded over the period since any of these fees were last increased, with effect from 1 January 2020. There have been no other increases in those fees during the three-year term of the current DRP.

### Risk and control impacts on remuneration

We have considered the significant impact on the Group of risk and control issues during 2022 throughout our remuneration decision-making this year, including the financial impact, the reputational impacts and how these events reflect on our control environment.

Principally, our consideration has been focused on the incentive pool for 2022. Our incentive funding incorporates a significant reduction to reflect the impact of risk and control issues, as referenced above. The Over-issuance of Securities in the US was a key factor in determining these remuneration impacts and accounts for the majority of the incentive pool reduction. The monetary penalties imposed by the SEC and CFTC for the use of unauthorised business communications channels were also taken into account.

| Incentive pool | Reduction |
|---|---|
| 2022 incentive pool reduction | c.£500m |

This reduction was c.£500m, which had an impact across the whole of Barclays but was more focused in the areas of the Group closest to where the incidents occurred, resulting in larger year-on-year reductions in those areas.

The Committee ensured that certain individuals who identified and escalated the over-issuance or who were most central to its remediation have been specifically recognised and rewarded, reinforcing the culture that colleagues should speak out, raise issues and work collaboratively to resolve those issues. On the other hand, our review of individuals who may be considered responsible or otherwise accountable for the over-issuance is progressing. Once concluded, appropriate action will be taken including negative adjustment to variable remuneration where applicable. As that review is ongoing, unvested variable remuneration of relevant persons will be suspended as required to allow the review to run its course.

## Remuneration report (continued)

For the Executive Directors, the financial measures for both the 2022 bonus and the 2020-2022 LTIP awards are defined as excluding material items (material one-off items that are typically called out within our financial reporting). The Committee exercised its discretion not to exclude the impacts associated with the Over-issuance of Securities in the US or the monetary penalties imposed by the SEC and CFTC for the use of unauthorised business communications channels. As a result, the 2022 annual bonus awards were £403,000, £166,000 and £76,000 lower than they would otherwise have been, for Venkat, Anna and Tushar respectively (after pro-rating for Anna and Tushar). The 2020-2022 LTIP vesting outcome was 5% less than it might have been, as the Committee set the Control environment element of the LTIP Risk scorecard to zero.

In addition, the Committee reduced the 2021 annual bonus outcomes for Venkat and Tushar, and the 2019-2021 LTIP outcome for Tushar, to reflect the impact of the restatement of the 2021 financial statements on the financial metrics for those awards, as outlined earlier.

In summary, the aggregate remuneration impacts for the Executive Directors in this respect are as shown in the following table:

| Executive Directors' incentive outcomes | Reduction |
|---|---|
| 2022 bonus outcomes | £645,000 |
| 2020-2022 LTIP outcome | £213,000 |
| 2021 bonus outcomes | £30,000 |
| 2019-2021 LTIP outcome | £116,000 |
| **Total** | **£1,004,000** |

The review by external counsel into the facts and circumstances relating to the Over-issuance of Securities concluded that the occurrence of the over-issuance was not the result of a general lack of attention to controls by Barclays, and that Barclays' management has consistently emphasised the importance of maintaining effective controls. As such, although the financial impact of the over-issuance on the Group was significant, the Committee concluded that reducing the Executive Directors' incentive outcomes via the financial performance metrics, plus setting the Control environment element of the 2020-2022 LTIP Risk scorecard to zero, was sufficient and appropriate.

### Update in respect of Jes Staley's remuneration

As outlined in last year's Annual Report, on 31 October 2021 the Board agreed with Jes Staley that he would step down from the role of Group Chief Executive with immediate effect. In doing so, Mr Staley was legally and contractually entitled to 12 months' notice, during which he continued to receive his Fixed Pay and other benefits. Accordingly, his employment came to an end in the usual way at the end of his notice period, on 31 October 2022.

No further remuneration decisions have been made in respect of Mr Staley. As outlined in last year's Remuneration report, his unvested awards remain suspended pending further developments in respect of the regulatory and legal proceedings related to the FCA and PRA investigation regarding Mr Staley, including LTIP awards that otherwise might have vested. Those proceedings are ongoing.

### Looking ahead

As the Group Chief Executive sets out in his review, although we have demonstrated that our diversified model can deliver attractive returns, our focus is to be prepared for the road ahead to create further value for our customers, clients, investors and other stakeholders.

As we move into 2023, the Committee maintains its commitment to rewarding sustainable performance. We will continue our focus on supporting management to use our performance management and remuneration policies and practices to incentivise and reward progress as we deliver our strategic goals, reinforce the importance of good conduct, strong controls and risk management, and support Barclays' Values, Mindset and culture.

We will continue to engage with our shareholders and other stakeholders on pay, and will be meeting with our largest shareholders to discuss our pay outcomes for 2022.

Beyond this, we will maintain focus on our Fair Pay Agenda, continuing to support colleagues through the challenges we all face and furthering our work on pay simplification. We remain committed to making sure that the way we pay our people continues to support the long-term health and success of the Group.

*Brian Gilvary*

**Brian Gilvary**
Chair, Board Remuneration Committee
14 February 2023