UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE BARCLAYS PLC
SECURITIES LITIGATION

22 Civ. 8172 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Between May 2017 and March 2022, Defendants Barclays PLC ("BPLC")
and Barclays Bank PLC ("BBPLC," and together with BPLC, "Barclays" or the
"Company") offered and sold roughly $17.7 billion worth of unregistered
securities (the "Over-Issuances") in direct violation of the federal securities
laws.  According to Lead Plaintiff Boston Retirement System ("Lead Plaintiff" or
"Plaintiff"), the Over-Issuances were occasioned by the Company's failure to
track the number of securities it was issuing pursuant to its active shelf
registration statements, which capped the total number of securities that the
Company could issue over any particular period of time.  On March 8, 2022,
Barclays discovered the error, commenced an investigation into its internal
controls over financial reporting, and began issuing a series of disclosures that
gradually revealed to the market the full extent of the consequent financial,
legal, and reputational harm.

This case concerns whether the statements made by Barclays (i) during
the period of time it was issuing these unregistered securities and (ii) as it
progressively disclosed the magnitude of the resulting damage amounted to
violations of Section 10(b) of the Securities Exchange Act of 1934 (the
"Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5,

promulgated thereunder by the Securities and Exchange Commission (the
"SEC").

As the parties recognize, the Private Securities Litigation Reform Act of
1995 (the "PSLRA"), Pub. L. 104-67, 109 Stat. 737, sets a high bar for bringing
private actions under the securities laws. Yet that bar is not impossible to
clear. For the reasons set forth herein, the Court finds that Plaintiff has
adequately pleaded facts to support its theory that the Company's failure to
disclose that it had not implemented any internal controls to monitor the
issuances of securities from its shelf registration statements — and thus to
prevent the over-issuance of securities in violation of the federal securities
laws — constituted a material omission of fact. Likewise, Plaintiff has met its
initial burden to plead that BPLC, as well as Defendants James E. Staley, C.S.
Venkatakrishnan, Tushar Morzaria, and Anna Cross (together with Defendant
Nigel Higgins, the "Individual Defendants," and collectively with Barclays,
"Defendants"), were actionably reckless in reassuring investors of the
Company's compliance with the securities laws, while wholly disregarding their
failure to implement the requisite internal controls. That said, Plaintiff's
allegations stretch too far with respect to statements made by Defendants after
the Over-Issuances were discovered, which statements cannot support the
findings necessary to sustain a securities fraud claim. Accordingly, the Court
grants in part and denies in part Defendants' motion to dismiss Lead Plaintiff's
Amended Class Action Complaint (the "Amended Complaint" or "AC") (Dkt.
#46).

**BACKGROUND**[1]

**A.      Factual Background**

**1.      The Parties**

Lead Plaintiff Boston Retirement System is a government-defined benefit pension plan that administers retirement benefits to more than 34,000 current and former employees of the City of Boston, Massachusetts, as well as its autonomous agencies, including the City of Boston, the Boston Planning & Development Agency, the Boston Housing Authority, the Boston Public Health Commission, and the Boston Water and Sewer Commission.  (AC ¶ 30).  As of early 2023, Lead Plaintiff's assets under management totaled approximately $7.131 billion.  (*Id.*).  Lead Plaintiff brings this action on behalf of all persons and entities that purchased or otherwise acquired American Depositary Receipts ("ADRs") sponsored by Barclays during the period from February 18, 2021, through February 14, 2023, inclusive (the "Class Period").  (*Id.* ¶ 1).

---

[1]     This Opinion draws its facts from the Amended Complaint (Dkt. #46 ("AC")), the well-pleaded allegations of which are taken as true for purposes of this Opinion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #54); to Plaintiff's memorandum of law in opposition to Defendants' motion to dismiss as "Pl. Opp." (Dkt. #58); and to Defendants' reply memorandum of law in further support of their motion as "Def. Reply" (Dkt. #59).  The Court also relies, as appropriate, on certain of the exhibits attached to the Declaration of Jeffrey Scott ("Scott Decl., Ex. [ ]" (Dkt. #55)), submitted in concert with Defendants' memorandum of law in support of their motion to dismiss.

All documents relied upon in the Court's analysis, including the aforementioned exhibits, are either documents incorporated by reference in the Amended Complaint or documents required by law to be filed — and actually filed — with the SEC (of which the Court may take judicial notice).  *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference in the complaint); *Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (explaining that a court may take judicial notice of documents required by law to be filed — and actually filed — with the SEC).

Defendant BPLC is a bank holding company headquartered in London, United Kingdom.  (AC ¶ 31).  It provides a range of financial services, including investment banking, wealth management, and the offer and sale of securities. (*Id.*).  Defendant BBPLC is BPLC's wholly owned United States-based subsidiary, headquartered in New York City.  (*Id.* ¶ 40).  BBPLC consists of a corporate and investment banking division; a consumer, cards, and payment division; and a private bank.  (*Id.*).

The Individual Defendants are persons who held significant positions at Barclays during part or all of the relevant time period.  James E. Staley served as Chief Executive Officer of BPLC, a member of its Executive Committee, and a Director on BPLC's Board of Directors (the "BPLC Board") from December 2015 through October 2021.  (AC ¶ 32).  From March 2019 through October 2021, Staley also served as CEO of BBPLC and a Director on BBPLC's Board of Directors (the "BBPLC Board").  (*Id.*).  In November 2021, C.S. Venkatakrishnan took over for Staley as CEO of BPLC, a position he still holds; Venkatakrishnan also serves as a member of BPLC's Executive Committee and a Director on the BPLC Board.  (*Id.* ¶ 33).  Prior to becoming CEO, Venkatakrishnan served as BPLC's Global Head of Markets from October 2020 to October 2021 and Chief Risk Officer from March 2016 to October 2020. (*Id.*).  Tushar Morzaria served as BPLC's Group Finance Director (the most senior finance position at Barclays), a member of its Executive Committee, and a Director on the BPLC and BBPLC Boards.  (*Id.* ¶ 34).  Anna Cross took over for Morzaria as BPLC's Group Finance Director in April 2022, having previously

4

served as Deputy Finance Director, Group Financial Controller, and Chief Financial Officer of the Company.  (*Id.* ¶ 35).  Finally, Nigel Higgins served as the Group Chairman (*i.e.*, Chairman of the Board) of BPLC and as a Director on the BPLC Board.  (*Id.* ¶ 39).

### 2.     The Benefits of Well-Known Seasoned Issuer ("WKSI") Status

The Over-Issuances can be traced back to the Company's loss of its status as a "Well-Known Seasoned Issuer" ("WKSI") in May 2017.  (AC ¶¶ 62-62).  This designation, adopted by the SEC in 2005, applies to certain large financial institutions — "the most widely followed issuers representing the most significant amount of capital raised and traded in the United States" — giving them greater flexibility in accessing the U.S. public capital markets than most other institutions.  (*Id.* ¶¶ 5, 45).[2]  Pertinent to the instant case, WKSIs are subject to more lenient communications and registration rules and regulations than non-WKSIs.  (*Id.* ¶ 47).

The most significant benefit of WKSI status is the ability to register securities offerings on so-called "shelf" registration statements that become effective automatically upon their filing.  (AC ¶ 47).  Issuers use shelf registration statements (also referred to herein as "shelves") to register securities for offerings that are to be made on a continuous or delayed basis

---

[2]     Generally speaking, WKSI status applies to issuers that meet the registrant requirements of either Form S-3 or Form F-3 and, as of a date within 60 days of the determination date, either: (i) "ha[ve] a worldwide market value of its outstanding voting and non-voting common equity held by non-affiliates of $700 million or more," or (ii) "ha[ve] issued in the last three years at least $1 billion aggregate principal amount of non-convertible securities, other than common equity, in primary offerings for cash, not exchange, registered under the [Securities] Act."  17 C.F.R. § 230.405 (listing requirements for WKSI designation).

over a specified timeframe; the securities registered pursuant to such statements are effectively placed on the issuer's "shelf" for future offers and sales. *See generally* 17 C.F.R. § 230.415. Issuers with WKSI status can register securities by filing a shelf registration statement and thereafter make an offer or sale of securities from that shelf without waiting for the SEC's Division of Corporation Finance to review it and declare it effective (a process that can take weeks, even months). (AC ¶ 47). What is more, WKSI issuers can disclose less detail in their shelf registration statements. (*Id.*). Among other differences, they are not required to identify the total number of securities that they plan to sell from each shelf during its specified duration, as must non-WKSI issuers. (*Id.* ¶¶ 5, 47).

An issuer can lose its WKSI status — and thus become an "ineligible issuer" — for a number of reasons. *See generally* 17 C.F.R. § 230.405 (defining, among other terms, "ineligible issuer"). Relevant to the instant dispute, a WKSI may become an ineligible issuer if they commit certain felonies or misdemeanors enumerated under Section 15 of the Exchange Act[3] or violate the anti-fraud provisions of the federal securities laws.[4] *Id.* Notwithstanding,

---

[3]    An issuer can lose its WKSI status if "[w]ithin the past three years, the issuer or any entity that at the time was a subsidiary of the issuer was convicted of any felony or misdemeanor described in paragraphs (i) through (iv) of section 15(b)(4)(B) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b)(4)(B)(i) through (iv))[.]" 17 C.F.R. § 230.405.

[4]    An issuer can lose its WKSI status if

> [w]ithin the past three years … the issuer or any entity that at the time was a subsidiary of the issuer was made the subject of any judicial or administrative decree or order arising out of a governmental action that: (A) [p]rohibits certain conduct or activities regarding, including future violations of, the anti-fraud provisions of the federal securities laws; (B) [r]equires that the

the SEC may grant waivers of ineligible issuer status "upon a showing of good cause, that it is not necessary under the circumstances that the issuer be considered an ineligible issuer." *Id.*

### 3. Barclays Loses Its WKSI Status

Barclays was first granted WKSI status in 2005 and has historically offered and sold securities pursuant to the expedited process detailed above. (AC ¶ 50; *see also* Barclays PLC, 2005 Annual Report (Form 20-F) (March 29, 2006)).  For various reasons, between 2007 and 2016, Barclays requested and received multiple waivers of its "ineligible issuer" status from the SEC's Division of Corporation Finance.  (AC ¶ 54; *see also id.* ¶¶ 55-56 (discussing waivers received by Barclays during that time and the associated conduct that had caused the Company's ineligibility)).  In its applications to the SEC for such waivers, Barclays stressed the importance of its WKSI status in "allow[ing] [Barclays] access to the widest possible global investor base" and otherwise providing Barclays the flexibility it needed to meet its capital and funding requirements.  (*Id.* ¶¶ 58-60).

On May 10, 2017, the SEC instituted public administrative and cease-and-desist proceedings against Barclays Capital Inc. — a subsidiary of BBPLC — arising out of its former wealth and investment management business.  (AC ¶ 62).  *See generally Barclays Cap. Inc.*, Securities Act Release

---

person cease and desist from violating the anti-fraud provisions of the federal securities laws; or (C) [d]etermines that the person violated the anti-fraud provisions of the federal securities laws[.]

17 C.F.R. § 230.405.

No. 10355, Exchange Act Release No. 80639, Investment Advisers Act Release
No. 4705 (May 10, 2017) (cease-and-desist order).  Barclays ultimately agreed
to settle the action with the SEC for $97 million (the "May 2017 Settlement").
(AC ¶ 62).  As a result of the proceedings, Barclays lost its WKSI status for a
period of three years.  (*Id.* ¶ 63).

This time, however, Barclays was unable to secure a waiver for the loss
of its WKSI status.  (AC ¶ 61).  Without the ability to file automatically effective
shelf registration statements corresponding to unspecified amounts of
securities, Barclays was forced to proactively determine and disclose the
number of securities that the Company anticipated offering and selling over the
duration of any shelf registration statement — and to pay the registration fees
for those securities in advance.  (*Id.* ¶¶ 64-65).  This further meant that
Barclays needed to implement a mechanism to track the offers and sales of
securities registered via its shelves, in order to ensure that no securities in
excess of the amount the Company had registered were offered or sold.  (*Id.*).
Failure to do so would mean that the Company would have no way of knowing,
at any time, whether they were selling unregistered securities in clear violation
of the federal securities laws, thus exposing the Company to potentially
significant financial, legal, and reputational harm.  (*Id.* ¶ 65).

### 4.    The 2018 and 2019 Shelves

In or around January 2018, Barclays formed a working group, the
purpose of which was to estimate the total number of securities Barclays —
now an ineligible issuer — anticipated offering and selling in the coming

8

months (the "Working Group").  (AC ¶¶ 70, 72).  Of note, the Working Group
was not charged with responsibility for designing or implementing protocols to
identify or prevent the over-issuance of securities.  At that time, the operative
shelf registration statement had been filed on July 18, 2016, and had a three-
year duration.  (*Id.* ¶¶ 66, 71-73).  In view of the Company's loss of WKSI
status, the Working Group converted the remaining portion of that existing
shelf into a non-WKSI shelf (the "2018 Shelf") through a post-effective
amendment, which was declared effective on March 30, 2018.  (*Id.*).

The 2018 Shelf would govern the Company's offers and sales of securities
for the ensuing 18 months.  (AC ¶¶ 71-72).  Of course, as an ineligible issuer,
Barclays was now required to register and pay the associated registration fee
for any securities that would be offered or sold from the 2018 Shelf in advance
of their actual offer or sale.  (*Id.* ¶¶ 65, 72).  Accordingly, the Working Group
determined the total number of securities Barclays would offer or sell from the
2018 Shelf.  (*Id.* ¶ 72).  Based upon the Working Group's calculations, the 2018
Shelf provided for the offer or sale of approximately $21.3 billion of securities
over the next 18 months.  (*Id.* ¶ 73).

The Working Group would reconvene in 2019, in anticipation of the
expiration of the 2018 Shelf.  (AC ¶ 75).  This time, the Working Group
determined the total amount of securities Barclays anticipated offering or
selling during the three-year duration of the new shelf registration statement
that Barclays would file later that year (the "2019 Shelf," and, together with the
2018 Shelf, the "Shelves").  (*Id.*).  The 2019 Shelf would cover the offer or sale of

approximately $20.8 billion of securities over the following three years. (*Id.*
¶ 77).

Additionally, because the Company was under the impression that the
2018 Shelf would have excess securities available for offer or sale when the
2019 Shelf became effective on August 1, 2019, the Working Group was tasked
with calculating the number of securities that would be "left over" on the 2018
Shelf. (AC ¶¶ 75-76). Barclays then "de-registered" these left-over securities,
using the fees that were originally assessed on them to offset a portion of the
registration fees Barclays owed for the securities on the 2019 Shelf. (*Id.* ¶ 76).

### 5.  Discovery of the Over-Issuances

Business continued at Barclays as usual until March 8, 2022. (AC ¶ 79).
On that day, a member of the Company's legal department, who had also been
a member of the Working Group, received an inquiry from another employee
regarding the number of securities that remained available to be offered or sold
from the 2019 Shelf. (*Id.*). By the next day, March 9, 2022, Barclays had
concluded that (i) the Company was not (nor had it ever been) counting the
securities it was offering and selling from the 2019 Shelf and (ii) the number of
securities it had offered and sold from the 2019 Shelf far exceeded the number
registered by the 2019 Shelf. (*Id.* ¶¶ 80-81, 89). In rapid succession, Barclays
halted new offers and sales of securities from the 2019 Shelf, notified
regulators about the over-issuances, and informed investors that it did not
have sufficient issuance capacity to support further sales from inventory or
issuances. (*Id.* ¶ 81). On March 28, 2022, Barclays filed a Form 6-K disclosing

that it had sold $15.2 billion worth of unregistered securities in excess of the maximum $20.8 billion registered by the 2019 Shelf and announcing a forthcoming rescission offer to purchasers of the over-issued securities.  (*Id.* ¶¶ 82, 160).

On May 23, 2022, Barclays filed amendments to the 2021 annual reports of BPLC and BBPLC that had been filed with the SEC on Forms 20-F.  (AC ¶ 87).  These amendments included restatements of the Company's year-end 2021 audited financial statements.  (*Id.* ¶¶ 86-87).  Certain disclosures were also amended to reflect management's conclusions as to the effectiveness *vel non* of the Company's internal control over financial reporting ("ICFR") and disclosure controls and procedures due to the material weakness that had been identified in its ICFR.  (*Id.* ¶ 98).

In early June 2022, Barclays determined that — because the Company had never tracked the amount of securities that it was offering and selling from the Shelves — the Working Group had also incorrectly calculated the number of securities that had been left over on the 2018 Shelf at the time the 2019 Shelf became effective.  (AC ¶ 84).  On July 28, 2022, Barclays announced that, beginning on June 26, 2019, Barclays had offered and sold approximately $1.3 billion dollars' worth of unregistered securities in excess of the amount that had actually remained on the 2018 Shelf, bringing the total value of the Over-Issuances to $17.7 billion.  (*Id.* ¶ 85).

On September 29, 2022, the SEC released an "Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933

11

and Section 21C of the Securities Exchange Act of 1934, Making Findings, and

Imposing a Cease-and-Desist Order" against Barclays.  (AC ¶ 92).  *See*

*generally Barclays PLC & Barclays Bank PLC*, Securities Act Release No. 11110,

Exchange Act Release No. 95944 (September 29, 2022) (the "SEC Order").  In

the SEC Order, Barclays admitted to violating Sections 5(a) and 5(c) of the

Securities Act and Sections 13(a) and 13(b)(2)(A), and 13(b)(2)(B) and Rule 13a-

15(a) of the Exchange Act.  (*Id.* ¶ 93).  Barclays further agreed to pay a $200

million penalty and more than $161 million in disgorgement and prejudgment

interest.  (*Id.*).

> The SEC Order explained that:

>> [a]t the time of the registration of both the 2018 Shelf and the 2019 Shelf, certain BBPLC personnel recognized the need to accurately record relevant information about securities that were offered or sold so as to be able to track the aggregate amount of securities that were cumulatively offer and sold from each respective [s]helf on a real-time basis.

(AC ¶ 95 (quoting SEC Order 2)).  Nonetheless, Barclays "fail[ed] to put into

place any internal control around the real-time tracking of securities being

offered or sold off its Commission-registered shelf registration statement[s]."

(*Id.* ¶ 94 (quoting SEC Order 2)).  The SEC Order required BBPLC to adopt a

series of reforms, including (i) centralizing oversight of its SEC-registered

shelves; (ii) implementation of certain minimum control requirements

pertaining to its SEC-registered shelves; and (iii) maintenance of a data

repository for the purpose of tracking offers and sales from its SEC-registered

shelves.  (*Id.* ¶ 99 (citing SEC Order 10)).

6.      **The Alleged Misrepresentations and Corrective Disclosures**

Plaintiff alleges that Defendants made a series of materially false and misleading statements across the Class Period related to the Company's internal controls over financial reporting as well as the Over-Issuances themselves.  (AC ¶¶ 133-134).  These statements are most easily conceptualized when broken up into three separate time periods, punctuated by the alleged corrective disclosures:

- ▪ Statements made from February 18, 2021, to March 27, 2022, the day before Barclays announced that it had discovered $15.2 billion worth of over-issuances from the 2019 Shelf (the "First Corrective Disclosure") (*id.* ¶¶ 134-160);

- ▪ Statements made from March 28, 2022, to July 27, 2022, the day before Barclays announced that it had discovered a further $1.3 billion worth of over-issuances from the 2018 Shelf (the "Second Corrective Disclosure") (*id.* ¶¶ 160-191); and

- ▪ Statements made from July 28, 2022, to February 15, 2023, the day Barclays announced the overall negative impact of the Over-Issuances on Barclays' financials for FY 2022 and that it was clawing back compensation from certain of the Individual Defendants (the "Third Corrective Disclosure") (*id.* ¶¶ 192-205).

The first period of alleged misrepresentations (the "Pre-Revelation Disclosures") began with BPLC's filing of its 2020 Annual Report on Form 20-F (the "2020 Form 20-F") on February 18, 2021.  (AC ¶ 135).  Also on this day, BBPLC first sold unregistered securities in excess of the maximum aggregate amount of securities registered via the 2019 Shelf.  (*Id.* ¶ 134).  The 2020 Form 20-F claimed that "management ha[d] assessed [BPLC's] internal control over financial reporting as of 31 December 2020," and had concluded that "[BPLC's]

internal control over financial reporting was effective as of 31 December 2020."
(*Id.* ¶ 137 (alterations adopted)).  The 2020 Form 20-F also noted that the BPLC
Board's Audit Committee, following its review of the Company's "significant
control issues," had arrived at a similar conclusion.  (*Id.* ¶ 138).  Plaintiff
maintains that the statements made by Defendants in the 2020 Form 20-F
concealed, or at least materially omitted, the facts that:

- Barclays had sold and was continuing to sell unregistered securities in excess of the amounts registered by the 2018 and 2019 Shelves;

- There were material weaknesses in the Company's internal control environment, as (ultimately) evidenced by the Over-Issuances;

- Barclays had violated and was continuing to violate the federal securities laws and SEC regulations, subjecting the Company to legal liability, reputational risk, fines, and sanctions, *inter alia*; and

- Barclays would be required to make a rescission offer to purchasers of securities in the Over-Issuances and to temporarily halt sale of some of its products.

(*Id.* ¶ 143).

As fiscal year 2021 progressed, BPLC issued its Q1 2021 Results
Announcement on April 30, 2021; its Interim 2021 Financial Results on
July 28, 2021; and its Q3 2021 Results Announcement on October 21, 2021.
(AC ¶¶ 144-149).  Because each of these disclosures incorporated the 2020
Form 20-F by reference, Plaintiff maintains that each was correspondingly
misleading.  (*Id.*).  The last of the Pre-Revelation Disclosures, BPLC's 2021
Annual Report on Form 20-F (the "2021 Form 20-F"), was issued in early 2022
(*Id.* ¶ 150).  The 2021 Form 20-F largely reiterated the claims regarding the

BPLC's internal control over financial reporting that Barclays had made in its 2020 Form 20-F.  (*Id.* ¶¶ 151-156).  In consequence, Plaintiff alleges that the 2021 Form 20-F concealed the same facts (listed above) as the 2020 Form 20-F.  (*Id.* ¶ 156).

Plaintiff claims that the truth about the Over-Issuances began to emerge on March 28, 2022, when BPLC issued the First Corrective Disclosure.  (AC ¶ 160).  The First Corrective Disclosure revealed that: (i) Barclays had sold $15.2 billion worth of unregistered securities in excess of the maximum $20.8 billion worth of securities registered under the 2019 Shelf; (ii) it would conduct a rescission offer for those securities; and (iii) the corresponding losses were approximately $590 million.  (*Id.*).  Barclays ADRs closed at a price of $8.09 per ADR on that day, falling $0.96 from their previous closing price of $9.05 per ADR on Friday, March 25, 2022.  (*Id.* ¶ 161).  The First Corrective Disclosure said nothing, however, about the portion of the Over-Issuances that corresponded with the 2018 Shelf.  (*Id.* ¶ 162).

During the second period of alleged misrepresentations, between March 28, 2022, and July 27, 2022, Defendants disclosed further details on the impact of the Company's sale of unregistered securities from the 2019 Shelf, including estimates of the various liabilities associated with the Rescission Offer.  (*See, e.g.*, AC ¶ 169).  Defendants also announced that BPLC would amend its 2021 Form 20-F to reflect the financial impact of the over-issuances from the 2019 Shelf.  (*Id.* ¶¶ 180-182).  Plaintiff claims that the alleged misrepresentations in this second period were materially false and

misleading because they failed to disclose that Defendants had sold and were continuing to sell unregistered securities from the 2018 Shelf (and that certain figures reported in the Company's 2021 Form 20-F were correspondingly overstated). (*Id.* ¶¶ 162, 176, 185).

The Second Corrective Disclosure, issued on July 28, 2022, publicized Defendants' over-issuances from the 2018 Shelf. (AC ¶¶ 187-188). On that day, BPLC issued its interim financial results for the six-month period ending June 30, 2022. (*Id.*). BPLC acknowledged for the first time that BBPLC had also over-issued $1.3 billion worth of unregistered securities under the 2018 Shelf, bringing the total value of the Over-Issuances to almost $17.7 billion. (*Id.*). At the same time, the price of Barclays ADRs declined from a closing price of $7.89 per ADR on July 27, 2022, to a closing price of $7.48 per ADR on July 28, 2022. (*Id.* ¶ 190).

The third and final period of alleged misrepresentations follows the Second Corrective Disclosure and consists of only one statement. Specifically, on October 26, 2022, BPLC issued its Q3 2022 Results Announcement, which Plaintiff maintains falsely asserted that the Over-Issuances "w[ere] not the result of a general lack of attention to internal controls by Barclays." (AC ¶¶ 192-193). According to Plaintiff, this statement was materially misleading because it failed to disclose that the BPLC Board "had yet to issue its final report assessing the individuals responsible for the over-issuance and its overall negative impact on Barclays' financials for [FY 2022]," as well as the

"harm to the Company's reputation and standing in the U.S. structured note market caused by the magnitude of the [O]ver-[I]ssuances." (*Id.* ¶ 194).

The "full truth" was finally exposed by the Third Corrective Disclosure, on February 15, 2023, when BPLC filed its 2022 Annual Report on Form 20-F (the "2022 Form 20-F"). (AC ¶ 198). On this date, the Company disclosed the full financial impact of the Over-Issuances. (*Id.* ¶¶ 195-197). The Third Corrective Disclosure also announced that the Company was clawing back compensation from certain of the Individual Defendants (including Venkatakrishnan, Morzaria, and Cross), specifically owing to the Company's the failure to implement effective internal controls over financial reporting and prevent the Over-Issuances in the wake of the Company's loss of WKSI status in May 2017. (*Id.* ¶¶ 199-200).[5] The price of the Company's ADRs fell from $9.22 per ADR on February 14, 2023, to $8.45 per ADR on February 15, 2023. (*Id.* ¶ 202).

---

[5]     BPLC's 2022 Annual Report states:

> Our [2022] incentive funding incorporates a significant reduction to reflect the impact of risk and control issues … The [Over-Issuances] w[ere] a key factor in determining these remuneration impacts and accounts for the majority of the incentive pool reduction … [T]he 2022 annual bonus awards were £403,000, £166,000[,] and £76,000 lower than they would otherwise have been, for Venkat[akrishnan], [Cross,] and [Morzaria] respectively (after pro-rating for [Cross] and [Morzaria])."

BARCLAYS PLC, ANNUAL REPORT 2022, 201-202 (available at https://home.barclays/content/dam/home-barclays/documents/investor-relations/reports-and-events/annual-reports/2022/AR/Barclays-PLC-Annual-Report-2022.pdf).

B.    **Procedural Background**

The initial complaint in this securities fraud class action was filed on

September 23, 2022, by the City of North Miami Beach Police Officers' and

Firefighters' Retirement Plan and the City of North Miami Beach General

Employees' Retirement Plan (together, the "NMB Funds") against Defendants

Staley, Venkatakrishnan, Morzaria, and BPLC.  (Dkt. #1).  On the same day,

the NMB Funds circulated notice of the pendency of the instant action, as

required by the PSLRA.  (Dkt. #7).  On October 5, 2022, the Court issued an

order requiring members of the purported class to file motions for appointment

as lead plaintiff on or before November 22, 2022.  (Dkt. #8).  On November 22,

2022, four organizations (or groups thereof) filed motions for appointment as

lead plaintiff: (i) the NMB Funds (Dkt. #18-20); (ii) the Boston Retirement

System (Dkt. #21-24); (iii) the City of Birmingham Retirement and Relief

System and City of Hialeah Employees' Retirement System (Dkt. #25-27); and

(iv) the International Brotherhood of Teamsters Local No. 710 Pension Fund

(Dkt. #29-32).  On December 21, 2022, following a hearing, the Court

appointed the Boston Retirement System as Lead Plaintiff.  (Dkt. #39; *see also*

December 21, 2022 Minute Entry).

Plaintiff thereafter filed an Amended Class Action Complaint on March 6,

2023, adding Defendants Cross, Higgins, and BBPLC.  (Dkt. #46).  On April 6,

2023, the Court set a briefing schedule for Defendants' anticipated motion to

dismiss.  (Dkt. #52).  On May 5, 2023, Defendants filed a memorandum of law

in support of their motion to dismiss and accompanying papers.  (Dkt. #53-56).

On July 12, 2023, Plaintiff filed a memorandum of law opposing Defendants' motion. (Dkt. #58). Finally, on August 21, 2023, Defendants filed a reply memorandum of law and accompanying papers. (Dkt. #59-60).

## DISCUSSION

### A.   Applicable Law

#### 1.   Motions to Dismiss Under Rule 12(b)(6)

Generally speaking, when considering the adequacy of a complaint upon a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must (i) accept all of the complaint's factual allegations (but not legal conclusions) as true, and (ii) determine whether it states a "plausible" claim for relief. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-79 (2009). In doing so, the court must always "draw all reasonable inferences in the non-movant's favor." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). Put another way, the court's task is to "assess[] the legal feasibility of the complaint," not "weigh the evidence that might be offered to support it." *Glob. Network Commc'ns, Inc.* v. *City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). This is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

At the motion to dismiss stage, a court may consider only "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *accord Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016). However, "where a document is not

incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).  Further, when faced with a motion to dismiss a securities class action, the court "may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC[.]" *Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("We stress that our holding relates to public disclosure documents required by law to be filed, and actually filed, with the SEC[.]").

### 2.   Pleading Requirements Specific to Securities Fraud Claims

Importantly, a complaint alleging securities fraud faces additional, heightened pleading requirements — beyond those enumerated above — absent which it cannot survive a motion to dismiss. *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  Before Congress enacted the PSLRA, these heightened requirements were circumscribed by Federal Rule of Civil Procedure Rule 9(b). *Compare* Fed. R. Civ. P. 8 (describing "General Rules of Pleading"), *with* Fed. R. Civ. P. 9(b) (setting forth requirements of "alleging fraud or mistake"); *see also Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007).  Rule 9(b) requires a plaintiff alleging fraud to "state with particularity the circumstances constituting [the] fraud." Fed. R. Civ. P. 9(b). In the context of a civil action alleging securities fraud, this means that a plaintiff must "[i] specify the statements that the plaintiff contends were

fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99 (citation omitted).  While Rule 9(b) demands specificity as to the circumstances of an alleged fraud, it allows a plaintiff to "allege[] generally" any requisite state of mind, *e.g.*, "[m]alice, intent, [or] knowledge[.]"  Fed. R. Civ. P. 9(b).

    With the enactment of the PSLRA, a plaintiff bringing a securities fraud claim must proffer even more factual detail to survive a motion to dismiss.  15 U.S.C. § 78u-4(b); *see Lewy* v. *SkyPeople Fruit Juice, Inc.*, No. 11 Civ. 2700 (PKC), 2012 WL 3957916, at *7 (S.D.N.Y. Sept. 10, 2012) ("Courts must dismiss pleadings that fail to adhere to the requirements of the PSLRA.").  The PSLRA requires a plaintiff to "do more than say that [a defendant's] statements ... were false and misleading; they must demonstrate with specificity why and how that is so."  *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *see also In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, No. 08 Civ. 11278 (DLC), 2009 WL 4823923, at *7 (S.D.N.Y. Dec. 14, 2009).  In particular, they must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief ... state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

    The PSLRA also establishes a more stringent rule for claims that a defendant acted with a particular state of mind.  *See* 15 U.S.C. § 78u-4(b)(2)(A). For a plaintiff bringing a Section 10(b) or Rule 10b-5 claim — for which the

21

requisite state of mind is scienter, *i.e.*, an intent to deceive, manipulate or defraud — the higher PSLRA standard applies to allegations of scienter. *Kalnit* v. *Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). "[S]ection [78u-4(b)(2)(A)] of the PSLRA ... requires that a plaintiff's complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with [scienter].'" *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (quoting 15 U.S.C. § 78u-4(b)(2)) (citation omitted). A "strong" inference is one that "a reasonable person would deem ... cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.[6]

---

[6]   *See also New England Carpenters Guaranteed Annuity & Pension Funds* v. *DeCarlo*, 80 F.4th 158, 177 (2d Cir. 2023) (footnotes omitted):

> [T]he central question with respect to the Appellants' claims under the Exchange Act is whether the Complaint adequately "pleaded facts giving rise to a strong inference that the ... Defendants acted with 'scienter, a mental state embracing intent to deceive, manipulate, or defraud.'" *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (quoting *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). Scienter may be established by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." [*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)]; *see Set Cap. LLC* v. *Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021). Any allegation of conscious misbehavior or recklessness should be "viewed holistically and together with the allegations of motive and opportunity" to determine whether the complaint supports a strong inference of scienter. *Set Cap. LLC*, 996 F.3d at 78. Although "the requisite intent of the alleged speaker of the fraud need not be alleged with great specificity," *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996), the "inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314, 127 S.Ct. 2499; *see also In re Advanced Battery*, 781 F.3d at 644; *ECA & Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

### 3.   Liability Under Section 10(b) of the Exchange Act

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]"  15 U.S.C. § 78j(b).  Section 10(b)'s implementing rule, Rule 10b-5, expounds upon the statute, making it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  Under the Supreme Court's interpretation of these provisions, a *prima facie* case for securities fraud under Section 10(b) and Rule 10b-5 consists of six elements: "[i] a material misrepresentation or omission by the defendant; [ii] scienter; [iii] a connection between the misrepresentation or omission and the purchase or sale of a security; [iv] reliance upon the misrepresentation or omission; [v] economic loss; and [vi] loss causation." *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

### 4.   Liability Under Section 20(a) of the Exchange Act

Section 20(a) of the Exchange Act renders "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" to also be held liable, jointly and severally, "with and to the same extent as such controlled person to any person to whom such controlled person is liable[.]"  15 U.S.C. § 78t(a).  Of course, "[a]ny claim for 'control person' liability under [Section] 20(a) of the Exchange Act must be

23

predicated on a primary violation of securities law." *Pacific Inv. Mgmt. Co. LLC* v. *Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010). Section 20(a) does provide a safety valve, however, for any "controlling person [who] acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Accordingly, "[t]o state a claim of control person liability under [Section] 20(a), 'a plaintiff must show [i] a primary violation by the controlled person, [ii] control of the primary violator by the defendant, and [iii] that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI*, 493 F.3d at 108).

## B.    Analysis

### 1.    The Court Grants in Part and Denies in Part Defendants' Motion to Dismiss Plaintiff's Section 10(b) Claims

As previously noted, the *prima facie* case for securities fraud under Section 10(b) and Rule 10b-5 consists of six elements: "[i] a material misrepresentation or omission by the defendant; [ii] scienter; [iii] a connection between the misrepresentation or omission and the purchase or sale of a security; [iv] reliance upon the misrepresentation or omission; [v] economic loss; and [vi] loss causation." *Stoneridge Inv. Partners*, 552 U.S. at 157. Defendants challenge the sufficiency of Plaintiff's pleading as to three of these elements: element (i), the materiality of any misrepresentation or omission by Defendants; element (ii), scienter; and element (vi), loss causation. (*See generally* Def. Br. 14-36). The Court addresses each challenge in turn and

concludes that Plaintiff has alleged a *prima facie* case of securities fraud sufficient to survive Defendants' motion to dismiss, but only with respect the Pre-Revelation Disclosures, *i.e.*, the alleged misrepresentations made before the First Corrective Disclosure, when Barclays revealed the over-issuances from the 2019 Shelf.

> ### a.   Plaintiff Sufficiently Alleges Materiality as to the Pre-Revelation Disclosures

The Court begins by analyzing the materiality of the alleged misrepresentations.  Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact" or "omit[ting] … a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  At the pleading stage, a plaintiff need not establish that each of the alleged misstatements or omissions "is [materially] misleading in and of itself"; rather, a plaintiff must only allege that "the defendants' representations, taken together and in context, would have misled a reasonable investor."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (internal quotation marks omitted).  Because materiality is a mixed question of law and fact, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Ganino* v. *Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (alterations adopted) (internal quotation marks omitted).  Making this determination is a fact-specific inquiry that "necessarily depends on all relevant circumstances," *ECA & Loc. 134 IBEW*

*Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009), "judged according to an objective standard," *Amgen Inc.* v. *Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).

For the purposes of the materiality analysis, the misrepresentations alleged in the Amended Complaint can be organized into four categories. The first two categories of misrepresentations encompass all of the Pre-Revelation Disclosures, *i.e.*, the alleged misrepresentations made prior to the First Corrective Disclosure. These include (i) statements concerning the Company's internal controls over financial reporting, *e.g.*, "[Barclays] is committed to operating within a strong system of internal control" (AC ¶ 137); and (ii) certifications made by certain of the Individual Defendants in the Company's SEC filings pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, Pub. L. 107-204, 116 Stat. 745, affirming the Company's compliance with the Exchange Act (the "SOX Certifications") (*id.* ¶ 142).

The third category of misrepresentations includes statements made between the First and Second Corrective Disclosures concerning the financial impact of the Over-Issuances that do not take into account the over-issuances from the 2018 Shelf, *e.g.*, "the Company's financial statements … for the year ended 31 December 2021 … [recognized] a[n] … impact of [] c.$15bn [due to the] over-issuance of securities by [BBPLC]." (AC ¶ 182). The fourth category of alleged misrepresentations consists of only one statement, made between the Second and Third Corrective Disclosures: the Company's Q3 2022 Results Announcement that purportedly failed to disclose that the BPLC Board "had

yet to issue its final report assessing the individuals responsible for the over-issuance and its overall negative impact on Barclays' financials for [FY 2022]" as well as the "harm to the Company's reputation and standing in the U.S. structured note market caused by the magnitude of the [O]ver-[I]ssuances." (*Id.* ¶¶ 192-194).

The Court presumes familiarity with the putative misrepresentations detailed in the Amended Complaint, and reproduces specific statements below only for illustrative purposes. (*See generally* AC ¶¶ 133-194).

> ### i.    Plaintiff Sufficiently Alleges Materiality as to Defendants' Statements Regarding the Company's Internal Controls

To review, the statements comprising the first category of alleged misrepresentations were made between February 18, 2021, and March 27, 2022, before the Company discovered the Over-Issuances. (AC ¶¶ 134-156). These statements characterize the Company's internal controls over financial reporting and provide assessments of the soundness of such controls. Examples of these statements include:

- "[Barclays] is committed to operating within a strong system of internal control[.]" (*Id.* ¶ 137).

- "[The Company's] frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance." (*Id.*).

- "Management has assessed the internal control over financial reporting as of 31 December 2020, utilized the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2020." (*Id.* (alterations adopted)).

▪ "A framework of disclosure controls and procedures is in place to support the approval of the financial statements of [Barclays]. Specific governance committees are responsible for examining the financial reports and disclosures to ensure that they have been subject to adequate verification and comply with applicable standards and legislation." (*Id.* ¶ 140).

Defendants argue that these statements are the kind of "simple and generic assertions about having 'policies and procedures' and allocating 'significant resources' to regulatory compliance efforts" that the Second Circuit has repeatedly held "cannot be construed as guarantees of compliance." (Def. Br. 24, 26 (quoting *Singh* v. *Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019); *see also id.* at 24 ("Plaintiff relies on the same 'creative attempt to recast corporate mismanagement as securities fraud' that the Second Circuit has rejected dozens of times." (quoting *Singh*, 918 F.3d at 59-60))).  For this reason, according to Defendants, the statements are not actionable under Section 10(b).  (*See id.* at 26-27 (citing *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 648 (S.D.N.Y. 2017) ("[A]llegations that [a company's internal] controls must have been deficient because they may have failed to detect some weaknesses in its financial reports or disclosures in some instances[] are not sufficient[.]"))).  Plaintiff counters that the challenged statements are:

"fact-based expressions of opinion," which are actionable because they conveyed positive beliefs about the strength of Barclays' internal controls that are in conflict with the fact that the over-issuances occurred because no tracking system was in place to monitor the issues of the non-WKSI shelves, an undisclosed fact available to Defendants when the statements were made.

(Pl. Opp. 16 (quoting *Wang* v. *Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 229 (S.D.N.Y. 2023))).

Stepping back for a moment to survey the legal landscape, the Court acknowledges that statements of this type are often "'simple and generic assertions' regarding [a company]'s 'commitment to regulatory compliance.'" *In re Citigroup Sec. Litig.*, No. 20 Civ. 9132 (LAP), 2023 WL 2632258, at *14 (S.D.N.Y. Mar. 24, 2023) (quoting *Singh*, 918 F.3d at 64). For this reason, such statements are typically inactionable, as "[n]o investor would take such [general] statements seriously in assessing a potential investment, for the simple fact that almost every [company] makes the[m]." *ECA*, 553 F.3d at 206 (finding statement that "[JP Morgan has] risk management processes that are highly disciplined and designed to preserve the integrity of the risk management process" to be immaterial (alterations adopted)); *see also, e.g.*, *Singh*, 918 F.3d at 61 (finding statement that "[Cigna] established policies and procedures to comply with applicable [regulations]" to be immaterial); *In re Citigroup*, 2023 WL 2632258, at *14 (finding statement that "Citi's [c]ompany-wide risk governance framework consists of the policies, standards, procedures and processes through which Citi identifies, assesses, measures, manages, monitors, reports and controls risks across the [c]ompany" to be immaterial); *see also Arora* v. *HDFC Bank Ltd.*, No. 20 Civ. 4140 (EK) (JMW), 2023 WL 3179533, at *7 (E.D.N.Y. May 1, 2023) (collecting cases in which "conclusory allegations" regarding the adequacy of internal controls have been dismissed).

The Court cannot accept, however, that the alleged misrepresentations at issue here fall neatly within the reasoning of these prior cases.  To begin, Plaintiff does not follow the standard formula, *i.e.*, Barclays represented that its system of internal controls was robust and effective and later — after such system failed to alert management of some lower-level instance of nefarious corporate conduct — disclosed that it was not.  *See Schiro* v. *Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 299 (S.D.N.Y. 2019).  "[R]ather, the principal allegation in this case is that the over-issuances occurred because Barclays failed to implement, much less bother to design, any internal controls whatsoever to track and monitor the issuances of securities during its period as an ineligible issuer lacking WKSI privileges."  (Pl. Opp. 16).

The critical difference, therefore, is that the Company's system for tracking the securities it sold off of the Shelves did not just underperform — it did not exist.  (*See* SEC Order 2 ("BBPLC[] fail[ed] to put into place *any internal control* around the real-time tracking of securities being offered or sold off of its Commission-registered shelf registration statement." (emphasis added)); AC ¶ 193 ("The Review found that the over-issuance occurred because Barclays did not put in place a mechanism to track issuances after BBPLC was subjected to a limit on issuance.")).  Lest there be any confusion about the seriousness of this error, the absence of a tracking system meant that Barclays was blindly issuing unregistered securities to the degree that the Company had an obligation, upon discovery, to buy back $17.7 billion worth of securities.  Accordingly, Defendants' statements were not materially

misleading because they misrepresented the strength of the Company's internal controls.  Rather, Defendants' statements were materially misleading because they omitted the Company's failure in the first instance to create a means of tracking the issuance of securities from the Shelves.

Under the securities laws, an omission such as this one is actionable only when the defendant has a duty to disclose the omitted fact, *see Basic Inc.* v. *Levinson*, 485 U.S. 224, 239 n.17 (1988), *e.g.*, "when silence would make other statements misleading or false," *Glazer* v. *Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992) (internal quotation marks omitted).  Here, the fact that Barclays never contemplated, designed, or implemented a system for tracking or monitoring the issuance of securities from the Shelves — a fundamental control and the only means by which the Company could prevent the unchecked issuance of unregistered securities — renders statements such as "[g]roup-wide frameworks, policies[,] and standards enable Barclays to meet regulators' expectations relating to internal control and assurance" (AC ¶ 153), and "[Barclays] has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations" (*id.*), materially false and misleading.  Stated differently, the dueling assertions that (i) Barclays "operated a sound system of internal control" and (ii) Barclays had *no* system of internal control whatsoever over the issuance of securities from the Shelves cannot at the same time be true.  No reasonable investor would believe as much.  *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d

31

260, 310 (S.D.N.Y. 2010) ("[T]here is a difference between enthusiastic statements amounting to general puffery and ... statements that are anchored in misrepresentations of existing facts." (internal quotation marks omitted)).

The Court therefore finds that the alleged misstatements falling into this category, "taken together and in context, would have misled a reasonable investor." *In re Vivendi*, 838 F.3d at 250 (internal quotation marks omitted). Plaintiff has sufficiently alleged the materiality of these statements to survive Defendants' motion to dismiss.

### ii.      Plaintiff Sufficiently Alleges Materiality as to Defendants' SOX Certifications

As the Court previously explained, the statements comprising the second category of alleged misrepresentations were also made prior to the First Corrective Disclosure.  (AC ¶¶ 134-156).  This category takes the form of certifications made by certain of the Individuals Defendants pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 affirming the Company's compliance with the Exchange Act.  (*See, e.g.*, *id.* ¶ 142).  These SOX Certifications, each one signed by an Individual Defendant, generally provide that:

> The Annual Report on Form 20-F for the year ended December 31, 2020 (the "Report") of Barclays fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Barclays.

(*Id.*).

The parties' arguments from the preceding section are largely repurposed here.  Defendants argue that "Plaintiff misconstrues statements regarding the design of financial reporting controls, and opinions regarding those controls, as ironclad assurances and guarantees that Barclays had and would have no control deficiencies."  (Def. Br. 28 (alterations adopted) (internal quotation marks omitted)).  Plaintiff, on the other hand, points out that "[while] it is well-established that 'SOX certifications do not constitute a standalone basis for liability,' SOX certifications are actionable 'to the extent that the Court finds Plaintiff to adequately have alleged that the defendant made any actionable misstatements or omissions in its public filings and with scienter.'"  (Pl. Br. 17 (quoting *In re Glob. Brokerage, Inc.*, No. 17 Civ. 916 (RA), 2019 WL 1428395, at *14 (S.D.N.Y. Mar. 28, 2019))).

The Court agrees with Plaintiff.  "To the extent that the Court finds Plaintiff to have alleged adequately that [Barclays] made any actionable misstatements or omissions in [its public filings] … in other portions of this [O]pinion, Plaintiff may proceed both on any such misstatement or omission and th[e] [corresponding] portion of [the relevant Individual Defendant]'s SOX certification."  *Banco Bradesco*, 277 F. Supp. 3d at 655.  As to this subset of statements, Plaintiff has sufficiently alleged the material misrepresentation element of a *prima facie* case of securities fraud under Section 10(b).

    **iii.**      **Plaintiff Fails to Allege Materiality as to Defendants' Statements Concerning the Financial Impact of the Over-Issuances**

The statements comprising the third category of alleged misstatements were made between the First and Second Corrective Disclosures, after Barclays had revealed the over-issuances associated with the 2019 Shelf, but before they had acknowledged those associated with the 2018 Shelf. (*See, e.g.*, AC ¶ 169). Generally speaking, these statements provided further detail on the impact of the sale of unregistered securities from the 2019 Shelf, including estimates of the liabilities associated with the Rescission Offer. (*Id.*). Examples include:

- "Barclays has a provision of £540m at Q122 relating to this matter, £320m (post-tax impact of £240m) of which was recognised in Q122 and £220m (post-tax of £170m) recognised in 2021 in relation to the c.US$13bn over issuance of structured notes which represents the best estimate of the rescission right investors have for these securities." (*Id.*).

- "[T]he Company's financial statements and consolidated financial statements as at and for the year ended 31 December 2021, including the notes thereto … are hereby refiled to reflect both a £220m litigation and conduct provision and associated income statement charge recognised in the year ended 31 December 2021 and a contingent liability disclosure in respect of the impact of the c.$15bn over-issuance of securities by Barclays Bank PLC (BBPLC) in excess of the maximum aggregate offering price registered under BBPLC's Registration Statement on Form F-3, as declared effective by the SEC in August 2019 (2019 F-3) (the [o]ver-issuance of Securities)[.]" (*Id.* ¶ 182).

Defendants argue that these statements cannot be actionable misrepresentations primarily because, at the time they were made, Barclays

had not yet discovered the over-issuances from the 2018 Shelf (Def. Br. 28),

and thus the statements were true when Defendants made them (*id.* at 29

(citing *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295

(S.D.N.Y. 2014) ("The fact that defendants recognized problems, announced

that they were implementing effective controls and procedures, and then

[subsequently] recognized more problems does not indicate that their

statements were false at the time that they were made."), *aff'd*, 616 F. App'x

442 (2d Cir. 2015) (summary order))).  According to Plaintiff, however, once

Defendants discovered the over-issuances from the 2019 Shelf, they had an

obligation to "make clear to investors that the internal controls failure

impacting the 2019 Shelf may also have caused an over-issuance from the

2018 Shelf," and their failure to do so rendered this category of statements

materially misleading.  (Pl. Opp. 21).

    With respect to this category of statements, the Court agrees with

Defendants.  As a preliminary matter, Plaintiff has pleaded no facts to support

a finding that Defendants were aware of the issues with the 2018 Shelf at the

time the challenged statements were made.  *See Novak* v. *Kasaks*, 216 F.3d

300, 311 (2d Cir. 2000) ("Corporate officials need not be clairvoyant; they are

only responsible for revealing those material facts reasonably available to

them.").

    More importantly, to plead a material misrepresentation under the

securities laws, Plaintiff's allegations must support "a plausible inference that

[D]efendants' statements were materially false when made."  *Magnum Hunter*,

26 F. Supp. 3d at 294-95.  In this case, the First Corrective Disclosure revealed Defendants' core omission: that Barclays never implemented a system of internal controls surrounding issuances from the Shelves.  It was this omission that made Defendants' prior statements "materially false."  For this reason, the statements that followed the First Corrective Disclosure — which, for all practical purposes, merely underscored the Company's lack of a system for tracking shelf-related issuances — were no longer "materially false."  The fact that Defendants did not "make clear to investors that the internal controls failure impacting the 2019 Shelf may also have caused an over-issuance from the 2018 Shelf" does not render them so.  (Pl. Opp. 21).  *See also Dalberth* v. *Xerox Corp.*, 766 F.3d 172, 186 (2d Cir. 2014) ("While [p]laintiffs may have desired more detailed or nuanced language, that is not what the law requires.").

Indeed, the March 28, 2022 Form 6-K that initially announced the Company's discovery of the over-issuances from the 2019 Shelf purported to provide the Company's "*best estimate* at this time of losses which *may* arise from these matters."  (Scott Decl., Ex. 6 at 5 (emphasis added)).  It further indicated that "Barclays has commissioned an independent review of the facts and circumstances relating to this matter including, among other things, the control environment related to such issuances," and warned investors that "Barclays is also assessing the impact of these matters on prior period financial statements."  (*Id.*).  Additionally, in the Company's Amended 2021 Form 20-F, filed May 23, 2022, Barclays more explicitly cautioned that the Company "is

36

also conducting an internal review involving a five-year look-back at limits in other issuance programmes."  (Scott Decl., Ex. 7 at 18).  That Barclays did not explicitly name the 2018 Shelf as a subject of either review does not constitute a "failure to be truthful[.]"  *C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan* v. *UBS AG*, No. 12 Civ. 4924 (KBF), 2013 WL 6576031, at *3 (S.D.N.Y. Dec. 13, 2013).  The Court thus concludes that the statements comprising this category of alleged misrepresentations are not materially false, and cannot, as a matter of law, amount to material misrepresentations.

### iv.   Plaintiff Fails to Allege Materiality as to the Q3 2022 Earnings Announcement

The last category of alleged misrepresentations is but a single statement, issued after the Second Corrective Disclosure, as part of the Company's Q3 2022 Earnings Announcement.  (AC ¶ 192).  The statement discussed the purported findings of the Company's "external counsel-led review" (the "Review"), which was "now complete," and which was commissioned to investigate "the facts and circumstances relating to the [O]ver-[I]ssuance[s] and the control environment related to such issuances[.]"  (*Id.* ¶ 193).  It reads:

> The Review found that the [O]ver-[I]ssuance[s] occurred because Barclays did not put in place a mechanism to track issuances after BBPLC was subjected to a limit on issuance.  Among the principal causes of the [O]ver-[I]ssuance[s] were, first, the failure to identify and escalate to senior executives the consequences of the loss of well-known seasoned issuer status, and, secondly, a decentralised ownership structure for securities issuance.

> The Review further concluded that [O]ver-[I]ssuance[s] w[ere] not the result of a general lack of attention to controls by Barclays, and that Barclays' management

> has consistently emphasised the importance of maintaining effective controls.

(*Id.*).  Plaintiff claims that this statement is materially false and misleading because it fails to disclose that the BPLC Board "had yet to issue its final report assessing the individuals responsible for the [O]ver-[I]ssuance[s] and its overall negative impact on Barclays' financials for [FY 2022]," as well as the "harm to the Company's reputation and standing in the U.S. structured note market caused by the magnitude of the [O]ver-[I]ssuances."  (*Id.* ¶ 194).

The Court strains to construe the Q2 2022 Earnings Statement as false or misleading.  As an initial matter, Barclays had already disclosed to investors — in September — that "[t]he Review's findings will be used to consider individual accountabilities in relation to this matter and may include adjustments to remuneration, including to past variable remuneration, the potential for disciplinary action[,] and performance management as appropriate."  (Def. Br. 31-32 (quoting Dkt. #57-8 at 3)).  Accordingly, Barclays explicitly warned investors that "individual accountabilities" (including compensation clawbacks) might be announced following the Review, previewing for investors what it would ultimately detail in the Third Corrective Disclosure.

Second, that the Q2 2022 Earnings Announcement failed to disclose the "overall negative impact" of the Over-Issuances on the Company's finances or the corresponding "harm to the Company's reputation and standing in the U.S. structured note market caused by the magnitude of the [O]ver-[I]ssuances" cannot be said to have misled investors.  (AC ¶ 194).  By October 2022 — after both the First and Second Corrective Disclosures had been issued, the latter of

38

which appraised the total value of the Over-Issuances at almost $17.7 billion (*id.* ¶ 188) — a reasonable investor would have appreciated the significant financial and reputational impact that the Over-Issuances would have on Barclays.  This is the case even if such harm had yet to be fully and finally quantified.  *See In re Donna Karan Int'l Sec. Litig.*, No. 97 Civ. 2011 (CBA), 1998 WL 637547, at *13 (E.D.N.Y. Aug. 14, 1998) ("[A] company has no duty to disparage its own competitive position in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's condition and the value of its stock." (internal quotation marks omitted)); *see also Zerman* v. *Ball*, 735 F.2d 15, 21 (2d Cir. 1984) ("It is not a violation of any securities law to fail to disclose a result that is obvious even to a person with only an elementary understanding of the stock market." (internal quotation marks omitted)).

The Court reiterates that, once Barclays revealed the over-issuances from the 2019 Shelf, it effectively disclosed what its previous disclosures had wrongfully omitted: that it had never implemented a system of internal controls surrounding the issuance of securities from the Shelves.  It is this omission that forms the core of Plaintiff's case; its revelation accordingly undermines Plaintiff's fraud claim.  As such, the Court finds that the Q2 2022 Earnings Announcement is not materially misleading as a matter of law and does not survive Defendants' motion to dismiss.

### b.   Plaintiff Sufficiently Alleges Scienter as to the Pre-Revelation Disclosures

The Court next examines whether the alleged misrepresentations — specifically, the Pre-Revelation Disclosures, which have surmounted the materiality bar — were made with scienter.  The Court finds, in concert with its materiality finding, that Plaintiff has sufficiently alleged scienter as to such disclosures.

As previously noted, at the pleading stage, the PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]."  15 U.S.C. § 78u-4(b)(2)).  A "strong" inference is one that "a reasonable person would deem … cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  Where, as here, one of the defendants is a corporation, a plaintiff must plead facts that give rise to "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Dynex*, 531 F.3d at 195.  "[T]he most straightforward way to raise a strong inference of corporate scienter is to impute it from an individual defendant who made the challenged misstatement" or from "the other officers or directors who were involved in the dissemination of the fraud."  *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (internal quotation marks omitted).  The Court's subsequent scienter analysis thus turns on the conduct of the Individual Defendants.

To establish the requisite "strong inference" that a defendant acted with scienter, a plaintiff must plead particularized facts either (i) "showing that the

defendant[] had both motive and opportunity to commit the fraud" (the "motive and opportunity" approach) or (ii) "constituting strong circumstantial evidence of conscious misbehavior or recklessness" (the "circumstantial evidence" approach). *ATSI*, 493 F.3d at 99. Where, as here, a plaintiff takes the (much thornier) circumstantial evidence approach, "the strength of the circumstantial allegations [that a defendant consciously or recklessly misbehaved] must be correspondingly greater." *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks omitted). "Recklessness" specifically "must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care," *Rothman* v. *Gregor*, 220 F.3d 81, 98 (2d Cir. 2000) (internal quotation marks omitted), "not merely a heightened form of negligence," *Novak*, 216 F.3d at 312 (internal quotation marks omitted). *See also Medis Inv. Grp.* v. *Medis Techs., Ltd.*, 586 F. Supp. 2d 136, 142 (S.D.N.Y. 2008) ("To properly allege recklessness, the plaintiff must plead a state of mind approximating actual intent[.]" (internal quotation marks omitted)), *aff'd*, 328 F. App'x 754 (2d Cir. 2009) (summary order).

   With varying degrees of success, federal courts have striven to elucidate the kinds of circumstantial evidence of a defendant's conscious misbehavior or recklessness under Section 10(b) that would be sufficient to support a strong inference of scienter.[7] The Second Circuit has identified at least four examples:

---

[7]    In a 2015 article, Professors Ann M. Olazábal and Patricia S. Abril characterized the then-existing jurisprudence on "reckless" conduct under Section 10(b) and Rule 10b-5:

> On the one hand, the Supreme Court has long cautioned against 10(b) expanding into a net that is so wide that it penalizes "mere instances of corporate mismanagement." … On the other hand, the Supreme Court's

evidence that a defendant "[i] benefitted in a concrete and personal way from the purported fraud; [ii] engaged in deliberately illegal behavior; [iii] knew facts or had access to information suggesting that their public statements were not accurate; or [iv] failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 311 (citations omitted).  Importantly, where there are "multiple defendants, a plaintiff must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *Banco Bradesco*, 277 F. Supp. 3d at 664 (internal quotation marks omitted).

In view of the imprecision of the governing legal standard, the Court finds it useful to review a few cases in which a plaintiff has survived a motion to dismiss by establishing a strong inference of scienter through circumstantial evidence of a defendant's conscious misbehavior or recklessness.  To begin, in *Novak* v. *Kasaks*, the plaintiffs alleged that the defendant corporation ("AnnTaylor") and its principal officers had overstated AnnTaylor's financial performance by accounting for inventory that they knew to be worthless at inflated values and by deliberately failing to adhere to AnnTaylor's publicly stated markdown policy.  216 F.3d at 304.  The Second Circuit held that the

---

own disjunctive language [in the *Tellabs* decision] referring to defendants who have acted "[either] intentionally *or* recklessly" makes clear that recklessness is something apart from (and presumably less than) intentional deception.

In the vast area between these two clear propositions — that negligent corporate mismanagement is not sufficient for culpability, but that recklessness is something apart from and less than intentional deception — the doctrine remains a mess.

Ann M. Olazábal & Patricia S. Abril, *Recklessness as a State of Mind in 10(B) Cases: The Civil-Criminal Dialectic*, 18 N.Y.U. J. LEGIS. & PUB. POL'Y 305, 321 (2015) (internal citations and quotation marks omitted).

plaintiffs pleaded facts constituting strong circumstantial evidence of the defendants' conscious misbehavior or recklessness, supporting a "strong inference" of scienter, in their refusal to markdown such inventory. *Id.* at 312. Specifically, the Second Circuit found persuasive the facts that (i) the defendants were aware of AnnTaylor's rising inventory levels; (ii) they knew that certain inventory was "worthless"; and (iii) they discussed the need to mark down such inventory. *Id.* at 311-12.

In *Rothman* v. *Gregor*, the plaintiffs alleged that the defendants, the seller of computer software ("GT") and its officers, misrepresented GT's income by failing to expense certain royalty advances after it became clear that the capitalized value of these advances had been significantly overstated. 220 F.3d at 84. GT was in the business of contracting with small, independent software developers, underwriting their development costs in large part by "pre-paying" the developers the amount of any royalty payments that GT expected to earn on their products. *Id.* at 84-85. Pursuant to company policy, these royalty advances were to be expensed by GT as soon as GT determined that the amounts would not be recovered through sales of the related product. *Id.* The Second Circuit held that the plaintiffs had pleaded facts constituting strong circumstantial evidence of the defendants' conscious misbehavior or recklessness in their refusal to expense certain royalty advances. *Id.* at 90. This time, the Second Circuit focused on the facts that (i) the defendants possessed information indicating that the related products were selling poorly; (ii) they had in fact sued the developers of the related products to recover

43

certain royalty advances; and (iii) the amount of royalty advances GT ultimately wrote off was significant.  *Id.* at 90-92.

Finally, in *Dobina* v. *Weatherford Int'l Ltd.*, the plaintiffs alleged that defendant corporation ("Weatherford") and its chief financial officer ("CFO") had made repeated misrepresentations relating to the quality of Weatherford's internal controls over financial reporting after Weatherford disclosed significant material weaknesses in its internal control over financial reporting for income taxes and a corresponding need to restate certain of its prior earnings statements.  909 F. Supp. 2d 228, 244 (S.D.N.Y. 2012).  Judge Kaplan held that the plaintiffs had pleaded facts constituting strong circumstantial evidence of the defendants' conscious misbehavior or recklessness in their repeated assertions that Weatherford's internal controls were adequate.  *Id.* at 246.  On this point, Judge Kaplan found the facts that (i) the CFO was responsible for establishing, maintaining, and supervising the company's internal controls; (ii) there was a "stark" discrepancy between the substance of the admissions in the corrective disclosure and the alleged misstatements; (iii) the CFO was aware of at least some problems with internal controls in the tax department during the class period; and (iv) taxes were "key to measuring Weatherford's financial performance and were a subject about which investors and analysts often inquired," all supported a strong inference of scienter.  *Id.* at 244-48 (alterations adopted) (internal quotation marks omitted).

Turning to the facts of this case, the Individual Defendants against whom Plaintiff's Section 10(b) claim is directed are James Staley, C.S.

Venkatakrishnan, Tushar Morzaria, and Anna Cross (together, the "Executive Defendants"). Staley served as the Company's CEO from December 2015 through October 2021 (the entire time Barclays was an ineligible issuer), throughout which time he signed the SOX Certifications associated with the Company's Form 20-F filings. (AC ¶¶ 32, 142). He also functioned as the CEO of BBPLC (the Barclays subsidiary at which the Over-Issuances occurred) from March 2019 through October 2021. (*Id.*). Venkatakrishnan served as the Company's Chief Risk Officer from May 2017 to May 2020 (the entire time Barclays was an ineligible issuer) (*id.* ¶ 33); the Co-President of BBPLC from October 2020 to October 2021, *see* Barclays PLC, 2022 Annual Report 55 (Form 20-F) (February 15, 2023); and the CEO of Barclays after October 2021 (AC ¶ 33); he thereafter signed the SOX Certifications associated with the Company's Form 20-F filings in Staley's place (*id.* ¶¶ 33, 154). Morzaria was the Group Finance Director (the most senior finance position at Barclays) throughout the time that Barclays was an ineligible issuer and when the bulk of the alleged misstatements were made; he signed the SOX Certifications associated with both the 2020 and 2021 Forms 20-F. (*Id.* ¶¶ 34, 142, 150). Cross took over from Morzaria as Group Finance Director in April 2022, and had served for several years prior as Deputy Finance Director, Group Financial Controller, and Chief Financial Officer of the Company. (*Id.* ¶ 35). Plaintiff's Section 10(b) claim also names BPLC as a Defendant.

Plaintiff proffers five facts that it believes constitute strong circumstantial evidence of the Executive Defendants' conscious misbehavior or recklessness.

(*See* Pl. Opp. 24).  *First*, Plaintiff points to statements made by Defendants when first disclosing the Over-Issuances, acknowledging that the Over-Issuances were a "simple" mistake and "entirely avoidable."  (AC ¶¶ 213-216). *Second*, Plaintiff stresses that issuing securities is a "core operation" of Barclays, and that the Company's WKSI status and automatic shelf registration were critical to the Company's ability to meet its capital and funding requirements.  (*Id.* ¶¶ 217-220).  *Third*, Plaintiff cites the Company's clawback of more than $1.2 million in compensation from the Executive Defendants, a direct result of the toll taken on the Company by the Over-Issuances.  (*Id.* ¶¶ 221-224).  *Fourth*, Plaintiff points to the fact that Barclays self-identified as a WKSI (or not) each year on the front page of the Company's Form 20-F.  (*Id.* ¶¶ 225-228).  *Fifth*, Plaintiff cites the Company's share of the structured note and exchange-traded note ("ETN") market, which share was artificially propped up by the Company's sale and issuance of unregistered securities.  (*Id.* ¶¶ 229-235).  According to Plaintiff, these facts demonstrate that the Executive Defendants "knew, or were reckless in not knowing, that Barclays did not implement any internal controls to account for the amount of securities issued once it became an ineligible issuer yet represented repeatedly that the Company had effective internal controls over financial reporting."  (*Id.* ¶ 228).

Defendants, unsurprisingly, dismiss the Over-Issuances as an honest mistake of which the Executive Defendants were not aware — and had no obligation to be aware — prior to their discovery.  (*See generally* Def. Br. 15-23).  For Defendants, the "relevant question" is whether the Executive

Defendants knew "that the Working Group established to address the loss of WKSI status failed to put in place controls to track the issuance of securities by a single trading desk at a single Barclays subsidiary in the United States." (Def. Reply 5, 9).  They accuse Plaintiff of "tr[ying] to plead an oversight failure of management" as a securities fraud claim.  (*Id.* at 11 (internal quotation marks omitted)).

The Court rejects Defendants' characterization of these events and finds that Plaintiff has alleged facts constituting strong circumstantial evidence of the Executive Defendants' conscious misbehavior or recklessness sufficient to raise a "strong inference" of scienter.  In this Circuit, a showing of recklessness requires "conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care, not merely a heightened form of negligence."  *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (internal quotation marks and citations omitted).  With this standard in mind, the Court finds several facts significant.

The Court begins with the evidence it finds the most compelling, that which underscores importance of the Company's WKSI shelves to its operations.  In a request for a waiver of its "ineligible issuer" status that Barclays filed with the SEC before the Company lost its WKSI status in 2017, the Company stated:

> Since 2011, Barclays has issued off the WKSI shelf the USD-equivalent of approximately $12.3 billion of regulatory capital securities, which represents 89% of all regulatory capital securities issued by Barclays in that period.  In that same period … the USD-equivalent value of all securities issued by Barclays off the WKSI

shelf is approximately $68 billion. These figures demonstrate the importance of the WKSI shelf to Barclays in meeting its capital and funding requirements.

(Letter from Barclays PLC and Barclays Bank PLC to Eun Ah Choi, Division of Corporate Finance, Request for Waiver of "Ineligible Issuer" Status Under Rule 405 (January 27, 2016) (available at https://www.sec.gov/divisions/corpfin/cf-noaction/2016/barclays-plc-020116-405.pdf)).  In addition to hampering the Company's efforts to "meet[] its capital and funding requirements," the letter also emphasized that loss of WKSI status would "curtail important channels of communication to investors," weaken the Company's ability to respond to "current regulatory and market conditions and uncertainties that are significantly transforming the landscape for financial institutions like Barclays," and harm "the speed at which Barclays could strengthen its capital position if require to do so" by a financial regulator.  (*Id.* at 11-13).  Beyond the Company's own statements about the importance of its WKSI designation, the SEC required the Company throughout the Class Period to affirmatively represent whether it was a WKSI on the front page of its annual Form 20-F filings.  (AC ¶¶ 225-228).

The Court is moved not merely by the criticality of the Company's WKSI status to its financing operations.  It also finds relevant the facts that each of the Executive Defendants either (i) had a managerial role specifically within BBPLC (the Barclays subsidiary at which the Over-Issuances occurred) during the events described in the Amended Complaint or (ii) was directly involved in the Company's financing operations (*i.e.*, its efforts to raise capital through the

48

issuance of securities) during the same period; and each signed off on the figures presented in one or more of the Company's Forms 20-F.  (*See* AC ¶¶ 31-33, 142, 150, 154).  And when Barclays announced that it was implementing remuneration adjustments focused on "the areas of the [Company] closest to where the incidents occurred," each of the Executive Defendants' positions was impacted.  (*Id.* ¶ 200).  *See also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 497 (S.D.N.Y. 2004) (holding that it is reasonable to impute knowledge to a signatory of SEC filings directly involved in the day-to-day operations of a company); *In re American Bank Note Holographics Sec. Litig.*, 93 F. Supp. 2d 424, 448 (S.D.N.Y. 2000) (finding scienter allegation sufficient as to CFO and Comptroller where the defendants were, because of their positions, "uniquely situated" to control the revenue recognition procedures, and the revenues had been overstated for a period of two years in repeated SEC filings).

On the facts pleaded in Amended Complaint, it is impossible to believe that the Executive Defendants were ignorant of the change in the Company's WKSI status.  *See In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012) (finding that, regardless of whether "core operations" doctrine is good law, "surely an inference of knowledge may be appropriate, even if not determinative," where, "employing a holistic analysis … it would be absurd to suggest that management was without knowledge of the matter." (internal

49

quotation marks omitted)).[8]  Further, it is equally difficult to believe that the
Executive Defendants were unaware of the Company's need to implement
controls surrounding issuances from the Shelves after the Company lost its
WKSI status in May 2017.  (AC ¶ 62).  *See generally In the Matter of Barclays
Capital Inc.*, Adm. Proc. File No. 3-17978 (May 10, 2017).  These facts, of
course, Defendants ultimately concede.  (*See* Def. Reply 5).

The parties diverge from there, however, with Defendants claiming that
"Plaintiff leaps to the conclusion" that the Executive Defendants "knew that
[the Company] did not implement any internal controls to account for the
amount of securities issued[.]"  (Def. Br. 20 (internal quotation marks omitted)).
The Court thinks it more a tiptoe than a leap:  If the Executive Defendants
knew that (i) Barclays had lost its WKSI status and (ii) the Company needed to
implement a system for tracking issuances from the Shelves, then they knew
that (iii) they, as the persons responsible for the Company's compliance with
the securities laws, had a duty to monitor whether such controls were
implemented.  Further, the fact that BBPLC convened a Working Group —
which convened twice over the four-plus-year duration of the Shelves, but was
tasked only with proactively calculating the total amount of securities that the

---

[8]     "[T]he 'core operations' theory allows courts to draw an inference of scienter where the
misrepresentations and omissions allegedly made by defendants were about their 'core
operations.'" *Lipow* v. *Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 n.10 (S.D.N.Y.
2015).  However, its vitality post-PSLRA has not been resolved by the Second Circuit.
*See, e.g.*, *In re Lottery.com, Inc. Sec. Litig.*, No. 22 Civ. 7111 (JLR), 2024 WL 454298, at
*33 (S.D.N.Y. Feb. 6, 2024) (collecting cases); *In re Chembio Diagnostics, Inc. Sec. Litig.*,
586 F. Supp. 3d 199, 222 n.9 (E.D.N.Y. 2022) ("After the PSLRA, however, courts do not
accept this pleading strategy as the sole evidence of scienter; such an inference can
only be additional evidence of scienter." (collecting cases)).

Company anticipated issuing from each shelf, and not actually designing and implementing a tracking system for such issuances — does not somehow immunize the Executive Defendants from their reckless failure to carry out this duty.  (SEC Order 5-6).  To the contrary, the very existence of the Working Group brings that failure into sharper relief.

Importantly, the Court makes no attempt here to undermine the longstanding principle that "allegations of mismanagement, even where a plaintiff claims that it would not have invested in an entity had it known of the management issues, are insufficient to support a [strong inference of scienter]." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 375 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Tr.* v. *Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006) (summary order).  And the Court very much agrees with Defendants that "a mistake … does not constitute fraud."  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 569 (S.D.N.Y. 2004).  But there is a critical difference between making an arithmetic error in calculating a factory's first-quarter earnings, *see City of Brockton Ret. Sys.* v. *Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 472-73 (S.D.N.Y. 2008), and promising investors that your factory is clean, safe, and efficient, all while having no system in place to even check if the lights are on, *see Rolf* v. *Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47-48 (2d Cir. 1978) (finding defendant broker-dealer — who consistently reassured plaintiff that the investment advisor assigned to plaintiff's portfolio "knew what he was doing," but never actually investigated the advisor's decisions — liable for securities fraud).

Another piece of circumstantial evidence supporting the Executive Defendants' conscious misbehavior or recklessness is the size of the Over-Issuances: the alleged fraud "implicat[es] $17.7 billion of illegally issued unregistered securities[.]"  (Pl. Opp. 26).  By way of comparison, for FY 2022, the Company's total income was $24.96 billion and profit was $5.02 billion.  (Barclays PLC, 2022 Annual Report 302 (Form 20-F) (February 15, 2023)).  While not dispositive, the magnitude of an alleged fraud can be "significant" circumstantial evidence of scienter.  *Rothman*, 220 F.3d at 92; *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001).  Such is the case here.  The Court views "the magnitude of the [Rescission Offer] [a]s compelling evidence that [the Executive] [D]efendants' theretofore rosy [assessments of the Company's internal controls] were not entirely forthright."  *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 327 (S.D.N.Y. 2001) ("That a corporation with $72.4 million in 1997 revenue could take a $56.7 million charge for bad debt in 1998 and profess to have little advance warning when receivables have a three-year collection cycle further supports a strong inference of scienter.").

Finally, the Court ascribes significance, in the scienter analysis, to the means by which the Over-Issuances were ultimately exposed.  The Over-Issuances were discovered when "a member of Group Treasury reached out to [a] member of the legal department … inquiring as to how many securities remained available to be offered and sold off of the 2019 Shelf because Group Treasury was planning on doing a sale of corporate debt securities."  (AC ¶ 79).

What this means is that had any of the Executive Defendants, at any time, simply asked someone how many securities Barclays had issued from the 2019 Shelf, the Over-Issuances would have come to light.  In other words, it would have taken much less than a "reasonable investigation" for any of the Executive Defendants to uncover information "that would have demonstrated the falsity of the allegedly misleading statements." *Dynex*, 531 F.3d at 196.  The ease with which Defendants could have uncovered the truth is further borne out by the statements of Defendants Higgins and Venkatakrishnan following the First Corrective Disclosure, which statements characterized the Over-Issuances as an "entirely avoidable," "self-inflicted" problem stemming from the Company's failure to execute "some simple tasks" that were "not rocket science."  (AC ¶¶ 177-179).

Taken together, these facts clearly suggest that the Executive Defendants made the Pre-Revelation Disclosures recklessly, in total disregard of their failure to implement a system for tracking the issuance of securities from the Shelves following the Company's loss of WKSI status in March 2017. Accordingly, the Court finds that the allegations in the Complaint give rise to a strong inference that the Executive Defendants acted with scienter, which may by their positions be imputed to BPLC.  *Jackson*, 960 F.3d at 98.

### c.   Plaintiff Sufficiently Alleges Loss Causation as to the Pre-Revelation Disclosures

In view of the Court's materiality and scienter findings, its loss causation analysis is necessarily truncated.  Importantly, Defendants challenge loss causation only as to the alleged misrepresentations that followed the First

Corrective Disclosure; there is no dispute between the parties on the issue of loss causation with respect to the Pre-Revelation Disclosures.  (Def. Br. 32-33). Therefore, as to those statements (which the Court has already determined to be both materially misleading and made with scienter), the Court finds that Plaintiff has sufficiently alleged loss causation.  The Court nonetheless explains its reasoning for clarity.

To plead loss causation, a plaintiff must allege "that [a] misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005); *see* 15 U.S.C. § 78u-4(b)(4).  In other words, "the subject of the [defendant's] fraudulent statement or omission [must be] the cause of the actual loss suffered." *Suez Equity Invs., L.P.* v. *Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001).

In Section B.1.a.iii-iv, *supra*, the Court emphasized that "once Barclays revealed the over-issuances from the 2019 Shelf, it effectively disclosed what its previous disclosures had wrongfully omitted: that it had never implemented a system of internal control surrounding the issuance of securities from the Shelves."  In the same way, the revelation of the "subject" of Defendants' fraudulent omission — their failure to implement controls surrounding securities issuances — in the First Corrective Disclosure is alleged to have caused the actual loss suffered by Plaintiff in its wake.  *Suez Equity*, 250 F.3d at 95.  Accordingly, Plaintiff sufficiently pleads loss causation as to the Pre-Revelation Disclosures.

54

### 2.   The Court Grants Defendants' Motion as to Plaintiff's Section 20(a) Claims

The Court now turns to Plaintiff's Section 20(a) claims.  Plaintiff alleges that two Defendants, BBPLC and Higgins, are liable as "control persons" under Section 20(a) of the Exchange Act for BPLC's violations of Section 10(b) under Section 20(a).  (AC ¶¶ 250-251).  As to both, the Court finds that Plaintiff fails to state a claim under Section 20(a).

Section 20(a) liability, of course, is derivative of Section 10(b) liability. *See, e.g.*, *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 631 (S.D.N.Y. 2014) (citing *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297-98 (S.D.N.Y. 2006)) (finding that, in the absence of a primary violation of Section 10(b), "control person" liability under Section 20(a) cannot exist.  As previously noted, "[t]o state a claim of control person liability under [Section] 20(a), 'a plaintiff must show [i] a primary violation by the controlled person, [ii] control of the primary violator by the defendant, and [iii] that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Carpenters*, 750 F.3d at 236 (quoting *ATSI*, 493 F.3d at 108).  Having concluded that Plaintiff sufficiently alleges a primary violation of Section 10(b) on the part of BPLC — and thus satisfies the first prong of this test — the Court only considers the second and third prongs.

The Court begins with Higgins.  Plaintiff's accusations against Higgins are that (i) he served as Chairman of the BPLC Board between May 2019 and April 2022 (AC ¶ 39); (ii) he addressed the Over-Issuances in his speech at the Company's 2022 Annual General Meeting (*id.* ¶ 177); and (iii) he was

"responsible for the accuracy of the public reports, releases, and other statements detailed [in the Amended Complaint]" (*id.* ¶ 247).  The Court finds these allegations plainly insufficient to state a claim under Section 20(a).

As an initial matter, Higgins's "mere status as a board member is not enough to demonstrate actual control over the company and the [incident] in question" for the purposes of the second prong.  *In re Alstom SA*, 406 F. Supp. 2d 433, 495 (S.D.N.Y. 2005).  Further, regardless of whether Higgins satisfies the second prong, Plaintiff's allegations fail to establish that he was "in some meaningful sense, a culpable participant in the [primary violator]'s fraud" for the purposes of the third prong.  *Carpenters*, 750 F.3d at 236 (internal quotation marks omitted).  Plaintiff alleges no real "involvement [by Higgins] in [the] alleged wrongdoing ... beyond just 'being there.'"  *Alstom*, 406 F. Supp. at 490.  Higgins is not even alleged to have signed any of the offending SEC filings.  *Id.* at 488-89 ("[A] person in a position to approve [a] corporation's financial statements ... has the power to direct or cause the direction of ... the management and policies referred to [that] relate to ensuring a measure of accuracy in the contents of company reports and SEC registrations that they actually sign.").  Accordingly, Plaintiff's Section 20(a) claim against Higgins fails.

As to BBPLC, Plaintiff claims that, at all relevant times, "BBPLC [was the subsidiary at which] the over-issuances at issue in this action occurred following the May 2017 loss of WKSI status for Barclays, ... oversaw the August 2022 rescission offer for those over-issued securities, and ... was subject to the

subsequent SEC cease-and-desist order[.]" (AC ¶ 251). As to BBPLC, Plaintiff's Section 20(a) claim falls flat at the second prong. That is, Plaintiff alleges no facts establishing BBPLC's "control" over BPLC. *See Pub. Emps. Ret. Sys. of Miss.* v. *Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010) (concluding that "mere allegations of a corporate affiliation" between defendants insufficient to "indicate control by one over another" for control person liability). More to the point, there is no evidence whatsoever to support the fact that BBPLC had control over BPLC's dissemination of the Pre-Revelation Disclosures. Plaintiff's Section 20(a) claim against BBPLC thus suffers the same fate as its claim against Higgins.

## CONCLUSION

In accordance with the foregoing analysis, Defendants' motion to dismiss is hereby GRANTED IN PART and DENIED IN PART. The Court dismisses Plaintiff's Section 20(a) claims against Defendants Higgins and BBPLC in their entirety, and dismisses Plaintiff's Section 10(b) claims against the remaining Defendants in all aspects except as to the Pre-Revelation Disclosures. The Clerk of Court is directed to terminate the motion at docket entry 53.

The parties are further ordered to meet and confer, and to submit a proposed case management plan on or before **March 15, 2024.**

SO ORDERED.

Dated:      February 23, 2024
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

57