**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE BARCLAYS PLC
SECURITIES LITIGATION

Case No. 1:22-cv-08172-KPF

ORAL ARGUMENT REQUESTED

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL RECONSIDERATION OR, ALTERNATIVELY, CERTIFICATION OF AN INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b)**

Jeffrey T. Scott
Matthew J. Porpora
Julia A. Malkina
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for Defendants*

March 8, 2024

**TABLE OF CONTENTS**

*Page*

PRELIMINARY STATEMENT ..................................................................................................... 1

BACKGROUND ........................................................................................................................... 7

ARGUMENT ................................................................................................................................. 9

I.    The Court Should Reconsider Whether Plaintiff Has Adequately Alleged
      Materiality and Falsity ........................................................................................................ 9

      A.    Under Controlling Precedent That Was Overlooked by the Court, the Pre-
            Revelation Disclosures Are Immaterial as a Matter of Law .................................. 9

      B.    Under Controlling Precedent That Was Overlooked by the Court, the Pre-
            Revelation Disclosures Were Not False or Misleading ....................................... 16

II.   Alternatively, the Court Should Certify the Order for Interlocutory Appeal Under
      28 U.S.C. § 1292(b) ......................................................................................................... 21

CONCLUSION ........................................................................................................................... 24

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Altayyar* v. *Etsy, Inc.*,
731 F. App'x 35 (2d Cir. 2018) ........................................................................ 23

*Ark. Teacher Ret. Sys.* v. *Goldman Sachs Group, Inc.*,
77 F.4th 74 (2d Cir. 2023) ....................................................................... *passim*

*Asay* v. *Pinduoduo Inc.*,
2021 WL 3871269 (2d Cir. Aug. 31, 2021) ....................................................... 22

*Barilli* v. *Sky Solar Holdings, Ltd.*,
389 F. Supp. 3d 232 (S.D.N.Y. May 23, 2019) ................................................ 20

*Bellino* v. *JPMorgan Chase Bank N.A.*,
2017 WL 129021 (S.D.N.Y. Jan. 13, 2017) ...................................................... 23

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
506 F. App'x 32 (2d Cir. 2012) ........................................................................ 23

*Capitol Recs., LLC* v. *Vimeo, LLC*,
972 F. Supp. 2d 537 (S.D.N.Y. 2013) ............................................................... 23

*Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) ...................................................................... *passim*

*City of Pontiac* v. *UBS AG*,
752 F.3d 173 (2d Cir. 2014) ...................................................................... *passim*

*Dekalb Cnty. Pension Fund* v. *Allergan PLC*,
2024 WL 677081 (2d Cir. Feb. 20, 2024) ......................................................... 18

*Diehl* v. *Omega Protein Corp.*,
339 F. Supp. 3d 153 (S.D.N.Y. Sept. 7, 2018) ................................................. 20

*ECA* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ............................................................................. 22

*Emps. Ret. Sys. of Providence* v. *Embraer S.A.*,
2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018) .................................................. 18

*Fed. Hous. Agency* v. *UBS Ams., Inc.*,
858 F. Supp. 2d 306 (S.D.N.Y. 2012) ............................................................... 21

*Fogel* v. *Vega*,
    759 F. App'x 18 (2d Cir. 2018) ...................................................................... 23

*Fogel* v. *Wal-Mart de Mexico SAB de CV*,
    2018 WL 1033227 (S.D.N.Y. Feb. 21, 2018) ............................................... 3

*Gusinsky* v. *Barclays PLC*,
    944 F. Supp. 2d 279 (S.D.N.Y. 2013) ...................................................... 4, 6

*In re Air Crash at Georgetown*,
    33 F. Supp. 3d 139 (S.D.N.Y. 2014) ........................................................... 23

*In re Austl. & N.Z. Banking Grp. Sec. Litig.*,
    2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ............................................. 20

*In re Banco Bradesco S.A. Sec. Litig.*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017) .......................................................... 20

*In re Citigroup Sec. Litig.*,
    2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) ........................................ 5, 18, 20, 21

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
    2017 WL 4049253 (S.D.N.Y. June 28, 2017) ........................................ *passim*

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
    2014 WL 2815571 (S.D.N.Y. June 23, 2014) ............................................... 5

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
    2014 WL 5002090 (S.D.N.Y. Oct. 7, 2014) ................................................. 5

*In re Liberty Tax, Inc. Sec. Litig.*,
    828 F. App'x 747 (2d Cir. 2020) ........................................ 11, 12, 15, 22

*In re SAIC, Inc. Sec. Litig.*,
    2014 WL 407050 (S.D.N.Y. Jan. 30, 2014) ................................................. 5

*In re Synchrony Fin. Sec. Litig.*,
    988 F.3d 157 (2d Cir. 2021) ....................................................................... 22

*Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016) ............................................................... 11, 22

*Klinghoffer* v. *S.N.C. Achille Lauro*,
    921 F.2d 21 (2d Cir. 1990) ......................................................................... 22

*Lopez* v. *CTPartners Exec. Search Inc.*,
    173 F. Supp. 3d 12 (S.D.N.Y. 2016) ........................................................... 20

-iii-

*Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*,
  277 F. Supp. 3d 500 (S.D.N.Y. 2017) ............................................................ 19, 20

*New Eng. Carpenters* v. *DeCarlo*,
  80 F.4th 158 (2d Cir. 2023) ................................................................................. 21

*Plumber & Steamfitters Local 773 Pension Fund* v. *Danske Bank A/S*,
  11 F.4th 90 (2d Cir. 2021) .......................................................................... *passim*

*Reese* v. *Bahash*,
  574 F. App'x 21 (2d Cir. 2014) .......................................................................... 23

*Richman* v. *Goldman Sachs Grp. Inc.*,
  868 F. Supp. 2d 261 (S.D.N.Y. 2012) ................................................................... 6

*Rothstein* v. *GMAC Mortg., LLC*,
  2014 WL 1329132 (S.D.N.Y. Apr. 3, 2014) ....................................................... 24

*SEC* v. *Rio Tinto PLC*,
  2021 WL 1893165 (S.D.N.Y. May 11, 2021) ..................................................... 22

*Shiro* v. *Cemex, S.A.B. de C.V.*,
  396 F. Supp. 3d 283 (S.D.N.Y. 2019) ................................................................ 19

*Shrader* v. *CSX Transp., Inc.*,
  70 F.3d 255 (2d Cir. 1995) .................................................................................... 9

*Singh* v. *Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019) ............................................................. 11, 13, 15, 22

*Strougo* v. *Barclays PLC*,
  105 F. Supp. 3d 330 (S.D.N.Y. 2015) ................................................................... 6

**Statutes**

28 U.S.C. § 1292(b) ................................................................................... *passim*

## PRELIMINARY STATEMENT

Defendants Barclays PLC ("Barclays"), James Staley, C.S. Venkatakrishnan, Tushar Morzaria, and Anna Cross respectfully request that the Court reconsider, in part, its February 23, 2024 Opinion and Order (the "Order") or, alternatively, certify the Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).[1]  This is the exceptional case warranting reconsideration or certification for interlocutory appeal.  As explained more fully below, the Court's Order is contrary to decisions of the Second Circuit and district courts in this Circuit.

In the Order, the Court held, in relevant part, that Plaintiff adequately alleged that Barclays' generic statements about internal controls across all of its operations around the world were materially false because one business activity at one subsidiary in one country "failed to implement . . . any internal controls whatsoever to track and monitor the issuances" of two particular types of securities (structured notes and exchange traded notes ("ETNs")).  (Order at 30.)  The Order also acknowledges that numerous decisions hold that "generic assertions regarding a company's 'commitment to regulatory compliance'" are immaterial as a matter of law because "[n]o investor would take such general statements seriously in assessing a potential investment."  (*Id.* at 29 (brackets omitted).)  The Court, however, reasoned that "[t]he critical difference" in this case that renders Barclays' generic statements actionable "is that the Company's system for tracking the securities it sold off of the Shelves did not just underperform—it did not exist."  (*Id.* at 30.)  Based on that perceived distinction, the Court concluded that Barclays' generic "statements were materially misleading because they omitted the Company's failure in the first instance to create a means of tracking the issuance of securities from the Shelves."  (*Id.* at 31.)  But, as controlling

---

[1]  Unless otherwise stated, all internal citations and quotation marks are omitted.

precedent shows, the materiality and falsity of generic statements regarding internal controls cannot be distinguished in this manner.

The Second Circuit and numerous courts in this district have held that the alleged absence of a "fundamental control" does not transform immaterial generalities into material statements of fact or opinion, or render any and all statements about internal controls materially misleading regardless of their subject matter.  The Order overlooks that well-established law to erroneously find actionable all of Defendants' challenged statements made before disclosure of the over-issuance (the "Pre-Revelation Disclosures").  (Order at 27-32.)  The Court should grant partial reconsideration of the Order regarding the sufficiency of Plaintiff's allegations as to the Pre-Revelation Disclosures for at least two reasons and dismiss Plaintiff's remaining claims.

*First*, the Court's holding that Plaintiff adequately alleged that Barclays' generic statements were material because the statements were misleading directly conflicts with controlling Second Circuit precedent and many decisions within this district.  As the Second Circuit held in *City of Pontiac* v. *UBS AG*, because the materiality inquiry focuses on whether the alleged misstatement is "sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome," allegations that such "statements were knowingly and verifiably false when made does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment."  752 F.3d 173, 183, 185 (2d Cir. 2014) (statements "about compliance, reputation, integrity" not material despite "admitted participation in a conspiracy to defraud the IRS").  For that reason, it was irrelevant that the plaintiffs alleged that UBS not only failed to implement a specific control to prevent cross-border tax fraud, but that "UBS's senior management knew of and *affirmatively directed* the illegal activity in the cross-border business."  (*UBS* Pls. CA2 Reply

Br. at 2 n.3, 2013 WL 3243599 (emphasis added)); *accord Fogel* v. *Wal-Mart de Mexico SAB de CV*, 2018 WL 1033227, at \*6 (S.D.N.Y. Feb. 21, 2018) (Failla, J.) (statement, "We do not tolerate, permit, or engage in bribery, corruption or unethical practices of any kind," held not actionable despite allegations of pervasive "bribery scheme").

The Second Circuit also recently made clear that the mode of analysis employed in the Order is incorrect. In *Arkansas Teacher Retirement System* v. *Goldman Sachs Group*, the Second Circuit held that when plaintiffs assert securities fraud claims based on generic disclosures regarding internal controls or other such business practices, "the disclosure itself acts as a gatekeeper." 77 F.4th 74, 101 (2d Cir. 2023) ("*GS III*"). Materiality does not depend on whether a challenged statement allegedly omitted an "admission of severe wrongdoing," but rather on "the level of detail in the disclosure" and "whether the disclosure as written is specific enough to evoke investor reliance." *Id.* at 101-02. That legal doctrine is what "avoids turning securities claims into a game of litigation-by-hindsight" where plaintiffs can "find a road to success in the rearview mirror." *Id*. at 101. Here, Barclays' generic statements contain no "detailed and specific" discussion of any particular internal controls—let alone controls specific to the tracking of securities issuance from SEC-registered shelves—so they are immaterial as a matter of law. *Id.* And it is legally irrelevant to the question of whether a statement is generic enough to be deemed immaterial as a matter of law that the statement can be said to be, in the words of the Second Circuit's *UBS* decision, "knowingly and verifiably false when made." 752 F.3d at 183.

*Second*, even if any Pre-Revelation Disclosure could be viewed as detailed enough to be material, the Court's holding that those statements were misleading because Barclays did not disclose one internal-controls error is at odds with Second Circuit precedent and numerous decisions within this district. The fundamental error in the Court's decision is that it concludes

that Barclays' generic statements about its internal controls worldwide could be rendered both material and misleading merely because one (albeit important) control as to one business activity conducted by one of Barclays' subsidiaries in the U.S. was not designed and implemented when it should have been. Specifically, the Court held that Barclays' generic statements are actionable because its subsidiary Barclays Bank PLC ("Barclays Bank") "fail[ed] in the first instance to create a means of tracking the issuance of securities" in the U.S. following its loss of well-known seasoned issuer ("WKSI") status. (Order at 27-32.)

The Second Circuit has made clear that a company's failure to identify a specific risk and address it does not render general statements about firm-wide internal controls misleading. In *Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*, the Second Circuit held that Barclays' general statements about internal controls—which are substantively indistinguishable from the ones at issue here—were not materially false or misleading even though "Barclays had *no* specific systems or controls for its LIBOR submissions process." 750 F.3d 227, 231, 236 (2d Cir. 2014) (emphasis added). The Second Circuit affirmed Judge Scheindlin's dismissal of all claims challenging Barclays' general internal controls statements, *Gusinsky* v. *Barclays PLC*, 944 F. Supp. 2d 279, 284, 290 (S.D.N.Y. 2013), because those statements did "not mention LIBOR, nor d[id] they say that Barclays had established specific systems and controls relating to LIBOR submission rates," 750 F.3d at 236. That holding applies on all fours here: as a legal matter, Barclays' general statements about its internal controls could not have been misleading simply because a particular control regarding the tracking of securities issuance—a subject the statements do not reference at all—"did not exist" at the time the statements were made. The Order overlooks that binding Second Circuit precedent in coming to the erroneous, opposite conclusion.

-4-

Plaintiff's allegations suffer from the same exact defect that was fatal to those in *Carpenters*. Plaintiff argues that, in light of the over-issuance, a host of generic statements that say nothing about the tracking of securities issued from Barclays Bank's SEC-registered shelves must have been false. (AC ¶¶ 135-55.) But Plaintiff pleads no facts to show that Barclays did not have "[a] framework of disclosure controls and procedures in place to support the approval of the financial statements." (AC ¶ 140.) Instead, Plaintiff asserts that the framework failed to properly identify one very specific risk and evolve to address that risk following Barclays Bank's loss of WKSI status. (*See, e.g.*, AC ¶¶ 11, 132 (alleging a "risk identification process" failure).) That singular control lapse does not mean that Barclays' overall "systems were so deficient that any reference to or description of them was misleading." *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *17 (S.D.N.Y. Mar. 24, 2023). As the Second Circuit emphasized in *GS III*, "the duty to disclose more is triggered only when that which *is* disclosed is sufficiently specific." 77 F.4th at 101 (emphasis in original). As a result, reconsideration of the Order is appropriate because the Order reflects a "clear error" of law as to materiality and falsity. *In re SAIC, Inc. Sec. Litig.*, 2014 WL 407050, at *2, 4 (S.D.N.Y. Jan. 30, 2014) ("[T]he Court should correct its initial mistake rather than proceed as if it did not exist.").

Alternatively, Defendants request that the Court certify the Order for interlocutory appeal pursuant to Section 1292(b). In the *Goldman Sachs* litigation, the district court denied reconsideration and leave for interlocutory appeal of its erroneous decision holding that Goldman Sachs' generic statements about "controls for avoiding conflicts" were material because the statements "were directly at odds with its alleged conduct."[2] Both parties then had to incur

---

[2] *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014) (denying reconsideration); *see* 2014 WL 5002090, at *3 (S.D.N.Y. Oct. 7, 2014) (denying

significant time and expense over the course of many years litigating class certification—including three trips to the Second Circuit and a trip to the Supreme Court—all of which could have been avoided if the Second Circuit had weighed in to provide clarity at the outset of the case. *See GS III*, 77 F.4th at 90, 105 (decertifying the class and lamenting the case's "long and difficult history"). Judge Sullivan emphasized the point in his concurrence that the case could and should have been easily resolved at the pleading stage because the Second Circuit's "materiality precedents . . . demonstrate that no reasonable investor would have attached any significance to the generic statements on which Plaintiffs' claims are based." *Id.* at 109 (Sullivan, J., concurring).

Courts in this Circuit regularly grant leave to seek appellate review where, as here, the decision at issue conflicts with a ruling of another court in the Circuit. Doing so would be especially appropriate here, given that the Court's ruling is diametrically opposite to other courts' rulings on virtually identical statements made by Barclays. *See Carpenters*, 750 F.3d at 236; *Gusinsky*, 944 F. Supp. 2d at 284, 290; *Strougo* v. *Barclays PLC*, 105 F. Supp. 3d 330, 345 (S.D.N.Y. 2015). Further warranting review is that different plaintiffs in a different securities fraud action currently pending before Judge Liman have challenged the same exact generic statements in the same exact context—in connection with Barclays Bank's over-issuance. *May* v. *Barclays PLC*, No. 23-cv-2583 (S.D.N.Y.). The defendants' motion to dismiss the complaint in that case will be fully briefed by May 29, 2024, and thus, there is the real prospect that a sister court in this district will render a decision in the short term regarding these same legal issues. Given the direct conflict between the Court's Order and Second Circuit case law on questions that are dispositive of Plaintiff's claims, there is good cause for the Court to grant certification.

---

interlocutory appeal); 868 F. Supp. 2d 261, 280 (S.D.N.Y. 2012) (denying dismissal of generic statements).

**BACKGROUND**

***Barclays' Global Operations and Risk Management.***  Although the over-issuance mistake that is the focus of the Complaint had an outsized impact on Barclays, as Plaintiff alleges, it arose from a risk management lapse in only one small part of Barclays' global operations.  Barclays is a company headquartered in London, United Kingdom.  (AC ¶ 42.)  Through its subsidiaries within Barclays Group, Barclays operates as a "transatlantic consumer and wholesale bank with a global reach offering products and services across person[al], corporate and investment banking, credit cards and wealth management."  (*Id.*)  Because of its complex and diverse operations, Barclays has numerous "frameworks, policies and standards . . . relating to internal control and assurance," including an overarching Enterprise Risk Management Framework.  (AC ¶ 153.)  And because it is impossible to ensure perfect compliance within large-scale and diverse global operations, Barclays expressly warned that its internal controls could fail:  "[i]nternal control systems, no matter how well designed, have inherent limitations and may not prevent or detect misstatements." (MTD Ex. 4 at 14.)

***The Over-Issuance Mistake.***  As Plaintiff alleges, "[t]he principal causes of the Over-issuance of Securities were, first, the failure to identify and escalate to senior executives the consequences of the loss of WKSI status and, secondly, a decentralized ownership structure for securities issuances" whereby responsibility for Barclays Bank's SEC-registered shelf was divided between the two business units that used it:  Barclays Bank's Structured Products Group and Group Treasury.  (AC ¶¶ 11, 52-53.)  The Structured Products Group used Barclays Bank's shelf for the frequent issuance of structured notes and ETNs, and "[o]n occasion, the Group Treasury at Barclays also use[d] the shelf registration statement to sell corporate debt securities."  (*Id.*)

Although the over-issuance mistake led to the over-issuance of "$17.7 billion worth of securities" (Order at 30), the $17.7 billion face value of the over-issued securities was not a

measure of any revenue or income earned by Barclays because relevant securities were debt securities that carried with them obligations for Barclays Bank to make payments to investors. (MTD Ex. 1 at 4 n.3, 4 n.4 (SEC Order).)  Indeed, the amount of the over-issuance was driven by the Structured Products Group's low-profit, high-volume business—that is why the SEC ordered Barclays to disgorge just under $150 million in profits, a small fraction of the face value of relevant securities.  (*Id.* at 11.)  Thus, the Order's comparison of the $17.7 billion over-issuance figure to Barclays' annual profits of $5.02 billion for fiscal year 2022 is inapt.  (Order at 52.)  An assessment of the "magnitude" of the over-issuance mistake using a more appropriate, but still imprecise, comparator would be $150 million in disgorged profits to $5.02 billion in total profits (about 3% of total profits for a year, which still overstates the percentage given that the over-issuance occurred over a longer period).  (*See id.*; MTD Ex. 1 at 11.)

*Plaintiff's Allegations.*   Plaintiff's allegations of falsity pertain to the over-issuance mistake and its unanticipated consequences.  (AC ¶¶ 143, 156.)  Plaintiff does not allege that Barclays' disclosed firm-wide risk management and internal control system did not exist, or that any of its component parts were not accurately described in Barclays' SEC filings.  (AC ¶¶ 135-55.)  Rather, Plaintiff asserts that Barclays' risk management and controls framework failed to properly identify and adapt to the risks arising from Barclays Bank's loss of WKSI status.  (*See, e.g.*, AC ¶¶ 11, 132 (alleging a "risk identification process" failure).)  As Plaintiff alleges, Barclays Bank's loss of WKSI status in 2018 presented many challenges and risks that needed to be addressed.  (AC ¶ 58.)  A working group was tasked with addressing Barclays Bank's continued issuance of structured notes and ETNs in the U.S. without WKSI status.  (AC ¶ 70.)  The working group filed new shelf registration statements with the SEC and addressed other matters (AC ¶¶ 70-77), but did not establish *one* (albeit important) control necessary to properly manage a risk that

appears significant and very obvious in hindsight: an "internal control . . . to track in real time the amount of securities offered and sold against the amount of securities registered" to avoid over-issuance. (AC ¶¶ 70-74, 80.)

***Related Litigation Regarding the Over-Issuance Mistake.*** Purchasers of certain ETNs allegedly affected by the over-issuance mistake have filed a putative securities fraud class action against Barclays, Barclays Bank and various individuals, which is pending before Judge Liman. *May* v. *Barclays PLC*, No. 23-cv-2583 (S.D.N.Y.). In addition to challenging the disclosures in the offering documents for those ETNs, those plaintiffs also allege that the identical generic statements at issue here, regarding "robust internal controls" in Barclays' annual reports on Form 20-F, were materially false as a result of the over-issuance mistake. *See May* Am. Compl. ¶¶ 93-96, 100-08, No. 23-cv-2583, ECF No. 69. After the defendants moved to dismiss the amended complaint, the plaintiffs were granted leave to file a second amended complaint, which is due on March 13, 2024. The defendants' motion to dismiss will be fully briefed on May 29, 2024, and thus a ruling in that case is expected in the near future.

## ARGUMENT

### I. The Court Should Reconsider Whether Plaintiff Has Adequately Alleged Materiality and Falsity.

Reconsideration is warranted where, as here, "the moving party can point to controlling decisions . . . that the court overlooked," which "might reasonably be expected to alter the conclusion reached by the court." *Shrader* v. *CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

#### A. Under Controlling Precedent That Was Overlooked by the Court, the Pre-Revelation Disclosures Are Immaterial as a Matter of Law.

The Order acknowledges that the generic statements about internal controls that Plaintiff challenges (AC ¶¶ 135-40, 150-53) are the sort of statements that are "typically inactionable." (Order at 29.) But the Court then found a "critical difference" that, it held, renders Barclays'

generic statements material:  that Barclays Bank's "system for tracking the securities it sold off of the Shelves did not just underperform—it did not exist."  (*Id.* at 30.)  That holding not only conflicts with many decisions from the Second Circuit and courts within the Circuit holding virtually identical statements immaterial as a matter of law, but it also overlooks Second Circuit law that expressly forecloses the Court's reasoning in finding the statements actionable.

As the Court recognized, it is well established that "generic assertions regarding a company's 'commitment to regulatory compliance'" are immaterial as a matter of law because "[n]o investor would take such general statements seriously in assessing a potential investment." (Order at 29 (brackets omitted).)  As shown in the attached Appendix A, the Second Circuit and other courts in this Circuit routinely hold that statements analogous to Barclays' statements about its internal controls—*e.g.*, that Barclays has "robust internal controls" across its global operations and "is committed to operating within a strong system of internal control" (AC ¶¶ 136-37)—are immaterial as a matter of law.  In nonetheless finding that Barclays' statements were material, the Court incorrectly focused on whether the statements were untrue, stating that "the dueling assertions that (i) Barclays 'operated a sound system of internal control' and (ii) Barclays had *no* system of internal control whatsoever over the issuance of securities from the Shelves cannot at the same time be true."  (Order at 31.)

That reasoning cannot be squared with the Second Circuit's numerous decisions making clear that materiality focuses on the specificity of the statement at issue and not whether it was false or misleading:  "To be 'material' within the meaning of § 10(b), the alleged misstatement must be *sufficiently specific* for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome."  *UBS*, 752 F.3d at 185 (emphasis added).  Thus, even if "statements [a]re knowingly and verifiably false when made," that "does not cure their generality,

which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment." *Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*, 818 F.3d 85, 97-98 (2d Cir. 2016) (quoting *UBS*). Rather, to be material, statements must be "detailed and specific." *Plumber & Steamfitters* v. *Danske Bank A/S*, 11 F.4th 90, 103-04 (2d Cir. 2021). Under this well-established law, the fact that one allegedly "fundamental control" is absent (Order at 31), inexcusably weak, or completely ignored does not transform immaterial generalities into material misstatements and omissions, *see, e.g.*, *UBS*, 752 F.3d at 183; *Danske Bank*, 11 F.4th at 103; *In re Liberty Tax, Inc. Sec. Litig.*, 828 F. App'x 747, 750-51 (2d Cir. 2020); *Singh* v. *Cigna Corp.*, 918 F.3d 57, 60, 63-64 (2d Cir. 2019); *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *2, 6 (S.D.N.Y. June 28, 2017).

    *1. UBS.* The plaintiffs alleged that UBS engaged in an illegal tax fraud "scheme in which UBS Swiss bankers traveled in and out of the United States to illegally advise American clients on the purchase of investments." *UBS*, 752 F.3d at 178. The plaintiffs alleged that this conduct rendered false UBS's statements that it "held its employees to the highest ethical standards and complied with all applicable laws," *id.* at 182, much like Barclays' statement here that it has "[g]roup-wide frameworks . . . to meet regulators' expectations relating to internal control" (Order at 31). Moreover, the plaintiffs did not merely allege that UBS failed to implement a specific control to prevent cross-border tax fraud; instead, they alleged something more egregious: that "UBS's senior management knew of and affirmatively directed the illegal activity in the cross-border business." (*UBS* Pls. CA2 Reply Br. at 2 n.3, 2013 WL 3243599.) But that did not render the challenged generic statements material. As the Second Circuit explained, "Plaintiffs' claim that these statements were knowingly and verifiably false when made does not cure their

generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment." *UBS*, 752 F.3d at 183.

That same logic should prevail here. If an allegedly express directive by UBS's senior management to violate U.S. tax law does not render UBS's generic statements material, then it cannot be that Barclays Bank's mistake in failing to properly identify and manage the risk of over-issuance can render Barclays' equally generic statements material. Barclays' internal control statements are immaterial as a matter of law because they are generic. Under controlling Second Circuit precedent, it does not matter whether these statements were "knowingly and verifiably false when made" (as alleged in *UBS*), because investors would not have relied on them in the first instance—whether true or not—precisely because they are generic. 752 F.3d at 183.

**2.    Liberty Tax.**    The plaintiff alleged that a senior executive had engaged in "sexual impropriety at work, and diver[ted] [] company resources to his own pocket," which rendered false "the company's statement that 'Our compliance task force was very successful.'" *Liberty Tax*, 828 F. App'x at 748-50. The plaintiff further alleged that the "Compliance Task Force was essentially a façade" and "a sham." (*Liberty Tax* Pls. CA2 Reply Br. at 2-3, 2020 WL 3498336.) The Second Circuit held that the generic statement that the task force had succeeded was immaterial as a matter of law. *Liberty Tax*, 828 F. App'x at 751. Although the plaintiff "argue[d] that [the challenged] statement was knowingly false," just as Plaintiff alleges here, that was inconsequential because, as the Second Circuit had made clear years earlier in *UBS*, the "claim that these statements were knowingly and verifiably false when made does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment." *Id.* (quoting *UBS*). To drive home the point that the focus is on a challenged statement's lack of specificity, the Second Circuit added that dismissal

-12-

was required because the challenged statement "lacks the specificity required to elevate it beyond mere puffery to an actionable, material misrepresentation," explaining further that "the statement references analyzing, reviewing, and evaluating the work of the compliance program, without describing what was analyzed, reviewed, or evaluated, much less when, or how, this work was done." *Id.* The same reasoning applies with full force here because the internal control statements at issue did not in any way reference, analyze, review, or evaluate any aspect of any controls relating to the tracking of securities issuance from Barclays Bank's SEC-registered shelves.

3. **Singh.** After Cigna acquired HealthSpring, it stated in its annual report that it had "'allocate[d] significant resources' to various compliance efforts" and had "established policies and procedures to comply with applicable requirements." *Singh*, 918 F.3d at 60. The plaintiffs alleged that those statements were untrue not merely because a massive control failure ultimately occurred, but because, after the acquisition, Cigna had fired the knowledgeable compliance personnel at HealthSpring and "made no effort to integrate the Cigna and HealthSpring data processing systems, a necessary component of a workable compliance infrastructure." (*Singh* Pls. CA2 Br. at 2, 2018 WL 925222.) The Second Circuit found that the challenged statements were too generic to be actionable: regardless of the underlying conduct, "such generic statements do not invite reasonable reliance. They are not, therefore, *materially* misleading, and so cannot form the basis of a fraud case." 918 F.3d at 60 (emphasis in original). It is, therefore, of no moment that "Barclays failed to implement, much less bother to design, any internal controls whatsoever to track [relevant] issuances of securities." (Order at 30.) Indeed, *Singh* shows that an allegation that a party made no effort with regard to specific controls is insufficient to transform immaterial generalities into actionable promises regarding those specific controls.

**4. Danske Bank.** As part of a merger with another bank, Danske acquired an Estonian branch where a single portfolio of customers accounted for more than half of the branch's pre-tax profits. *Danske Bank*, 11 F.4th at 96. Despite various alleged warnings, Danske failed "to identify material money laundering risks" related to this portfolio and "implement[] risk-mitigating measures," resulting in "a near total process failure" that allegedly caused approximately $230 billion in suspicious transactions to flow through the Estonian branch. *Id*. at 96-97. The Second Circuit, however, held that statements that Danske "takes the steps necessary to comply with internationally recognized standards, including Know Your Customer procedures" and "has procedures for customer due diligence, reporting, . . . and communications" were immaterial as a matter of law. *Id*. at 103. "Although Danske averred that it took steps to comply with AML protocols and vaguely recited some AML buzzwords, it claimed no particular acts of compliance" so the challenged statements were insufficiently "detailed" and "specific" to be actionable. *Id*. at 103-04. The same is true here. Plaintiff does not point to any "detailed" and "specific" statements that Barclays made regarding how it was counting securities issued from relevant U.S. shelves, and it does not allege that Barclays made a single specific promise to its shareholders that it had done so.

**5. Deutsche Bank.** The plaintiffs alleged that, "[b]etween 2011 and 2015, Deutsche Bank facilitated thousands of transactions that resulted in money being laundered out of Russia," which rendered false Deutsche Bank's statements that "[w]e comply with all laws and regulations," "we adhere to international standards and guidelines," and "Deutsche Bank is committed to ensuring the robust risk management of financial crime." *Deutsche Bank*, 2017 WL 4049253, at *2, 6 n.4. Significantly, the plaintiffs did not merely allege that the statements were material because the controls failed to detect money laundering. Rather, they alleged that, even though Deutsche Bank

had controls "on paper," it "ha[d] been repeatedly notified of and asked by various governmental authorities to fix significant deficiencies," including "the lack of appropriate oversight by compliance and internal audit," and specifically had received "multiple warnings from the Federal Reserve Bank of New York . . . detailing unaddressed deficiencies." (Pls. MTD Opp. at 3, 20, No. 16-cv-03495, ECF 91.) The plaintiffs alleged that this disregard for internal controls resulted in a "brazen $10 billion money laundering scheme perpetrated by Deutsche Bank and its employees" that was carried out "openly" in Russia. (*Id.* at 2, 20.) Despite those allegations, Judge Torres dismissed the case because, under *UBS*, "[e]ven assuming the statements were knowingly and verifiably false when made[,] their generality prevents them from rising to the level of materiality required to form the basis for assessing a potential investment." 2017 WL 4049253, at *6. Once again, that rationale compels dismissal of Plaintiff's claims here.

*     *     *

As these cases demonstrate, there is no doctrinal basis to distinguish, on the one hand, a situation where a bank's control system failed to identify and manage one particular risk (as alleged here), and, on the other hand, the claim that a bank had a control process "on paper" but which was never actually employed in practice (*Deutsche Bank*), or the claim that a control process was merely a "façade" and a "sham" (*Liberty Tax*), or the claim that senior management "affirmatively directed" illegal activity (*UBS*), or the claim that management took no steps to implement controls after a merger (*Singh* and *Danske Bank*). As the Second Circuit made clear in *GS III*, the sole focus is on "the level of detail in the disclosure," and the question is "whether the disclosure as written is specific enough to evoke investor reliance." 77 F.4th at 101-02. "Were it otherwise, securities plaintiffs could find a road to success in the rearview mirror: they would need only find negative news, such as the revelation that a company may have committed securities fraud, and

then point to any previous disclosure from the company which touches upon a similar subject, such as that company's commitment to complying with the law—no matter how generic that statement is." *Id.* at 101. Because the Order did not apply controlling Second Circuit precedent and employ the method of analysis that Second Circuit precedent demands as set forth in *GS III*, the Order incorrectly permits Plaintiff to find "success in the rearview mirror" premised on hindsight-based challenges to generic statements. *Id*.

**B.    Under Controlling Precedent That Was Overlooked by the Court, the Pre-Revelation Disclosures Were Not False or Misleading.**

Although all of Plaintiff's claims should be dismissed because they are premised on statements that are immaterial, Plaintiff's claims regarding all of the "Pre-Revelation Disclosures" should also be dismissed for the separate reason that none of those statements was false or misleading. The Order held that all of Barclays' challenged statements about internal controls were misleading because Barclays allegedly "never contemplated, designed, or implemented a system for tracking or monitoring the issuance of securities" from Barclays Bank's SEC-registered shelves after Barclays Bank lost WKSI status. (Order at 31.) But Barclays did not make a single statement to investors about tracking or monitoring the issuance of structured notes and ETNs. Rather, Barclays made general statements about global internal controls initiatives and global frameworks. (AC ¶¶ 135-56.) For example, Plaintiff challenges the following statements:

- "Barclays Internal Controls Environment Program" was "focus[ed] on strengthening the internal control environment across the Group" and left "[t]he Group's control environment [] now in a much stronger position." (AC ¶ 136 (alterations in original).)

- "A framework of disclosure controls and procedures is in place to support the approval of financial statements of the Group. Specific governance committees are responsible for examining the financial reports and disclosures to ensure that they have been subject to adequate verification and comply with applicable standards and legislation." (AC ¶¶ 140, 153.)

- "Processes are in place for identifying, evaluating and managing the Principal Risks facing the Group in accordance with the 'Guidance on Risk Management, Internal

-16-

Control and Related Financial and Business Reporting, published by the" Financial Reporting Counsel.  (AC ¶ 153.)

- "[M]anagement has assessed the internal control over financial reporting as of 31 December 2020 [], utilized the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2020."  (AC ¶ 137.)

The Order nonetheless held that these general statements about Barclays' firm-wide system of controls across all of its business units in all of the many countries in which it operates were "misleading because they omitted the Company's failure in the first instance to create a means of tracking" structured notes and ETNs issued by Barclays Bank in the U.S.  (Order at 31.)  That reasoning contravenes controlling Second Circuit precedent.

In *Carpenters*, the Second Circuit addressed the stock-drop suit that was brought against Barclays in the wake of multiple governmental and regulatory settlements in which Barclays paid $450 million in fines related to the making of false submissions to widely used benchmark interest rates, LIBOR and EURIBOR.  750 F.3d at 230.  The Second Circuit held that general statements about how Barclays had established "minimum control requirements" were not rendered false or misleading by the fact that "Barclays had *no* specific systems or controls for its LIBOR or EURIBOR submissions" during the years in which certain employees were allegedly "directed" to make false submissions.  *Id.* at 235-36 (emphasis added).  This was because the challenged general statements "do not mention LIBOR, nor do they say that Barclays had established specific systems and controls for LIBOR."  *Id*. at 236.

The Second Circuit's logic in *Carpenters* squarely applies here.  None of the general statements that Plaintiff challenges references the existence of "a system for tracking or monitoring the issuance of securities" (Order at 31) or otherwise touches on the sale or marketing of securities—let alone structured notes and ETNs in the U.S. issued by the Structured Products Group within Barclays Bank.  Each statement was, as stated, true and is precisely the kind of

statement that has been held not to be actionable in the face of allegations of corporate misfeasance or mismanagement because "revealing one fact about a subject does not trigger a duty to reveal all facts on the subject." *Deutsche Bank*, 2017 WL 4049253, at \*7; *see also Dekalb Cnty. Pension Fund* v. *Allergan PLC*, 2024 WL 677081, at \*2-3 (2d Cir. Feb. 20, 2024) (statements about the cancer risk generally associated with breast implants did not give rise to a duty to disclose the specific fact that the company's textured implants allegedly created a higher risk than those of other manufacturers).  This is a reflection of the "controlling principle . . . that 'disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing.'" *Emps. Ret. Sys. of Providence* v. *Embraer S.A.*, 2018 WL 1725574, at \*5 (S.D.N.Y. Mar. 30, 2018) (quoting *UBS*, 752 F.3d at 184).

Application of this well-settled law here shows that Plaintiff's claims fail.  For example, Plaintiff pleads no facts to show that Barclays' Internal Controls Environment Program did not exist or was not a program "focus[ed] on strengthening the internal control environment."  (AC ¶ 136.)  Accordingly, there is nothing false or misleading about that statement because it says nothing about strengthening controls specific to the tracking of securities issuance off of Barclays Bank's SEC-registered shelves in the U.S.  *See Citigroup*, 2023 WL 2632258, at \*10, \*16 (rejecting claims premised on statements about specific "investments in risk, control and compliance" despite regulatory findings that Citibank generally had "longstanding deficiencies and unsafe and unsound practices in the areas of risk management, and internal controls").

Similarly, Plaintiff does not allege that "[s]pecific governance committees" were not in fact "responsible for examining the financial reports and disclosures to ensure that they have been subject to adequate verification and comply with applicable standards and legislation."  (AC ¶ 140.)  Nor does Plaintiff allege that Barclays lacked a process "for identifying, evaluating and

managing the Principal Risks." (AC ¶ 153.) At most, Plaintiff vaguely alleges without the requisite particularity that these controls and processes "were ineffective," which is an "allegation of corporate mismanagement," not securities fraud. *Deutsche Bank*, 2017 WL 4049253, at *7 (rejecting challenges to statements that "certain internal control policies [were] in place" despite "evidence that the Bank's AML and KYC procedures were deficient at identifying" one type of illegal transaction).

Lastly, Plaintiff makes no allegation that "management" did not in fact "assess[] the internal control over financial reporting as of 31 December 2020 [], utiliz[ing] the criteria set out in the 2013 COSO framework," or "conclude[] that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2020." (AC ¶ 137.) Barclays' subsequent disclosure that its "financial controls had not been effective during this time period" does not render this statement false or misleading because it "did not state that the Company's internal controls were effective"; it "stated only that management had concluded as much" and "Plaintiff[] offer[s] no allegation that management had not so concluded." *Shiro* v. *Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 299 (S.D.N.Y. 2019) (dismissing securities fraud claims brought after disclosure of $20 million in illegal payments and a related material weakness in internal control over financial reporting).

In sharp contrast with the Order, other courts in this Circuit routinely hold that general descriptions of internal controls do not trigger a duty to disclose specific misconduct or control lapses:

- *Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500 (S.D.N.Y. 2017): Company's statements were not "misleading because they described Och-Ziff's compliance program while omitting the FCPA violations" and "rampant corruption," because the company "did not describe [the controls for] specific regions, specific initiatives, or make any assurances of efficacy"; instead, the company merely

"described [its] 'global compliance program,' [and] 'comprehensive policies and supervisory procedures.'" *Id.* at 512-14.

- *Lopez* v. *CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12 (S.D.N.Y. 2016): "Company's statements lauding its culture" were not "misleading because the Company did not disclose . . . its allegedly discriminatory and hostile treatment of women employees"; the company was "not required to disclose [the] misconduct to make those representations not misleading, because the representations were not material in the first place." *Id.* at 29-30.

- *Diehl* v. *Omega Protein Corp.*, 339 F. Supp. 3d 153 (S.D.N.Y. Sept. 7, 2018): Although "defendants affirmatively misrepresented on multiple occasions that Omega had 'implemented a comprehensive compliance program,'" the company had no duty to disclose that its controls were "failing to prevent continued violations of environmental regulations"; a duty to disclose more depends on the "specificity of the disclosures," and "specificity [] is not present here." *Id.* at 162-63.

In the end, Plaintiff's repeated allegations of falsity are insufficient because they all are focused on the over-issuance, which implicates practices that were "not the subject of the representations cited in the Complaint." *In re Austl. & N.Z. Banking Grp. Sec. Litig.*, 2009 WL 4823923, at *5, *14 (S.D.N.Y. Dec. 14, 2009) (general statements about internal controls were not rendered materially false and misleading by the "lack of a proper control environment" in a bank's Equity Finance business). A control lapse in one facet of a company's business does not mean that the company's *overall* "systems were so deficient that any reference to or description of them was misleading." *Citigroup*, 2023 WL 2632258, at *16-17; *see also In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 648 (S.D.N.Y. 2017) (statements that controls exist "do not purport to guarantee that [the] controls will perform perfectly in every instance"); *Barilli* v. *Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 253 (S.D.N.Y. May 23, 2019) ("[S]tatements regarding . . . internal controls do not, standing alone, constitute assertions that the controls are adequate, nor

does a subsequent circumvention of such controls support an inference that descriptive statements about the implementation of such controls were false.").[3]

## II. Alternatively, the Court Should Certify the Order for Interlocutory Appeal Under 28 U.S.C. § 1292(b).

If the Court will not reconsider the Order, Defendants respectfully request that the Court certify the Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) to address an important conflict of law between this Court's Order and the holdings in many prior cases decided in the Second Circuit.

Under 28 U.S.C. § 1292(b), a district court may certify an order for interlocutory review if (i) the order involves a "controlling question of law," (ii) on which there is "substantial ground for difference of opinion," (iii) and "immediate appeal from the order may materially advance the ultimate termination of the litigation." Those criteria are met here. Indeed, interlocutory appeal is especially warranted here because the actionability of the same generic statements is currently pending before Judge Liman. *See Fed. Hous. Agency* v. *UBS Ams., Inc.*, 858 F. Supp. 2d 306, 338 (S.D.N.Y. 2012) (granting certification where same "legal uncertainty . . . h[ung] over" other actions in suite of cases).

---

[3] As the Order acknowledges (Order at 33), if other challenged statements are not actionable, then Barclays' SOX certifications also are not actionable (AC ¶¶ 141-43, 154-56). Further, because all of the SOX certifications are opinions qualified as being "based on my knowledge," the Order's conclusion that none of the Individual Defendants had actual knowledge of the over-issuance or the control lapse that led to it (Order at 35, 53) warrants dismissal of Plaintiff's claims regarding SOX certifications under controlling and persuasive precedent. *See, e.g.*, *New Eng. Carpenters* v. *DeCarlo*, 80 F.4th 158, 176 (2d Cir. 2023) (affirming dismissal of claims relating to SOX certifications); *Citigroup*, 2023 WL 2632258, at *20 (subsequent "identification of control deficiencies and misstatements, without more, does not show" that SOX certifiers "knew—at the time they signed their certifications—of any misrepresentations"). None of the SOX certifications is adequately alleged to have been knowingly false when made.

*First*, the question of whether Barclays' generic statements about internal controls are actionable for purposes of a putative securities fraud claim brought under Section 10(b) of the Securities Exchange Act is a controlling question of law because, if the answer to this question is "no," the case would be dismissed. *Klinghoffer* v. *S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990) ("a question of law is 'controlling' if reversal of the district court's order would terminate the action" and "impact" of an appeal "on other cases is a factor" properly taken into consideration in the inquiry); *see SEC* v. *Rio Tinto PLC*, 2021 WL 1893165, at \*2 (S.D.N.Y. May 11, 2021) (granting Section 1292(b) application where "authoritative guidance from the Second Circuit . . . will help resolve [similar] actions quickly and consistently"). Further, as in *Rio Tinto*, the issue presented here "has precedential value for a large number of cases." *Id.* Because all public companies make statements describing their system of controls, the question of whether plaintiffs can evade the well-established case law holding that such generic statements are immaterial as a matter of law simply by alleging that the defendant did not put in place a specific mechanism to detect or monitor a particular act that ultimately occurred to the company's detriment is of critical importance to innumerable cases.

*Second*, there clearly are reasonable grounds for divergence of opinion from the Court's holding that Barclays' generic statements are actionable given the plentiful Second Circuit precedents holding that such statements are not actionable, including with respect to virtually identical statements that Barclays itself made previously. *See*, *e.g.*, *UBS*, 752 F.3d at 178, 183; *GS III*, 77 F.4th at 101-02; *Carpenters*, 750 F.3d at 236; *Liberty Tax*, 828 F. App'x at 750-51; *Singh*, 918 F.3d at 60, 63-64; *Danske Bank*, 11 F.4th at 104; *SAIC*, 818 F.3d at 97-98; *ECA* v. *JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009); *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 173 (2d Cir. 2021); *Asay* v. *Pinduoduo Inc.*, 2021 WL 3871269, at \*2-3 (2d Cir. Aug.

31, 2021); *Fogel* v. *Vega*, 759 F. App'x 18, 21, 23-24 (2d Cir. 2018); *Altayyar* v. *Etsy, Inc.*, 731 F. App'x 35, 37-38 (2d Cir. 2018); *Reese* v. *Bahash*, 574 F. App'x 21, 23 (2d Cir. 2014); *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012). Both the conflict between the Court's Order and the overwhelming authority in the Second Circuit, and the direct conflict between the holdings by numerous courts in this district on almost exactly the same facts, strongly support granting interlocutory appeal. *See Capitol Recs., LLC* v. *Vimeo, LLC*, 972 F. Supp. 2d 537, 552 (S.D.N.Y. 2013) (substantial difference of opinion supporting certification of an interlocutory appeal where a "judge [] of this court reached the opposite conclusion"); *Bellino* v. *JPMorgan Chase Bank N.A.*, 2017 WL 129021, at *3 (S.D.N.Y. Jan. 13, 2017) (substantial difference of opinion supporting certification of an interlocutory appeal where "a handful of [district court] opinions from this Circuit" were contrary to the court's holding).

*Lastly*, resolution of this issue would meaningfully hasten the resolution of the action because, if the decision is in Defendants' favor, this case is over, and the parties and this Court will avoid proceeding to discovery in a class action that cannot be certified under the Second Circuit's recent decision in *GS III* given the equally glaring mismatch between the generic statements at issue and highly specific alleged corrective disclosures. *See In re Air Crash at Georgetown*, 33 F. Supp. 3d 139, 155 (S.D.N.Y. 2014) (immediate appeal materially advanced litigation for purposes of § 1292(b) certification where "reversal of the district court's order would terminate the action").

In the *Goldman Sachs* litigation, the district court denied a motion to dismiss generic statements about controls and further denied certification under Section 1292(b), which resulted in years of additional litigation—including three class certification orders in the district court, three Rule 23(f) appeals in the Second Circuit, and a reversal of class certification by the Supreme

Court—at the parties' and courts' great time and expense. *See GS III*, 77 F.4th at 109 (Sullivan, J., concurring) (Second Circuit's "materiality precedents . . . demonstrate that no reasonable investor would have attached any significance to the generic statements on which Plaintiffs' claims are based"); *see id.* at 105 (majority opinion) (decertifying the class and lamenting the case's "long and difficult history"). Thus, recent experience demonstrates that this is an unusual case where the interest of judicial economy counsels in favor of granting leave for interlocutory appeal. *See Rothstein* v. *GMAC Mortg., LLC*, 2014 WL 1329132, at *3 (S.D.N.Y. Apr. 3, 2014) (certifying 1292(b) appeal because "protracted litigation might be avoided by an immediate appeal").

## CONCLUSION

For the foregoing reasons, the Court should reconsider the portions of its Order with respect to whether Barclays' general statements regarding its internal controls were material and whether they were false or misleading. Alternatively, the Court should certify the Order for interlocutory appeal pursuant to Section 1292(b).

Dated: March 8, 2024

Respectfully Submitted,

/s/ *Jeffrey T. Scott*
Jeffrey T. Scott
Matthew J. Porpora
Julia A. Malkina
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendants*

-24-