**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE BARCLAYS PLC SECURITIES LITIGATION | Case No. 1:22-cv-08172-KPF |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR CLASS CERTIFICATION, APPOINTMENT
<u>AS CLASS REPRESENTATIVE, AND APPOINTMENT OF CLASS COUNSEL</u>**

**TABLE OF CONTENTS**

<u>Page</u>

I.   PRELIMINARY STATEMENT ................................................................................. 1

II.  STATEMENT OF FACTS ....................................................................................... 4

    A.   Barclays Loses Its Well-Known Seasoned Issuer ("WKSI") Status ..................... 4

    B.   The 2018 Shelf and 2019 Registration Statements ................................................. 5

    C.   Barclays' Over-Issuances and Aftermath ............................................................... 6

III. PROCEDURAL BACKGROUND ........................................................................... 7

IV.  THE PROPOSED CLASS SATISFIES RULE 23 AND SHOULD BE CERTIFIED ............................................................................................................ 8

    A.   The Proposed Class Satisfies the Requirements of Rule 23(a) .............................. 9

        1.   The Class Is So Numerous That Joinder is Impractical ............................. 9

        2.   Questions of Law and Fact are Common to the Class ............................. 10

        3.   Plaintiff's Claims Are Typical of Class Claims ...................................... 11

        4.   Plaintiff Will Fairly and Adequately Protect the Interests of the Class .......................................................................................................... 11

    B.   The Proposed Class Satisfies the Requirements of Rule 23(b)(3) ....................... 13

        1.   Common Factual and Legal Issues Predominate ..................................... 13

            a.   Plaintiff is Entitled to the Fraud-on-the-Market Presumption of Reliance ............................................................ 14

            b.   Reliance Is Presumed Under *Affiliated Ute* ................................. 22

            c.   Damages Are Measurable by a Common Methodology, Supporting a Finding of Predominance ...................................... 23

        2.   Superiority Is Established ........................................................................ 24

    C.   Class Counsel Satisfies the Requirements of Rule 23(g) ..................................... 25

V.   CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens v. United States*,
406 U.S. 128 (1972)..................................................................................................3, 14, 22

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) ......................................................................................21

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)....................................................................................................12, 13

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013).....................................................................................................8, 13

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000)...............................................................................................12

*In re Bank of Am. Corp. Sec., Deriv., & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
281 F.R.D. 134 (S.D.N.Y. 2012) .....................................................................................11

*In re Barrick Gold Sec. Litig.*,
314 F.R.D. 91 (S.D.N.Y. 2016) ..................................................................................13, 23

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).....................................................................................................3, 14

*In re Beacon Assocs. Litig.*,
282 F.R.D. 315 (S.D.N.Y. 2012) .....................................................................................14

*Billhofer v. Flamel Techs., S.A.*,
281 F.R.D. 150 (S.D.N.Y. 2012) ..................................................................................9, 21

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989), *appeal dismissed*, 993 F.2d 875 (3d Cir.
1993) ......................................................................................................................16, 17, 18

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ..................................................................................17, 20

*In re China Ne. Petro. Holdings Ltd. Sec. Litig.*,
2017 WL 11564337 (S.D.N.Y. Aug. 8, 2017)..................................................................23

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007)................................................................................................24

*In re Deutsche Bank AG Sec. Litig.*,
　328 F.R.D. 71 (S.D.N.Y. 2018) ................................................................................11, 12, 24

*Erica P. John Fund, Inc. v. Halliburton Co.*,
　563 U.S. 804 (2011)...................................................................................................14, 15

*Fogarazzo v. Lehman Bros., Inc.*,
　232 F.R.D. 176 (S.D.N.Y. 2005) ........................................................................................22

*Green v. Wolf Corp.*,
　406 F.2d 291 (2d Cir. 1968).............................................................................................24

*Gruber v. Gilbertson*,
　2019 WL 4439415 (S.D.N.Y. Sept. 17, 2019)...........................................................8, 22, 23

*Halliburton Co. v. Erica P. John Fund, Inc.*,
　573 U.S. 258 (2014)...................................................................................................14, 15

*Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
　338 F.R.D. 205 (S.D.N.Y. 2021) .................................................................................9, 12, 16, 23

*In re J.P. Morgan Stable Value Fund ERISA Litig.*,
　2017 WL 1273963 (S.D.N.Y. Mar. 31, 2017) ...........................................................................8

*In re JPMorgan Chase & Co. Sec. Litig.*,
　2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015)..........................................................11, 15, 20

*Kaplan v. S.A.C. Cap. Advisors, L.P.*,
　311 F.R.D. 373 (S.D.N.Y. 2015) .......................................................................................24

*Katz v. Image Innovations Holdings, Inc.*,
　2010 WL 2926196 (S.D.N.Y. July 22, 2010) ..........................................................................2

*Krogman v. Sterritt*,
　202 F.R.D. 467 (N.D. Tex. 2001) ......................................................................................19

*Kurtz v. Costco Wholesale Corp.*,
　818 F. App'x. 57 (2d Cir. 2020) .........................................................................................8

*Martinek v. AmTrust Fin. Servs., Inc.*,
　2022 WL 326320 (S.D.N.Y. Feb. 3, 2022) (Failla, J.) ...........................................9, 15, 16, 23

*McIntire v. China MediaExpress Holdings, Inc.*,
　38 F. Supp. 3d 415 (S.D.N.Y. 2014)................................................................................10, 20

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., Inc.*,
　772 F.3d 111 (2d Cir. 2014)................................................................................................9

*Pearlstein v. Blackberry Ltd.*,
    2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ..................................................................... *passim*

*In re Perrigo Co. PLC Sec. Litig.*,
    493 F. Supp. 3d 291 (S.D.N.Y. 2020)....................................................................................12, 13

*In re Petrobras Sec. Litig.*,
    862 F.3d 250 (2d Cir. 2017)..............................................................................................13, 15, 19

*In re Pfizer Inc. Sec. Litig.*,
    282 F.R.D. 38 (S.D.N.Y. 2012) ........................................................................................14

*Pirnik v. Fiat Chrysler Autos., N.V.*,
    327 F.R.D. 38 (S.D.N.Y. 2018) ........................................................................................18

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*,
    277 F.R.D. 97 (S.D.N.Y. 2011) ........................................................................................10

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2016)...............................................................................................23

*In re SCOR Holding (Switzerland) AG Litig.*,
    537 F. Supp. 2d 556 (S.D.N.Y. 2008)................................................................................14

*In re SLM Corp. Sec. Litig.*,
    2012 WL 209095 (S.D.N.Y. Jan. 24, 2012) ......................................................................1

*In re Smith Barney Transfer Agent Litig.*,
    290 F.R.D. 42 (S.D.N.Y. 2013) ........................................................................................22

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016), *aff'd sub nom. Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)....................................................................................14, 18, 22

*In re SunEdison, Inc. Sec. Litig.*,
    329 F.R.D. 124 (S.D.N.Y. 2019) ......................................................................................11

*Sykes v. Mel S. Harris & Assocs., LLC*,
    780 F.3d 70 (2d Cir. 2015)................................................................................................23

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008)..............................................................................................19

*In re Teva Sec. Litig.*,
    2021 WL 872156 (D. Conn. Mar. 9, 2021) ................................................................10, 20

*In re Vale S.A. Sec. Litig.*,
    2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) .....................................................................23

*Villella v. Chem. & Mining Co. of Chile, Inc.*,
    333 F.R.D. 39 (S.D.N.Y. 2019) ..................................................................................16, 17

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
    2017 WL 2062985 (S.D.N.Y. May 15, 2017) .....................................................................1, 8

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)...................................................................................13, 15, 22, 23

*Williams v. KuCoin*,
    2021 WL 5316013 (S.D.N.Y. Oct. 21, 2021)....................................................................24, 25

*Wilson v. LSB Indus., Inc.*,
    2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)..................................................................10, 21

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) ...............................................................................................17

*Yi Xiang v. Inovalon Holdings, Inc.*,
    327 F.R.D. 510 (S.D.N.Y. 2018) ...............................................................................................10

**Other Authorities**

17 C.F.R. § 239.13 .......................................................................................................................17

Fed. R. Civ. P. 23(a)(1)...................................................................................................................9

Fed. R. Civ. P. 23(a)(2).................................................................................................................10

Fed. R. Civ. P. 23(a)(3).................................................................................................................11

Fed. R. Civ. P. 23(a)(4).................................................................................................................11

Fed. R. Civ. P. 23(b)(3).................................................................................................................13

Fed. R. Civ. P. 23(g)(1)(A)...........................................................................................................25

Court-appointed Lead Plaintiff Boston Retirement System ("Plaintiff" or "BRS") respectfully submits this memorandum of law in support of its Motion for Class Certification pursuant to Federal Rules of Civil Procedure 23(a), (b)(3), and (g), seeking: (i) certification of a class of investors in the publicly traded American Depositary Receipts ("ADRs") of Barclays PLC ("Barclays" or the "Company"), defined below; (ii) BRS's appointment as Class Representative; and (iii) appointment of Labaton Keller Sucharow LLP ("Labaton") as Class Counsel.[1]

## I.    PRELIMINARY STATEMENT

This federal securities action arising from Defendants' materially false and misleading statements and omissions regarding the strength and efficacy of Barclays' internal controls over financial reporting following the bank's unprecedented loss of well-known seasoned issuer ("WKSI") status in the United States, which resulted in Barclays becoming an "ineligible issuer" throughout 2018 and 2019.  As courts in this Circuit have recognized, "claims alleging violations of Sections 10(b) and 20(a) of the Exchange Act are especially amenable to class certification." *In re SLM Corp. Sec. Litig.*, 2012 WL 209095, at *3 (S.D.N.Y. Jan. 24, 2012); *see also In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *2 (S.D.N.Y. May 15, 2017) (securities fraud claims are "especially amenable to class certification").

This case is no exception.  Plaintiff seeks to certify a class of all persons and entities who or which purchased or otherwise acquired the publicly traded, Barclays-sponsored ADRs during the period from February 18, 2021 through March 27, 2022, inclusive (the "Class Period"), and were damaged thereby (the "Class").

---

[1] Defendants are: (i) Barclays PLC ("Barclays" or "BPLC"); (ii) James E. Staley; (iii) C.S. Venkatakrishnan; (iv) Tushar Morzaria; and (v) Anna Cross.  Staley, Venkatakrishnan, Morzaria, and Cross are collectively referred to as the "Individual Defendants."  The Amended Class Action Complaint is referred to herein as the "Complaint."  ECF No. 46 (cited as "¶__").  All capitalized terms have the same meaning as in the Complaint.  All internal citations are omitted and emphasis is added, unless otherwise noted.

For a class to be certified, "the Court must determine that the party seeking certification has satisfied the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation." *Katz v. Image Innovations Holdings, Inc.*, 2010 WL 2926196, at *1 (S.D.N.Y. July 22, 2010). The Court must also find that the party qualifies under one of the three sets of criteria set forth in Rule 23(b)(1), (2), or (3). *Id.* Rule 23(b)(3) permits certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Each requirement is met here.

*First*, this Class is sufficiently numerous—far exceeding the minimum presumptive threshold of forty (40) geographically dispersed investors, with over 191 million shares of Barclays ADRs outstanding throughout the Class Period, and public records showing that 426 institutional investors reported owning Barclays ADRs during the Class Period. *See infra* Section IV(A)(1). *Second*, this Action involves numerous common questions of law and fact, including: (i) whether federal securities laws were violated by Defendants' acts; (ii) whether statements made by Defendants during the Class Period misrepresented and/or omitted material facts about Barclays' internal controls; (iii) whether Defendants acted with scienter; (iv) whether the price of Barclays ADRs was artificially inflated because of Defendants' misconduct; and (v) the proper method of calculating damages. These questions are subject to common evidence and proof. *See infra* Section IV(A)(2). *Third*, Plaintiff's claims are "typical" of the claims of the Class because, like all other Class members, Plaintiff purchased Barclays ADRs at market prices that had been artificially inflated by Defendants' material misrepresentations and omissions. Additionally, Plaintiff and all other Class members suffered the same injuries arising from the same misconduct—the losses incurred as a result of the revelation of the relevant truth concealed by

Defendants' fraud and the resulting declines in the price of Barclays ADRs.  *See infra* Section IV(A)(3).  **Fourth**, Plaintiff will fairly and adequately protect the interests of the Class.  Indeed, Plaintiff has retained experienced counsel with extensive experience in securities class actions to represent their interests and those of the proposed Class.  *See infra* Section IV(A)(4).

This Action also satisfies Rule 23(b)(3).  Rule 23(b)(3)'s predominance element is satisfied in this Action because common questions of law and fact overwhelmingly predominate over any individualized issues.  *See infra* Section IV(B)(1).  The primary elements of the claims in this Action—falsity, materiality, scienter, loss causation, and damages—are issues that affect all Class members equally and are subject to common proof.  The same is true with respect to reliance, which may be presumed using the "fraud-on-the-market" presumption under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), or the presumption of reliance for omissions under *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972).  Indeed, *Basic* permits the presumption in this case because, as established in the accompanying Expert Report of Chad Coffman, CFA, the market for Barclays ADRs, which traded on the New York Stock Exchange ("NYSE"), was efficient throughout the Class Period. *See* Declaration of Lauren A. Ormsbee ("Ormsbee Decl."), Ex. A ("Coffman Report" or "Coffman Rpt."), ¶¶29-30.  Because Plaintiff's claims are based, in part, on Defendants' material omissions, *Affiliated Ute* also permits a presumption of reliance. Finally, maintaining this Action as a class action is superior to any alternate means of resolution because: (1) thousands of investors suffered damages as a result of Defendants' misconduct; (2) it is unlikely that investors would file individual actions due to litigation costs; (3) it is efficient to hear all such claims in one court; and (4) there is no difficulty in maintaining this case as a class action. *See infra* Section IV(B)(2).  Accordingly, Plaintiff's motion should be granted.

## II.    STATEMENT OF FACTS

Barclays is a transatlantic bank with global reach offering products across personal, corporate, and investment banking, credit cards, and wealth management.  ¶42.  Barclays is headquartered in London, U.K., and operates its U.S.-based subsidiary, Barclays Bank PLC ("BBPLC"), from New York, New York.  *Id*.  Barclays' ADRs trade on the NYSE under the ticker "BCS", and Barclays sells securities in the U.S. BBPLC.  ¶28(b).

### A.    Barclays Loses Its Well-Known Seasoned Issuer ("WKSI") Status

Barclays historically benefitted from the Securities and Exchange Commission's ("SEC") WKSI status, which permits an issuer to register their securities offerings on shelf registration statements that become effective automatically upon filing, avoiding the weeks or months-long process non-WKSIs must endure while awaiting the SEC's review and approval of a registration statement prior to becoming effective.  ¶47.  To maintain its eligibility for WKSI status, Barclays must not, among other things, possess any characteristics that render it an "ineligible issuer" under the relevant SEC rule, which include, among others, an issuer (or its subsidiary) that has violated the anti-fraud provisions of the federal securities laws, or that are the subject of a judicial or administrative decree or order prohibition certain conduct or activities involving the anti-fraud provisions of the federal securities laws, within the last three years (see 17 C.F.R. § 230.405).  ¶48.

Between 2007 and 2016, Barclays requested and received waivers of the automatic imposition of ineligible issuer status following repeated federal securities violations by the bank.  ¶¶54-60.  In each of its violations and subsequent waiver requests to the SEC, Barclays stressed the importance of its WKSI status to the operations of the bank as the justification for continued WKSI status despite its many securities violations.  ¶¶58-60.  For example, in 2015 and 2016, Barclays wrote that the SEC needed to allow it to maintain its WKSI status because "[t]he WKSI shelf []process allows access to the widest possible global investor base and provides an important

means of accessing capital and funding for Barclays' global operations." ¶58.  Barclays stated that losing WKSI status would have an impact on its ability to promptly issue new securities and threaten market demand and favorable pricing for those securities.  ¶¶59-60.

Despite prior successful waiver attempts, in connection with a May 2017 settlement with the SEC for overcharging clients for mutual funds, Barclays paid $97 million to the SEC and automatically became an ineligible issuer pursuant to Rule 405, losing its WKSI status for three (3) years.  ¶¶62-63.  This eliminated Barclays' ability to use an automatic shelf registration statement and required Barclays to pay filing fees in advance of actual sales of its securities.  ¶64

### B.    The 2018 Shelf and 2019 Registration Statements

In or around 2018, Barclays convened a Working Group whose purposes was to estimate the amount of securities needed for Barclays' shelf registration statements in 2018 and 2019 for its U.S. structured note business.  ¶70.  This Working Group determined the total number of securities Barclays would offer or sell and converted the remaining portion of its operative shelf registration statement into a non-WKSI shelf (the "2018 Shelf"). ¶72.  In 2019, the Working Group reconstituted itself and performed many of the same tasks it had performed during the shelf conversion process in 2018 to calculate the amount of securities and fees required for the bank's next shelf, which would have a three-year duration (the "2019 Shelf").  ¶75.  Because the 2018 Shelf had excess securities still available for offer or sale, the Working Group also needed to perform "Carry-Over Calculations" to determine: (i) the number of securities Barclays would need from the 2018 Shelf during the time between when it filed the registration statement for the 2019 Shelf and when it became effective (the "Gap Period"); and (ii) how many securities would be left over on the 2018 Shelf after accounting for the Gap Period offers and sales.  ¶76.  This would also require Barclays to de-register excess securities on the 2018 Shelf and use fees applied thereto to

offset a portion of the fees necessary to register the 2019 Shelf. *Id.* Upon effectiveness, the 2019 Shelf covered the offer or sale of approximately $20.8 billion of securities for three years. ¶77.

### C.    Barclays' Over-Issuances and Aftermath

On March 9, 2022, Barclays determined there was an over-issuance in connection with the 2019 Shelf, meaning that Barclays had sold to market approximately $16.37 billion worth of unregistered securities, and halted all further sales and issuances from that shelf. ¶81. Five days later, on March 14, 2022, Barclays informed the SEC about the over-issuance and, without disclosing to investors the over-issuance or internal controls problems that created the over-issuance, announced that it was suspending the sale and issuance of the VXX and OIL ETNs— two popular exchange traded notes issued from the 2019 Shelf. *Id.* Then, before the U.S. market opened on March 28, 2022, Barclays publicly disclosed the over-issuance, its internal control issues that created the over-issuance, and announcing a rescission offer to investors who purchased the illegally issued unregistered securities. ¶¶82, 160-61. In response, the price of Barclays ADRs declined $0.96 per ADR by the close of trading on March 28, plunging 10.61%. ¶161.

The effects and impacts of the failure of Barclays' internal controls to monitor and track issuances during its time as an ineligible issuer further revealed the scope of the fraud. On May 16, 2022, Barclays announced that Barclays would need to restate the financial statements included in its 2021 Form 20-F, cautioning investors "not to rely on the financial statements included in the 2021 Form 20-F, or KPMG LLP's audit report thereon, until the amended 2021 Form 20-F has been filed." ¶180. These results were restated a week later. ¶¶182-83. Further, on September 29, 2022, the SEC issued a Consent Decree and Cease-and-Desist Order (the "SEC Order") against Barclays "aris[ing] from BPLC's failure to put into place any internal control around the real-time tracking of securities being offered or sold off its Commission-registered shelf registration statement." ¶¶92-94. The SEC Order detailed the SEC's investigation and Barclays' related

6

settlement, amounting to a $200 million penalty and more than $161 million in disgorgement and prejudgment interest. *Id*. On February 15, 2023, Barclays reported its full-year earnings and announced a 19% plunge in profits due in part to "a costly trading blunder in the U.S." [i.e., the over-issuances]. ¶195. Barclays' February 15, 2023 Form 20-F revealed that the Board had resolved to claw back compensation from certain Individual Defendants to account for their responsibility in the over-issuance. ¶200.

## III.    PROCEDURAL BACKGROUND

BRS is a government defined benefit pension plan that administers retirement benefits to all employees of the City of Boston, Massachusetts, with approximately $7.0 billion in assets under management. *See* Ormsbee Decl. Ex. B (Declaration of Timothy J. Smyth, Esq. in Support of Lead Plaintiff's Revised Motion for Class Certification), ¶2. BRS purchased or otherwise acquired Barclays' ADRs at artificially inflated and/or artificially maintained prices during the Class Period and suffered significant losses when the truth that was concealed by Defendants' misstatements and omissions was revealed to the market. *Id*. On December 21, 2022, BRS was appointed Lead Plaintiff in this Action. ECF No. 39. On March 6, 2023, BRS filed the Complaint alleging violations of Exchange Act. ECF No. 46.

On February 23, 2024, the Court issued an order granting in part and denying in part Defendants' motion to dismiss. ECF No. 61 (the "MTD Order"). The Court sustained Plaintiff's allegations of misstatements and omissions related to Barclays' internal controls made between February 18, 2021 and March 27, 2022. *Id*. For example, the Court upheld "statements such as "[g]roup-wide frameworks, policies[,] and standards enable Barclays to meet regulators' expectations relating to internal control and assurance" (¶153), and "[Barclays] has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations" (*id.*), materially false and misleading" because

7

those statements "omitted the Company's failure in the first instance to create a means of tracking the issuance of securities from the Shelves." MTD Order at 31. The Parties subsequently agreed to, and the Court approved, a case schedule directing Plaintiff to file the present motion. ECF No. 74. The Parties have exchanged discovery. To date, Defendants have produced only 164 documents, with a substantial completion deadline of October 4, 2024.

## IV.    THE PROPOSED CLASS SATISFIES RULE 23 AND SHOULD BE CERTIFIED

To certify the Class, BRS must establish that the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and at least one subsection of Rule 23(b) are satisfied. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013). Actions "alleging violations of Section[] 10(b) . . . of the Exchange Act are especially amendable to class certification," and "[i]n light of the importance of the class action device in securities fraud suits," the Rule 23 "factors are to be construed liberally." *Virtus*, 2017 WL 2062985, at *2. Any "doubts concerning the propriety of class certification should be resolved in favor of class certification." *In re J.P. Morgan Stable Value Fund ERISA Litig.*, 2017 WL 1273963, at *5 (S.D.N.Y. Mar. 31, 2017).

Class certification is appropriate where, as here, each requirement of Rule 23 is satisfied by a preponderance of the evidence. *See Kurtz v. Costco Wholesale Corp.*, 818 F. App'x. 57, 60 (2d Cir. 2020) (Summary Order). The inquiry at this stage is not whether Plaintiff will ultimately prevail on the merits, but "whether the requirements of Rule 23 are met." *Gruber v. Gilbertson*, 2019 WL 4439415, at *1 (S.D.N.Y. Sept. 17, 2019). Thus, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466. As demonstrated below, all requirements of Rule 23 are met here.

8

A.    **The Proposed Class Satisfies the Requirements of Rule 23(a)**

1.    **The Class Is So Numerous That Joinder is Impractical**

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although the "numerosity inquiry is not strictly mathematical but must take into account the context of the particular case," it "is presumed for classes larger than forty members." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., Inc.*, 772 F.3d 111, 120 (2d Cir. 2014). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Pearlstein v. Blackberry Ltd.*, 2021 WL 253453, at *7 (S.D.N.Y. Jan. 26, 2021).

Here, the proposed Class consists of thousands of members. Additionally, during the Class Period, Barclays' ADRs were actively traded on the NYSE, with between 152.62 and 163.75 million shares of Barclays ADRs outstanding throughout the Class Period. Coffman Rpt., ¶71. Further, 426 institutional investors owned Barclays ADRs during the Class Period. *Id.*, ¶77; *see Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 153, 156 (S.D.N.Y. 2012) (demonstrating numerosity where defendant corporation had 23 million ADRs outstanding and between 71 and 82 institutional investors). Joinder of this large number of investors would be impractical and the "numerosity" requirement is thus satisfied. *See Martinek v. AmTrust Fin. Servs., Inc.*, 2022 WL 326320, at *5 (S.D.N.Y. Feb. 3, 2022) (Failla, J.) (certifying class where 36 million shares outstanding); *Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 211 (S.D.N.Y. 2021) (certifying class where between 34.3 million and 55.1 million shares outstanding).

### 2.    Questions of Law and Fact are Common to the Class

The "commonality" requirement under Rule 23(a) is met if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Rule 23(a)(2) commonality requirement is a "low hurdle" that Plaintiff easily overcomes here. *See Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 522 (S.D.N.Y. 2018). "Even a single common question of law or fact may suffice to satisfy the commonality requirement." *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 105 (S.D.N.Y. 2011). In securities actions, the commonality requirement is satisfied "[w]here plaintiffs allege that class members have been injured by similar material misrepresentations and omissions." *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 424 (S.D.N.Y. 2014); *see also In re Teva Sec. Litig.*, 2021 WL 872156, at *4 (D. Conn. Mar. 9, 2021) (same).

Here, all Class members' claims arise out of the same misrepresentations and omissions by Defendants and are subject to common proof. Questions of law or fact common to the Class include: (i) whether Defendants violated the Exchange Act; (ii) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) whether Defendants knew or recklessly disregarded that their statements were false and misleading; (iv) whether the price of the Company's ADRs was artificially inflated and/or artificially maintained; and (v) the extent of damage sustained by Class members and the appropriate measure of damages. *See Pearlstein*, 2021 WL 253453, at *7 (commonality satisfied by common issues including whether defendants made misrepresentations, whether misrepresentations were material, and whether defendants acted with scienter); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *4 (S.D.N.Y. Aug. 13, 2018) (such issues are "susceptible to common answers because their resolution does not differ based on the identity of the plaintiff"). Indeed, here, "[a]ll class members' entitlement to relief would turn

10

on whether the misstatements and omissions were false, misleading and material, and whether purchasers of the [ADRs] suffered losses resulting therefrom." *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 140 (S.D.N.Y. 2019). Thus, commonality is established.

### 3. Plaintiff's Claims Are Typical of Class Claims

Typicality is satisfied when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). To do this, Plaintiff must show that each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re JPMorgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at *3 (S.D.N.Y. Sept. 29, 2015). This showing is "not demanding," *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 80 (S.D.N.Y. 2018), and is easily met here.

Like all members of the Class, BRS purchased Barclays ADRs during the Class Period, while Defendants' misstatements and omissions created or maintained artificial inflation in Barclay's ADR price. Similarly, like all members of the Class, BRS was harmed upon the public revelation of the truth concealed by Defendants' misrepresentations and omissions. ¶¶160-61, 275. The proof necessary for BRS and all members of the Class to prevail on their claims in this case is the same, which establishes typicality. *See In re Bank of Am. Corp. Sec., Deriv., & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 139 (S.D.N.Y. 2012).

### 4. Plaintiff Will Fairly and Adequately Protect the Interests of the Class

The "adequacy" prong of Rule 23(a) requires that the proposed class representative "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Courts assess whether "plaintiff's interests are antagonistic to the interests of other members of the class" and whether "plaintiff's attorneys are qualified, experienced and able to conduct litigation." *Bank of*

11

*Am.*, 281 F.R.D. at 139.  Only a "fundamental" conflict of interest will defeat adequacy under Rules 23(a)(4).  *Deutsche Bank*, 328 F.R.D. at 82.

In complex securities litigations, the "named plaintiffs are not expected to possess expert knowledge of the details of the case and must be expected to rely on expert counsel." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61-62 (2d Cir. 2000).  In *Baffa*, the Second Circuit held it was sufficient that the proposed class representative "understood that the [] investments were the subject of [the] litigation" and "that he and others had sustained a loss due to the alleged fraud." *Id.* at 62.  Indeed, a plaintiff is adequate where it "participate[s] in discovery by producing documents and submitting to depositions" and "follow[s] every key event in the litigation," while "delegat[ing] a significant degree of decision-making authority to [its] attorneys." *In re Perrigo Co. PLC Sec. Litig.*, 493 F. Supp. 3d 291, 295 (S.D.N.Y. 2020).

Here, both elements of Rule 23(a)(4)'s adequacy requirement are easily satisfied.  First, Labaton is a sophisticated law firm with considerable experience in complex securities cases and is therefore "qualified, experienced and generally able to conduct the litigation." *See* Ormsbee Decl. Ex. C; *AMC*, 338 F.R.D. at 213.  Plaintiff respectfully submits that proposed counsel is one of the most experienced securities class action firms in the country, having recovered more than $25 billion for investors since 1995. *See* Ormsbee Decl. Ex. C.  Because Labaton has devoted substantial time and resources to the litigation and will continue to do so, Labaton should be appointed as Class Counsel.

Second, BRS "possess[es] the same interest and suffer[ed] the same injury as the class members," *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997), and no actual or potential conflicts exist between Plaintiff and any proposed Class member relating to recovering the damages they suffered due to their purchases of Barclays ADRs at artificially inflated prices.

12

Plaintiff's interests are directly aligned with the interests of the proposed Class members, who were injured by the same misrepresentations and have the same interest in establishing Defendants' liability and obtaining the maximum recovery. It is in Plaintiff's interest to vigorously prosecute this Action on behalf of itself and the Class. *See* Ormsbee Decl. Ex. B, ¶4; *see also Perrigo*, 493 F. Supp. 3d at 295; *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 103-04 (S.D.N.Y. 2016).

### B.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3)

The proposed Class should be certified under Rule 23(b)(3) because, as discussed below, "questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### 1.    Common Factual and Legal Issues Predominate

"Predominance is a test readily met in certain cases alleging . . . securities fraud[.]" *Amchem*, 521 U.S. at 625. This inquiry is satisfied where "*questions* of law or fact common to the class will 'predominate over any question affecting only individual members' as the litigation progresses." *Amgen*, 568 U.S. at 467 (emphasis in original). *See Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (predominance satisfied where questions subject to "generalized proof . . . are more substantial than the issues subject only to individualized proof"); *In re Petrobras Sec. Litig.*, 862 F.3d 250, 268 (2d Cir. 2017) (predominance is a "comparative standard" that "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof," only that common issues "*predominate* over any questions affecting only individual [class] members") (emphasis and alterations in original).

Courts regularly find that the falsity, scienter, materiality, and loss causation elements of a Section 10(b) claim are common to all class members. *See Amgen*, 568 U.S. at 467 ("materiality is a 'common questio[n]' for purposes of Rule 23(b)(3)") (alteration in original); *id.* at 475 ("loss

13

causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions"); *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 52 (S.D.N.Y. 2012) (same). Accordingly, whether common questions predominate often "turns on the element of reliance." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("*Halliburton I*"); *Strougo v. Barclays PLC*, 312 F.R.D. 307, 312 n.17 (S.D.N.Y. 2016), *aff'd sub nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017) ("[r]eliance is typically the only ground on which to challenge predominance because section 10(b) claims will almost always arise from a common nucleus of facts"). As demonstrated below, BRS and other Class members are entitled to a presumption of reliance under both (a) *Basic*, 485 U.S. 224 and *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ("*Halliburton II*"), because their claims arise from Defendants' public material misrepresentations and omissions, and the market for Barclays' ADRs was efficient at all relevant times; and (b) *Affiliated Ute*, 406 U.S. 128, because the fraud claims are grounded in Defendants' material omissions. As such, predominance is satisfied.[2]

### a. Plaintiff is Entitled to the Fraud-on-the-Market Presumption of Reliance

To the extent that Plaintiff's claims are based on affirmative misstatements, Plaintiff may easily demonstrate it is entitled to a presumption of reliance based upon the "fraud-on-the-market" theory, as established in *Basic*, 485 U.S. 224 and reaffirmed in *Halliburton II*, which provides that a proposed class representative may: "[S]atisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price

---

[2] Common questions also predominate as to BRS's Section 20(a) claims because "the issue of control is susceptible to generalized proof." *See In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 572 n.21 (S.D.N.Y. 2008); *see also In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 333 (S.D.N.Y. 2012) (finding common issues related to Section 20(a) claims predominate).

14

may be considered to have done so in reliance on the misrepresentation." 573 U.S. at 283-84. To invoke the *Basic* presumption of reliance, Plaintiff must establish that: (1) the alleged misrepresentations were public; (2) the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed; and (3) the ADRs traded in an efficient market. *Halliburton I*, 563 U.S. at 811. Here, Plaintiff has made these requisite showings.

*First*, Plaintiff alleges that Defendants made material misstatements and omissions in their public statements to investors that artificially inflated or artificially maintained the market price of Barclays ADRs. *See, e.g.*, ¶¶134-59. *Second*, on market timing, Plaintiff alleges that it purchased Barclays ADRs during the Class Period, and suffered losses when the artificial inflation came out of the ADR price when the truth was disclosed. ¶30. *Third*, Barclays ADRs traded in an efficient market, as demonstrated below. Thus, Plaintiff has satisfied all the prerequisites to invoke the fraud-on-the-market presumption.

In the Second Circuit, the burden on Plaintiff to show market efficiency "is not an onerous one." *Petrobras*, 862 F.3d at 278. Establishing market efficiency at the class certification stage is a flexible inquiry, as the Second Circuit has "repeatedly . . . declined to adopt a particular test for market efficiency." *Waggoner*, 875 F.3d at 94. Accordingly, there are no "distinct requirements" in proving market efficiency; rather, the Second Circuit has endorsed "opting instead for a holistic analysis based on the totality of the evidence presented." *Id.* at 96-97. Here, based on both direct and indirect evidence, Plaintiff has established that Barclays ADRs traded in an efficient market during the Class Period, and the presumption of reliance applies.

Importantly, during the Class Period, Barclays ADRs were listed and actively traded on the NYSE, which courts have "presume[d] to be an efficient market." *See Martinek*, 2022 WL 326320, at *12; *see also JPMorgan*, 2015 WL 10433433, at *7 ("a stock's listing on the [NYSE]

15

is a strong indication that the market for the stock is efficient.").  In addition, when assessing whether a security trades in an efficient market, courts generally consider the following non-exhaustive list of factors set forth in *Cammer v. Bloom*:

> (1) average weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) a history of immediate movement of the [security] price caused by unexpected corporate events or financial releases.

711 F. Supp. 1264, 1285-87 (D.N.J. 1989), *appeal dismissed*, 993 F.2d 875 (3d Cir. 1993).

Here, each *Cammer* factor supports a finding that Barclays ADRs traded in an efficient market during the Class Period, as demonstrated in the Expert Report of Chad Coffman, CFA.

***Barclays ADRs Had a High Weekly Trading Volume.***  Courts consistently hold that a "turnover of two percent or more of outstanding shares gives rise to a strong presumption of market efficiency."  *AMC*, 338 F.R.D. at 217 (citing *Cammer*, 711 F. Supp. at 1286).  *See also Villella v. Chem. & Mining Co. of Chile, Inc.*, 333 F.R.D. 39, 54 (S.D.N.Y. 2019) (finding weekly trading volume of 4.4% sufficient under *Cammer*).  Here, the weekly trading volume of Barclays ADRs during the Analysis Period (February 18, 2020 through March 27, 2023) was 17.82%, far exceeding the 1% or 2% threshold in *Cammer*.  Coffman Rpt., ¶30.  The average weekly trading volume was 27.79 million ADRs.  *Id.*

***Barclays ADRs Were Thoroughly Covered by Analysts.***  *Cammer* recognizes that "the existence of a number of financial analysts who report on a security supports a finding of market efficiency because it permits an inference that financial statements relating to a security are closely reviewed by investment professionals, who in turn make buy/sell recommendations to client investors."  *Martinek*, 2022 WL 326320, at *12.  At least 26 securities analysts from major financial institutions published reports on Barclays ADRs during the Analysis Period (Coffman Rpt., ¶38), resulting in at least 302 individual analyst reports on Barclays throughout the Analysis

16

Period, further supporting a finding of market efficiency. *See Villella*, 333 F.R.D. at 54 (coverage by 15 analyst firms supported finding of market efficiency); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013) (coverage by at least three analysts sufficient for efficiency).

*There Were Numerous Market Makers for Barclays ADRs.* The third *Cammer* factor considers the existence of the market makers and traders who increase liquidity in the market. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 79 (S.D.N.Y. 2015). As *Cammer* explained, market makers and arbitrageurs "ensure completion of the market mechanism" and "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87. At all relevant times, Barclays ADRs traded on the NYSE with at least 66 market makers during the Analysis Period. Coffman Rpt., ¶¶42-46. This is additional strong evidence that it traded in an efficient market. *See Pearlstein*, 2021 WL 253453, at *16.

*Barclays Was Eligible to File Form S-3 Registration Statements.* The fourth *Cammer* factor examines whether a company is eligible to file a Form S-3 registration statement if it has filed SEC reports for 12 straight months and has a public float of at least $75 million. 17 C.F.R. § 239.13. "The ability to file this form indicates that the company is easily able to issue new securities." *Winstar*, 290 F.R.D. at 447. Barclays satisfied the condition for S-3 registration eligibility (and Form F-3 with respect to foreign issuers) throughout the Analysis Period, and therefore throughout the Class Period. Coffman Rpt., ¶¶47-49.[3]

*Barclays' ADR Price Reacted to New, Company-Specific Information During the Class Period.* The final *Cammer* factor asks whether Plaintiff can make a *prima facie* showing that,

---

[3] While Barclays lost its eligibility in connection with its loss of WKSI status in May 2017, Barclays regained that eligibility during the Class Period and filed a Form F-3ASR in March 2021. *Id.*, ¶30 n.44.

during the Class Period, Barclays' ADR price quickly responded to the release of new, Company-specific, "unexpected" news. *Cammer*, 711 F. Supp. at 1287. This Court has recognized that when "Plaintiffs easily satisfy the first four *Cammer* factors, the Court need not and does not analyze the fifth *Cammer* factors, which asks for direct evidence of price impact." *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 44-45, n.3 (S.D.N.Y. 2018). Thus, here, where each of the first four *Cammer* factors strongly supports a finding of market efficiency, an "event study" establishing the fifth *Cammer* factor is not "necessary to demonstrate [market] efficiency." *Strougo*, 312 F.R.D. at 320. Nonetheless, the evidence submitted in the Coffman Report, which includes an event study, demonstrates a causal connection between new, Barclays-specific information and the reactions in market price of Barclays ADRs. Coffman Rpt. ¶¶50-69.

As detailed in his expert report, Mr. Coffman has shown through empirical analyses based on the results of his event study that the price of Barclays ADRs reacted in an efficient manner to new information about the Company. *Id.*, ¶¶53-69. Using a well-established methodology, Mr. Coffman first created regression models to control for market and industry wide factors that might influence the price of Barclays ADRs. *Id.*, ¶¶51-52. These models allow him to isolate the change in the price of Barclays ADRs that can be attributed to Company-specific news by finding the difference between the actual price movement on a given day and the movement predicted by the regression model (which, as noted above, controls for market and industry factors). *Id.*, ¶¶57-59.

Then, Mr. Coffman performed an empirical analysis based on the generally accepted and commonly utilized event study methodology on two sets of days: (1) days during the Analysis Period on which Barclays made earnings announcements, and (2) days during the Analysis Period on which no news articles or analyst reports about Barclays were released, and the Company did not make SEC filings or issue press release. *Id.*, ¶¶60-68. Because it is more likely that material,

18

new information about the Company would be released to the market on days with earnings announcements than on days with no identified news released or Company SEC filings or press releases, in an efficient market, one would expect to find a greater percentage of earnings announcement days with a statistically significant stock price movement—*i.e.*, a movement that could not be accounted for by random chance alone.

Indeed, that is precisely what Mr. Coffman found. His analysis shows that Barclays ADRs exhibited a statistically significant price change at the 95% confidence level or greater on 62% of the earnings announcement days compared to only 4% of the days with no Barclays-related news having statistically significant reactions—a difference across those two sets of days that is itself highly statistically significant. *Id.*, ¶64 & n.85-86. Furthermore, both the magnitude of the average change in the price of Barclays ADRs and its daily trading volume were statistically significantly higher on earnings announcement days as compared to days without news, analyst reports, SEC filings, or press releases. *Id.*, ¶¶65-68. Based on this analysis, Mr. Coffman concluded that there was "a clear cause-and-effect relationship between new material news and changes in the market price of Barclays ADRs during the Analysis Period, and thus the Class Period." *Id.*, at ¶69; *see also, e.g.*, *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 207-08 (2d Cir. 2008) (observing that an event study "has been considered *prima facie* evidence of existence of such a causal relationship.").

In addition to the *Cammer* factors, other factors may support market efficiency. *See Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). For example, the *Krogman* factors inquire into: (1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders ("the float"). *See Petrobras*, 862 F.3d at 276. An analysis of the *Krogman* factors confirms the conclusion that Barclays ADRs traded in an efficient market.

19

***Market capitalization.***   During the Analysis Period, the market capitalization (the total value of a company's equity) of Barclays ADRs averaged $1.58 billion.   *See* Coffman Rpt., ¶72. Barclays' market capitalization during the Analysis Period was greater than at least 59% of NYSE-listed and NASDAQ-listed stocks, respectively.   *See id.*   Courts have found less substantial market capitalizations to be indicators of market efficiency.   *See Carpenters Pension*, 310 F.R.D. at 92 (finding that market capitalization of between $0.5 to $3.2 billion indicated market efficiency); *McIntire*, 38 F. Supp. 3d at 433 (finding market capitalization of $292 to $585 million supported market efficiency).   Barclays' substantial market capitalization supports a finding of market efficiency.   *See* Coffman Rpt., ¶¶70-73.

***Bid-ask spread.***   Bid-ask spreads are a measure of transaction costs; low transactions costs indicate that arbitrage opportunities can be exploited.   *See id.*, ¶74.   The bid-ask spread for Barclays ADRs during the Analysis Period ranged between 0.039% and 0.090%.   *See id.*, ¶75.   The bid-ask spread on Barclays ADRs during the Class Period were comparable to those of randomly sampled stocks listed on the NYSE.   *See id.*   Such a low bid-ask spread indicates that arbitrage opportunities could be exploited, which is evidence of market efficiency.   *See Teva*, 2021 WL 872156, at *15 (0.035% bid-ask spread indicated market efficiency); *Pearlstein*, 2021 WL 253453, at *16 (0.09% bid-ask spread indicated market efficiency); *JPMorgan*, 2015 WL 10433433, at *7 (0.02% bid-ask spread indicated market efficiency).

***The percentage of stock not held by insiders ("the float").***   A large float percentage can be an indicator of market efficiency.   *See Pearlstein*, 2021 WL 253453, at *16 (average float of 84.4% of shares outstanding supported finding of market efficiency); *McIntire*, 38 F. Supp. 3d at 433 (public float of between 31% and 43% supported market efficiency).   Here, during the Analysis Period, Barclays public ADR trading data indicated that insiders held no outstanding

20

shares of Barclays ADRs, meaning that 100% of Barclays ADRs were held by non-insiders. Coffman Rpt., ¶76. Barclays' float further indicates market efficiency. *Id.*, ¶¶76-77.

The Coffman Report also addresses four factors that demonstrate market efficiency: (i) institutional ownership (*id.*, ¶77); (ii) autocorrelation (*id.*, ¶¶78-81); (iii) the presence of option trading (*id.*, ¶82); and (iv) lack of arbitrage opportunity (*id.*, ¶83).

High institutional ownership has been considered indicative of market efficiency. *See, e.g.*, *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008). Here, 426 institutions reported owning Barclays ADRs during the Class Period, further supporting a finding of market efficiency. Coffman Rpt., ¶77; *see LSB Indus.*, 2018 WL 3913115, at *12 (ownership by 251 major institutions supported efficiency). Mr. Coffman also ran accepted autocorrelation analyses, which "test[] for the presence of a statistical relationship between price changes (also known as returns) on successive trading dates," *Billhofer*, 281 F.R.D at 160, finding "no evidence of autocorrelation," further indicating an efficient market. Coffman Rpt., ¶81. Further, Mr. Coffman also analyzed the option trading activity related to Barclays—activity that academics have cited as "improv[ing] efficiency by permitting an expansion of the contingencies that are covered by the market." *Id.*, ¶82. According to Mr. Coffman, there was "considerable option trading in Barclays ADRs during the Class Period," supporting a finding of market efficiency. *Id.* Finally, Mr. Coffman found little arbitrage opportunity, concluding that "there was no persistent divergence between the prices of Barclays ADRs and Barclays ordinary shares throughout the Class Period." *Id.*, ¶83.

Because all the *Cammer* and *Krogman* factors, as well as additional market analyses, demonstrate that the market for Barclays ADRs was efficient during the Class Period, Plaintiff is entitled to rely on the fraud-on-the-market presumption of reliance.

21

####     b.    **Reliance Is Presumed Under *Affiliated Ute***

A presumption of reliance is also appropriate here under *Affiliated Ute*, because the fraud

claims are grounded in Defendants' material omissions.  *See Waggoner*, 875 F.3d at 93; ¶253.

Indeed, this Court found that:

> In this case, the First Corrective Disclosure revealed Defendants' ***core
> omission***: that Barclays never implemented a system of internal controls
> surrounding issuances from the Shelves. ***It was this omission that made
> Defendants' prior statements "materially false."***

MTD Order at 36; *see also id.* at 2 (finding that the Complaint's theory of fraud "constituted a

material omission of fact"). In cases "involving primarily a failure to disclose, positive proof of

reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153.[4]  Rather, "[a]ll that is

necessary is that the facts withheld be material in the sense that a reasonable investor might have

considered them important in the making of [their investment] decisions." *Id*. at 153-54.  In this

District, "[w]hen a defendant's fraud consists primarily of omissions, '[r]equiring a plaintiff to

show a speculative set of facts, i.e., how he would have behaved if omitted material information

had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff.'" *In re Smith

Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013) (describing the *Affiliated Ute*

doctrine as a "pragmatic one").  Indeed, the *Affiliated Ute* presumption reflects the reality that

where information is omitted "reliance as a practical matter is impossible to prove." *Gruber*, 2019

WL 4439415, at *6-7.

This case fits squarely within the intended application of the *Affiliated Ute* presumption.

Plaintiff's claims arise from Defendants' alleged material omissions regarding the effectiveness of

---

[4] The "existence of affirmative misrepresentations" does not "preclude [plaintiffs] from relying on the *Affiliated Ute* presumption" at the class certification stage. *Strougo*, 312 F.R.D. at 319.  *See also Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 186 (S.D.N.Y. 2005) (presumption "is not undermined simply because a defendant makes misstatements at the same time it omits material information.").

Barclays represented internal controls over financial reporting.  ¶¶134-59. Accordingly, reliance may be presumed under *Affiliated Ute*.  *See, e.g.*, *AMC*, 338 F.R.D. at 216 (granting class certification and applying *Affiliated Ute* where defendants omitted material information); *Gruber*, 2019 WL 4439415 at *7 (granting class certification and applying *Affiliated Ute* where action "primarily omissions case"); *In re China Ne. Petro. Holdings Ltd. Sec. Litig.*, 2017 WL 11564337, at *5 (S.D.N.Y. Aug. 8, 2017).

### c.    Damages Are Measurable by a Common Methodology, Supporting a Finding of Predominance

Plaintiff's ability to establish Class members' damages using a common methodology further demonstrates predominance.  *See Waggoner*, 875 F.3d at 105-06; *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405-07 (2d Cir. 2016).  Courts in this District regularly find that damages issues in securities fraud actions are common to all class members, as damages can be calculated on a class-wide basis using an event study to measure the price impact of material, company-specific information disclosed to the public.  *See, e.g.*, *Martinek*, 2022 WL 326320, at *18-19 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)).  Notably, however, Rule 23 does not require plaintiff to set forth a detailed model for calculating damages at the class certification stage. *See Waggoner*, 875 F.3d at 105-06; *Roach*, 778 F.3d at 407; *see also Sykes v. Mel S. Harris & Assocs., LLC*, 780 F.3d 70, 88 (2d Cir. 2015) ("All that is required at class certification is that 'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'").  "In general, courts have found *Comcast* to pose a low bar."  *In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *18 (E.D.N.Y. Jan. 11, 2022).

Courts recognize that out-of-pocket damages under Section 10(b) are "measurable on a class-wide basis" and do not raise "individualized damages issues that defeat predominance." *Barrick Gold*, 314 F.R.D. at 106.  Plaintiff's class-wide damages methodology more than satisfies

*Comcast*.  As Mr. Coffman explains, damages are calculable with the standard out-of-pocket methodology.  Coffman Rpt., ¶84.  This methodology quantifies the amount of artificial inflation, caused or maintained by Defendants' alleged misconduct, that existed in Barclays ADRs on each day of the Class Period.  *Id*., ¶¶84-89.  Mr. Coffman's proposed methodology is consistent with Plaintiff's theory of liability that Defendants' misstatements and omissions artificially inflated the price of Barclays ADRs during the Class Period.  *See Pearlstein*, 2021 WL 253453, at *22.

### 2.    Superiority Is Established

Rule 23(b)(3) requires that a class action be superior to other methods of handling litigation.  Together with predominance, the superiority requirement "ensures that the class will be certified only when it would 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'"  *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007).   Cases alleging securities fraud "easily satisfy" this requirement, *Kaplan v. S.A.C. Capital Advisors, L.P.*, 311 F.R.D. 373, 383 (S.D.N.Y. 2015), as "the alternatives are either no recourse for thousands of stockholders" or "a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir. 1968). Here, each of these superiority factors set forth in Fed. R. Civ. P. 23(b)(3) supports a finding of superiority.

Plaintiff seeks to represent a Class consisting of a large number of geographically dispersed Barclays ADRs purchasers whose individual damages are likely small enough to render individual litigation prohibitively expensive.  *See Deutsche Bank*, 328 F.R.D. at 85.   Additionally, concentrating litigation against Defendants "in a single forum, particularly this one, has clear benefits," like eliminating the "risk of inconsistent adjudication" and promoting "the fair and efficient use of the judicial system."  *Williams v. KuCoin*, 2021 WL 5316013, at *16 (S.D.N.Y.

24

Oct. 21, 2021).  Finally, securities class actions do not generally raise manageability issues and are routinely certified in this District.  *Id.*  Thus, superiority is easily established.

### C.      Class Counsel Satisfies the Requirements of Rule 23(g)

Plaintiff has retained Labaton as lead counsel in this matter, and seeks its appointment as Class Counsel, pursuant to Rule 23(g).  Rule 23(g)(1)(A) sets forth the factors a court must consider in appointing Class Counsel, including: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class.  *See* Fed. R. Civ. P. 23(g)(1)(A). Labaton is highly experienced in litigating federal securities class actions and other complex litigation.  *See* Ormsbee Decl., Ex. C.  Moreover, counsel has demonstrated its commitment to prosecuting this action, and will continue to devote the resources required to serve the Class's best interests.  *See Pearlstein*, 2021 WL 253453, at *11.

## V.      CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court: (i) certify this Action as a class action pursuant to Rules 23(a) and 23(b)(3); (ii) appoint Lead Plaintiff Boston Retirement System to serve as Class Representative; (iii) appoint Labaton as Class Counsel; and (iv) grant such other and further relief as the Court deems just and proper.

Dated:  August 12, 2024

Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**


By:*/s/ Lauren A. Ormsbee*
Lauren A. Ormsbee
Christine M. Fox
James M. Fee
Lisa Strejlau
David Saldamando
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
lormsbee@labaton.com
cfox@labaton.com
jfee@labaton.com
lstrejlau@labaton.com
dsaldamando@labaton.com

*Counsel for Lead Plaintiff Boston Retirement
System and the Proposed Class*