# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE BARCLAYS PLC SECURITIES LITIGATION | Case No. 1:22-cv-08172-KPF |

**EXPERT REPORT OF CHAD COFFMAN, CFA**

**August 12, 2024**

# Table of Contents

**Page**

I.    **INTRODUCTION** ........................................................................................................3

II.   **QUALIFICATIONS**..................................................................................................4

III.  **SUMMARY OF OPINIONS** ....................................................................................5

IV.  **OVERVIEW OF THE COMPANY AND ALLEGATIONS**..................................5

V.   **DISCUSSION OF RELIANCE ELEMENT** .........................................................10

VI.  ***CAMMER* FACTORS** ...........................................................................................13

VII. **APPLICATION OF EFFICIENCY FACTORS TO BARCLAYS ADRS** .......14

     A.     OVERVIEW.......................................................................................... 14

     B.     *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME................................. 16

     C.     *CAMMER* FACTOR 2: ANALYST COVERAGE ................................................. 18

     D.     *CAMMER* FACTOR 3: MARKET MAKERS ....................................................... 20

     E.     *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY ..................................... 22

     F.     *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION ........................... 23

     G.     *KROGMAN* FACTOR 1: MARKET CAPITALIZATION ..................................... 32

     H.     *KROGMAN* FACTOR 2: THE BID-ASK SPREAD.......................................... 34

     I.     *KROGMAN* FACTOR 3: PUBLIC FLOAT .......................................................... 35

     J.     ADDITIONAL FACTOR: INSTITUTIONAL OWNERSHIP........................... 36

     K.     ADDITIONAL FACTOR: AUTOCORRELATION ............................................ 36

     L.     ADDITIONAL FACTOR: OPTIONS ................................................................... 37

     M.    ADDITIONAL FACTOR: LACK OF ARBITRAGE OPPORTUNITY ............................... 38

VIII. **DAMAGES**...............................................................................................................**38**

IX.   **CONCLUSION** ........................................................................................................**41**

## I.    INTRODUCTION

1.    My name is Chad Coffman.  I am the President of Peregrine Economics, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, litigation.  I have been asked by counsel for Lead Plaintiff Boston Retirement System in this matter to examine and opine on whether the market for Barclays PLC ("Barclays" or the "Company") American Depositary Receipts ("Barclays ADRs" or the "ADRs") was efficient during the period from February 18, 2021 through March 27, 2022, inclusive (the "Class Period").[1]  In addition, I have been asked to opine on whether calculating damages in this action is subject to a common methodology under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 adopted thereunder (collectively "Section 10(b)").

2.    The materials I have considered in forming my opinions are summarized in **Appendix A**.  Peregrine Economics is being compensated at an hourly rate of $950 per hour for my work on this matter, and at rates between $270 and $475 for members of my staff who performed work in connection with this report under my direction and supervision.  My compensation is in no way contingent on the outcome of this case.  My qualifications are described below.

---

[1] The original Class Period alleged in the Complaint was February 18, 2021 through February 14, 2023, however I understand that the end of the Class Period was shortened by the Motion to Dismiss Order which sustained claims only based on the alleged false and misleading statements or material omissions made before the first corrective disclosure.  *See* Amended Class Action Complaint filed March 6, 2023, *IN RE BARCLAYS PLC SECURITIES LITIGATION*, Case No. 1:22-cv-08172-KPF, (ECF No. 46, "Complaint") ¶ 1; OPINION AND ORDER filed February 23, 2024, *IN RE BARCLAYS PLC SECURITIES LITIGATION*, Case No. 1:22-cv-08172-KPF, p. 25 (ECF No. 61, "Motion to Dismiss Order").

## II.    QUALIFICATIONS

3.    I hold a Bachelor's Degree in Economics with Honors from Knox College and a Master's of Public Policy from the University of Chicago.  I am also a CFA charter-holder.  The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three examinations over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

4.    I, along with several others, founded Peregrine Economics in January 2024.  Before starting Peregrine Economics, I served as the President of Global Economics Group, which I co-founded in March 2008.[2]  Prior to starting Global Economics Group, I was employed by Chicago Partners LLC for over twelve years.  At both Global Economics Group and Chicago Partners, I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination, and antitrust.  I have been engaged more than one hundred times as a securities expert both within and outside the litigation context.  My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers, and a prominent mediator (Hon. Judge Daniel Weinstein (Ret.)) to provide economic analysis and opinions in dozens of securities class actions as well as other matters.  As a result of my involvement in these cases, much of my career has been spent analyzing how securities prices react to new information and evaluating damages in securities-related matters.

5.    My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

---

[2] Prior to March 16, 2011, Global Economics Group was known as Winnemac Consulting, LLC.

### III.   SUMMARY OF OPINIONS

6.     After analyzing Barclays' ADRs during the Class Period and giving careful consideration to the efficiency factors described in detail throughout this report, I have formed the opinion that the market for Barclays ADRs was efficient during the Class Period.

7.     I have also formed the opinion that consistent with Lead Plaintiff's theory of liability, damages in this action can be calculated on a class-wide basis using a common methodology.  These opinions are based upon my analysis described below.

8.     The remainder of this report is organized as follows: **Section IV** of this report provides an overview of Barclays' business operations and the allegations in this case.  **Section V** discusses the reliance requirement for the claims under Section 10(b) of the Exchange Act and the "fraud on the market" theory.  **Section VI** introduces the "*Cammer* factors" and other factors that financial economists and courts, including in this Circuit, apply when evaluating market efficiency under the "fraud on the market" theory.  **Section VII** provides the results of my empirical evaluation of each *Cammer* factor and other factors for Barclays ADRs during the Class Period.  **Section VIII** addresses how damages in this matter are subject to a common approach and methodology that can be applied class-wide.  Finally, **Section IX** offers my conclusions.

9.     I reserve the right to amend this report, including to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

### IV.    OVERVIEW OF THE COMPANY AND ALLEGATIONS

10.    Barclays was founded and incorporated in England and Wales with its principal executive offices in London.[3]  Barclays described its business during the Class Period as follows:

---

[3] Barclays PLC SEC Form 20-F/A for the fiscal year ended December 31, 2021, p. 314, cover.

The Group is a British universal bank diversified by business, geography and income type, serving consumer and wholesale customers and clients globally and for segmental reporting purposes it defines its two operating divisions as Barclays UK and Barclays International. Barclays UK consists of our UK Personal Banking, UK Business Banking and Barclaycard Consumer UK businesses. These businesses are carried on by our UK ring-fenced bank (Barclays Bank UK PLC) and certain other entities within the Group. Barclays International consists of our Corporate and Investment Bank and Consumer, Cards and Payments businesses. These businesses are carried on by our non ring-fenced bank (Barclays Bank PLC) and its subsidiaries, and certain other entities within the Group.[4]

11.    For the fiscal year ended December 2021, Barclays reported total income of £21,940 million, profit of £6,205 million, and listed total assets of £1,384,285 million.[5]  As of December 31, 2021, Barclays employed approximately 81,600 full time employees.[6]  During the Class Period, Barclays' ordinary shares traded on the London Stock Exchange ("LSE") in London.[7]  Since 1986 and throughout the Class Period, Barclays ordinary shares have also traded in the form of American Depositary Shares ("ADSs") on the New York Stock Exchange ("NYSE") under the ticker "BCS."[8]  Each Barclays ADS is equal to four ordinary shares and is represented by an ADR, therefore I refer to Barclays ADRs throughout this report.[9]  The Barclays ADRs were issued by a depositary bank, J.P. Morgan Chase Bank, N.A. ("J.P. Morgan").[10]

---

[4] Barclays PLC SEC Form 20-F/A for the fiscal year ended December 31, 2021, p. 230.

[5] Barclays PLC SEC Form 20-F/A for the fiscal year ended December 31, 2021, pp. 196, 198.

[6] Barclays PLC SEC Form 20-F/A for the fiscal year ended December 31, 2021, p. 230.

[7] Barclays PLC SEC Form 20-F/A for the fiscal year ended December 31, 2021, p. 316.

[8] *Id.*

[9] *Id.*

[10] *Id.*

12.    The Complaint alleges that Barclays and the Individual Defendants,[11] made false or misleading statements during the Class Period, ultimately causing damages to purchasers of Barclays ADRs who unknowingly bought ADRs at artificially inflated prices and suffered economic loss when the stock price ultimately reflected the concealed information.[12]

13.    More specifically, the Complaint alleges that throughout the Class Period, Barclays concealed information about its failure to implement internal controls, resulting in Barclays issuing over ten billion worth of securities in excess of what it had registered with the SEC in its 2018 and 2019 shelf registration statements.[13]    Additionally, due to the Company's lack of internal controls, Barclays had to restate its year-end 2021 financial results including an explanatory note that Barclays' "internal control over financial reporting and disclosure controls and procedures were not effective."[14]    Further, the Complaint alleges that Defendants "subsequently admitted that the over-issuances were a 'self-inflicted problem' because 'we missed some simple tasks'… and that the 'situation was entirely avoidable…'" which was apparent also in the Company's filing restating its year-end 2021 results.[15]

14.    Leading up to the over-issuance, in May 2017 Barclays lost its status with the SEC as a "well-known seasoned issuer" ("WKSI"), a status that allowed the company to qualify for automatic shelf registration of securities effective through filing a Form S-3.[16]    The loss of WKSI status meant Barclays had to quantify the total amount of securities that they anticipated

---

[11]The Individual Defendants are James E. Staley, C.S. Venkatakrishnan, Tushar Morzaria, and Anna Cross.  *See* Complaint ¶¶ 32-35.

[12] Complaint ¶¶ 236-238.

[13] *E.g.,* Complaint ¶ 3.

[14] Complaint ¶¶ 4, 180-183; Barclays PLC SEC Form 20-F/A for the fiscal year ended December 31, 2021, explanatory note.

[15] Complaint ¶¶ 4, 180-183.

[16] Complaint ¶¶ 5, 47.

offering and selling over the duration of the shelf and pay the registration fees for those securities in advance.[17]  As a result, Barclays created a working group to estimate the amount of securities needed to be registered for Barclays' 2018 and 2019 shelf registration statements.[18]  In a series of filings with the SEC throughout the Class Period, Defendants made and repeated statements attesting to Barclays' internal control practices and procedures.[19]  For example, Barclays told investors in the Company's 2020 Annual Report that "management ha[d] assessed [Barclays'] internal control over financial reporting as of 31 December 2020," and concluded that Barclays' internal control over financial reporting was effective as of December 31, 2020.[20]  Further, Barclays stated it "has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations."[21]  Two of the Individual Defendants, James E.  Staley (Group Chief Executive) and Tushar Morzaria (Group Finance Director) also each signed a Sarbanes-Oxley Act ("SOX") Certification affirming the Company's compliance with the Exchange Act.[22]

15.    However, on March 14, 2022, Barclays informed the SEC that it sold $15.2 billion worth of unregistered securities in excess of the maximum $20.8 billion worth of securities registered under the 2019 Shelf, yet still had not publicly disclosed this information to investors.[23]  It was not until March 28, 2022 that Barclays disclosed this over-issuance to the

---

[17] Complaint ¶ 64.

[18] Complaint ¶¶ 9, 70-74.

[19] Complaint ¶ 3.

[20] Complaint ¶ 137; Barclays PLC SEC Form 20-F for the fiscal year ended December 31, 2020, p. 40.

[21] Complaint ¶¶ 138, 153; Barclays PLC SEC Form 20-F for the fiscal year ended December 31, 2020, p. 39.

[22] Complaint ¶¶ 32, 34, 142; Barclays PLC SEC Form 20-F for the fiscal year ended December 31, 2020, exhibit 13.1.

[23] Complaint ¶¶ 14-15, 81, 158.

public.[24]  On that date, the market learned that Barclays had over issued securities in its 2019

shelf registration statement by approximately $15.2 billion, that Barclays would conduct a

rescission offer and incur related losses of approximately £450 million, and that, as a result of

those events, Barclays faced scrutiny from regulatory authorities.[25]  The price of Barclays ADRs

dropped $0.96 (10.61%) and lost $157.2 million in market capitalization, harming investors who

bought at inflated prices.[26]

16.     Several weeks after this alleged corrective disclosure, on May 16, 2022, Barclays

issued a press release that the Board of Directors had concluded Barclays would need to restate

the financial statements included in its 2021 Form 20-F, cautioning investors "not to rely on the

financial statements included in the 2021 Form 20-F, or KPMG LLP's audit report thereon, until

the amended 2021 Form 20-F has been filed."[27]  These results were restated on May 23, 2022.[28]

17.     On September 29, 2022, the SEC issued a Consent Decree and Cease-and-Desist

Order (the "SEC Order") against Barclays, documenting the SEC's findings and related

settlement relating to the over-issuance.[29]  Barclays paid a $200 million penalty and more than

$161 million in disgorgement and prejudgment interest.[30]  The SEC Order, among other things,

explained that its investigation "'arises from [Barclays'] failure to put into place any internal

---

[24] Complaint ¶ 160; "Barclays PLC Impact of over-issuance under BBPLC US Shelf," *Regulatory News Service*, March 28, 2022, 2:00 AM ET.

[25] Complaint ¶¶ 15, 160.

[26] Complaint ¶¶ 16, 161.

[27] Complaint ¶ 180; "Barclays PLC Restatement of Financial Statements on Form 20-F," *Regulatory News Service*, May 16, 2022, 7:00 AM ET.

[28] Complaint ¶¶ 182-183.

[29] Complaint ¶¶ 20, 92-96; https://www.sec.gov/files/litigation/admin/2022/33-11110.pdf.

[30] Complaint ¶¶ 20, 92-93.

control around the real-time tracking of securities being offered or sold off its Commission-registered shelf registration statement.'"[31]

18.    On February 15, 2023, Barclays reported its financial results for FY 2022.[32]  In the Company's related 2022 Form 20-F, the Company recognized the existence of a material weakness in internal control over financial reporting following the over-issuance of its securities.[33]  The 2022 Form 20-F also revealed that due to the over-issuances, the Company was clawing back compensation from certain Barclays executives, including Individual Defendants Venkatakrishnan, Morzaria, and Cross, because of their responsibility in the failure to implement effective internal controls over Barclays' financial reporting.[34]

## V.    DISCUSSION OF RELIANCE ELEMENT

19.    Class members' reliance on the alleged misstatements and material omissions is a required element for Lead Plaintiff's Section 10(b) claims.  Lead Plaintiff asserts the fraud on the market theory of reliance in this matter.[35]  The fraud on the market theory is based on the fact that in an efficient market (one in which widely-available public information is quickly incorporated into the market price of a security), all purchasers implicitly rely on any material misrepresentations or omissions since the value of those misrepresentations or omissions is incorporated into each class member's purchase price.  The fraud on the market theory was first addressed by the U.S. Supreme Court in *Basic Inc. v. Levinson*:

> … [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its

---

[31] Complaint ¶ 94.

[32] Complaint ¶ 195; "Barclays PLC Annual Final Results," *Regulatory News Service*, February 15, 2023, 2:00 AM ET.

[33] Complaint ¶ 198; Barclays PLC SEC Form 20-F for the fiscal year ended December 31, 2022, Directors' report.

[34] Complaint ¶¶ 199-200.

[35] Complaint ¶¶ 253-256.

business…Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[36]

20.    The Supreme Court reaffirmed this theory in *Halliburton II*:

More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation.  We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[37]

21.    As stated in *Basic* and reaffirmed in *Halliburton II*, in an open, developed and efficient market, market prices reflect what is publicly known about a company.  If a company provides the market with misleading information regarding its financial strength or business practices, the market price will be inflated (or deflated) compared to what the price would have been if the truth were known (but-for misleading information).  Thus, in an efficient market, where the plaintiff asserts there were material misrepresentations or omissions, all purchasers implicitly relied on those misrepresentations and/or lack of disclosure by paying the inflated (or deflated) price.

22.    It is an empirical exercise to determine whether the market for a security was "open and developed" or "efficient" to the degree required for a presumption of reliance under the "fraud on the market" theory.[38]  The esteemed economist Dr. Eugene Fama, in his seminal

---

[36] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) ("*Basic*").

[37] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2417 (2014) ("*Halliburton II*").

[38] To recognize the presumption of reliance, the *Basic* Court explained, was not "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic*, 485 U.S. at 248 n.28.  The *Basic* Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Basic*, 485 U.S. at 246 n.24.  *Basic's* presumption of reliance thus does not rest on a "binary" view of market efficiency, but rather, market efficiency is a matter of degree.

11

research, first outlined definitions of an "efficient market."[39]  He described different levels of efficiency which he called "weak-form," "semi-strong-form," and "strong-form" efficiency.[40]

23.    The market efficiency standard adopted by *Basic* and reaffirmed by *Halliburton II* as necessary for the presumption of reliance conforms most closely with Dr. Fama's "semi-strong form" efficiency.  "Semi-strong form" efficiency implies that all publicly available information is reflected in a security's current market price.  This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information.  *Basic* stated: "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."[41]  The Supreme Court's effective adoption of the "semi-strong form" efficiency standard is economically sensible because it recognizes that insiders often possess non-public information and that securities prices do not necessarily reflect this non-public information, but that to presume reliance, the market price must reflect publicly available information.

24.    In the next section, I explain the factors that are regularly considered by financial economists and courts in determining whether the market for a particular security is efficient.

---

[39] Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no.2 (1970): 383.

[40] "Weak-form" efficiency requires that historical prices are not predictive of future prices.  Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices.  Therefore, technical analysis will not produce consistent excess returns over time.  "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price.  Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information.  Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns.  "Strong-form" efficiency implies all information in the market, whether public or private, is accounted for in the market price.  In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

[41] *Basic,* 485 U.S. at 241.

## VI.   *CAMMER* FACTORS

25.    In *Cammer v. Bloom*, the court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: 1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 Registration Statement eligibility, and 5) price reaction to unexpected information.[42]

26.    The *Cammer* decision relied on Bromberg & Lowenfels' definition of efficiency. As articulated below, the adopted definition of efficiency is consistent with Fama's definition of "semi-strong form" efficiency.  For the purposes of this exercise, I adopt Bromberg & Lowenfels' definitions for the terms "open," "developed," and "efficient" as described below:

> An *open market* is one in which anyone, or at least a large number of persons, can buy or sell.

> A *developed market* is one which has a relatively high level of activity and frequency, and for which trading information (*e.g.*, price and volume) is widely available.  It is principally a secondary market in outstanding securities.  It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).

> An *efficient market* is one which rapidly reflects new information in price.

> These terms are cumulative in the sense that a developed market will almost always be an open one.  And an efficient market will almost invariably be a developed one.[43]

27.    While there is a well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient."  In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory.  I also consider a number of other factors that courts have utilized beyond the *Cammer* factors.

---

[42] *Cammer, v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*").

[43] *Cammer,* 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988) ("Bromberg & Lowenfels")) (emphasis added).

However, since there are no bright-line tests for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics is determinative as to whether a particular market is efficient.

28.    In the subsequent sections, I evaluate the market for Barclays ADRs during the Class Period under each of the *Cammer* factors, as well as the following additional factors that courts have also considered in assessing market efficiency: 1) market capitalization, 2) bid-ask spread, 3) the percentage of ADRs not held by insiders (the float), 4) the amount of ADRs held by institutional investors, 5) autocorrelation (meaning whether there is a pattern in a security's returns so that future returns can be predicted based upon past returns), 6) options trading, and 7) a lack of arbitrage opportunity between Barclays ADRs and Barclays ordinary shares.

## VII.  APPLICATION OF EFFICIENCY FACTORS TO BARCLAYS ADRS

### A.  OVERVIEW

29.    After giving careful consideration to each of the efficiency factors described in detail below, I find that each factor supports the conclusion that the market for Barclays ADRs was efficient throughout the Class Period.  In addition to the discussion below, **Exhibit 1** summarizes how, for each of the factors examined, the empirical evidence supports a finding that Barclays ADRs traded in an efficient market.  As further background to my analyses, **Exhibit 2** displays Barclays ADRs' closing price and trading volume for each day throughout the Class Period.

30.    In summary, and as discussed more fully below, Barclays ADRs traded in an efficient market during the Class Period.  First, the average weekly trading volume of Barclays ADRs during the Class Period far exceeded benchmarks that courts have established.  During the Class Period, the average weekly trading volume for Barclays ADRs was 27.79 million shares,

14

which represents 17.82% of ADRs outstanding, higher than the average security traded on the NYSE and/or NASDAQ.  Second, there were a large number of securities analysts following and reporting on Barclays.  Third, Barclays ADRs were actively traded on the NYSE, fulfilling the *Cammer* factor regarding market makers.  Fourth, Barclays filed a Form F-3ASR (*i.e.*, the foreign equivalent of a Form S-3ASR) during the Class Period on March 1, 2021.[44]  Fifth, there was a strong cause-and-effect relationship between new Company-specific information and the market price of Barclays ADRs during the Class Period as well as a broader time period (the "Analysis Period").[45]  Sixth, Barclays ADRs had a large market capitalization relative to all other firms that traded on the NYSE and NASDAQ.  Seventh, Barclays ADRs had a low bid-ask spread relative to other exchange-traded common stocks.  Eighth, institutions, which are considered generally to be well-informed investors, held the majority of the public float of Barclays ADRs (as opposed to insiders) during the quarters of interest.  Ninth, there was no evidence of statistically significant autocorrelation during the Analysis Period.[46]  Tenth, there was active trading in Barclays ADRs options throughout the Class Period.  Finally, there was no

---

[44] The Complaint correctly alleges that Barclays lost its WKSI status in May 2017 and the over-issuances at issue relate to registration statements filed when Barclays was not eligible for WKSI status (*i.e.*, the 2018 Shelf and 2019 Shelf).  *See* https://www.sec.gov/files/litigation/admin/2022/33-11110.pdf ("On May 10, 2017, the Commission instituted settled public administrative and cease-and-desist proceedings against Barclays Capital Inc.—a subsidiary of BBPLC—arising out of its former wealth and investment management business.  In the Matter of Barclays Capital Inc., Adm. Proc. File No. 3-17978 (May 10, 2017).  As a result of that action, BPLC and BBPLC became ineligible issuers under Securities Act Rule 405, thereby losing their status as WKSIs.  Loss of WKSI status meant that, among other things, BPLC and BBPLC would be unable to file automatic shelf registration statements, which allow WKSIs to register unspecified amounts of different specified types of securities on immediately effective registration statements." ¶¶ 17-18).  However, Barclays' filing of a Form F-3ASR in March 2021 is evidence that Barclays had regained this status during the Class Period.  *See* Complaint ¶¶ 62-65.

[45] The Analysis Period is from February 18, 2020 through March 27, 2023.  For certain elements of my report, I analyzed this broader time period to enhance the power of my statistical tests.  By analyzing and applying the methodologies described herein to this Analysis Period, of which the Class Period is a subset, I conclude that the evidence supports efficiency during the Class Period.  The Analysis Period was selected to capture one full calendar year before and one full calendar year after the Class Period.  In this case, this resulted in a total of 13 earnings to evaluate and analyze (opposed to what would have just been 5 during the Class Period itself).

[46] I also found no evidence of autocorrelation during the Class Period.

persistent divergence between the price of Barclays ADRs and its underlying ordinary shares during the Class Period, indicating little to no opportunities for arbitrage. My analyses of each of these factors support the conclusion that Barclays ADRs traded in an open, developed, and efficient market at all relevant times during the Class Period.

### B. *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME

31. The first *Cammer* Factor is the average weekly trading volume of a security. According to one authority cited by the *Cammer* court:

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[47]

32. Volume as a fraction of shares outstanding is an important indicator of market efficiency for several reasons. First, volume is objectively quantifiable and comparable across securities. Second, high volume is generally indicative of continuity, liquidity, and market depth – which are highly indicative of market efficiency.[48] Third, substantial volume would indicate there is likely a market for the collection and distribution of information about the security. As Professors Thomas and Cotter explain, "[t]rading volume was also considered as an eligibility

---

[47] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

[48] Continuity means that trades may occur at any time. Liquidity in this context means that investors can convert cash into shares or shares into cash at a price similar to that of the prior trade (assuming no new information). William Sharpe, et al., *Investments*, (5th ed.) Prentice Hall (1995), Chapter 3, pp. 44-45.

Bromberg and Lowenfels define a market that has continuity and liquidity as "the ability to absorb a reasonable amount of trading with relatively small price changes." *Cammer*, 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels).

Market depth refers to "the number of shares that [can] be traded at the quoted bid and ask prices." A deep market will have significant orders on the buy and sell side so that the market can experience a relatively large market order without greatly altering the market price. *See* Yakov Amihud, et al., "Liquidity and Asset Prices," *Foundations and Trends in Finance* 1, no. 4 (2005): 317.

standard because it affects information dissemination to the market and was an important criterion for investment analysts in deciding which stocks to follow."[49]

33.    Barclays ADRs easily surpass the threshold level of average weekly trading volume necessary for an efficient market.  The average weekly trading volume for Barclays ADRs during the Class Period was 17.82% of shares outstanding, compared to 2.48% for the average weekly trading volume on both the NYSE and NASDAQ exchanges.  Based on this figure, the weekly trading volume for Barclays ADRs far exceeds the 1% or 2% threshold cited by *Cammer*. **Exhibit 3** plots Barclays ADRs' trading volume as a fraction of shares outstanding for each week during the Class Period.[50]  Indeed, the average weekly trading volume for Barclays ADRs during the Class Period was 27.79 million shares.  This volume of trading supports the conclusion that the market for this security was efficient throughout the Class Period.

34.    Another way to measure trading volume is annualized turnover velocity, which is essentially the first *Cammer* factor expressed in dollar terms.[51]  To be more specific, instead of looking at shares traded divided by shares outstanding, turnover velocity is the dollar value of shares traded (*i.e.*, shares traded multiplied by price per share) divided by the dollar value of all shares outstanding (*i.e.,* shares outstanding multiplied by price per share).  This is the same ratio because the numerator and denominator are multiplied by price per share.  The advantage of this measure is that once quoted in annualized terms, Barclays ADRs' turnover velocity can be

---

[49] Randall S. Thomas & James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63, no. 3, (2000): 108.  Randall S. Thomas is a Director of the Law and Business Program at Vanderbilt University.  Dr. James Cotter was an Associate Professor of Finance at Wake Forest University.

[50] For the purposes of this analysis, a "trading week" consists of five (5) consecutive trading days, which may not follow the calendar week.

[51] Turnover velocity as a formula is:

**Turnover Velocity Ratio** = (Volume x Price)/(Shares Outstanding x Price) = Dollars Traded/Dollars Outstanding.

compared directly with other publicly-traded stocks based on exchange-reported statistics. For example, over the Class Period, the annualized turnover velocity ratio for Barclays ADRs was 891.21% compared with the NYSE and NASDAQ average of 129.31% for the Class Period.[52] Thus, Barclays ADRs had an average annualized turnover that was substantially higher than the average stock trading on the NYSE and NASDAQ, further supporting that it traded in an efficient market.

35.     In short, the relatively high trading volume in Barclays ADRs throughout the Class Period supports the conclusion that the market for Barclays ADRs was efficient.

## C.  *CAMMER* FACTOR 2: ANALYST COVERAGE

36.     The *Cammer* decision stated the following related to analyst coverage:

> … [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [analyst] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[53]

37.     Analyst coverage can be important evidence of efficiency. Significant analyst coverage implies that there is sufficient interest in a company and its securities, that there is an active market for information regarding the company and its securities, and that the information is widely distributed.

38.     During the Class Period, there was consistent analyst coverage for Barclays. **Exhibit 4** shows that there were at least 302 reports issued during the Class Period and lists 26 separate firms that had equity analysts issue reports on Barclays, including major firms such as

---

[52] Turnover velocity for the NYSE and NASDAQ is calculated from data provided by the World Federation of Exchanges. *See* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

[53] *Cammer*, 711 F. Supp. at 1286.

Credit Suisse, J.P. Morgan, and Morgan Stanley.[54]  These reports served the purpose of disseminating publicly available information along with commentary, news, updates, analyses, and recommendations of the analysts to investors.  The extensive coverage of Barclays by securities analysts supports the conclusion that Barclays ADRs traded in an efficient market throughout the Class Period.

39.    Since 1989, when the *Cammer* decision was issued, there has been a significant increase in alternative methods by which publicly available information about publicly-traded securities is disseminated to investors.  For example, since the *Cammer* decision, through the Internet, 24-hour cable news networks, email, RSS feeds,[55] and other media, the ability of individual and institutional investors to obtain information about publicly-traded securities and the market in general has revolutionized the manner in which investors and investment professionals receive and process information.

40.    Moreover, information regarding the market price, the current bid-ask spread, and the ability to trade online is available almost instantaneously via the Internet for anyone with an online brokerage account.  Thus, in addition to the substantial analyst coverage of Barclays, there were many other sources of public information dissemination.  For example, there was substantial public press regarding Barclays.  A search for articles classified as related to Barclays

---

[54] I obtained Barclays analyst reports from Lead Plaintiff's Counsel and S&P Capital IQ.  The number of analyst reports I identify is likely understated because many analyst reports are not available through third party data providers.  For example, it is clear that analysts from Goldman Sachs and Exane BNP Paribas participated on earnings conference calls during the Class Period, but I did not have access to research reports from those firms through Lead Plaintiff's Counsel or S&P Capital IQ in connection with preparing this report.  (*See* "FQ1 2021 Earnings Call Transcripts," *S&P Capital IQ*, April 30, 2021).

[55] RSS is an acronym for Really Simple Syndication or Rich Site Summary.  RSS files are formed as XML files and are designed to provide content summaries of news, blogs, forums or website content.  The RSS feeds are generally simple headlines and brief descriptions; if the user is interested, the user can click to see additional information.  Content viewed in the RSS reader or news aggregator is known as an RSS feed.  RSS is becoming increasingly popular since it is a free and easy way to promote a site and its content without the need to advertise or create complicated content sharing partnerships.  *See* http://www.rss-specifications.com/ and *see also*, http://www.rss-specifications.com/what-is-rss.htm.

by Factiva over the Class Period resulted in 2,295 unique articles (and 6,020 articles over the Analysis Period).[56]  In addition, there were numerous SEC filings available online at the SEC EDGAR search database at no cost, as well as various other sources of public information available throughout the Analysis Period that I do not attempt to quantify.  The degree of news coverage and publicly available information further supports the conclusion that there was substantial supply of, and demand for, information regarding Barclays in the public arena throughout the Analysis Period, and thus the Class Period.

41.    In summary, the large number of analyst reports and the substantial public dissemination of news and other information regarding Barclays provides evidence of a robust and active market for public information about the Company and evidence that Barclays's ADRs traded in an efficient market during the Class Period.

### D.  *CAMMER* FACTOR 3: MARKET MAKERS

42.    A market maker is a firm that is ready to buy or sell a particular stock on a regular and continuous basis.[57]  The third *Cammer* factor states:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion.  Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[58]

---

[56] Factiva is a business information and research tool owned by Dow Jones & Company.  Factiva aggregates content from both licensed and free sources, and provides organizations with search, alerting, dissemination, and other information management capabilities.  The 2,295 unique articles for the Class Period ("February 18, 2021 – March 27, 2022") were identified as a result of a search for "Major News and Business Sources" with the company field "Barclays PLC."  The 6,020 unique articles for the Analysis Period ("February 18, 2020 – March 27, 2023") were identified as a result of the same search.  Of the 6,020 unique articles for the Analysis Period, I identified 2,513 articles that were unrelated to Barclays' underlying business including but not limited to articles titled "… -- Market Talk," "…Roundup: Market Talk," "OSSIAM …Net Asset Value(s)," "AMUNDI INDEX…Net Asset Value(s)," and additional duplicates identified as having the same source, title and publication time, if applicable.  Duplicate articles have also been removed by a proprietary function accessible in Factiva's search builder.  I acknowledge that this may not reflect all news as the Factiva database is limited to certain sources and content type.

[57] *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

[58] *Cammer*, 711 F. Supp. at 1293.

43.    The premise that the number of market makers can serve as an efficiency criterion relates to the notion that market makers are:

> …[P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (*i.e.*, the "order flow").  Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[59]

44.    Barclays ADRs traded on a major exchange (*i.e.*, the NYSE) with continuous public price and volume reporting, as opposed to an over-the-counter market without volume reporting, which is the context in which *Cammer* indicated this was a relevant criterion.[60]  On such over-the-counter markets, there may be reason for concern regarding liquidity and information dissemination.  However, these concerns are generally not applicable to stocks trading on large, modern exchanges such as the NYSE and NASDAQ, which are presumed to be efficient, report volume and trade details, and tend to have rules that virtually guarantee a liquid market.[61]

45.    The NYSE and NASDAQ are two of the largest and most liquid security exchanges in the world with billions of shares traded each day.  Unlike over-the-counter markets that rely on decentralized market makers providing liquidity for trading, the NYSE and NASDAQ rely on a computerized system to match orders and provide quotes.[62]  The minimum requirements to be listed on the NYSE or NASDAQ and remain in good standing virtually guarantee a liquid market

---

[59] Brad Barber, et al., "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *The Journal of Corporation Law* 19 (1994): 291.

[60] *See Cammer,* 711 F. Supp. at 1292 (citing Bromberg & Lowenfels): "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."

[61] For example, there are rules for minimal market capitalization and specialists are *required* to maintain an orderly market; s*ee* Introduction and Appendices at https://www.nyse.com/publicdocs/nyse/NYSE_IPO_Guide_Third_Edition.pdf.  *See also*, William Sharpe, et al., *Investments*, (5th ed.) Prentice Hall (1995), Chapter 3, pp. 45-53; Frank J. Fabozzi, et al., *Foundations of Financial Markets and Institutions*, (4th ed.) Prentice Hall, (2010), Chapter 18 – Appendix A.

[62] For NYSE, *see* https://www.nyse.com/market-model.  For NASDAQ, *see* https://www.nasdaqtrader.com/Trader.aspx?id=TradingUSEquities.

for that security.  Therefore, the number of "market makers" itself is not a particularly relevant metric in this case.

46.   Nevertheless, according to Bloomberg, throughout the Class Period, there were 66 market makers for Barclays ADRs.[63]  Therefore, Barclays ADRs easily meets the letter and spirit of this factor, further supporting the efficiency of the market during the Class Period.

### E.  *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY

47.   The fourth *Cammer* Factor is SEC Form S-3 eligibility, which states,

> …[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met.  Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[64]

48.   Through Form S-3 (and Form F-3 with respect to foreign issuers),[65] the SEC allows certain companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available.[66]  In order to be eligible to issue a Form S-3 or Form F-3, among other things, a company: 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for more than one year, 2) must have filed all documents in a timely manner for the past twelve months, and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted on debts or material leases.  Eligibility to file a

---

[63] Bloomberg RANK function.

[64] *Cammer*, 711 F. Supp. at 1287.

[65] https://www.sec.gov/files/formf-3.pdf.

[66] For additional information, *see* www.sec.gov/about/forms/forms-3.pdf.

Form S-3 is confirmatory evidence of efficiency, not a requirement. Interpreted in this way, the standard makes sense as an indicator of efficiency.

49.     Barclays filed a Form F-3ASR (the equivalent of a Form S-3ASR for a foreign company), during the Class Period on March 1, 2021. I have found no evidence that Barclays was not F-3 eligible throughout the Class Period. Throughout the Class Period, Barclays had been subject to SEC filing requirements for more than one year, had filed all documents in a timely manner over the preceding twelve months, and did not fail to meet its debt obligations, to my knowledge. Therefore, Barclays meets this *Cammer* efficiency factor, which supports the conclusion that Barclays ADRs traded in an efficient market.

## F.  *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION

50.     The fifth *Cammer* Factor relates to how the price of a security reacts to new, company-specific information and states:

> …[O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[67]

51.     Establishing a causal connection between new company-specific events and movements in the market price is convincing evidence of market efficiency. A technique often relied upon, both inside and outside of the context of litigation, to establish such a causal connection is called an "event study." An event study is a well-accepted statistical method utilized to isolate the impact of information on market prices.[68] Indeed, academics used event studies as one tool for evaluating the efficient market hypothesis in the first place. Event studies

---

[67] *Cammer,* 711 F. Supp. 1291.

[68] A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997): 13.

have been used for over 50 years and have appeared in hundreds if not thousands of academic

articles as scientific evidence in evaluating how new information affects securities prices.[69]

52.    An event study is a technique used to measure the effect of new information on the

market prices of a company's publicly-traded securities.  New information may include, for

example, company press releases, earnings reports, SEC filings, and news reports or analyst

reports.  An event study is conducted by specifying a model of expected price movements

conditioned on outside market factors and then testing whether the deviation from expected price

movements is sufficiently large that simple random movement can be rejected as the cause.

53.    To analyze cause and effect, I performed an event study to determine whether

Barclays ADRs reacted to earnings announcements in a manner significantly different from how

the stock moved on days with no Barclays-related news.[70]  Based on the event study I performed,

which explicitly controls for market and industry factors, I find that there is a clear cause-and-

effect relationship between new public information about Barclays and the market price of

Barclays ADRs.  I now describe in further detail the event study methodology, the events I

tested, and the results.

54.    A well-accepted method for performing an event study is to estimate a regression

model over some period of time (an "estimation window") to observe the typical relationship

between the market price of the relevant security and broad market factors.[71]  I have performed

---

[69] John J. Binder, "The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting* 11, (1998): 111.

[70] For purposes of this analysis, I analyzed this broader time period to enhance the power of my statistical tests. After analyzing and applying the methodologies described herein to this Analysis period, of which the Class Period is a subset, I conclude that the evidence supports a cause-and-effect relationship during the Class Period.

[71] A "regression" or "regression model" is a statistical technique for measuring the ability of one or more variables (the "independent variables") to "explain" another variable of interest (the "dependent variable").  In this case, the daily percentage change in Barclays ADRs (the Barclays daily return) is the dependent variable and the contemporaneous daily returns for a market and peer index are the independent variables.  For a general discussion of regression analysis, see Damodar N. Gujarati, *Basic Econometrics*, (3rd ed.) McGraw Hill (1995), Chapters 1-3.

such an analysis in this matter where I evaluate the relationship between Barclays ADRs' daily returns (percentage change in price) controlling for the S&P 500 Total Return Index (the "Market Index") and an equal weighted peer index (the "Peer Index").[72, 73, 74]

55.    For each trading day analyzed, I constructed a regression model using data from the prior 120 trading days (roughly six months).[75]  By using a "rolling" estimation window, it allows for the relationship between Barclays ADRs, industry and market factors, as well as firm-specific volatility to update over time according to the data observed over the most recent 120 trading day period.  Use of a rolling model to account for changing volatility and evolving relationships among market indices is accepted in peer-reviewed literature.[76]

56.    The model indicates that there is a positive correlation between Barclays ADRs and the control variables.  In other words, the movement of the Market Index and Peer Index helps explain the price movements of Barclays ADRs during the broader Analysis Period (of which the Class Period is a subset).  For instance, choosing a day in the Class Period purely as an example, August 24, 2021, and looking at the regression results based on the 120 days prior to that day, the estimated coefficient for the S&P 500 is 1.21 which means that a 1% rise in the S&P 500 predicts a 1.21% increase in returns for Barclays ADRs.  The estimated coefficient for the Peer Index is 0.83, meaning that the expected return for Barclays ADRs is about a 0.83% increase for

---

[72] The Peer Index is an equal weighted index using the returns of Bank of America, Citigroup, Goldman Sachs, Morgan Stanley, Credit Suisse, Deutsche Bank, JP Morgan Chase, and UBS.

[73] I constructed the Peer Index based on the companies Barclays lists as Peers on its website.  *See* https://home.barclays/investor-relations/share-price-and-calculator/.

[74] The returns of the Peer Index are net of the S&P 500 Total Return Index.

[75] A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997): 15 ("For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event.").

[76] Phillip A. Braun, et al., "Good News, Bad News, Volatility, and Betas," *The Journal of Finance* 50, no. 5 (1995): 1575-1577, 1597.

every 1% increase in the Peer Index over and above the return of the S&P 500. **Exhibit 5** plots

the estimated coefficients for the rolling regression models for each day during the Analysis

Period (of which the Class Period is a subset), and it demonstrates there is a consistently positive

relationship between the general market, the Peer Index, and the price of Barclays ADRs.

57.    Another important statistic from the regression model is the standard deviation of

the errors, which measures the degree of imprecision in the predictions from the model.  Put

another way, this measure provides a metric for how much unexplained price movement remains

in the price movement of Barclays ADRs after controlling for the Market Index and Peer Index.

For instance, on the example date, August 24, 2021, the model predicted that absent any value

relevant new firm-specific information, the price of Barclays ADRs would increase by 1.03%

because the S&P 500 was up 0.15% and the Peer Index was up 0.97%.[77]  Because of the inherent

randomness observed in stock price returns, I do not expect the model to predict returns exactly.

In this example, I observe an actual return of 0.80%.  Thus, the "abnormal return" for this day is

-0.23% (the actual return of 0.80% minus the predicted return of 1.03%).  I then rely on the

standard deviation of the errors from the regression model to tell if this abnormal return of -

0.23% is sufficiently large that I can reject random movement as the explanation.

58.    The test for whether randomness can be rejected is done by calculating what is

known as a "t-statistic," which represents the number of standard deviations between the actual

observation and the prediction.  For the example date, an abnormal return of -0.23% represents

0.21 standard deviations or a t-statistic of -0.21 (abnormal return of -0.23% divided by the

---

[77] The predicted return of 1.03% is found as follows: 1.21 * 0.15% (coefficient on Market Index *times* Market Index return) + 0.83 * 0.97% (coefficient on Industry Index *times* Industry Index return) + 0.04% (constant term from regression).

standard deviation of the errors of .011).[78]  Using the standard assumption that, in the absence of

new value relevant company-specific news, abnormal returns will be normally distributed around

zero, probability theory implies that based on randomness alone, using a 95% confidence level

and large sample size, the abnormal return should have a t-statistic greater than 1.96 (or less than

-1.96) only 5% of the time.[79, 80]  Stating this point another way, there is 95% confidence that the

actual return will fall within 1.96 standard deviations of the predicted return unless there is some

non-random explanation.  Since our example has a t-statistic of -0.21, the abnormal return is not

statistically significant at the 95% confidence level, and I cannot reject randomness as the cause

of the abnormal price movement with greater than 95% confidence.  By contrast, if on a

particular day one observes an abnormal return that has a t-statistic of a magnitude greater than

1.96 (statistically significant at the 95% confidence level) and one observes new value relevant

firm-specific information, one would reject randomness as the explanation with 95% confidence

and infer that the new information is the cause of the stock price movement.

59.    **Exhibit 6** shows that the standard deviation of the errors for Barclays ADRs varied

over the Analysis Period (of which the Class Period is a subset).  By adopting the rolling

regression model, my event study explicitly adjusts for the changing Company-specific

volatility.

---

[78] The standard deviation of the errors is plotted in **Exhibit 6**.  The standard deviation of the errors is also known as the standard error.  The National Academies Press, *Reference Manual on Scientific Evidence*, (3rd ed.) (2011): 243. ("An estimate based on a sample is likely to be off the mark, at least by a small amount, because of random error. The standard error gives the likely magnitude of this random error, with smaller standard errors indicating better estimates.")

[79] Basic statistics state that for a normally distributed variable, 5% of the observations are expected to fall outside 1.96 standard deviations from the mean.  The National Academies Press, *Reference Manual on Scientific Evidence*, (3rd ed.) (2011): 342.  ("The normal distribution has the property that the area within 1.96 standard errors of the mean is equal to 95% of the total area.")

[80] The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.  *See* David I. Tabak & Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook, The Role of the Financial Expert*, (3rd ed.) (2001), Chapter 19.

60.    To analyze cause-and-effect, I examined the price response of Barclays ADRs to the 13 earnings announcements during the Analysis Period.  This includes the five earnings announcements that occurred during the Class Period, the three quarters and one preannouncement prior to the start of the Class Period, and the four quarters after the end of the Class Period in order to have a more robust set of observations.  *See* **Exhibit 7**.

61.    There are many academic articles and financial treatises that explain theoretically and demonstrate empirically that the release of company earnings information often (but not necessarily always) causes a significant change in investors' beliefs regarding the value of a security.[81]  Also, newly released earnings reports by a company are an objective set of news to identify and test.  Considering the ninth earnings release listed in **Exhibit 7** as an example, on February 23, 2022, the Company announced positive quarter results for the fiscal quarter ending December 31, 2021, announcing pre-tax profit of £1.5 billion that beat company-compiled consensus by 26%.[82]  In response, the market price of Barclays ADRs increased by 2.58%, compared to the predicted return of -1.29%.  Thus, the abnormal return on February 23, 2022 was 3.87%.  With a t-statistic of 3.41, this abnormal price movement is statistically significant at the 99% level, and I therefore have scientific evidence that Barclays ADRs reacted rapidly to this new information.

---

[81] William H. Beaver, "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research* 6, (1968): 67-92; Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research* 9, (1971): 119-163; Joseph Aharony & Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance* 35, no. 1, (1980): 1-12.

[82] *See* "Sound 4Q helped by loan loss releases," *BofA Global Research,* February 23, 2022; "4Q21 First take: Good cost discipline drives Q4 with ongoing share buybacks," *J.P. Morgan*, February 23, 2022.

62.    Similar to this example, I analyzed the market reaction to Barclays's other earnings announcements I identified above.  In total, of the 13 earnings announcements Barclays issued during the Analysis Period, eight resulted in statistically significant price movements above the 95% confidence.[83,84]  It is not unusual to observe many earnings announcements that are not statistically significant.  This happens, for instance, in quarters where there was insufficient surprise and/or the firm roughly met expectations, if the firm offered little change in guidance, and/or if there was a mix of both positive and negative information.

63.    **Exhibit 7** presents a summary of the earnings releases during the Analysis Period.

64.    I then compared these results against the 25 days during the Analysis Period where I identified no Barclays-related news from the Factiva database search I performed and when there were no analyst reports, SEC filings, or Barclays press releases issued.  Of these 25 days, there was one statistically significant price movement.  Thus, during the Analysis Period there was a statistically significant price reaction at the 95% confidence level or greater on 62% of the earnings announcements, but when compared to days with no Barclays-related news, I observed only a 4% rate of the days having statistically significant reactions.[85, 86]  This is powerful scientific evidence of a cause-and-effect relationship between new publicly released information concerning the Company and changes in the price of Barclays ADRs.

65.    Furthermore, on the 25 days with no news, the average change in price of Barclays ADRs was only 1.04% after controlling for market and industry factors, while the average

---

[83] Six earnings announcements were also significant at the 99% level.

[84] I also note that my event study finds a statistically significant price decline at the 99% confidence level on the alleged corrective disclosure date, March 28, 2022.

[85] This difference between 62% and 4% is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).

[86] Based on randomness alone, one would expect 5% of the no news days to be statistically significant.  The observed rate of 4% is not statistically significantly different than 5%.

change in Barclays ADRs on earnings announcement dates after controlling for market and industry factors was 4.35%.  In other words, the average magnitude of stock price movement on earnings announcement days was over 4 times higher than on no news days.[87]  Again, this demonstrates that on days when important company-specific information is released to the market, the stock price moves much more than on days where there is no company-specific news.  This provides further evidence of a cause-and-effect relationship between company-specific news and changes in the price of Barclays ADRs, and thus an efficient market.

66.    The bar charts below summarize this analysis while **Exhibit 8** gives more detail.



**Percentage of Days Significant at the 95% Confidence Level**

---

[87] This difference between 4.35% and 1.04% is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).

**Average Absolute Abnormal Return**



67.    Finally, when important Company-specific news is released to the market (*e.g.*, earnings announcements), the daily trading volume of Barclays ADRs also tends to be higher[88] than on days where there is no news.  For instance, the average daily trading volume of the 11 days with earnings announcements was 7.0 million.  Compare this to the average daily trading volume of 5.3 million for days where there is no news in the Analysis Period.[89]  The bar chart below summarizes this analysis.

---

[88] William H. Beaver, "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research* 6, (1968): 69, 84.

[89] This difference between 7.0 million and 5.3 million is itself statistically significant at the 90% confidence level.



68.    The bar charts above establish a strong cause-and-effect relationship between new, Company-specific news and rapid changes in the price of Barclays ADRs.  The earnings announcement days have a much greater percentage of significant price movements, higher daily trading volume on average, and statistically significant larger price changes than those found on days with no news.

69.    In conclusion, the event study analysis presented in this section demonstrates a clear cause-and-effect relationship between new material news and changes in the market price of Barclays ADRs during the Analysis Period, and thus the Class Period.

## G. *KROGMAN* FACTOR 1: MARKET CAPITALIZATION

70.    In *Krogman*, the court noted that economic theory includes other possible relevant factors for determining whether a stock trades in an efficient market, in addition to the *Cammer*

factors.[90]  The *Krogman* court held: "Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[91] Furthermore, Thomas and Cotter find that firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following."[92]  Therefore, market capitalization is another quantifiable measure that is likely correlated with efficiency.

71.    Barclays ADRs had a higher market capitalization than the majority of NYSE and NASDAQ stocks during the Class Period, thus suggesting this factor is supportive of efficiency. There were between 152.62 and 163.75 million shares of Barclays ADRs outstanding throughout the Class Period.[93]

72.    Based on the market price, the market capitalization for Barclays ADRs averaged $1.58 billion during the Class Period.  **Exhibit 9A** shows the market capitalization for Barclays' ADRs over the Class Period while **Exhibit 9B** shows the market capitalization for Barclays' ordinary shares.  **Exhibit 10** shows that during the Class Period, Barclays ADRs market capitalization ranged from the 59th to 63rd percentile of the combined NYSE and NASDAQ markets for the applicable quarters during the Class Period.[94]  In other words, over the Class

---

[90] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*").  The factors identified by the *Krogman* Court are 1) market capitalization, 2) the percentage of stock not held by insiders (the float) and 3) bid-ask spread.

[91] *Krogman*, 202 F.R.D. at 478.

[92] Randall S. Thomas & James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63, no. 3, (2000): 117.

[93] This is based upon daily ADRs outstanding data obtained from third-party J.P Morgan in response to a subpoena and supplied by Counsel.

[94] Bloomberg EQS Function.

Period, Barclays ADRs had a higher market capitalization than at least 59% of the firms on the combined NYSE and NASDAQ exchanges.

73.    Given that the market capitalization for Barclays ADRs was consistently large relative to other publicly-traded companies, this factor is supportive of market efficiency for Barclays ADRs.

## H.  *KROGMAN* FACTOR 2: THE BID-ASK SPREAD

74.    The second *Krogman* factor considers the bid-ask spread for a security, reasoning that "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[95]  The bid-ask spread is an important indicator of the degree to which a market is developed.  The bid-ask spread represents a measure of the cost to transact in a market.  Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price.  Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price.  In addition, the wider the bid-ask spread, the more costly it is to arbitrage away small inefficiencies because the cost of the trade could be greater than the perceived inefficiency.  Thus, a narrow bid-ask spread supports the presence of an efficient market where the prices reflect publicly available information.

75.    I analyzed bid-ask spreads for Barclays ADRs during the Class Period.  **Exhibit 11** shows that during this period, the time-weighted average percentage bid-ask spread for Barclays ADRs in each month was between 0.039% and 0.090%.[96]  This is well below the average and

---

[95] *Krogman*, 202 F.R.D. at 478.

[96] The time-weighted average bid-ask spread was calculated by taking the average of the spread during trading hours on the primary exchange of each security, weighted by the amount of time each quote prevails in the market.  That is, I take the weighted average quote, with the weight being the number of seconds between that quote and the next quote that occurs.  Spread is calculated as the difference between the bid price and ask price divided by the midpoint

median bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in February 2022 (the full month during the Class Period when Barclays had the largest percentage bid-ask spread).[97,98]  **Exhibit 11** demonstrates that Barclays ADRs had a monthly average bid-ask spread of 0.090% in February 2022, while a randomly selected group of 100 other common stocks on the NYSE and NASDAQ had an average bid-ask spread of 0.62%. Accordingly, Barclays ADRs' bid-ask spread was low during the Class Period, and this factor further supports market efficiency for Barclays ADRs.

### I.  *KROGMAN* FACTOR 3: PUBLIC FLOAT

76.    The *Krogman* court's final factor is that the public float (*i.e.*, the amount of shares not held by insiders) is considered to be indicative of market efficiency.  As shown in **Exhibit 12**, during the Class Period, insiders held no outstanding shares of Barclays ADRs to my knowledge, meaning that 100% of Barclays's ADRs were held by non-insiders.[99]  This large percentage of shares held by non-insiders – a substantial percentage of which were purchased and held by institutional investors – supports a finding of market efficiency.

---

of the bid-ask spread.  I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang & Hans R. Stoll, "Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE," *Journal of Financial Economics* 41, no. 3 (1996): 320.

[97] Quote data for Barclays and other publicly traded stocks were obtained from the TICK database.  *See* https://tickapi.tickdata.com/.

[98] I constructed a random sample because I am not aware of any exchange-wide reporting of average or median bid-ask spreads.  Determining the average bid-ask spread for the entire market would be a very costly and data intensive process, therefore I adopted a random sampling methodology.  I determined the constituents of the NYSE and NASDAQ for February 2022 and then randomly generated a list of 100 common stock securities.  I then calculated the time-weighted average monthly bid-ask spread for February 2022.

[99] S&P Capital IQ did not list any insider holdings of Barclays ADRs during the quarters contained in the Class Period.

### J. ADDITIONAL FACTOR: INSTITUTIONAL OWNERSHIP

77.    Institutional investors are considered to be sophisticated and well-informed with access to most publicly available information for the stocks that they own.  These investors include mutual funds, pension funds, investment banks, and other types of large financial institutions that have substantial resources to analyze the securities they purchase for their portfolios.  As **Exhibit 12** shows, 426 institutions reported owning Barclays ADRs during the Class Period, holding the majority of the public float.  This substantial level of institutional ownership of Barclays ADRs during the Class Period coupled with the high trading volume further supports a conclusion of market efficiency.

### K. ADDITIONAL FACTOR: AUTOCORRELATION

78.    If previous price movements of a security have the ability to predict future price movements, then it is said to be "autocorrelated."  Autocorrelation is relevant to efficiency because if the autocorrelation is persistent and sufficiently large enough that a trader could profit from taking advantage of the autocorrelation, it means that past price movements are not fully reflected in the current price, which would suggest market inefficiency.

79.    Autocorrelation may occur from time to time for random reasons or due to the pattern of company-specific news.  Efficiency would only be violated, however, if the autocorrelation were large enough and persistent enough that a trader could consistently earn riskless profits over time.[100]

80.    A well-accepted methodology to test for the existence of autocorrelation is to run a regression analysis that tests whether, on average, the abnormal return from the previous day has

---

[100] Doron Avramov, et al., "Liquidity and Autocorrelations in Individual Stock Returns," *The Journal of Finance* 61, no. 5 (2006): 2365, 2367-68; Michael C. Jensen, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* 6, nos. 2/3 (1978): 95-101.

a statistically significant effect on the abnormal return today.[101]  If the previous day's abnormal

return has no statistically significant predictive power, then there is no evidence of

autocorrelation.

81.    **Exhibit 13** displays the autocorrelation coefficient for Barclays ADRs for the

Analysis Period using the abnormal returns from the event study model described above.  The

coefficient is not statistically different than zero, meaning there is no evidence of autocorrelation

in the trading of Barclays ADRs during the Analysis Period.[102]  These results are consistent with

the notion that an investor could not consistently predict abnormal movements and earn arbitrage

profits.  Therefore, this factor also supports the conclusion that Barclays ADRs traded in an

efficient market throughout the Analysis Period.

## L.  ADDITIONAL FACTOR: OPTIONS

82.    In addition to the factors analyzed above, there was also considerable option trading

in Barclays ADRs during the Class Period.[103]  Academic articles have demonstrated that options

written on existing assets can improve efficiency by permitting an expansion of the

contingencies that are covered by the market.[104]  Empirical analysis has shown that option

listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading

volume, trading frequency, and transaction size – an overall improvement of the market quality

---

[101] William H. Greene, *Econometric Analysis*, (6th ed.) Prentice Hall (2008), Chapter 19, p. 644.

[102] **Exhibit 13** also shows that I found no evidence of autocorrelation during the Class Period.

[103] For instance, according to Bloomberg, there were 232,686 Barclays ADR put contracts and 600,392 Barclays ADR call contracts that traded during the Class Period.

[104] Stephen A. Ross, "Options and Efficiency," *Quarterly Journal of Economics* 90, no. 1 (1976): 75.

of the underlying stocks.[105]  Thus, this factor also supports that Barclays ADRs traded in an efficient market throughout the Class Period.

### M. ADDITIONAL FACTOR: LACK OF ARBITRAGE OPPORTUNITY

83.    Throughout the Class Period, Barclays' ordinary shares were listed on the LSE and its ADRs traded on the NYSE.  In an efficient market, one would expect related securities such as these to move in tandem in the marketplace after taking into account the conversion ratio and exchange rate.  If, by contrast, the securities did not trade in tandem, then there would be opportunities for arbitrage.  Arbitrage is defined as the "exploitation of security mispricing in such a way that risk-free economic profits may be earned."[106]  It involves the simultaneous purchase and sale of equivalent securities in order to profit from discrepancies in their price relationship.[107]  As shown in **Exhibit 14**, however, Barclays ADRs moved in tandem with Barclays ordinary shares.  The correlation in the prices is 99% and the average difference in closing prices during the Class Period is only 1.1%.  This further supports my view that Barclays ADRs traded in an efficient market.

## VIII. DAMAGES

84.    Counsel for Lead Plaintiff also asked me to opine on whether per share damages could be measured for all purchasers of Barclays ADRs during the Class Period under Section 10(b) using a common methodology that is consistent with Lead Plaintiff's theory of liability.[108],[109]  There is a standard and well-accepted method for calculating class-wide damages

---

[105] Raman Kumar, et al., "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *The Journal of Finance* 53, no. 2 (1998): 717.

[106] Zvi Bodie, et al., *Investments*, Fourth Edition, Irwin McGraw-Hill, 1999, p. 307.

[107] *Id*.

[108] *See* **Section III** and **Section IV**.

[109] References to a "share" throughout this section refer to a share of Barclays ADRs.

in cases under Section 10(b). This method, typically referred to as the "out-of-pocket" method, states that damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private Securities Litigation Reform Act of 1995's ("PSLRA") "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).[110] The out-of-pocket method has been applied in virtually every matter in which I have observed or participated in as a consulting, testifying, or neutral expert.

85. Once the inflation per share has been quantified on each day during the class period, the computation of damages for each class member is formulaic based upon information collected in the claims process (*i.e.*, the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Therefore, there is a well-accepted method to compute damages in Section 10(b) matters such as this.

86. Separate and apart from whether there is a common method for computing damages is the question of how to quantify the artificial inflation per share that is an input to the damages methodology. The quantification of the artificial inflation per share requires a detailed loss causation analysis.[111] Nevertheless, whatever the method for determining the artificial inflation per share, it would be common to all class members.

---

[110] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See* Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

[111] I have not been asked to conduct a loss causation analysis at this time. In my experience, loss causation analyses are often informed by information learned in discovery.

87.     For example, the most widely-used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that revealed the relevant truth, such as the alleged corrective price reaction to Barclays' disclosure that it had issued securities in excess of what it was allowed,[112] which was concealed by the alleged material omissions and/or misrepresentations (*i.e.*, a "corrective disclosure").[113]  Such an event study would also need to consider whether and to what extent any non-fraud related information (*i.e.*, "confounding information") contributed to the observed price movement.  If there is such confounding information, disaggregating the price impact of corrective disclosures from confounding information may utilize valuation techniques and may depend on information learned through discovery.  Determining the specific valuation approach necessary to perform a loss causation analysis that reasonably disaggregates corrective and confounding information is an inherently case-specific question that depends on specific facts and circumstances.  Examples of such techniques include, but are not limited to, fundamental valuation analysis such as discounted cash flow methods, valuation multiple methods (*i.e.*, price to earnings multiples, price to EBITDA multiples, price to revenue multiples, etc.), use of academic studies regarding the value of certain types of information, and other available valuations whether from securities analysts or made available through discovery.  Regardless of the technique used, it is performed on a class-wide basis – in other words, the specific methodology applies regardless of the identity or circumstances of any individual class member.

88.     Loss causation analysis also requires an analysis of how inflation per share may have evolved over a class period.  Again, the nature of this analysis is intensely factual, case-

---

[112] Complaint ¶¶ 160-161.

[113] The event study I have performed for this report is for Market Efficiency purposes and is not an attempt at valuing artificial inflation.

specific, and may depend on information learned through discovery. For example, an often-used method is to assume "constant dollar inflation," which implies that the artificial inflation was the same dollar amount during the class period. In certain circumstances, it may be more reasonable to apply "constant percentage inflation," which implies the price was inflated by a consistent percentage in the absence of additional disclosures. In other cases, artificial inflation has evolved based upon the nature and timing of specific misstatements or the inflation varied on a daily basis as a result of information contained in internal documents obtained in discovery. To summarize, the determination of how artificial inflation evolves over a class period is also a case-specific, fact-specific loss causation exercise that can rely on valuation techniques including, but not limited to, event studies, fundamental valuation, contemporaneous valuations or documents, or some combination of the above. Once again, however, all of these loss causation methodologies are class-wide in nature and do not depend on the identity or circumstance of any specific investor.

89. Accordingly, although I have not been asked to calculate class-wide damages in this report, and such calculations would likely depend, in part, on the completion of discovery, and full development of the case record, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole.

## IX.  CONCLUSION

90. In sum, every factor analyzed supports my opinion that Barclays ADRs traded in an efficient market during the Class Period. Furthermore, class-wide damages in this matter can be calculated on a class-wide basis using a common methodology.

42

91.    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.


Executed on August 12, 2024

_Chad Coffman_
Chad Coffman

42

# Exhibit 1
# Summary of Efficiency Factors for Barclays PLC

| Factor | Summary of Factor | Barclays |
|---|---|---|
| Average Weekly Trading Volume Cammer I | "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption." | • The average weekly trading volume of 17.82%, as a percentage of ADRs outstanding, exceeds the standard of 2% that courts have suggested would justify a strong presumption of an efficient market (Note: 27.79 million ADRs traded weekly on average during the Class Period). |
| Analyst Coverage Cammer II | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." | • During the Class Period at least 26 securities analysts issued 302 analyst reports which implies that important information relevant to trading Barclays ADRs was widely communicated to the market. |
| Market Makers Cammer III | "For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." | • Because Barclays' ADRs was exchange-traded on the NYSE during the Class Period, not over the counter, this factor is satisfied. According to Bloomberg, throughout the Class Period, there were at least 66 market makers for Barclays ADRs. |
| SEC Form S-3 Eligibility Cammer IV | "It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." | • Barclays filed a Form F-3ASR, the equivalent of a Form S-3ASR for a foreign company, during the Class Period on March 1, 2021. I have found no evidence to believe that Barclays was not F-3 eligible throughout the Class Period, thus satisfying this factor. |
| Price Reaction to New Information Cammer V | "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." | • The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for Barclays ADRs. |
| Market Capitalization | Firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following." | • As of 3/31/2021 and 3/31/2022, Barclays ADR's market capitalization was $1.57 billion and $1.30 billion, respectively, which is at least the 59th percentile of all NYSE and NASDAQ stocks. Barclays ADRs therefore easily meets this criterion. |
| Bid-Ask Spread | The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. | • During the Class Period, the average percentage bid-ask spread for Barclays ADRs in each month ranged from 0.039% to 0.090%. Barclays's average percentage bid-ask spread was well below the mean and median bid-ask spread of a random sample of 100 other common stocks trading on the NASDAQ and NYSE in February 2022 (the full month when Barclays ADRs had the largest bid-ask spread). This supports a finding of efficiency. |
| Float and Institutional Ownership | Institutional investors are considered to be sophisticated, well-informed investors with access to most publicly available information for the stocks that they own. | • 426 institutions held the majority of the public float throughout the Class Period, which further supports the finding that Barclays ADRs traded in an efficient market. |
| Autocorrelation | If autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price. | • There was no evidence of statistically significant autocorrelation, which means that there was no systematic opportunity for a trader to profit from trading Barclays ADRs based solely on its past price movements. This supports a finding of efficiency. |
| Options | Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks. | • There were 232,686 Barclays ADR put contracts and 600,392 Barclays ADR call contracts that traded during the Class Period. Barclays ADRs therefore easily meets this criterion. |

**Exhibit 2**
**Barclays ADR Price & Volume**
**2/18/2021 - 3/31/2022**



Sources: Complaint, Motion to Dismiss Order, and S&P Capital IQ.

**Exhibit 3**
**Barclays ADR Average Weekly Trading Volume**
**as a Percentage of Shares Outstanding**
**2/18/2021 - 3/27/2022**



Source: S&P Capital IQ, ADRs outstanding data supplied by Counsel.

Note: Average weekly trading volume is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period on February 18, 2021 through March 27, 2022. The last week consists of four trading days (i.e., 3/22/2022, 3/23/2022, 3/24/2022 and 3/25/2022), and therefore, the average of the daily trading volume on this day is multiplied by five to get a comparable measure for the average weekly trading volume as a percentage of shares outstanding.  The last week is excluded from the median calculation.

# Exhibit 4
## Summary of Securities Analyst Reports Issued for Barclays

| | Analyst Name | Reports Issued During the Class Period: 2/18/2021 - 3/27/2022 |
|---|---|---|
| [1] | CFRA EQUITY RESEARCH | 73 |
| [2] | CREDIT SUISSE | 30 |
| [3] | CITIGROUP INC. RESEARCH | 17 |
| [4] | ZACKS INVESTMENT RESEARCH INC. | 17 |
| [5] | BOFA GLOBAL RESEARCH | 16 |
| [6] | JEFFERIES LLC | 16 |
| [7] | J.P. MORGAN | 13 |
| [8] | MORGAN STANLEY | 13 |
| [9] | UBS INVESTMENT BANK | 13 |
| [10] | SEEKING ALPHA | 13 |
| [11] | RBC CAPITAL MARKETS | 12 |
| [12] | MORNINGSTAR INC. | 12 |
| [13] | DEUTSCHE BANK | 9 |
| [14] | INVESTEC BANK PLC (UK) | 9 |
| [15] | BERENBERG | 7 |
| [16] | AUERBACH GRAYSON | 6 |
| [17] | SOCIETE GENERALE CROSS ASSET RESEARCH | 5 |
| [18] | MARKTFELD | 5 |
| [19] | WATCHDOG RESEARCH INC. | 4 |
| [20] | QUANT IP GMBH | 3 |
| [21] | HSBC | 2 |
| [22] | SADIF-INVESTMENT ANALYTICS S.A. | 2 |
| [23] | RATING AND INVESTMENT INFORMATION | 2 |
| [24] | THE BUSINESS RESEARCH COMPANY | 1 |
| [25] | BANCO SANTANDER | 1 |
| [26] | SHORE CAPITAL GROUP LTD | 1 |
| | **Total** | **302** |

Source: Counsel, S&P Capital IQ.

Note: Many analyst reports are not available through third party data providers (e.g. S&P Capital IQ); therefore, this almost certainly understates the total amount of analyst coverage.

**Exhibit 5**
**Coefficients from Rolling Event Study Regression for Barclays ADR**
**2/18/2020 - 3/27/2023**



Note: The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is an equal-weighted index using the returns of the eight companies that are mentioned as a peer by Barclays on its website as of July 2024 (*see* https://home.barclays/investor-relations/share-price-and-calculator/). The returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcements, pre-announcements, and the alleged corrective disclosure date have been removed from estimation.

**Exhibit 6**
**Standard Deviation of the Errors for Rolling Event Study**
**Regression for Barclays ADR**
**2/18/2020 - 3/27/2023**



Note: The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is an equal-weighted index using the returns of the eight companies that are mentioned as a peer by Barclays on its website as of July 2024 (*see* https://home.barclays/investor-relations/share-price-and-calculator/). The returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcements, pre-announcements, and the alleged corrective disclosure date have been removed from estimation.

**Exhibit 7**
**Event Study Analysis of Barclays Earnings Announcements**

| # | Date | Time | Market Date | Event | Headline | Closing Price | Raw Return | Abnormal Return | Abnormal Dollar Change | t-Stat | Sig Level |
|---|------|------|-------------|-------|----------|--------------|-----------|-----------------|------------------------|--------|-----------|
| | | | | | | | | Rolling Regression Model (120-day window) | | | |
| 1 | 4/29/2020 | 2:00 AM | 4/29/2020 | Q1 2020 Earnings | Barclays PLC 1st Quarter Results *Source -Regulatory News Service* | $5.52 | 13.35% | 8.38% | $0.41 | 3.71 | *** |
| 2 | 7/13/2020 | 6:06 AM | 7/13/2020 | Q2 2020 Pre-Announcement | Barclays PLC Update on Barclays' CET1 capital ratio *Source -Regulatory News Service* | $5.91 | -1.66% | -1.40% | -$0.08 | -0.61 | |
| 3 | 7/29/2020 | 2:00 AM | 7/29/2020 | Q2 2020 Earnings | Barclays PLC Half-year Report *Source -Regulatory News Service* | $5.51 | -4.34% | -4.86% | -$0.28 | -2.10 | ** |
| 4 | 10/23/2020 | 2:00 AM | 10/23/2020 | Q3 2020 Earnings | Barclays PLC 3rd Quarter Results *Source -Regulatory News Service* | $5.83 | 6.00% | 5.31% | $0.29 | 3.54 | *** |
| 5 | 2/18/2021 | 2:00 AM | 2/18/2021 | Q4 2020 Earnings | Barclays PLC Annual Results Announcement *Source -Regulatory News Service* | $8.20 | -3.98% | -2.24% | -$0.19 | -1.23 | |
| 6 | 4/30/2021 | 2:00 AM | 4/30/2021 | Q1 2021 Earnings | Barclays PLC 1st Quarter Results *Source -Regulatory News Service* | $9.57 | -10.39% | -8.31% | -$0.89 | -4.36 | *** |
| 7 | 7/28/2021 | 2:00 AM | 7/28/2021 | Q2 2021 Earnings | Barclays PLC Half-year Report *Source -Regulatory News Service* | $9.71 | 2.32% | 2.05% | $0.19 | 1.51 | |
| 8 | 10/21/2021 | 2:00 AM | 10/21/2021 | Q3 2021 Earnings | Barclays PLC 3rd Quarter Results *Source -Regulatory News Service* | $11.05 | -1.69% | -1.27% | -$0.14 | -1.40 | |
| 9 | 2/23/2022 | 2:00 AM | 2/23/2022 | Q4 2021 Earnings | Barclays PLC Annual Financial Report *Source -Regulatory News Service* | $10.74 | 2.58% | 3.87% | $0.41 | 3.41 | *** |
| 10 | 4/28/2022 | 2:01 AM | 4/28/2022 | Q1 2022 Earnings | Barclays PLC Q1 2022 Results Announcement *Source -Regulatory News Service* | $7.55 | 3.71% | 2.98% | $0.22 | 2.35 | ** |
| 11 | 7/28/2022 | 2:00 AM | 7/28/2022 | Q2 2022 Earnings | Barclays PLC Half-year Results *Source -Regulatory News Service* | $7.48 | -5.20% | -6.71% | -$0.53 | -5.55 | *** |
| 12 | 10/26/2022 | 2:00 AM | 10/26/2022 | Q3 2022 Earnings | Barclays PLC 3rd Quarter Results *Source -Regulatory News Service* | $7.00 | -0.14% | -0.53% | -$0.04 | -0.44 | |
| 13 | 2/15/2023 | 2:00 AM | 2/15/2023 | Q4 2022 Earnings | Barclays PLC Annual Final Results *Source -Regulatory News Service* | $8.45 | -8.35% | -8.62% | -$0.79 | -6.92 | *** |

Sources: S&P Capital IQ and Factiva.
Notes:
(1) The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is an equal-weighted index using the returns of the eight companies that are mentioned as a peer by Barclays on its website as of July 2024 (see https://home.barclays/investor-relations/share-price-and-calculator/). The returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcements, pre-announcements, and the alleged corrective disclosure date have been removed from estimation.

(2) "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater. "*" Denotes statistical significance at the 90% confidence level or greater.

**Exhibit 8**

**Comparison of Statistical Significance and Abnormal Returns
for Barclays Earnings Announcements
vs. Days with No News During the Analysis Period**

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [1] | 13 | 25 |
| Significant Days at 95% Confidence Level | 8 | 1 |
| % Significant Days at 95% Confidence Level [2] | 62% | 4% |
| Average Absolute Abnormal Return [3] | 4.35% | 1.04% |
| Average Volume (Millions) [4] | 7.0 | 5.3 |

Notes:

(1) Results are based on the Analysis Period. For the purposes of this analysis, I selected the 25 days with no news. Days with no news were days that had zero news articles from my Factiva database search and no analyst reports or SEC filings were issued.

(2) 62% rate of statistical significance is statistically significantly different than 4% at the 99% confidence level using either a Chi-Square test or Fisher's Exact test.

(3) 4.35% absolute return is statistically significantly different than 1.04% based on a t-test for difference of means at the 99% confidence level.

(4) The difference between 7.0 million and 5.3 million is statistically significant at the 90% level.

**Exhibit 9A**
**Barclays ADR Market Capitalization**
**2/18/2021 - 3/31/2022**



Sources: Complaint, Motion to Dismiss Order, S&P Capital IQ, ADRs outstanding data supplied by Counsel.
Note: Market capitalization is the product of the ADR price and the total ADRs outstanding for each trading day.

**Exhibit 9B**
**Barclays Ordinary Share Market Capitalization (USD)**
**2/18/2021 - 3/31/2022**



Sources: Complaint, Motion to Dismiss Order, S&P Capital IQ, and Barclays SEC Filings.
Note: Market capitalization is calculated as the market price for Barclays ordinary shares in USD multiplied by the shares outstanding value reported in Barclays' Annual Reports.

**Exhibit 10**
**Barclays ADR**
**Market Capitalization Rankings**

| Last trading day of: | Market Capitalization (Billions) | Percentile Rank on NYSE & NASDAQ |
|---|---|---|
| Q1 2021 | $1.57 | 59% |
| Q2 2021 | $1.48 | 59% |
| Q3 2021 | $1.58 | 61% |
| Q4 2021 | $1.63 | 63% |
| Q1 2022 | $1.30 | 62% |

Source: S&P Capital IQ, ADRs outstanding data supplied by Counsel.
Note: Market capitalization is the product of the ADR price and the total ADRs outstanding for each trading day.

**Exhibit 11**
**Barclays ADR Average Monthly Bid-Ask Percentage Spread**
**2/18/2021 - 3/27/2022**



Source: Thomson Reuters Eikon and TICK Data.
Note: February 2021 and March 2022 data are limited to the Class Period.

**Exhibit 12**
**Barclays ADRs Outstanding, Insider Holdings, and Institutional Holdings**

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 3/31/2021 | 153,021 | 248 | 0 | 6,155 | 159,175 | 0.00% | 89,037 | 58.19% | 55.94% |
| 6/30/2021 | 152,996 | 289 | 0 | 5,795 | 158,791 | 0.00% | 106,509 | 69.62% | 67.08% |
| 9/30/2021 | 153,009 | 295 | 0 | 8,027 | 161,035 | 0.00% | 110,423 | 72.17% | 68.57% |
| 12/31/2021 | 157,458 | 308 | 0 | 10,289 | 167,747 | 0.00% | 118,420 | 75.21% | 70.59% |
| 3/31/2022 | 164,013 | 331 | 0 | 11,719 | 175,732 | 0.00% | 132,656 | 80.88% | 75.49% |

| Total Institutions over Class Period: | 426 | | | Class Period Average: | 0.00% | | 71.21% | 67.53% |
|---|---|---|---|---|---|---|---|---|

Sources: S&P Capital IQ, ADRs outstanding data supplied by Counsel.

**Exhibit 13**
**Barclays ADR**
**Test for Autocorrelation**

| Quarters During the Analysis Period | Coefficient on Previous Day's Abnormal Return [2] | t-Statistic | Sig Level [3] |
|---|---|---|---|
| Q1 2020 | 0.28 | 1.55 | |
| Q2 2020 | -0.13 | -1.00 | |
| Q3 2020 | 0.02 | 0.17 | |
| Q4 2020 | -0.07 | -0.56 | |
| Q1 2021 | -0.13 | -1.03 | |
| Q2 2021 | 0.00 | -0.03 | |
| Q3 2021 | -0.07 | -0.50 | |
| Q4 2021 | 0.00 | -0.04 | |
| Q1 2022 | -0.09 | -0.72 | |
| Q2 2022 | -0.08 | -0.63 | |
| Q3 2022 | -0.17 | -1.40 | |
| Q4 2022 | -0.15 | -1.21 | |
| Q1 2023 | -0.08 | -0.61 | |
| **Analysis Period[3]** | **-0.01** | **-0.22** | |
| **Class Period[1],[3]** | **-0.04** | **-0.63** | |

Source: S&P Capital IQ.
Notes:
(1) I also found no evidence of autocorrelation during the Class Period.
(2) For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable. Quarterly data is limited to the Analysis Period.
(3) *** Denotes statistical significance at the 99% confidence level or greater. ** Denotes statistical significance at the 95% confidence level or greater. * Denotes statistical significance at the 90% confidence level or greater.

**Exhibit 14**
**Prices of Barclays Securities Traded on LSE and NYSE**
**2/18/2021 - 3/31/2022**



Sources: Complaint, Motion to Dismiss Order, and S&P Capital IQ.
Note: Barclays ordinary share close price was downloaded in USD are multiplied by 4 to account for the 1:4 ADR ratio between Barclays ADRs and ordinary shares.

# Appendix A
# Documents Considered

## Court Documents

- Amended Class Action Complaint filed March 6, 2023, *IN RE BARCLAYS PLC SECURITIES LITIGATION*, Case No. 1:22-cv-08172-KPF.

- OPINION AND ORDER filed February 23, 2024, *IN RE BARCLAYS PLC SECURITIES LITIGATION*, Case No. 1:22-cv-08172-KPF.

## Court Decisions and Securities Law

- *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).
- Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6. (Aug. 1988).
- *Cammer, et al., v. Bruce M. Bloom, et al.*, 711 F. Supp. 1264 (D.N.J. 1989).
- *Halliburton Co., et al., v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014).
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

## SEC Filings

- Barclays PLC SEC Form 20-F and 20-F/A filings submitted throughout the Class and Analysis Period.
- Barclays PLC SEC Form 6-K filings submitted during the Class and Analysis Period.
- Barclays PLC SEC Form F-3ASR filed on March 1, 2021.

## Security Data

- Historical price and volume data for Barclays PLC ADRs was obtained from S&P Capital IQ.
- Historical price data for Barclays PLC Ordinary Shares, companies comprising the Peer Index, and the S&P 500 Total Return Index was obtained from S&P Capital IQ.
- Trade and quote data for Barclays PLC ADRs during the Class Period and one hundred randomly selected companies trading on the New York Stock Exchange and NASDAQ for February 2022 were obtained from Tick Data, *see* https://tickapi.tickdata.com/. Companies trading on the New York Stock Exchange and NASDAQ for February 2022 were identified using Thomson Reuters Eikon.
- Institutional and insider holdings data was obtained from S&P Capital IQ.
- Barclays PLC ADRs options data was obtained from Bloomberg.
- Barclays ADRs outstanding data was obtained from third-party J.P. Morgan in response to a subpoena and supplied by counsel.
- Barclays PLC ADRs market makers data was obtained from Bloomberg, using the RANK function.

- Barclays PLC ADRs market capitalization percentiles were obtained from Bloomberg, using the SEQ function.
- Turnover velocity data for NYSE and NASDAQ were obtained from the World Federation of Exchanges, *see* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

**Barclays PLC News**

- Barclays PLC news headlines and select articles downloaded from Factiva for the Analysis Period.  The Factiva search for news over the Analysis Period resulted in 6,020 unique articles (and 2,954 articles over the Class Period) as a result of a search for "Major News and Business Sources" with the company field "Barclays PLC."  Of the 6,020 unique articles for the Analysis Period, I identified 2,513 articles that were unrelated to Barclays' underlying business including but not limited to articles titled "… - - Market Talk," "…Roundup: Market Talk," "OSSIAM …Net Asset Value(s)," "AMUNDI INDEX…Net Asset Value(s)," and additional duplicates identified as having the same source, title and publication time, if applicable.  Duplicate articles have also been removed by a proprietary function accessible in Factiva's search builder.
- Barclays PLC earnings conference call and investor call transcripts during the Class Period and Analysis Period, including but not limited to:
  - "FQ1 2021 Earnings Call Transcripts," *S&P Capital IQ*, April 30, 2021.
- Barclays PLC press releases, including earnings and guidance update press releases during the Class and Analysis Period, including but not limited to:
  - "Barclays PLC Impact of over-issuance under BBPLC US Shelf," *Regulatory News Service*, March 28, 2022, 2:00 AM ET.
  - "Barclays PLC Restatement of Financial Statements on Form 20-F," *Regulatory News Service*, May 16, 2022, 7:00 AM ET.
  - "Barclays PLC Annual Final Results," *Regulatory News Service*, February 15, 2023, 2:00 AM ET.

**Barclays PLC Analyst Reports**

- Barclays PLC analyst reports supplied by Counsel during the Analysis Period, including but not limited to:
  - "Sound 4Q helped by loan loss releases," *BofA Global Research*, February 23, 2022.
  - "4Q21 First take: Good cost discipline drives Q4 with ongoing share buybacks," *J.P. Morgan*, February 23, 2022.
- Seeking Alpha articles or reports for Barclays PLC published during the Class and Analysis Period under the site's "Analysis" section.
- S&P Capital IQ analyst reports for Barclays PLC published during the Analysis Period under the site's "Investment Research" Section.

## Academic Articles

- Aharony, Joseph & Swary, Itzhak. "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance* 35, no. 1, (1980): 1-12.

- Amihud, Yakov, et al., "Liquidity and Asset Prices," *Foundations and Trends in Finance* 1, no. 4 (2005): 269-364.

- Avramov, Doron, et al., "Liquidity and Autocorrelations in Individual Stock Returns," *The Journal of Finance* 61, no. 5 (2006): 2365-2394.

- Barber, Brad, et al., "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *The Journal of Corporation Law* 19, (1994): 285-312.

- Beaver, William H. "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research* 6, (1968): 67-92.

- Binder, John J. "The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting* 11, (1998): 111-137.

- Bodie, Zvi, et al., *Investments*, Fourth Edition, Irwin McGraw-Hill, 1999, p. 307.

- Braun, Phillip A., et al., "Good News, Bad News, Volatility, and Betas," *The Journal of Finance* 50, no. 5 (1995): 1575-1603.

- Fabozzi, Frank J., et al., *Foundations of Financial Markets and Institutions*, (4th ed.) Prentice Hall, (2010), Chapter 18 – Appendix A.

- Fama, Eugene F. "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383-417.

- Greene, William H. *Econometric Analysis*, (6th ed.) Prentice Hall (2008), Chapter 19, p. 644.

- Gujarati, Damodar N., *Basic Econometrics*, (3rd ed.) McGraw Hill (1995), Chapters 1-3.

- Huang, Roger D. & Stoll, Hans R. "Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE," *Journal of Financial Economics* 41, no. 3 (1996): 313-357.

- Jensen, Michael C. "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* 6, nos. 2/3 (1978): 95-101.

- Kumar, Raman, et al., "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *The Journal of Finance* 53, no. 2 (1998): 717-732.

- MacKinlay, A. Craig. "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997): 13-39.

- May, Robert G. "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research* 9, (1971): 119-163.

- Ross, Stephen A. "Options and Efficiency," *Quarterly Journal of Economics* 90, no. 1 (1976), pp. 75-89.
- Sharpe, William, et al., *Investments*, (5th ed.) Prentice Hall (1995), Chapter 3.
- Tabak, David I. & Dunbar, Frederick C. "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook, The Role of the Financial Expert*, (3rd ed.) (2001), Chapter 19.
- The National Academies Press, *Reference Manual on Scientific Evidence*, (3rd Ed.) (2011).
- Thomas, Randall S. & Cotter, James F. "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63, no. 3, (2000): 105-122.

**Other**

- https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.
- https://www.nyse.com/publicdocs/nyse/NYSE_IPO_Guide_Third_Edition.pdf.
- https://www.nyse.com/market-model.
- https://www.nasdaqtrader.com/Trader.aspx?id=TradingUSEquities.
- http://www.rss-specifications.com/.
- http://www.rss-specifications.com/what-is-rss.htm.
- www.sec.gov/about/forms/forms-3.pdf.
- https://www.sec.gov/files/formf-3.pdf.
- https://home.barclays/investor-relations/share-price-and-calculator/.
- https://www.sec.gov/files/litigation/admin/2022/33-11110.pdf.

**Appendix B**

**CHAD W. COFFMAN, MPP, CFA**

Peregrine Economics
125 South Wacker Drive
Suite 2610
Chicago, Illinois 60606
Mobile:          (815) 382-0092
Email:          ccoffman@peregrine-econ.com

## EMPLOYMENT:

**Peregrine Economics**
President (2024 - Current)

Peregrine Economics provides independent economic and financial analysis. Peregrine applies big picture thinking and proven economic tools to build a clear narrative around complex problems. Practice areas include: Data Science, General Damages, Labor & Employment, Regulatory Economics, and Securities Valuation.

**Global Economics Group, LLC**
President (2008 - 2023)

**Market Platform Dynamics, LLC**
Chief Financial Officer & Chief Operating Officer (2010 – 2023)

**Chicago Partners, LLC**
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

## EDUCATION:

**CFA**    Chartered Financial Analyst, 2003

**M.P.P.**  University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**    Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing:  Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

**Appendix B**

**PROFESSIONAL EXPERIENCE:**

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters.

- Expert Consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options.  Performed econometric analysis of various measures of option spread using tens of millions of trades.

**Testimony in the last four years:**

- Testifying Expert in Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated, v. Esperion Therapeutics, Inc., et al., Defendants, No. 2:16-cv-10089-AJT-RSW, United States District Court for the Eastern Michigan of Michigan. Filed expert report June 6, 2019. Deposition July 26, 2019. Filed rebuttal reply report October 7, 2019. Filed expert report May 15, 2020. Deposition July 31, 2020.

- Testifying Expert in Eric Weiner, Individually and on Behalf of All Others Similarly Situated, vs. Tivity Health, Inc., Donato Tramuto, Glenn Hargreaves and, Adam Holland, Defendants, Case No.: 3:17-cv-01469 United States District Court for the Middle District of Tennessee. Filed expert report July 1, 2019. Deposition September 4, 2019. Filed rebuttal reply report December 20, 2019. Filed expert report July 30, 2020. Filed rebuttal reply report September 30, 2020. Deposition October 22, 2020.

- Testifying Expert in Peace Officers' Annuity and Benefit Fund of Georgia, Individually and On Behalf of All Others Similarly Situated, and Jacksonville Police and Fire Pension Fund, Individually and On Behalf of All Others Similarly Situated vs. DaVita, Inc. et al., No. 1:17-cv-00304-WJM-NRN, United States District Court for the District of Colorado. Filed expert report January 31, 2020. Deposition May 27, 2020.

- Testifying Expert in In Re Avon Securities Litigation, No. 19 Civ. 01420- CM, United States District Court for the Southern District of New York. Filed expert report February 13, 2020.

- Testifying Expert in In Re Allergan Generic Drug Pricing Securities Litigation, Civil Action No. 2:16-9449 (KSH) (CLW), United States District Court for the District of New Jersey. Filed expert report March 20, 2020. Deposition July 16, 2020. Filed expert reply report November 25, 2020.

- Expert Declaration in Martin Cohen, Individually and On Behalf of All Others Similarly Situated, v. Luckin Coffee Inc., Jenny Zhiya Qian, and Reinout Hendrik Schakel, Case no. 1:20-cv-01293-LJL, United States District Court for the Southern District of New York. Filed declaration May 13, 2020.

- Testifying Expert in <u>In RE Navient Corporation Securities Litigation, No. 1:17-cv-08373-RBK-AMD, United States District Court of New Jersey.</u> Filed expert report May 15, 2020. Deposition July 23, 2020. Filed declaration August 21, 2020. Filed expert report April 16, 2021. Deposition June 3, 2021.

- Testifying Expert in <u>Yellowdog Partners, LP, Individually and on Behalf of All Others Similarly Situated, vs. CURO Group Holdings Corp., *et al*., Civil Action No. 2:18-cv-02662-JWL-KGG, United States District Court for the District of Kansas, Kansas City.</u> Filed expert report May 18, 2020.

- Testifying Expert in <u>Julian Keippel, Individually and On Behalf of All Others Similarly Situated, vs. Health Insurance Innovations, Inc., Gavin Southwell, and Michael D. Hershberger, No. 8:19-CV-00421-WFJ-CPT, United States District Court Middle District of Florida Tampa Division.</u> Filed expert report May 21, 2020. Deposition June 15, 2020.

- Testifying Expert in <u>In Re Perrigo Company plc Securities Litigation, No: 1:19-cv-00070-DLC, United States District Court for the Southern District of New York.</u> Filed expert report July 10, 2020. Deposition August 4, 2020. Filed expert report October 6, 2020. Filed expert rebuttal reply report December 4, 2020. Deposition March 4, 2021.

- Testifying Expert in <u>Plymouth County Retirement System, Individually and On Behalf of All Others Similarly Situated, vs. GTT Communications, Inc., Richard D. Calder, Jr., Chris Mckee, Michael Sicoli, And Gina Nomellini, Case No. 1:19-cv-00982-CMH-MSN, United States District Court for the Eastern District of Virginia Alexandria Division.</u> Filed expert report August 7, 2020. Filed expert report September 25, 2020.

- Testifying Expert in <u>Thomas W. Luczak, Individually and On Behalf of All Others Similarly Situated, vs. National Beverage Corp., Nick A. Caporella, and George R. Bracken, Case No. 0:18-cv-61631-KMM, United States District Court for the Southern District of Florida.</u> Filed expert report September 25, 2020. Deposition November 5, 2020.

- Expert Declaration in <u>In re: PG&E Corporation – and – Pacific Gas and Electric Company Debtors, Case No. 19-30088 (DM), United States Bankruptcy Court for the Northern District of California, San Francisco Division.</u> Filed declaration September 28, 2020.

- Testifying Expert in <u>Oklahoma Police Pension Fund and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Teligent, Inc. and Jason Grenfell-Gardner, Defendants, Case No. 1:19-cv-03354-VM, United States District Court for the Southern District of New York</u>. Filed expert report September 30, 2020. Deposition March 11, 2021.

- Testifying Expert in <u>John Utesch, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Lannett Company, Inc., Arthur P. Bedrosian, and Martin P. Galvan, Defendants, Civil Action No. 2:16-cv-05932-WB, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2020. Deposition December 10, 2020. Filed expert rebuttal report on May 13, 2021. Hearing testimony July 27, 2021. Filed expert report May 8, 2024. Deposition August 6, 2024.

- Testifying Expert in <u>City of Warren Police and Fire Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. World Wrestling Entertainment, Inc., Vincent K. McMahon, George A. Barrios and Michelle D. Wilson, Defendants, Civil Action No. 1:20-cv-02031-JSR, United States District Court for the Southern District of New York.</u> Filed expert report on October 6, 2020. Deposition October 14, 2020.

- Testifying Expert in <u>Employees' Retirement System of the Puerto Rico Electric Power Authority, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Conduent Inc., Ashok Vemuri, and Brian Webb-Walsh, Defendants, Case No. 2:19-cv-08237-SDW, United States District Court for the District of New Jersey.</u> Filed expert report on December 7, 2020. Deposition December 22, 2020.

- Testifying Expert in <u>The Police Retirement System of St. Louis, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Granite Construction Incorporated, James H. Roberts, Jigisha Desai, and Laurel J. Krzeminski, Defendants, Case No. 3:19-cv-04744-WHA, United States District Court for the Northern District of California.</u> Filed expert report on November 25, 2020. Filed declaration re: Plan of Allocation May 25, 2021.

- Testifying Expert in <u>Plumbers & Pipefitters National Pension Fund and Juan Francisco Nieves, as Trustee of the Gonzalez Coronado Trust, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. Kevin Davis and Amir Rosenthal (Performance Sports Group Ltd.), Defendants, Case No.: 1:16-CV-3591-GHW, United States District Court for the Southern District of New York.</u> Filed expert report on December 18, 2020. Deposition February 5, 2021. Filed expert rebuttal report on April 6, 2021. Filed declaration re: Plan of Allocation January 21, 2022.

- Testifying Expert in <u>Mayuko Holwill, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. AbbVie Inc., Richard A. Gonzalez, and William J. Chase, Defendants, Case No. 1:18-cv-6790, United States District Court for the Northern District of Illinois.</u> Filed expert report on February 1, 2021. Filed expert rebuttal report on September 20, 2021. Filed expert report on July 6, 2023. Filed expert rebuttal report on February 6, 2024.

- Testifying Expert in <u>Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Newell Brands Inc., Michael B. Polk, John K. Stipancich, Scott H. Garber, Bradford R. Turner, Michael T. Cowhig, Thomas E. Clarke, Kevin C. Conroy, Scott S. Cowen, Domenico De Sole, Cynthia A. Montgomery, Christopher D. O'Leary, Jose Ignacio Perez-Lizaur, Steven J. Strobel, Michael A. Todman, and Raymond G. Viault, Defendants, Case No: HUD-L-3492-18, Superior Court of New Jersey Law Division (Hudson County).</u> Filed expert report on May 3, 2021. Filed expert rebuttal report on June 15, 2021. Deposition July 21, 2021. Filed expert supplemental reply report on February 4, 2022. Deposition March 15, 2022.

- Testifying Expert in <u>Carmignac Gestion, S.A., Mason Capital L.P., et al., Pentwater Equity Opportunities Master Fund LTD., et al., First Manhattan Co., Nationwide Mutual Funds, on behalf of its series Nationwide S&P 500 Index Fund, et. al., WCM Alternatives: Event-Driven Fund, et al., Hudson Bay Master Fund LTD., et al., Schwab Capital Trust on behalf of its series Schwab</u>

S&P 500 Index Fund, et al., Sculptor Master Fund, LTD. f/k/a OZ Master Fund, Ltd., et al., Aberdeen Canada Funds – Global Equity Fund, a series of Aberdeen Canada Funds, et al., Discovery Global Citizens Master Fund, LTD., et al., York Capital Management, L.P., et al., Burlington Loan Management DAC, Universities Superannuation Scheme LTD., Principal Funds, Inc., et al., Kuwait Investment Authority et al., BlackRock Global Allocation Fund Inc., et al., Plaintiffs, vs. Perrigo Company PLC, et al, Defendants, Civil Action No(s): 17-10467 (MCA) (LDW), 18-1119 (MCA) (LDW), 18-1121 (MCA) (LDW), 18-2291 (MCA) (LDW), 18-15382 (MCA) (LDW), 18-16204 (MCA) (LDW), 18-16206 (MCA) (LDW), 19-3973 (MCA) (LDW), 19-4900 (MCA) (LDW), 19-6560 (MCA) (LDW), 19-21502 (MCA) (LDW), 19-21732 (MCA) (LDW), 20-1484 (MCA) (LDW), 20-2262 (MCA) (LDW), 20-2410 (MCA) (LDW), 20-3431 (MCA) (LDW), 20-4748 (MCA) (LDW), United States District Court for the District of New Jersey. Filed expert report on June 23, 2021. Filed expert report on September 29, 2021. Deposition October 26, 2021.

- Testifying Expert in In Re Nielsen Holdings PLC Securities Litigation, Case No. 18-CV-07143-JMF, United States District Court Southern District of New York. Filed expert report on July 14, 2021. Deposition September 30, 2021. Filed expert report December 17, 2021.

- Testifying Expert in Allegheny County Employees Retirement System et al. v. Energy Transfer LP et al., Case No. 2:20-cv-00200-GAM, United States District Court for the Eastern District of Pennsylvania. Filed expert report on September 17, 2021. Deposition November 18, 2021. Filed expert rebuttal report on April 22, 2022. Filed expert report on September 15, 2023. Deposition December 13, 2023.

- Testifying Expert in Julia Junge and Richard Junge et al. v. Geron Corporation et al., Case No. 3:20-cv-00547-WHA, United States District Court for the Northern District of California, San Francisco Division. Filed expert report on September 30, 2021. Deposition October 15, 2021. Filed expert rebuttal report on November 4, 2021.

- Testifying Expert in In Re MINDBODY, Inc. Securities Litigation, Civil Action No. 1:19-cv-08331-VEC, United States District Court Southern District of New York. Filed expert report on October 15, 2021.

- Testifying Expert in Plymouth County Retirement System and Oklahoma Police Pension and Retirement System, Individually and On Behalf of All Others Similarly Situated, v. Evolent Health, Inc., Frank Williams, Nicholas McGrane, Seth Blackley, Christie Spencer, and Steven Wigginton, Case No. 1:19-cv-01031, United States District Court Eastern District of Virginia, Alexandria Division. Filed expert report on October 19, 2021. Filed expert report on April 8, 2022. Deposition May 9, 2022. Filed expert report on May 27, 2022. Deposition June 22, 2022.

- Testifying Expert in In re Uniti Group Inc. Securities Litigation, Case No. 4:19-cv-00756-BSM, United States District Court Eastern District of Arkansas, Central Division. Filed expert report on October 25, 2021. Deposition December 6, 2021. Filed declaration re: expert report on January 24, 2022. Filed expert rebuttal report on February 22, 2022.

**Appendix B**

- Testifying Expert in <u>David Kanefsky, Individually and On Behalf of All Others Similarly Situated, v. Honeywell International Inc., Darius Adamczyk, and Thomas A. Szlosek, Civ. No. 2:18-15536-WJM, United States District Court for the District of New Jersey</u>. Filed expert report on November 1, 2021.

- Testifying Expert in <u>In Re Pareteum Securities Litigation, No. 1:19-cv-09767-AKH-GWG, United States District Court for the Southern District of New York</u>. Filed expert report December 1, 2021.

- Expert Declaration in <u>Arkansas Teacher Retirement System and John A. Prokop, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. OSI Systems, Inc., Deepak Chopra, Alan Edrick, and Ajay Mehra, Defendants, Case No. 17-cv-08841-VAP-SKx, United States District Court for the Central District of California, Western Division</u>. Filed declaration re: Plan of Allocation and aggregate damages December 10, 2021.

- Testifying Expert in <u>Boston Retirement System, Individually and On Behalf of All Others Similarly Situated v. Alexion Pharmaceuticals, Inc., Leonard Bell, David L. Hallal, Vikas Sinha, David Brennan, David J. Anderson, Ludwig Hantson, and Carsten Thiel, Defendants, Civ. No. 3:16-cv-2127(AWT), United States District Court for the District of Connecticut</u>. Filed expert report December 15, 2021. Deposition March 8, 2022. Filed expert rebuttal report June 17, 2022.

- Testifying Expert <u>In Re Aphria, Inc. Securities Litigation, No. 1:18-cv-11376-GBD, United States District Court Southern District of New York.</u> Filed declaration January 28, 2022 re: class certification. Filed expert report January 28, 2022. Deposition May 19, 2022.

- Testifying Expert in <u>Discovery Global Citizens Master Fund, Ltd., et al., MSD Torchlight Partners, L.P., et al., Incline Global Master LP., et al., Valic Company I, et al., Okumus Opportunistic Value Fund, Ltd., The Boeing Company Employee Retirement Plans Master Trust, et al., Första Ap-Fonden, et al., GMO Trust, et al., Hound Partners Offshore Fund, LP, et al., Colonial First State Investments Limited As Responsible Entity For Commonwealth Global Shares Fund 1, et al., Bharat Ahuja, et al., Brahman Partners II, L.P., et al., The Prudential Insurance Company Of America, et al., 2012 Dynasty UC LLC, et al., BlackRock Global Allocation Fund, Inc., et al., Northwestern Mutual Life Insurance Co., et al., Bahaa Aly, et al., James M. Templeton, et al., GIC Private LTD., et al., USAA MUTUAL FUNDS TRUST On Behalf Of Its Series USAA Aggressive Growth Fund, et al., Maverick Select Fund, Ltd., et al., Plaintiffs, vs. Valeant Pharmaceuticals International, Inc. et al., Defendants, Civil Action No(s): 3:16-cv-07321-MAS-LHG, 3:16-cv-07324-MAS-LHG, 3:16-cv-07494, 3:16-cv-07496, 3:17-cv-06513-MAS-LHG, 3:17-cv-07636-MAS-LHG, 3:17-cv-12088-MAS-LHG, 3:18-cv-00089, 3:18-cv-08705-MAS-LHG, 3:18-cv-00383-MAS-LHG, 3:18-cv-00846-MAS-LHG, 3:18-00893, 3:18-cv-01223-MAS-LHG, 3:18-cv-08595-MAS-LHG, 3:18-cv-00343-MAS-LHG, 3:18-cv-15286-MAS-LHG, 3:18-cv-17393, 3:20-cv-05478, 3:20-cv-07460-MAS-LHG, 3:20-cv-07462-MAS-LHG, 3:20-02190-MAS-LHG, United States District Court for the District of New Jersey.</u> Filed expert report February 2, 2022. Filed expert rebuttal report on May 9, 2022. Deposition June 3, 2022. Filed declaration September 28, 2022 (related only to 3:20-cv-02190-MAS-LHG). Filed declaration November 10, 2022.

- Testifying Expert in <u>Roei Azar, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Grubhub Inc., et al., Defendants, Case No. 1:19-cv-07665, United States District</u>

Court Northern District of Illinois Eastern Division. Filed expert report June 1, 2022. Deposition July 14, 2022.

- Testifying Expert in In Re Peabody Energy Corp. Securities Litigation, Civil Action No. 1:20-cv-08024-PKC, United States District Court Southern District of New York. Filed expert report July 15, 2022.

- Testifying Expert in BlackRock Asset Management Canada Limited, et al., Plaintiffs, v. Valeant Pharmaceuticals International, Inc. (n/k/a Bausch Health Companies Inc.), et al. Defendants, Nos.: 500-11-054155-185, 500-17-103749-183, and California State Teachers' Retirement System, Plaintiff, v. Bausch Health Companies Inc. (f/k/a Valeant Pharmaceuticals International, Inc.), et al., Defendants, Nos.: 500-11-055722-181, 500-11-055722-181, Canada Superior Court, Province of Québec, District of Montreal. Filed expert report September 30, 2022. Filed expert rebuttal report on July 10, 2023.

- Testifying Expert in Sheet Metal Workers National Pension Fund and International Brotherhood of Teamsters Local No. 710 Pension Fund, individually and as Lead Plaintiffs on behalf of all others similarly situated, and International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware, individually and as Named Plaintiff, on behalf of all others similarly situated, Plaintiffs v. Bayer Aktiengesellschaft, Werner Baumann, Werner Wenning, Liam Condon, Johannes Dietsch, and Wolfgang Nickl, Defendants, No. 3:20-cv-04737-RS, Northern District of California, San Francisco Division. Filed expert report October 28, 2022. Deposition December 21, 2022. Filed expert rebuttal report on March 21, 2023. Filed expert report June 11, 2024.

- Testifying Expert in In Re: Maxar Technologies, Inc. Shareholder Litigation, Lead Case No.:19CV357070, Superior Court of the State of California, County of Santa Clara. Filed expert report December 12, 2022.

- Testifying Expert in In Re FibroGen Inc., Securities Litigation, Case No. 3:21-cv-02623-EMC, United States District Court Northern District of California. Filed expert report January 27, 2023. Deposition April 4, 2023.

- Testifying Expert in Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago, individually and on behalf of all others similarly situated, Plaintiffs, v. Pluralsight, Inc.; Aaron Skonnard; and James Budge, Defendants, Case No. 1:19-cv-00128, United States District Court for the District of Utah. Filed expert report March 3, 2023.

- Testifying Expert in Sothinathan Sinnathurai, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Novavax, Inc., Stanley C. Erck, Gregory F. Covino, John J. Trizzino, and Gregory M. Glenn, Defendants, Case 8:21-cv-02910-TDC, United States District Court for the District of Maryland. Filed expert report March 16, 2023. Deposition September 14, 2023. Filed expert rebuttal report November 13, 2023.

- Testifying Expert in Meysam Moradpour, Individually and On Behalf of All Others Similarly Situated, v. Velodyne Lidar, Inc., Anand Gopalan, Andrew Hamer, James A. Graf, Michael Dee,

and Joseph B. Culkin, Case No. 3:21-CV-01486-SI, United States District Court Northern District of California San Francisco Division. Filed expert report March 20, 2023.

- Testifying Expert in In Re Boston Scientific Corporation Securities Litigation, Case No. 1:20-cv-12225-DPW, United States District Court District of Massachusetts. Filed expert report April 21, 2023. Filed declaration June 22, 2023.

- Testifying Expert in In Re Okta, Inc. Securities Litigation, Case 3:22-cv-02990-SI, United States District Court Northern District of California. Filed expert report August 18, 2023.

- Testifying Expert in Carl Shupe and Matthew Pearlman, Individually and on Behalf of All Others Similarly Situated, vs. Rocket Companies, Inc., Jay D. Farner, Julie R. Booth, Robert Dean Walters, Daniel Gilbert, and Rock Holdings Inc., Civ. No. 1:21-cv-11528, United States District Court Eastern District of Michigan, Southern Division. Filed expert report August 30, 2023. Deposition November 8, 2023. Filed expert rebuttal report on January 26, 2024. Filed expert report February 12, 2024. Deposition February 22, 2024. Filed expert rebuttal report on March 8, 2024. Filed expert report April 5, 2024. Deposition June 18, 2024.

- Testifying Expert in Richard R. Weston, Individually and on Behalf of All Others Similarly Situated, Plaintiff v. DocuSign, Inc., Daniel D. Springer, Michael J. Sheridan, Cynthia Gaylor, and Loren Alhadeff, Defendants, Case No. 3:22-cv-0084-WHO, United States District Court, Northern District of California, San Francisco Division. Filed expert report September 15, 2023. Deposition January 4, 2024. Filed expert rebuttal report on April 17, 2024.

- Testifying Expert in John Brazinsky, Individually and on behalf of all other similarly situated, Plaintiff, vs. AT&T Inc., Randall L. Stephenson, John T. Stankey, Pascal Desroches, and John Stephens, Defendants, Case No. 2:23-cv-04064-KM-JBC, United States District Court for the District of New Jersey. Filed declaration October 23, 2023.

- Testifying Expert in In Re Concho Resources Inc. Securities Litigation, No. 4:21-cv-02473, United States District Court Southern District of Texas, Houston Division. Filed expert report December 7, 2023. Filed expert rebuttal report on May 8, 2024.

- Testifying Expert in Reginald T Allison, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Oak Street Health, Inc., et al., Defendants, Case No. 1:22-cv-00149, United States District Court, Northern District of Illinois. Filed expert report December 15, 2023. Deposition January 23, 2024. Filed expert rebuttal report April 22, 2024.

- Testifying Expert in Boston Retirement System, et al., Plaintiff, v. Uber Technologies, Inc., et al., Defendants, Case No. 3:19-cv-06361, United States District Court, Northern District of California. Filed expert report February 1, 2024. Filed expert rebuttal report March 12, 2024. Deposition April 12, 2024.

- Testifying Expert in In Re Plantronics, Inc. Securities Litigation, Case No. 4:19-cv-07481-JST, United States District Court Northern District of California Oakland Division. Filed expert report February 8, 2024.

- Testifying Expert in <u>Robert Ciarciello, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Bioventus Inc., Kenneth M. Reali, Mark L. Singleton, Gergory O. Anglum, and Susan M. Stalnecker, Defendants, Case No. 1:23-cv-00032-CCE-JEP, United States District Court Middle District of North Carolina.</u> Filed expert report March 7, 2024. Filed expert report March 27, 2024. Deposition April 8, 2024. Filed expert rebuttal report May 10, 2024. Filed declaration re: Plan of Allocation August 5, 2024.

- Testifying Expert in <u>Michael Pardi, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Tricida, Inc. and Gerritt Klaerner, Defendants. Case No. 4:21-cv-00076-HSG, United States District Court, Northern District of California.</u> Filed expert report April 30, 2024.

- Testifying Expert in <u>Miriam Edwards, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. McDermott International, Inc., David Dickson, and Stuart Spence, Defendants. Case No. 4:18-cv-04330, United States Southern District Court, Southern District of Texas, Houston Division.</u> Filed expert report April 30, 2024.

- Testifying Expert in <u>Humberto Lozada and Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. Taskus Inc., Bryce Maddock, Jaspar Weir, Balaji Sekar, Amit Dixit, Mukesh Mehta, Susir Kumar, Jacqueline D. Reses, and BCP FC Aggregator L.P., Defendants, United States District Court, Southern District of New York</u>. Filed expert report May 10, 2024. Deposition June 20, 2024.

- Testifying Expert in <u>John Harvey Schneider, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Natera, Inc., Steve Chapman, Michael Brophy, Matthew Rabinowitz, and Ramesh Hariharan, Defendants, Case No. 1:22-cv-00398-DAE, United States District Court, Western District of Texas</u>. Filed expert report June 4, 2024. Deposition July 19, 2024.

- Testifying Expert in <u>Stadium Capital LLC, on Behalf of All Others Similarly Situated, Plaintiff, v. Co-Diagnostics, Inc., Dwight H. Egan, and Brian L. Brown, Defendants, Case No.: 22-cv-6978 (AS), United States District Court, Southern District of New York.</u> Filed expert report July 26, 2024.

<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert Consultant in various class action matters regarding race, age, or gender discrimination.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert Consultant in high-profile antitrust matters in the computer and credit card industries.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

**Appendix B**

**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.
- Volunteer for Chicago Food Depository.
- Volunteer for Habitat for Humanity ReStore.