**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE BARCLAYS PLC SECURITIES LITIGATION | Case No. 1:22-cv-08172-KPF |

**DECLARATION OF LAUREN A. ORMSBEE IN SUPPORT OF (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES**

I, Lauren A. Ormsbee, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.       I am a member of the law firm of Labaton Keller Sucharow LLP ("Labaton" or "Lead Counsel"), which serves as Lead Counsel for court-appointed Lead Plaintiff Boston Retirement System ("BRS" or "Lead Plaintiff"), on behalf of itself and all other members of the proposed Settlement Class in the above-captioned litigation (the "Action").[1]  I am admitted to practice before this Court and have been actively involved in the prosecution and resolution of the Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my close supervision of and participation in the Action.

2.       I respectfully submit this Declaration in support of Lead Plaintiff's motion pursuant to Rule 23(e) of the Federal Rules of Civil Procedure ("Federal Rules" or "Rules") for final approval of the proposed settlement with all defendants: Barclays PLC ("Barclays" or the "Company"), James E. Staley, C.S. Venkatakrishnan, and Tushar Morzaria (collectively, "Defendants")[2] for $19,500,000 in cash.  If approved, the Settlement will resolve all claims in the Action against Defendants, on behalf of the Settlement Class, consisting of all persons and entities who or which purchased or otherwise acquired American Depository Shares ("ADSs"), sometimes denoted as American Depository Receipts ("ADRs"), of Barclays PLC during the period from February 18, 2021 through February 14, 2023, both dates inclusive (the "Class Period"), and were allegedly damaged thereby.[3]  The Court preliminarily approved the Settlement and directed notice

---

[1]      All capitalized terms herein that are not otherwise defined have the same meanings provided in the Stipulation and Agreement of Settlement, dated as of November 27, 2024 (the "Stipulation").  ECF No. 96-1.

[2]      The defined term "Defendants" herein refers to the remaining Defendants in this Action, whereas any mention of defendants generally is intended to include defendants named in this Action that were subsequently dismissed pursuant to a Court order.

[3]      Excluded from the Settlement Class are: (i) Defendants and former defendants in the Action; (ii) members of the immediate family of any Defendant or former defendant who is an

*(Footnote continued on next page…)*

1

to the Settlement Class by Order dated December 5, 2024 ("Preliminary Approval Order").  ECF No. 98.

3.      I also respectfully submit this Declaration in support of: (i) approval of the proposed plan for allocating the net proceeds of the Settlement to eligible Settlement Class Members ("Plan of Allocation"); and (ii) Lead Counsel's motion for an award of attorneys' fees of 29% of the Settlement Fund, which includes accrued interest; payment of Litigation Expenses incurred by Lead Counsel in the total amount of $238,001.30, plus accrued interest; and, in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), payment of $2,123.00 to Lead Plaintiff for costs incurred in connection with its representation of the Settlement Class ("Fee and Expense Application").

4.      For the reasons discussed below and in the accompanying memoranda,[4] I respectfully submit that: (i) the terms of the Settlement are fair, reasonable, and adequate in all respects and should be approved by the Court; (ii) the proposed Plan of Allocation is fair, reasonable, adequate and should be approved by the Court; and (iii) the Fee and Expense Application is fair, reasonable, supported by the facts and the law, and should be granted in all respects.  Moreover, the Settlement, Plan of Allocation, and Fee and Expense Application have

---

individual; (iii) any person who was an officer, director, and/or control person of Barclays during the Class Period; (iv) any firm, trust, corporation, or other entity in which any excluded person or entity has or had a controlling interest and/or beneficial interest; and (v) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity. Notwithstanding the foregoing exclusions, no Investment Vehicle shall be excluded from the Settlement Class. Also excluded from the Settlement Class will be any person or entity who or which exclude themselves by submitting a timely and valid request for exclusion that is accepted by the Court.

[4]      In conjunction with this Declaration, Lead Plaintiff and Lead Counsel are submitting the Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Proposed Class Action Settlement and Plan of Allocation ("Settlement Memorandum") and the Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses ("Fee and Expense Memorandum").

the full support of Lead Plaintiff—a sophisticated, institutional investor that has actively supervised the Action since its inception. *See* Declaration of Boston Retirement System in Support of Approval of Proposed Settlement and Request for Attorneys' Fees and Expenses, attached hereto as Exhibit 1.[5]

## I.     PRELIMINARY STATEMENT

5.      The proposed Settlement now before the Court provides for the full resolution of the Action, and related Released Plaintiff's Claims, in exchange for a cash payment of $19.5 million.   As detailed herein, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement represents an excellent result for the Settlement Class, particularly in light of the significant risks of continuing to litigate the Action.

6.      In choosing to settle, Lead Plaintiff and Lead Counsel took into consideration the substantial challenges associated with advancing the claims through trial, as well as the duration and complexity of the legal proceedings that remained ahead.   As discussed in detail below, had the Settlement not been reached, there were considerable barriers to a greater recovery, or any recovery at all.   The decision to settle was informed by a comprehensive investigation into the claims and defenses in the Action, substantive motion practice and discovery, and vigorous arm's-length negotiations, based upon adequate information after consultation with experienced legal counsel.

7.      The case—which was litigated efficiently and aggressively until the agreement to settle—was settled only after Lead Plaintiff, among other things: (i) conducted a rigorous

---

[5]      All exhibits to the Motions are annexed hereto.  For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. ___ - ___."  The first numerical reference is to the designation of the entire exhibit attached hereto and the second reference is to the exhibit designation within the exhibit itself.

investigation of the claims at issue, including contacting and interviewing former employees of Barclays, financial industry journalists who covered Barclays during the Class Period, and professors in the field of securities regulation to discuss the issues related to the Action; (ii) prepared and filed a detailed Complaint, which expanded the scope of the initial complaint by adding additional misrepresentations, disclosures, and other allegations in support of the claims at issue; (iii) defeated, in part, defendants' motion to dismiss the Complaint; (iv) opposed defendants' motion to reconsider the Court's motion to dismiss opinion; (v) moved for class certification; (vi) researched, drafted, and propounded discovery requests on defendants; (vii) reviewed over 23,000 pages of documents produced in discovery; (viii) prepared for and participated in a formal in-person arms' length settlement meeting; and (ix) engaged and consulted with accounting, damages and causation experts.

8. The Settlement is above industry trends. It exceeds the median reported settlement amount in securities class actions in 2023, which was $15 million. *See* Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements – 2023 Review and Analysis* (Cornerstone Research 2024), Ex. 2, attached hereto, at 1. For the period from 2018 through 2022, the median settlement value was $11.7 million, and in 2022 it was $13.5 million. *Id.* It is also well above the $8.9 million median recovery for securities class actions prosecuted and settled within the Second Circuit from 2014 through 2023. *Id.* at 1, 20.

9. Moreover, Lead Plaintiff consulted with experts in the fields of damages and loss causation who analyzed classwide damages in light of the facts and circumstances presented in the case and developed through the discovery process to date. Lead Plaintiff's primary damages expert has estimated that maximum damages attributable to the sole remaining corrective disclosure in the sustained class period (February 18, 2021 through March 27, 2022) were between

approximately $92 million and $111 million, depending on the trading model and assumptions used. If disaggregation of confounding information was required, damages could have been reduced by approximately 40%. Accordingly, the Settlement recovers a range of approximately 17.5% to 35% of these estimated damages.[6]

10.     In addition to seeking approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation governing the calculation of claims and the distribution of the Settlement proceeds. As discussed below, the proposed Plan of Allocation was developed with the assistance of Lead Plaintiff's damages expert and provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment on a *pro rata* basis based on their losses attributable to the alleged fraud.

11.     With respect to Lead Counsel's request for an award of attorneys' fees and payment of expenses, the requested fee of 29% would be fair both to the Settlement Class and counsel, and warrants the Court's approval. The fee request is within the range of fee percentages frequently awarded in connection with similar settlements and, under the facts of this case, is justified considering the benefits that Lead Counsel conferred on the Settlement Class, the risks it undertook, the quality of the representation, the nature and extent of the legal services, and the fact that Lead Counsel pursued the case at its own financial risk. Lead Counsel also seeks expenses in the amount of $238,001.30, plus reimbursement to Lead Plaintiff, pursuant to the PSLRA, for its

---

[6]     With respect to the Class Period in the Settlement, which is the originally pled class period of February 18, 2021 through February 14, 2023, both dates inclusive, Lead Plaintiff's consulting damages expert has estimated that maximum damages, without disaggregation, were approximately $190 million, depending on the trading model and assumptions used, in which case the Settlement would represent approximately 10% of such maximum estimated damages. However, as discussed *infra*, the MTD Order shortened the class period to end on March 27, 2022.

efforts on behalf of the Settlement Class in the amount of $2,123.00. The expense amounts are less than the maximum amount of expenses of $300,000 provided for in the Notice.

12.    Lead Counsel has worked with the Court-authorized Claims Administrator, Verita Global, LLC ("Verita" or "Claims Administrator"), to disseminate notice of the Settlement to Settlement Class Members as directed in the Preliminary Approval Order. In this regard, Verita has provided 142,575 copies of the Notice and Claim Form (together, "Notice Packet") to Settlement Class Members and their nominees.[7] Additionally, Verita has posted the Notice and Claim Form, along with other relevant documents, on the website www.BarclaysSecuritiesSettlement.com, and has caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire*. *See* Mailing Decl., ¶¶9-12. As ordered by the Court and stated in the notices, objections and requests for exclusion from the Settlement Class are due no later than February 25, 2025. To date, there have been no objections to any aspect of the Settlement and no requests for exclusion.[8]

## II.    SUMMARY OF LEAD PLAINTIFF'S CLAIMS

13.    Lead Plaintiff's claims in this Action are set forth in the operative Amended Class Action Complaint for Violations of the Federal Securities Laws, filed on March 6, 2023 (ECF No. 46) (the "Complaint"), which asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5.

---

[7]    *See* Declaration of Lance Cavallo Regarding (A) Mailing of Notice and Claim Form; (B) Publication of Summary Notice; (C) Establishment of Telephone Hotline and Settlement Website; and (D) Report on Requests for Exclusion Received to Date, dated February 10, 2025, attached hereto as Exhibit 3 ("Mailing Decl."), ¶¶2-8.

[8]    Lead Plaintiff and Lead Counsel will address any objections that may be received after this submission in their reply submission to be filed with the Court on or before March 11, 2025.

14.    Between May 2017 and March 2022, Barclays and Barclays Bank PLC offered and sold roughly $17.7 billion worth of unregistered securities (the "Over-Issuances") in direct violation of the federal securities laws.  According to Lead Plaintiff, the Over-Issuances were occasioned by the Company's failure to track the number of securities it was issuing pursuant to its active shelf registration statements, which capped the total number of securities that the Company could issue over any particular period of time.  According to Lead Plaintiff's Complaint, on March 8, 2022, Barclays discovered the error, commenced an investigation into its internal controls over financial reporting, and began issuing a series of disclosures, beginning on March 28, 2022, that gradually revealed to the market the full extent of the consequent financial, legal, and reputational harm.  The Complaint alleges that the statements made by Barclays (i) during the period of time it was issuing these unregistered securities and (ii) as it progressively disclosed the magnitude of the resulting damage, amounted to violations of Section 10(b) of the Exchange Act and Rule 10b-5.

15.    In the Complaint, Lead Plaintiff alleges, among other things, that, beginning on February 18, 2021, defendants made materially false and misleading statements and omissions about both the strength and effectiveness of Barclays' internal controls and procedures and Barclays' over-issuance of securities.  ¶¶134-159.[9]  On March 28, 2022, Barclays issued a press release before the market opened that disclosed that an over-issuance of securities had occurred from a Barclays Bank PLC shelf registration statement that became effective in August 2019. Barclays halted new offers and sales of securities from that registration statement.  ¶¶160-167. Then, on July 28, 2022 Barclays disclosed for the first time that a small portion of Barclays Bank PLC's Over-Issuances also occurred under the predecessor shelf registration statement that became

---

[9]    Citations of "¶__," unless otherwise noted, refer to the Complaint.

effective in 2018. ¶¶187-191. On February 15, 2023, Barclays reported full-year 2022 earnings, reporting a 19% plunge in profits due in part to the Over-Issuances, and its decision to claw back compensation from top executives, including certain defendants. ¶¶195-205. The Complaint alleges that the price of Barclays' ADSs was artificially inflated as a result of the allegedly false and misleading statements and omissions and that the price of the ADSs declined when the alleged truth about Barclays' internal controls and procedures and the over-issuance of securities was revealed to the market, causing damages to the Settlement Class. ¶¶236-245.

## III. RELEVANT PROCEDURAL HISTORY OF THE ACTION AND CLASS COUNSEL'S LITIGATION EFFORTS

### A. Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel

16. On September 23, 2022, the Action was commenced by the filing of an initial complaint in the United States District Court for the Southern District of New York alleging violations of the federal securities laws on behalf of a class of persons and entities who purchased or otherwise acquired Barclays' ADRs during the class period February 18, 2021 through March 25, 2022, inclusive. ECF No. 1.

17. On November 22, 2022, BRS filed a motion seeking to be appointed Lead Plaintiff and seeking appointment of its counsel, Labaton Sucharow LLP (n/k/a Labaton Keller Sucharow LLP) ("Labaton"). ECF No. 21 (the "Lead Plaintiff Motion"). On the same day, three other putative class members filed similar motions for lead plaintiff appointment. ECF Nos. 18-20, 25-27, & 29-32. Following the filing of BRS's Lead Plaintiff Motion and the review of the respective motions and supporting papers, all the other movants either filed a notice of non-opposition or withdrew their motion. *See* ECF Nos. 34-36, 38.

18. On December 21, 2022, following a hearing on Lead Plaintiff's Motion and pursuant to the PSLRA, the Court issued an order: (i) appointing BRS as Lead Plaintiff; (ii)

8

approving BRS's selection of Labaton as Lead Counsel; and (iii) recaptioning this Action *In re Barclays Securities Litigation*, No. 1:22-cv-08172-KPF.  ECF No. 39.

19.     On January 5, 2023, this Court entered and so-ordered a joint stipulation filed by the Parties on January 4, 2023, providing that Lead Plaintiff would file its amended complaint on March 6, 2023. ECF No. 45.

**B.      Lead Plaintiff's Investigation and Filing of the Complaint**

20.     Prior to filing the Complaint, Lead Counsel conducted an extensive investigation into the facts underlying potential claims.  Lead Counsel's investigation included reviewing: (i) documents filed publicly by the Company with the SEC; (ii) publicly available information, including press releases, news articles, and other public statements issued by or concerning the Company and the defendants; (iii) research reports issued by financial analysts concerning the Company; (iv) publicly available materials related to the September 29, 2022 Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("SEC Order"); and (v) other publicly available documents.  Additionally, Lead Plaintiff, through Lead Counsel, contacted former employees of Barclays, financial industry journalists who covered Barclays during the Class Period, and professors in the field of securities regulation to discuss the issues related to the Action.  Further, Lead Counsel consulted with financial experts in connection with evaluating accounting, loss causation and damages issues.

21.     After Lead Counsel's thorough investigation, on March 6, 2023, Lead Plaintiff filed the 101-page Complaint, detailing defendants' alleged violations of Sections 10(b) and 20(a) of the Exchange Act. ECF No. 46.

22.     The Complaint asserted claims against (i) Barclays, Tushar Morzaria, James E. Staley, C.S. Venkatakrishnan, and Anna Cross under Section 10(b) of the Exchange Act and Rule

10b-5 promulgated thereunder; and (ii) against Barclays Bank PLC, Tushar Morzaria, James E. Staley, C.S. Venkatakrishnan, Anna Cross, and Nigel Higgins under Section 20(a) of the Exchange Act. The Complaint expanded the initially-pled class period by nearly one year to include two additional alleged corrective disclosures, on July 28, 2022 and February 15, 2023, and added Barclays Bank PLC, Anna Cross, and Nigel Higgins as defendants.

> ### C. Defendants' Motion to Dismiss the Complaint and Lead Plaintiff's Opposition

23. On May 5, 2023, defendants filed a 37-page motion to dismiss the Complaint in its entirety pursuant to Rule 12(b)(6). ECF Nos. 53-55 (the "Motion to Dismiss"). In support of their motion, defendants submitted 11 exhibits totaling over 150 pages.

24. In their Motion to Dismiss, defendants argued that the Complaint should be dismissed on numerous grounds, including, among others, the following:

    i.    Defendants contended that Lead Plaintiff failed to allege actionable misstatements, arguing specifically that defendants made no actionable misstatements regarding Barclays' internal controls and that defendants' post-March 28, 2022 alleged misstatements were neither false nor material to investors.

    ii.    Defendants contended that Lead Plaintiff had not established the "strong inference" of scienter required to plead liability for securities fraud. Defendants advanced a number of contentions in support of this argument, including that (a) Lead Plaintiff did not allege any defendant's motive to commit securities fraud; (b) Lead Plaintiff did not allege any defendant's scienter for statements made after March 28, 2022 because defendants "could not have disclosed information it had not yet discovered;" and (c) Lead Plaintiff otherwise failed to allege with particularity that any individual defendant "knew or recklessly disregarded" that the Company's subsidiary, Barclays Bank PLC, did not have internal controls in place to track the securities issued off of the 2018 and 2019 shelf registrations.

    iii.    Defendants contended that if the Court found that falsity and scienter were adequately alleged, the class period should terminate on March 28, 2022 because Lead Plaintiff failed to allege that the July 28, 2022 and February 15, 2023 disclosures revealed the falsity of a prior statement or the materialization of a concealed risk, as opposed to risks already revealed and discussed on March 28, 2022 and thereafter.

    iv.    Defendants argued that Lead Plaintiff failed to allege that defendants Higgins and Barclays Bank PLC had "actual control" over the alleged misstatements.

v.      Defendants argued that, because Lead Plaintiff had not sufficiently alleged a primary violation of the securities laws, it had failed to adequately plead Section 20(a) control person liability against any of the Section 20(a) defendants.

25.      Lead Counsel reviewed and analyzed defendants' Motion to Dismiss and the legal authority cited therein. Lead Counsel also conducted extensive legal research into defendants' arguments and potential responses thereto. On July 12, 2023, Lead Plaintiff filed a 40-page opposition to defendants' Motion to Dismiss. ECF No. 58. Lead Plaintiff rebutted the arguments and authorities in defendants' Motion to Dismiss and argued that the Complaint adequately alleged all elements of its Exchange Act Claims. *Id.*

26.      Among other things, in its opposition, Lead Plaintiff contended that defendants' alleged misstatements regarding the effectiveness of Barclays' internal controls over financial reporting were highly material to investors and that defendants' post-March 28, 2022 statements were false and misleading when made. Lead Plaintiff also argued that a strong inference of scienter was adequately pled, based on, for example, the historic efforts by Barclays to remedy the Over-Issuances, defendants' admissions regarding the failure to monitor the Over-Issuances, the compensation clawback from certain defendants in connection with the Over-Issuances, and application of the core operations doctrine. Lead Plaintiff also contended that loss causation with respect to the latter two corrective disclosures was adequately pled, and that the Complaint adequately alleged that Barclays Bank PLC and Higgins were Section 20(a) control persons.

27.      On August 21, 2023, defendants filed their reply brief in further support of their Motion to Dismiss. ECF No. 59.

**D.      The Court's Opinion Granting in Part and Denying in Part Defendants' Motion to Dismiss**

28.      On February 23, 2024, the Court entered its fifty-seven page Opinion and Order granting, in part, and denying, in part, defendants' Motion to Dismiss ("MTD Order"). ECF No.

11

61. As a result of the MTD Order, the Court dismissed certain alleged misstatements, ended the class period on March 28, 2022, and dismissed Section 20(a) claims against defendants Barclays Bank PLC and Nigel Higgins.[10]

29.    On April 15, 2024, the remaining defendants filed their Answer to the Complaint. ECF No. 71. In their Answer, defendants denied Lead Plaintiff's claims in their entirety, and asserted thirty-five affirmative or other defenses, including loss causation, lack of falsity and scienter, lack of reliance, and truth-on-the-market, among others.

### E.    Defendants' Motion for Partial Reconsideration and Lead Plaintiff's Opposition

30.    On March 8, 2024, defendants filed a Motion for Partial Reconsideration or, Alternatively, Certification of an Interlocutory Appeal Under 28 U.S.C. § 1292(b) ("Reconsideration Motion"). In the Reconsideration Motion, defendants argued: (i) the Court's holding that Lead Plaintiff adequately alleged that Barclays' generic statements concerning internal controls were material, because the statements were misleading, directly conflicts with controlling Second Circuit precedent and other decisions within this district; and (ii) even if any pre-March 28, 2022 statement could be viewed as detailed enough to be material, the Court's holding that those statements were misleading because Barclays did not disclose one internal-controls error is at odds with Second Circuit precedent and numerous decisions within this district. Defendants asked the Court to alternatively certify these issues to the Second Circuit should it not reconsider its MTD Order. ECF Nos. 66-67.

---

[10]    On September 26, 2024, defendant Anna Cross was voluntarily dismissed as a defendant, given that she did not make any alleged misstatements with respect to the claims sustained in the MTD Order. ECF No. 91.

12

31.     Lead Counsel, on behalf of Lead Plaintiff, reviewed and analyzed defendants' Reconsideration Motion and the legal authority cited therein.  Lead Counsel also conducted extensive legal research into defendants' arguments and potential responses thereto.  On March 22, 2024, Lead Plaintiff opposed the Reconsideration Motion.  ECF No. 68.  Lead Plaintiff rebutted the arguments and authorities in defendants' Reconsideration Motion and argued that the motion was an unsubstantiated attempt to rehash the same unsuccessful arguments that were raised in defendants' Motion to Dismiss. *Id.*

32.     On March 29, 2024, defendants filed their reply in further support of their Reconsideration Motion.  ECF No. 69. The Reconsideration Motion remained *sub judice* at the time settlement was reached.

### F.     Lead Plaintiff's Motion for Class Certification

33.     On April 17, 2024, the Court issued a Civil Case Management Plan and Scheduling Order ("Scheduling Order") that set a schedule requiring class certification to be fully briefed by November 26, 2024; fact discovery to close on February 28, 2025; and expert discovery to close on June 30, 2025.  ECF No. 74.

34.     On August 12, 2024, Lead Plaintiff filed its motion to certify the class, appoint class representative, and appoint class counsel, along with an expert report in support of its motion from Chad Coffman, CFA, addressing market efficiency and common damages methodologies, and a Declaration of Timothy J. Smyth on Behalf of Boston Retirement System in Support of Lead Plaintiff's Motion for Class Certification dated August 7, 2024.  ECF Nos. 83-86.

## IV.     THE PARTIES' SUBSTANTIVE DISCOVERY EFFORTS

### A.     Case Management Plan and Initial Discovery Disputes

35.     On April 15, 2024, the Parties submitted a joint letter to the Court regarding a proposed Case Management Plan and Scheduling Order.  ECF No. 72.  The Parties' joint letter

13

highlighted three issues on which the Parties were at an impasse: (i) the deadline for Lead Plaintiff to file a motion to amend or join additional parties to the Action; (ii) in connection with the filing of expert reports in advance of trial, Lead Plaintiff's position that all Parties should be permitted to file reply reports; and (iii) in connection with class certification briefing, defendants' position that they should be permitted to file a sur-reply on the sole issue of price impact.

36.    On April 17, 2024, the Court issued the Scheduling Order that provided, among other things, that class certification briefing be completed by November 26, 2024, fact discovery be completed by February 28, 2025, and expert discovery be completed by June 30, 2025.  ECF No. 74. The Court ordered that any motion to amend or join additional parties be filed by July 15, 2024, and that the Parties should revisit the requests for defendants' sur-reply in connection with class certification and reply expert reports in advance of trial at a later date. ECF No. 73.

37.    In May 2024, Lead Plaintiff began formal discovery efforts.  Until that point, discovery had been stayed pursuant to the PSLRA.  *See* 15 U.S.C. § 78u-4(b)(3)(B).  Lead Plaintiff's efforts thereafter included propounding formal discovery requests on defendants and responding to discovery requests served by defendants. As detailed below, the Parties' discovery included the review of over 23,000 pages of documents produced by defendants and third parties.

38.    The discovery efforts set forth herein provided Lead Plaintiff with a thorough understanding of the strengths and weaknesses of its claims and assisted Lead Counsel in considering and evaluating the fairness and adequacy of the Settlement.

**B.    Initial Disclosures and Protective Order**

39.    Beginning on May 6, 2024, the Parties engaged in discovery efforts by exchanging initial disclosures pursuant to Rule 26(a).

40.    The Parties also engaged in a series of meet and confers to negotiate a protective order ("Protective Order") to govern the confidentiality of material produced in discovery and an

electronically stored information protocol ("ESI Protocol").  On May 15, 2024, defendants filed a proposed stipulated Protective Order and proposed stipulated ESI Protocol.  ECF Nos. 75-76.

41.    On May 16, 2024, the Court approved and so ordered both the proposed Protective Order and the proposed ESI Protocol.  ECF Nos. 77-78.

### C.    Discovery Propounded on Defendants

42.    Lead Plaintiff served two sets of requests for the production of documents ("RFP") on defendants on May 8, 2024.  On May 28, 2024, Lead Plaintiff also served its first set of interrogatories on defendants.

43.    The Parties engaged in multiple meet-and-confer conferences and exchanged meet-and-confer letters and emails, as to the scope and manner of the requested document productions and interrogatories, including issues pertaining to search terms, relevant time periods, document custodians, and other disputes related to the requests.  Through this comprehensive effort, the Parties were able to reach an understanding as to the scope of defendants' discovery and reached many compromises without having to seek the Court's assistance.

44.    In advance of the September 13, 2024 settlement meeting, defendants produced, and Lead Plaintiff reviewed, approximately 23,000 pages of documents.  Lead Counsel conducted an efficient review of those documents.  A team of experienced attorneys reviewed and analyzed the productions.  These attorneys have all worked on multiple securities cases and specialize in securities litigation, and are experienced in utilizing the latest technology with respect to document review.  These attorneys were integral to the litigation team and focused on reviewing defendants' document productions for the purpose of preparing for settlement discussions as well as continued litigation, such as fact depositions, expert reports, depositions, and trial preparation.

45.    To efficiently focus on the most relevant documents, these attorneys used the Relativity eDiscovery platform's search and data analytic software tools to analyze the data and

target the most significant communications, workpapers, and reports. The review was conducted with a combination of linear review, targeted search terms, and custodial document review using the Relativity eDiscovery platform.

46.    The attorneys conducted targeted searching through text, file names, document type, dates, bates numbers, etc. to identify relevant, irrelevant, and "hot" documents for additional review, and to create collections of documents sorted by issue. Through experience and their increasing familiarity with the documents, the review team identified additional swaths of important documents, which were also run through the analytics and search functions to derive the most significant documents.

### D.    Discovery Propounded on Lead Plaintiff

47.    Defendants sought discovery from Lead Plaintiff in connection with the class certification motion. On May 31, 2024, defendants served their first set of RFPs and Interrogatories on Lead Plaintiff.

48.    Lead Plaintiffs objected to many of defendants' requests on the basis that they were exceedingly broad, were not limited to a reasonable scope or time period, and sought information that was protected by various privileges and other protections. As a result of the breadth of defendants' requests, the Parties engaged in extended meet-and-confer conferences and exchanged multiple meet-and-confer letters and emails to negotiate the scope of discovery on Lead Plaintiff. The Parties were able to reach a compromise on Lead Plaintiff's productions without seeking the Court's assistance.

49.    By September 2024, Lead Plaintiff produced over 2,000 pages of documents to defendants.

### E.    Discovery Propounded on Third Parties

50.    On July 17, 2024, Lead Plaintiff served a notice of subpoena on third party JPMorgan Chase Bank, N.A. seeking the production of documents related to the trading of Barclays ADS.  On July 24, 2024, Lead Plaintiff and JPMorgan Chase Bank, N.A. met and conferred regarding Lead Plaintiff's subpoena.  On August 9, 2024, JPMorgan Chase Bank, N.A. served its responses and objection to Lead Plaintiff's subpoena together with a small production in response thereto.

51.    On July 12, 2024, defendants served a subpoena on Todd Asset Management LLC, Lead Plaintiff's investment manager with respect to its investments in Barclays ADS at issue in this Action, seeking the production of documents.  On or before August 20, 2024, Todd Asset Management LLC produced over 500 pages of documents in connection with defendants' subpoena.  Lead Counsel, on behalf of Lead Plaintiff, reviewed these documents.

52.    On August 5, 2024, Barclays served a subpoena on Goldman Sachs & Co. LLC seeking the production of documents.  On August 7, 2024, Barclays served a subpoena on Capital Research and Management Company seeking the production of documents.  On August 21, 2024, Barclays served subpoenas on EuroPacific Growth Fund seeking the production of documents and requesting a remote deposition pursuant to Rule 30(b)(6). On September 4, 2024, Barclays served a subpoena on Goldman Sachs International seeking the production of documents.  On September 6, 2024, both Capital Research and Management Company and EuroPacific Growth Fund served their respective responses and objections to  Barclays subpoenas.

53.    In September 2024, defendants served subpoenas requesting depositions pursuant to Rule 30(b)(6) on EuroPacific Growth Fund and Todd Asset Management LLC.

## V.    THE SETTLEMENT

### A.    The Parties' Settlement Negotiations

54.    In mid-July 2024, as fact discovery was underway, the Parties began exploring the possibility of a negotiated resolution of the Action through telephonic conferences and written correspondence, ultimately agreeing that the Parties' counsel would meet in person to discuss a potential resolution.  Following an all-day in-person settlement meeting held on September 13, 2024, the Parties agreed in principle to settle the Action for $19.5 million.

55.    On September 17, 2024, the Parties informed the Court of their agreement to settle the Action and, on September 18, 2024, the Court granted the Parties' request for a sixty day stay of the case pending the filing of the motion for preliminary approval of the Settlement.  ECF Nos. 87-88.  The Parties memorialized their agreement in a term sheet that was executed on September 20, 2024 (the "Term Sheet"), subject to the execution of a formal settlement agreement, related papers, and approval by the Court. On November 19, 2024, the Court granted the Parties' request for an additional sixteen day stay of the case.  ECF Nos. 92-93.

### B.    Preparation of Settlement Documentation and Preliminary Approval Motion

56.    Once the Parties agreed in principle to settle the Action, they worked diligently to negotiate the full settlement terms set forth in the Stipulation and its exhibits, as well as a confidential supplemental agreement regarding requests for exclusion ("Supplemental Agreement").  On November 27, 2024, the Parties executed the Stipulation setting forth the full terms and conditions of the Settlement. ECF No. 96-1.

57.    The Settlement provides, among other things, that Defendants will pay, or cause to be paid, $19.5 million in cash into an interest-bearing Escrow Account.  *See* Stipulation at ¶7.  The Settlement Amount, plus accrued interest, after the deduction of Court-awarded attorneys' fees

and Litigation Expenses, Notice and Administration Expenses, Taxes, and any other costs or fees approved by the Court (the "Net Settlement Fund"), will be distributed to Settlement Class Members who submit timely and valid Claims, in accordance with a plan of allocation approved by the Court.

58.    In exchange for payment of the Settlement Amount, on the Effective Date of the Settlement, Lead Plaintiff and the Settlement Class will release the Released Defendant Parties from all of Released Plaintiff's Claims, and Defendants will release the Released Plaintiff Parties from all Released Defendants' Claims. *See* Stipulation ¶¶1(aa)-(ee), 5, and 6.  In order to provide the Released Defendant Parties with "complete peace" with respect to the claims in the Action, the Settlement Class covers all purchases of Barclays ADSs during the period from February 18, 2021 through February 14, 2023, both dates inclusive. *See* Stipulation ¶1(hh).  The Released Plaintiff's Claims have been tailored to relate only to the facts and allegations in the Action and the claims in *May v. Barclays PLC, et al.*, Case No. 1:23-cv-02583-LJL (S.D.N.Y.), and *Puchtler v. Barclays PLC, et al.*, Case No. 1:24-cv-01872- LJL (S.D.N.Y.) are not released.  *See* Stipulation ¶1(dd). The Settlement is not "claims-made" and there is no reversion of unclaimed funds. *See* Stipulation ¶13.

59.    On December 3, 2024, Lead Plaintiff submitted its unopposed motion for an order preliminarily approving the Settlement, approving the manner and form of notice to be sent to Settlement Class Members, and scheduling a hearing for final approval of the Settlement ("Preliminary Approval Motion").  ECF No. 94.

60.    On December 6, 2024, the Court issued an order granting Lead Plaintiff's Preliminary Approval Motion and scheduled the final settlement hearing for March 18, 2025.  ECF No. 98.

## VI.    RISKS OF CONTINUED LITIGATION

61.    As explained above, the Settlement is the result of extensive arm's-length negotiations by fully informed Lead Plaintiff and Lead Counsel, resolves this hard-fought litigation, and represents a very favorable result for the Settlement Class when considered on its own and when evaluated in light of the risks and challenges of continued litigation.  Lead Plaintiff and Lead Counsel understood that while Lead Plaintiff's claims were strong and Lead Plaintiff believes it had adduced substantial evidence to support the Settlement Class's claims at summary judgment and trial, there were a number of factors that made the outcome of continued litigation uncertain, weighing in favor of a settlement.

62.    Principally, and as discussed below, although the Court denied, in part, defendants' Motion to Dismiss, there is a possibility that the Court would grant defendants' pending Reconsideration Motion in full.  If that were the case, then Lead Plaintiff and the Settlement Class might not recover anything without pursuing, and prevailing on, an appeal.  And even if the Reconsideration Motion were denied, Lead Plaintiff understands that it faced risks in establishing one or more of the required elements—falsity, materiality, scienter, and/or loss causation—to sustain the remaining securities fraud claims through class certification, summary judgment, and trial.

63.    Overall, the considerable factual record developed through document discovery, and the Parties' settlement negotiations, allowed Lead Plaintiff and Lead Counsel to undertake a comprehensive evaluation of the strengths and weaknesses of the claims.  Based on that evaluation, Lead Counsel (a firm with extensive experience in the prosecution and trial of complex securities litigation) together with Lead Plaintiff (a sophisticated institutional investor with billions of dollars in assets under management for the benefit of more than 34,000 active and retired members and beneficiaries) determined that the Settlement was in the best interests of the Settlement Class.

A.     **Risks Related to Proving Material Falsity**

64.     Lead Plaintiff faced several challenges with respect to proving that the remaining misrepresentations were materially false and misleading.  As an initial matter, defendants' Reconsideration Motion was *sub judice* and Lead Plaintiff faced the risk that the Court may decide to reconsider its MTD Order and dismiss the Complaint on falsity grounds.  ECF No. 67.

65.     For example, in the Reconsideration Motion, defendants argued that the purported generic nature of the misstatements alleged in the Complaint regarding Barclays' internal controls are typically the sort of statements that are inactionable and that the Court's MTD Order conflicted with prevailing Second Circuit precedent, such as *City of Pontiac v. UBS AG*, 752 F.3d 173, 183, 185 (2d Cir. 2014).  Specifically, defendants argued that, like in *UBS*, the Court should have held that the misstatements at issue regarding Barclays' internal controls were not "sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome."  ECF No. 67 at 2-3 (citing *UBS*, 752 F.3d at 183, 185).  Moreover, defendants pointed to the Second Circuit's holding that the plaintiff's allegations—that UBS not only failed to implement a specific control to prevent cross-border tax fraud, but that "UBS's senior management knew of and *affirmatively directed* the illegal activity in the cross-border business"—were irrelevant.  *Id.* (citing *UBS* Pls. CA2 Reply Br. at 2 n.3, 2013 WL 3243599 (emphasis added)).

66.     Even if the Court denied the Reconsideration Motion, Lead Plaintiff faced challenges at the class certification stage with respect to materiality and price impact arguments that defendants said they would likely raise.  ECF No. 73 at 3-4.  Defendants were likely to attempt to "rebut the presumption" of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), to defeat class certification by demonstrating, by a preponderance of the evidence, that the misrepresentations did not actually effect, or impact, the market price of Barclays ADSs.  *Id.*

21

67.    Specifically, Defendants would likely raise a *Goldman* "mismatch" argument, in an attempt to convince this Court that there is a mismatch between the specificity of the purportedly generic misstatements and the remaining corrective disclosure. *See id.* (citing *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 93 (2d Cir. 2023)).  For example, Defendants would likely argue that the alleged misstatements regarding Barclays' "robust internal controls" were overly generic in comparison to the very specific corrective disclosure—a press release that announced Barclays had sold $15.2 billion of unregistered securities and would conduct a rescission offer for those unregistered securities. *See, e.g.*, ¶¶136, 160.  These anticipated arguments would, once again, allow Defendants to challenge the purported generic nature of the alleged misstatements at issue.  *See* ECF No. 73 (citing *In re Kirkland Lake Gold Ltd.*, 2024 WL 1342800, at *10 (S.D.N.Y. Mar. 3, 2024) for the proposition that the defendants carried their burden of establishing a lack of price impact and rebutting the presumption of reliance with respect to the "generic statements about the company's growth strategy").

68.    Although the Court has found that Lead Plaintiff has sufficiently alleged false and misleading misstatements, there was a substantial risk that the Court could have changed course, if not on reconsideration, at summary judgment, and if not dismissed on motions, that a jury could have found the statements too generic to hold Defendants liable—especially given anticipated evidence undercutting the particular aspects of the internal control statements that the Court originally credited.  For example, Defendants would likely rely on evidence demonstrating that Barclays had internal controls and procedures in place that were comparable to other corporations. Moreover, Defendants would likely argue that the issuance of unregistered securities did not reflect an internal control error but rather a human error that did not reflect systemic issues within the Company. Defendants would therefore likely argue that Lead Plaintiff could not prove that

Defendants concealed any material negative information about the lack of any internal controls, presenting a real risk to establishing the theory of fraud that the Court credited in upholding the alleged misstatements made between February 18, 2021 through March 14, 2022. Any finding against Lead Plaintiff in this regard, in whole or in part, would have significant consequences for the class with respect to proving falsity and damages.

### B.       Risks Related to Proving Scienter

69.     Lead Plaintiff also faced significant challenges with respect to proving Defendants' scienter. On this point, Defendants would likely argue that Lead Plaintiff could not establish that the alleged misstatements were made with the requisite intent.

70.     For example, Defendants would have likely argued, *inter alia*, that Lead Plaintiff could not establish that the Individual Defendants acted with the requisite fraudulent intent because they did not know that Barclays had failed to establish "an internal control to track actual offers and sales of securities on a real-time basis." ECF No. 59 at 5. Moreover, Defendants would likely seek to prove that the oversight failure constituted an innocent mistake and "mismanagement," not recklessness in the context of securities fraud. *Id.* at 11.

71.     Accordingly, Defendants would likely seek to establish the theme that this was not severely reckless securities fraud, but rather an inadvertent mistake that was subsequently disclosed to investors once Barclays discovered the Over-Issuances.

72.     Affirmatively proving Defendants' intent through documents and witnesses indicating an absence of proper procedures, rather than affirmative wrongful conduct, would have been extremely difficult.

C.     **Risks Related to Proving Loss Causation and Damages**

73.     Even if Lead Plaintiff was successful in proving falsity and scienter with respect to the remaining misstatements alleged in the Complaint, it faced significant challenges and uncertainty with respect to proving loss causation and damages.

74.     In order to recover, Lead Plaintiff would need to prove that the allegedly corrective information in Barclays' March 28, 2022 press release, filed with the SEC on Form 6-K prior to market open, caused the prices of the ADSs to decline, as opposed to other information about the Company that was unrelated to the alleged misstatements.

75.     Defendants' primary defense, if not successful at the class certification stage, would be to argue that the evidence did not establish that the specific disclosures in the March 28, 2022 press release revealed the falsity of the "generic" misstatements concerning Barclays' internal control policies and protections, and therefore did not support loss causation.

76.     Moreover, alternatively, Defendants would likely have raised an additional argument, which could have significantly reduced recoverable damages, concerning the impact of purportedly confounding information released during trading hours on March 28, 2022. Specifically, Defendants would likely have argued that news released several hours following the alleged March 28, 2022 corrective disclosure concerning a large block trade sale of approximately 575 million common shares of Barclays stock by an unnamed significant shareholder was the cause of a significant amount of the decrease in Barclays' share price on March 28, 2022. Lead Plaintiff would have opposed any attempt to attribute most, or all, of the March 28, 2022 share price decline to the later news of the block trade, and the Parties would need to pursue considerable third party and expert discovery to litigate this defense. However, if the trier of fact were to credit Defendants' argument regarding this confounding information, damages would have been reduced significantly.

77.    Lead Plaintiff consulted with experts in the fields of damages and loss causation who analyzed classwide damages in light of the facts and circumstances presented in the case and developed through the discovery process to date.  Lead Plaintiff's primary damages expert has estimated that maximum damages attributable to the sole remaining corrective disclosure in the sustained class period (February 18, 2021 through March 27, 2022) were between approximately $92 million and $111 million depending on the trading model and assumptions used.  However, if disaggregation of confounding information was required, damages could have been reduced by approximately 40%.

78.    Accordingly, substantial risks to establishing loss causation and damages remained in the case at the time the Settlement was reached and would have continued throughout summary judgment briefing, trial, post-trial motions, and in inevitable appeals.

## VII.    COMPLIANCE WITH THE PRELIMINARY APPROVAL ORDER AND REACTION OF THE SETTLEMENT CLASS TO DATE

79.    As required by the Court's Preliminary Approval Order, Verita, working under Lead Counsel's supervision, began disseminating notice of the Settlement on December 23, 2024. Ex. 3.  Specifically, Verita has: (i) mailed by First-Class Mail a copy of the Notice Packet to potential Settlement Class Members using information gathered to date; (ii) mailed a copy of the Notice Packet to brokers and nominees that may have purchased Barclays ADSs on behalf of Settlement Class Members ("Nominees"), contained in Verita's Nominee database; (iii) published the Summary Notice in *The Wall Street Journal* and transmitted it over *PR Newswire*; and (iv) created a website, www.BarclaysSecuritiesSettlement.com, to provide information about the Action and the Settlement.  *Id.*, ¶¶2-12.

80.    The Notice contains important information about the Action and the Settlement, including, among other things, the definition of the Settlement Class, a description of the proposed

Settlement, information regarding the claims asserted in the Action, and the proposed Plan of Allocation. *See generally id*., Ex. 3-A. The Notice also provides information for Settlement Class Members to determine whether to: (i) participate in the Settlement by completing and submitting a Claim Form; (ii) object to any aspect of the Settlement, the Plan of Allocation, or the Fee and Expense Application; or (iii) request exclusion from the Settlement Class. *Id*. The Notice also informs recipients of Lead Counsel's intent to apply for attorneys' fees in an amount not to exceed 29% of the Settlement Fund, and for payment of Litigation Expenses incurred by Lead Counsel in an amount not to exceed $300,000. *Id*.

81.     In accordance with the Preliminary Approval Order, as of February 9, 2025, Verita has provided 142,575 copies of the Notice Packet to potential Settlement Class Members and their Nominees. *Id*., ¶8. In addition, Verita caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire* on January 6, 2025. *Id*., ¶9.

82.     In connection with the notice dissemination, Verita developed a website for the Settlement in order to provide information concerning the case and important dates and deadlines in connection with the Settlement, as well as access to an online claim portal and downloadable copies of the Notice, Claim Form, Stipulation, Preliminary Approval Order, and other relevant documents. *Id*., ¶¶11-12. Copies of the Notice and Claim Form are also available on Lead Counsel's website, www.labaton.com. Additionally, Verita maintains a toll-free telephone number and email for inquiries regarding the Settlement. *Id*., ¶10.

83.     The deadline for Settlement Class Members to file an objection to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion is February 25, 2025. To date, not a single objection to any aspect of the Settlement has been received. In addition, Verita has received no requests for exclusion. *Id*., ¶13.

84.      Lead Counsel will file reply papers on or before March 11, 2025 that will address any objections and report on requests for exclusion and claims received.

## VIII.   THE PLAN FOR ALLOCATING THE NET SETTLEMENT FUND TO THE SETTLEMENT CLASS IS FAIR, REASONABLE, AND ADEQUATE

85.      In accordance with the Preliminary Approval Order, and as explained in the Notice, Settlement Class Members who wish to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less: (i) any Taxes; (ii) any Notice and Administration Expenses; (iii) any Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v) any other costs or fees approved by the Court) must submit a valid Claim and all required supporting documentation to the Claims Administrator by mail or online at www.BarclaysSecuritiesSettlement.com.  As provided in the Notice, the Net Settlement Fund will be distributed to Authorized Claimants in accordance with the plan for allocating the Net Settlement Fund approved by the Court.  The plan of allocation proposed by Lead Plaintiff (*i.e.*, the "Plan of Allocation" or "Plan") is set forth on pages 12-15 of the Notice.  *See* Ex. 3-A.

86.      The proposed Plan is designed to achieve an equitable and rational distribution of the Net Settlement Fund.  However, calculations made pursuant to the Plan do not represent a formal damages analysis and are not intended to measure the amounts that Settlement Class Members could recover after a trial.  Lead Counsel developed the Plan in consultation with Lead Counsel's damages expert.  The Plan creates a framework for the equitable distribution of the Net Settlement Fund among Settlement Class Members who suffered economic losses as a result of Defendants' alleged violations of the federal securities laws set forth in the Complaint, as opposed to economic losses caused by market or industry factors or unrelated Company-specific factors. To this end, Lead Plaintiff's damages expert calculated the estimated amount of alleged artificial

inflation in the per-share price of Barclays's publicly traded ADSs that was allegedly caused by Defendants' materially false and misleading statements and omissions.

87.     As set forth in the Plan, a Claimant's "Recognized Claim" will depend upon several factors, including the date(s) when the Claimant purchased or acquired his, her, or its Barclays ADSs during the Class Period, and whether such shares were sold (and if so, when and at what price) or held.  Specifically, Barclays ADSs purchased or otherwise acquired during the Class Period (*i.e.*, from February 18, 2021 through February 14, 2023, inclusive) must have been held through at least the first alleged corrective disclosure on March 28, 2022 to have a recognized loss, consistent with *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005). Recognized Losses relating to the alleged misstatements dismissed by the Court have been reduced by 95%.

88.     Once Verita has processed all submitted Claim Forms and provided Claimants with an opportunity to cure any deficiencies in their claims or challenge the rejection of their claims, processed responses, and made claim determinations, distributions will be made to Authorized Claimants.  Verita will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund by dividing the Authorized Claimant's Recognized Claim (*i.e.*, the sum of the Claimant's Recognized Loss Amounts for each purchase as calculated under the Plan) by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. Lead Plaintiff's losses will be calculated in the same manner.  Payments of $10.00 and greater will be made in the form of checks and wire transfers.  (Payments of less than $10.00 will not be made, given the costs associated with such distributions and low rates of negotiation.)

89.     As set forth in the Plan, if there is any balance remaining in the Net Settlement Fund (whether by reason of uncashed checks, or otherwise), after at least six (6) months after the initial distribution, and after payment of any unpaid fees and expenses incurred in administering the

28

Settlement, and Taxes, the Claims Administrator will, if feasible and economical, reallocate such balance among Authorized Claimants who have cashed their initial distribution checks in an economic fashion. Re-distributions will be repeated until it is determined that re-distribution of the funds remaining in the Net Settlement Fund would no longer be feasible and economical. Thereafter, any remaining balance will be donated to the Council of Institutional Investors, a non-sectarian, not-for-profit 501(c)(3) organization, or such other non-sectarian, not-for-profit 501(c)(3) organization designated by Lead Plaintiff and approved by the Court. *See* Ex. 3-A at ¶72.

90.     As discussed in the Settlement Memorandum, the structure of the Plan is similar to that of plans of allocation that have been used in numerous other securities class actions. To date, no objections to the Plan have been filed. In sum, Lead Counsel believes that the Plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants, and respectfully submits that the Plan should be approved by the Court.

## IX.    THE FEE AND EXPENSE APPLICATION

91.     In addition to seeking final approval of the Settlement and approval of the Plan of Allocation, Lead Counsel is applying to the Court for an award of attorneys' fees and payment of expenses incurred by Lead Counsel during the course of the Action.[11] Specifically, Lead Counsel is applying for attorneys' fees in the amount of 29% of the Settlement Fund, or $5,655,000 plus interest earned at the same rate as earned by the Settlement Fund, and for Litigation Expenses in the amount of $238,001.30.[12] Lead Counsel also seeks reimbursement in the amount of $2,123.00

---

[11]     Any determination with respect to Lead Counsel's application for an award of attorneys' fees and Litigation Expenses will not affect the Settlement, if approved.

[12]     The time and expense detail for Lead Counsel is set forth in the Declaration of Lauren A. Ormsbee on behalf of Labaton Keller Sucharow LLP ("Labaton Fee and Expense Decl."), attached

*(Footnote continued on next page…)*

to Lead Plaintiff for its costs, including lost wages, incurred in connection with their representation of the Settlement Class in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4). *See* Ex. 1 at ¶¶9-11. Lead Counsel's Fee and Expense Application is consistent with the amounts set forth in the Notice and, to date, not one objection regarding the maximum fee and expense amounts set forth in the Notice has been received.

92.    Below is a summary of the primary factual bases for Lead Counsel's Fee and Expense Application. A full analysis of the factors considered by courts in the Second Circuit when evaluating requests for attorneys' fees and expenses from a common fund, as well as the supporting legal authority, is presented in the accompanying Fee and Expense Memorandum.

### A. Lead Counsel's Fee Request Is Fair and Reasonable and Warrants Approval

#### 1. The Result Achieved

93.    Here, the Settlement provides for a recovery of $19.5 million in cash for the benefit of the Settlement Class. For the reasons set forth above, and in light of the substantial risks of continued litigation, Lead Counsel believes that the Settlement represents a very good result for the Settlement Class. Indeed, given the serious challenges that Lead Plaintiff faced in this case—most significantly —prevailing on Defendants' Motion for Reconsideration, seeking certification of the class, and establishing damages and loss causation—there was significant risk that there would be no recovery at all. In contrast, the Settlement avoids the potential impact of this challenge and other risks and achieves a fair and certain result.

---

hereto as Exhibit 4. The declaration sets set forth the names of the attorneys and professional support staff members who worked on the Action, their hourly rates, the lodestar value of the time expended by such attorneys and professional support staff, the expenses incurred, and the background and experience of the firms.

94.     As discussed above, the Settlement represents a meaningful portion of the Settlement Class's reasonably recoverable damages, as estimated under various potential scenarios analyzed by Lead Plaintiff's damages expert.  If the Settlement Class's claims survived the Reconsideration Motion, class certification, summary judgment, trial, post-trial motions, and appeals completely intact, then maximum aggregate damages under the sustained class period were estimated to be approximately $92 million and $111 million.  However, Defendants would have staunchly sought to establish that their maximum exposure, assuming liability was proven, was significantly less if not zero.  The Settlement recovers a range of approximately 17.5% to 35% of estimated potential damages.

95.     Moreover, as a result of the Settlement, numerous Settlement Class Members will benefit and receive compensation for their losses and avoid the substantial risks of a lesser, or no, recovery in the absence of settlement.

### 2.     The Risks of the Litigation and the Contingent Nature of the Fee

96.     The risks faced by Lead Counsel in prosecuting this Action are highly relevant to the Court's consideration of an award of attorneys' fees, as well as its approval of the Settlement. Here, Defendants adamantly deny any wrongdoing and, if the Action had continued, would have aggressively litigated their defenses through a trial, and the appeals that would likely follow.  As detailed in Section VI. above, Lead Counsel and Lead Plaintiff faced significant risks to proving Defendants' liability, loss causation, and damages at all stages of the litigation.

97.     These case-specific litigation risks are in addition to the risks accompanying securities litigation generally, such as the fact that this Action is governed by stringent PSLRA requirements and case law interpreting the federal securities laws and was undertaken on a contingent-fee basis.  From the outset, Lead Counsel understood that this would be a complex, expensive, and potentially lengthy litigation with no guarantee of ever being compensated for the

31

substantial investment of time and financial expenditures that vigorous prosecution of the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources (in terms of attorney and support-staff time) were dedicated to prosecuting the Action, and that funds were available to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case like this typically demands. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an hourly, ongoing basis. Lead Counsel has dedicated 2,453 hours in prosecuting the Action for the benefit of the Settlement Class yet have received no compensation for their efforts.

98. Lead Counsel also bore the risk that no recovery would be achieved. Lead Counsel is aware that despite the most vigorous and competent efforts, a law firm's success in contingent litigation such as this is never guaranteed. Moreover, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to persuade sophisticated defendants to engage in serious settlement negotiations at meaningful levels. Lead Counsel is aware of many hard-fought lawsuits in which, because of the discovery of facts unknown when the case commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts by a plaintiff's counsel produced no fee for counsel.

99. Successfully opposing a motion to dismiss and a motion for summary judgment is also not a guarantee that plaintiffs will prevail at trial. While only a few securities class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Securities Litigation*, Case No. C-02-1486 CW (EDL), slip op. (N.D. Cal. Nov. 27, 2007) (tried by Labaton), and *In re Tesla, Inc. Securities Litigation*, Case No. C-18-04865 (N.D. Cal. Feb. 3,

2023), or substantially lost as to the main case, such as *In re Clarent Corp. Securities Litigation*, Case No. C-01-3361 CRB, slip op. (N.D. Cal. Feb. 16, 2005).

100.    Even plaintiffs who succeed at trial may find their verdict overturned by a post-trial motion for a directed verdict or on appeal.  *See, e.g.*, *In re BankAtlantic Bancorp, Inc.,* No. 07-cv-61542-UU, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2010) (in case tried by Labaton, after plaintiffs' jury verdict, court granted defendants' motion for judgment as a matter of law on loss causation grounds), *aff'd,* 688 F. 3d 713 (11th Cir. 2012) (trial court erred, but defendants entitled to judgment as matter of law on lack of loss causation); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing plaintiffs' jury verdict for securities fraud); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Glickenhaus & Co., et al. v. Household Int'l, Inc., et al.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction under *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)); *Robbins v. Koger Props., Inc*., 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice).  And, the path to maintaining a favorable jury verdict can be arduous and time consuming.  *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) (trial court rejecting unanimous verdict for plaintiffs, which was later reinstated by the Ninth Circuit Court of Appeals) and judgment re-entered (*id.*) after denial by the Supreme Court of the United States of defendants' Petition for Writ of Certiorari (*Apollo Grp. Inc. v. Police Annuity and Benefit Fund*, 562 U.S. 1270 (2011)).

101.    The United States Supreme Court and numerous other courts have repeatedly recognized that the public has a strong interest in having experienced and able counsel enforce the

federal securities laws through private actions. *See, e.g.*, *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (Private securities actions provide '"a most effective weapon in the enforcement' of the securities laws and are a 'necessary supplement to [SEC] action."') (citations omitted).  Vigorous private enforcement of the federal securities laws can only occur if private investors can obtain some parity in representation with that available to large corporate defendants. If this important public policy is to be carried out, courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action as well as the economics involved.

102.    Lead Counsel's efforts, in the face of substantial risks and uncertainties, have resulted in what Lead Counsel believes to be a significant (and certain) recovery for the Settlement Class.  In these circumstances, and in consideration of their hard work and the excellent result achieved, Lead Counsel believes the 29% fee request is fair and reasonable and should be approved.

### 3.    The Skill Required and Quality of Lead Counsel's Representation

103.    The skill and diligence of Lead Counsel also support the requested fee.  As demonstrated by the firm biography included as Exhibit C to the Labaton Fee and Expense Declaration, Lead Counsel is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases, and is consistently ranked among the top plaintiffs' firms in the country.  Here, Labaton attorneys have devoted considerable time and effort to this case, thereby bringing to bear many years of collective experience. *See, e.g., In re Am. Int'l Grp, Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund and reaching settlements of $1 billion); *In re Dell Techs. Inc. Class V S'holders Litig.*, Consol. C.A. No. 2018-0816-JTL (Del. Ch.) (securing $1 billion

shareholder settlement); *In re HealthSouth Corp. Sec. Litig.*, No. 03-1500 (N.D. Ala.) (representing the State of Michigan Retirement System, New Mexico State Investment Council, and the New Mexico Educational Retirement Board and securing settlements of more than $600 million); *In re Countrywide Sec. Litig.*, No. 07-5295 (C.D. Cal.) (representing the New York State and New York City Pension Funds and reaching settlements of more than $600 million); *In re Schering-Plough Corp./ ENHANCE Sec. Litig.*, No. 08-397 (D.N.J.) (representing Massachusetts Pension Reserves Investment Management Board and reaching a settlement of $473 million). *See* Ex. 4-C.

104.    The quality of the work performed by Lead Counsel in obtaining the Settlement should also be evaluated in light of the quality of opposing counsel. Defendants in this case were represented by experienced counsel from Sullivan & Cromwell LLP, a prominent litigation firm that vigorously and ably defended the Action on behalf of defendants. In the face of this formidable defense, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the Action on terms that are favorable to the Settlement Class.

### 4.    The Time and Labor Devoted to the Action

105.    As more fully described above, Lead Counsel: (i) conducted an extensive investigation of the claims at issue; (ii) prepared and filed a detailed Complaint, which expanded the scope of the initial complaint by adding particularized allegations supporting claims that Defendants misled investors about the strength and efficacy of Barclays' internal controls over financial reporting following its loss of "well-known seasoned issuer" ("WKSI") status in the United States, and becoming an "ineligible issuer"; (iii) defeated, in part, Defendants' motion to dismiss the Complaint; (iv) opposed Defendants' Reconsideration Motion; (v) moved for class certification; (vi) researched, drafted, and propounded discovery requests; (vii) produced 2,000

pages of documents and reviewed 23,000 pages of documents in connection with discovery efforts; (viii) prepared for and participated in a formal in-person settlement meeting; and (ix) consulted with experts in the fields of accounting, damages, and loss causation. *See supra* Sections III-V. Lead Counsel's efforts were driven and focused on advancing the litigation to achieve the most successful outcome for the Settlement Class, whether through settlement or trial, by the most efficient means possible.

106.    Throughout the litigation, Lead Counsel worked efficiently and maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Action. Experienced attorneys at Labaton were involved in motion practice, discovery efforts, and the settlement negotiations. More junior attorneys and paralegals worked on matters appropriate to their skill and experience level, such as drafting pleadings, legal research, discovery matters, and document review.

107.    The time devoted to this Action by Lead Counsel is set forth in the Labaton Fee and Expense Declaration, Exhibit 4. Included with the declaration are schedules that summarize the time expended by attorneys and professional support staff, as well as expenses ("Fee and Expense Schedule"). The Fee and Expense Schedule also reports each person's resulting "lodestar," *i.e.*, their hours multiplied by their current hourly rates.

108.    The hourly rates of Lead Counsel here range from $1,100 to $1,375 per hour for partners, $750 to $975 per hour for of counsels, and $350 to $675 for associates and other attorneys. *See* Ex. 4-A. These hourly rates are reasonable for this type of complex litigation. Exhibit 5, attached hereto, is a table of hourly rates for defense firms compiled by Labaton from fee applications submitted by such firms nationwide in bankruptcy proceedings in 2024. The

analysis shows that across all types of attorneys, Lead Counsel's hourly rates here are consistent with, or lower than, the firms surveyed.

109.    In total, from the inception of this Action to date, Lead Counsel expended 2,453 hours on the investigation, prosecution, and resolution of the claims against defendants representing a total lodestar of $1,778,912.[13] Thus, pursuant to a lodestar "cross-check," Lead Counsel's fee request of 29% of the Settlement Fund (or $5,655,000, plus interest), if awarded, would yield a multiplier of approximately 3.2 on Lead Counsel's lodestar, which is within the range of fee multipliers awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in the Second Circuit.    *See* Fee and Expense Memorandum, §I.C.

### 5.    Lead Plaintiff's Endorsement of the Fee and Expense Application

110.    Lead Plaintiff is a sophisticated institutional investor that has closely supervised, monitored, and actively participated in the prosecution and settlement of the Action.  Lead Plaintiff has evaluated and fully supports Lead Counsel's fee and expense request.  As set forth in the declaration submitted on behalf of BRS (Ex. 1), Lead Plaintiff has concluded that the requested fee has been earned based on the efforts of Lead Counsel and the favorable recovery obtained for the Settlement Class in a case that involved serious risk.

111.    Lead Plaintiff's endorsement of Lead Counsel's Fee and Expense Application further demonstrates its reasonableness, and this endorsement should be given meaningful weight in the Court's consideration of the fee award.

---

[13]    Lead Counsel will continue to perform legal work on behalf of the Settlement Class should the Court approve the Settlement. Additional resources will be expended assisting Settlement Class Members with their Claim Forms and related inquiries and working with the Claims Administrator to ensure the smooth progression of claims processing. No additional legal fees will be sought for this work.

**B.      Lead Counsel's Request for Litigation Expenses Warrants Approval**

**1.      Lead Counsel Seeks Payment of Reasonable and Necessary Litigation Expenses from the Settlement Fund**

112.    Lead Counsel seeks payment from the Settlement Fund of $238,001.30 for expenses that were reasonably and necessarily incurred in connection with the Action.  The Notice informed the Settlement Class that Lead Counsel would apply for payment of Litigation Expenses in an amount not to exceed $300,000, including the request for reimbursement of the reasonable costs and expenses (including lost wages) incurred by Lead Plaintiff directly related to its representation of the Settlement Class in accordance with 15 U.S.C. § 78u-4(a)(4).  The amount of Litigation Expenses requested by Lead Counsel, along with the amount requested by Lead Plaintiff, is below the maximum expense amount set forth in the Notice.

113.    From the inception of the Action, Lead Counsel was aware that it might not recover any of the expenses incurred in prosecuting the claims against defendants and, at a minimum, would not recover any expenses until the Action was successfully resolved.  Lead Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would not compensate counsel for the lost use or opportunity costs of funds advanced to prosecute the claims against Defendants.  Lead Counsel was motivated to take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the Action.

114.    Lead Counsel's expenses include fees and costs for, among other things: (i) experts and other professionals in connection with various stages of the litigation; (ii) litigation support related to electronic discovery; (iii) work-related travel; and (iv) online factual and legal research.[14]

---

[14]     Lead Counsel's expenses are listed in detail in the Labaton Fee and Expense Declaration.  *See* Exhibit 4-B.  The expenses incurred by Labaton are reflected on the books and records

*(Footnote continued on next page…)*

Courts have consistently found that these types of expenses are payable from a fund recovered by counsel for the benefit of a class.

115.   The largest component of Lead Counsel's expenses (*i.e.*, $194,419.40, or approximately 82% of total expenses) was incurred for experts. Among other things, in connection with class certification, Lead Counsel retained an expert to opine on loss causation and market efficiency.  This expert was also retained to analyze aggregate damages and to draft the proposed Plan of Allocation.  Lead Counsel also consulted with an accounting expert in connection with Lead Counsel's investigation and drafting of the Complaint, providing expertise related to rules and regulations governing a company's internal controls over financial reporting ("ICFR") and disclosure controls and procedures ("DCP").

116.   Another substantial component of the expenses (*i.e.*, $27,710.53 or approximately 12% of total expenses) was for litigation support costs, which primarily related to document hosting and management related to electronic discovery.  Lead Counsel retained a third-party vendor to host document productions on its sophisticated electronic database and litigation support platform.  Lead Counsel used this electronic database to, among other things: (i) process documents so that they would be in a searchable format, including the conversion and uploading of any hard copy documents; (ii) apply data analysis tools to focus the review on the most significant documents to efficiently target information counsel needed to support their allegations; and (iii) review and analyze the document productions.

---

maintained by the firm.  These books and records are prepared from expense vouchers, check records, and other source materials, and are an accurate record of the expenses incurred.  These expense items are not duplicated in the firm's hourly rates.

117.    The expenses also include $3,272,83 for work-related transportation expenses, meals, and lodging related to, among other things, working late hours and traveling in connection with discovery and meetings with Lead Plaintiff.  (Airfare was at economy rates.)

118.    The costs of computerized research services, such as Lexis, Westlaw, and PACER, amounted to $11,103.07. It is standard for attorneys to use online services to assist them in researching legal and factual issues and, indeed, courts recognize that these tools create efficiencies in litigation and ultimately save money for clients and the class.

119.    The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in litigation and routinely paid in non-contingent cases. These expenses include, among others, duplicating costs and overnight delivery expenses.  All of the Litigation Expenses were reasonable and necessary to the successful litigation of the Action.

### 2.    PSLRA Reimbursement to Lead Plaintiff Would Be Fair and Reasonable

120.    The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4).  Accordingly, Lead Plaintiff seeks reimbursement for the time it spent in connection with its efforts on behalf of the Settlement Class.  Specifically, BRS seeks reimbursement of $2,123.00 for the 23 hours it dedicated to the Action. Ex. 1 at ¶¶9-11. Lead Plaintiff's efforts required its representatives to devote time and resources to this Action that would otherwise have been devoted to the retirement system and its beneficiaries.

121.    As discussed in the Fee and Expense Memorandum and in Lead Plaintiff's supporting declaration, Lead Plaintiff has been fully committed to pursuing the class's claims since it became involved in the litigation.  Lead Plaintiff provided valuable assistance to Lead Counsel

40

during the prosecution and resolution of the Action.  The efforts expended by Lead Plaintiff during the course of this Action, as set forth in Exhibit 1, included communicating with Lead Counsel, reviewing pleadings and motion papers, responding to discovery requests and gathering and reviewing documents in response, and communicating with counsel regarding the settlement negotiations, are precisely the types of activities courts have found to support reimbursement to lead plaintiffs, and fully support the request for reimbursement here.

## X.    MISCELLANEOUS EXHIBITS

122.    Attached hereto as Exhibit 6 is a compendium of unreported cases and hearing transcripts, in alphabetical order, cited in the accompanying Fee and Expense Memorandum.

## XI.    CONCLUSION

123.    For all the reasons set forth above, Lead Counsel respectfully submits that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  Lead Counsel further submits that the requested fee in the amount of 29% of the Settlement Fund should be approved as fair and reasonable, and the requests for payment of Litigation Expenses in the amount of $238,001.30, plus interest, and reimbursement of Lead Plaintiff's costs in the amount of $2,123.00 should also be approved.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed in New York, New York this 11th day of February, 2025.

_Lauren A. Ormsbee_

Lauren A. Ormsbee

41

42

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 11, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

/s/ *Lauren A. Ormsbee*
LAUREN A. ORMSBEE

42