P3IRINRc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

IN RE BARCLAYS PLC SECURITIES
LITIGATION

                                      18 MD 2865 (LAK)
-------------------------------x      22-cv-08172
                                      Conference

                                      New York, N.Y.
                                      March 18, 2025
                                      11:00 a.m.

Before:

              HON. KATHERINE POLK FAILLA,

                            District Judge


LABATON KELLER SUCHAROW LLP
     Attorneys for Plaintiffs
BY:  LAUREN ORMSBEE
     LISA MARIE STREJLAU
     NICOLE ZEISS

SULLIVAN & CROMWELL, LLP
     Attorneys for Defendants
BY:  JEFFREY T. SCOTT
     STEPHEN HENDRIX OLIVER CLARKE

P3IRINRc

THE COURT:  Good morning, everyone.  Thank you very much.  Please be seated.

(Case called)

MS. ORMSBEE:  Good morning, your Honor.  Lauren Ormsbee from Labaton Keller Sucharow for lead plaintiff.

THE COURT:  Thank you.  Just one moment, please.  Ms. Ormsbee, should I be directing my questions to you or someone else at your table?

MS. ORMSBEE:  To me, your Honor, although my partner Nicole Zeiss is here.  If there's a very technical question about claims administration, I may defer to her.

THE COURT:  I hope I'm not asking very technical questions --

MS. ORMSBEE:  I do, too.

THE COURT:  -- but we shall see.  Please introduce yourself.

MS. STREJLAU:  Good morning, your Honor.  Nicole Zeiss, also from Labaton Keller Sucharow.

THE COURT:  And good morning.

MS. STREJLAU:  Good morning, your Honor.  Lisa Strejlau, also from Labaton Keller Sucharow.

THE COURT:  Are you planning on speaking today?

MS. STREJLAU:  I am not.

MR. SCOTT:  Jeff Scott from Sullivan & Cromwell on behalf of all defendants.  Good morning, your Honor.

THE COURT:  Sir, good morning, and thank you.

MR. CLARKE:  Good morning, your Honor, Steven Clarke from Sullivan & Cromwell.

THE COURT:  I thank you very much.

My experience has been my friends at the back table speak very little at these proceedings unless something goes off the rails.  None of us is expecting anything to go off the rails, but please let me know, Mr. Scott or Mr. Clarke, if there's a point in the proceedings where you would like to comment on things.

MR. SCOTT:  Thank you, your Honor.

THE COURT:  Okay.  Thank you.

So we are here for the fairness hearing in this case.  To the best of my knowledge, there have been no objections raised.  Ms. Ormsbee, you wanted to add something, please?

MS. ORMSBEE:  No, that's correct.  I was just saying that's correct, your Honor.

THE COURT:  Stay standing, please.  I do have a few questions for you.  Thank you very much.  To the best of my understanding, there have been no objections.  There has been one person requesting exclusion.  That was granted even though it was untimely.  I do have a couple of questions just to clarify for myself on some points.

MS. ORMSBEE:  Absolutely.

THE COURT:  Always in this setting when it comes to

P3IRINRc

the issue of attorneys' fees, I want to make sure that I understood what the amount that was cited as the hours and the costs billed came from.  The way I read your submission from February in support of your motion for fees, and you don't have to turn to it.  There's one section I can read to you.

MS. ORMSBEE:  Absolutely.

THE COURT:  Counsel expended 2,453 hours on the investigation, prosecution, and resolution of the claims against defendants.  When I see the word "resolution," that indicates to me, perhaps incorrectly, that your fees also included the preparation of the materials that I'm working from right now.  Isn't that correct?

MS. ORMSBEE:  It is correct up to a certain point in time.

THE COURT:  Okay.  Yes, please let me know.

MS. ORMSBEE:  I believe up to a few days before the filing of the declaration but -- Nicole?  I'm sorry.  Not the fee motion.

THE COURT:  See, that's my question.  Because there's this concept, as you know, of fees on fees, I'm not philosophically opposed to it.  I just want to know what I'm getting into.  As I understood the submissions that you made to me, what I saw was an aggregate of the hours but not, for example, the monthly billing statements.  I could understand why you wouldn't want to include those because privileged

P3IRINRc

information, but I was trying to figure out where your billing stopped, and I'd also like to know what you did not bill for and will not bill for going forward.  On the same page from which I'm reading, for example, there's a footnote 13.  It's page 37 of your brief.

MS. ORMSBEE:  Sure.

THE COURT:  There's a listing of the things that you will have to do going forward for which you will not be charging.  So I'm basically gilding the lily here, but I do want to understand what this fee figure of 1,778,912 covered and what it didn't cover.

MS. ORMSBEE:  Absolutely, your Honor.  It covered the work from the inception of the case through February 5, 2025, excluding any work done on the fee motion and any other administrative cost; the cost for me standing before you today with my colleagues.

THE COURT:  Of course.  The three of you, yes.

MS. ORMSBEE:  Always good to have hearing time in front of the Judge for my colleague, Lisa, but we are not -- none of the hours -- none of those hours are included in what --

THE COURT:  I'll ask you to slow down just so I can take better notes.  Thank you so much.

MS. ORMSBEE:  Sure.  None of the hours after February 5, 2025, are included into the hours submitted to your

Honor, and we will not be billing or taking any compensation for the settlement of any of the work done after that date from our law firm or any -- or only law firm involved in this case, which is our law firm.

THE COURT:  Fair enough.  Thank you.  I'm glad I asked the question because I thought you were being exceptionally artful with the resolution of the claims, including the fee petition, but it did not.  Thank you.

In terms of work to be done going forward, is it fully encompassed by your footnote 13 on page 37?

MS. ORMSBEE:  I believe it is.  I'll confirm.  Yes. Any of the work being done that we heretofore work with our claims administrator on, you know, going through the different claimants and verifying those and distributing the settlement, those fees are not being billed from this day forward to the class.

THE COURT:  Fair enough.  Thank you.  In your costs component on your petition --

MS. ORMSBEE:  Yes.

THE COURT:  -- it looks like the lion's share are experts.  I'm not shocked, but it is interesting to see so much of a percentage going to experts at this stage of the case, as distinguished from perhaps in summary judgment or had we gone to trial or something of that nature.  So may I have a sense? I guess the experts were to help you articulate the theories

P3IRINRc

that are alleged in the complaint.  Were they also consulted in the connection with the manner of settlement or other things?

MS. ORMSBEE:  Yes, your Honor.  There's one expert that is the lion's share of the expert fees, something around $27,000, and that expert assisted us on for the complaint for allocating the economic losses that we allege and the stock drops.  That's also the expert that devised the plan of allocation to be used in the distribution of the settlement proceeds, and that's also the expert in the class certification context.  Plaintiffs had filed a motion for class certification.  It stopped at that.  It had not been fully briefed, but that expert did submit an expert report on market efficiency and *Comcast* damages, and that expert did that work that was filed with the Court.

THE COURT:  That is what I'm forgetting.  You'll understand if I stopped paying substantive attention to the certification motion after I got word of settlement, but I appreciate being reminded that there's an expert witness report there.  Thank you.  Any other things I should know about your experts?

MS. ORMSBEE:  The only other expert that we had some fees for is an accounting expert, and that is a consulting expert that we engaged in the investigation and the drafting of the amended complaint.

THE COURT:  Okay.  Thank you so much.

I believe those are the questions that I have, and I'd be happy for you to tell me what you'd like me to know that I might not have gotten from the materials.  Please understand I commit to you that I have read everything here.  I will also, in the interest of transparency, tell you perhaps I didn't read every word of everyone's bio.  I know you've worked on great cases.  It's fine, but obviously I was paying attention to other things.  Whatever you'd like me to know, if your more junior colleague also wants to take a turn at this, if it would be useful for her, I'd be happy to hear from her as well.

MS. ORMSBEE:  She would love to.  I don't want to put her on the spot because I don't think she was prepared for that today.  But at the next hearing -- not on this case, but we have many status conferences and hearings coming up in other cases, and we'll be here that Ms. Strejlau gets ample opportunity.

THE COURT:  Off the record for a second.

(Discussion off the record)

THE COURT:  Let me know, please, Ms. Ormsbee, what you'd like me to know, either highlighting things from written materials or -- perish the thought -- if something has been left out of them.

MS. ORMSBEE:  Your Honor, I don't think anything has been left out.  I believe the papers are complete and accurate. I will note that the claims deadline was last week, so all of

the claims have come in.  I think we have before you that there's about 140.  Two thousand notices were out.  We've received many claims from the claims administrator.  They have let us know, and they are working through processing those claims, filing deficiency notices where more information is needed from the claimants.  We obviously are motivated to have as many eligible claimants receive compensation from the settlement fund.

So that's just the processes that are going forward right now.  But otherwise, I think it is just notable that there's no objections to the settlement.  There's no objections to the expenses and fee request.  There's no objections to the plan allocation, so we hope that the papers are sufficient for your Honor.  I'm happy to answer any more questions, but otherwise I think the record is fairly complete in the papers before you.

THE COURT:  Thank you so much.  Mr. Scott or Clarke, anything, to add?

MR. SCOTT:  No, your Honor.  Thank you.

THE COURT:  Thank you so much.  Please give me a moment.  Thank you.

Let me do this, please.  In deciding these motions -- and spoiler alert, I am approving everything -- I do need to read a lot into the record.  So apologies in advance that you have to sit here, the five of you, and listen to it, but it is

P3IRINRc

the fair and appropriate thing to do.  You'll also excuse me if I'm not looking at you necessarily as I'm doing it because I do want to get it right.

This action stems from allegations that defendants violated the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder.  In November 2024, court-appointed lead plaintiff Boston Retirement System entered into a stipulation and agreement to settlement with the Barclays PLC, James E. Staley, C.S. Venkatakrishnan, and Tushar Morzaria.  I'll just call them "defendants."

On December 5, 2024, this Court granted lead plaintiff's motion for preliminary approval of the settlement agreement.  In the same Order, this Court preliminarily certified, solely for settlement purposes, a Settlement Class of:  All persons and entities who or which purchased or otherwise acquired American Depository Shares, ADS, of Barclays PLC during the period from February 18, 2021, through February 14, 2023, both dates inclusive, and were allegedly damaged thereby.  There are, therefore, some exclusions from the class that I will not read into the record.  I know the parties are aware of them.

There is pending before me an application for final approval of the parties' settlement agreement, an application for final approval of the plan of allocation, and an application for approval of attorneys' fees and expenses.

P3IRINRc

Generally speaking, the settlement provides for a recovery of $19,500,000.  After considering the arguments that are put forth in the written submissions and the clarifications I've received today, I will grant in full the application for final approval of the parties' settlement agreement and for final approval of the plan of application, and, of course, the motion for attorneys' fees and litigation expenses.  All of these will be granted in full.

Before I get into sort of the legal analysis, I want to compliment plaintiff's counsel for the way in which you structured the settlement materials to accord with the Second Circuit's focus on Federals Rule of Civil Procedure 23(e)(2) post-*Moses*.  I think it's *Moses v. New York Times.*  Yours is actually the first firm to orient your materials this way.  Everyone else, since the *Moses* decision has come out, has simply added on a 23(e)(2) analysis after their *Grinnell* analysis.  You're right, but it turns out my template begins with the *Grinnell* analysis.  Since I think we can agree that the Venn diagram between the two is pretty co-extensive, I am going to do things my way, but I appreciate the way you set it up and going forward, I intend to use your way.

Let me then begin by noting that Federal Rule of Civil Procedure 23(e)(2) provides that where "a proposed settlement" of a class action "would bind class members, the court may approve it only after a hearing and only on finding that it is

P3IRINRc

fair, reasonable, and adequate."  And in determining whether to approve such a class action settlement, the "court must review the negotiating process leading up to the settlement for procedural fairness, to ensure that the settlement resulted from an arm's-length, good faith negotiation between experienced and skilled litigators."  I am quoting here from *Charron v. Wiener,* 731 F.3d 241, 247 (2d Cir. 2013).  The court must also evaluate the substantive fairness of the settlement, considering the factors set forth in the amended Rule 23(e)(2) as well as the nine factors set forth in *Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).

So let me please begin with procedural reasonableness. And in this instance, the Second Circuit "recognizes a presumption of fairness, reasonableness, and adequacy as to a settlement where it is reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'"  I'm quoting here from *McReynolds v. Richards-Cantave,* 588 F.3d 790.  It in turn is quoting from *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 116 (2d Cir. 2005)), which is, I think, going to show up a number of times in my notes.

So here, it's obvious that the settlements was not non-collusive.  There were arm's-length negotiations and an in-person settlement meeting in September of 2024, and these negotiations took place following the exchange of 23,000 pages

P3IRINRc

of documents, class certification briefing, and other opportunities for lead plaintiff's counsel to adequately investigate plaintiffs' claims and become familiar with their strengths and weaknesses.  No one has suggested that this settlement agreement is procedurally unfair, and I therefore think that the presumption of reasonableness continues to apply.

Moving onto the related issue of the notice.  The notice of a settlement must also be reasonable.  It must "fairly apprise the prospective members of the class of the terms of the proposed settlement and the options that are open to them in connection with the proceedings...and be the best notice practicable under the circumstances."  Again, the *Wal-Mart Stores* decision, Federal Rule of Civil Procedure 23(e).

The forms here describe, among other things:  The terms of the settlement and the recovery; the reasons for the settlement; the maximum attorneys' fees and expenses that may be sought; the procedures for requesting exclusion from the settlement class and objecting; the procedure for submitting a claim form; the proposed plan of allocation for distributing the settlement proceeds to the settlement class; and the date, time, and place of the settlement hearing.

I'm aware that the claims administrator, Verita Global, mailed and emailed, to the extent emails were possible,

P3IRINRc

the long-form notice.  The summary notice was published in *The Wall Street Journal*, and it was released over PR Newswire.  There was a website that was established.  I believe there was a telephone number that one could call.  And I find that the class notice adequately advised the settlement class about the existence of this action, the terms of the settlement, the benefits to each settlement class member potentially, the proposed fees and costs to lead plaintiff's counsel, and the rights to object or opt out.

I turn now to the issue of substantive reasonableness, and I'm going to begin with the *Grinnell* factors, because I am.  They include:  The complexity, expense, and likely duration of the litigation, the reaction of the class to the settlement, the stage of the proceedings, and the amount of discovery completed, the risks of establishing liability, the risks of establishing damages, the risks of maintaining the class action through the trial, the ability of the defendants to withstand a greater judgment, the range of reasonableness of the settlement fund in light of best possible recovery, and the range of reasonableness of the settlement fund to a possible recovery in light of all of the attending risks of litigation.

"Not every factor must weigh in favor of settlement, but the court must consider the totality of these factors in light of the particular circumstances."  I'm quoting from Judge Lynch's decision as a district judge *In re Glob. Crossing Sec.*

P3IRINRc

*& ERISA* Litig., 225 F.R.D. 436, 456 (S.D.N.Y. 2004).

So going through the factors, plaintiff argues -- and I know your plaintiff is a lead plaintiff. I may just refer to Boston Retirement System as plaintiff. You'll know who I'm talking about. What was discussed in terms of the issue of complexity expense and likely duration was the procedures that had taken place thus far, discovery -- well, let me say it this way: A lot had been done, but a lot was left to go, including completing discovery, dealing with the defendant's reconsideration motion, certifying a class, prevailing in connection with summary judgment challenges, achieving a litigated verdict, sustaining any such verdict on appeal. And I do agree that that suggests that there was a long way to go in this litigation.

Some of these other issues go to complexity and duration, but as well to the risks of establishing liability that we'll talk about later. There would have been a need for extensive expert testimony on the issues of damages, standards regarding internal controls over financial reporting. There was the possibility that the Court would have granted the reconsideration motion. There still would have been issues that plaintiff had to face regarding establishing falsity, materiality, scienter, lost causation, in order to sustain the remaining securities fraud claims through the rest of the litigation, and I therefore find that that factor favors

P3IRINRc

approval of the settlement.

On the issue of the reaction of the class to the settlement, it is often said, and it is discussed in the *Walmart* case, that a small number of objections can be viewed as indicative of the adequacy of the settlement.  We've already talked about just how many notice packets have been mailed, over 142,000 of them, and yet there is not one objection and only one request for exclusion.  This is a positive reaction of the class to this settlement.  It counsels in favor of approval.

On the issue of the stage of the proceedings, the concern we have here is we want to be sure that counsel for plaintiffs have made a decision based on a full consideration of the possibilities facing them.  And here, the issue is whether the parties have completed enough investigation to agree on a reasonable settlement.  At page 18 of the plaintiff's brief, there's a rather lengthy description of how lead plaintiff and lead counsel developed an understanding of the facts which included an investigation, preparing the complaint, addressing the motion to dismiss the complaint, addressing the motion to reconsider, moving for class certification, researching, drafting, and propounding discovery requests, reviewing over 23,000 pages of documents, and preparing for and participating in the settlement meeting.  All of this investigation ensures that lead plaintiff's counsel

P3IRINRc

weighed their position based on a full consideration of the possibilities facing them, and it counsels in favor of approval.

There is next the risk of establishing liability, and here I balance the benefits afforded to members of the class and the immediacy and certainty of substantial recovery against the continuing risks of litigation.  I'm quoting here from a fellow district court opinion, *Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358 (S.D.N.Y. 2002).  Lead plaintiff was fair in netting some of the vulnerabilities to the continued litigation, and some of these were mentioned a moment ago. There was a question about being able to establish whether the statements were materially false and misleading.  Were they sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome? There were concerns, and certainly the defense would argue, that lead plaintiff could not prove that there was any concealment of material, negative information about the lack of any internal controls, which was pretty much the linchpin of the theory of fraud in this case.

There was also the concern that defendants would argue that the statements about Barclays' robust internal controls were overly generic in comparison to the press release, and all of this suggested that there were risks of going forward.  And I do think the risk of establishing liability factor favors

P3IRINRc

approval of this settlement.

There is relatedly the risk of establishing damages. The damages expert suggested that the damages could be between $92 million and $111 million. However, a disaggregation of the confounding information could have reduced that number by 40 percent. I am confident that defendants would have found very well-qualified experts who would have had a very different view of the damages in this case, and therefore the risk of establishing damages favors approval.

There's the question of the risks of maintaining the class action through trial. The certification motion wasn't fully briefed, so I couldn't even give you an advisory opinion, which I wouldn't, as to whether the class could have been certified, but there were likely defenses based on or efforts to rebut the presumption of reliance established in *Basic Inc v. Levinson*, 485 U.S. 224. And I do find that the settlement avoids the uncertainty with respect to class certification and maintaining class certification through trial and appeal. I find that this favors approval of the settlement.

I always find this factor interesting: The ability of defendants to withstand a greater judgment. I think they can. I don't think it matters. Most courts consider this among the least important of the factors, so that's all I'll say about it.

P3IRINRc

The last two *Grinnell* factors are often combined together, and it is a comparison of the terms of the compromise with the likely rewards of litigation and the attendant risks of litigation here.  I am advised that the settlement represents approximately 17.5 percent to 35 percent of estimated damages, depending on the model and the assumptions used.  And once again, we've talked about sort of the range of damages found by plaintiff's expert and the possibility of significant reduction.

Lead plaintiff also asserts that the settlement amount is above industry trends.  It exceeds the median reported settlement in securities class actions in 2023, which was $15 million, and it emphasizes that the median settlement value for the period from 2018 to 2022 was $11.7 million.  In 2022, it was $13.5 million, and it is above the median recovery for securities class actions prosecuted and settled within the Second Circuit for 2014 through 2023.  I think that this guaranteed recovery for the class members is a reasonable disposition of the claims in this case, and I have already reviewed the litigation risks inherent in the case, and I find that the settlement agreement is a fair resolution in light of those risks.

Now, going back to where plaintiff's counsel began, which was the amended Rule 23(e)(2), the Second Circuit explained in the case of *Moses v. New York Times Company*, which

is 79 F.4th 235 (2023), that this revised Rule 23(e)(2) does not displace the traditional *Grinnell* factors, but the rule now mandates courts to evaluate factors that might not have been highlighted in the prior case law and its terms prevails over any prior analysis that is inconsistent with its requirements.

The *Moses* decision also suggested that courts must expressly consider two core factors when reviewing the substantive fairness of a settlement:  The adequacy of relief provided to a class, and the equitable treatment of the class members.  So the factors that are set forth in Rule 23(e)(2) include the following:  Whether the class representatives and class counsel have adequately represented the class; whether the proposal was negotiated at arm's length; whether the relief provided for the class is adequate taking into account the costs, risks, and delay of trial and appeal; the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims; the terms of any proposed award of attorneys' fees, including the timing of payment; and any agreement required to be identified under Rule 23(e)(3), which I know the parties have discussed in their papers; and finally whether the proposal treats class members equitably relative to each other.

As should be clear from the Court's discussion thus far, it finds that lead plaintiff and lead plaintiff's counsel have adequately represented the class, including in negotiating

P3IRINRc

an arm's length settlement. As to the adequacy of relief factor, I must review the terms of the settlement and any fee award encompassed in the settlement agreement in tandem.

As I am discussing and will be discussing further, lead plaintiff's counsel seeks an award of 29 percent of the settlement fund or $5,655,000, plus accrued interest in the settlement fund account. This is well within the range of what courts regularly award in comparable class actions, whether calculated as a percentage of the fund or as a lodestar. I know in plaintiff's submission -- I think in the fee petition of page 5 -- there's a long list of approved settlements, including some from this Court. So this award of fees from counsel does nothing to undermine the adequacy of the relief otherwise provided to settlement class members.

When considering the equitable treatment of class members, I must also consider whether any proposed incentive payments will result in an unfair payment. Now here, the lead plaintiff, Boston Retirement System, is seeking $2,123 in reimbursement of costs and expenses relating to its representation of the settlement class. I believe it's authorized to do so by the PSLRA. I think of this as reimbursement of expenses and costs. To the extent someone else wants to think of this as a service award -- and I don't think they should -- I approve it as a service award. I don't think it results in an unequitable treatment of one class

P3IRINRc

member over another.

Lead plaintiffs representatives spent significant time producing documents, responding to requests, reviewing filings in this case and other tasks.  And as I noted, the PSLRA actually allows reasonable costs and expenses directly relating to the representation of the class to be made to any representative parties serving on behalf of the class.  I do find it reimbursement, but to the extent someone else were to find it a service award, I think it supports rather than undermines the equitable treatment of the class members.

And so having reviewed the settlement documents and the attendant briefing, I find that the settlement is substantively and procedurally fair under the *Grinnell* factors and under the Rule 23(e)(2) factors.  I also find that class treatment of the proposed settlement class is appropriate for settlement purposes.  I know everyone in this courtroom knows that the factors under Rule 23 are numerosity, commonality, typicality, and adequacy.  They are set forth until Rule 23(a).  23(b)(3) requires that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action be superior to other available methods for fairly and efficiently adjudicating controversy.

So with the parties permission, I'm going to speak very briefly about the requirements of Rule 23, because I think

P3IRINRc

they've been done to death in the briefing with respect to the motion for class certification and then as well here. I am told that the proposed class consists of thousands of members, which gets me numerosity. I believe commonality is met because the class members' claims are arising from the same alleged misrepresentation and omissions and are subject to common proof. For the same reason, I do believe that the lead plaintiff here is typical to the other claims in the class, and that the class members' claims are typical because they arise from the same course of events, and each class member would be making similar legal arguments to prove the defendant's liability, and I do find that the lead plaintiff and lead plaintiff's counsel will fairly and adequately protect the interests of the class.

I know that the Second Circuit also has this concept of ascertainability. I don't think that's an issue here. We've been able to figure out the class members. As for the 23(e)(3) factors, I do find that common questions predominate, namely, whether the damages of the class arise from defendant's alleged material misrepresentations and omissions. There are also questions about whether the market for Barclays' ADRs was efficient at all relevant times, things of that nature, and whether they are entitled to a presumption of reliance under the *Basic* case and the *Halliburton Co. v. Erica P. John Fund* case.

P3IRINRc

I do believe as well that the class action device is superior.  It's a very large class.  I shudder to think about single-plaintiff actions in this matter.  I also think concentrating the litigation in a single forum would eliminate the risk of inconsistent adjudication and promote the fair and efficient use of the judicial system, and from my experience, securities class actions are routinely certified in this district, so I think superiority is easily established.

Let me speak briefly about the allocation plan because Rule 23(e)(2)(C)(ii) requires that courts examine the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims.  And here the plan of allocation has been developed in consultation with a damages expert.  The proceeds of the settlement would be distributed with the assistance of an experienced claims administrator that would employ a well-tested protocol for processing the claims in securities class action.

Verita, the claims administrator, would determine each claimant's recognized claim, calculate it according to the formulas in the plan of allocation.  There would then be distribution of the net settlement fund among authorized claimants on a *pro rata* basis based on their calculated recognized claim.  I do find that the plan is fair and reasonable and that the relief requested is adequate, and I do

P3IRINRc

approve that plan of allocation.

I turn now to the issue of attorneys' fees and expenses.  I mentioned earlier that lead plaintiff's counsel seeks 29 percent of the settlement fund plus expenses of $238,001.30, and reimbursement to the lead plaintiff of $2,123.  As was discussed earlier today, courts award fees in this these cases under the either the lodestar method or the percentage of the fund method.  In this district, I believe the trend is toward the percentage method because it aligns the interests of the class and counsel, and it provides a useful incentive for the efficient prosecution and early resolution of litigation.  I'm quoting here from the *Walmart Stores* case I mentioned earlier.

Both methods have issues, and precisely for that reason, the Second Circuit has left the decision as to the appropriate method to the district court, which is intimately familiar with the nuances of the case.  Quoting here from the Second Circuit's 2010 decision in *McDaniel v. County of Schenectady*, 595 F.3d 411, and that in turn is quoting *Goldberger v. Integrated Res*, 209 F.3d 43 (2000).

The *Goldberger* factors are the ones that I consider in determining whether the fee is appropriate.  They include:  The time and labor expended by counsel, the magnitude and the complexities of litigation, the risk of litigation, the quality of representation, the requested fee in relation to the

P3IRINRc

settlement and public policy considerations.  There is, as should not be shocking, a lot of overlap with the *Grinnell* factors I mentioned earlier.  But I do note that I ultimately conclude that the fee is reasonable, and it does fight squarely within the comparators cited by plaintiff in the memorandum of law in support of the fees.

Going through the *Goldberger* factors, time and labor expended by counsel weighs in favor of approving the award requested.  I'm advised that lead counsel expended more than 2,453 hours prosecuting the action with a lodestar value of $1,778,912, and as was confirmed by discussions today, that only measures work through February 5, 2025.  It does not measure the substantial effort undertaken to put together these fee materials.  It does not take into account their preparation for and attendance at today's proceeding, and it does not take into account the work that they will have to do going forward in consultation with the settlement administrator.  Ultimately that fee would represent a multiplier of 3.2 of the total lodestar of lead counsel.  I find that this factor favors approval.

We talk next about the second and third *Goldberger* factors, which are the magnitude and complexities of litigation and risks of litigation.  I feel like we've done these before, so I'll be as brief as I can.  Contingency risk here is the thing that I did not mention earlier, and it is an important

P3IRINRc

consideration in evaluating a fee petition.

As the Court has already discussed, this case presented not inconsiderable litigation risks.  Lead plaintiff's success at class certification and at trial is far from guaranteed.  There were significant challenges not only to liability but to calculating damage, and lead plaintiff's counsel assumed these risks by taking the case on contingency.  As I've suggested to you earlier, this litigation is particularly complex.

There was a lot to go in this case before anyone could see any money, including the reconsideration motion, the class certification motion, discovery, certain summary judgment motions, a trial, and depending on how that goes, almost certainly appeal.  So I feel that prosecuting these claims required expertise, skill, and dedication, including extensive expert analysis across multiple fields, including damages, and as well including some substitute areas regarding internal controls over financial reporting.  So this supports the requested fee award.

Quality of representation has been fine.  I review the recovery obtained and the background of the lawyers involved.  I mentioned that I have -- although maybe not every last matter, but I do accept plaintiff counsel's representations that the firm has substantial experience litigating and trying securities class actions in courts throughout the country.  I

am aware of them.  I have seen them in this court before.  As well, I know that the firm has a long and successful track record representing investors in cases of this type, and I'm told that they are consistently ranked among the top plaintiffs firms in the country.  That is good to know.

They are litigating against some very formidable adversaries at the table behind them, experienced counsel from Sullivan & Cromwell, a prominent litigation firm that vigorously and ably defended the action on behalf of defendants.  And therefore, I do believe, and some courts have found, that the quality of opposing counsel is also relevant to this factor.

Talking about the requested fee in relation to the settlement, as I mentioned, it is 29 percent, and in similarly complex cases with large settlement cash values, judges in this district have awarded fees that are comparable to or higher than what is being requested here.  I find that this factor favors approval of the requested fee award.

We are then at the issue of public policy considerations, and those considerations support a substantial attorneys' fee.  Awarding lead plaintiff's counsel their requested fee supports the public policy of vigorously enforcing the securities laws.  It encourages meritorious securities class action suits, and so that investors and securities can vindicate their legal rights.

P3IRINRc

So having reviewed the *Goldberger* factors, I find that they weigh in favor of the fee, and I'm going to therefore find that the requested award of 29 percent of the settlement fund or $5,655,000 is fair and appropriate.  Let me just say though that I was burned previously, so you are getting the sins of prior lawyers visited upon you, I am not opining specifically on the objective reasonableness of anyone's particular rate.

I'm sure you can imagine there's a great story, and it involved me being placed on someone's website, so please don't. I'll approve the fee, but I'm not going to opine on anyone's hourly rates.

So let me please turn then to the issue of costs. Where the lion's share of expenses reflect the typical costs of complex litigation, including experts and consultants, trial consultants, litigation and trial support services, document imaging and copying, deposition costs, online legal research and travel expenses, courts should not depart from the common practice in this circuit of granting expense requests.  I'm quoting from a colleague's decision in *Pennsylvania Public School Employee Retirement System v. Bank of America Corporation,* 318 F.R.D. 19, and that in turn is quoting a decision from the Eastern District in 2013*, In re Visa/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503.

Here lead plaintiff requests an expense award of $238,001.38 plus interest.  This is a sizable amount, but that

Case 1:22-cv-08172-KPF    Document 116    Filed 04/29/25    Page 30 of 32    30

P3IRINRc

is in fact why I was discussing the issue with counsel.  And I understand that a lot of the requests were expert-related expenses that were reasonable and appropriate for this litigation.  Therefore, I will be granting the expenses in full.

That leaves us with lead plaintiff's request for reimbursement, which I talked to you earlier about as a service award, but as I said, I think it's actually appropriate reimbursement.  It is $2,123 in connection with the 23 hours approximately that its representations dedicated to the litigation.  I understand this to include monitoring and participating in the litigation efforts as a representative of the class, assisting lead counsel in the collection and retention of relevant documents in the possession, custody, or control of the Boston Retirement System, completing certifications and declarations in support of case filings, receiving and reviewing material court filings in both draft and final form, and assisting with responding to discovery requests.  The way in which this was accomplished, this figure was accomplished, was by multiplying the 23 hours by the hourly rates derived from the annual wages and benefits of the staff that performed the work.  That makes eminent sense to me, and I therefore am awarding reimbursement to lead plaintiff in the amount of $2,123.

That is the very long way of saying that I am

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P3IRINRc

approving the settlement agreement.  I am approving the plan of allocation of the settlement.  I am approving the requests for attorneys' fees and expenses.  I will be entering orders to that effect as well as the judgment.  I think I know this already, but I am assuming that the parties are withdrawing the pending motions for reconsideration and for class certification.  Effectively they've been mooted by the entry of the judgment, but I'm getting nods which tell me, yes, you're withdrawing those motions.

MR. SCOTT:  Yes, your Honor.  We'll be withdrawing that.

THE COURT:  That's fine.  I can do that for you.

MR. SCOTT:  Okay.  Thank you.

THE COURT:  All right.  And to my friends at the front table as well, withdrawing the certification motion?

MS. ORMSBEE:  Yes, your Honor.  That is correct.

THE COURT:  All right.  Many thanks.  So I imagine that later today, you'll be seeing a flurry of documents signed by me.  I don't think that anything has changed from the proposed orders that you sent my way.  I didn't, for example, change the fees.  There isn't a difference in terms of the settlement amount, so I think I can work toward those.  Would you agree, Ms. Ormsbee?

MS. ORMSBEE:  I agree, your Honor.  If easier for the Court, we can email Word versions of those to you when we get

P3IRINRc

back to the office, but nothing has changed.

THE COURT:  That would be great.  Thank you very much.

I want to take a moment now before we part to extend to you my personal thanks.  This was a fun case, a really interesting case, a really challenging case, but you did me a personal favor by advising me of the settlement when you did, because I was the clerk on reconsideration motion.  I was pretty deep into it, and getting the word that I didn't have to do it, it's always a benefit when people let us know as soon as they can that we don't have to keep working on something.  So I really thank you for doing that, and as it happens, it had great personal benefits for me as well.

Thank you, also, just for the quality of representation.  I know I will see you again in the courtroom, and I look forward to it.  From my friends at the front table, is there anything else we should be addressing today?

MS. ORMSBEE:  No, your Honor.

THE COURT:  Thank you so much.  From my friends at the back table, anything else to be address today?

MS. ORMSBEE:  No.

MR. SCOTT:  No, your Honor.  Thank you.

THE COURT:  Thank you very much.  We are adjourned.

(Adjourned)

o0o